IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DISTRICT

UNITED STATES OF AMERICA Plaintiff

v. Case No. 2:19-CR-20037

ANTHONY BOEN Defendant

---

TRANSCRIPT OF JURY TRIAL

VOLUME 1 of 6

BEFORE THE HONORABLE TIMOTHY L. BROOKS

AUGUST 2, 2021

FAYETTEVILLE, ARKANSAS

---

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL SONGER
United States Department of Justice
Civil Rights Division
905 Pennsylvania Ave NW
Washington, D.C. 20530
(202) 514-3204
michael.songer@usdoj.gov

MR. BRANDON T. CARTER
United States Attorneys Office
414 Parker Avenue
Fort Smith, Arkansas 72901
(479) 783-5125
brandon.t.carter@usdoj.gov

Also Present: Special Agent Matthew Ferguson
Federal Bureau of Investigation

IT Technician: Mr. Kenneth Moon

FOR THE DEFENDANT:

MR. RUSSELL A. WOOD
Wood Law Firm, P.A.
501 East 4th Street, Suite 4
Russellville, Arkansas 72801
(479) 967-9663
rwood@woodlawfirmpa.com

MR. PAUL PRATER
Prater Law Firm, PLLC
4700 Edgemere
North Little Rock, Arkansas 72116
(870) 543-9064
paul@praterlawfirmpllc.com

# I N D E X


Page

Preliminary Matters .............................. 4

Jury Selection

Introduction by the Court ...................... 13

Inquiry by the Court ........................... 23

Inquiry by Mr. Carter .......................... 151

Inquiry by Mr. Wood ............................ 166

Jury Sworn ........................................ 190

Jury Released for the Day ......................... 193

In-Chambers Hearing Regarding Detained Witness .... 193

Reporter's Certificate ............................ 196

(Outside the Presence of the Venire Panel)

THE COURT: The Court will call up the matter of the United States versus Anthony Boen. Our Case Number is 2:19-CR-20037, defendant number 1. The matter comes before the Court today for purposes of a jury trial.

The government today is represented by Brandon Carter and Michael Songer. And then also present at their table is Agent Ferguson.

SPECIAL AGENT FERGUSON: Yes, sir.

THE COURT: And then Ms. Hatfield is assisting them.

And then Mr. Boen is present. Good morning, Mr. Boen.

THE DEFENDANT: Good morning.

THE COURT: And then representing Mr. Boen is Russell Wood and Paul, I want to say Prater?

MR. PRATER: It's Prater, Your Honor.

THE COURT: Prater.

MR. PRATER: Like praying.

THE COURT: I had a 50/50 chance, and I knew I was going to lose. Good morning, gentlemen.

MR. WOOD: Good morning, Your Honor.

MR. PRATER: Good morning, Your Honor.

THE COURT: Is the government ready for trial?

MR. CARTER: We are indeed, Your Honor.

THE COURT: Is the defendant ready for trial?

MR. PRATER: We are, Your Honor.

THE COURT: All right. The record will reflect that we are proceeding outside the presence of the jury for the moment. They are going through their jury orientation. The Court at pretrial conference recently explained the voir dire protocols, so I'm not going to do that now again, but I will state that it may take just a little bit to get them up here, those that are not taking the stairs. They could only get about three or so in the elevator at a time, so it's going to take us just a little while.

There was a flow chart or an outline, a seating chart is the word I'm looking for, that should have been on counsel table when you came in this morning. That will tell you where everyone will be sitting. That will help you keep track of our venire panel. I would remind you that when it's your turn to question jurors, that we do so by juror number and not by name.

Ms. Craig, when we get ready for voir dire, we're going to need to move that side plexiglass panel over in front of the small podium. And then we will move it back after we finish with voir dire, if someone can help me with that.

I see that we have some members of the media. We're glad to have you here today. We are a court that is

open to the public. In trying a case during the Coronavirus pandemic, we obviously have to take some extra measures. And as the jury panel is going through their orientation -- and they will be coming up here in a few minutes -- that will be about 60, 55 to 60, depending on whether everyone found the courthouse this morning. But we're going to be filling up every row and every seat in our gallery. So for purposes of voir dire, we're accommodating public interest in this trial and public access to this trial through an audio feed in the first floor courtroom. But I did want to see if there were any members of the media that would want to have interest in covering it from the courtroom. So you have been given permission to come up. You're not required to be here, but if you'd like to be here, that's fine.

Is there a Max Bryan here?

REPORTER SACCENTE: He's my colleague. He's in the courthouse, but I don't know where he is. He was out taking pictures before.

THE COURT: Okay. And he is a colleague of yours where?

REPORTER SACCENTE: At the Northwest Arkansas Democrat-Gazette.

THE COURT: Okay. I want to inform counsel that a Court Security Officer noted that Mr. Bryan was, as he

was clearing through security and in line to clear security, he was communicating with another individual about the case and asking them what the case was about. And I don't know whether it occurred to him that that might be a juror, but apparently it didn't, because it was a potential juror. So we'll be asking Mr. Bryan some more questions about that and whether this was a one-way conversation or whether he was sharing facts with them and then we'll figure out what to do.

The preliminary information I have is that the person that he was in line next to and speaking with was juror number 35.

(Max Bryan enters courtroom)

THE COURT: Are you Mr. Bryan?

REPORTER BRYAN: Yes, sir.

THE COURT: All right. Mr. Bryan, if you don't mind, you can just stand right there. That's fine. I just need to ask you a few questions.

Obviously, as people were entering the courthouse today, I suspect that there was a line as people were clearing security. I'm informed of information from a Court Security Officer that you were speaking with someone while waiting in line, and that "someone" turned out to be a member of our jury panel today.

Is the information conveyed to me correct? Were

you speaking with someone in line today?

REPORTER BRYAN: It was before the line formed. It was while they were all waiting in the courtyard.

THE COURT: In the courtyard outside in front of the building?

REPORTER BRYAN: Yes, sir.

THE COURT: And I suspect that you either didn't think about it, or you didn't know that this was a potential juror?

REPORTER BRYAN: Correct.

THE COURT: All right. Can you summarize, first let me have you characterize the nature of that conversation. Sometimes reporters are good at getting the "who, what, when, where, why and how" out of someone, and that's one thing. But if it was you telling this person what you understood about the case, that could be potentially different.

So in that vein, can you characterize this conversation for me?

REPORTER BRYAN: Yes, sir. It was casual in nature. It was completely off the record and I simply told this gentleman that Sheriff Anthony Boen has been federally accused of using excessive force against three detainees.

THE COURT: What prompted you to tell this person that?

REPORTER BRYAN: This gentleman asked me, "What are you doing here?"

THE COURT: Did you know this person?

REPORTER BRYAN: No.

THE COURT: All right. When they said, "What are you doing here," what did you say?

REPORTER BRYAN: I said just that.

THE COURT: Did you explain that you were a reporter?

REPORTER BRYAN: No. I assumed he saw my camera and understood.

THE COURT: I see. Did you ask the person any questions?

REPORTER BRYAN: I asked him what he was doing here, and he said he was on jury duty.

THE COURT: All right. And then what happened?

REPORTER BRYAN: After that -- well, and he just said, "I was just wondering if we were in for an interesting case."

THE COURT: Okay. And is that when you explained what you knew about the case?

REPORTER BRYAN: No.

THE COURT: It was before that?

REPORTER BRYAN: It was beforehand. And actually, before, he said, "Is there anything here

interesting that you are here for?" And that's when I said the spiel about Sheriff Boen.

THE COURT: All right, sir. Was the person you were speaking to male or female?

REPORTER BRYAN: Male.

THE COURT: All right. Did you speak with anyone else?

REPORTER BRYAN: No. No, other than other reporters.

THE COURT: All right. And so the sum and substance of what you told this person that turns out was a potential juror was that Sheriff Anthony Boen had been federally accused of using excessive force against three detainees?

REPORTER BRYAN: Yes, sir.

THE COURT: All right. No other specifics?

REPORTER BRYAN: No.

THE COURT: All right, sir. Would the government like to inquire?

MR. CARTER: Just one question, Your Honor.

Were there any other jurors around that heard your conversation?

REPORTER BRYAN: There might have been. There were other -- there were three or four other jurors nearby who may have been listening, yes.

MR. CARTER: But they weren't in your circle, kind of part of the conversation? They just might have heard?

REPORTER BRYAN: Yes, sir. Yes, sir.

MR. CARTER: I have nothing further, Your Honor.

THE COURT: All right. Mr. Prater or Mr. Wood?

MR. PRATER: No, Your Honor. We don't have any questions.

THE COURT: All right. Thank you, sir. I appreciate you answering our questions. You're free to go.

REPORTER BRYAN: Thank you, Your Honor.

THE COURT: So let's discuss the mask rules again. I had e-mailed you this drill, but just so that we're all clear.

The general rule is that everyone must wear masks in the courthouse including the courtroom at all times. The exception is if you are engaged in a speaking role at the moment, you may, but are not required, to remove your mask. So, for example, if you are an attorney asking questions of the jury panel, and as long as we can get a plexiglass screen in front of the inquiry podium that's behind Mr. Boen, you may, but are not required to, remove your mask so that you can ask your questions of the venire panel.

Similarly, when we reach the evidentiary -- well,

for that matter, the opening statements, we will have -- those will be delivered from the main podium that is encircled by plexiglass. You may choose to leave your mask on, or you may remove it. Same is true during the evidentiary portion. And basically the idea is, if you are at the lectern behind plexiglass, you may remove your mask if you are in an active speaking role at that time. Any questions about that?

Mr. Wood, I had conveyed to you that we're happy to assist anyone in the courtroom with any special issues or concerns, and if you would like to discuss that further, you're free to come back on this next break to chambers and we can talk about that.

I've already explained how the voir dire will go, so I'm not going to go back over that again. While we're waiting for the jurors to finish their orientation and be brought upstairs, do the parties have any other questions or issues to take up? Mr. Carter?

MR. CARTER: I don't believe so, Your Honor, on behalf of the government.

THE COURT: Mr. Prater or Mr. Wood?

MR. PRATER: No, Your Honor.

THE COURT: All right. We will be in recess until such time as our venire panel has arrived in the courtroom.

(recess taken from 9:05 a.m. to 10:03 a.m.)

(Venire Panel enters courtroom)

THE COURT: I'd like to thank everyone so much for being here. Arguably, you didn't have a whole lot of choice, but I appreciate you being here anyway.

I would like to welcome you to the United States District Court. This is Federal Court. This is the Western District of Arkansas. My name is Tim Brooks. I'll be your trial Judge for the next week or so if you are selected to be on our trial that is scheduled to begin this week.

The trial of the case, or the style of the case, is called the *United States versus Anthony Boen*. I'm going to tell you just a little bit about what the case is about just to get you in the right ball park, and then a few minutes later, I'll give you some more specific details about the case.

This is a criminal case brought by the United States government against Sheriff Anthony Boen, who is the Sheriff of Franklin County, Arkansas. The charges against him are of depriving three persons of their civil rights by using unreasonable force. Mr. Boen denies these charges. He has pleaded not guilty to these charges, and Mr. Boen is presumed innocent.

Now, over the next hour or perhaps longer this

morning as I ask you some questions to determine whether you would be an appropriate juror in our case, I'm going to cover many different topics, and I would like to give you a roadmap as to where my discussion with you will be going this morning.

We're first going to have a little bit of a civics lesson. This will be as to the origin and importance of the jury system. I think that it is important for you to understand the significance of the juror's role in our method and system of justice in the United States. Then I'm going to give you an overview of how we go about selecting a jury. There are about 54 of you that are present today. We will be ultimately selecting a jury of 12 persons and some alternates. So I'll be explaining how we get from starting with 54 down to the actual jury.

Then I want to discuss with you jury service in the pandemic and some COVID considerations and the Court's mask rules. Then I'll introduce the parties, I'll introduce you to some more facts, and I'll introduce you to the trial participants, including those that you see here immediately in front of the bench, and I'll also review some witnesses that may testify in this case.

Next, I need to know something about you in terms of your prior courtroom experience, whether you have done

this before as a juror or whether you have been a plaintiff or a defendant in a civil case. Then, and because this is a criminal case, there are some bedrock principles that have to do with the rights of a person who is accused of a crime. And I need to make sure that everyone understands what I call these bedrock principles and can go into this jury agreeing that you have the ability to abide by them. We'll discuss some other ground rules for serving as a juror. And then there are going to be some specific intersections in your life, potentially with the issues in this case, that I would like to review with you.

First, the civics lesson. Here is how this Court, this beautiful courtroom, fits into our federal government. Of course, we all know that there are three branches of government. The legislative branch, those are our Congress persons. There's the executive branch. That's the President and the cabinet, and the federal agencies. And then there's the third branch, which is the United States courts.

There are three levels of United States courts. The one that we all hear about in the news most often is the United States Supreme Court. Just below that are the United States Courts of Appeals. And below that is the United States District Courts. These are the trial courts. This is where the action is. We like to think that things

aren't quite as boring as they are just reading papers up at the Court of Appeals.

There are 94 such trial courts, known as districts, in the country. Two of those are in Arkansas, and we have come up with some very clever names for our districts. This district is known as the Western District of Arkansas, whereas the other district in Arkansas is known as the Eastern District of Arkansas. This slide has certain counties that are highlighted, and these counties are shaded in different colors, and this represents the six different divisions within the Western District of Arkansas. This Court that you are sitting in is in the Ft. Smith Division and our jury panel today is drawn from all of those seven counties shaded in red. And I know that some of you traveled a great distance to be here, and I very much appreciate that.

So why do we need juries? Isn't that inconvenient? Isn't that an inconvenient thing to ask? Why doesn't the Judge just make the decisions? Well, that's the way that it used to be in England before the American Revolution. But the reason that we need juries to decide cases and to be fact-finders is because this is our Constitutional mechanism for citizen participation in the third branch of government. Our justice system relies on citizen jurors. If you think about it, citizens

participate in other branches of government. If we're talking about the executive branch, we all vote for who the President is. You can even run for President if you want to. In the legislative branch, we vote for those that represent us in Washington, D.C. You can even run to be a legislator if you want. Citizen participation.

In the third branch, the justice system, being on the jury is how the Constitution and our founding fathers envisioned that everyday, average citizens from all walks of life would participate in the decisions of the Court. This is a keystone of our democracy. It's one of the reasons that the Revolutionary War was fought in the first place. It's a founding principle of our country.

If you are chosen to be a juror for this trial, you will actually become a judge. The jury is the judge of the facts of this case. And in that sense, without question, the jurors serve the most important function in this entire process. And understanding why that is so is fundamental to your understanding of the importance of your role.

This goes back to the Declaration of Independence, 1776. It is why we sought freedom from the King's Rule. The concept of citizen juries is embedded in the United States Constitution. That's from 1787. It's further embedded in the Bill of Rights that followed a few

years later in 1789. Thomas Jefferson, obviously one of our founding fathers, said this about the jury trial:

"The right to a jury trial is no mere procedural formality, but rather a fundamental reservation of power to the citizens in our Constitutional structure." He later says -- think about this -- "Just as the right to vote ensures the peoples' ultimate control in the legislative and executive branches, a jury trial is meant to ensure the citizens' control in the judiciary."

From the Constitution, Article III, Section 2. "The trial of all crimes shall be by a jury." The Sixth Amendment, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and in the district wherein the crime shall have been committed." And it is that underlined portion, "impartial jury," why we are going to be asking you some questions this morning. In other words, to see if you have the ability to be fair and impartial in this particular case.

So this is a great country, this unique form of government we all enjoy so much. But as with all of the other privileges and freedoms that we enjoy as Americans, there is a price to be paid. The sacrifice of our time and the disruption of our daily lives and routines. And these sacrifices are necessary in exchange for the collective

wisdom of a jury. Think about that. If we just had one person as the juror, we would just get one perspective in this search for the truth and this search for what the true facts are. But when you get multiple perspectives, that sharpens the focus. This sacrifice, I understand, is particularly great in these pandemic times in which we live, and we're going to be speaking about that a little bit more in just a minute.

This process of the Court asking you some questions that I'll get to in just a moment, and then later the attorneys asking you some questions, lawyers learn in law school that this is known as the "voir dire" process, or as we say where I went to school here in Arkansas, the "voir dire" process.

This is from the Latin and French, meaning, "To speak the truth," or more simply, "To inquire." And my spin on that is, the Judge, and then the attorneys will inquire, and you will speak the truth today. And the truth that we are looking for at this point is not about facts. It's about whether you have the ability to be fair and impartial.

You know, there really is something magical about a jury. I've been doing this for going on eight years now. I've tried cases before that for a long number of years. Didn't quite have the same perception. But I can tell you

that there is magic in the process of bringing together, in this case 12 jurors from all walks of life, and they bring their own sense of common sense, their collective set of life experiences, and they deliberate on the facts. And it's magic to see how 12 people from these different backgrounds can discern what the true facts are. It's magic, in my opinion. It is a crucial ingredient to the process of our justice system.

But that said, not everyone can be fair and impartial in every case. And the reason that that's true is because we are all the sum of our life experiences and our judgments. How we were raised, what we have witnessed over time. To be a juror on this case, you're certainly not required to check your common sense at the front door. We hope that you bring that, that you brought that with you today, and that you will continue to use your common sense if you're selected as a juror. But what I'm talking about are life experiences that form who you are. We're not asking you to leave your life experiences at the front door, either. But what we need to know about is whether you have a particular life experience that touches you in such a way that you would have to admit to yourself that you really couldn't be fair and impartial in a particular case.

If the lawsuit was about your next-door neighbor

and you liked your next-door neighbor, you might not be impartial. If the lawsuit were about your next-door neighbor, and you didn't like your next-door neighbor, you might not be impartial either. We might need to find a different jury for you to be on. So, again, the voir dire process is to determine whether you have the ability to be fair and impartial.

We're now getting to the part where I'm going to be asking you some questions. And here's how this is going to work. If you need to answer one of the questions that I have for you today, I would ask that you raise your hand real high so that I and our courtroom clerks can see you. And I will then call upon people who are raising their hands. I may ask, as a group, to stand so that I can see you easier. We do have microphones on each side of the courtroom that we can pass over. If you would prefer not to use a microphone, then I would just ask that you speak up as loudly as you possibly can.

The first thing that I need to hear from you when you're responding is your juror number. That's the piece of paper that's affixed to your shirt. We do not need to know your names at this point, so just tell us your juror number. That will become part of our record that the court reporter is making and that's how we will do that.

I also want you to know, however, that some of

the questions I may have, you may not feel comfortable answering in front of your 53 new best friends today. And if that's the case, at any time, you can and should ask to speak privately with the Judge. And when I say "privately with the Judge," I mean privately with the Judge and a small entourage of attorneys representing the parties. But the main point is that it's going to be private and not shared with your 53 new best friends. And it's no problem or inconvenience for us to do that. And I recognize that there are certain private things that people would rather not share, and that's fine.

So next, I'd like to make some introductions. First, I want to introduce you to some participants that will be trying the case or taking a role in trying this case. First, the plaintiff in this case is the United States government. The United States is legally represented today by their attorneys, Brandon Carter. Mr. Carter, if you would please stand. And Michael Songer. Brandon Carter lives up in Washington County, I think. And he is an Assistant United States Attorney for the Western District of Arkansas.

Mr. Songer is a trial lawyer for the government, and he's from the Washington, D.C. area, so I doubt that you have come across Mr. Songer's path before, but if you have, let me know. But more specifically, do any of you

know Brandon Carter? He lives in Springdale, I think.

Mr. Carter, before this job, was a prosecutor up in Benton County, so if you have ever lived in Benton County, hopefully you have not crossed paths with him in that capacity, but if you have, I need to know. Thank you, gentlemen.

The human being representing the United States government today is Special Agent Matthew Ferguson. If you would please stand. He's an FBI Agent. I believe you're from Ft. Smith, is that right?

SPECIAL AGENT FERGUSON: Crawford County, Your Honor.

THE COURT: Where?

SPECIAL AGENT FERGUSON: Crawford County, Your Honor.

THE COURT: Okay. Even better. Does anyone know Special Agent Matt Ferguson?

There's some other people at the table that I will introduce you to. There's a trial tech, Kenneth Moon, and then also assisting the attorneys this morning is Melissa Hatfield. They won't be taking an active role, but if that name rings a bell, would you please let me know right now. Yes, ma'am?

VENIRE PERSON: Number 14. I go to church with Kenneth Moon. I go to church with him.

THE COURT: All right. Ms. Number 14, thank you very much. I'm going to give you an A-plus on how you followed the Court's instructions so far.

I have been in several trials with Mr. Moon. I'm not sure exactly what title he has, but all of the electronics and digital media that will be displayed during the trial, he's responsible for that for the government. So he knows how to work the computers and put together the slides and that sort of thing. He will not have -- literally, he will not say a single word in this trial, but he does work for Mr. Carter and Mr. Carter's office.

Is there anything about the fact that you go to church with Mr. Moon that would interfere with your ability to be fair and impartial for both sides?

VENIRE PERSON: No, sir.

THE COURT: All right. Thank you very much, ma,am.

The defendant's table is to my left. The defendant is Sheriff Anthony Boen.

Mr. Boen, would you please stand? Mr. Boen, do you live in Ozark or what city do you live in?

THE DEFENDANT: Ozark.

THE COURT: He actually lives in Ozark. And I believe you were first elected Sheriff in 2010?

THE DEFENDANT: Yes, sir.

THE COURT: 2010 and reelected in?

THE DEFENDANT: Took office in 2011, Your Honor.

THE COURT: All right. Took office in 2011.

Does anyone know Sheriff Anthony Boen?

VENIRE PERSON: Juror number 29.

THE COURT: Yes, ma'am. How do you know Mr. Boen?

VENIRE PERSON: I live in Franklin County. He is a -- he's considered a friend of my husband.

THE COURT: There are friends, and then there are friends. How would you characterize and what is the nature of the friendship between your husband and Mr. Boen?

VENIRE PERSON: I'm going to say friend and political colleagues.

THE COURT: To your knowledge, have you or your husband ever socialized in Mr. Boen's home?

VENIRE PERSON: No, not to my knowledge.

THE COURT: Has he in yours?

VENIRE PERSON: No.

THE COURT: With what frequency does your husband, as a friend, interact with Mr. Boen?

VENIRE PERSON: Well, since they are on Facebook together, I'm not sure.

THE COURT: But they are on Facebook together?

VENIRE PERSON: Yes.

THE COURT: What about you? Are you friends with Mr. Boen as well?

VENIRE PERSON: No.

THE COURT: All right. If you were selected as a juror in this case, you would be instructed that you can't talk to anybody else about the case until the case is over.

Would it be possible for you to serve as a juror and go home and not talk to your husband about the case?

VENIRE PERSON: I honestly don't know.

THE COURT: If you returned a verdict that favored Mr. Boen, do you think your husband would be happy with that?

VENIRE PERSON: I think my husband would want a fair trial, no matter which way it goes.

THE COURT: What I'm getting at is, if your husband wants the trial to come out a particular way, and you found yourself having to vote in favor of it coming out a different way, would that cause any ruffle between you and your husband?

VENIRE PERSON: No.

THE COURT: All right. There's a backlog of trials in this district, and so you are going to have plenty of opportunities to serve on juries, I think, so let me ask you:

Based on this nature of your relationship and

your husband's relationship with Mr. Boen, is this a trial which you can represent to all of the attorneys, the government's attorneys and to Mr. Boen's attorneys, that you have the ability to be fair and impartial to both sides?

VENIRE PERSON: I would rather not.

THE COURT: All right, ma'am. Then we're going to find a different trial for you, and I'm going to excuse you. That's Ms. Number 29 is excused.

Mr. Boen, you can sit down. Does anyone else know Sheriff Boen?

Does anyone think that they have ever had a law enforcement encounter with Sheriff Boen? I doubt that he's literally running radar on Highway 22, or whatever it is, 23, that goes through Franklin County, but I don't know.

Has anyone had an encounter with Mr. Boen professionally?

VENIRE PERSON: Number 21, Your Honor.

THE COURT: Yes.

VENIRE PERSON: Back in, I think year of about 2009, the gentleman that I was working for at the time, we were working for the City of Altus. What we were doing, we were maintaining the ditches for the City of Altus. And in one particular area, we ran into an incident where the gentleman, he didn't want his part of the ditches taken

care of. So at that point in time, we called the Sheriff's Office, and Mr. Boen came out. But personally, I do not know the man. I didn't deal with the situation. The gentleman that I worked for, he's the one that dealt with Mr. Boen.

THE COURT: And were you present when Mr. Boen arrived?

VENIRE PERSON: I was present, but I didn't get in the conversation.

THE COURT: Do you have an opinion about whether he handled the situation that you observed professionally?

VENIRE PERSON: Well, like I said, I really didn't have anything to do with it. I was just working for the gentleman that dealt with Mr. Boen.

THE COURT: All right.

VENIRE PERSON: So I really don't know on that part.

THE COURT: Could you hear what was said or see what was done?

VENIRE PERSON: No.

THE COURT: All right. Did you leave that day having a better -- having any better or more favorable opinion of Sheriff Boen?

VENIRE PERSON: No, sir.

THE COURT: Did you leave that day having any

worse opinion of Sheriff Boen?

VENIRE PERSON: No, sir.

THE COURT: Do you think you can be a fair and impartial juror in this case, even though there was this one encounter as you've described?

VENIRE PERSON: Yes, sir.

THE COURT: All right. Thank you.

Anyone else ever had a professional encounter, law enforcement encounter, with Sheriff Boen to your knowledge?

Sheriff Boen I guess would be described as the chief law enforcement officer of Franklin County. And they do have deputy sheriffs there, as I understand it.

Has anyone ever had a law enforcement encounter with a Franklin County Deputy Sheriff? Thank you very much.

Now, representing Mr. Boen this week is Russell Wood and Paul Prater. Mr. Wood is with the Wood Law Firm, and he offices out of Russellville. Mr. Prater is with the Prater Law Firm, and he offices, I think in North Little Rock.

MR. PRATER: Correct, Your Honor.

THE COURT: Does anyone on our panel know Mr. Wood? Does anyone on our panel know Mr. Prater?

Mr. Wood and Mr. Prater are in private practice,

which means they have clients who hopefully pay them money to represent them in various issues.

Have either of these gentlemen ever represented you in any type of legal issue?

Sometimes when lawyers get hired to represent a client, they send mean letters to people saying, "If you don't do A, B, and C, my client and I are going to sue you." And sometimes they actually sue people.

So my question is, has Mr. Wood or Mr. Prater ever sent any of you a mean letter saying, "I'm going to sue you on behalf of my client if you don't do A, B, or C?"

To your knowledge, have either of these gentlemen ever represented someone that filed a lawsuit against you? Thank you very much, gentlemen. You may sit down.

Actually, I want to go back to the United States, and there's a line of questions there that I forgot to ask about the United States.

Is anyone employed by the United States government? Yes, ma'am.

VENIRE PERSON: Juror number 30. I'm employed by the Department of Homeland Security.

THE COURT: And more specifically, what do you do for the Department of Homeland Security?

VENIRE PERSON: I am a supervisory transportation security officer for the Transportation Security

Administration at the Ft. Smith Municipal Airport.

THE COURT: We appreciate your service. You guys have done a great job.

VENIRE PERSON: Thank you.

THE COURT: Is the TSA considered, or are you considered I guess I should say, federal law enforcement?

VENIRE PERSON: No.

THE COURT: Do you carry a gun on duty?

VENIRE PERSON: Not on duty.

THE COURT: All right. Well, remind me not to quarrel with you off duty.

So you get a paycheck from the government, hopefully, and the government is the plaintiff in this action, in this criminal action. Is there anything about the nature of your employment relationship as you have described it that's going to cause you to already be thinking that you're going to vote in favor of the government's side before you have heard any evidence at all?

VENIRE PERSON: No.

THE COURT: Even though you work for the United States government at the TSA, can you represent to Sheriff Boen and to his attorneys that you have the ability to judge the facts of this case in a fair and impartial manner?

VENIRE PERSON: I could.

THE COURT: All right. Thank you very much, ma,am.

Anyone else work for the United States government or one of its agencies? Almost always, we have somebody that works for the Department of Agriculture or something like that.

Does anyone have contractual relationships with the United States government, like a dairy cow operation or a farming operation or something like that?

Does anyone here have such a favorable impression of the United States government that it wouldn't be fair to the defense in this case for you to serve as a juror?

Does anyone presently have a negative view or a negative connotation of the government such that you would say that you really aren't going to give the government a fair shake at meeting its burden of proof in this case? Thank you very much.

Let's talk about the pandemic. We've all lived it for about a year and a half now. And especially last year, and into the first part of this year, for some, it has substantially altered how people live, where they go to work, do they work remotely, do they stay at home, have they been able to send their kids to school, kids at home, can you go out to a restaurant, can you not, stay within

your own little bubble of friends. It's altered our daily lives.

But in late last year or the spring of this year, our community started opening up again. Our economy started opening up again. The mask rules have changed from time to time, but people have gone back to their lives and to living their lives. Their routines may be a little bit new, they may be a little bit different. We may encounter people at Walmart who are or are not wearing masks. But we have gone back to our routines to differing extents in some form or fashion.

The United States Courts have an essential function in our community, and we must go about resuming our business too. And the business of jury trials cannot be done without you. In the last few weeks, my impression is that COVID statistics have worsened. We kind of thought we were coming out of things and then the numbers have been going up. And it seems like every week, the numbers are getting a little bit worse. When you were originally summoned for jury service, I think we included a sheet that explained our mask rules, which were optional if you were fully vaccinated. But this past week, we have changed those rules in light of the COVID situation here and we are now requiring everyone, regardless of vaccination status, to wear a mask.

I want you to know that over the last year and a half, and in preparation for this trial, the Courts have taken a number of measures to make this experience as reasonably safe and to lessen the risks as much as can be possible. We bought a small plexiglass factory somewhere and had them adorn our courtroom with multiple sheets of it. In all seriousness, we've placed physical barriers everywhere.

The picture you see off to the right is a training room that we have co-opted into our new jury room so that if you're on the jury in this case, it's a much larger space than just the conference table in a smaller room that we normally use. Each person will have their own table, more or less, that's about the size of these tables that you can see up front. The space is much larger to accommodate distancing. We have now, and we have had for some time, enhanced daily cleaning. There is -- and this is something you can't see -- but there is enhanced air filtration systems that have been installed. We have these questionnaires that you have now seen at the front door, the health assessments and your history and your recent contacts with anyone that may have COVID. There's a temperature check at the front door. The sheets that you fill out along with the staffing of the employees -- we know where they are at different times -- allows us to do

contact tracing if there is a problem. We have given a lot of thought on how to be safe as we start trying jury trials, but we can't eliminate all of the risks. I understand that. You understand that. Against this background, I have some questions for you.

Is there anyone who believes that they should not have to comply with the Court's mask rules for purposes of their jury service this week? And, again, the Court's mask rules are, everyone must wear a mask. There's an exception to that rule. If a trial participant is in a speaking role, such as the Judge is now, that person may, but is not required, to remove their mask. The same will be true for witnesses who will testify.

Is there anyone who believes that as a juror, they should not be required to wear masks, or they won't comply with wearing a mask if selected? Yes, sir.

VENIRE PERSON: Juror number 50. I have asthma, so when I wear the mask for a long time, it makes me light-headed.

THE COURT: That's fair. This trial is going to last all this week, and there's a possibility that it could go into Monday or perhaps Tuesday of next week. I'm kind of giving you a preview of a few slides from now. But with some breaks along the way, we are going to be working every day from about 8:30 to 5:00. I can appreciate the fact

that wearing a mask may be abnormal to you if in your normal, regular life outside this courthouse, you don't wear one.

I guess my real question is, is it an imposition -- and not just an imposition -- but is the flare-up in your asthma going to be something that you think we should find another jury trial for you to serve on in the future when you wouldn't have to wear a mask, or do you think that you can comply with this mask rule even though it impacts your asthma?

VENIRE PERSON: The job I work at, I don't have to wear a mask or anything. But -- sorry -- I kind of forgot where I was going with that.

THE COURT: Given your asthma and given the fact that the Court has this rule, would you prefer to be excused from this trial, or would you like to serve? Because only you know how big of a complication this poses.

VENIRE PERSON: If there's a trial I can participate in that didn't require me to wear a mask, that would be optimal. Because I take not just my inhaler, but medication to control my asthma.

THE COURT: All right, sir. Would you prefer that I excuse you today and then we'll put you back in line for jury service at some point in the future?

VENIRE PERSON: Yes, please. If there's --

THE COURT: All right, sir. You're excused and you're free to go. And when the Court excuses someone, if you need an off-work slip or information about getting your mileage or your pay today, you can ask one of these ladies or stop in at the clerk's office on the first floor and they will give you that information. Thank you for being here today.

VENIRE PERSON: Thank you.

THE COURT: I have several COVID-related questions. This one is specifically regarding masks.

Is there anyone who believes they should not have to comply with the Court's mask rules, or as Juror Number 50 told us, may have a physical problem wearing a mask? All right. Thank you.

Next question. Vaccinated? Oh, are you not vaccinated? This is a personal decision that people in our community have made. It's also a question that has been politicized. This trial is a quest for facts and the truth, and there is nothing about it that is political.

Does anyone believe that they would not be able to fulfill this fact-finding mission by serving on a jury, which will very likely be composed of people who are both vaccinated and non-vaccinated? Does anyone have a problem with serving with vaccinated and non-vaccinated jurors? Anyone who says, "You know, I just believe so strongly

about this that if I encounter someone who is on the other side of this debate we're having in our society, that I just couldn't deliberate with them?" Anyone that can't put that political issue off to the side, because this case is not about political issues. Thank you very much.

Does anyone believe they might have a problem respecting the personal and private vaccination decisions of your fellow jurors? Thank you.

Does anyone have, like Juror Number 50 who we heard from, a health risk factor or a unique issue, or a genuine fear that causes you a significant concern with your ability to serve as a juror in this case? And as I told you, it's going to last for about a week, or maybe a week and a couple of days. Yes, ma'am?

VENIRE PERSON: I just have a question. Is the mask mandate --

THE COURT: What's your number?

VENIRE PERSON: 20.

THE COURT: All right. Thank you.

VENIRE PERSON: Sorry. 28. Okay. My question is, during this trial, is the mask mandate going to be for the whole trial?

THE COURT: Yes, ma'am.

VENIRE PERSON: Okay. That's all I really needed to know. I've got people at home I'm concerned with.

THE COURT: Yes. Yes. And when you need relief, we'll take breaks, and you can go outside. It's supposed to be a little bit cooler this week, I think. And you can remove your mask outside as long as you're not right up on other people. But inside the courthouse, and except for taking a sip of water or something like that, everyone needs to wear masks. All right. Thank you, ma'am.

Anyone else? Now, I want to introduce you to some more of the facts. And I want you to listen to this pretty closely because my questions for you are going to be whether you know anything about the case, okay?

So as I've already told you, this is a criminal case brought by the United States against Anthony Boen, who is the Sheriff of Franklin County, Arkansas.

The government alleges that on three separate occasions, Mr. Boen deprived three individuals of their civil rights by using unreasonable force against them. Specifically, Mr. Boen is charged with three counts in an indictment.

Count One asserts that Mr. Boen, on or about September 14, 2017, deprived Justin Phillips of his civil rights by using unreasonable force.

Count Two asserts that Mr. Boen, on or about November 21, 2018, deprived Brandon English of his civil rights by using unreasonable force.

And Count Three asserts that Mr. Boen, on or about December 3, 2018, deprived Zachary Greene of his civil rights by using unreasonable force.

Mr. Boen has pleaded not guilty to all three counts, and Mr. Boen is presumed innocent. My question for you is: Does anyone have any personal knowledge of these facts or these three separate counts? And let me explain what I mean about personal knowledge. Personal knowledge is not what you may have read in a newspaper or seen on a T.V. news show. When I use the term "personal knowledge," what I'm talking about is firsthand knowledge, or you know about the incidents that are alleged in the three counts.

Does anyone have any personal knowledge of the facts that I've just summarized? Very well.

Next, I want to introduce you to some potential witnesses that will take this witness stand and testify to you if you're selected to serve on this jury. There are a lot of potential witnesses. I do not expect that all of these people will testify, but I asked the attorneys on both sides for a list of people who may testify, and so this is a rather inclusive list.

I have several pages of witnesses. Here's how I'm going to do this. I'm going to read off these names and I have some description of how they plug in to either this case or what their employment is. I give you this

information for context. "Is this the Jim Jones you know from church," or, "Is this the Jim Jones that is employed in some other county?"

After I read the witnesses on each page, I'm going to stop and I'm going to ask if anyone on our jury panel knows, or thinks that they know, any of these witnesses. If you do, please raise your hand.

So our first page, these are potential witnesses, Brandon English. He's from Ozark. Carolyn McCain is from Ozark. I believe she's a former Deputy Sheriff in Franklin County. There's a gentleman named Chris Roberson from Little Rock. Christy Sanders from Ozark, who is a current dispatcher at the Franklin County Sheriff's Office. Dakota Cowens, also from Ozark, a former jailer at Franklin County. Dalton Miller, also from Ozark, is a current Deputy Sheriff at the Franklin County Sheriff's Office.

Does anyone know any of these potential witnesses? All right.

All right. Second page. Deb Ross, also from Ozark. Sensing a theme here. She is a current dispatcher at the Franklin County Sheriff's Office. Jeff Phillips is from Russellville, Arkansas. He's described as a prosecuting attorney. Jeff Wood is from Clarksville. He's a former Franklin County Deputy and a current deputy at the Johnson County Sheriff's Office. There's Joshua Starnes

from Hartman. He's a current jailer in Franklin County. Justin Phillips is from Panama, Oklahoma. There's a gentleman by the name of Jason Earp from Leander, Texas.

Do you know any of these witnesses? Yes, ma'am?

VENIRE PERSON: Juror Number 18.

THE COURT: Yes, ma'am.

VENIRE PERSON: I am a teacher in Clarksville.

THE COURT: Okay.

VENIRE PERSON: And I believe I taught Jeff Wood's son.

THE COURT: What grade or subject do you teach?

VENIRE PERSON: I teach high school, 10th through 12th, business and marketing classes.

THE COURT: How long have you done that?

VENIRE PERSON: This is my 26th year.

THE COURT: Thank you for your service as a teacher in our community, ma'am.

VENIRE PERSON: Thank you.

THE COURT: How long ago has it been that Jeff Wood's son would have been one of your students?

VENIRE PERSON: A number of years ago. I want to say at least 15 or more.

THE COURT: All right. His father, Jeff Wood, if we're talking about the same Mr. Wood, his son was a student of yours 10-plus years ago. In that context, did

you ever meet his father?

VENIRE PERSON: I did with parent/teacher conferencing and open-house situations.

THE COURT: That would be a few times a year or a few times a semester?

VENIRE PERSON: Possibly a few times a year.

THE COURT: How many semesters was the son in your class?

VENIRE PERSON: It was for a year-long course, so two semesters.

THE COURT: Is there anything about that connection, as you have described it, that would cause you, if you are selected as a juror in this case, to automatically place greater importance or weight on Mr. Wood's testimony, if he testifies?

VENIRE PERSON: No, sir.

THE COURT: Any reason why you would put less weight on his testimony if he testifies?

VENIRE PERSON: No, sir.

THE COURT: Based on the nature of that parent of a student relationship as you have described, is there any reason that you could articulate why you couldn't be a fair and impartial juror for both sides?

VENIRE PERSON: No, sir.

THE COURT: All right. Thank you, ma'am. I

appreciate you explaining that.

Anyone else know these potential witnesses on page 2?

Page 3. Kambrie English from Charleston, current dispatcher at Franklin County. Ken Pence, from Ozark. Kevin Hutchison from Ozark, a former Deputy Sheriff. Kim Nichols from Ozark, current dispatcher at Franklin County. Lori Ann Greene is from Ozark. Marguerite Stout is from Paris, but I think it's the Paris, Arkansas, not Paris, France. She's described as a former jailer in Franklin County. That's Marguerite Stout.

Does anyone know any of the witnesses on this page? In the back row?

VENIRE PERSON: 41. Ken Pence. My ex-husband, I think, used him in the past for body work. I think I met him once or twice in Ozark. And he may have serviced a tire or a vehicle I had broke down.

THE COURT: How long ago was that?

VENIRE PERSON: It probably was 10 to 15 years ago.

THE COURT: Other than helping you with your vehicle or doing some body work on your ex-husband's vehicle, do you have any other connections or associations with Ken Pence?

VENIRE PERSON: No, Your Honor.

THE COURT: Is there any reason why that seemingly remote interaction would factor in to your ability to be fair and impartial to both sides?

VENIRE PERSON: No, Your Honor.

THE COURT: Thank you, ma'am. Anyone else know the witnesses on this page?

Next page, Marshall Elmore from Booneville. Mason Berry from Ozark. He's a former Deputy Sheriff at Franklin County. You've already been introduced to Matthew Ferguson. He's at plaintiff's trial table. He's an FBI Special Agent. MyCailia Carlson from Ozark. She is a former dispatcher and jailer at Franklin County. Reuben Gay is from Ft. Smith. He is also an FBI Special Agent. Ronica Young, who is from Alma, formerly worked as a nurse at the Franklin County Jail.

Does anyone know the witnesses on this page?

On to the next one. Sarah Capp from Ozark. Scotty Voorhies from Springdale. Scout Ingram-Simpson from Ozark is a former dispatcher at Franklin County. Toby Yancy is from Mulberry, Arkansas. And Travis Ball, who is also from Ozark, is a former Deputy Sheriff at Franklin County.

Does anyone know the witnesses on this page? Yes, ma'am?

VENIRE PERSON: 41. Sarah Capp and I went to law

school together.

THE COURT: Where did you go to law school?

VENIRE PERSON: Little Rock.

THE COURT: When did you graduate?

VENIRE PERSON: 2004.

THE COURT: Was she in your class? Did she graduate with you?

VENIRE PERSON: Yes, Your Honor.

THE COURT: Do you practice currently?

VENIRE PERSON: I do.

THE COURT: Where?

VENIRE PERSON: Ft. Smith, Arkansas.

THE COURT: What is Ms. Capp's current position in the legal business?

VENIRE PERSON: I think she is in private practice, but I don't know what she does exactly.

THE COURT: All right. In the last five years, how many interactions would you characterize that you've had with your former classmate, Ms. Capp?

VENIRE PERSON: I don't think I've talked to her personally. I think I might have said something on Facebook to her, maybe about kids or her job or something there. That's it. I don't think I have personally spoke with her in, I don't know, longer than that.

THE COURT: I have some friends that I went to

law school with that I still keep up with.

VENIRE PERSON: Right.

THE COURT: I have other people that I went to law school with that I would certainly recognize their name and be able to recall things about them, but that I haven't spoken with in 30 years.

VENIRE PERSON: Right.

THE COURT: How does Ms. Capp fit in?

VENIRE PERSON: I would say that I would recognize her, I know what she's been doing, but I don't have any interactions. I don't consider her to be a friend outside of really that we attended school together.

THE COURT: If Ms. Capp testifies in this case -- and you've already explained that she is an attorney, so that's some new information here -- but setting aside that fact, is there anything in particular or special about you going to law school with Ms. Capp and your relationship since then as you have described that's automatically going to cause you to place more or less weight on her testimony relative to the testimony of other witnesses?

VENIRE PERSON: No, Your Honor.

THE COURT: Knowing this relationship, do you believe that you can be a fair and impartial juror for both sides?

VENIRE PERSON: Yes, Your Honor.

THE COURT: All right. Thank you very much, ma,am.

Does anyone else know any of the potential witnesses on this page?

Last page. B.J. Gilbreath from Branch. He's a current deputy at Franklin County. Zachary Greene from Ozark. Zachery English, also from Branch. He's a former deputy at Franklin County.

Anyone know these three witnesses?

VENIRE PERSON: 54. I have sold Zachery English tires in the past.

THE COURT: Can I ask where you work or the type of job you have?

VENIRE PERSON: I'm a store manager for RNR Tire Express.

THE COURT: And Zachery English has been a customer of yours?

VENIRE PERSON: Yes, sir.

THE COURT: Over what period of time?

VENIRE PERSON: It was a couple of years ago.

THE COURT: Was this one purchase, or is he a repeat customer?

VENIRE PERSON: It was one purchase, but he made payments.

THE COURT: Outside of that relationship, do you

know Mr. English?

VENIRE PERSON: No, sir.

THE COURT: Is there anything about the nature of this business relationship that would cause you to automatically place more or less weight on something that he testifies to as opposed to the testimony you will hear from other witnesses?

VENIRE PERSON: No, sir.

THE COURT: Do you think you can be fair and impartial to both sides in this case?

VENIRE PERSON: Yes, sir.

THE COURT: Thank you very much, ma,am.

Anyone else know the witnesses on this page? We've been going for a little while now. I have quite a few questions left. After I finish asking questions, the attorneys are going to have some questions. My plan would be to take a break in between my questions and the lawyers' questions. But if anyone is like needing to take a break now, or if I keep going on later, would you all just raise your hand if like you really need for me to take a break? Does anyone really need for me to take a break right now? All right. It's not a problem at all. Just let me know if you need to take a break.

I want to talk to you about media exposure. First, I want you to understand this. It's a common thing

for people to read newspapers and to watch T.V. news shows, or now more frequently people get their news from their cell phones on Facebook or Twitter or what have you. So reading the newspaper, watching the news, staying informed, does not disqualify you from being a juror, if, and only if, you have the ability to set aside what you may have read in a newspaper or watched on a T.V. news show and judge the facts of this case based solely on the evidence that will come in within the four walls of this courtroom.

But it may not be appropriate and therefore disqualification could be necessary if someone has had a certain level of exposure to media reports about this case such that it has hardened your opinion about what the facts are and you cannot truly tell these attorneys that you have the ability to only base your opinion or your determination based on the evidence that comes in from within this courtroom, okay.

So we're going to do this exercise. This will get some blood flowing here. In general, if you regularly read a newspaper, or newspapers, at least once per week that reports on Arkansas or more specific local news, and that's the old-fashioned hard copy of the paper or the more predominant method now, electronic versions, then I would like for you to stand as I call out the name of three publications.

Again, the question is, would you please stand if you read the Arkansas Democrat-Gazette at least once per week? All right. And for those standing, would you just shout out your juror numbers.

VENIRE PERSON: 56.

VENIRE PERSON: 36.

VENIRE PERSON: 51.

THE COURT: All right. What about the Southwest -- I think I misspelled this -- Southwest Times Record? All right. The individuals that just stood up from my left to right, would you please state your juror numbers?

VENIRE PERSON: 21.

VENIRE PERSON: 25.

VENIRE PERSON: 19.

THE COURT: I'm informed that there is a newspaper in Franklin County called the Ozark Spectator.

Would you please stand if you read this publication? Everyone that stood up a minute ago, please stand back up. This is part of the blood-flowing part of this exercise.

State again -- and we'll start on my left -- I would like for you to answer the questions that are in red on this screen. Give me your juror number and then tell me which paper that you read, with what frequency you read it,

and whether you would characterize you as a skimmer or someone who reads most of the paper, or someone who reads every single word of the paper. Also whether you ever -- if you subscribe online, sometimes you can post comments down below the story. If you're a commenter, I would want to know that as well.

So we'll start over here on my left.

VENIRE PERSON: Juror Number 21. The name of the paper that I read is Southwest Times Record. I don't read it all that much, and I really don't read all of it. Mostly it's the sports section. And online, I don't do online.

THE COURT: All right, sir. Thank you very much. Next?

VENIRE PERSON: Juror Number 25. Southwest Times Record. I would say I skim it, but I read the articles that are of interest.

THE COURT: How frequently?

VENIRE PERSON: Once a week. I'm sorry. Once a day.

THE COURT: All right.

VENIRE PERSON: And I do not post comments or responses at all.

THE COURT: All right. Thank you, sir. Next?

VENIRE PERSON: Yes. Juror Number 19. I read

the Southwest Times Record on Sunday. I get the coupons and I glance at the obituaries. And I don't do any online or any response to any articles.

THE COURT: I'm going to give you an A-plus for your ability to follow those instructions. I appreciate that information.

Next?

VENIRE PERSON: Juror Number 36. I take the Arkansas Democrat-Gazette once a week on Sundays, mostly for the coupons. My wife is a coupon-clipper, so she likes that. I like the sports section. They cover the Razorbacks pretty good. And I do skim through it, just checking out what's going on around the state. But as far as that goes, that's about it.

THE COURT: All right. Thank you very much, sir.

VENIRE PERSON: Juror 51. I read the Arkansas Democrat-Gazette every Sunday. Pretty much a skimmer. However, I did read an article on this case in yesterday's paper.

THE COURT: All right. I'm going to get to that in just a moment about this particular case, so I'll have you stand back up in just a moment. Thank you for saying that, though.

VENIRE PERSON: Juror 56. I take the Arkansas Democrat-Gazette daily, electronically. I skim it probably

two to three times a week. I like the political section, the editorials. Profiles, style. But I'm just a skimmer, also. I do no social media, so I don't post anything. That's it.

THE COURT: Thank you very much. Thank everyone for sharing.

Little bit different question. So up to this point, I've introduced you to the parties. I've given you a statement of the case that gives you some idea about what the case is about and about the people associated with the three counts. And you know that this is a civil rights case.

So against that background, and regardless of whether you just stood up and told me about the newspapers that you read, I would now like for anyone who believes that they have read about this case in a newspaper at least one time, regardless of the newspaper, and regardless if you stood up a few minutes ago, if you believe that you have read something in the newspaper about this case, please stand up. This would be similar to Mr. Juror Number 51 who described that he just read something yesterday.

I'm seeing three jurors, including Number 51, so I'll start with you, sir. Is the story you read that you think was yesterday, is that the only time you believe that

you have read a story about this case?

VENIRE PERSON: Yes, it is.

THE COURT: Which of the following statements best describes any beliefs you may have formed based on what you read in yesterday's newspaper:

Option one would be, "I may have already formed beliefs as to the true facts of this case just based on what I read in a newspaper."

Number two, "I have not formed beliefs as to the accuracy of the facts reported one way or the other."

Or, "I recall reading something about this case, but I don't recall enough of the facts to carry on a conversation about any specifics."

How would you describe yourself?

VENIRE PERSON: Number one.

THE COURT: That you may have already formed some beliefs?

VENIRE PERSON: Yes, sir.

THE COURT: And would the beliefs that you have formed be such that you could not easily set that aside and only base your decision on the evidence that comes in on the witness stand?

VENIRE PERSON: I believe I could set that aside. I read the case and it's the first I had heard about it despite living three blocks from Town Square in Ozark. But

I really don't know the Sheriff or anything about him, so I'm open to hearing what the attorneys say.

THE COURT: So newspaper reporters, this is a respected profession. And I'm sure that every newspaper reporter starts out, when they are writing a story that they have been assigned to, they start out trying to get it right. But sometimes they may get it wrong. They may have misunderstood something, they may not have vetted something. And more importantly, sometimes they may report on something that they have seen somewhere or someone has told them, but it's not evidence in the sense that it's not subject to cross examination, and it's not something that could come in under our fairly thick rule books called the Rule of Evidence.

So this is why it's important, as jurors, that you only decide what you believe the true facts are based on evidence that comes in in the courtroom that has had the opportunity for cross examination, that is real evidence that gets past our Rule of Evidence book. The danger is if you think, even a little bit, that you're not going to be able to distinguish what you read in the paper -- which may or may not be accurate -- from what you saw in the courtroom, especially since you just read this yesterday, that's potentially dangerous. And I would have to have some pretty firm assurance on your part that you do have

the ability to set whatever it was that you read aside and only make your decision based on the facts that come in in this courtroom. That's number one.

And number two, that you won't tell other of your fellow jurors about what you read in the newspaper yesterday. So that's what you would have to represent to me to stay on this jury. Or -- and this is -- I don't mean to be critical, I appreciate you being honest with me -- if you feel like that you couldn't distinguish between the paper versus evidence in this courtroom, or you're not sure that you are going to be able to distinguish where you heard what from, then we need to find a different case for you to be a juror on. What do you think about that?

VENIRE PERSON: I think probably I should try another case.

THE COURT: All right, sir. Thank you very much. The Court will excuse Juror Number 51. And I appreciate you telling me about that, sir.

VENIRE PERSON: Yes, sir.

THE COURT: We'll go to Juror Number 25, is that right?

VENIRE PERSON: Juror Number 25.

THE COURT: Let me go back. I'm on the wrong slide now. How many times do you believe that you have read news stories about this case?

VENIRE PERSON: Maybe two or three times.

THE COURT: Which newspaper have you read about this case?

VENIRE PERSON: The Southwest Times Record.

THE COURT: Which best describes your thoughts based on what you have read in the newspaper:

Number one, "I have already formed beliefs as to the true facts of the case."

Number two, "I have not formed beliefs as to the accuracy of the facts reported one way or the other."

Or number three, "I recall reading something about this case, but I don't recall enough of the facts to carry on a conversation with you about any specifics."

Which of those describe you?

VENIRE PERSON: Number two.

THE COURT: So you've read a few articles. Over what period of time? Is this recently or in the past?

VENIRE PERSON: The article yesterday in the Times Record, and then I think previously in the past.

THE COURT: You heard my discussion with Mr. Juror Number 51?

VENIRE PERSON: Yes, sir.

THE COURT: You heard what I said about the importance of being able to separate what you read in a newspaper that, try as they might, may or may not be

accurate, or may or may not be capable of being received in a courtroom from what you do hear in a courtroom.

Do you have that ability?

VENIRE PERSON: Yes, sir.

THE COURT: Is there any question in your mind that you have the ability to decide this case based solely on the evidence that comes in within the four walls of this courtroom?

VENIRE PERSON: No question, Your Honor.

THE COURT: You can do that?

VENIRE PERSON: Yes, sir.

THE COURT: And you will represent that to all the attorneys here?

VENIRE PERSON: That's correct.

THE COURT: Thank you very much, sir. One more. What's your Juror Number?

VENIRE PERSON: 36.

THE COURT: Mr. Number 36, about how many articles do you think that you have read about this case?

VENIRE PERSON: I believe it was just one, which was in yesterday's Arkansas Democrat-Gazette about the trial starting.

THE COURT: You don't recall reading any stories about it before yesterday?

VENIRE PERSON: Not really, no, sir.

THE COURT: Again, which of the following best describes you:

Number one, "I've already formed beliefs as to the true facts based on what I read yesterday."

Number two, "I have not formed beliefs as to the accuracy of the facts reported one way or the other."

Or three, "I recall reading something about the case, but I don't recall enough of the facts to even carry on a conversation about the specifics."

VENIRE PERSON: I'd say number two.

THE COURT: All right. Similar to the questions that I had for Mr. Juror Number 25 just now.

Can you represent to me and to these parties that you have the ability, despite what you read in the newspaper, and despite whether that's accurate or not --

VENIRE PERSON: Yes, sir.

THE COURT: -- that you will only decide this case based on the evidence that comes in through the four walls of this courtroom?

VENIRE PERSON: Yes, sir, I can.

THE COURT: And do you believe, despite what you may have read in the newspaper, that you have the ability to be fair and impartial to both sides?

VENIRE PERSON: Yes, sir, I do.

THE COURT: All right, sir. Thank you very much.

Mr. Juror Number 35, would you please stand up? Mr. Juror Number 35, information was conveyed to me that you had an inadvertent conversation with someone who works for a local newspaper this morning as you were waiting or preparing to come into the courthouse. Have I got that right? Was that you?

VENIRE PERSON: Yes, that was me.

THE COURT: And we visited with that reporter, or that employee, and he gave us the gist of the conversation that he had with you. Here's my question for you:

You've heard the statement of the case. I've got that slide up now that the case is a criminal case against Sheriff Boen. The government alleges on three separate occasions, he deprived three individuals of their civil rights by using unreasonable force against them.

Is there anything that this reporter, in his inadvertent conversation with you this morning, is there any other facts or anything else he told you that was more specific than the information on this slide?

VENIRE PERSON: No, Your Honor. He actually gave me less information than what's on that slide.

THE COURT: Did you form any impressions about what the facts are in this case based on your conversation with that --

VENIRE PERSON: No, I did not.

THE COURT: Do you have the ability, and can you represent to these attorneys that you have the ability to decide this case based solely on the evidence that comes in within the four walls of this courtroom?

VENIRE PERSON: Yes, I can.

THE COURT: All right. Thank you, sir.

Is there anyone else that may have been standing near Mr. Juror Number 35 and this reporter, or an employee of a paper who may have been holding a camera, that overheard their conversation?

Would everyone that overheard the conversation, would you please stand up? And we'll just go around and I need you to identify your juror numbers.

VENIRE PERSON: Juror 53.

THE COURT: And what's your number, sir?

VENIRE PERSON: 55.

THE COURT: Number 55? And ma'am?

VENIRE PERSON: 18.

THE COURT: And Ms. Juror Number 18. Did you hear the employee of the newspaper give any details that are more specific or greater than the facts that are on the slide that I read to you in the statement of the case? Raise your hand if that's true. All right.

Would you please raise your hand if there's anything about that conversation that you overheard that

would have solidified any notions about what the true facts are in this case? Is there any reason, based on what you overheard from that conversation, that would cause you to have to say that you can no longer be a fair and impartial juror if selected to serve in this case?

For the record, I'm getting all negative responses. You may sit down.

Quickly, I want to go back to this idea about news. We've talked about newspapers. It may be that you consume your news from a T.V. news show. I'm not going to go into quite as many details. I'm going to go to the punchline here.

Based on the parties that I've told you about, the statements of the case that I have read to you, the introduction to who is going to be a potential witness, would you please stand if you recall watching a T.V. news story about this case? Okay. I see Ms. Juror Number 3. And then what's the number on my far left?

VENIRE PERSON: 11.

THE COURT: 11. And Mr. Juror Number 25. And then --

VENIRE PERSON: 28.

THE COURT: And Ms. Juror Number 28. Anyone else believe they watched a story on the T.V. news about this case? All right.

My question is for the four of you standing. We're just going to go one, two, three, four across the line in the same order that I called your number.

Would you say that you've seen one news story, two, or three T.V. news stories, or four or more T.V. news story, Ms. Number 3?

VENIRE PERSON: I know when they first reported about this, I remembered seeing it. And then we watch the news every night, so if they have had anything since then, I'm sure we've seen it. I don't really recall it.

THE COURT: Which of these statements best describes you:

"I believe T.V. news coverage is always complete and accurate."

Or, "Based on what I have seen on local T.V. network news about the facts of this case" -- well, let me take these one at a time.

Do you believe everything is true that you see on the T.V. news?

VENIRE PERSON: Not unless they have like video to back it up. You know, it's hard.

THE COURT: Sometimes there can be inaccuracies on T.V. news, correct? Do you agree with that?

VENIRE PERSON: Correct. Yes.

THE COURT: Different question. Based on what

you have seen on local T.V. news, and basically you're telling me that if it's been on the news station that you watch, you've probably seen it. Have you -- that's a question -- have you already formed strong beliefs about the accuracy of the facts reported on the T.V. news about this case?

VENIRE PERSON: No.

THE COURT: All right. Do you have the ability to separate off whatever news story you may have seen on T.V. and decide this case based solely on the evidence that comes in within the four walls of this courtroom?

VENIRE PERSON: Yes.

THE COURT: And regardless of what you have seen on T.V., can you be a fair and impartial juror for both sides?

VENIRE PERSON: I hope so.

THE COURT: All right. Now, hand that back to Ms. Juror Number 11.

VENIRE PERSON: 11.

THE COURT: How many news stories do you think you have watched about this case?

VENIRE PERSON: Last night I believe is really the first time that I noticed anything. And it was just a real brief -- I was walking through the living room and I glanced at the T.V. and briefly heard.

THE COURT: Do you believe that T.V. news coverage is always complete and accurate?

VENIRE PERSON: No.

THE COURT: Based on what you saw walking through the living room last night, have you already formed opinions and beliefs as to the accuracy of what you heard?

VENIRE PERSON: No, sir.

THE COURT: Can you be a fair and impartial juror on this case deciding it only on what you hear in the four walls of this courtroom?

VENIRE PERSON: Yes, sir.

THE COURT: Mr. Number 25, this is becoming old hat for you. How many T.V. news stories have you read?

VENIRE PERSON: Two or three.

THE COURT: Same concept with regard to the newspaper articles. Have you already formed any opinions about the completeness or accuracy of the information that you have absorbed from T.V. news?

VENIRE PERSON: No, sir.

THE COURT: Despite what you may have seen on T.V. news, and same question as with regard to the newspapers, do you have the ability to decide the facts in this case based solely on the evidence that comes in within the four walls of this courtroom?

VENIRE PERSON: Yes, Your Honor.

THE COURT: All right. Thank you, sir.

VENIRE PERSON: Juror 28.

THE COURT: Yes, ma'am.

VENIRE PERSON: Okay. I saw the news, but I didn't really see the whole thing last night. I was cooking dinner and I heard it. And I was getting ready to call for jury duty and I'm going, "Oh, I wonder." And that's all. That's all I know about the case.

THE COURT: "I wonder if that's me." I appreciate your service here today. Is that the only news story that you can recall?

VENIRE PERSON: Yes. Yes.

THE COURT: These questions that I've been asking, do you believe that T.V. news coverage is always complete and accurate?

VENIRE PERSON: No, sir.

THE COURT: They cover a lot of territory in a small amount of time, don't they?

VENIRE PERSON: Yeah.

THE COURT: Based on what you recall seeing last night, have you already formed impressions or beliefs about what the true facts are in this case?

VENIRE PERSON: Only that it would be a serious case.

THE COURT: Of course, serious is relative,

but --

VENIRE PERSON: Serious for all parties involved.

THE COURT: Right, exactly. Exactly. Can you represent to the parties that you have the ability to decide this case based solely on the evidence that comes in in this courtroom and not from any other source?

VENIRE PERSON: Yes, sir.

THE COURT: Thank you very much, ma,am.

Kind of covered this earlier. Hard to say exactly how long this case will take. I think that after we complete jury selection, it's four to possibly seven days in length. So there's some possibility we could get the case tried this week, but there's also some possibility that it will last over until Monday or Tuesday of next week.

Starting tomorrow, if you are selected as a juror, our standard hours are going to be 8:30 to 5:00. We'll take at least an hour for lunch, and there will be a morning break and an afternoon break. I don't know what sort of mask fatigue people are going to have, so I will be asking the jurors how that's going, and if they would like to take more frequent or longer breaks so they can get outside and get some fresh air, that sort of thing. That's kind of a play-it-by-ear sort of thing. But this is our general schedule.

Knowing that that's our schedule, and we've already talked about the COVID-related issues, but knowing this is going to be our schedule and how long it's going to last, would jury service in this case pose any true hardship on anyone? Yes, ma'am?

VENIRE PERSON: Juror Number 38. And I have outpatient surgery scheduled for Thursday, August the 5th, this week.

THE COURT: Well, I'm not sure what sort of surgery that is, so let me ask you this question:

Would you rather get your surgery done or would you rather be here?

VENIRE PERSON: Well, I think I better get my surgery done.

THE COURT: I will excuse you, ma'am. Thank you very much for being here today.

VENIRE PERSON: Juror Number 3. Me and my husband both have doctors' appointments scheduled for the 10th, which isn't until next Tuesday. But I don't know if it runs over, and if I am selected, what to do about that.

THE COURT: Well, I mean, the other thing here is, it's a real wild card. Even if we get all of the evidence in, in let's say five days or six days, then there's jury deliberations. And it's hard to know how long that will take. So I certainly can't represent to you that

we will be finished before, did you say it was Tuesday?

VENIRE PERSON: The 10th.

THE COURT: And so if you were selected and you had heard the case all week, I'd kind of sort of hate to lose you at that point. But I also understand that people like fulfilling their civic responsibilities and serving on juries. But I also want you to see your doctor. So what would you rather do? Would you rather us find you a different case that didn't conflict?

VENIRE PERSON: Well, I don't know what to do at this point so -- I wanted to get this done, but getting a doctor's appointment takes two or three months, also.

THE COURT: How about we find you a different one, would that be okay?

VENIRE PERSON: Okay.

THE COURT: If you really want to serve and confront this issue when it comes up, but it may necessitate rescheduling the appointment.

VENIRE PERSON: That's what I'm afraid of.

THE COURT: Would you rather me find you a different jury to serve on?

VENIRE PERSON: That will be fine.

THE COURT: We'll excuse Ms. Juror Number 3.

Anyone else have a true hardship they would like to discuss? Very good. I very much appreciate everyone.

In this next segment, I'm going to be asking you about your prior experience with the courts. I'm going to call this a flash-round because I have some questions after this that I really want to ask you about. So I'm going to have you stand up if you have ever been a plaintiff or a defendant in a civil case and answer the questions that are on the screen, which are, were you a plaintiff or a defendant, when was it, where was it, what type of case, and what happened. Did it settle, or did it go to trial, and if so, who prevailed.

If you have ever been a plaintiff or a defendant in a civil case, please stand up.

VENIRE PERSON: 41. Defendant. Last few years.

THE COURT: Can I interrupt you?

VENIRE PERSON: Sorry.

THE COURT: When I say a civil case, I'm not talking about what Ms. Miller will understand to be equity types of cases. I'm talking about cases in which money damages were at issue. So I'm not talking about divorces or boundary line disputes or anything like that. So I thought I better get that clear. See, we had people sit down already. I'm glad I clarified that. Don't want to get into that.

All right. Ms. Juror Number?

VENIRE PERSON: Number 14.

THE COURT: Yes, ma'am.

VENIRE PERSON: I was, I guess a defendant in a malpractice suit that was settled before it went to trial. And that was here in Ft. Smith. Oh, and when, that would have been 2013.

THE COURT: You said that you were the plaintiff or the defendant? Did you bring --

VENIRE PERSON: We brought the suit. So what was I?

THE COURT: Plaintiff.

VENIRE PERSON: Okay. I was the plaintiff.

THE COURT: Yeah. You were suing a professional, like a doctor or a lawyer or something like that?

VENIRE PERSON: Hospital, yes.

THE COURT: Hospital. There you go. Was there anything about that experience that left a bad taste in your mouth about the justice system that would carry over to your experience as a juror in this case?

VENIRE PERSON: No, Your Honor.

THE COURT: All right. Thank you, ma,am.

Anyone else ever been a plaintiff or a defendant in a suit where money damages was the objective?

VENIRE PERSON: 17.

THE COURT: Yes, ma'am.

VENIRE PERSON: It's been so many years ago, I

had almost forgot about it. Probably 15, 20 years ago, I had a truck accident. Someone rear-ended me in an 18-wheeler. And there was a lawsuit -- never went to court -- in Missouri.

THE COURT: All right. Is there anything about that lawsuit and your experience with that lawsuit that ultimately resolved that left a bad taste in your mouth such that it's still lingering and it would interfere with your ability to be fair and impartial in your case?

VENIRE PERSON: No. Everything turned out fine.

THE COURT: All right. Thank you, ma'am.

VENIRE PERSON: I'm sorry. I didn't remember this until just a second ago. I'm 13.

THE COURT: Yes, ma'am.

VENIRE PERSON: It was several years ago. A lady had taken her dog to the vet and he had been shot. I paid the vet bill. Well, then when she took the guy to court that shot the dog, she got the money for the vet bill. Well, it was being sent to her instead of being sent to me, so I had to take her and get it sent to me.

THE COURT: Like there was a restitution payment?

VENIRE PERSON: Yeah.

THE COURT: And it got sent to the dog owner as opposed to the good samaritan?

VENIRE PERSON: Yes. Yes.

THE COURT: Did you get that sorted out?

VENIRE PERSON: Yes. No good deed goes unpunished.

THE COURT: Exactly. And was that actually a court suit?

VENIRE PERSON: Yeah.

THE COURT: Anything about that experience that left a bad taste in your mouth --

VENIRE PERSON: No.

THE COURT: -- that would interfere with your ability to be fair and impartial here?

VENIRE PERSON: No. No.

THE COURT: All right. Thank you, ma'am.

VENIRE PERSON: Juror Number 30. And I might have misunderstood the question. You said not divorce and not anything else like that. I was involved in a custody battle of children that were not mine in 2002. It was me versus the state, and there was money involved because we were fighting over my parents' money.

THE COURT: And I don't need to know about that. The types of cases that I'm interested in are cases that were tried to a jury, or could have been tried to a jury. And family law cases are not tried to juries. Those are only tried to judges.

VENIRE PERSON: Just wanted to make sure.

THE COURT: I know. I appreciate you saying that. Anyone else?

Next question at the bottom of the screen. I need to know if you have ever been a defendant in a criminal case. I'm not talking about speeding tickets or minor moving violations. But if you have ever been charged with a crime, regardless of whether you were convicted or found not guilty, I need to talk to you about that, okay?

Remember that I explained at the beginning that if you would like to visit with me privately, then we can -- we'll all mask up and we can have a discussion at the bench. If you would like to share it with your 53, or it's dwindling.

VENIRE PERSON: Juror Number 2.

THE COURT: Yes.

VENIRE PERSON: I was charged with DUI.

THE COURT: How long ago was that?

VENIRE PERSON: Ten years ago.

THE COURT: Did that go to trial?

VENIRE PERSON: No.

THE COURT: Did you agree and pay the fine?

VENIRE PERSON: I pled out. Paid the fine, did my stuff.

THE COURT: Was your interaction with the prosecution -- well, let me back up. Was your interaction

with the police in that case, did you find that the law enforcement that was involved to be appropriate and professional?

VENIRE PERSON: Yes, Your Honor.

THE COURT: Anything untoward by the law enforcement officers at all?

VENIRE PERSON: No.

THE COURT: And what about the prosecutor that was assigned to the case? Anything unprofessional on their part?

VENIRE PERSON: Not at all.

THE COURT: Does that experience that you had, is that going to in any way taint or alter your ability to be a fair and impartial juror in this criminal case?

VENIRE PERSON: No, sir.

THE COURT: You can be fair and impartial for both sides, is that right?

VENIRE PERSON: Yes, sir.

THE COURT: Thank you very much, Mr. Juror Number 2.

We're going to work the left half of the courtroom first. If you would please stand.

VENIRE PERSON: 24.

THE COURT: Yes, ma'am.

VENIRE PERSON: Can I talk to you guys private?

THE COURT: Absolutely. Come on up here.
(Bench conference with Juror Number 24)
THE COURT: Ms. Juror Number 24. You see this microphone right here?
VENIRE PERSON: Yeah.
THE COURT: Can you step over here? I want you to talk into this microphone. We're sending white noise out there so no one can hear us, okay?
VENIRE PERSON: They can't hear me? Okay. It was about 2016. It was drug paraphernalia.
THE COURT: Okay.
VENIRE PERSON: I did a no contest, like guilty. No drugs or nothing in the system, but it was my car and I was the only one in there, so I said okay.
It was a good experience. The officer was really nice. It was a sheriff. He even put my hands up front because I had never been in trouble. No trouble in the courtroom. Everybody --
THE COURT: Was this a misdemeanor?
VENIRE PERSON: Yeah.
THE COURT: What city or county?
VENIRE PERSON: Sebastian, Ft. Smith.
THE COURT: And you said that it was a Deputy Sheriff --
VENIRE PERSON: Uh-huh.

THE COURT: -- that pulled you over? Was he polite, courteous, professional?

VENIRE PERSON: Yeah. He was real nice.

THE COURT: All right. Did you take that charge to court and contest it?

VENIRE PERSON: No. I said no contest.

THE COURT: But you went before the Judge?

VENIRE PERSON: Yeah.

THE COURT: And he gave you a sentence?

VENIRE PERSON: I just did -- paid a fine and I had to do NA.

THE COURT: The prosecutor that was involved when you went to court, was he kind, professional, courteous?

VENIRE PERSON: Yeah.

THE COURT: Is there anything about that experience that has left a bad taste in your mouth and you've just been waiting for an opportunity to get on a jury and --

VENIRE PERSON: No. It was real positive.

THE COURT: -- get back at people?

VENIRE PERSON: He was nice and made me comfortable, hands in the front instead of behind me. So it was a good experience.

THE COURT: Anything about that that would limit your ability to be a fair and impartial juror on this

criminal case?

VENIRE PERSON: No. I would want to hear each side and go from there.

THE COURT: Mr. Carter? Mr. Songer?

MR. CARTER: I don't believe I have any questions, Your Honor. Thank you.

THE COURT: Mr. Prater? Mr. Wood?

MR. WOOD: No further.

THE COURT: Thank you, ma'am.

(End of bench conference with Juror 24)

THE COURT: All right. Next?

THE CLERK: She would like to speak to you, Judge.

THE COURT: And this is Ms. Juror Number?

THE CLERK: Juror Number 11.

THE COURT: Number 11, come right up here.

(Bench conference with Juror 11)

THE COURT: Hang on one second. I want you to talk into this microphone, even though you won't be looking at them. Just talk into this microphone.

VENIRE PERSON: I don't know that it would have anything to do with this case, but since you're asking.

THE COURT: Yes, ma'am.

VENIRE PERSON: Eighteen years ago, my ex-husband was prosecuted by the state for molestation charges on my

daughter. And he did go to prison. But that's the only other time I have been involved in any type of court or anything. But we were -- my name and my daughter's name were named as, you know, whenever the prosecutor called us to come talk, you know. Our names were involved because of her being the actual victim.

THE COURT: This was 18 years ago?

VENIRE PERSON: A little over 18 years ago, yeah.

THE COURT: I'm sorry about that.

VENIRE PERSON: Yeah.

THE COURT: I know it's painful to kind of peel back scabs that have hopefully healed, so I apologize.

VENIRE PERSON: Yeah.

THE COURT: My understanding is that to the extent that there was a criminal case, it was your --

VENIRE PERSON: It was my ex-husband.

THE COURT: Now ex-husband?

VENIRE PERSON: Oh, yeah. Oh, yeah. Long time ago ex-husband.

THE COURT: That was the defendant in the case?

VENIRE PERSON: Yes.

THE COURT: And your role would have been as a witness who was brought forward to testify?

VENIRE PERSON: Well, when I realized it, I left with my daughter.

THE COURT: Okay. Your daughter was the victim, and you're the victim's mother?

VENIRE PERSON: Exactly. Right.

THE COURT: And you interacted with the justice system as part -- in that manner?

VENIRE PERSON: Yeah. But that's the only other situation I've ever been in a courtroom to, you know.

THE COURT: All right.

VENIRE PERSON: Criminal or anything.

THE COURT: Did you think -- and was your ex-husband convicted and sent to prison?

VENIRE PERSON: Oh, yes. He went to prison for 10 years.

THE COURT: Did he take that case to trial?

VENIRE PERSON: No, he took a plea deal. He got a plea deal.

THE COURT: Were you present when law enforcement showed up to arrest him?

VENIRE PERSON: Actually, I took him to the police station.

THE COURT: He turned himself in?

VENIRE PERSON: Yeah, pretty much.

THE COURT: You took him there?

VENIRE PERSON: He thought he could talk his way out of it. You know how they can be. Yeah.

THE COURT: Right. Right. The police officers that he dealt with, were you able to see his interaction with them?

VENIRE PERSON: After a couple of weeks, they let me see a tape. Because you go through all these crazy things, you know. But, yeah, they let me see a tape. And I saw that he confessed, you know, to the mildest things that he could confess to, yeah.

THE COURT: Was there anything about the law enforcement officers who interviewed him that you felt was unprofessional or inappropriate?

VENIRE PERSON: No. I think they handled everything very professionally.

THE COURT: And what about the prosecutor in the case? Did they handle the case in a professional manner?

VENIRE PERSON: Yeah. I mean, I wish that he actually got to go to trial, but, you know.

THE COURT: You wished he had gone to trial?

VENIRE PERSON: I wish he had gotten to go to trial, but, you know. You know how plea deals, you know.

THE COURT: Is he still in prison?

VENIRE PERSON: No, no. He only spent 10 years.

THE COURT: Two years?

VENIRE PERSON: Ten years, yes.

THE COURT: Ten years, okay. You wished it would

have been more?

VENIRE PERSON: Oh, yes. But, anyway, it is what it is.

THE COURT: So this a very personal interaction with the criminal justice system.

VENIRE PERSON: Right. That's why I felt I should say something, you know.

THE COURT: I agree. I agree. And thank you for that. This is a completely different context.

VENIRE PERSON: Uh-huh. Exactly.

THE COURT: But it's someone that's accused of a crime.

VENIRE PERSON: Uh-huh. Uh-huh.

THE COURT: They are presumed innocent.

VENIRE PERSON: Right.

THE COURT: And if you are on this jury --

VENIRE PERSON: Uh-huh.

THE COURT: -- it would be up to you and your fellow jurors to decide whether the government has proved their case --

VENIRE PERSON: Uh-huh.

THE COURT: -- beyond a reasonable doubt.

VENIRE PERSON: Right. Right.

THE COURT: My question for you is, you've got this experience that's obviously -- it's been a long time.

VENIRE PERSON: It's been a long time, yeah.

THE COURT: But it's still in your heart. Is there anything about that experience that would prohibit you from being a fair and impartial juror?

VENIRE PERSON: No, because this is nothing like that whatsoever, yeah.

THE COURT: Do you have the ability to make your decisions in this case based solely on the evidence that you hear that comes in in the four walls of this courtroom?

VENIRE PERSON: Yes.

THE COURT: All right. Where was that case prosecuted?

VENIRE PERSON: Crawford County.

THE COURT: Crawford County?

VENIRE PERSON: Judge Cottrell.

THE COURT: Judge Cottrell. I hope he was kind and professional.

VENIRE PERSON: He was very good with what he had to work with. He was.

THE COURT: All right. Government?

MR. CARTER: I'm sorry. I have to ask the question.

VENIRE PERSON: That's okay.

MR. CARTER: But I appreciate this. You have said that the prosecutors and the law enforcement treated

you fairly. Were they fair and impartial -- did law enforcement treat your daughter with kindness and respect as well?

VENIRE PERSON: Yes. She was just four years old, yes.

MR. CARTER: There's nothing about your daughter's experience that gives you a sour taste about the court system or law enforcement?

VENIRE PERSON: No, no, no, no, no.

MR. CARTER: Nothing further, Your Honor.

THE COURT: Mr. Wood? Thank you, ma'am.

VENIRE PERSON: Thank you.

(End of bench conference with Juror 11)

THE CLERK: Your Honor, I have another one that would like to approach.

THE COURT: That's fine. Come on up.

JUROR NUMBER 15: Juror 15. I would like to approach the bench.

THE COURT: Yes. Yes, sir. And why don't we just kind of form a line and we will just stay up there and you can send them up there.

(Bench conference with Juror 15)

THE COURT: You're Juror 15. I need you to speak into this microphone, which is going to the court reporter. She can hear it in her ear, okay?

VENIRE PERSON: Okay. Can I begin?

THE COURT: Yes.

VENIRE PERSON: Okay. I was involved in a truck accident. And at first, I was the plaintiff. And I won that. I was awarded some monetary award. But then I was filed a lawsuit against me by my passenger. And that was settled out of court. So that kind of puts me in a situation where I was both of them. And this happened about 2014, that year.

THE COURT: So were you charged with a traffic offense or --

VENIRE PERSON: No. None of that was filed against me. No ticket or anything.

THE COURT: You were in an accident. The at-fault driver ended up having to pay you money?

VENIRE PERSON: Right, the trucking company.

THE COURT: But then the guest --

VENIRE PERSON: My passenger.

THE COURT: Yes, the passenger sued you?

VENIRE PERSON: Correct. Yes, sir. And that was settled out of court, right.

THE COURT: By your insurance company.

VENIRE PERSON: Yes, sir.

THE COURT: Anything about that that left a bad taste in your mouth such that you couldn't be a fair and

impartial juror in this criminal case?

VENIRE PERSON: No, sir.

THE COURT: Thank you very much, sir.

VENIRE PERSON: I wanted to clarify that.

THE COURT: I appreciate you doing that.

(End of bench conference with Juror 15)

(Bench conference with Juror 45)

THE COURT: 45. Yes, sir. Number 45.

VENIRE PERSON: Yes. Probably five years ago, I had a DWI number two. Before that, I had another one, but I don't remember how long, but it was recent enough where they charged me with number two. Has no bearing on this case. I have no problem with law enforcement. I, in fact, was military police in the Navy for a number of years.

I was also charged in the early 2000s by my wife's ex-husband with terroristic threatening. Disposition of the case was dismissed. It was one of them, "If nothing happens between you guys in the next six months, we'll dismiss it."

THE COURT: You were charged with terroristic threatening?

VENIRE PERSON: Yes.

THE COURT: And the alleged victim was?

VENIRE PERSON: My wife's ex-husband.

THE COURT: Wife's ex-husband?

VENIRE PERSON: Yeah.

THE COURT: How long ago was that?

VENIRE PERSON: It was in the early 2000s. We got married in '01. Probably '02. '02, '03, maybe, somewhere around there.

THE COURT: Let's go back up to the DWIs and we'll work our way back to the terroristic threatening.

DWI two was about five years ago. What city?

VENIRE PERSON: '96.

THE COURT: What city or county did that happen in?

VENIRE PERSON: That happened in Crawford County, in the county, or Alma.

THE COURT: So were you pulled over by a deputy?

VENIRE PERSON: Yes.

THE COURT: County deputy?

VENIRE PERSON: No, by a state trooper.

THE COURT: State trooper?

VENIRE PERSON: Yes.

THE COURT: Was that interaction with the trooper, was there anything unprofessional --

VENIRE PERSON: No, sir.

THE COURT: -- or unreasonable that the trooper did?

VENIRE PERSON: No, sir. He did a good job.

THE COURT: And you pled guilty to that?
VENIRE PERSON: Yes, sir.
THE COURT: Did you go before a Judge?
VENIRE PERSON: Yes, sir.
THE COURT: Did the sentence you get, did you think it was fair?
VENIRE PERSON: No, it was pretty much --
THE COURT: You didn't think it was fair?
VENIRE PERSON: No, it was normal for --
THE COURT: Normal for that?
VENIRE PERSON: -- what the law states, yes.
THE COURT: Any part about that experience that left a bad taste in your mouth that you --
VENIRE PERSON: No. The fact that I got another one, yes. That's on me. Not on law enforcement or the criminal system or anything like that.
THE COURT: Mad at yourself?
VENIRE PERSON: Yes.
THE COURT: But now you're being asked potentially to serve as a -- well, let me save that question. So the most recent DWI was five or six years ago?
VENIRE PERSON: Six years.
THE COURT: Before that, when was the DWI one?
VENIRE PERSON: Had to have been three or four

years before that, I guess.
THE COURT: And where did that take place?
VENIRE PERSON: North of Alma, Collum Lane exit.
THE COURT: Crawford County again?
VENIRE PERSON: Yes.
THE COURT: Trooper or deputy?
VENIRE PERSON: City. Alma City Police.
THE COURT: Were you arrested on the scene and taken to jail?
VENIRE PERSON: Yes.
THE COURT: Were you placed in handcuffs?
VENIRE PERSON: Yes.
THE COURT: Were you placed in the back of a squad car?
VENIRE PERSON: Yes.
THE COURT: In all of those incidents, were you treated rudely or unprofessionally by the law enforcement officer?
VENIRE PERSON: No.
THE COURT: Terroristic threatening. So that was in the early 2000s?
VENIRE PERSON: Yes, sir.
THE COURT: You described that. Did you get into like a fist fight with your wife's ex-husband?
VENIRE PERSON: Word fight.

THE COURT: Word fight. You threatened to do something to him?

VENIRE PERSON: He said.

THE COURT: He said. You denied that?

VENIRE PERSON: I did not.

THE COURT: Did not happen?

VENIRE PERSON: We had words, but it wasn't threatening.

THE COURT: So it was a situation where you were wrongly accused?

VENIRE PERSON: Yes. As a matter of fact, when my attorney mentioned that, that's when the prosecuting attorney and the ex-husband said, let's not pursue this because my attorney, Bill Walters, said, "Okay, after this is done, we'll be back in here because he's wrongly accused." And it got dismissed.

THE COURT: It did get dismissed?

VENIRE PERSON: The Judge put it as, "Okay, if nothing happens between the parties" --

THE COURT: Took it under advisement?

VENIRE PERSON: -- "within the next six months, it will be dismissed."

THE COURT: And it was?

VENIRE PERSON: Yes.

THE COURT: So would you agree that this is a

situation where accusations were brought against you that weren't true. And if you had taken that to trial, perhaps a jury would have had to sort out --

VENIRE PERSON: Sure.

THE COURT: -- what really happened?

VENIRE PERSON: Yes.

THE COURT: Because that's the situation that you are being placed into if you are selected as a juror.

VENIRE PERSON: Right.

THE COURT: You are going to be asked to hear two sides of a story --

VENIRE PERSON: Yes.

THE COURT: -- on three counts, and you are going to have to decide what the true facts are.

VENIRE PERSON: Yes, sir.

THE COURT: Having been through this and having had some interactions with law enforcement, and especially this terroristic threatening charge that was dismissed, can you be fair and impartial to both sides with that life experience?

VENIRE PERSON: Sure.

THE COURT: You can represent to all these attorneys that you can be fair and impartial?

VENIRE PERSON: Sure.

THE COURT: And you would base your decision

solely on the evidence that comes in within the four walls of this courtroom?

VENIRE PERSON: Yes, sir.

THE COURT: DWIs would have been both misdemeanors, is that correct?

VENIRE PERSON: Yes. Before I raised my hand, I said that I will answer any questions that you all had honestly, so I did.

THE COURT: Absolutely. I'm going to fast forward in my slide deck to a question so that you don't have to answer it when we get there, okay.

I have a question coming up about whether anyone has been a member of law enforcement. Did you say a few minutes ago that you were in the military police?

VENIRE PERSON: Yes.

THE COURT: Tell me about that.

VENIRE PERSON: I went to the law enforcement academy in San Antonio, Texas. And served in the Sigonella, Sicily, Naval Air Station from '92 to '96 as a military policeman. I was a patrolman. I was a desk sergeant, a dispatcher, as well as an armour. Ran radar, did DWI stops. Did all the same stuff a normal county sheriff, deputy or whatever would do, except on a naval air station facility, and surrounding areas.

THE COURT: And were you a certified law

enforcement officer?

VENIRE PERSON: Yes.

THE COURT: Was the certification by the military or some state jurisdiction?

VENIRE PERSON: By the military.

THE COURT: Did you receive training before you got your certification?

VENIRE PERSON: Yes. I went through the law enforcement academy in San Antonio, Texas.

THE COURT: Did you receive training in the proper and improper uses of force --

VENIRE PERSON: Yes, sir.

THE COURT: -- when encountering suspects?

VENIRE PERSON: Yes, sir. All elements thereof. Escalation of force from mere presence as a deterrent, all the way to deadly force, everything in between.

THE COURT: Have you ever been accused of using too much force when taking someone into custody?

VENIRE PERSON: No, sir.

THE COURT: Not by anyone?

VENIRE PERSON: No, sir.

THE COURT: Did you carry a gun in your position?

VENIRE PERSON: Yes, sir. Sometimes more than one.

THE COURT: Did you carry handcuffs?

VENIRE PERSON: Yes, I did.

THE COURT: Did you put people in handcuffs?

VENIRE PERSON: Yes, I did.

THE COURT: Did you have the military equivalent of patrol cars where you would put people in the back of the patrol car?

VENIRE PERSON: For sure. Certainly.

THE COURT: Did you ever have anyone create a ruckus in the back of the patrol car?

VENIRE PERSON: All the time.

THE COURT: What would you do when they created a ruckus?

VENIRE PERSON: Tell them to stop. Physically restrain them by the handcuffs if need be. If they kicked and screamed and tried to kick you or kick the door, you sometimes have to put leg restraints on them, or even connect leg restraints to handcuffs.

THE COURT: Have you ever been in a position where you would take people -- I don't know if they call it the brig in the military, the jail or a holding cell or something?

VENIRE PERSON: Yes, sir.

THE COURT: Did you have interaction with that part?

VENIRE PERSON: Yes, sir.

THE COURT: Are you familiar with the protocols for booking in people to the brig and for detaining them in the brig facility?

VENIRE PERSON: Yes, sir. I served as a patrolman. The holding cell, we didn't really have a jail, we had a couple of holding cells similar to what you call a drunk tank, you know. Somebody would stay until they decided maybe they was going to transfer them to the brig or they would be released. Also served in the -- acted as a desk sergeant where you would fingerprint them, process them, in between the receiving and putting them in the cell.

THE COURT: So here's the deal. These two guys represent the government.

VENIRE PERSON: Yes, sir.

THE COURT: They are -- talk over here.

VENIRE PERSON: Okay.

THE COURT: They are going to put on a case with regard to the three counts that I described earlier. And they are going -- they're tasked to prove beyond a reasonable doubt that these guys' client used unreasonable force in the Constitutional sense of that term.

VENIRE PERSON: Unreasonable as in --

THE COURT: Pardon?

VENIRE PERSON: Unreasonable as in more than a

reasonable person would think is correct?

THE COURT: You'll get more instructions --

VENIRE PERSON: Yes, sir.

THE COURT: -- as to the standard of the Constitution that applies. But it's a knowing and intentional violation alleged of Constitutional rights based on the use of an unreasonable amount of force.

VENIRE PERSON: Okay.

THE COURT: You've been in that very same situation.

VENIRE PERSON: I've been on both sides of it.

THE COURT: You have. You have. But on the side we're talking about now --

VENIRE PERSON: Yes, sir.

THE COURT: -- you've been in their client's position.

VENIRE PERSON: Yes, I have. As far as having to administer force and escalate, depending on the situation, yes.

THE COURT: Here's my question for you. Well, first, I have two. Do you think you can be fair and impartial to these guys', the defense side of this case?

VENIRE PERSON: Sure.

THE COURT: What about to their side, the prosecution side?

VENIRE PERSON: Yes.

THE COURT: Here's my real question. If you're selected on this jury, and you've heard all the evidence, you will be sent back to deliberate with your fellow jurors.

VENIRE PERSON: Yes, sir.

THE COURT: Would you have a tendency to want to interject into those discussions how things really work, or how you would have done it, or your knowledge of what is reasonable and what is not?

VENIRE PERSON: Possibly. Pretty much things are a little bit different in the military because there's no Constitution. There's a Uniform Code of Military Justice, which is different. When you sign to go serve your country, you lose that part. You go under these rules now.

THE COURT: I understand. Government have any questions?

MR. CARTER: I think you covered everything, Your Honor.

THE COURT: Mr. Wood?

MR. WOOD: No questions.

THE COURT: Sir, you may be excused. I mean, go sit down.

VENIRE PERSON: Thank you.

MR. CARTER: Excused from here.

THE COURT: Yeah.

(End of bench conference with Juror 45)

THE COURT: Are there any challenges for cause?

MR. CARTER: I would ask he be struck for cause, Your Honor.

THE COURT: What's the defense's position?

MR. WOOD: We would oppose that position. He said that he could be fair and impartial. He hasn't indicated anything that he would assert that he would not be a fair and impartial juror.

MR. CARTER: Your Honor, the record the United States would make is he seemed to indicate that he would use more than just the information presented and the evidence presented from the witness stand. He may perhaps use his own knowledge and experiences and share those with the jury, said it would be hard for him.

Because of that, we would ask that he be struck for cause as not being able to deliberate in true faith.

THE COURT: Mr. Wood is correct. He did make the statements that he could be fair and impartial. I get the sense that he would like to fulfill his civic responsibility and be on this jury. But the Court harbors a tremendous amount of concern that he would not be able to keep from interjecting the way that he did things. He told me as much when I asked him directly. And I'm concerned

that that tendency would taint the rest of the jury panel if that happened.

We've got plenty of other jurors available and I think that in the interest of fairness and justice, that the Court is going to grant the government's challenge for cause and excuse Juror Number 45. Sheri, pull him from the wheel.

Mr. 58?

(Bench conference with Juror 58)

THE COURT: Yes, sir. I need you to talk into this microphone. The only person that can hear it is my court reporter over there.

VENIRE PERSON: Oh, sure. It's not an insanely personal thing. I just didn't think it was appropriate to say in front of everyone else.

Back in 2009, I had gotten a littering ticket in Fayetteville, Arkansas. And I moved in the next week. I forgot to pay it. So about eight months goes by. It was $80. I was traveling through Springdale on a Moped, and I got pulled over about 10:30 by the Springdale Police officer. And they told me about the ticket, got me to come to the back of the bike, and slammed me on the ground. Then they took me to the police station. I sat there for maybe 10 minutes, got it resolved in that amount of time, around 10, 11 miles away. They had me leave all my

personal belongings in the Moped, so I didn't have a way back. So they made me walk 10 miles back. They laughed at me. It was very unprofessional. So when you were talking about that earlier, it was -- I'm kind of sensitive to matters like that. And I don't know any details about this case, but --

THE COURT: And where did this happen again?

VENIRE PERSON: In Springdale.

THE COURT: In Springdale?

VENIRE PERSON: Ticket was out of Fayetteville. They arrested me.

THE COURT: There was a warrant out for you?

VENIRE PERSON: I think so, yeah.

THE COURT: For littering?

VENIRE PERSON: For not paying the ticket. It was $80. They had me take care of it then, that night. And I was literally only there for like 10 minutes.

THE COURT: And they impounded the Moped, though, and so you had to --

VENIRE PERSON: No, they left it on the side of the road.

THE COURT: Oh, I see. They took you to the jail?

VENIRE PERSON: They took me.

THE COURT: And you had no way to get back to the

Moped?

VENIRE PERSON: No way to get back. It was -- up until that point, all of my interactions with police -- I've never been in trouble for anything, and all my interactions with police officers were great. But after that, it's been -- I don't know how fair I could be. I'd still love to serve on something, on a jury. I'm not asking to be excused if you don't think it's proper, but I don't know about this one.

THE COURT: You're thinking that this, you've just kind of been looking for an opportunity to sit in judgment of police, and this may be your opportunity?

VENIRE PERSON: Well, not looking for an opportunity. Just I'm hoping it doesn't --

THE COURT: I'm being a little facetious in saying that. But that's kind of where you're coming from?

VENIRE PERSON: Whenever the charge was brought up on the screen earlier, I instantly got a little fiery about it. I've been pretty passionate about it for a while now. And I didn't even really think about it until maybe 20, 30 minutes later, once you started asking all the questions. I honestly don't know whether or not -- the whole situation was a bit more aggressive than I'm even able to let on. So I don't know.

THE COURT: All right. Any questions?

MR. WOOD: No questions.

THE COURT: You can go back and have a seat.

(End of bench conference with Juror 58)

THE COURT: Any challenges for cause?

MR. WOOD: Your Honor, we would ask that he be struck for cause.

MR. CARTER: We're not going to oppose it, so you don't have to make much of a record here.

THE COURT: Juror Number 58 will be stricken for cause. I will ask the Court clerk to pull his name from the wheel. Is that it?

(bench conferences concluded)

THE COURT: And we may have one more person, but not privately necessarily.

VENIRE PERSON: Number 60.

THE COURT: Yes, sir.

VENIRE PERSON: It says ever. I don't know how long you want to go back. It was '86. Went in front of a Judge, but they was supposed to have got rid of it. I don't know if that counts, if you want to talk about that.

THE COURT: 1980?

VENIRE PERSON: Six.

THE COURT: 1986?

VENIRE PERSON: Yes, sir.

THE COURT: Were you charged with a crime?

VENIRE PERSON: Yes, sir.

THE COURT: What was the crime?

VENIRE PERSON: Criminal mischief, destruction of private property, DUI, fleeing an officer, failure to maintain control, destruction of private property.

THE COURT: And did you take that case to a trial?

VENIRE PERSON: No, just saw a Judge.

THE COURT: Did you try it to a Judge?

VENIRE PERSON: I'm not sure what, really. They said they was going to get rid of it if I went in the service.

THE COURT: Is that what you did?

VENIRE PERSON: I did.

THE COURT: So that matter would not be on your record today?

VENIRE PERSON: I hope not. You said ever, so --

THE COURT: To your understanding?

VENIRE PERSON: Yes, sir.

THE COURT: No, I did say ever. Now when you were arrested in this incident, how were you treated by the law enforcement officers? Were they professional?

VENIRE PERSON: Yes, sir.

THE COURT: Any complaints about that?

VENIRE PERSON: Just going to jail, didn't like

that part. But they were very professional.

THE COURT: Right. Okay.

VENIRE PERSON: Doing their jobs.

THE COURT: And when you went to court, there was probably a prosecutor in the courtroom. Did the prosecutor treat you with respect?

VENIRE PERSON: Yes, sir.

THE COURT: No one ever likes being called before a Judge or a Court under that scenario, but did you have any complaints in how you were treated in this instance?

VENIRE PERSON: No.

THE COURT: And then you went into the service?

VENIRE PERSON: Yes, sir.

THE COURT: What branch were you in?

VENIRE PERSON: U.S. Navy.

THE COURT: Thank you for your service.

VENIRE PERSON: Thank you.

THE COURT: Is there anything about that experience -- and I thank you for sharing it -- that you think would cause you to favor one side or the other in this case before you have heard any of the actual evidence?

VENIRE PERSON: No.

THE COURT: You can be a fair and impartial juror on both sides?

VENIRE PERSON: I believe so.

THE COURT: Thank you very much, Mr. Juror Number 60.

Anyone else? I think we better take a break. I don't have very much more to go, but we need to take a break. I do need to advise you that while we're on this break, you may not speak with any of your new best 50 friends now from jury service about this case or about any of the things that I have told you about this case. And we have a good example that we heard about earlier. This newspaper employee inadvertently started conversing with a juror. And nothing happened. I mean, he didn't learn anything more than what the Judge was planning on saying anyway, but the more you talk to other people about the facts, that starts solidifying what the facts are in your mind. And you, as jurors, and in this case potential jurors, are obligated to keep an open mind until you hear all of the evidence.

So while we're on this recess, you can talk to people about the Razorbacks. You can talk to people about the weather. You can talk about where they are from and if they have kids, but you can't talk about anything having to do with this case.

I would propose to do this. And if ya'll don't want to do this, then I need you to let me know. But I would propose that we take a 20-minute break and come back

about 10 minutes before 1:00. I have about 20 minutes more to go. I suspect that each of the sides may have that much to go, so there could be another hour of questioning. And then we will see where we are at that point and would likely either break for lunch so that our jurors or people who are not selected for our jury could then go on home is what I'm trying to accomplish here. But a lot of people have, you know, hypoglycemia or whatever where they have to get food at lunch. And if you have an issue where you need to take a lunch break now, we can do that. You're serving us today, so we want to do what you want to do. I'm just trying to minimize the inconvenience for those that won't ultimately be on our jury.

So my game plan is 20-minute break now, come back for another hour, see if we can get our jury picked. If we can, then we let those who aren't on our jury go home. All in favor of that plan, wave at me. Anyone that would say, "I'm not in favor of that plan, Judge, I need to get something to eat?" All right. We'll go with option one. I'll see you back here in 20 minutes.

(Venire panel leaves courtroom)

(Recess taken from 12:29 p.m. to 12:58 p.m.)

(Venire panel enters courtroom)

THE COURT: Another flash-round. I'm going to have you stand up if you meet the following criteria. And

then I'll go from my left to my right and have you answer the questions that are highlighted in pink.

The criteria is whether you have ever previously served on a jury. Have you ever previously served on a jury? Would you please stand up? Some people get called for jury duty. My question is, have you ever gone through this part of voir dire and been selected as a juror.

And we'll start with Mr. Juror Number 21. The questions are: Was it a civil or criminal case? Approximately what year? Where was it; Arkansas, Delaware? Where was it? What type of claim or crime? What was the verdict? Which side was it in favor of? And importantly, were you the jury foreperson?

This is Mr. 21.

VENIRE PERSON: I served on a civil case and a criminal case. I don't remember what year it was, been some time ago. My jury duty that I have served has been in Oklahoma. I've never served in the State of Arkansas.

The nature of the claim or crime were disputes between boundary lines on one, and the criminal charge was murder. And the verdict in favor of the defendant in the civil crime. In the criminal case was life in prison without parole. And I was not the foreperson.

THE COURT: How long ago did you serve on that murder trial as a juror?

VENIRE PERSON: I'm going to say that was probably back in about 1999 or so.

THE COURT: And what city or county in Oklahoma was that?

VENIRE PERSON: Le Flore County.

THE COURT: Do the courts in Le Flore County require in a criminal case that all 12 people on the jury be unanimous?

VENIRE PERSON: Yes, sir.

THE COURT: And were all 12 people in your case unanimous?

VENIRE PERSON: Yes, sir.

THE COURT: You think it's important that everyone be unanimous?

VENIRE PERSON: Yes, sir.

THE COURT: Good, because that's the same rule we have here. I'll get to that in a minute.

Anything about your service as a juror in these other two cases that left a bad taste in your mouth or you didn't think something was right or you didn't like how the Court staff treated you, or just something that would make you tend to be reluctant to want to, once again, do your civic duty on this trial?

VENIRE PERSON: No, sir.

THE COURT: All right, sir. You think you can be

fair and impartial to both sides here?

VENIRE PERSON: Yes, sir.

THE COURT: Let's go over to Ms. Juror Number 24. Tell us about your prior jury experience by answering these questions on the screen.

VENIRE PERSON: 24. It was a civil case. It was about 2015 here in Ft. Smith, so Sebastian County, Arkansas. It was like a guy on a motorcycle settlement, and he wanted more money on top of that. But we favored the plaintiff, denied his claim. And I was not the foreperson.

THE COURT: So the person that was injured and suing for money, did you vote for them or against them?

VENIRE PERSON: We voted against because he had already received a settlement. He was wanting more on top of that, so --

THE COURT: He had recovered from the people that caused the accident, then he was suing his own insurance company for more money?

VENIRE PERSON: For more money, yeah.

THE COURT: I hate it when people do that.

VENIRE PERSON: I was like, that's a little greedy. But, yeah.

THE COURT: Anything about that experience -- were you the foreperson?

VENIRE PERSON: No.

THE COURT: Anything about that experience that was unpleasant that would affect your ability to serve here?

VENIRE PERSON: No. No, sir.

THE COURT: Thank you very much, ma,am.

VENIRE PERSON: Thank you.

THE COURT: Mr. 35?

VENIRE PERSON: 35. I was on a civil case in Greenwood, Arkansas. I think it was 2007 or 2008. It was a dispute over a house. A lady had purchased a home, and the previous owner had failed to disclose that it had previously been infested with termites. So she was trying to sue for damages to get about half the cost of the home. And we found in favor of the plaintiff. We were pretty much instructed by the Judge that there was definitely concealment, so we got to pick how much money she was awarded.

THE COURT: So the Judge decided liability and you were there to decide damages?

VENIRE PERSON: Pretty much, yes. And I was not the foreperson on the jury.

THE COURT: Anything about that experience that would affect your ability to be a good, fair, and impartial juror in this case?

VENIRE PERSON: I don't think so, no.

THE COURT: Would you hand the microphone behind you?

VENIRE PERSON: I was probably -- this is number 45. It was a civil case in the early 2000s in Crawford County in Van Buren. I don't remember the exact nature of the claim. I'm sure it was some sort of settlement. We never actually went out into the box. We were back waiting and then were informed that they settled, and we never had to go to the juror's box. So I don't know if that counts.

THE COURT: Okay. All right. Well, it was close. It was close.

VENIRE PERSON: I was a juror. Just didn't go there.

THE COURT: That's right. Thank you, sir. Would you pass the microphone across the aisleway there.

VENIRE PERSON: Number 56.

THE COURT: Yes, ma'am.

VENIRE PERSON: I served on a criminal case approximately 1990 in Johnson County. It was a murder case. The verdict was guilty. And I was the jury foreperson.

THE COURT: You were the foreperson?

VENIRE PERSON: I was.

THE COURT: All right. Did your Judge in Johnson County instruct you that the Jury had to be unanimous in their verdict?

VENIRE PERSON: Yes, Your Honor.

THE COURT: Do you recall the extent to which the government had to prove its case?

VENIRE PERSON: Honestly, no. It's been too long ago.

THE COURT: Does the term "beyond a reasonable doubt" ring a bell?

VENIRE PERSON: Absolutely. Of course, yes.

THE COURT: And what approach did you take as the foreperson on getting folks to talk and discuss and deliberate upon the evidence?

VENIRE PERSON: I don't know how much I can elaborate being it was so long ago, but that's exactly -- when we came into the jury box after we listened to everything, the trial, each person, we went around the jury room to get everyone's feel for what they were thinking. It was pretty much unanimous all along. It was a pretty solid case as far as evidence beyond a reasonable doubt. Unbeknownst to the Jury at the time, we learned later, after a guilty verdict, that the Judge advised us that the person, the accused, was a felon already. And so he attached additional years to the sentence because he had a

firearm and was a felon.

THE COURT: Did you make a sentencing recommendation to the Judge in that case?

VENIRE PERSON: I believe we did. And I believe that the Judge decided the sentencing upon his own.

THE COURT: In that case, for example, hypothetically, if there were three things called "elements" that the state in that murder case had to prove --

VENIRE PERSON: Right.

THE COURT: -- and their evidence on the first two were overwhelming, but pretty weak on the third, and, in fact, there was some evidence, but you didn't think that they had proved it beyond a reasonable doubt, as the foreperson, what sort of discussion would you be having with your fellow jurors?

VENIRE PERSON: I don't recall that we had to have that discussion. As I said, it was very well proven. The evidence was very good. As a jury foreperson, I just -- if everyone hadn't already been in agreement pretty much throughout the whole thing, I would have encouraged them to speak more about why they felt -- to discuss with the Jury the evidence that they did or didn't see, why it was different from the other jurors so that we could share. I felt like, again, it was very important that everything be

based on evidence and not what we thought or what we felt.

THE COURT: Well, so in this case, if the government proves two elements strongly, in your opinion, when you deliberate --

VENIRE PERSON: Right.

THE COURT: -- but the third element is kind of weaker, would you have any hesitancy to follow the Court's instructions that the government has to prove each element beyond a reasonable doubt?

VENIRE PERSON: No, I don't think so. I wouldn't have a problem following the rules.

THE COURT: All right. Anything about your service on that prior Jury that would adversely affect your ability to be a fair and impartial juror in this case?

VENIRE PERSON: No. In all honesty, I think it helps you understand how fair your process needs to be. How you need to understand what your instructions are and follow those instructions to the tee.

THE COURT: Yes, ma'am. I totally agree with that. Thank you for saying that.

VENIRE PERSON: Certainly. I also served on a Federal Grand Jury here in the Western District before, but, again, it's been many, many years ago.

THE COURT: So you understand how that process works?

VENIRE PERSON: Yes, sir.

THE COURT: And you understand that in that process, your mission was not to determine whether someone was guilty or not guilty, right?

VENIRE PERSON: That is correct, yes, sir.

THE COURT: As a Grand Juror, you're simply determining whether there is probable cause to believe that a crime has been committed?

VENIRE PERSON: Yes, sir. Yes, sir.

THE COURT: Big difference, right?

VENIRE PERSON: Absolutely.

THE COURT: After the Grand Jury has returned their vote, it's simply still an accusation, right?

VENIRE PERSON: Yes, sir.

THE COURT: Thank you, ma'am.

VENIRE PERSON: Thank you.

VENIRE PERSON: Number 36.

THE COURT: Yes, sir.

VENIRE PERSON: I did serve on a jury for a civil case. It was either like 1988 or 1989, one of those two. It was right here in Sebastian County, Arkansas. It was a case involving a business owner, I think, that was not doing what they were supposed to do with the customer and the customer filed a suit against them. The Jury, we did find in favor of the plaintiff on that, so the defendant

had to pay what he was supposed to.

THE COURT: All right, sir. Anything about that experience that would impair your ability to be a fair and impartial juror in this case?

VENIRE PERSON: No, sir.

THE COURT: Thank you very much.

VENIRE PERSON: Thank you.

THE COURT: If you will hand the microphone next door there.

VENIRE PERSON: Number 37.

THE COURT: Yes, sir.

VENIRE PERSON: Served on a Jury approximately 20 years ago. It was across the street over there. There were three cases. One was a criminal case, which I served as the jury foreman. It had to do with domestic battery, child endangerment, and rape. And we found in favor of the plaintiff on that.

THE COURT: The plaintiff being the state?

VENIRE PERSON: The -- it was a woman.

THE COURT: The prosecutor?

VENIRE PERSON: Found in favor of the prosecutor, yes.

THE COURT: They proved their case against a person charged with a crime?

VENIRE PERSON: Yes. And the second one was

theft by receiving. I'm not sure if it was civil or criminal. We found the person that was charged with theft by receiving guilty, I guess, the defendant.

THE COURT: Were you the foreperson in that case?

VENIRE PERSON: No. And then the civil case was like a -- had to do with a car dealership, and the person that bought the car from the car dealership was complaining that he had a prior deal with him. And anyway, we found in favor of the car dealership, so I guess that was the defendant. We found for the defendant.

THE COURT: So you've served on both a civil case and a criminal case. Do you recall the differing burden of proof that the plaintiff has to show?

VENIRE PERSON: No.

THE COURT: Do you recall --

VENIRE PERSON: Beyond a reasonable doubt?

THE COURT: Right, in the criminal case. But in the civil case, did your Judge instruct you that it was a mere preponderance of the evidence that the plaintiff had to prove?

VENIRE PERSON: That sounds -- I'm recalling that, him explaining to us exactly what -- before we went in and beforehand, what all we had to know and what the law said.

THE COURT: And so is it your understanding that

the burden in a criminal case is a much greater burden of proof?

VENIRE PERSON: Yes.

THE COURT: Do you have any problem with that?

VENIRE PERSON: No, sir.

THE COURT: Considering what's at stake, do you think that's right?

VENIRE PERSON: Yes, sir.

THE COURT: And thank you for your prior Jury service, by the way. Sounds like you have done this a lot.

VENIRE PERSON: Yeah.

THE COURT: Did you take any particular approach or have a particular style as the foreperson?

VENIRE PERSON: I just made sure we went over everything that was presented and let's look at the evidence clearly and anything that -- if anybody had any unclear things, let's discuss it thoroughly, just to get everything clear in everyone's head. Try to keep it all organized, and let's look at the evidence presented, let's look at the testimony, and go from that. Let's not try to make conjectures or anything, but stay with what we have seen and heard.

THE COURT: And what about the Court's instructions on the law?

VENIRE PERSON: Yes, the Court's instructions,

exactly. Here's what you can rule or whatever. Yes, that was explained thoroughly. We made sure we had that in front of us.

THE COURT: Anything about those experiences that you think would impair your ability to be a fair and impartial juror in this case?

VENIRE PERSON: No, sir.

THE COURT: Thank you very much, again, for today and for your prior service.

VENIRE PERSON: You're welcome.

THE COURT: Yes, ma'am.

VENIRE PERSON: Juror 28.

THE COURT: Yes, ma'am.

VENIRE PERSON: It was a criminal case. And it was around 1990. It was here in Ft. Smith. It was a home invasion. And the verdict, found the intruder guilty. And I was not the foreperson.

THE COURT: Anything about your service in that case that would interfere with your ability to be a fair and impartial juror in this case?

VENIRE PERSON: No, sir.

THE COURT: Thank you very much, ma,am.

VENIRE PERSON: Yes, Your Honor. Juror Number 19. My cases are criminal. I've been serving since 2017 in Little Rock, Pulaski County. The nature of the

crimes that I see involve nurses. I serve as a governor-appointed on the Arkansas State Board of Nursing. We meet every month other than August or December. And what's before us, we have our own general counsel. The nurse that's charged with a crime can bring counsel or he or she may represent herself. And each month, when we meet, two days out of the week, there's several -- I mean, two days per month -- there's several cases. There's evidence and testimony from the nurse, or she can bring witnesses as well. So basically our duty on the State Board of Nursing is to decide if that nurse is guilty or innocent. So it does not have to be unanimous, and I am not the foreperson.

THE COURT: How many people are on the State Nursing Board licensure committee?

VENIRE PERSON: There's 12, plus the president is 13.

THE COURT: How many people have to show up to have a quorum?

VENIRE PERSON: Seven.

THE COURT: And then is it a majority vote?

VENIRE PERSON: It is.

THE COURT: And do you determine the disciplinary consequences?

VENIRE PERSON: We do.

THE COURT: And if you find that an infraction has been established, do you impose the consequences? Do you determine what the consequences are?

VENIRE PERSON: We do.

THE COURT: And that would affect their licensing, right?

VENIRE PERSON: Correct.

THE COURT: And so that is similar to jury service in court in that you're sitting as a fact-finder, right?

VENIRE PERSON: Yes.

THE COURT: But there's some differences as well, right?

VENIRE PERSON: Correct.

THE COURT: That is a civil administrative board charged with monitoring the practice of nursing and compliance with nursing laws and regulations?

VENIRE PERSON: Correct.

THE COURT: And if a person is a bad nurse or violates rules, they can lose their license or get it suspended, right?

VENIRE PERSON: Yes, sir.

THE COURT: In this criminal case, the consequences involve one's liberty; criminal punishment, right?

VENIRE PERSON: Correct.

THE COURT: And so do you understand that that's why the standard is as high as it is, proof beyond a reasonable doubt, as to each element?

VENIRE PERSON: I do.

THE COURT: Since you kind of have served for a number of years in this administrative adjudicatory body, would you think that you would have any problem transitioning to being a juror where what you were being asked to do and the standards by which you had to make your findings were different?

VENIRE PERSON: I wouldn't have any problem.

THE COURT: Do you think that you could follow all of the Court's instructions as to the various standards of proof and enforce those as a juror?

VENIRE PERSON: Yes, sir.

THE COURT: Thank you very much for serving our state in that capacity.

VENIRE PERSON: You're welcome.

THE COURT: Next, a little bit of law school. And I've tried to cover most of these points by illustrating them with actual jurors from former cases that you have just heard about. But there are three bedrock principles embedded in our Constitution in the way that we pursue our criminal justice system. And these are held

inviolate. And if you can't agree that this is what the law requires, then you're not qualified to be a juror in this case and it's important that you let me know this, okay?

So we're talking about the presumption of innocence, the government's burden of proof, and a defendant's Fifth Amendment rights.

First of all, the presumption of innocence. All suspicion must be set aside. Just because someone is accused of a crime, that's no evidence that a crime has been committed. The government will have met its burden of proof only if it proves in this case that the charges, or any one of them brought against Mr. Boen, have been established beyond a reasonable doubt.

This is not like the civil case that we have heard some of the jurors say they were on. This is not like the administrative case. It's a criminal case. The burden is beyond a reasonable doubt. And the reason for that is, a criminal defendant goes into a case with the complete presumption of innocence. And that presumption continues all the way through the trial into the jury room and until such time as the jurors in a case might find that the government had met its burden. The presumption of innocence alone is sufficient for a finding of not guilty unless the government has proved its case. Bedrock

principle. Does anybody have a problem with that?

Second bedrock principle is this notion of beyond a reasonable doubt and what that means. Reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act in life's most important decisions. Reasonable doubt, something that would make one hesitate to act in life's most important decisions.

Constitutional right not to testify. I have no idea in this case if Mr. Boen will testify, but I can tell you this. Mr. Boen is not -- because of the presumption of innocence, doesn't have to put on any evidence. It's the government's burden. But my concern and what I want to be sure that you all understand is, every criminal defendant has a right not to testify. It's the defendant's choice. That's a Constitutional right. And you can't hold it against someone for not testifying as a defendant if you're on the Jury. Because if we say that it's one's Fifth Amendment right, but we go back to the jury room and say, "Hey, he didn't testify, so here's what I think about that," what kind of right is the Fifth Amendment?

Anyone have a problem with that? Again, the defendant doesn't have to put on any evidence, so I don't know if he will testify or not. But is there anyone who thinks that they would be more inclined to find for the government just because the defendant exercised a

Constitutional right? Thank you. That's a bedrock principle in our system.

Quickly, some ground rules. As I've alluded to earlier, you are the fact-finders, but you must apply the law that I will give you, even if you disagree with it and even if you think the law is or should be something different.

Secondly, you may only use the facts introduced inside the walls, the four walls, of this courtroom. We've explained that already. You can't use facts from the outside. So you can't go home at night and do internet research about the case or anybody involved with the case or any of the witnesses or the parties or the lawyers. As my wife and I sit at home at night and discuss various things from what band and what year a song came out, I have come to both love and resent Google. Because these answers to these important questions are at our fingertips, and unfortunately, she's right more often than I am. So you can find anything on Google, but not if you're a juror in this case. You can't do your own outside research. You can't look it up on Wikipedia. You can't phone a friend if you know a lawyer or if you know somebody that lives in Franklin County. You can't talk to anybody about the case.

Do we have any self-professed Google-holics that would not be able to restrain themselves from doing outside

research if you become a juror in this case? Thank you. I'm going to hold you to that.

You can't communicate with the outside world once you're a juror. In fact, you can't talk to your fellow jurors about the case until it's time to deliberate. You can't send e-mails. You can't Tweet. You can't Snapchat. You certainly can't post on social media. There have actually been cases where -- and this has been a while ago now -- where there was a jury trial in Washington County and somebody was live-Tweeting from the jury room. I mean, it kind of defies common sense, but you can't communicate with the outside world. Point made.

Next, I need to talk to you about a few issues where you may have points of intersection with some issues in this case. The first is your experience with law enforcement.

Do you presently or in the past or have a close family member who works or used to work as a law enforcement officer? Would you please stand?

We're going to work the left side first and identify your juror number and tell me about that. And as part of your explanation, I'd like for you to let me know whether you or your family member, to your knowledge, who is a law enforcement officer has ever been accused of using excessive force in the course of their work as a law

enforcement officer.

VENIRE PERSON: Okay. I'm Juror Number 4. And my cousin, but he lives in Chicago, is an officer. And, no, he's never been in any kind of trouble.

THE COURT: And the point is beyond whether somebody has been in trouble, because an accusation is just an accusation until it's been proved. To your knowledge, has your cousin ever been accused of using unreasonable force on a citizen?

VENIRE PERSON: No.

THE COURT: All right. Anything about the fact that you have a cousin that's in law enforcement that would cause you not to be able to be a fair and impartial juror in this case that involves a law enforcement officer accused of using unreasonable force?

VENIRE PERSON: No.

THE COURT: You think you can be fair and impartial to both sides?

VENIRE PERSON: (nods affirmatively.)

THE COURT: Mr. Juror Number 5?

VENIRE PERSON: Number 5. My son was part of security forces for the Air Force for a couple of years. And, no, he's never been accused of, or wasn't accused of excessive force.

THE COURT: All right. What was his specific job

duties? Did he -- anything comparable to being a patrol officer or a jailer or --

VENIRE PERSON: He worked the gate, security at the gates, and went out on patrol when required to do so.

THE COURT: All right. Anything about the fact that your son is a security force service member that would affect your ability to be equally fair and impartial for the government as you're fair and impartial for the defendant?

VENIRE PERSON: No, sir.

THE COURT: Thank you. If you would hand the microphone back, please.

VENIRE PERSON: Juror Number 15. A police officer in the City of Mena, Arkansas, is married to my niece, Jessica. And to my knowledge, he has never been accused of excessive force.

THE COURT: Your niece, Jessica, is married to --

VENIRE PERSON: A police officer in the City of Mena.

THE COURT: In Mena. Okay. How often do you hang out with your niece's husband who is a law enforcement officer?

VENIRE PERSON: At least once a month, we will have a social gathering.

THE COURT: In the course of those gatherings,

does he ever tell war stories about being a police officer?

VENIRE PERSON: No, sir.

THE COURT: All right. Does the fact that your niece's husband is a law enforcement officer, is that in any way going to hinder your ability to be fair and impartial for the government's side of this case in the same way that you could be fair and impartial for the defense?

VENIRE PERSON: No, it will not have any affect on my decision.

THE COURT: Thank you, sir. You can hand the microphone back.

VENIRE PERSON: Juror Number 25. I'm currently a reserve deputy with Sebastian County Sheriff's Department. And I've never been accused of excessive force.

THE COURT: Are you a certified law enforcement officer?

VENIRE PERSON: Part-time, as a reserve.

THE COURT: Do you hold a certification from the academy?

VENIRE PERSON: No, sir.

THE COURT: Have you received training?

VENIRE PERSON: Yes, sir.

THE COURT: Do you carry a firearm?

VENIRE PERSON: When on duty.

THE COURT: Have you been trained in the use of force when encountering suspects or making arrests?

VENIRE PERSON: Yes, sir.

THE COURT: Do you ever ride in a patrol car?

VENIRE PERSON: Yes, sir.

THE COURT: Do you drive a patrol car?

VENIRE PERSON: Occasionally.

THE COURT: The Court is going to instruct you on the Constitutional standard for what constitutes an unreasonable use of force when dealing with pretrial detainees.

Do you think that if you are on this Jury, you are going to be able to set aside what you may have seen or the rules as you understand them and follow the Court's instructions as to what the law is, the federal law is, the Constitutional law is, as to reasonable versus unreasonable force in this case?

VENIRE PERSON: Absolutely.

THE COURT: Do you think that you would have any tendency, given your experience as a reserve officer, to side with the defense side of this case before you've heard any evidence?

VENIRE PERSON: Not at all.

THE COURT: So are you telling me that if this were a -- this is the Olympic season. I've been watching

some track and field, so I'm going to draw an analogy from there.

Sometimes in the sprints, they have staggered starts, but in the longer distance, they all start on the -- or I may have that backwards. Sometimes they all start on the same line, and that's important to my analogy here. If you're a juror on this case, based on what you know right now, and based on your life experiences, are both parties equal on the starting line, or is the government a few steps behind and they have some ground to make up in your mind?

VENIRE PERSON: The government obviously has the burden of proof. I don't know if that puts them behind or not. I guess that's a matter of opinion.

THE COURT: Well, I trust that you can affirm that you have the ability to follow the Court's instructions, is that right?

VENIRE PERSON: Yes, sir.

THE COURT: And as you have determined what the facts are, to apply the Court's instructions on the law to the facts, correct?

VENIRE PERSON: Yes, sir.

THE COURT: But before you have heard anything else, what I'm trying to understand is your predisposition based on your life experiences.

Here's one more analogy. This involves, this analogy involves eyeglasses. And what we're looking for are jurors who can look at the disputed facts in this case with perfectly clear lenses in their eyeglasses so they can see and discern through their collective wisdom what the facts are. If a juror, because of a prior life experience -- and we can't expect you to set that aside -- but if a juror has a prior life experience that can't be set aside, that's like a little opaque tint in the eyeglasses, and you may not see the facts as clearly if you hadn't had this prior life experience in your background.

And so what I'm getting at is not necessarily whether you can or will follow the Court's instructions. I take that as a given, you've told me that. What I want to know is, can you truly separate your prior life experience as a reserve officer who has ridden in a patrol car, arrested people, et cetera, or assisted in the arrest of people, can you set that all aside and judge this case with perfectly clear lenses in your eyeglasses?

VENIRE PERSON: Yes, sir.

THE COURT: And you'll represent to the government that your prior experience and life experience is something that, in setting it aside, that you can be a fair and impartial juror for them?

VENIRE PERSON: Yes, Your Honor.

THE COURT: It's just that you are going to hold them to the burden of proof?

VENIRE PERSON: That's correct.

THE COURT: Thank you so much, sir. If you would pass the microphone.

VENIRE PERSON: Number 23.

THE COURT: Yes, ma'am.

VENIRE PERSON: My husband is a current Sebastian County Deputy.

THE COURT: How long has he held that position?

VENIRE PERSON: 19 years.

THE COURT: Lots of different jobs in the Sheriff's Office. What is his current job?

VENIRE PERSON: Currently, he is a patrol sergeant.

THE COURT: Does he ever have war stories to talk to you about sometimes?

VENIRE PERSON: Yes, sir.

THE COURT: My wife and I kind of debrief on our days at the end of the day. Do you all do that?

VENIRE PERSON: Yes.

THE COURT: A lot of deputy sheriffs from Franklin County, current and former, are going to be witnesses. The defendant who is accused -- and that's all it is at this point, an accusation -- he's a law

enforcement officer.

VENIRE PERSON: Yes, sir.

THE COURT: First of all, do you think that your husband knows Sheriff Boen?

VENIRE PERSON: I don't know.

THE COURT: Don't know. Okay. Do you think without -- I mean, I've told you big picture what the case is about. You haven't heard any real evidence yet.

VENIRE PERSON: No.

THE COURT: Going back to my road race analogy, can you really hold the government and the defendant to the same starting line as you begin to hear evidence, or before you have heard anything, are you starting one side out a little bit ahead of the other?

VENIRE PERSON: I tend to agree with our other juror. I feel like the government does need to show the burden of proof. But I do feel, without hearing any evidence whatsoever or anything, that pretty much on the same starting line.

THE COURT: Do you believe that police officers are not capable of violating the law?

VENIRE PERSON: I believe they are capable of violating the law. I do feel that they need to almost be held to a higher standard than regular citizens.

THE COURT: Given that your husband is a deputy

sheriff, is that going to have a tendency, when you hear other law enforcement officers testify in this case, are you going to be able to hold their testimony to the same standard as every other witness and judge their credibility the same as you would any other non-law enforcement officer's testimony?

VENIRE PERSON: Yes, sir.

THE COURT: Can you represent to the government and to the defendant that you have the ability to be a fair and impartial juror to both sides?

VENIRE PERSON: Yes, sir.

THE COURT: Thank you so much, ma,am. I appreciate that.

VENIRE PERSON: Number 21, Your Honor.

THE COURT: Yes, sir.

VENIRE PERSON: My son previously worked for the Le Flore County Sheriff's Department as a deputy. At the present time, he is a DOT for Oklahoma at the present time. And was he ever accused of excessive force? As far as I know, he hasn't been.

THE COURT: All right, sir. And this was your son?

VENIRE PERSON: Yes, sir.

THE COURT: How long has he been a law enforcement officer?

VENIRE PERSON: Oh, probably for about 10 years.

THE COURT: And when you say he works now for the DOT, is he a highway policeman?

VENIRE PERSON: Yes, sir, in Oklahoma.

THE COURT: Anything about your son's service as a law enforcement officer that would cause you to identify with Sheriff Boen in this case to the point that you kind of start out favoring his side of the case over the government's?

VENIRE PERSON: I don't favor anybody's case. I go by facts.

THE COURT: That is a good answer. I'm going to give you an A-plus for that.

VENIRE PERSON: That just puts it all in a nutshell for me.

THE COURT: Do you believe that a police officer is incapable of violating the law?

VENIRE PERSON: I think so.

THE COURT: That they are incapable, or they are capable?

VENIRE PERSON: I think they are capable. Nobody is perfect.

THE COURT: When a police officer violates the law, and that's established in a court and found so by a jury, should they be held accountable?

VENIRE PERSON: Yes, sir.

THE COURT: All right, sir. Can you be fair and impartial to both sides?

VENIRE PERSON: Yes, sir.

THE COURT: Thank you very much. Yes, ma'am.

VENIRE PERSON: Juror 11. My sister, she worked for Crawford County Sheriff's Department for over 12 years. I believe about 13 years. And she would book in people when they came in arrested. She would book them in. And as far as I know, she was never accused or anything of anything, violating the law.

THE COURT: So she worked in the booking department at the jail?

VENIRE PERSON: Yes.

THE COURT: May I ask her name?

VENIRE PERSON: Tehrina Means. She is currently a DHS investigator for the State of Arkansas.

THE COURT: How long has it been since she worked at the Crawford County Jail?

VENIRE PERSON: I think she has been with DHS five years now, I think.

THE COURT: I think that we're going to hear evidence in this case that involves detainees at the jail at the Franklin County Sheriff's Office. So your sister worked at --

VENIRE PERSON: Crawford County.

THE COURT: The jail, in the booking area?

VENIRE PERSON: Yes.

THE COURT: Does the fact that we're going to be talking about another county jail a few miles down the road, is that going to cause you to identify more with the defendant in this case and predispose you to siding with the defendant in this case before you have heard any of the evidence?

VENIRE PERSON: No. No.

THE COURT: Do you think you can be fair and impartial for both sides?

VENIRE PERSON: Yes.

THE COURT: Thank you, ma'am.

VENIRE PERSON: Juror 53. My brother was a Sebastian County reserve officer and stuff, which he transported prisoners.

THE COURT: What is his name?

VENIRE PERSON: Steve Tankersley.

THE COURT: How often do you see him?

VENIRE PERSON: Not very often.

THE COURT: When you get together, does he tell war stories?

VENIRE PERSON: We haven't had interactions in the last three or four years.

THE COURT: Okay. This is your brother-in-law?

VENIRE PERSON: No, this is my brother.

THE COURT: Brother. This case is going to also I think involve some evidence of transporting a detainee. It sounds like your brother does something similar in Sebastian County. Is that fact going to cause you to identify more with the defendant's side of this case than the government's side, just before you've heard any evidence?

VENIRE PERSON: No, sir. No. Neither one. It's the burden of proof. They are going to have to prove, you know.

THE COURT: Do you believe that a police officer, including a police officer that's transporting someone to a jail, is capable of violating the law? My question isn't worded very good, so listen to my question and don't look at the one on the screen.

VENIRE PERSON: The thing is, each human is capable of making mistakes, sir.

THE COURT: This case isn't about mistakes. You're going to hear an instruction that the government must prove that the defendant in this case did something intentionally; not mistakenly. An intentional violation of civil rights.

Do you think that a law enforcement officer would

really intend to violate someone's rights?

VENIRE PERSON: I don't think -- I would not intentionally think they would, sir, in my belief.

THE COURT: What's your Juror number again?

VENIRE PERSON: 53.

THE COURT: 53. Does anyone, whether you're standing or not, disagree with that? Does anyone think that just because someone is a law enforcement officer does not mean that they are incapable of intentionally violating the law? Show of hands. Do you agree with the proposition that a law enforcement officer can intentionally violate the law? The badge doesn't give them some -- it's not kryptonite.

Sir, if that is your belief that a law enforcement officer would not intentionally violate someone's rights, do you think that that causes you to side at this point with the defendant more than the government before you have heard any evidence?

VENIRE PERSON: No, sir. No, sir.

THE COURT: If the government proves all of the elements of their case beyond a reasonable doubt, would you have any problem of convicting a law enforcement officer of intentionally violating the law?

VENIRE PERSON: If the government provides the evidence beyond a reasonable doubt, yes, sir.

THE COURT: You wouldn't have any problem?
VENIRE PERSON: No, sir.
THE COURT: Thank you very much. I appreciate that. Back over to number 45.
VENIRE PERSON: Jury number 45, yes, sir. I served as a law enforcement.
THE COURT: I think we have already --
VENIRE PERSON: I don't have to go over that?
THE COURT: We don't have to go over that again. We took that up at the side bar earlier with Mr. 45.
Yes, ma'am.
VENIRE PERSON: 17.
THE COURT: Yes, ma'am.
VENIRE PERSON: About 25 years ago, I was married to a law enforcement reserve trainer in Roland. We got divorced. He died a few years later. And that was it.
THE COURT: All right. Well, then I take it that there's nothing about that relationship as you have described that would inhibit your ability to be fair and impartial to both sides in this case, is that correct?
VENIRE PERSON: That's right.
THE COURT: Thank you, ma'am.
VENIRE PERSON: Juror 40.
THE COURT: Yes, ma'am.
VENIRE PERSON: I have a very close nephew that

is a reserve police officer in the City of Greenwood. And my husband served several years as a constable in the lower part of Sebastian County.

THE COURT: That's your husband?

VENIRE PERSON: Uh-huh.

THE COURT: This reserve officer situation, what exactly are his responsibilities?

VENIRE PERSON: I want to say it's sort of a part-time thing that he goes and serves, but he does it a lot. He's really avid about it. And he just rides along, just as if he was an officer.

THE COURT: Does he get paid, or is it volunteer?

VENIRE PERSON: I think it's volunteer.

THE COURT: Is he a certified law enforcement officer?

VENIRE PERSON: He may be. I'm not really sure about that.

THE COURT: Does he have a badge and carry a gun?

VENIRE PERSON: He does have a badge.

THE COURT: Does he carry a gun on duty?

VENIRE PERSON: I don't know. I think so.

THE COURT: You said he's a close nephew. How often are you around your nephew?

VENIRE PERSON: At least once a week, once every two weeks.

THE COURT: If he's been on a ride with a full-time officer and let's say they pick up somebody and there's some interesting story or something interesting that happened, would he share that with you?

VENIRE PERSON: Would I hear? No, he doesn't.

THE COURT: He doesn't talk about his work with you?

VENIRE PERSON: No. Not really, no. He might with my husband, but he doesn't with me.

THE COURT: Would you be able to resist the urge to talk to your nephew about this case while you were on the Jury?

VENIRE PERSON: Oh, yes. I wouldn't talk about that.

THE COURT: If you were trying to make up your mind about whether the government had proved its case or not, would the thought of having to explain to this nephew that you're close to that you were holding another police officer accountable, would that enter your mind?

VENIRE PERSON: No, I would not do that.

THE COURT: Can you tell both sides that you would be a fair and impartial juror in this case?

VENIRE PERSON: Yes, I would.

THE COURT: Thank you, ma'am.

VENIRE PERSON: You're welcome.

THE COURT: And last, but not least, sorry to keep you standing so long.

VENIRE PERSON: Juror 60. I served law enforcement security in the military. Two cousins, deputy sheriff, or Deputy Sheriff in Polk County, and highway policeman down there in Polk County. My best friend is Assistant Police Chief in Mena.

THE COURT: Did you say that you have two --

VENIRE PERSON: Cousins.

THE COURT: -- cousins that are law enforcement officers in Pope County?

VENIRE PERSON: P-O-L-K.

THE COURT: Polk?

VENIRE PERSON: Yes, sir.

THE COURT: And what is their specific job? Are they patrol officers or detectives or --

VENIRE PERSON: I think one is patrol and the other is highway police, DOT.

THE COURT: How often are you around your cousins?

VENIRE PERSON: Once or twice a month, family functions.

THE COURT: At family functions, if they have had something interesting, a difficult arrestee or something like that, or unusual set of facts, is that something that

ya'll will talk about and begin telling war stories about?

VENIRE PERSON: It varies in a certain respect on what they share with folks. They are kind of closed-mouthed.

THE COURT: Tell me about, did you say that you were in law enforcement in the military?

VENIRE PERSON: Yes, sir.

THE COURT: Tell me more about that. Where were you and what specifically were your job assignments?

VENIRE PERSON: It was joint service with the Air Force at Tinker Air Force Base. We done patrols and security forces for the base.

THE COURT: Did you arrest people?

VENIRE PERSON: Detained them every once in a while. I kind of avoided that if I could.

THE COURT: Did you carry handcuffs?

VENIRE PERSON: Yes, sir. Went to law enforcement academy out of San Antonio.

THE COURT: You're a certified law enforcement officer?

VENIRE PERSON: I am not.

THE COURT: But you're certified in the military as a police officer?

VENIRE PERSON: I was, yes, sir.

THE COURT: How frequently did you put people in

handcuffs and take them to a detention facility?

VENIRE PERSON: Maybe every other month or so. Not very often.

THE COURT: All right. Were the people that you were arresting charged with misdemeanors or felonies, or some of both?

VENIRE PERSON: Mostly just drunk. I was on the base, worked night shift. I didn't know what the end result was. We carried them in there and everybody else dealt with it.

THE COURT: Do you believe that a police officer for the military or for the local sheriff's office is incapable of violating, incapable of intentionally violating the law?

VENIRE PERSON: I do not believe they are incapable.

THE COURT: All right. Can you be a fair and impartial juror for both sides in this case?

VENIRE PERSON: I believe so.

THE COURT: Thank you so much for sharing that with us.

Does anyone have a negative view about police officers? Let me expand this discussion. Over the course of the last few years, there have been some political hot-button issues and some movements in this country geared

towards law enforcement. Some believe that law enforcement officers are too quick to use force, and others believe that they have every right to use that force. And there have been various incidents across the country that have drawn attention to this issue, and it has been politicized as well.

This case is not and cannot be about your political views. This case is about what happened on three instances that are charged in the indictment. And it is against this background that I want to explore this just a little bit further.

Would anyone here identify themselves as being part of a social movement, adverse to police or law enforcement? And by that, I mean, are you a dues-paying member of an organization that has antipolice views? Do you attend rallies in support of victims of alleged excessive force? Anyone consider themselves a participant in a political or a social movement in this country geared towards these issues?

Regardless of what may happen in other jurisdictions, regardless of what may have occurred in other cases, can everyone agree that if you're selected for the jury in this case, that you will leave whatever your thoughts about other cases are at home and decide this case based only on the facts presented in this courtroom and the

law as I instruct you?

Is there anyone here that thinks, because of how it's been politicized, that they just can't set aside their view or their side, your side, of that political issue? Because if you can't set it aside, that doesn't make you a bad person. It just means that you're passionate about a belief that you have. That's okay. But you can't be a juror in this case if you're so passionate about something that it causes you to lose sight of being a fair and impartial juror.

Considering all this, is there anyone who would have the courage to say, "I probably shouldn't serve on this Jury?" Thank you very much. I'll take that as a commitment.

Has anyone here ever been detained or arrested by a police officer who treated you badly or unprofessionally?

VENIRE PERSON: That one thing I told you about earlier.

THE COURT: What's your Juror number?

VENIRE PERSON: 58.

THE COURT: 58. We have spoken about that before. Anyone else that has ever been arrested or detained by a police officer who you think treated you badly or unprofessionally?

I may have spoken with some of you at the bench

if you came up earlier, so you don't need to speak up again if you've already covered this. But have you or a close family member ever been a victim of a crime involving physical force or violence?

Let's start with you. Has anyone here ever been a victim of a crime involving physical force or violence? What about family members?

Mr. Juror Number 60, I had something in my notes here, and I failed to circle back to it. Did you mention that your best friend is the Chief of Police in Mena?

VENIRE PERSON: Yes, sir.

THE COURT: If you felt like the government proved its case here beyond a reasonable doubt, would you have any thoughts in the back of your head about your best friend, the Chief of Police, and what he might think of you effectively voting to find a law enforcement officer guilty?

VENIRE PERSON: No. I think he would expect me to do that. I have no -- to be fair. I hope I didn't misunderstand your question.

THE COURT: No, I think you understood it. Do you think that police officers, if they have done anything wrong -- and that's of course subject to the proof -- but if a police officer does something that's against the law, that there should be accountability?

VENIRE PERSON: If they are proven to have done that, yes, accountability needs to be had.

THE COURT: And if that's what the proof is here, you wouldn't have any problems looking your best friend in the eye and telling him that's what your vote was?

VENIRE PERSON: No, I would have no problems.

THE COURT: Thank you. That is essentially all of the Court's questions. I would tender the panel to the government.

MR. CARTER: Good afternoon. I am Brandon Carter. I'm going to reintroduce myself. I'm very glad to have my mask off. I'm sorry that everybody in here that's uncomfortable has to wear a mask right now.

The Judge introduced me earlier. I'm from Washington County, but I want to make it clear, my office is right across the street over here at the U.S. Attorney's Office. It dawned on me while the Judge was doing his voir dire -- I went to U of A as well, so it's voir dire for me, not voir dire. Some of you have lived in Western Oklahoma, and it dawned on me that I probably should -- now that my mask is off -- reveal there's yet another context where you may have run into me. Now, it would have been about 20 years ago. I was a state trooper with the State of Oklahoma, just across the river.

So does anybody, 20 years ago, remember

encountering, I'd like to say it's a guy with the same name as me, but looked a lot younger, but it would have been me. Does anybody recall running into me as a state trooper just across the river? Very good. I'm glad that's the case.

The Judge covered most of what I wanted to talk about. This is the only opportunity I get to speak with you. I'm going to try to not talk at you. I would like to create a conversation as much as I possibly can. I know that some people probably have a fear of speaking in public. It's my hope the Judge has done a good job of warming everybody up to where that won't be an issue. To the extent that you're bothered speaking in public, I apologize on the front-end, but I may be asking some of you individually some questions to follow up on what the Judge has talked about for the last several hours.

I kind of want to start where the Judge ended. The Judge talked about political hot-button issues in certain cases and how you should set aside those cases, and this is not those cases, and that's absolutely correct. But I want to begin with the topic kind of related to that of law enforcement officers and the job they have to do in today's society.

And Mr. Juror Number 25, you are kind of the perfect candidate to ask this question of because of your experience. Is there any part, with your background, that

you think police officers have a harder job today than they did say 20 years ago?

VENIRE PERSON: Is the job harder today than it was 20 years ago?

MR. CARTER: Largely because of the things, those hot-button political issues that we see in the news. Do you think a police officer's job is harder today than it was say 20 years ago, or 30 years ago?

VENIRE PERSON: That's a difficult question.

MR. CARTER: Sorry to start with a hard one.

VENIRE PERSON: I don't know if it's any harder. But I know with the advent of cameras and cell phones, that there's a lot of eyes out there, and that can work in your advantage or to your disadvantage.

MR. CARTER: Okay. Does it create a situation for you, Juror Number 25, where law enforcement is held to a higher or lower standard, or are they held to the same standard as any citizen walking around in society as it relates to obeying the law? Or do you view it differently as a result of the changes today?

VENIRE PERSON: I think that they should be held to a higher standard.

MR. CARTER: You think law enforcement should be held to a higher standard?

VENIRE PERSON: Yes, sir.

MR. CARTER: Juror Number 53, I have the same question for you. Do you think that law enforcement has a harder job to do today as a result of sort of the recent movements the Judge talked about, or easier, or has it changed?

VENIRE PERSON: I feel that the fact is that the law enforcement and stuff has it a little bit harder to do their jobs and stuff. As far as the standard that they should be held to, it should be the same standard across the board, even across the board. In other words, no higher standard than any other agency in the United government.

MR. CARTER: So because their job is seemingly, it sounds like to you, a little harder than it was, they should be held to at least the same standard. They don't get a lower standard because their job is so hard?

VENIRE PERSON: No, sir. They are all the same standard.

MR. CARTER: Thank you for understanding that question, because I think I did a poor job of asking it.

Juror Number 60, I would like to talk to you about the same thing. Law enforcement, with today's kind of hot-button political issues that the Judge briefly touched on, do they have a harder job today than they did say 20 years ago, or an easier job, or has it changed at

all?

VENIRE PERSON: I think the job is harder.

MR. CARTER: Why do you think it's harder?

VENIRE PERSON: I think the job is pretty much the same, but the different aspects of the job are harder. They have to take into account the political hot buttons. They have to be aware of all of that. And with all that comes the community continually watching. The job I don't think is that much harder. The rules are the rules.

MR. CARTER: So you hold them to the same standard, a higher standard, or a lower standard?

VENIRE PERSON: Impartially. I hold them to the same standard when it comes to rules and everything, but they need to dress better and act better than everybody else. They are law enforcement.

MR. CARTER: A higher standard in that regard?

VENIRE PERSON: Higher standard in appearances and stuff.

MR. CARTER: Very good. Kind of show of hands here. We're not going to be asking you to second guess a police officer's decision, but we are asking you to weigh evidence and determine if a crime has been committed. So kind of keeping in mind what we just talked about with law enforcement officers, and the job they have to do maybe being harder than it was, is there anybody that's got any

pause at all on weighing the evidence of what a law enforcement officer is alleged to have done in the course of their duties? Okay. I don't see any hands.

All right. The Judge called them bedrock principles. He talked about the presumption of innocence, the government's burden of proof, and the Fifth Amendment. Essentially, those are all things, as the Judge told you, that come from the Constitution of the United States.

Now, in this case, the defendant is charged with violating the Constitutional rights of individuals who were in a similar situation to what he's in now. They were awaiting their own trials for things that they had been accused of. I want to talk about the ability as jurors to be able to set aside, or not set aside, those defendants' bedrock principles while they were awaiting their own trials.

Juror 54. Let me phrase the question here for you so I can ask a little better question than I've done so far. You agreed, obviously, when the Judge asked about bedrock principles and believed in the defendant's bedrock principles. Do you agree that those victims that are alleged to have had their Constitutional rights violated in this case have those same bedrock principles? Do you look at them as the same as you would the defendant?

VENIRE PERSON: Yes.

MR. CARTER: So essentially, you agree that their views, or their rights, are the same as what the defendant has as he sits here today?

VENIRE PERSON: Yes, sir.

MR. CARTER: Let's go over to Juror Number 48.

VENIRE PERSON: Yes, sir.

MR. CARTER: I'd like to kind of ask you the same question. In some of these cases -- and there's three counts here -- the persons who are alleged to have had their Constitutional rights violated, they were in custody as inmates. There is nothing secret about that. That's not being hidden at all.

Are you going to be able to set aside the reason they were in custody as an inmate when looking at whether the defendant violated their Constitutional rights when you're trying to weigh the evidence and determine if that occurred?

VENIRE PERSON: Yes.

MR. CARTER: No issue at all whatsoever?

VENIRE PERSON: No.

MR. CARTER: Does it even matter to you why the people were in custody?

VENIRE PERSON: No, sir.

MR. CARTER: How about just to your left, Juror Number 49. I kind of have the same question.

VENIRE PERSON: No, sir. I don't have any problems.

MR. CARTER: You will look at the alleged victims' in this case rights the same as the defendant's as he sits here today?

VENIRE PERSON: Yes, sir.

MR. CARTER: I'd like to ask Juror Number 8 the same question, please.

So as you kind of heard me say here, there are three alleged victims in this case. They were awaiting their own trials when the defendant is alleged to have violated their Constitutional rights. Do their rights seem the same to you, those bedrock principles, as the defendant's here today?

VENIRE PERSON: Yes, they are the same.

MR. CARTER: They are on the same footing?

VENIRE PERSON: Uh-huh.

MR. CARTER: Does it matter to you why they are in custody in determining whether the defendant violated their rights?

VENIRE PERSON: It is irrelevant.

MR. CARTER: Completely irrelevant. Juror Number 9. Try to make this easy. Kind of have the same question. Do you have any commentary on that principle?

VENIRE PERSON: I don't see where it would make

any difference why they was in custody. They still got rights.

MR. CARTER: Thank you, sir. Let's talk about civil rights. This is a civil rights case. You have heard that phrase kind of thrown around here a couple of different times, Constitutional rights, civil rights.

Show of hands. Is there anybody here that thinks the government goes -- and by the government, I mean the federal government -- goes too far in trying to protect the civil rights of someone, say an inmate in custody? Is government too protective of the civil rights of people that are in their custody? I'm going to ask Juror Number 15.

VENIRE PERSON: Yes, sir.

MR. CARTER: Do you have any thoughts on, is the government too protective of individual's civil rights, not protective enough, or about right?

VENIRE PERSON: I would say that the government is doing all it can to protect the civil rights of everybody.

MR. CARTER: So about right?

VENIRE PERSON: Yeah. Yeah. They are doing a good job.

MR. CARTER: Does anybody disagree with Juror Number 15? Juror 46, Juror Number 46. Do you have any

commentary on that issue? I think we are deciding which microphone you are going to get.

VENIRE PERSON: No, I don't. I don't know if I know enough to really say that, I guess that they are doing too much.

MR. CARTER: So if my question is, does the government do too much to protect peoples' civil rights, or not enough, or about the same, you just don't know enough about that subject to give an answer?

VENIRE PERSON: No. I would say just -- it's probably the same.

MR. CARTER: Thank you. I have a few miscellaneous topics.

Mr. Escabar, I want to ask you about this one, because I noticed your profession, that you work in aviation.

VENIRE PERSON: I'm an aircraft inspector.

MR. CARTER: I'm sorry?

VENIRE PERSON: I'm an aircraft inspect.

MR. CARTER: You're an aircraft inspector?

VENIRE PERSON: Yes, sir.

MR. CARTER: So you work in an environment where you have to follow kind of procedures and rules?

VENIRE PERSON: Yes, sir.

MR. CARTER: And it pertains to the safety of

whoever is using that plane?

VENIRE PERSON: I'm sorry?

MR. CARTER: And that would pertain to the safety of whoever is using the plane?

VENIRE PERSON: Right.

MR. CARTER: Have you ever been in a position where you have had to report anybody for not following those procedures?

VENIRE PERSON: To the supervisors, yes. Yes, that is my job.

MR. CARTER: How does it make you feel when you do that?

VENIRE PERSON: It's not a good feeling to have to have somebody lose his license, or his standing in our maintenance organization when you do something like that. But it's a serious accusation, or it's a serious business, because the lives of all those people that are flying aboard that airplane, that depends on me. All ability is on me when I sign that document and say, "This aircraft is airworthiness."

MR. CARTER: So you sometimes have some reluctance to do that, because it may get your colleague in trouble?

VENIRE PERSON: I consider all the facts before I report somebody. How serious it is, whether it's minor.

But everything has to be reported when it concerns the safety of that airplane.

MR. CARTER: Thank you, sir. Does anybody have a job like Juror Number 15? Juror Number 5?

VENIRE PERSON: I'm with internal audit department where a lot of times, we have to report people that -- someone that doesn't follow the rules or doesn't do what they are supposed to do.

MR. CARTER: How does it make you feel when you have to do that?

VENIRE PERSON: In some cases, it doesn't feel good, but the facts are what the facts are.

MR. CARTER: Thank you, sir.

VENIRE PERSON: Juror Number 30. At my job, we see something, we say something. We have to report our own. My employees, people underneath me, people above me, also the public. Anybody in the lobby, anybody leaving a car unattended. The rules are the rules, and they are set there by somebody above me. My job is to enforce those rules and report them when they are broken. It doesn't matter who you are or who you work for. The rule is the rule.

MR. CARTER: That was such a good answer that I don't have a question to follow up with.

VENIRE PERSON: Sorry.

MS. CARTER: Anything similar from anybody else? Yes, Juror Number 10?

VENIRE PERSON: I'm a certified teacher of a preschool, so I am a mandated reporter. So if we see anything, any abuse, any suspicions or anything like that, we have to report that.

MR. CARTER: Did you ever have any kind of reluctance -- I'm sorry, I interrupted you.

VENIRE PERSON: No. I have actually had to report a few times to DHS. And it's hard, because you have a relationship with the parents. But then the child is the first priority. So it does become difficult at times, but you've got to do what you've got to do.

MR. CARTER: Thank you for your answer.

VENIRE PERSON: You're welcome.

MR. CARTER: Juror Number 18?

VENIRE PERSON: Yes. Being a teacher, I'm also a mandated reporter as well.

MR. CARTER: Do you have similar feelings as Juror Number 10?

VENIRE PERSON: I do. I do. But it is my duty, so I have to report it.

MR. CARTER: I understand. Anybody else?

So the Judge asked you about the Franklin County Sheriff's Office, and it sounded like nobody in here really

had any experience with them.

He did not ask you about the FBI. There's a show I think on one of the channels right now just called "FBI." Anybody watch that show? Couple of you watch it. Now, the guys on that show are better looking than Matt.

Does anybody have any preconceived notions or strong feelings about the FBI? Strong feelings about the FBI one way or another? Or the Department of Justice? I always get at least one hand. I guess I got a hand on the FBI T.V. show question.

The last topic I want to cover. Videotape. Today's society, there are cameras everywhere. A couple of you have kind of alluded to that as it relates to law enforcement officers. There's cameras on your phone. There are cameras on doorbells. There's cameras in hallways. There's cameras everywhere. You are kind of hard-pressed if you live somewhere with any kind of population at all to not end up on camera at some point during your day.

I'm just going to kind of give you the punchline at this point. You are not going to see videotape of the crime in this case. There is no videotape that the government will be showing you of the crime in this case. Now, that's not to say that this is a case that's just like a "he said, she said." You are going to have witness

testimony from eyewitnesses that saw it. You will have testimony from people who heard it. I like to call them ear witnesses. Is there anybody in here that in today's society with video cameras being everywhere, that to consider the evidence fairly for the government, I absolutely have to see the crime having occurred on Videotape? I guess it's not tape anymore, but digital media.

Juror Number 2, do you have any feelings about that?

VENIRE PERSON: I don't need to see it on tape.

MR. CARTER: You will be able to evaluate just from the evidence you get from the witness stand?

VENIRE PERSON: Yes, sir.

MR. CARTER: Jury Number 13, do you feel any differently at all about that?

VENIRE PERSON: No.

MR. CARTER: Anybody in the audience at all feels they need to see a videotape to be able to consider the evidence fairly?

Just a moment, Your Honor. Thank you all for your time and attention this morning and early this afternoon. I'll pass the panel, Your Honor.

THE COURT: Thank you, Mr. Carter.

Mr. Wood or Mr. Prater?

MR. WOOD: Thank you, Your Honor.

Good afternoon. My name is Russell Wood. I represent Sheriff Boen, along with Mr. Prater. So I only have a few more questions, just a few follow-up questions.

First, is there anybody here that would require Sheriff Boen or hold him to a higher standard because he's an elected official? Because he's the elected official of Franklin County, would he be held to a higher standard in anybody's opinion? Anybody?

Juror Number 23. Tell me what your thoughts are on that.

VENIRE PERSON: Well, I feel since he is an elected official, I mean, that would be held to a higher standard. One thing representing the county and other law enforcement agency, it kind of sets the standard for those working below him.

MR. WOOD: And what type of higher standard do you have in mind?

VENIRE PERSON: Well, I mean, definitely following all of the laws, all of the rules of the Sheriff's department and enforcing those rules and laws with the people below him.

MR. WOOD: And who else raised their hand? Okay. Number 24?

VENIRE PERSON: 24. I would say yes, just

because I see his position as leadership. That's why I would hold it at a higher standard. I would expect, like she said, follows the rules. Just kind of demonstrating at all times, just because of his position, how things should be for others.

MR. WOOD: Okay. And if the Court instructs you as to the standard that would be applied to the Sheriff, and that standard may not be the same as the standard that you have in your mind --

VENIRE PERSON: Yeah.

MR. WOOD: -- would you be able to follow the instructions of the Court?

VENIRE PERSON: Yes, because those are his standards. That's what he was to follow. So it doesn't matter what I think he needs to follow. If he's doing what he needs to as the Court has put in place, then that's what counts. That's what we go by.

MR. WOOD: Okay. And number 25, what's your thoughts on that?

VENIRE PERSON: I think that he -- I think that all law enforcement should be held to a little higher standard.

MR. WOOD: And, again, is that a standard -- well, if the Court provides you with the legal standards in this case, and those standards may not match what you

believe the standards should be for an elected official or law enforcement in general, would you be able to accept the laws that the Court provides as what we're determining here today?

VENIRE PERSON: Yes, sir.

MR. WOOD: Is there any reservation in your mind that the fact that you believe that all police officers should be held to a higher standard will affect your judgment in this matter?

VENIRE PERSON: No, sir.

MR. WOOD: All right. Then I saw a head shaking over here. Anybody else believe that the Sheriff, a Sheriff or an elected official should be held to a higher standard?

VENIRE PERSON: 31. I do. He's elected. I think he should show an example to the employees that he has underneath him. About what I have.

MR. WOOD: Okay. And, again, when the Court provides the law to you, would you be able to set aside whatever your own opinions are and just apply the law as it's given to you by the Court?

VENIRE PERSON: Yes.

MR. WOOD: And is there any reason that you think that you may not be able to do that in light of this higher standard?

VENIRE PERSON: No.

MR. WOOD: Okay. Thank you very much. Along the same lines, he is a Sheriff. It is an elected position. Is there anybody in here that's going to hold it against him simply because he's a politician? Does that create any just underlying animosity in general with anybody? Because ultimately, a Sheriff is a politician. They have to run for office, so they are out there campaigning. A few politicians may not have the best reputation around on the state and federal level.

Anybody have any problems with him just simply being a politician? Anybody have any problems with the fact that he was elected in his county?

So what about the use of force? Anyone in here believe that any use of force is not justified just in civilized society? Anybody have just a complete ban on the use of force? They are passivists or don't believe that police officers should get to use force to protect themselves or otherwise? Anyone?

Juror Number 30. I want to ask you a question. And I'm not entirely certain on your job. Can you explain to me what your job is again? I don't know if I couldn't hear because of the mask. And you can take your mask off if you want while you're speaking, but I'm just not real certain that I understand exactly what your job is.

VENIRE PERSON: I check people and property for bombs, explosives, and firearms. Anything that would disrupt the integrity of an aircraft above cities, places, lakes. My job is administrative search. My job says, I will search you if you come into this area, and then you come into my area. By coming to me, you are already agreeing to be searched. So any confrontation that happens after that is on you because you accepted that when you walked towards me.

Any violations that we find, if I find dynamite, if I find loaded firearms that are chambered, if I find stuff that's dangerous and deadly to the inside of an aircraft when you're in the air, I respond to law enforcement. That no longer makes it compliance. I found what I'm looking for, told you that you can't have it, and law enforcement will be here to talk to you. Most of the time they just give them, "Hey, unload it, go put it out in your car." Because to law enforcement, having a loaded firearm isn't a threat. In the air, it is. So it's just my job to tell you where you need to put it.

If you want to fly with that because you're going to Alaska to shoot a moose, good. Go unload it and put it in your checked baggage and send it how it's supposed to be. So my job is more compliance. We do have people that get agitated and throw stuff at us and physically assault

us, and then that's just where the reporting gets to. We tell you that that's not how it works and then you can either continue or you can go back outside.

MR. CARTER: Okay. Thank you.

And like Mr. Carter, I wanted to advise you that I was, years ago, a prosecuting attorney in Pulaski County. And so as a result of that, is there anybody here that remembers having any contact with me, positive or negative, in my role as a prosecuting attorney in Pulaski County in Little Rock?

We talked about some of these movements and organization and dealing with law enforcement around the country. Is anybody part of any Facebook groups that advocate for the support of police or to defund the police or any of those types of issues that are obviously current in the national topic for the last few years? Anybody part of any Facebook groups? Anybody made any comments on any Facebook posts that deal with law enforcement, defund law enforcement, excessive force across the country with law enforcement? Anybody been involved in any type of communications on Facebook, Twitter, social media, or anything like that that involves police reform or defund the police? All right. And I understand --

VENIRE PERSON: Not defunding, but a couple of times, I have gone on Twitter and gotten into conversations

about various incidents around the country.

THE COURT: Is this Juror Number 58?

MR. WOOD: Yes. Yes, Your Honor. Also, what about any websites? Oh, I'm sorry.

VENIRE PERSON: I'm on a Facebook group of National Police Wives Association. Number 23. I don't really comment or anything, but I do read the posts.

MR. WOOD: You're on a Facebook group?

VENIRE PERSON: It's National Police Wives Association.

MR. WOOD: All right. Anybody here know anyone that's a current or former inmate at any detention centers or jails around the state?

Juror 14. Who do you know and how do you know them?

VENIRE PERSON: My grandson is a current inmate at Sebastian County Detention Center.

MR. WOOD: Okay. And how long has he been there, do you know?

VENIRE PERSON: Since January.

MR. WOOD: And have you went and seen him or anything?

VENIRE PERSON: I go every under Sunday afternoon.

MR. WOOD: And he's there on a felony or

misdemeanor?

VENIRE PERSON: He's accused of a felony.

MR. WOOD: And in your discussions with him while he's being housed in the Sebastian County facility, has that created any impression in your mind about jails or how the jails are run or the individuals that work in there for law enforcement?

VENIRE PERSON: Well, yes.

MR. WOOD: Okay.

VENIRE PERSON: And I think, my impression is that, in general, it's an overwhelming job for those that work there. I would not choose to work in a jail. I would volunteer there. I think -- quite frankly, I think they need an auxiliary for both the staff and the inmates. But overall, I'm impressed with what they do.

MR. WOOD: Okay. Thank you very much. Anyone else know or have some individuals --

VENIRE PERSON: Number 20. My brother and my stepfather.

MR. WOOD: Are they currently incarcerated?

VENIRE PERSON: Yes, they are both currently in prison.

MR. WOOD: In prison?

VENIRE PERSON: Yes.

MR. WOOD: Maybe down in Pine Bluff or something?

VENIRE PERSON: I don't know where they are at. I don't go see them.

MR. WOOD: Have you had any -- you don't go see them. Have you had any contact with them while they have been incarcerated?

VENIRE PERSON: Not in years.

MR. WOOD: Anything about that incarceration, any communication that you have had with them, that would negatively impact your opinion of jails or prisons or law enforcement personnel?

VENIRE PERSON: No.

MR. WOOD: Thank you. Yes, ma'am.

VENIRE PERSON: 30. All former inmates, my children have all been inmates of Washington County awaiting their trials. One of the officers that I started TSA with in 2008 at Northwest Arkansas was charged with, I think it was dispersing a firearm or something like that, and he served federal time. So I talked to him a few times while he was gone. He's released now, but we don't keep in touch much because I'm still employed and he is not.

MR. WOOD: And did you say they were in Washington County?

VENIRE PERSON: Washington County, yes. The one that went away for federal time, I don't remember exactly the name of the prison he was in.

MR. WOOD: And so any of your involvement with your children and their incarceration that has made you form a negative opinion about detention centers, jails, or prisons and the individuals that work in there?

VENIRE PERSON: For Washington County, the experience that I've had with the jails, I just think that it's a staffing issue. You don't have enough staff to get to all the inmates. I do understand that some people just cry wolf and some don't. So just with any job, there is going to be things that are difficult. I don't know a lot about the federal prisons.

My husband also has a nephew that did a good amount of time over in Oklahoma for grand theft auto, which was also a felony.

MR. WOOD: So in your experience dealing with those various issues, did you become informed about whether or not the jails are violent places?

VENIRE PERSON: My husband's nephew said there was, you know, certain things when he was gone. Like I said, I still don't know the prison, but it's the prison and you know who you are with.

With my children, they never really had issues because they were only in there long enough to go to their trial. Mom's tough love. I don't bail them out. You got in there; figure your way out. Sorry, that's just how I

am. But like I said, any conversation or complaints that I heard from my children, it was just, well, it's not going to be pleasant. Like you're not there to play on the Nintendo. Sorry.

MR. WOOD: Thank you very much. Anybody else that has had any experience with friends or family that are inmates in a county detention facility? Some cities have detention facilities, state facilities.

VENIRE PERSON: A close friend of mine spent a couple of months -- I'm sorry, 54 -- a close friend of mine spent a couple months in Kay County, Oklahoma, last year.

MR. WOOD: And did you form any opinions or get any information about the conditions or the jail or the --

VENIRE PERSON: Overall, I think it was a -- seemed like a pretty pleasant experience, as pleasant as jail could be. I think he was kind of cushioned in Oklahoma. He didn't have any complaints.

MR. WOOD: So no part of that interaction created any type of issues for you to be able to fairly and accurately sit as a juror?

VENIRE PERSON: No, sir.

MR. WOOD: For Sheriff Boen?

VENIRE PERSON: No, sir.

MR. WOOD: Thank you very much. I think that's all I have. Thank you very much.

Thank you very much, Mr. Wood.

Could I see counsel at side bar, please?

(bench conference)

THE COURT: Does the government have any challenges for cause?

MR. CARTER: Your Honor, for the first, I don't think I do.

THE COURT: Very good. Mr. Wood?

MR. WOOD: See my list here on a few of them.

Your Honor, first with Juror Number 15, Mr. Escabar. Got him, 15, Mr. Escabar. I'm not sure if it's a language issue or what, but we're concerned with his comprehension of the instructions that the Court gave. He come up last time under, have you been a criminal -- involved in a criminal defendant, but he clearly was talking about the civil portion of your instructions. And it just didn't appear to us that he had comprehended all of the instructions that the Court had given him in the process. We are concerned that given the nature of jury instructions, the complexity of the law, the multiple elements. and like I said, it may just be a language barrier issue, but we're concerned with his ability to fully comprehend the proceedings the way that I think a competent juror needs to.

THE COURT: Okay. Response on number 15?

MR. CARTER: Your Honor, I don't believe cause exists. I questioned Juror Number 15 fairly extensively about his employment, which is in the aviation industry as an inspector. That's a complex industry, first off. And second off, he didn't have any problem whatsoever answering the government's questions. He gave coherent answers. I don't think he will have any issues serving as a juror or understanding. I agree he has an accent, but I don't take that he has any problem comprehending the English language.

THE COURT: The Court will deny the challenge as to Juror Number 15. This was a juror that responded to Mr. Carter's questions about being an aircraft inspector and what he would do to report people who hadn't done their job correctly. I think this is also the juror that responded not exactly on point to some of the Court's questions. And I think for the Judge and for the lawyers that do this routinely, we kind of all flag that initially. But these are laypersons from our community who don't do this every day and who are kind of put on the spot and who are trying to answer the questions as they understand them as best they can. And I think that that's just a simple -- the example cited is just a simple misunderstanding. And I did not see anything in Number 15's demeanor or his ability to answer the questions as a whole that would cause this Court any concern that they should be stricken for cause.

Any other challenges, Mr. Wood?

MR. WOOD: We do have some challenges, Your Honor.

Get my list here. Juror Number 18. She indicates that she does know one of our potential jurors. I mean, one of our potential witnesses. And she was also exposed to the reporter. We believe that she should be struck for cause for prior knowledge of a witness. Although she said that it was some time ago, he will be a fact witness in this case, and so we're asking she be struck.

THE COURT: This is the teacher in Clarksville who had the son of one of your witnesses as a student for one year. And that's been, was it 10 or 15 years ago?

MR. CARTER: My notes reflect 15, Your Honor.

THE COURT: 15 years ago. Okay. What's the government's position?

MR. CARTER: Your Honor, although she did admit that she had been the teacher for a witness's son 15 years ago, she also indicated that she could absolutely set that aside and fairly weigh the evidence. Likewise, as it relates to the contact with the reporter, I think all of us have agreed at this point that the contact with the reporter was innocuous and it was something she just heard. It wasn't a conversation that she was participating in. I

don't believe cause exists for Juror Number 18.

THE COURT: The Court will overrule the challenge for cause on Number 18. Her knowledge of this witness is tangential and remote in time to give this Court any concern that she -- of the sincerity of her response about her ability to be a fair and impartial juror.

MR. WOOD: I have one more, Your Honor.

THE COURT: Okay.

MR. WOOD: Number 26. Juror Number 26. She's a young female.

MR. CARTER: What's the reason? I don't believe she ever spoke.

MR. WOOD: She did not. She sat out there and fell asleep several times. She's clearly disinterested. And myself and Mr. Prater observed her appear to be sleeping on multiple occasions, so we would ask that she be struck.

THE COURT: Mr. Carter?

MR. CARTER: I didn't see that. May I go look at a note I have on my desk? I'll be right back.

THE COURT: Yes.

MR. CARTER: Your Honor, we oppose the strike for cause. We never saw that she wasn't paying attention. I didn't note that whatsoever. All the jurors were given open-ended questions. Some where they had to raise hands.

I didn't see her not participating in that. And although she never spoke, there are a few jurors on this panel that never spoke. I don't believe cause exists for Juror Number 26.

THE COURT: Well, the Court is going to overrule the objection. I didn't notice that she was falling asleep, but I'm not -- I'm focused on whoever is answering questions at the moment, so that very well could have happened. Certainly, if she were to start nodding -- if she were selected as a juror and start nodding off in trial, that could be brought to the Court's attention and we could address it at the time. But there's no information before the Court that she does not have the ability to be fair and impartial, so the Court will overrule that challenge for cause as well.

Counsel, we have 47 numbers left in the wheel. That is enough to exercise your strikes today. So I'm going to offer the jury the option of taking a break. I'm going to tell them what lies ahead. We're about an hour and a half later than where I thought that I would be. I feel bad that -- I'm starting to get hungry at this point. But I think they are also wanting to figure this out and move on. But I intend what they would like to do after I explain to them where we are. Anything else?

MR. WOOD: No, Your Honor.

MR. CARTER: You'll be taking a break after we impanel?

THE COURT: Yes.

(bench conference concluded)

THE COURT: Well, I'm starting to get pretty hungry at this point, and so I so much apologize for being this long. We're about an hour and a half later than what I thought, but this is important business, and I really appreciate ya'll sticking with us. Here's where we are:

We are ready to pull juror numbers from a wheel. And if you think of this as Survivor Island, you were invited to the island today. We've completed the first challenge and now we're at the meeting where we select the people who will advance to the next phase.

And what we're going to be doing is, we'll be calling 37 numbers from the wheel. After we call 37 numbers, we're going to take a break. And the attorneys can exercise up to 20, they are known as peremptory strikes. These are strikes, challenges -- not challenges. The parties can eliminate one of the 37 for almost any reason that they want. Not necessarily any reason. And that will leave us with our 12 jurors and five alternate jurors. It's going to take, if you just add up calling 37 numbers, a few minutes to do this. But then we're going to take a break. And we will let you know who the final --

we'll take a break so that the strikes can be exercised, and then we will announce who the 12 are, and the five alternates are.

It's five until 3:00. I think it's going to take until about 3:30 to 3:35 to do all of that. After we call the 37 numbers, we are going to take a break for 20 minutes. If you'd like to have lunch and make that an hour break, or an hour and 15-minute break, I am more than happy to do that.

Who is in favor of plowing forward with the understanding that in about 10 minutes, we're going to take a 20-minute break? Who would prefer in 10 minutes that we take about an hour break so you can get some lunch? I think that that is what we will do. I will add that when we come back, all we're going to be doing is impaneling those jurors and we will take a break today and we'll come back tomorrow morning with preliminary jury instructions and opening statements. So the finish line is in sight. But it's been a while and I think we can get everything wrapped up before 5:00 p.m. today. So we will proceed as some of the jurors would like.

Ms. Craig, will you please call 37 numbers? Let me tell you all this. Normally, we have an empty jury box and we're not calling quite so many people. But to eliminate movement around the courtroom, and since we don't

have a seat to move you to, you just need to remember whether your number is called or not. If there's some confusion about that, then on the break, you can check with one of the Court staff members and we'll tell you whether your number was called or not. But stay seated and just make a mental note that your number has been called if it's called.

MS. CRAIG: The first number is 27. The second is number 5. The third is number 6. Then we're on number 8. 26. 36. 37. 56. 39. 17. 22. 60. 57. 32. 16. 41. 31. 24. 18. 42. 49. 11. 13. 12. 19. 40. 4. 2.

THE COURT: Is that the first 28?

MS. CRAIG: Yes, sir.

THE COURT: All right. The next nine?

MS. CRAIG: 15. 28. 30.

THE COURT: I'm sorry, what did you say?

MS. CRAIG: 30. 14. 43. 54. 48. 20. 21. That's nine.

THE COURT: Here's what we're going to do. I'm going to ask Ms. Craig to go through the first 28 numbers again real quickly. She won't have to type in names this time so it will go much more quickly. And then she's going to pause and do the last nine, and then I'll give you further direction. So please listen.

MS. CRAIG: 27. 5. 6. 8. 26. 36. 37. 56. 39. 17. 22. 60. 57. 32. 16. 41. 31. 24. 18. 42. 49. 11. 13. 12. 19. 40. 4. And 2.

And then the other nine: 15. 28. 30. 14. 43. 54. 48. 20. And 21.

THE COURT: We're going to take about a 10-minute convenience break. You can use the rest rooms or whatever. Come back and sit in the same seat that you're in right now. And the Court clerk staff is going to confirm with you whether you're to stay or whether you are free to go. Before I just dismiss everyone whose numbers have not been called, I need to confer with the attorneys and see if there are any irregularities. So you're almost there. So we're going to take a short five or 10-minute recess. Come back and sit in your exact seats.

(Venire Panel exits courtroom)

THE COURT: Did the government observe any irregularities about the jury numbers that were called?

MR. CARTER: I wrote them down the same as Ms. Craig.

THE COURT: In terms of any member of the venire panel that had been stricken, there weren't any irregularities?

MR. CARTER: No, Your Honor.

THE COURT: Mr. Wood, did you observe any

irregularities?

MR. WOOD: No, Your Honor.

THE COURT: All right. So just to make sure that we're on the same page with the jurors, I'm going to have them come back as I just announced. And then a clerk will dismiss them if they are not a member of the 37 remaining. We will have our jury impaneled at -- let's say everyone be -- well, I'm going to tell them to come back at 4:15. You do not necessarily need to be back here until say 4:00. I'll let you go now. You can work on your strikes. But Ms. Craig needs to have your strikes by no later than 4:00.

Court will be in recess. The jurors will come back, take their seat, and the clerk will tell them whether they are free to go or not.

Any issues or questions about that procedure?

MR. WOOD: No, Your Honor.

MR. CARTER: No, Your Honor.

THE COURT: We need your peremptories by 4:00. We're in recess.

(Recess taken from 3:06 p.m. to 4:16 p.m.)

(Venire panel enters courtroom)

THE COURT: The clerk has tabulated the peremptories submitted by counsel. And at this time, the clerk will be calling our 12 jurors, and then our alternates as well. Then when she's finished with that, we

will excuse those whose numbers were not called.

Again, because we don't have a lot of room to move around, just stay in your place for right now and remember to yourself whether you have been selected or not, and then we will dismiss those of you specifically who have not been selected.

Ms. Craig?

MS. CRAIG: Number 27. Number 5. Number 37. Number 56. 22. 57. 32. 16. 31. 18. 42. And 11.

That's our first 12.

THE COURT: All right. And then the other five?

MS. CRAIG: The other five are 28. 30. 14. 54. And 48. Does anybody want me to repeat that? Yes?

THE COURT: Please.

MS. CRAIG: I'll go through them one more time.

The first 12: 27. 5. 37. 56. 22. 57. 32. 16. 31. 18. 42. 11.

And the next five are: 28. 30. 14. 54. And 48.

THE COURT: So what I'm going to do, and I would ask Ms. Craig to check me. I need to check in with counsel to be sure that they concur with the numbers that Ms. Craig just stated, but then I'm going to go through the juror numbers that may leave at this moment.

So first of all, let me check with the

government. Reconciling your strikes against the numbers that have just been called, do you see any incongruities?

MR. CARTER: I do not, Your Honor.

THE COURT: Does the defense?

MR. PRATER: No, Your Honor.

THE COURT: All right. So I'm now going to read the numbers of people that can leave. And once they have left, we will swear in our Jury, and I will give you instructions on when to report back tomorrow.

So first of all, Jurors Number 6, 8, and 26, would you please stand? Okay. You may be excused. You're free to go.

Next, Juror Numbers 36, 39, and 17. Would you please stand? You're free to go. Thank you very much.

Next, Jurors 60, 41, and 24, would you please stand? All right. You're free to go.

Next, Jurors 49, 13, and 12. Thank you very much for your time. You're free to go.

Next, Jurors 19, 40, and 4. You were hiding back there. All right. You are free to go. Thank you very much.

Next, Jurors 2, 15, and 43. You are free to go. Thank you very much for your time.

And then Jurors 20 and 21. You are free to go. Thank you very much for your time.

Now, just to audit our results, we should have 17 people remaining.

So Ladies and Gentlemen, if this were a game of Survivor Island, you have survived all the way to the end and you will be with us for the next four or five days or so as the parties present the evidence in this case to you.

As I discussed earlier, it would be the Court's plan to begin every day at 8:30. We'll go to about 5:00. We'll use common sense on if we have -- if we're right in the middle of a witness, whether to stay a few minutes late or dismiss a few minutes early, that sort of thing. We will also make some decisions as we go about the lengths of our breaks, depending on people's individual situations.

Tomorrow morning, I would ask that you report to the jury room a few minutes earlier than we will on successive days because the Court clerk will need to give you our seating charts so you will know where you will be sitting in our jury box and check you in. There has been a front door questionnaire that asks you various COVID questions. The clerk, rather than have you fill that out every day at the front door, when you're checking of a morning in the jury room, they will go over those questions with you to see if there's been any change in your status.

You will also be given tomorrow morning -- can we give those now? We have them now. So on your wait out,

Ms. Whitney will be giving you a juror badge and a lanyard. If you will try your best not to lose that, at least not until tomorrow so you can get in the front door of security. Wear that with you and that will identify you as a juror in this case. As you're leaving, Mr. Whitney and Ms. Kara will also show you the jury room. I know I showed you the picture of it earlier, but it's right outside the door to the courtroom. You can assemble there and we will have coffee and some packaged snacks. Should we say 8:15 or 8:20 tomorrow, if we're going to start at 8:30? 8:15 tomorrow, and we'll see how long it takes to check everyone in. And then on successive days, we won't have you get here quite so early.

Is 8:15 arrival time for you tomorrow morning going to be a problem for anyone? Okay. Well, what we need to do now is to get you sworn as jurors, and then I have an instruction that I need to read to you. If you would please stand and raise your right hand to take the juror's oath.

(Jury Panel Sworn)

THE COURT: Thank you. You may be seated.

Ladies and Gentlemen, during this evening recess, and for that matter, on every recess in this trial, you must not discuss this case with anyone, including your fellow jurors, members of your family, people involved in

the trial or anyone else. Do not allow anyone to discuss the case with you or within your hearing. Only you have been chosen as jurors in this case, and only you have sworn to uphold the law. No one else has been chosen to do this.

You should not even talk among yourselves about this case before you have heard all the evidence and the case has been submitted to you by me for deliberations because it may affect your final decision. And if anyone tries to talk to you about this case, please let me know about that immediately. And you can do that by notifying one of the Court clerks or one of the Court Security Officers. All the Court Security Officers wear blue blazers with a badge on the pocket.

And when I say you must not discuss this case with anyone, I also mean do not do that orally or electronically. For example, do not e-mail about the case, don't send text messages, don't blog about it. Do not engage in any form of written, oral, or electronic communication as I have instructed you.

Also -- and this will be especially important in this case -- do not read any newspaper or other written account or watch any televised account or listen to any radio program about this trial or that has news coverage about this trial. Do not conduct any internet research or consult with any other sources about this case, the people

involved in the case, or its general subject matter. You must keep your mind open and free of outside information. Only in this way will you be able to decide the case fairly based solely on the testimony, the evidence presented in this courtroom, and my instructions to you on the law.

If you were to decide this case on anything else, you will have done an injustice. It would be a violation of your oath for you to base your decision on some reporter's view or opinion, or upon other information you acquire from them through an article or from some other source from outside the courtroom. It is very important that you follow these instructions.

Now, I may not repeat the entirety of this so-called recess instruction to you every time we recess, but please bear in mind that at every recess, it applies and I will remind you of some of the particulars from time to time.

Tomorrow morning, you are going to be here at 8:15. We will begin promptly at 8:30 with opening statements, and then we will begin receiving testimony.

Anyone have any questions? Yes, ma'am.

VENIRE PERSON: Number 14. Where do the alternates sit?

THE COURT: There will be a seating chart that we will give you tomorrow, but you're going to be interspersed

with the Jury.

VENIRE PERSON: Thank you.

THE COURT: All right. Good question. We will see you tomorrow. Court is in recess.

(Court recessed at 4:30 p.m.)

(In-Chambers Proceedings)

MR. CARTER: I wanted to come back and visit with you. The prosecution witness, Brandon English, found himself arrested on Saturday for a drug charge out of Franklin County. It's a possession of meth charge. And having read the police report, which I will provide you all by e-mail when we get out of here, it's a pretty weak charge. I had him writ-ed over to the Marshals custody while we were in voir dire today, so he's currently in the Marshals custody on a writ. It will be our plan when we call him, he'll be in Marshals custody. So we would like to ask the Court to allow us to have him appear in civilian clothing and unshackled. He does not have a violent history, does not have a history of escape. He has a history of thefts and now this drug charge.

THE COURT: I don't have a problem with that. I would want -- there's a Marshal that's presently sitting on the other side of the witness box. In other words, on the -- well, the direct opposite side of the witness box. For purposes of that witness, I'll have -- well, I'll speak

to the Marshals Service about whether they can move a chair over by where the CSO sits.

MR. CARTER: He'll be a very brief witness, I imagine, as well. They will need -- I don't know if you want to -- they need an order from the Court for us to put him in civilian clothing.

THE COURT: The Marshals Service does?

MR. CARTER: That's what they asked me for today.

THE COURT: Who should I talk to?

MR. CARTER: Chris Blevins.

THE COURT: Okay. That will work.

MR. CARTER: That's all we need. All right.

THE COURT: Any other issues?

MR. WOOD: Well, we object. He's actually out on bond for meth and heroin, and now has picked up additional charges.

THE COURT: What does that have to do with him appearing in civilian clothing?

MR. WOOD: Well, typically, witnesses -- I've never had a witness that I've been able to get in civilian clothes. He's a witness only. He's not a party or anything like that to the proceedings. So that's the only reason we would object. I think it's a security issue too. Like I said, he was out on bond for heroin when he caught these new charges. So that would be our objection.

THE COURT: All right. Well, it's overruled. The Court has confidence in its Marshals Service. If you can come up with some sort of authority that says a post -- has he been formally charged?

MR. CARTER: He just got arrested on Saturday. I'm not sure he's even had his probable cause hearing for the state. I don't know the procedure in Franklin County.

THE COURT: I mean, I'm certainly familiar with customs where if they are bringing them in from the ADC or something like that, that they would be in their ADC garb, but I'm not -- I don't know that I have ever come across this particular scenario. But if overnight you come up with some authority that says that the Court doesn't have the authority to allow a post-arrest, pre-probable-cause hearing detainee to appear not in their jail attire, then I'll look at it. But something tells me that doesn't exist. But if you find it, let me know, we'll take a look at it.

MR. WOOD: Yes, sir.

THE COURT: All right. See you in the morning.

(proceedings recessed at 4:41 p.m.)

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 18th day of September 2021.



____________________________________
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

