IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA PLAINTIFF

v. CASE NO. 2:19-CR-20037

ANTHONY BOEN DEFENDANT

---

JURY TRIAL, VOLUME 2 OF 6

BEFORE THE HONORABLE TIMOTHY L. BROOKS

AUGUST 3, 2021

FAYETTEVILLE, ARKANSAS

---

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL J. SONGER
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-1762
michael.songer@usdoj.gov

MR. BRANDON T. CARTER
United States Attorney's Office
414 Parker Avenue
Fort Smith, Arkansas 72901
(479) 783-5125
brandon.t.carter@usdoj.gov

Also Present: Special Agent Matthew Ferguson
Federal Bureau of Investigation

IT Technician: Mr. Kenneth Moon

FOR THE DEFENDANT:

MR. RUSSELL A. WOOD
Wood Law Firm
501 East 4th Street, Suite 4
Russellville, Arkansas 72801
(479) 967-9663
rwood@woodlawfirmpa.com

MR. PAUL PRATER
Prater Law Firm
4700 Edgemere
North Little Rock, Arkansas 72116
(870) 543-9064
paul@praterlawfirmpllc.com

I N D E X

Page
Preliminary Instructions by the Court .......... 201
Rule Invoked ................................. 217
Opening Statement by Mr. Carter ............... 218
Opening Statement by Mr. Prater ............... 234
MASON BERRY
Direct Examination by Mr. Songer ........... 242
Cross Examination by Mr. Wood .............. 294
Lunch Recess ................................. 341
Redirect Examination by Mr. Songer ......... 387
CAROLYN MCCAIN
Direct Examination by Mr. Carter ........... 398
Cross Examination by Mr. Prater ............ 420
Redirect Examination by Mr. Carter ......... 426
JUSTIN PHILLIPS
Direct Examination by Mr. Songer ........... 427
Evening Recess ............................... 464
Reporter's Certificate ....................... 465

E X H I B I T S

| | | Received |
|---|---|---|
| Govt's Exhibit 1(a) | Photo, Justin Phillips Franklin County | 275 |
| Govt's Exhibit 1(b) | Photo, Justin Phillips Franklin County | 275 |
| Govt's Exhibit 1(c) | Photo, Justin Phillips Franklin County | 275 |
| Govt's Exhibit 2(a) | Photo, Justin Phillips Crawford County | 261 |
| Govt's Exhibit 2(b) | Photo, Justin Phillips Crawford County | 261 |
| Govt's Exhibit 3 | Map, Phillips Incident | 255 |
| Govt's Exhibit 6 | Franklin County, Use of Force Policy (Offered, Page 401) | |
| Govt's Exhibit 10 | Audio Recording, Excerpt #1 from Call, 8-8-19 | 287 |
| Govt's Exhibit 11 | Audio Recording, Excerpt #2 from Call, 8-8-19 | 287 |
| Govt's Exhibit 12 | Audio Recording, Excerpt #3 from Call, 8-8-19 | 287 |
| Govt's Exhibit 13 | Audio Recording, Excerpt #4 from Call, 8-8-19 | 287 |
| Govt's Exhibit 14 | Audio Recording, Excerpt #5 from Call, 8-8-19 | 287 |
| Govt's Exhibit 15 | Report Authored by Mason Berry, 9-14-17 | 278 |
| Govt's Exhibit 16 | Google Map, Mason Berry's Phone, 9-14-17 | 393 |

(Jury in at 8:34 a.m.)

THE COURT: So this is day two of our jury trial. We picked our Jury yesterday, and they are all back for more today. Appreciate you all being here. We're going to begin this morning with opening statements of counsel. But before we do that, I need to provide you with some preliminary jury instructions. They are preliminary in the sense that these are the instructions that the Court will give you before we have received any evidence. And then later, when the case is submitted to you, there will be additional instructions that will be given prior to closing arguments. But I would request your attention at this time for the preliminary instructions.

Ladies and Gentlemen, I will take a few moments now to give you some initial instructions about this case and about your duties as jurors. At the end of the trial, I will give you further instructions. I may also give you instructions during the trial. Unless I specifically tell you otherwise, all of the instructions that I give you, whether now or during the trial, or at the end of the trial, are binding and they -- and you must follow all of them.

This is a criminal case brought against Anthony Boen, the Sheriff of Franklin County, Arkansas, by the United States Government. The government alleges that on

8:36AM three separate occasions, Mr. Boen deprived three different individuals of their civil rights by using unreasonable force against them. Specifically, Mr. Boen is charged with three counts in the indictment.

8:36AM Count One asserts that Mr. Boen, on or about September 14, 2017, deprived Justin Phillips of his civil rights by using unreasonable force.

Count Two asserts that Mr. Boen, on or about November 21, 2018, deprived Brandon English of his civil 8:37AM rights by using unreasonable force.

Count Three asserts that Mr. Boen, on or about December 3, 2018, deprived Zachary Greene of his civil rights by using unreasonable force.

You should understand that these charges are 8:37AM simply accusations. They are not evidence of anything. Mr. Boen has pleaded not guilty to each charge and is presumed to be innocent unless and until such time as he may be proved guilty beyond a reasonable doubt.

It will be your duty to decide from the evidence 8:38AM whether Mr. Boen is guilty or not guilty of the crimes charged.

From the evidence, you will decide what the facts are. You are entitled to consider that evidence in the light of your own observation and experiences in the 8:38AM affairs of life. You may use reason and common sense to

draw deductions or conclusions from facts which have been established by the evidence. You will then apply those facts to the law which I will give you in these and in my other instructions, and in that way, you will reach your verdict.

You are the sole judges of the evidence, but you must follow my instructions in your determination of the facts, whether you agree with those instructions or not. You have taken an oath to do so. Do not allow sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you.

You should not take anything that I may say or do during the trial as indicating what I think of the evidence or what I think your verdict should be.

Finally, please remember that only Mr. Boen, and no one else, is on trial here. And Mr. Boen is only on trial for the three crimes charged and not for anything else.

In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes charged. These are the elements that the government must prove beyond a reasonable doubt to make its case:

As to Count One, which is the crime -- and all counts are the same crime -- Count One, the crime charged

8:40AM is deprivation of rights under color of law. The elements are, one, that on or about September 14, 2017, Mr. Boen deprived Justin Phillips of a right, privilege, or immunity secured by the Constitution or laws of the United States. 8:40AM That is, in this case, the right to be free from the use of unreasonable force by a law enforcement officer.

Element number two, that Mr. Boen acted willfully, which means he committed such act with a bad purpose or improper motive to disobey or disregard the law, 8:41AM specifically intending to deprive the person of that right.

Number three, that Mr. Boen acted under color of law.

And, four, that bodily injury resulted from Mr. Boen's conduct.

8:41AM As to Count Two, again, this is the offense of deprivation of rights under color of law. Here, the elements are similar, but they are specific to the alleged victim.

Element one, that on or about November 21, 2018, 8:42AM Mr. Boen deprived Brandon English of a right, privilege, or immunity security by the Constitution or laws of the United States. That is, the right to be free from the use of unreasonable force by a law enforcement officer.

Element two, that Mr. Boen acted willfully, which 8:42AM means he committed such act with a bad purpose or improper

8:42AM motive to disobey or disregard the law, specifically intending to deprive the person of that right.

Number three, the third element, that Mr. Boen acted under color of law.

8:43AM And the fourth element, that bodily injury resulted from Mr. Boen's conduct.

Count Three, same offense, deprivation of rights under color of law, but different alleged victim.

Element one, that on or about December 3, 2018, 8:43AM Mr. Boen deprived Zachary Greene of a right, privilege, or immunities secured by the Constitution or laws of the United States, that is, the right to be free from the use of unreasonable force by a law enforcement officer.

Element two, that Mr. Boen acted willfully, which 8:43AM means he committed such act with a bad purpose or improper motive to disobey or disregard the law, specifically intending to deprive the person of that right.

The third element is that Mr. Boen acted under color of law.

8:44AM And, four, that bodily injury resulted from Mr. Boen's conduct.

Now, with regard to each of these three counts, I told you that the third element requires the government to prove that Mr. Boen was acting under color of law. The 8:44AM parties agree and have stipulated to this third element in

8:44AM each charge and that Mr. Boen was acting under color of law.

You should understand, however, that the preliminary instructions as to this offense that I have given you is only a preliminary outline. At the end of the trial, I will give you a final instruction on these matters. If there is any difference between what I just told you and what I tell you in the instructions that I will give you at the end of the trial, the instructions given at the end of the trial must govern your deliberations and findings.

Now, I've mentioned this word "evidence." Evidence includes the testimony of witnesses that you will hear from in the course of this trial. It includes documents and other things received as exhibits that you will have available to you back in the jury room for deliberations. It also includes any facts that have been stipulated, that is, formally agreed to by the parties, like the color of law stipulation that I just referenced. It also includes any facts that the Court may judicially notice, that is, facts which I say that you may, but are not required, to accept as true even without evidence.

However, certain things are not evidence and I need to give you a list of those things. Number one, the statements, arguments, questions, and comments by the

8:46AM lawyers representing the parties in this case are not evidence.

Number two, objections that a lawyer might make to evidence or testimony are not evidence. Lawyers have a 8:46AM right, and indeed an obligation, to object when they believe that something is improper. You should not be influenced by the objection. If I sustain an objection to a question, you must ignore the question and must not try to guess what the answer might have been.

8:47AM Number three, any testimony that I instruct is to be stricken from the record or that I tell you to disregard is not evidence and you may not consider it.

Number four, anything that you see or hear about this case from outside the four walls of this courtroom is 8:47AM not evidence unless for some reason I specifically tell you otherwise during the trial.

Furthermore, sometimes a particular item of evidence is received for a limited purpose. That is, it can be used by you only for your consideration of one 8:48AM purpose, but not any other purpose. If this situation arises in this trial, I will alert you to that situation and I will instruct you on the purposes for which the item of evidence can be considered and why it may not be considered for other purposes.

8:48AM Finally, some of you may have heard the terms

"direct evidence" and "circumstantial evidence." You are instructed that you should not be concerned with those terms because the law makes no distinction between direct and circumstantial evidence. You should give all evidence the weight and value that you believe it is entitled to receive.

So in deciding what the facts are in this case, you may have to decide what testimony you believe and what testimony you do not believe. And you may believe all of what a particular witness says, or only part of what a particular witness says, or it may be that you believe none of what a particular witness says.

In deciding what testimony of any witness to believe, you should consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying. Whether that witness said something different at an earlier time, the general reasonableness of the witness's testimony, and the extent to which the testimony is consistent with other evidence that you do believe.

At the end of the trial, you must make your decision based on what you recall of the evidence presented during the trial. You will not have a written transcript

8:50AM in the jury room to consult and it may not be practical for the court reporter to read back lengthy testimony. So you must pay close attention to the testimony as it is given. Any exhibits that are received, you will have those

8:51AM available to you in the jury room.

If you wish, you may take notes to help you remember what witnesses said. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. And do not let

8:51AM note-taking distract you so that you do not hear other answers by the witness. That's a common problem that I have. I'm writing my notes down and I miss a few questions and answers. I think that's a common phenomenon. So I want you to take notes, but just understand that you have

8:52AM got to be careful not to miss anything.

When you leave at night, your notes will be secured by the clerk and not read by anyone. In other words, you may not take your notes home with you. During the trial, it may be necessary for me to talk with the

8:52AM lawyers outside of your hearing us either by having a bench conference that will normally gather over here at the end and we'll pump some white noise into the jury box so you can't hear us. Or it may be necessary in some instances to actually have a recess, send you all back to the jury room

8:52AM so that we can have a better conversation in the courtroom.

8:53AM Please understand that while you are waiting for us at these bench conferences, we are working. The purpose of these conferences is to decide how certain evidence is to be treated under the Rules of Evidence and to avoid confusion and error, so we are trying to get it right. There's the old expression about it can be "hard to un-ring a bell." So we're trying to present you with the proper evidence in accordance with the Rules of Evidence, and in that sense, we are working and we do not mean to waste your time or to be perceived as wasting your time. We will, of course, do what we can to keep the number and length of these conferences to a minimum.

To ensure fairness, you, as jurors, must obey the following rules. And I covered some of these rules in voir dire and so they will be familiar to you. But I covered them in voir dire to make sure that you would understand that if you're selected, these are the rules you have to abide by, and that is true. Here they are:

First, do not talk or communicate among yourselves about this case or about anyone involved with it until the end of the case when you go to the jury room to decide your verdict.

Second, do not talk with anyone else about this case or about anyone involved with it until the trial has ended and you have been discharged as jurors.

8:54AM Third, when you are outside the courtroom, do not let anyone approach you and do not let anyone tell you anything about the case or about anyone involved with it until the trial has ended and your verdict has been accepted by me. 8:55AM If anyone tries to talk with you about this case during the trial, please report it to the courtroom security officer.

Fourth, during the trial, you should not talk with or speak to any of the parties, the lawyers, or witnesses involved in the case. 8:55AM You should not even pass the time of day with them or talk about the Razorbacks with them. It is important not only that you do justice in this case, but that you also give the appearance of doing justice.

8:55AM For example, if a person from one side of the lawsuit were to get off the elevator out here and see you a few yards away speaking with someone else, a witness or a party or a lawyer, the wrong impression could be conveyed. An unwarranted and unnecessary suspicion about your 8:56AM fairness might be aroused. So if any lawyer, party, or witness does not speak to you when they pass you in the hallway or perhaps ride the elevator with you, it's not because they are trying to be rude. It's because the lawyers know that they are not supposed to speak with you 8:56AM and so they will take efforts to be sure that they avoid

8:56AM that. Again, this would be because they are not supposed to talk or visit with you.

Fifth, it may be necessary for you to tell your family, close friends, teachers, coworkers, or employer about the fact of your participation in this trial.
8:56AM And it's fine if you need to explain to them some logistics like when you are required to be in court. And you can also tell them not to ask you questions about this case or to tell you anything that they know or think about this
8:57AM case and to not discuss the case in your presence. But you must not communicate with anyone about anything else related to this case, nor may you post information about the parties, witnesses, participants, charges, evidence, or anything else related to this case.

8:57AM You must not tell anyone anything about the jury's deliberations once those begin in this case until after I accept your verdict or until I give you specific permission to do so. If you discuss this case with someone other than your fellow jurors when you're authorized to do
8:57AM so during deliberations, it could create the perception that you have clearly decided the case, or that you may be influenced in your verdict by their opinions. That would not be fair to the parties and it may result in the verdict being thrown out and the case having to be retried.

8:58AM During the trial, while you are in the courthouse

8:58AM and after you leave for the day, do not provide any information to anyone by any means about this case. In other words, do not talk face to face and do not have communication by an electronic device or over any type or form of social media, not by cell phone or smartphone, not by computer, not via anything connected to the internet, not by text message, not by instant message. Not in any chat room, blog, website, or app such as Facebook, Instagram, YouTube, or Twitter, or any other way that exists to communicate with anyone on the outside world about any information about this case until such time as I have accepted your verdict.

Sixth, do not do any research. Do not do research on the internet or in libraries or in newspapers or in any other way. You may not make any investigation about this case on your own. Do not visit or view any places that may be discussed in this case and do not use any internet programs or other devices to search for or to find a way to view any place discussed in the testimony. Also, do not research any information or news stories about the case, the law, or the people involved, including the specific parties here, the witnesses, the lawyers, or even the Judge.

Seventh, do not read any news stories or articles in print or on the internet or on a blog about this case or

9:00AM about anyone involved with it, nor are you allowed to listen to any radio or television news reports about this case or about anyone involved with it. In fact, until the trial is over, I suggest that you avoid reading any state
9:00AM or local print or digital newspapers and avoid listening to television or radio newscasts at all. I do not know whether there might be any news reports on this case, although I suspect that there will be. So it could be that you would turn on the T.V. news and inadvertently find
9:00AM yourself reading or listening to something before you could do anything about it, so the better practice is to just not go there.

If you want, you can obviously have your spouse or a friend clip out any stories and set them aside to give
9:01AM you after the trial is over. That said, I can assure you that you have the best seat in the house and that by the time you have heard the evidence in this case, you will know what you need to know to return a just verdict.

The parties have a right to have the case decided
9:01AM only on the evidence that they know about and that has been introduced here within the four walls of this courtroom. If you were to do some research or investigation or experiment that we don't know about, then your verdict may be influenced by inaccurate, incomplete, or misleading
9:01AM information that has not been tested through the trial

9:01AM process, including the process that involves the oath that all witnesses must take to tell the truth and by the process of cross examination. All of the parties are entitled to a fair trial rendered by an impartial jury, and 9:02AM you must conduct yourself as to maintain the integrity of the trial process. If you decide a case based on information not presented in court, you will have denied the parties a fair trial in accordance with the rules of this country and you will have done an injustice. It is 9:02AM very important that you abide by these rules.

Remember, you have taken the oath to abide by these rules and you must do so. Failure to follow these rules may result in the case having to be retried and, in fact, potentially could result in you being held in 9:02AM contempt.

Eighth, do not make up your mind during the trial about what the verdict should be. You must keep an open mind until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the 9:03AM evidence.

The trial will now proceed in the following manner. First, the government's attorney will make an opening statement, then Mr. Boen's attorney may make an opening statement. Remember, the opening statements of the 9:03AM attorneys are not evidence, but merely a summary of what

9:03AM each attorney expects the evidence to be.

The government will then present its evidence and counsel for Mr. Boen may cross-examine. Following the government's case, Mr. Boen may, but does not have to,
9:03AM present evidence, testify, or call other witnesses. If Mr. Boen does call witnesses, then the government will have an opportunity to cross-examine them. After presentation of all of the evidence is complete, the attorneys will make their closing arguments to summarize and interpret the
9:04AM evidence for you. As with opening statements, closing arguments are not evidence. The Court will instruct you further on the law immediately prior to closing arguments. After that, you will be instructed on the deliberation process and you will go to the jury room to deliberate your
9:04AM verdict.

The government may proceed with its opening statement at this time.

MR. WOOD: Your Honor, may we approach?

THE COURT: Yes.

9:04AM (bench conference)

MR. WOOD: The mother of the alleged victim, Zach Greene, is in the courtroom. We have subpoenaed her. She tried to come in yesterday and they turned her away. We have no control over her and she needs to be advised
9:05AM that she needs to stay out of the courtroom until such time

9:05AM as she is called as a witness.

THE COURT: So she's on your witness list?

MR. WOOD: That's correct.

THE COURT: Okay. So we haven't discussed Rule 615. So you're invoking the Rule at this time?

MR. WOOD: That's correct.

THE COURT: The Rule is invoked. I will make a general announcement. I don't know who these people are, so to a certain extent, I'm going to need the attorneys' assistance in policing the Rule. If you see a witness in the courtroom, just as Mr. Wood has done, let the Court know and we'll take it up.

MR. WOOD: Thank you.

(bench conference concluded)

THE COURT: Let me make one more announcement for purposes of members of the public who may be watching the trial, but in particular, anyone who has received notice that you are a witness in this case.

Under the Rules of Evidence, witnesses other than the parties or a representative of the party, may be excluded from the courtroom until such time as they testify and have been dismissed as a witness. So if you have been advised that you're going to be a witness, you may stay through opening statements, but when we begin receiving evidence from witnesses, you will have to wait. And there

9:07AM are benches outside, or perhaps you can consult with the attorney that has arranged for you to be a witness and they will give you a time that you should be at the courthouse to be available. So, again, you may stay for opening statements, but you may not stay during the evidence portion of the case.

Mr. Carter?

MR. CARTER: Thank you, Your Honor.

Shocked. That's a word that I believe will come up continuously for you throughout this trial. Let me say it again. Shocked. That's the reaction that many of the witnesses to the defendant's alleged crimes in this case had when they observed the defendant's actions; actions against detainees for whom the defendant was responsible in his capacity as the Franklin County Sheriff.

Over the course of this trial, you will hear from at least four separate law enforcement officers who witnessed three separate events, all of which shocked them, and in some cases, caused them to leave the profession of law enforcement altogether. Many of these law enforcement officers were high-ranking deputies with the Franklin County Sheriff's Office, many with years of law enforcement experience. People who the defendant had hired, promoted, and employed during his time as the Sheriff of Franklin County.

9:08AM Ladies and Gentlemen, what I'm going to outline for you here and what I believe you will see over the course of this trial is that these three events, they did not occur in the heat of the moment. I believe the
9:08AM evidence will show you that these are not incidents of police brutality where you are going to have to second guess an officer's actions. I believe you will see that the three counts in this indictment are three separate, premeditated, and deliberate attacks by the defendant in
9:09AM his official capacity as the Sheriff of Franklin County.

The first of these attacks occurred to Justin Phillips on September 14th of 2017. The second occurred to Brandon English on November 21st, 2018. The final occurred to Zachary Greene just a couple of weeks
9:09AM later on December 3, 2018.

These attacks deprived Mr. Phillips, Mr. English, and Mr. Greene of their Constitutional rights to be free from the use of unreasonable force. We're going to begin with Count One.

9:09AM This incident occurred on September 14th of 2017. And I would like to present what I believe the evidence will be for Count One through the eyes of Mason Berry. He's a deputy who you will hear from later in this trial. Now, back in 2017, September of 2017, Mason Berry was a
9:10AM uniformed Franklin County Sheriff's deputy. I think when

9:10AM he takes the witness stand, he'll refer to it as being a road deputy. He'd been in the job about two years back in 2017. Now, September 14th of 2017 is Mason Berry's day off. That afternoon, he received a call from the 9:10AM defendant, Sheriff Anthony Boen. The defendant wanted Mason to come in to work that day so that he could go to the hospital in Van Buren to monitor an inmate who was there with a medical issue. That inmate was Justin Phillips. Phillips was a Franklin County detainee, but he 9:11AM had been transferred to the Crawford County Jail just recently.

Now, Mason agreed to come in on his day off, but to undertake this undertaking, he wanted another deputy to accompany him, so a part-time reserve deputy was assigned 9:11AM to accompany Mason to the hospital in Van Buren. Mason and his backup reserve deputy reported to the Van Buren hospital where they joined Justin Phillips. They stayed with Phillips at the hospital until he was finished receiving his treatment and they transported him back to 9:11AM the Crawford County Jail. Mason at this point thought the interruption of his day off was nearly over. He was wrong.

Now, just as Mason is leaving the Crawford County Jail, standing in the parking lot even for the Crawford County Jail, Mason received a second telephone call from 9:11AM the defendant. And this call was different from the first

call that brought Mason in on his day off. When Mason testifies, I believe that he will tell you that one of the first things the defendant said on the phone was to ask Mason if he was by himself. Now, of course Mason wasn't. He had that part-time reserve deputy there with him that had been assisting all afternoon. When Mason told the defendant this, the defendant told Mason to get out of the car so that they could speak privately. Mason did as he was told.

9:12AM Once alone, the defendant told Mason to return to Franklin County, drop off that part-time deputy, and then come to the defendant's house to pick him up. And once they were in the vehicle together, they would travel back to Crawford County, get Justin Phillips, and return him to the Franklin County Jail. Now, at this point, Mason becomes puzzled. His boss, the defendant, the elected Sheriff of Franklin County, wants him to leave where he's at, the Crawford County Jail, where Justin Phillips is literally on the other side of the wall, drive all the way back to Franklin County, pick him up so they can drive back to Crawford County to get Justin Phillips in order to take him to the Franklin County Jail. This doesn't make sense to Mason, especially given that he literally was standing in the parking lot of the Crawford County Jail and could go inside and get Justin Phillips right then and accomplish

this in a single trip. Mason is puzzled by this, but the evidence is going to show you that Mason did as he was told. He returned to Franklin County, dropped off the reserve deputy, and picked up the defendant at his house.

The defendant entered Mason's patrol vehicle, and I believe the evidence will show you that at this point, Mason's puzzlement turned to concern. Mason grew even more concerned based upon the instructions that the defendant gave him during the approximate 45-minute ride from the defendant's house back to the Crawford County Jail. I believe that Mason will testify that during this ride, the defendant told him, "We're going to take care of this."

The defendant elaborated further and told Mason the plan of on the way back, Justin Phillips is going to escape, and we're going to call that in as an escape, and that will give us the excuse we need to stop the car and take care of this, take care of business. They had each others' backs on this because they are brothers in blue.

Now, at this point, Mason's concern, it turns into shock. Mason is shocked at what he hears the defendant saying, but not as shocked by what he witnessed later. As they started the journey back to Franklin County after picking up Justin Phillips, the defendant turned up the radio in the patrol vehicle very loud, blaring music at a very loud volume. I think that Mason will testify that

9:15AM as this was happening, the defendant was talking to Justin Phillips in a snide, profane manner. Mason was shocked when the Sheriff began yelling for Phillips to sit back down, yelled that Phillips was escaping when Phillips was

9:15AM just sitting back in the back seat of the patrol vehicle with his hands cuffed and his legged shackled.

The defendant ordered Mason to pull over. This is the Mulberry exit on I-40. Maybe you're familiar with this area. It's very, very rural. At this point, it's

9:16AM also very, very dark. Mason did as the defendant instructed him. He made a radio call that Phillips was escaping, even though Phillips was just handcuffed and shackled, sitting in the back seat. And this is when I believe Mason will testify that the real shock, the serious

9:16AM shock began.

Mason watched as the defendant exited the vehicle and made a beeline for the back passenger door. Mason watched as the defendant yanked open that door. Mason listened as Justin Phillips began to scream, "God, why me?

9:16AM Why are you doing this?" Mason watched in shock as the defendant hit Justin Phillips, five, six, seven times with a closed fist, all making contact with the head area of Justin Phillips while Phillips was still handcuffed and in leg shackles. Mason was shocked, but he finally

9:17AM intervened.

9:17AM I believe that the evidence is going to show you that Mason got himself between the defendant and Justin Phillips, got between this man, his boss, the elected Sheriff of Franklin County and stopped the attack on Phillips, got the patrol vehicle door shut, putting Phillips safely back inside. But Mason himself would not get back into the patrol vehicle until he made sure the defendant was back in the front passenger seat. At that point, Mason got himself back into the patrol vehicle, turned on his lights, turned on his sirens, and got back to Franklin County just as quick as he possibly could, still shocked, sickened by the situation, so much so that almost as soon as Mason got back to the Franklin County Jail, he went home as quickly as he could.

9:18AM Mason went home and he began contemplating his exit from the Franklin County Sheriff's Office because he was so shocked by what he had seen the defendant do. A few days later, the defendant, the Sheriff, asked Mason to write an official report about what happened. It was a false account. The Sheriff asked him to write a false account of what happened. And Mason again did as he was told and wrote this false report. And not long after that, the defendant rewarded Mason with a promotion. The defendant made Mason the Chief Deputy of the Franklin County Sheriff's Office, the number two job in that

department right under this man.

Even though it was a huge promotion, Mason voluntarily left the Sheriff's Office not very long after receiving the promotion because the shock of what he had experienced on September 14th, 2017, had not worn off. Today, I think you will find Mason is clear out of the law enforcement profession. He has an office job with the State of Arkansas and his desire to work as a police officer, the desire he had since he was a little boy, completely drained from him by the shock of what he saw that night. Mason was absolutely shocked and he was absolutely terrified to report it.

Kevin Hutchison is a veteran law enforcement officer. In November of 2018, I believe the evidence will show that he had been a law enforcement for about 20 years, maybe a little less, but he had been at Franklin County for somewhere between nine and 10 years at that point. He was a criminal investigator and he was eventually promoted to sergeant by the defendant. It is through his perspective that I would like to outline for you the evidence that you will hear regarding Count Two of the indictment.

Like Mason previously, Kevin was shocked by what he saw unfold, this time on November 21st, 2018. Around this time, Kevin was conducting an investigation into a series of thefts that had been occurring in or around

Franklin County. This investigation had zeroed him in on a series of suspects, one of which was a man named Brandon English. Eventually, Kevin gathered enough evidence in his investigation to arrest English. This is a few days before November 21st. English was in possession of some stolen items. Once English was arrested, he was taken to the Franklin County Jail, and on a couple of occasions, two occasions, Kevin made attempts to interview Brandon English, took him into an office, read him his Miranda warnings, turned on the recorder, and tried to ask English questions about the crimes that he was being accused of. I think that Kevin Hutchison will testify that these interviews were not helpful; they did not provide useful information. English, a day or two after these interviews, posted bond and left the jail. Now, none of this is shocking. This is really just kind of routine police work, quite frankly.

Now, Kevin had been keeping his boss, again this man, the elected Sheriff of Franklin County, up to speed on the investigation. The defendant was aware that English had been arrested previously and had been interviewed twice and nothing useful had come from these interviews. So on or about November 21st, 2018, English was arrested once again. This arrest was related to that same series of thefts that Kevin Hutchison was previously investigating.

Kevin updated the defendant to this development, the second arrest, and I believe when Kevin testifies, he will tell you that when the defendant heard that English had been arrested again, the defendant seemed irritated this time; irritated that English was once again in his jail, back in the Franklin County Jail. So about 15 minutes after the defendant was updated, the defendant showed up in Kevin's office. The defendant had an order for Kevin. That order, "Go get Brandon English."

Now, Kevin, like Mason before him, followed the instructions of his boss and retrieved English from the jail and he was taken to an office there at the Franklin County Sheriff's Office. This office belonged to a man named Travis Ball. Travis Ball is another investigator with the department. He's also a veteran law enforcement officer who at the time of this event had had about 10 years' experience in law enforcement at various agencies in the area, but he had been hired by the defendant back in 2017 to work at Franklin County.

So present in this office was Brandon English, who was seated in a chair across from a desk. Travis Ball, it was his office, so he was seated behind the desk. The defendant, who sat himself in the chair next to Brandon English. And also Kevin Hutchison, who was standing, because the room is out of chairs, next to a closed door.

9:23AM Now, this interview was different than the first two interviews that Kevin had conducted several days prior. Nobody read English his Miranda warnings. Nobody turned on a recorder. And this man, the defendant, is the one that did the questioning, if you can call it questioning. I believe that when Kevin testifies, he will tell you that as soon as the defendant began asking questions of English, the defendant got agitated, yelling at English. And this is when the shock begins. English was sitting in a chair, calmly. The defendant jumped out of his own chair, lunged at English, knocking both English and the chair he was sitting in backwards where English found himself in kind of a seated position on his back in the chair. And Kevin watched as the defendant grabbed English by his long hair and pinned him down, screaming obscenities at him. This took place for about 30 to 45 seconds. Kevin was shocked at what he was seeing. He was shocked at what he was hearing. And I believe when Kevin testifies, he will tell you that in his almost 20 years of law enforcement experience, he had never seen anything like this happen. I believe he or Travis, or both of them, will testify about the look of shock they exchanged as this was occurring. They were shocked.

On December 3, 2018 -- this is less than two weeks later -- yet another law enforcement officer was

shocked by the defendant's behavior. This is the conduct that makes up Count Three of the indictment. Dalton Miller is a very young law enforcement officer. I think he had been a Franklin County Sheriff's deputy only for about a year prior to December 3rd. He was hired by the defendant. It's through his observations and the observations of Travis Ball that I would like to present you the evidence in this third count of the indictment.

During the week of December 3, 2018, the Franklin County Sheriff's Office was getting some new software installed to help administer the running of the jail and the Sheriff's Office. This software company will frequently treat its customers to meals while they are doing one of these installs. On December 3, 2018, such a meal was taking place at the Bricktown Brewery just a couple of blocks that way here in Ft. Smith. Present at this meal was a software company representation. His name is Christopher Roberson. He was treating the defendant, the defendant's date, Travis Ball, and Travis Ball's wife to this dinner. Also present at the dinner was a woman named Scout Simpson, though I think she's gotten married since then and she goes by Scout-Ingram now. She was an 18-year-old dispatcher at the Franklin County Sheriff's Office at that point. I believe the evidence will show you that as this meal and drinks were being consumed, the

9:27AM defendant got a call from the jail. There had been a disturbance among the inmates just a little bit after 6:00 p.m., but it was under control. The meal commenced, alcohol was consumed, and plans were made for the defendant 9:27AM to stop by the jail when they got done with their meal and made their way back to Franklin County.

The disturbance had involved a detainee named Zachary Greene. The Franklin County Jail, because of space limitations, was housing Zachary Greene in an area that I 9:27AM think all of the witnesses will refer to as the "shower room." Now, there's no shower in the shower room. I believe they call it that because there's a shower curtain that closes the entrance to the room. What this area really is, is a really small enclave, a cutout of a hallway 9:28AM just outside the jail's kitchen. Inside the shower room, there's a metal bench affixed to the floor and wall. And when they have to house an inmate there, they shackle them by the leg to that bench. This is how Greene was held in the jail on December 3, 2018, when the disturbance happened 9:28AM that caused the phone call to the Sheriff.

Greene was still housed in this space when the defendant arrived at the jail after his meal, and this was well after the disturbance involving Greene at 6:00 p.m. had passed. I believe when he testifies, Travis will tell 9:28AM you that almost immediately upon entry of the jail, the

9:28AM defendant made his way to the shower room where Greene was shackled to the bench, lying on the floor of this room, his head kind of propped up against the wall in this small area. Travis followed, watching, shocked as the defendant 9:29AM picked up a cup of water that was on the bench and threw it in Greene's face. Travis was even more shocked by what he observed next. As Greene remained seated on the floor, shackled to this bench, the defendant reached into the shower room, and with a closed fist, but the back of his 9:29AM hand, struck Greene four, five times, taunting Greene between strikes. Travis saw Greene bleed from his mouth and lip area as a result of the defendant's strikes. Travis, shocked from what he saw, walked away. But this didn't end the incident.

9:29AM Remember Deputy Dalton Miller, he was also at the jail. He reported there from his patrol duties at one point to look into this disturbance at the jail and eventually found him in the company of this man, the Sheriff. He asked for a word with Dalton. Dalton followed 9:30AM the defendant down the hall of the jail back towards this shower room, and I believe Dalton, when he takes the witness stand, will tell you that the Sheriff posed him a question. "Dalton, can I trust you?"

Now, Dalton, like Mason before him, was puzzled 9:30AM by this, but assured the defendant, his boss, the elected

Sheriff of Franklin County, that he was trustworthy. Now, the defendant's next actions puzzled Dalton even more. I believe when Dalton takes the witness stand, he will tell you that the defendant sort of grabbed him by the shoulders and moved Dalton and positioned him in a certain spot around this shower room. And this seems puzzling and seems weird, but I believe the evidence is going to show you that that was purposeful to block the view of a camera down the hall.

Dalton's puzzlement, it turned into shock as he watched his boss -- again this man, the defendant -- lean into this shower room for the second time that night and start hitting Greene in a backhanded manner, making contact three, four times. This is while Zachary Greene is still sitting on the floor, head propped against the wall, ankles shackled to a bench.

The defendant did stop hitting Greene when Dalton, after he recovered from the initial shock, asked the defendant, "What are you doing?" At this point, the defendant stops striking Greene, but he did spit on Greene, causing Dalton to walk away in what I think he will describe to you as disgust. Disgust and shock.

Ladies and Gentlemen of the Jury, at this point, Travis Ball is going to witness to the incidents in Counts Two and Three of the indictment, and I think when he

9:32AM testifies, you will find out that he's got some information about Count One as well. Travis is troubled by these things, and in early February of 2019, after a few weeks of struggling with it, Travis makes the very difficult decision to approach the FBI and tell them what he knows. This causes the investigation of the defendant and ultimately causes us to all be here today. This is very hard for Travis to do. He's very reluctant to make this report. And that's another common theme I think you will see throughout this trial, one of reluctance. Reluctance on the part of the law enforcement officers to report what they have seen, their boss, this man, the defendant, the elected Sheriff of Franklin County, do. In some cases, I believe the law enforcement officers will even tell you they were intimidated.

The officers will tell you that they decided to come forward because they knew the defendant's unprovoked beatings were wrong. They knew the defendant dishonored what they stood for as law enforcement officers.

9:33AM Ladies and Gentlemen, this has merely been an overview of the evidence encompassing Counts One, Two, and Three of the indictment through the eyes of the law enforcement officers who watched it. It's not a preview of all the evidence that you will hear. The witnesses I previewed for you are not the only witnesses you will hear

9:33AM from. You will actually hear much more. This is going to include evidence relating to the efforts the defendant took to cover up these incidents. It's going to include evidence that includes testimony from officers who heard 9:34AM the defendant bragging about these incidents. It will include evidence regarding the defendant's later promotion of Travis Ball to Chief Deputy, witness to two of these events, once the defendant realized he was under investigation by the FBI.

9:34AM Ladies and Gentlemen of the Jury, when you hear all of this evidence, I believe you too will find yourselves shocked by what you hear. Now, upon hearing all of this evidence, I believe the only conclusion you're going to be able to draw as members of the Jury is that the 9:34AM defendant is guilty; guilty of trying to place himself above the law. Guilty of using his office as the Sheriff of Franklin County to deprive three individuals of their Constitutional rights by using unreasonable force against them. I thank you for your attention this morning.

9:35AM THE COURT: Thank you, Mr. Carter.

Mr. Prater, you may deliver the opening statement for the defense.

MR. PRATER: Thank you, Your Honor.

Ladies and Gentlemen of the Jury, please allow me 9:35AM to introduce myself. My name is Paul Prater. Russell Wood

9:35AM is at the defense table, and Sheriff Anthony Boen is our client.

The case you're going to hear is about a Sheriff, one who was overwhelmingly elected, and has served his community where he was born and raised for 11 years in that capacity. Sheriff Boen has been accused by the government of assaulting three inmates on three different occasions. The Sheriff has pled not guilty, and he has vehemently denied these charges against him. Indeed, that's why we are here today.

The Sheriff stands here today wrongly accused, and at the end of this trial, we're going to ask you to render a verdict of not guilty, the only appropriate verdict in this case.

The government has brought three separate charges, and each one of them is factually different. There's not a dispute as to the law; however, there's much dispute when it comes to the allegations and the facts in this case.

You will see no videos. You will see no medical records that back up any of these allegations of assault by the Sheriff. You will not be presented with documentary evidence that will support the government's accusations. This trial is going to be about witness testimony, so credibility is crucial. It's very important that you as

9:36AM Jury members listen and pay attention to all of the witnesses who present in this matter.

The only thing you are going to hear from the government is testimony from alleged witnesses who will
9:36AM tell you what they claim to have seen. Throughout this trial, you are going to see firsthand how unreliable the government's eyewitnesses' testimony is. You will hear conflicting stories. It's likely that you will hear witnesses change their stories from previous versions.
9:37AM It's important too as this trial progresses that you take notes, for a few reasons.

First, there's a lot of similar names. You've already heard some of those. There's a Kambrie English. There's a Zach English. There's a Brandon English. So
9:37AM it's important to note these names. They are confusing even for us. It's crucial that you keep them separate. And then timelines and dates are also going to be important in this. I think you will hear conflicting testimony as to when certain things happened, so it's important to pay
9:37AM attention to those timelines and to those dates.

Now, you get to decide who you believe, but more importantly, it's your job to decide if the government has put on enough proof to convict the Sheriff. It's the government's job to put on that proof.

9:37AM Now, there are some facts that both sides are in

agreement on. The first, you already heard an instruction about acting under color of law. That means the defendant was the Sheriff and was acting as the Sheriff the entire time. We agree on that issue. Secondly, the Sheriff was present at all of these alleged incidents. We agree to that. We're not making a claim of mistaken identity or anything along those lines. The Sheriff was indeed there. And the Sheriff is entitled to use force under the law. That's about all we can agree on.

The rest of the facts are disputed, they are convoluted, and they are full of inconsistencies. The government and the defendant disagree about whether force was used in some instances. Was it used to intentionally deprive the alleged victims of their rights, and that the alleged victims were injured in any way by the Sheriff.

Now, let's start with the first allegation. In September of 2017, the Sheriff was alleged to assault an inmate in the back of a vehicle while transporting him from Crawford County back to Franklin County. This is Justin Phillips, who you just heard about. The Sheriff and Mason Berry, who will be one of the government's witnesses, were transporting Justin Phillips back. He was in the back of the vehicle, and the evidence will show that Justin Phillips was slipping his cuffs and was kicking and thrashing around in the back of the vehicle. The vehicle

9:39AM was stopped so the Sheriff could check on the cuffs, and at that point, Justin Phillips resisted and a fight ensued.

Mason Berry, who the government has introduced you to, filed a police report detailing this escape attempt

9:39AM and the fact that he was tearing up the back of the vehicle. Now, aside from Justin Phillips, the only other witness to this is Mason Berry, and his testimony will be contradictory. You won't see any video, but you will see the report that Mason Berry filed, the report that details

9:39AM the escape attempts. You will not hear any testimony that Justin Phillips asked for any medical attention or that he made any report of any alleged assault until three years later when he was approached by the FBI.

The second alleged assault was in November of

9:40AM 2018 when Sheriff Boen was questioning an inmate, Brandon English. During this questioning, Sheriff Boen grabbed Brandon English by the shirt. When he did, Brandon English backed away and that chair flipped over. The evidence presented by the government's eyewitnesses will again be

9:40AM conflicting as to what actually happened next. The evidence will show the Sheriff did not act willfully in depriving Brandon English of a right and that there were no injuries to Brandon English. Again, he did not seek any medical attention, he did not make a report, and he did not

9:40AM report this alleged assault to anyone again until he was

approached by the FBI.

Finally, in December of 2018, the evidence presented will show that Sheriff Boen was at a dinner here in town when he was called back to the Sheriff's department because a fight broke out between an inmate, Zach Greene, and a trustee. The Sheriff had to use force when dealing with this erratic inmate who had already been involved in a fight with another prisoner and sustained injuries. Again, the evidence will also show the Sheriff did not act willfully in depriving this person of their rights, and there were no injuries to Zach Greene which were caused by the Sheriff. Any injuries Greene received were from his fight with another inmate.

Once again, you will hear contradicting testimony from witnesses. Travis Ball has already been mentioned. Two different witnesses are going to say that they were the only ones present to witness this. And these are the government's witnesses. Again, you won't see any video. There was mention of a video camera. It didn't aim into that room. There is no video of any assault. You will be presented with evidence that will show that Zach Greene's injuries were sustained in a fight that occurred before the Sheriff arrived at the jail. You will not see any videos or photographs showing additional injuries after the Sheriff arrived, nor will you hear any testimony that

9:41AM anyone saw any additional injuries after the Sheriff's use of force.

Now, the facts are different in each of these three allegations. It's important that you remember that 9:42AM there are three separate allegations here, three individual charges. Each one must be viewed separately and considered on its own and independently. There's no totality of allegations that lead to an assumption of wrongdoing. Remember, the presumption is that Sheriff Boen is innocent. 9:42AM It's the government's burden to prove all elements on all three charges.

At the end of this trial, we will ask you, the Jury, to find that the government has not met their burden of proof on each of the elements for each of these separate 9:42AM charges. We will ask you to find that the defendant is not guilty of all charges which the government has alleged against him. Thank you.

THE COURT: Thank you, Mr. Prater. I'm debating on whether we should take our morning recess a little bit 9:43AM early. It would help me if I knew how long the first witness is going to be on direct.

MR. SONGER: Yes, Your Honor. We would advise the Court that we expect the first witness will be pretty long. I would think at least a couple of hours.

9:43AM THE COURT: All right. Ladies and Gentlemen, why

9:43AM don't we go ahead and take our morning recess a little bit early. I would suggest about 15 minutes this time. And then I'll be asking you later whether 15 minutes is okay for these type of breaks or whether, because of mask

9:43AM fatigue, we need a little bit longer, but let's start with 15 minutes. I think the clock on the wall back there is a little fast, but by my watch, let's plan on going back in session with our first witness at 10:00. We're in recess.

(Jury out at 9:43 a.m.)

10:03AM (Jury in at 10:04 a.m.)

THE COURT: I'll remind any potential witnesses that if you're in the courtroom, and unless you're seated at counsel table, you need to leave the courtroom at this time as the Rule has been invoked.

10:04AM The government may call its first witness.

MR. SONGER: Thank you, Your Honor. The United States calls Mason Berry.

THE COURT: Mr. Berry, if you would please come forward, wind yourself through this maze of plexiglass.

10:04AM Sir, if you would actually pause about there and raise your right hand.

(witness sworn)

THE COURT: If you could situate yourself in our witness box. Mr. Berry, our general mask rule is that

10:05AM everyone must wear a mask unless they are in a speaking

10:05AM role. A witness is considered to be in a speaking role, so you may remove your mask. I'm not going to require you to do that, but sometimes it is helpful for the fact-finders to be able to make credibility assessments and demeanor assessments if you would remove your mask, but I'm not going to require you to unless you want to. All right. Thank you, sir.

MASON BERRY, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SONGER:

Q. Good morning, sir.

A. Good morning.

Q. We're talking to each other today through a number of walls of glass here like a hockey penalty box, so if you ever have any trouble hearing me, please just say so and I'll repeat the question. Okay?

A. Okay.

Q. To get us started, could you please introduce yourself to the Jury by telling us your full name.

A. My name is Mason Mark Hamilton Berry.

Q. Could you spell your last name, please?

A. B-E-R-R-Y.

Q. Mr. Berry, how are you currently employed?

A. I'm employed with the State of Arkansas.

10:06AM Q. What do you do with the State of Arkansas?
A. I'm a caseworker for child support enforcement.
Q. And what does that mean, that you're a caseworker for child support enforcement? What do you do?
10:06AM A. I monitor cases to make sure child support is being paid and on time and in an acceptable manner.
Q. Have you ever worked at the Franklin County Sheriff's Office?
A. I have.
10:06AM Q. When did you start working there?
A. About 2014.
Q. And what was your first job with Franklin County?
A. Part-time dispatcher.
Q. Was that job in the jail?
10:06AM A. Yes.
Q. At some point, did you move out to the road?
A. I did.
Q. And when was that?
A. Late 2014.
10:07AM Q. And what would you call your job title then?
A. Patrol deputy.
Q. Would you consider that to be a promotion?
A. Absolutely, yes.
Q. And who promoted you?
10:07AM A. Sheriff Boen.

10:07AM Q. And were you excited to be out there on the road?
A. Absolutely.
Q. Did you call anybody to tell them when you got promoted?
10:07AM A. Everybody.
Q. Why did you go to work in law enforcement, sir?
A. Ever since I was a kid, I've always had a great respect for law enforcement. I had a lot of mentors in my life as a child that were in law enforcement and I always
10:07AM had high respect.
Q. Now, before you could start working that new position as a patrol deputy, did you have to complete any training?
A. I did. I first went to the reserve training academy, and then after that, I went to the ALETA full-time, 13-week
10:08AM academy.
Q. That's the full law enforcement certification course?
A. Yes.
Q. You said it was 13 weeks?
A. Yes.
10:08AM Q. Did that 13-week training include instruction on using force as a law enforcement officer?
A. Yes.
Q. Did it include instruction on when it's permissible and when it's not permissible to use force?
10:08AM A. Yes.

10:08AM Q. Based on that training you received as a law enforcement officer, is it ever permissible for an officer to use force to punish someone?
A. Absolutely not.
10:08AM Q. Is it ever permissible for an officer to use force to retaliate against someone because you don't like something they did earlier?
A. No.
Q. And when did you leave the Franklin County Sheriff's
10:08AM Office?
A. Late 2017, early 2018.
Q. Is there a reason you decided to leave?
A. Yes.
Q. Why is that? Why did you decide to leave?
10:09AM A. Because of an incident that happened while transporting an inmate.
Q. Who was the inmate that you were transporting?
A. Justin Phillips.
Q. And just generally speaking, what was the incident
10:09AM that upset you so much that you left?
A. We were transporting an inmate from one detention center to another. And I was instructed to pull over and -- I was instructed to pull over so -- I'm sorry -- so Sheriff Boen could hit Mr. Phillips.
10:10AM Q. All right. I'd like to talk through that incident

10:10AM sort of step by step.
A. Okay.
Q. Do you remember the date on which that happened?
A. I believe it was September 14th.
10:10AM Q. Of what year?
A. 2017.
Q. Just a couple months before you left the office?
A. Correct.
Q. Now, did you know who Justin Phillips was before that
10:10AM night?
A. We had prior dealings with him, but not on a personal level.
Q. Were you friends with him?
A. No.
10:10AM Q. Did you ever hang out with him outside of your duties as a law enforcement officer?
A. No.
Q. So when did you first learn that something was happening with Justin Phillips that day?
10:11AM A. It was my day off. And I heard that -- I got a phone call that Justin Phillips had tried to escape the jail and that they needed somebody to transport him to a different facility because he was familiar with the facility that we were at.
10:11AM Q. And who made that phone call to tell you that Justin

10:11AM Phillips had tried to escape and you needed to transfer him?
A. Sheriff Boen.
Q. So what did you do after you got that call?
10:11AM A. It was my regular day off, so we had to do some errands. And after we got done doing the errands, I said that I wouldn't transport him by myself because of his history. So I asked somebody to, or I asked them to get me a reserve deputy or somebody to go with me. And so we
10:12AM transported him to the Crawford County Sheriff's Office.
Q. Do you remember who went with you on that transport?
A. Zachery English.
Q. All right. Was he another Sheriff's Office employee?
A. Yes.
10:12AM Q. The two of you transported Justin Phillips to this other facility?
A. Yes.
Q. I'm sorry. Where did you say you took him?
A. Crawford County Detention Center.
10:12AM Q. Were there any cameras in your patrol vehicle that were on while you took Justin Phillips to Crawford County?
A. No.
Q. During the time that you worked at the Franklin County Sheriff's Office, did you ever have any conversations with
10:12AM Sheriff Boen about cameras in law enforcement?

10:12AM
A. Yes.
Q. Tell us about that. What did you all talk about relating to cameras?
A. He advised me that a mentor of his had told him that some things needed to be handled off camera.
10:12AM
Q. Do officers -- back then, anyway -- did officers in the Franklin County Sheriff's Office have body cameras that they wore when they were on duty?
A. No.
10:13AM
Q. At some point, did you get a body camera on your own?
A. I did.
Q. How did you get it?
A. It was a Christmas gift from my parents.
Q. How did you feel when you got your own body camera?
10:13AM
A. I was pretty proud. I thought I was taking initiative since it was a small department and they didn't have any -- the funds to order body cameras for everybody, so I took it upon myself.
Q. Did you ever show that body camera that you got for Christmas -- did you ever show it to Sheriff Boen?
10:13AM
A. I did.
Q. What did he say when you showed it to him?
A. He just reiterated that some things -- he said that that was great, but some things just needed to be handled off camera.
10:13AM

10:13AM Q. What did you understand that to mean?
A. I was just really confused at the time. I didn't -- I mean, I had never been put in a situation or didn't think anything of it at the time.
10:14AM Q. When was that? Was that before this incident you're talking about now, or later?
A. Yes, it was before.
Q. So let's go back to that first time when you came in on your day off and took Justin Phillips over to Crawford
10:14AM County with the other deputy. Did anything happen during that ride over to Crawford County?
A. Yes.
Q. And what was that?
A. We were on the interstate and I had Zachery English
10:14AM with me. We heard some wrestling in the back and I had Zach look in the back and he had -- Mr. Phillips had successfully slipped one of his cuffs and was working on his ankle cuff.
Q. Was he completely out of his cuffs yet?
10:15AM A. Not completely, no.
Q. And you mentioned his ankle cuffs. Did he have leg shackles of some sort on too?
A. Yes.
Q. Had he gotten those off?
10:15AM A. No.

10:15AM Q. Can you describe the area in your vehicle where you transport inmates, where the inmates have to sit?
A. There's a partition between the driver and passenger. And then behind that, there's metal down by the feet area,
10:15AM plexiglass in the center, and steel bars across the side windows.
Q. So even if Justin Phillips had been able to get all his handcuffs and restraints off, could he have gone anywhere?
10:15AM A. No, I don't believe so.
Q. Do the doors open from the inside?
A. No.
Q. And you indicated there are steel bars over the windows, is that right?
10:15AM A. Yes.
Q. So would it have been possible for him to get out the window?
A. No.
Q. So what did you do when you realized he had gotten one
10:16AM of his handcuffs off?
A. Radioed in, had our dispatch call Crawford County Detention Center so they could have some deputies waiting and pulled into the Crawford County sally port.
Q. Were you already at the sally port when this happened
10:16AM or were you out on the road somewhere?

A. We were out on the road.
Q. Did you just keep driving to the sally port?
A. Yes.
Q. You didn't stop the car?
A. No.
Q. When you arrived at the Crawford County Jail, did you have any trouble getting Justin Phillips out of the car and into their custody?
A. No.
Q. What was his demeanor like when you were dropping him off?
A. Just relaxed. Not -- just relaxed.
Q. Was he cooperative?
A. Yeah.
Q. So then after you dropped Justin Phillips off at Crawford County, what happened next on your day off?
A. We dropped him off, started coming back to Ozark. Then we got a phone call that he needed to go to the hospital, so we turned around and went to the hospital.
Q. If you got a call saying that he needed to go to the hospital, why did you go straight to the hospital instead of going to get him?
A. Normally, it's standard protocol. The agency that has custody of him will take him to the hospital. They will sit there with him until the arresting agency shows up so

10:17AM we don't tie up resources.
Q. Was Franklin County the arresting agency?
A. Yes.
Q. So is it right that after the Crawford County guys
10:17AM dropped him off at the hospital, you had to go and sit with him?
A. Correct.
Q. Did you have any trouble with Justin while he was at the hospital?
10:18AM A. No.
Q. And about how long did you stay there with him?
A. It wasn't too long. I don't even think more than an hour.
Q. And then what happened?
10:18AM A. He was released and we transported him back to Crawford County Detention Center.
Q. Did you drop him off and have him booked into the Crawford County Detention Center?
A. Yes.
10:18AM Q. What did you do after you left Justin in Crawford County's custody?
A. We exited the sally port and drove around the front of the building.
Q. And just tell us, what is a sally port for people who
10:18AM may not be familiar with jails?

10:18AM A. A sally port is an entrance and an exit for patrol vehicles where it's secure. So one door opens, you drive in, you park, that door closes. So it's a secure area inside the facility.
10:19AM Q. So what happened after you dropped Justin off, went back out to the sally port, and exited the jail?
A. We got a phone call.
Q. Who was that call from?
A. Anthony Boen.
10:19AM Q. And what did Sheriff Boen say?
A. He asked me if I was alone. I told him, no, I had a deputy with me. And he asked me to step out of my vehicle.
Q. Did you step out of your car?
A. I did.
10:19AM Q. What did he say then?
A. He told me to come get him, that we were going to go back and pick up Justin.
Q. And where exactly were you when Sheriff Boen called you and told you to come get him?
10:19AM A. In the parking lot of the jail.
Q. Of the Crawford County Jail?
A. Correct.
Q. And where was Justin Phillips?
A. The Crawford County Jail.
10:19AM Q. Just like the other side of the wall?

10:20AM A. 100 yards.
Q. And where was Sheriff Boen at that point?
A. At his house.
Q. About how far away is that?
10:20AM A. 45 minutes.
Q. Now, did you still have that other deputy with you at that time?
A. Yes.
Q. And the two of you had already moved Justin Phillips
10:20AM around a few times that day, right?
A. Yes.
Q. Was there any reason that the two of you couldn't have just gotten Justin Phillips again and driven him back to Franklin County?
10:20AM A. No.
Q. Did Sheriff Boen tell you any reason on that call why you needed to drive 45 minutes to pick him up and then come right back to where you were standing?
A. No. He just told me to come pick him up.
10:20AM Q. How did that request seem to you?
A. Seemed pretty fishy.
Q. Sir, I believe there's a binder in front of you on the witness stand. Do you see that?
A. Yes.
10:21AM Q. Yes, sir. Could you please turn to tab number 3.

10:21AM Do you recognize what's there?
A. Yes.
Q. What is it?
A. It's a map of Crawford County Jail, defendant Boen's house, and Franklin County Jail.
Q. Does that map appear to be a fair and accurate depiction of those places where you were on September 14th?
A. Yes.
MR. SONGER: Your Honor, the government moves to admit Government's Exhibit 3 into evidence.
THE COURT: Mr. Wood?
MR. WOOD: No objection, Your Honor.
THE COURT: Government's 3 is received.
(Government's Exhibit 3 received)
MR. SONGER: Thank you. May we publish it to the Jury?
THE COURT: You may.
MR. SONGER: Mr. Moon, could you please bring up Government's Exhibit 3?
10:22AM Q. (By Mr. Songer.) Mr. Berry, I think, if our government technology works, this is sort of a fancy touch screen that's in front of you. Can you circle on that map for us where you were when Defendant Boen called you and asked you, "Are you alone?"
10:22AM A. It's off.

Q. We've all tried to draw on iPhones before. You want to try again? All right.
And then can you just show us the route that you took that night -- just trace it with your finger -- to pick up Defendant Boen and then come back and get Justin Phillips?
And so what you just drew, what route is that? Where did you go?
A. That was from the Crawford County Jail to the Franklin County Jail, and dropped off the deputy, and then went to Sheriff Boen's house.
Q. And then once you got to Sheriff Boen's house, where did you have to go?
A. Back to Crawford County Jail.
Q. Can you show us that on the map too?
Were you aware of any reason, any law enforcement reason, that you needed to do that, to go retrace your steps like that?
A. No.
Q. And in total, this is at least an hour and a half out of your way?
A. Yeah, at least.
Q. We can take that down, Mr. Moon. Thank you.
Mr. Berry, when you arrived at Sheriff Boen's house, was Sheriff Boen there?
A. Yes.

10:24AM Q. Can you describe how he appeared when you got there?
A. Pretty amped up and excited.
Q. Did he have anything with him?
A. He did.
10:24AM Q. What did he have?
A. A metal Yeti-style tumbler.
Q. Was he holding it?
A. Yes.
Q. Could you smell anything coming from that Yeti cup?
10:24AM A. I could.
Q. What did it smell like?
A. Alcohol.
Q. When you got to Sheriff Boen's house, did he say anything to you about what you guys were going to do?
10:25AM A. He just said that we were going to go up there and handle it.
Q. Go up there and handle it?
A. Uh-huh.
Q. What was he referring to?
10:25AM A. At the time, I wasn't sure.
Q. So then did you start the drive back towards Crawford County where Justin Phillips was?
A. I did.
Q. And as you drove toward Crawford County, did Sheriff
10:25AM Boen say anything else to you about what he was planning to

do?
A. He was on the phone most of the way up there. And then once we got closer to Crawford County, he let me know that I was going to radio in that Justin was going to escape.
Q. He told you that on the drive to Crawford County before you had picked up Justin Phillips?
A. Yes.
Q. Did he say anything else on that drive? Did he say anything about you specifically?
A. Yes, he did. He said that I was a true brother in blue and that he knew that I had his back and he had mine.
Q. He told you that he had your back and you had his while you were driving to pick up Justin Phillips?
A. Yes.
Q. How many times did he say that?
A. On the way there?
Q. Uh-huh.
A. A couple.
Q. So based on those things that Sheriff Boen had said, what did you think was going to happen?
A. I started to panic. I wasn't sure what was going to happen, but I knew something bad was going to happen.
Q. So what happened when you arrived at Crawford County?
A. We pulled into the sally port and he set his tumbler

10:27AM down. We went in -- there's two holding areas. We went into the holding area and went in to get Mr. Phillips.
Q. Did Mr. Phillips come out so you could take custody of him?
10:27AM A. No. We went in -- we went into the booking area.
Q. Did you have any trouble taking over custody of Justin Phillips?
A. No.
Q. What was Justin's demeanor like when you and Sheriff
10:27AM Boen were taking custody of him?
A. He was calm.
Q. Did you put him in any restraints for the trip back to Franklin County?
A. I did.
10:27AM Q. What restraints did you put on him?
A. Leg shackles, a belly chain, and hand shackles.
Q. Can you describe those hand shackles to us?
A. Just regular handcuffs.
Q. Did you have any trouble getting any of those
10:28AM restraints on Justin?
A. No.
Q. Did he fight you at all getting put into handcuffs or into the shackles?
A. No.
10:28AM Q. Do the handcuffs connect to the shackles or are they

10:28AM separate?
A. Well, the handcuffs, they normally connect to the belly chain, but due to the circumstances, I was just trying to think of how -- how I could kind of help the
10:28AM situation without making it obvious. So I didn't cuff his hands to his belly chain just in case he needed to protect himself.
Q. Why did you think he was about to need to protect himself?
10:29AM A. I just had a bad feeling. I didn't know what was going to happen.
Q. When you and Sheriff Boen took custody of Justin Phillips and got the handcuffs on him, did you see any injuries on him?
10:29AM A. No.
Q. Did he have any marks on his face?
A. No.
Q. Did he have any injuries that were visible anywhere on his body?
10:29AM A. No.
Q. Sir, can you now, please, in that same binder turn to tab number 2 and look at the exhibits that have been marked as Government's Exhibits 2(a) and 2(b).
Do you see those?
10:29AM A. Yes.

Q. What are they?
A. Booking photos of Justin Phillips.
Q. Are those photos fair and accurate depictions of how Justin looked when you and Sheriff Boen took custody of him the night of September 14th?
A. Yes.
MR. SONGER: Your Honor, the government moves to admit Exhibits 2(a) and 2(b).
MR. WOOD: No objection.
THE COURT: Government's 2(a) and 2(b) are received.
(Government's Exhibits 2(a) and 2(b) received)
MR. SONGER: Mr. Moon, could you please publish 2(a) to the Jury.
Q. (By Mr. Songer.) Mr. Berry, is that how Justin Phillips looked right when you took custody of him?
A. Yes.
Q. And, again, are there any injuries at all on his face?
A. No.
Q. Thank you, Mr. Moon. You can take that down.
So at that point, did you start to take Justin back towards Franklin County?
A. Yes.
Q. What happened as you started to drive towards Franklin County?

A. Sheriff Boen turned the music up in the car.
Q. Did Sheriff Boen say anything to Justin?
A. Yes.
Q. What did he say?
A. "You fucked with so many people, it's time to get fucked with."
Q. Do you remember if he said anything else to him?
A. He did. He said, "You're not a true brother in blue. This is a true brother in blue." Or, "This is what a true brother in blue looks like."
Q. Do you know what he was referring to when he said Justin Phillips wasn't a "true brother in blue"?
MR. WOOD: Objection.
THE COURT: Sustained as phrased.
MR. SONGER: Let me rephrase, sir.
Q. (By Mr. Songer.) Do you know whether Justin Phillips used to be a police officer?
A. He was.
Q. And I apologize for my language, but can you describe the Sheriff's tone when he said -- when he told Justin, "You fucked with so many people, it's time to get fucked with"?
A. Anger.
Q. Sir, in your career as a law enforcement officer, have you had a chance to interact with drunk people at times?

A. I have.
Q. Did Sheriff Boen appear drunk to you that night?
A. Intoxicated, yes.
Q. Did he have any trouble walking around?
A. No, not walking around.
Q. Did he have any trouble communicating what he seemed to be wanting to communicate?
A. No.
Q. Did he seem to know what he was doing?
A. Yes.
Q. So what happened next after Sheriff Boen turned the music up and said those things to Justin Phillips?
A. We proceeded on to Franklin County Sheriff's Office.
Q. And what was Justin Phillips doing during that ride?
A. Sitting in the back seat.
Q. Was he seat-belted in?
A. Yes.
Q. Was he handcuffed?
A. Yes.
Q. Was he shackled on his legs?
A. Yes.
Q. Was he doing anything out of the ordinary?
A. No.
Q. Do you remember getting to around Exit 24 on the interstate?

10:33AM A. Yes.
Q. That's the Mulberry exit, right?
A. Yes.
Q. What happened when you got close to Exit 24?
10:33AM A. Sheriff Boen started yelling, "Sit back, sit back."
Q. Who was he yelling that at?
A. Justin Phillips.
Q. And what was Justin doing when the Sheriff was yelling at him to "sit back"?
10:34AM A. Sitting in his seat.
Q. Was he trying to get up?
A. No.
Q. Was Justin trying to get his handcuffs off?
A. No.
10:34AM Q. Was Justin banging on anything?
A. No.
Q. Was Justin kicking anything?
A. No.
Q. Was he doing anything wrong at all?
10:34AM A. No.
Q. Was Justin Phillips even saying anything to you guys?
A. No.
Q. So what happened next, sir?
A. I was instructed to pull off the interstate and radio it in.
10:34AM

10:34AM Q. And just to be clear, who instructed you to pull off the interstate and radio it in?
A. Sheriff Boen.
Q. Did you radio something in?
10:34AM A. I did.
Q. What did you radio in?
A. What I was told, that he was escaping.
Q. Was Justin Phillips escaping?
A. No.
10:34AM Q. So why did you radio that in if that's not what was happening?
A. Because I was told to. I was following instruction.
Q. So then what happened next after you radioed in that Justin was escaping?
10:35AM A. We proceeded down the exit ramp. I initiated my blue lights, the only thing at the time that I could think of to draw attention.
Q. Did you stop on the exit ramp?
A. We stopped at the stop sign, yes.
10:35AM Q. And could you describe that area around the stop sign at the top of the exit ramp?
A. Very rural.
Q. Are there any street lights around there?
A. No.
10:35AM Q. Any people walking around?

A. No.
Q. About what time of night was this?
A. 10:00, 11:00.
Q. Did you see any other cars?
A. I did see one.
Q. What did that car do?
A. As I saw it passing, I thought that whenever it saw the blue lights, that it would stop. But it didn't stop. It just kept on going.
Q. Were you hoping it would stop?
A. Yes.
Q. Why is that?
A. To stop whatever we were -- whatever was about to happen.
Q. So after that car passed and you brought your vehicle to a complete stop, what happened then?
A. Sheriff Boen exited the passenger side of the vehicle and went to the rear of the vehicle.
Q. And what did Sheriff Boen do when he got to the rear of the vehicle?
A. Started hitting Mr. Phillips.
Q. And what was Mr. Phillips doing right when the Sheriff started hitting him?
A. Nothing.
Q. Was he still handcuffed?

10:36AM A. He was.
Q. Was he still shackled?
A. He was.
Q. Was he still sitting in the back seat of the car?
10:36AM A. He was.
Q. Was he doing anything threatening at all?
A. No.
Q. How was the Sheriff hitting Justin?
A. Closed fist.
10:37AM Q. Where? What part of his body?
A. In his face region.
Q. Closed fist to the face?
A. Yes.
Q. How many times did he hit Justin with a closed fist to
10:37AM the face while he was handcuffed?
A. That I saw, six or seven.
Q. Now, based on your training and experience as a law enforcement officer, did you see any reason at all to hit Justin Phillips six or seven times?
10:37AM A. No.
Q. Did you see any reason to even hit him once?
A. No.
Q. Could you hear Justin saying anything while Sheriff Boen punched him in the face?
10:37AM A. I could.

10:38AM
Q. What was he saying?
A. "Anthony, why are you doing this? God, why me?"
Q. Did he appear to be in pain?
A. He did.
10:38AM
Q. What was Sheriff Boen saying while he hit him?
A. I don't recall what he was saying. I was just -- the only thing I can hear is Justin screaming.
Q. Saying, "God, why me?"
A. Uh-huh.
10:39AM
Q. So what did you do when you saw this?
A. I couldn't -- after hearing him, I couldn't -- I couldn't take any more of it, so I got in between Anthony and Justin. I told him that was enough.
Q. You had been a road deputy for about two years at this
10:39AM
point, right?
A. Correct.
Q. And he was the Sheriff of the whole county?
A. Yes.
Q. You jumped in between him and the guy he was beating?
10:39AM
A. Yes.
Q. Why did you do that?
A. Couldn't see somebody do that to somebody continue.
Q. What was going through your head while you watched Sheriff Boen punch Justin in the face?
10:40AM
A. How I couldn't -- I didn't think it was real and it

was like I was in the middle of a horror movie.
Q. Were you able to stop Sheriff Boen from hitting Justin?
A. I was.
Q. Did you have to physically pull him away?
A. I did.
Q. So what happened after you intervened and stopped the beating?
A. I stayed with my arm in between Justin and Sheriff Boen. And I remember Sheriff Boen looking at me and just kind of winking, like he was just messing with him.
Q. Were you able to get Sheriff Boen back in the car and away from Justin?
A. Yes.
Q. So then what happened next?
A. We drove lights and sirens back to the Sheriff's Office. I just remember trying to get there as fast as I could.
Q. And when you got back at the Sheriff's Office, were there other officers around?
A. Yes.
Q. Do you remember about how many?
A. Six.
Q. Why would there have been that many officers there late at night?

10:41AM
A. Because my radio transmission, they heard that somebody was trying to escape and showed up there.
Q. So what did you do when you arrived back at the Franklin County Jail with Justin and the Sheriff?
10:41AM
A. They got Justin out of the car and brought him into the booking area and I just kind of hung out in front of the house, or in front of the -- front of my vehicle in between, just kind of staying away from the situation.
Q. Why did you stay behind?
10:42AM
A. Because I didn't want -- I didn't want to have anything else to do with it.
Q. How were you feeling at that point?
A. Shock. I had never seen anything like that before.
Q. Did you see what Sheriff Boen did after you guys got
10:42AM
back to Franklin County?
A. I did.
Q. What did he do?
A. We have a little med cart that has over-the-counter medications and stuff for cuts and he was doctoring his
10:42AM
hands.
Q. Could you see what part of his hands he was doctoring?
A. His knuckles.
Q. What had he been doing with his knuckles a few minutes before that?
10:43AM
A. Been hitting Justin Phillips.

10:43AM Q. How much longer did you stay around at the jail that night?
A. Not very long.
Q. And where did you go when you left?
10:43AM A. I went home.
Q. Was your wife there?
A. She was.
Q. Did you tell her what happened?
A. No.
10:43AM Q. Why not?
A. She asked me if everything was okay. I lied to her and told her that it was okay, everything was fine.
MR. SONGER: Could we hand the witness some Kleenexes?
10:44AM A. Sorry.
Q. Did you cry that night too?
A. I did.
Q. What you just described, sir, how did that feel about making you work in law enforcement?
10:45AM A. I was ashamed. I didn't want to -- didn't want to be associated with it anymore.
Q. I'd like to step back now, and take as much time as you need, but I want to ask you a couple more questions about when you were at the Franklin County Jail that night.
10:46AM When you got to the Franklin County Jail to drop

10:46AM Justin off, did you look at his face, at Justin's face?
A. I didn't.
Q. You did not?
A. No.
10:46AM Q. Why not?
A. I couldn't bring myself to look at him.
Q. So did you go home that night without ever looking at his face?
A. Yes.
10:46AM Q. When was the next time that you saw Justin Phillips?
A. A few days later whenever I came back to work.
Q. At that point, did you see his face?
A. Yes.
Q. What did it look like?
10:46AM A. There was bruising on his face.
Q. Were the injuries you saw on his face then the same places that you had seen the Sheriff hitting him?
A. Yes.
Q. Can you please get that binder out again and look at
10:47AM tab 1, and specifically the items that are marked Government's Exhibits 1(a), 1(b) and 1(c).
Do you recognize those, sir?
A. Yes.
Q. Are those pictures of Justin Phillips?
10:47AM A. Yes.

10:47AM Q. Are those pictures a fair and accurate depiction of how Justin looked when you saw him a few days after this incident happened?

A. Yes.

10:48AM MR. SONGER: Your Honor, the government moves to admit Exhibits 1(a), 1(b), and 1(c).

MR. WOOD: Your Honor, we have an objection.

THE COURT: What's the objection?

MR. SONGER: Your Honor, perhaps we should

10:48AM approach to discuss this.

(bench conference)

MR. WOOD: Your Honor, the photographs here offered by the government, they have obviously been modified with the darker red hue or something to that

10:48AM effect. We have the exact same photos that they provided to us, and here is what they look like in natural light. Look at the same exact photograph. What they have done is darkened these up to bring out the red in all of the injuries. These are the ones that they sent to us. These

10:49AM do not accurately represent what he looked like.

THE COURT: So on the photographs that he sent you, did he send you -- did the government send you a digital file?

MR. WOOD: Yes.

10:49AM THE COURT: That you then printed?

MR. WOOD: Yes.

MR. SONGER: The photographs were provided digitally. The only difference here is that we used different printers to print them out. We are going to display the digital file. That's what's located on our computer. And the witness has now authenticated the printed photo that we provided him as an accurate representation, so I don't think there's an issue here.

THE COURT: Well, Mr. Wood, the foundation that is required when one seeks to introduce a photograph is that the exhibit is what it purports to be, and that foundation has been laid. So to the extent that --

MR. WOOD: By this witness?

THE COURT: That's why I brought this up here.

MR. WOOD: This witness said he couldn't look him in the face and never looked him in the face when they got back to the detention center, that it was dark and he never looked at him. He never looked at him.

THE COURT: The testimony is:

"Did you go home that night?" And this is rough.

"Yes."

"When was the next time you saw Justin Phillips?"

"A few days later, whenever I came back to work."

"At that point, did you see his face?"

"Yes."

"What did it look like?"

"There was bruising on his face."

"Were the injuries on his face in the same place that you had seen the Sheriff hit him?"

Come down, drop down a few questions later, these exhibits are marked.

"Are those pictures of Justin Phillips?"

"Yes."

"Is this a fair and accurate depiction?"

"Yes."

That's a textbook foundation, so your issues go to cross examination.

MR. WOOD: Okay.

(bench conference concluded)

THE COURT: You may proceed.

MR. SONGER: Thank you, Your Honor. Just for the record, are Exhibits 1(a), (b), and (c) admitted into evidence?

THE COURT: I'm sorry. Yes, the Court will receive Exhibits 1(a), 1(b), and 1(c).

MR. SONGER: Thank you.

(Government's Exhibits 1(a), 1(b), 1(c) received)

Q. (By Mr. Songer.) Mr. Moon, can we bring up Exhibit 1(a), please?

10:51AM Mr. Berry, is this how Justin Phillips appeared to you when you saw him a few days later?
A. Yes.
Q. Could you describe the mark around his left eye?
10:52AM A. Just a black eye with swelling.
Q. And do you see the mark above his left eye too and on his forehead?
A. Yes.
Q. Did you see Sheriff Boen punch Justin Phillips above
10:52AM and below his left eye and in the middle of his face?
A. In that area, yes.
Q. And just to be clear, did Justin Phillips have any of those injuries that are in this photograph when you picked him up from the Crawford County Jail with the defendant?
10:52AM A. No.
Q. Thank you. We can take that down.
Mr. Berry, when officers at the Sheriff's Office are involved in an incident where force is used, are they required to complete an incident report describing what
10:53AM happened?
A. Yes.
Q. The night of this incident, did you fill out any report?
A. No.
10:53AM Q. Why not?

10:53AM A. I asked Sheriff Boen if I needed to do the report, and he said, "Just do it whenever you come back."
Q. And then when you came back a few days later, did you, in fact, complete a report?
10:53AM A. Yes.
Q. Before you wrote that report, did you talk to Sheriff Boen about it? Did he say anything to you?
A. Yes.
Q. What did he tell you about the report?
10:53AM A. He just patted me on the shoulder and said, "Just write what happened."
Q. What was his tone like when he patted you on the shoulder and said, "Write what happened"?
A. Meaning write what we had talked about.
10:53AM Q. And what was that?
A. That he was trying to escape.
Q. What he had told you about on the drive over to pick up Justin Phillips?
A. Yes.
10:54AM Q. Were you intimidated at that point?
A. Yes.
Q. Were you scared?
A. He's my boss.
Q. What were you afraid he would do to you if you didn't
10:54AM write a false report?

10:54AM A. I wouldn't have a job.
Q. Were you afraid of anything else?
A. After seeing him with Mr. Phillips, I didn't know if he would do it to me, to anybody I knew.
10:54AM Q. So, sir, if you would please turn to tab 15 in that binder.
MR. SONGER: Your Honor, I believe this exhibit has been admitted by stipulation already, so may we publish it?
10:55AM THE COURT: We discussed that, but I don't know that it's actually been admitted yet. Is this the exhibit, Mr. Wood, that we discussed that was being stipulated?
MR. WOOD: Yes, Your Honor.
THE COURT: All right. Government's 15 is
10:55AM received by stipulation.
(Government's Exhibit 15 received)
MR. SONGER: Thank you, Your Honor.
Q. (By Mr. Songer.) Mr. Moon, could you pull up the first page of that exhibit. And is it possible to zoom in
10:55AM sort of the top half of the report so folks can see it?
Mr. Berry, is this the report that you were just referencing that you filed when you came back to work a few days later?
A. Yes.
10:55AM Q. And if you would, sir, look at the top right. Do you

10:55AM see the date and time on that report?
A. Yes.
Q. What is that?
A. 9-18-17.
10:56AM Q. So is that three or four days after this happened?
A. Yes.
Q. And your name is listed there as the reporting officer, right?
A. Yes.
10:56AM Q. Mr. Moon, could we now please bring up the third page of the report. If you could blow out the top half that's written there. Thank you.
Mr. Berry, is this the description of the incident with Justin Phillips that you just told us about? Is this
10:56AM the description as you reported it back on September 18th, a few days later?
A. Yes.
Q. Now, you wrote that you had handcuffed and secured Justin Phillips' hands to his belly chain in this report,
10:57AM is that right?
A. Yes.
Q. Now, is that true? Did you actually secure his hands to the belly chain?
A. No.
10:57AM Q. So why did you put that in the report?

A. Because I was afraid of repercussions if he knew that I was trying to help Justin.
Q. If who was afraid that you were trying to help Justin?
A. Uh-huh.
Q. Who were you referring to?
A. Sheriff Boen.
Q. And did Sheriff Boen know that you had kept his hands from being cuffed to his belly chain?
A. No.
Q. Do you also see in that report that you wrote that, "Phillips started hitting and kicking the partition of my patrol unit and causing damage to the glass." That's sort of in the middle of the paragraph. Do you see that?
A. Yes.
Q. Is that true?
A. No.
Q. You also wrote that, "Phillips started fighting Sheriff Boen and I." Do you see that? It's about two-thirds of the way down.
A. Yes.
Q. Is that true?
A. No.
Q. At any point on that transport from Crawford County to Franklin County, did Justin Phillips ever fight either one of you at all?

A. No.
Q. So is this report false?
A. Yes.
Q. Why did you write a false report?
A. In fear for my job and what else may happen.
Q. Sitting here today, how do you feel about the fact that you agreed to go along with writing this report?
A. Ashamed. Embarrassed. Goes against everything that I ever thought that I am.
Q. Thank you, Mr. Moon. We can put that down.
Now, after this happened, the next few weeks, months -- I guess not months because you said you weren't there that long -- but the next few weeks at the Sheriff's Office, did you sometimes run into Sheriff Boen, and did this incident come up?
A. Yes, in passing.
Q. Do you remember Sheriff Boen saying anything to you about the possibility that state police might look into what happened with Justin Phillips on that trip back?
A. Yes.
Q. And when Sheriff Boen mentioned to you that the state police might look into it, what did he say to you about what you should do?
A. Said that there was only two people there and that he had my back and I had his.

11:00AM Q. And what did you understand that to mean when he said that, "He had your back and you had his"?
A. That we were going to go along with the story.
Q. What story was that?
11:00AM A. The story that Justin Phillips was escaping.
Q. Shortly after that, did Sheriff Boen give you another promotion?
A. He did.
Q. And to what position did he promote you?
11:00AM A. Chief Deputy.
Q. Where is Chief Deputy on the hierarchy at the Sheriff's Office?
A. Number two.
Q. Number two right under the Sheriff?
11:00AM A. Yes.
Q. Did you get a pay raise to go along with that?
A. I did.
Q. You told us that you had wanted to be a police officer since you were a little boy. Was this a goal of yours,
11:01AM getting that high-level job at a police department?
A. Absolutely.
Q. Did you decide to stay in that high-ranking job with more money?
A. No.
11:01AM Q. Why not?

11:01AM A. Because I couldn't -- I couldn't trust what -- I couldn't trust what was going to happen. I didn't want to be a part of anything anymore.
Q. When did you start looking for a new job? How soon
11:01AM after this incident with Justin Phillips?
A. I'd say within a week.
Q. And did you find a new job?
A. Eventually I did, yes.
Q. And did you leave the Sheriff's Office?
11:02AM A. I did.
Q. And you said that was near the end of 2017?
A. Yes.
Q. Now, after you left the Sheriff's Office, did you keep talking to Sheriff Boen?
11:02AM A. We had conversations in passing. I helped with, "Shop with a cop." That was one of my favorite things.
Q. Did he ever try to get you to come back to the Sheriff's Office?
A. I remember one incident, we were eating in the Mexican
11:02AM restaurant in Ozark and he had mentioned, "Let me know if you ever want to come back." And I said, "Okay, I will."
Q. Now, at some point after you left, did you learn that the FBI was investigating that beating of Justin Phillips?
A. I did.
11:03AM Q. Do you remember about how long that was after you

left?
A. Years.
Q. At that time, when you found out, had you talked to Sheriff Boen recently?
A. No, not before the FBI.
Q. You hadn't talked to him for a while?
A. Not for a while, no.
Q. But then around that time, did Sheriff Boen try to contact you all of a sudden?
A. He did.
Q. How did he try to contact you?
A. He sent me a text message.
Q. Do you remember the gist of what that text message said?
A. It says, "Call me when you get this on this phone number."
Q. "Call me when you get this"?
A. Yes.
Q. Did Sheriff Boen also try to call you around that same time?
A. He did.
Q. How many times did he try to call you?
A. A couple.
Q. And all this is after not hearing from him for a long time?

11:04AM
A. Correct.
Q. Now, then at some point, did you call him back?
A. Yes.
Q. And before you made that call, did you agree to let the FBI record the call?
A. Yes.
Q. When you agreed to let the FBI record that call, did they make any promises to you?
A. No.
Q. Did they threaten you in any way?
A. Not at all.
Q. So why did you agree to cooperate and let the FBI record that call?
A. Because it was the right thing to do. It needed to happen.
Q. And do you remember the approximate time that you called Sheriff Boen back and recorded it?
A. Early afternoon.
Q. Do you remember about what time of year it was?
A. I think maybe around August.
Q. Was it August of 2019?
A. That's about right.
Q. And could you tell us just generally what was the thrust of those conversations? What were they about, the calls, the two calls that you made?

11:05AM

A. About this incident.
Q. And what did you understand that the Sheriff was trying to do on those calls?
A. Trying to get me to lie to the FBI.

11:05AM

Q. Can you now turn in that binder, please, to, I think it's tabs 10 through 14. I think they are stapled together, but there should be a folder in there that has some flash drives in it.
Are you there?

11:05AM

A. Yes.
Q. Now, do you know what's on those flash drives?
A. Yes.
Q. Are those portions of the conversations that you had with Sheriff Boen back in August of 2019?

11:06AM

A. Yes.
Q. Have you listened to those recently?
A. Yes.
Q. And did you initial the flash drives after listening to them?

11:06AM

A. Yes.
Q. So are the flash drives that are in front of you, do they have your initials on them?
A. Yes.
Q. So those flash drives that you listened to and

11:06AM

initialed, are those true and correct copies of the

recording of the call that you had with Sheriff Boen?
A. Yes.
MR. SONGER: Your Honor, the government moves to admit Government Exhibits 10, 11, 12, 13, and 14.
THE COURT: Mr. Wood?
MR. WOOD: Your Honor, we would just renew any previous objections.
THE COURT: All right. Prior objections are noted and overruled again. The Court references its prior written order on this matter. Government's Exhibits 10, 11, 12, 13, and 14 are received.
MR. SONGER: Thank you.
(Government's Exhibits 10-14 received)
Q. (By Mr. Songer.) Mr. Berry, near the beginning of that call, when you called the Sheriff back, did the Sheriff ask you anything?
A. He asked me if I was alone.
Q. Is that the same thing he asked you when he asked you to come pick him up to go get Justin Phillips?
A. Yes.
MR. SONGER: Mr. Moon, could you please play Government's Exhibit Number 14.
THE COURT: Ladies and Gentlemen -- before you do that -- Ladies and Gentlemen, you are about to hear recordings of conversation as described by the witness.

These conversations were legally recorded and you may consider the recordings just like any other evidence. There is a transcript of the words being spoken that is superimposed onto the recording in such a fashion that as you hear the recorded audio conversation, you will see the words that are being spoken. This transcript, that I'll refer to it, was prepared by the government for the limited purpose of helping you follow the conversation as you listen to the recording. Differences in meaning between what you hear in the recording and what you may read in the superimposed transcript may be caused by such things as the inflection in a speaker's voice. To be clear, it is what you hear and not what you read that is evidence. And whether the transcript that you see on the screen correctly or incorrectly reflects the conversation is entirely for you to decide. The superimposed words are thus an aid to the presentation of this evidence in the courtroom. The actual exhibit that will go back to the jury room will be just the recorded words.

You may proceed.

MR. SONGER: Thank you, Your Honor.

(Government's Exhibit 14 played)

VOICE NUMBER 1: You by yourself?

VOICE NUMBER 2: Yeah. Yeah, I just got back from lunch. Fixing to go inside and finish working.

VOICE NUMBER 1: You haven't heard anything about anything, have you, anything going on?

VOICE NUMBER 2: Um, um.

(end of audio)

Q. (By Mr. Songer.) Is that how the Sheriff started the conversation before talking to you about Justin Phillips?

A. Yes.

Q. Now, on those calls that you had, did Sheriff Boen say anything to you about making sure that the two of you got your stories lined up?

A. Yes.

MR. SONGER: Mr. Moon, could we please play Exhibit Number 13.

(Government's Exhibit 13 played)

VOICE NUMBER 2: Oh, great.

VOICE NUMBER 1: Yeah. Like I say, it's -- I know we got each other on it, so it's --

VOICE NUMBER 2: Well, that's, uh, damn. I don't even know what to say now.

VOICE NUMBER 1: Yeah. Well, if you would, keep it between us. Don't say anything to anybody. I mean, it's -- I'm sure people will talk, but --

VOICE NUMBER 2: Yeah. I mean, it's Ozark.

VOICE NUMBER 1: Oh, yeah. Yeah.

VOICE NUMBER 2: Okay. Well, thanks for the

heads-up.

VOICE NUMBER 1: Yeah. If you hear anything, will you give me a call on this phone?

VOICE NUMBER 2: Yeah.

VOICE NUMBER 1: Okay. Like I say, man, just keep it between us.

VOICE NUMBER 2: Okay.

VOICE NUMBER 1: But like I say, it's -- I mean, it was just us there. And I can't remember, but I know we need to be on the same page with everything.

VOICE NUMBER 2: Yeah.

(end of audio)

Q. (By Mr. Songer.) What did you understand Sheriff Boen to be saying when he reminded you it was, "just us there," and, "we need to be on the same page with everything"?

A. That there weren't any other witnesses and that we needed to stick with the same story.

Q. Is that story true?

A. No.

Q. And as you and the Sheriff were taking Justin Phillips back to Franklin County that night, was there a camera in your car that worked?

A. No.

Q. Did Sheriff Boen say anything about that on this call?

A. He did.

11:12AM MR. SONGER: Mr. Moon, will you please play Exhibit Number 10.

(Government's Exhibit 10 played)

VOICE NUMBER 1: So I'm just giving you a heads-up. The FBI is going to be subpoenaing you to talk to you about that night, so --

VOICE NUMBER 2: Oh, shoot. It's been so long ago. I don't remember. It's been two years.

VOICE NUMBER 1: Yeah.

11:13AM VOICE NUMBER 2: Shoot, I hadn't even thought about all that stuff.

VOICE NUMBER 1: But they're gonna call you into their office, I'm sure, and want to talk to you about it.

VOICE NUMBER 2: Okay.

11:13AM VOICE NUMBER 1: So, I mean, we need to -- I don't remember. Actually, I can't even remember what was said either on the radio or -- I know we pulled over to the side of the road. Did he have one of his cuffs off or -- I can't remember.

11:13AM VOICE NUMBER 2: Man, I -- don't even get me lying.

VOICE NUMBER 1: Yeah. So --

VOICE NUMBER 2: Okay. Well --

VOICE NUMBER 1: But, I mean, it was just me and

11:13AM you there so --

11:13AM

VOICE NUMBER 2: Yeah.

VOICE NUMBER 1: I mean, there wasn't -- the camera didn't work in your car either, did it?

VOICE NUMBER 2: Uh, I don't know.

11:13AM

(end of audio)

Q. (By Mr. Songer.) Now, on that clip, did Sheriff Boen say something about, "Didn't Justin Phillips have a handcuff off?"

A. Uh-huh.

11:14AM

Q. And your response to that was, "Don't get me lying?"

A. Correct.

Q. When you told the Sheriff, "Don't get me lying," did he say anything like, "You're not lying, that's exactly what happened"?

11:14AM

MR. WOOD: Objection, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Songer.) When you told the Sheriff, "Don't get me lying," what did he then say to you?

A. There were only us there.

11:14AM

Q. Did he also then remind you there was nothing on camera?

MR. WOOD: Objection.

THE COURT: Well, let's move along.

Q. (By Mr. Songer.) What did you understand the Sheriff to be saying to you on those clips?

11:15AM

11:15AM
A. That we needed to get our stories straight.
Q. After these calls, did you agree to get your story straight and cover up what happened?
A. No.
11:15AM
Q. Why not?
A. Because the truth needed to happen. It needed to be said.
Q. Do you still think about this today?
A. I do.
11:15AM
Q. Why?
A. Because I had never been a part of something like that before. I never knew that -- never knew that a person could do that to somebody else.
MR. SONGER: I have nothing further at this time.
11:16AM
Thank you.
THE COURT: Mr. Wood, how long do you anticipate your cross examination will take? I'm trying to plan our lunch break.
MR. WOOD: Probably 45 minutes or so, or longer.
11:16AM
I would prefer to be able to do it all at one time.
THE COURT: Okay. Ladies and Gentlemen, here's our choice. We can get through the rest of Mr. Berry's testimony and then take our lunch recess -- may or may not be after noon by that point -- or we can take an early
11:17AM
lunch recess. It would kind of defeat the point to take

another 15-minute break now.

So what is the sense? Would you all like to recess early or would you like -- for lunch early, or would you like to finish up with this witness? All right. The consensus is to finish.

Mr. Wood, you may proceed.

CROSS EXAMINATION

BY MR. WOOD:

Q. Mr. Berry, my name is Russell Wood. I represent Sheriff Boen.

So when exactly did the FBI contact you in this matter?

A. I'd say July.

Q. Of what year?

A. 2019.

Q. So it had been a couple of years since ya'll had transported Justin Phillips, correct?

A. Correct.

Q. And in that time, you haven't told anybody this story that you have told today, is that correct?

A. I don't believe so, no.

Q. You didn't report it to the state police, did you?

A. No.

Q. And they conducted an investigation, didn't they?

A. From what I was told.

11:19AM Q. Okay.
A. I don't know for sure.
Q. But it was your understanding that the state police conducted an investigation, right?
11:19AM A. Yes.
Q. And, in fact, you were wanting the state police to come talk to you. Isn't that what you have advised before?
A. Yes.
Q. So you knew that there was an investigation?
11:19AM A. I was told, yes.
Q. You made no effort to contact the state police, the Arkansas State Police, who were doing the original investigation, is that correct?
A. Yes.
11:19AM Q. You were so distraught over this whole situation that you never made any attempt to contact the first agency that did an investigation, correct?
A. Yes.
Q. And did that make you feel proud at that time?
11:19AM A. No.
Q. Did you ever write an anonymous report to anybody about this?
A. No.
Q. Anybody else, any other agency, anything else that you
11:20AM contacted or told about this story that you have here

11:20AM today?
A. No.
Q. So when the FBI came and made contact with you, that was the first time anybody came to you, is that correct?
11:20AM A. Correct.
Q. And when the FBI made contact, that was scary, wasn't it?
A. Not really.
Q. Well, then on your audio that we just heard, why would
11:20AM you say, "Oh, great," and act like it was a big deal?
A. I'm not sure.
Q. So when the FBI contacted you -- and, in fact, they approached you and told you that there were allegations against you also?
11:20AM MR. SONGER: Objection.
THE COURT: What's the objection?
MR. SONGER: I'm sorry. I may have mis-heard the question, Your Honor. I apologize.
THE COURT: Rephrase.
11:21AM Q. (By Mr. Wood.) When you were approached by the FBI, what did they advise you?
A. That there was an investigation.
Q. Into who?
A. The Franklin County Sheriff's Office.
11:21AM Q. And who else?

A. Sheriff Boen.
Q. Anybody else? Anybody else?
A. I don't think so.
Q. And what was your understanding of what they were investigating?
A. The incident with Justin Phillips.
Q. Had you ever been advised that the FBI was conducting an investigation other than when they contacted you and other than the audio we just listened to?
A. I'm sorry. Can you repeat that?
Q. Were you ever advised that the FBI was conducting an investigation by anybody other than the Sheriff when ya'll had your phone call, or the FBI themselves?
A. No.
Q. So were you aware of any of the other allegations that had been lodged against the Sheriff?
A. No.
Q. What about any other officers?
A. No.
Q. And so when was the first time that you actually met with them?
A. I don't recall an exact date.
Q. Where did you meet with them?
A. At the FBI office.
Q. You ever been to the FBI office before?

11:22AM A. No.
Q. And where was the FBI office?
A. Downtown Ft. Smith.
Q. Do you recall who you met with?
11:22AM A. Yes.
Q. Who was that?
A. Matthew Ferguson.
Q. Anybody else?
A. There was another individual there, but I can't remember his name.
11:22AM
Q. Do you know if it was an FBI agent or --
A. Yes.
Q. An attorney or --
A. FBI agent.
11:23AM Q. And at that meeting, were you advised at that point in time of any allegations against you?
A. I don't believe so.
Q. You don't recall any allegations by any of the alleged victims against you?
11:23AM A. Other than this situation?
Q. Other than -- no, I'm saying any allegations in the Justin Phillips' situation that were made against you?
A. There were allegations that I was there and partook in this.
11:23AM Q. Exactly. That's my point. You were aware that there

11:23AM were allegations made by Justin Phillips that you were involved in this incident?
A. Yes.
Q. You were aware that there were allegations that Justin
11:23AM Phillips, that you actually held Justin Phillips' head while the Sheriff beat him?
A. Yes.
Q. And you were made aware that there were allegations by Justin, or Mr. Phillips, that you engaged in other portions
11:24AM of the alleged beating?
A. What other portions?
Q. Well, the hitting, right?
A. Okay. Yes.
Q. Is that a yes?
11:24AM A. Yes.
Q. So for the first time in your life, you got called up to the FBI office, an FBI building, correct?
A. Correct.
Q. You had never been to one before?
11:24AM A. No.
Q. You go in there and you are advised that, in fact, they are investigating you for being involved in this alleged beating?
A. Yes.
11:24AM Q. And that was scary, wasn't it?

11:24AM A. I don't know if I would call it scary.
Q. Well, if it wasn't scary, then what would you call it?
A. Nerve-wracking, maybe.
Q. Nerve-wracking. Did you go see a lawyer?
11:25AM A. No.
Q. Did you bring one with you?
A. Today?
Q. No, when you met with the FBI for the very first time?
A. No.
11:25AM Q. And while you were at that meeting, did ya'll discuss any issues of leniency with you, or you not being charged?
A. No.
Q. Or did you all discuss the actual allegations that Justin Phillips was making against you?
11:25AM A. Yes.
Q. And what were those allegations again?
A. That I held him.
Q. Would it be fair to say that you held his head while the Sheriff beat him?
11:25AM A. No.
Q. Well, I'm saying, though, would it be fair that those were the allegations that Mr. Phillips was making?
A. Yes.
Q. And then also you participated in other punches and beating his head and body. Would that be correct?
11:26AM

11:26AM A. The allegations?
Q. Yes.
A. Yes.
Q. All right. As a result of this, were you put in the position where you could either be a defendant, or you could be a witness?
A. No.
Q. And so you didn't at that point in time decide that you were going to create this story so that you didn't have to have the wrath of the FBI and the Department of Justice down on you because it would be better to be a witness than it would be to be a defendant?
A. No.
Q. So you met with them, and then what was that meeting like? What did you talk about?
A. Everything that we talked about today.
Q. And did you tell them that that part of Justin Phillips' story was not true?
A. Can you clarify?
Q. The portion where you held his head so that the Sheriff could beat him, that that portion was not true?
A. Yes.
Q. And the other portions where you partook in the beating of him in the head and the body, that was not true?
11:27AM A. Correct.

Q. So that we're clear, Justin Phillips was not telling the truth about that part?
A. Correct.
Q. And you agreed to then, what, work for the FBI?
A. I don't know about work for them, but --
Q. Well, you did some recorded phone calls that we just heard for them, right?
A. Yes.
Q. And you agreed to do that, right?
A. Yes.
Q. And so you made those recordings; yes?
A. Yes.
Q. Who made the recordings? Where were you at when they were made?
A. In a vehicle.
Q. I'm sorry?
A. In a vehicle.
Q. And who was with you?
A. Special Agent Ferguson.
Q. So you guys had prearranged a meeting, and ya'll got together and either made these phone calls or waited on these phone calls?
A. No.
Q. Tell me how that happened.
A. Text message was sent by Sheriff Boen. I contacted

11:28AM the FBI, and then they came to me.
Q. On all of those recordings?
A. Yes.
Q. That's how it worked on every one of them? They met
11:28AM with you in your vehicle?
A. Yes. We met in their vehicle.
Q. You met in their vehicle for each one of their recordings?
A. Uh-huh.
11:28AM THE COURT: Is that a yes?
THE WITNESS: Yes.
Q. (By Mr. Wood.) Let's go back to the beginning of the Justin Phillips' saga. Okay?
The day that he escaped from the jail, were you on
11:28AM duty or not?
A. No.
Q. And what day did he escape from the jail?
A. September -- I'm not 100 percent sure of the exact date.
11:29AM Q. Okay.
A. September 14th.
Q. All right. September the 14th. So it's your testimony that he escaped from the jail September the 14th, correct?
11:29AM A. Yes.

11:29AM Q. Were you working on September the 13th?
A. I don't recall.
Q. Did you ever have patrols at the Franklin County Sheriff's department where you're called an "overlap car" or an "overlap patrol?"
11:29AM
A. Yes.
Q. And what is that?
A. A swing shift.
Q. What does that mean? That doesn't mean anything to me.
11:29AM
A. You have a morning, afternoon car, then we have a middle car.
Q. So tell me on a weekday evening, how many patrol cars does Franklin County Sheriff's department have working for the whole county?
11:30AM
A. Two, I believe.
Q. And is it always two?
A. I'm not sure. I would -- I'm not 100 percent sure.
Q. So at night, you would have a normal night shift vehicle or patrol, and then you would have this overlap, or what you called swing shift, is that correct?
11:30AM
A. Yes.
Q. That makes up the two vehicles?
A. Yes.
11:30AM Q. And what is the purpose of the swing shift?

11:30AM A. To take care of calls in case you get covered up in calls.
Q. What about transporting and doing stuff like that?
A. Yes.
11:30AM Q. You've got one deputy that will be assigned. He's the main patrol guy. He's assigned to the county. That's his primary responsibility. The swing guy helps out if they get backed up or if there's some unusual event -- I say unusual -- a transport or something to that effect?
11:31AM A. Sometimes, yes.
Q. The swing shift would handle that type of stuff?
A. Normally, yes.
Q. Now, do you know if Zach English was working the day before you transported Mr. Phillips?
11:31AM A. I don't.
Q. Do you know that he was working on the day that you did transport Mr. Phillips?
A. I'm not sure.
Q. Well, you testified earlier that Zach English was with
11:31AM you when you transported Mr. Phillips to Crawford County?
A. Correct. I had somebody call to make sure that I had somebody to go with me.
Q. So the day that -- according to your story, the day that you transported Mr. Phillips to Crawford County, Zach
11:31AM English was working and was with you?

A. He was with me.
Q. So why were you advised that you were transporting him -- "him" being Mr. Phillips -- to Crawford County?
A. Because they wanted somebody more experienced.
Q. And who called you?
A. Sheriff Boen.
Q. He said, "We need somebody more experienced to transport Justin Phillips"?
A. Yes.
Q. And why was that?
A. Due to who he was and what he -- his criminal record.
Q. Well, earlier, you testified that it was because of his history. Now it's because of who he was.
But my question is, in your mind, why do you have to have an extra person to transport this particular individual?
A. To make me feel more comfortable.
Q. And why would you be uncomfortable?
A. It's just better to have somebody else with you.
Q. So it's not -- so now you're telling me it's not just Justin Phillips was the issue; it would be any transport, you would want this other person?
A. Depending on the situation.
Q. Well, that's what we're trying to get to. I'm trying to figure out what that situation is.

As I understand your testimony, the situation requiring an additional deputy is that it was in particular because it was Justin Phillips, correct?
A. Correct.
Q. And you had knowledge of Mr. Phillips?
A. I knew who he was.
Q. And you knew his -- like you said, you knew his history. You knew his criminal record. That's what you said, correct?
A. I knew that he had tried to escape.
Q. So you pick him up from the Franklin County Detention Center?
A. Yes.
Q. And tell me how that went. You picked him up from -- I don't know where -- booking, or where did you pick him up from?
A. From the sally port.
Q. Did you pull all the way in the sally port?
A. I don't recall.
Q. It's not typically used as a sally port at Franklin County, is it?
A. Sometimes, yes.
Q. So who shackled him?
A. I believe that was Mr. English.
Q. But you're not sure?

11:34AM A. Not 100 percent, no.
Q. And when he got shackled the first time that you saw him, what all restraints did he have on?
A. Handcuffs and leg irons.
11:34AM Q. What about any other -- what about a belly band or belly chains?
A. I don't recall.
Q. Tell me, do you know what a belly chain is, or a belly belt?
11:34AM A. Yes.
Q. What do you call them?
A. Belly chain.
Q. Is it an actual chain that goes around the waist, or does Franklin County use the leather belts?
11:34AM A. There's two different types.
Q. Well, let's talk about them. Tell me about the leather kind.
A. I believe they have a buckle in the back, some rings on the front.
11:35AM Q. So tell me how they work. I mean, you've got to secure him with that apparatus somehow, right?
A. Correct.
Q. Tell me how it works.
A. So on the leather type, they secure in the back. You
11:35AM cuff the handcuffs to the chain in the front.

11:35AM Q. So the leather kind, it's a leather belt, but it's backwards. Instead of the buckles and stuff being in the front, they are in the back, correct?
A. Yes.
11:35AM Q. And then it's got a steel ring on the front of it, correct?
A. Yes.
Q. Now, I'm a former police officer. There's different kinds of these apparatus. Does this one -- is it just a
11:35AM ring where you put your handcuff on one side of the prisoner, you put the other cuff, opened-up cuff through the ring, and then you handcuff his other, or does it got actual cuffs on the belt?
A. I believe there's multiple rings on the belt.
11:36AM Q. So are you telling me that you take one cuff and put on his wrist, and one cuff and put on this ring, and the same thing on the other side?
A. There's multiple.
Q. I don't understand what you're talking about. What
11:36AM does that mean, "multiple"?
A. Multiple rings, so you can cuff them on the side or you can cuff them in the front.
Q. I gotcha. Then the metal belly chains, how do they work?
11:36AM A. It's just a chain with a padlock.

11:36AM Q. And where does it padlock at?
A. To the end of the chain.
Q. So again, you put the chain around them, correct?
A. Yes.
11:36AM Q. And then in the back, you padlock the chain just like you would affix a belt that was in the back, correct?
A. Either on the side, or if it's in the back, then it's jamming into the prisoner's back, so --
Q. But you put a chain around them, and somewhere around
11:37AM this chain, you padlock that chain so that they -- it won't come off of them, correct?
A. Correct.
Q. And then you have leg shackles. What are leg shackles?
11:37AM A. Larger handcuffs.
Q. They are big handcuffs because they've got to go around peoples' ankles. And the chain in between them are not like this. The chain in between them is anywhere from two or three feet long, correct?
11:37AM A. Uh-huh.
THE COURT: Is that a yes?
THE WITNESS: Yes.
Q. (By Mr. Wood.) There's also -- when you put belly chains on, there's another portion of that to further
11:37AM restrain a prisoner, isn't that correct?

A. Say that one more time.
Q. After you put the belly chains on, you've got the shackles on, there's another restraint that you can attach to further restrain a prisoner?
A. I'm not aware of what you're --
Q. Have you ever -- you have never seen the restraint that goes from the handcuff area and clips to the shackles? You've never seen the prisoners walking around in court where they are holding that chain up in their hands so that it's not dragging on the ground?
A. Yes. Yes. Yes.
Q. How many transports have you done?
A. Not many.
Q. But you've been to court a bunch, I would assume?
A. Yes.
Q. So you have seen the prisoners in court, and they come in, and their legs are shackled and their hands are shackled. And then they are carrying that extra chain that goes from their hand to their feet. They got it kind of balled up, pulling their leg shackles up so they can walk around, right?
A. Yes.
Q. That extra chain from the hands to the feet, that's extra security, isn't it?
A. Yes.

11:39AM
Q. That's an extra restraint, right?
A. Yes.
Q. And it's to further immobilize them -- because it's only so long -- it's to further immobilize them, correct?
11:39AM
A. Yes.
Q. Well, let's go back. How many transports have you ever done?
A. I'm not aware of a number.
Q. Well, at that time, how many had you done?
11:39AM
A. I don't want to guess.
Q. Well, you just said, "Not many"?
A. Not many.
Q. What does that mean to you, "Not many"?
A. No more than 20.
11:39AM
Q. And so at the time that you initially transported Justin Phillips, do you recall if he had on the belly chains, if he had on the leg shackles, if he was cuffed or any of that?
A. During the first transport?
11:39AM
Q. Yes, sir.
A. Yes, he did have handcuffs in the front and leg irons. And I believe he did have a belly chain on at that time.
Q. So that was a long way to get to this point. So you do that when you need to have extra restraint for certain
11:40AM
people?

11:40AM A. Yes.
Q. Especially somebody that you're picking up because he escaped out of a detention center, right?
A. Yes.
11:40AM Q. So ya'll get him. Who puts him in the car?
A. Mr. English.
Q. And which side did he put him on?
A. Passenger side rear.
Q. Passenger rear. That's standard, correct? Right?
11:40AM A. Yes.
Q. And so you guys -- you and Mr. English -- ya'll take off. And then you're headed towards Crawford County. You're headed to Crawford County Detention Center, right?
A. Yes.
11:40AM Q. Somewhere along the way, you and Mr. English, or Mr. English or you, started hearing rustling of the chains and stuff back there, correct?
A. Yes.
Q. You talked earlier about the partition that's in a
11:41AM police vehicle, what we call the cage a lot of times is what it's referred to as. That cage back there, it runs, I mean, directly behind the front seat from one side of the vehicle to the other, correct?
A. Yes.
11:41AM Q. And it also comes up as a solid platform to about the

top of the headrest -- or not the headrest -- but the top of the regular seats, doesn't it?
A. Roughly, yes.
Q. And then for the top third of it or so, it's either -- usually they have got plexiglass. Maybe there's a section that slides. Sometimes it's expanded metal, or it's just like steel mesh, right?
A. Yes.
Q. What kind did you have?
A. Plexiglass, I believe.
Q. So what kind of vehicle were you driving?
A. A Ford Explorer.
Q. An Explorer. And did that Explorer have tinted windows?
A. I don't recall.
Q. So you guys are driving down the road. You start hearing rustling of the chains and some commotion back there, correct?
A. Yes.
Q. So tell me then what happened.
A. I had Mr. English look in the back seat.
Q. And what did he observe?
A. That Mr. Phillips was slipping one of his cuffs off.
Q. Now, Mr. Phillips, the one you're transporting for escaping -- let's back up just a second.

11:42AM He actually -- Mr. Phillips -- worked at the Franklin County Detention Center as a dispatcher or something to that effect, didn't he, at one point in time?
A. I think so, at one point in time.
11:43AM Q. And then from there, he went and he worked over at Ozark PD, Police Department, Ozark Police Department, correct?
A. I believe so.
Q. So that would be the same jail -- when he was an
11:43AM officer, he would bring his prisoners to that same jail, right?
A. I would assume so, yes.
Q. So Mr. Phillips, he had intimate knowledge of that facility, of the Franklin County Detention Center, right?
11:43AM A. I would assume so.
Q. And it's not a very new facility, or it was not a very new facility at all, was it?
A. No, sir.
Q. In fact, it was very old, wasn't it?
11:43AM A. Yes.
Q. And it was in poor condition, correct?
A. Correct.
Q. And the reality of it is, it just wasn't very secure, even for a detention center, was it?
11:44AM A. I don't -- it was an old jail.

11:44AM Q. My question is, but the reality of it is, it wasn't a very secure detention facility, was it?
A. It was fairly secure.
Q. Was it your understanding that Mr. Phillips, while he
11:44AM was being booked in, he just hopped through -- he pushed out a window and hopped into the dispatch room?
A. I'm not sure how he did that.
Q. So you weren't -- you received no knowledge of him exiting through the back door?
11:44AM A. No.
Q. All right. So you got Mr. Phillips. You guys were going down the road. He's back there rustling chains, causing a commotion. Mr. English, Zach English says, "He's trying to slip his cuffs." What does that mean to you?
11:44AM A. That he was trying, just trying to get his hand out of his cuff.
Q. Well, is that -- did that not startle you? Did that not alarm you?
A. Yes.
11:44AM Q. I mean, that's a fairly significant situation, isn't it?
A. Uh-huh.
Q. I mean, the escape of a prisoner is high on the, "We've got a problem" list, correct?
11:45AM A. Yes.

11:45AM Q. So what did you do when he said, "He's got his cuff off"?
A. I radioed to our dispatch.
Q. And what did you tell them?
11:45AM A. To let Crawford County know that we were coming, and the situation.
Q. And did you actually see that he had a cuff off?
A. I didn't.
Q. Do you remember in August of 2019, you actually
11:45AM provided testimony to the Grand Jury?
A. Yes.
Q. And as part of that testimony to the Grand Jury, you stood up, or raised your right hand, however they did it, and you were sworn in to tell the truth and the whole
11:46AM truth, correct?
A. Yes.
Q. So back during that testimony, you said, yeah, he had -- he got to rustling in the back, could hear his leg shackles and cuffs.
11:46AM Did you ever become aware of the fact that Justin Phillips could dislocate his thumbs?
A. Yes.
Q. And when somebody can dislocate their thumbs, then they can make their hands smaller and they can slip the
11:46AM cuffs off, correct?

A. Yes.
Q. All right. And so you were aware that he could do that?
A. I was aware then.
Q. Well, you were aware at that moment because Zach -- is it my understanding that Zach English said, "Hey, he can dislocate his thumbs," right?
A. Uh-huh.
Q. So at that moment, you knew that he could perform some physical feats and slip his cuffs off, correct?
THE COURT: Mr. Wood, can I ask you to rephrase your questions? I don't think the record is clear as to the point in time that you're talking about.
And, Mr. Berry, you're doing a pretty good job of saying "yes," but it's difficult for the court reporter whenever you sometimes say "uh-huh," because it's not clear whether that's a yes or a no always. Okay? We want to make a good record, so try to always say "yes" or "no." Okay?
THE WITNESS: Yes, sir.
Q. (By Mr. Wood.) So when you were transporting him up to Crawford County, he slipped out of a cuff. Now, you were aware of that, correct?
A. Yes.
Q. You radioed to Crawford County, or you radioed to

11:47AM Franklin County, and told them the situation?
A. Yes.
Q. And why did you call Franklin County if you were headed to Crawford County?
11:47AM A. So our dispatch could let Crawford County know the situation.
Q. And that's because you can't talk to Crawford County on your radio?
A. Correct.
11:48AM Q. So at that point in time, what did you do after you talked to -- after you called dispatch at Franklin County, said, "Hey, call Crawford, tell them what we got going on"?
A. Proceeded to Crawford County.
Q. Tell me what happened when you got to Crawford County.
11:48AM A. I pulled into the sally port, and Crawford County deputies took Mr. Phillips into custody.
Q. Well, I mean, it wasn't quite that nondescript. When you got there, did you have an opportunity to look at Mr. Phillips?
11:48AM A. I don't believe so.
Q. You didn't notice that he had blood, blood and problems with his wrists and on his ankles?
A. I didn't see that. That was the other deputies.
Q. And, again, you recall giving testimony to the Grand
11:49AM Jury, correct?

A. Yes.
Q. And Mr. Songer here, he was the one that was questioning you at that Grand Jury, right?
A. Yes.
Q. And he asked you, "Okay, could you describe that transport to us?" And you started your answer and we went through basically what we have here.
Whenever we got to Crawford County -- your answer was, "Whenever we got to Crawford County Detention Center, he had some marks on his ankles from where he was trying to slip that off of his heel."
Do you recall giving that testimony?
A. Yes. Yes, I do.
Q. Before we came here today, did you review any of your testimony that you provided to the Grand Jury?
A. Briefly.
Q. And where did you review that at briefly?
A. At the U.S. Attorney's Office.
Q. So you have met with the U.S. Attorney's Office, I assume with Mr. Carter or Mr. Songer, recently?
A. Yes.
Q. And did you previously meet with them before your Grand Jury testimony?
A. I believe so.
Q. And when you met with them this time to prepare this

11:50AM testimony, did they go over your Grand Jury testimony with you?
A. Some, yes.
Q. And did they identify any problems that your Grand
11:50AM Jury testimony had compared to other witnesses that they were talking to?
A. I don't believe so.
Q. And so when ya'll were going over this stuff, you didn't go over the fact that when you got to Crawford
11:50AM County, you saw that he had marks on his ankles from where he was trying to slip the leg shackle off, correct?
A. Can you repeat your question?
Q. So when you reviewed your testimony and prepared for your testimony today with the U.S. Attorney's Office, did
11:51AM ya'll go over the fact that Mr. Phillips had marks on his heels from where he was trying to slip off the leg shackles?
A. No.
Q. So you just simply didn't remember that?
11:51AM A. Correct.
Q. Mr. Songer also asked you, he also asked you:
"Mr. Phillips got one hand out of the handcuffs?"
And you answered, "Yes."
"Was he able to get his leg shackles off?"
11:51AM "No."

So at the Grand Jury, you testified that, in fact, he did get one of his hands out of his handcuffs?

MR. SONGER: Object. This is not proper impeachment. He hasn't laid a foundation for any inconsistent statement.

THE COURT: Sustained. You first have to establish the inconsistency. You can't refer directly to the impeachment material until you've laid a foundation for why it's inconsistent.

Q. (By Mr. Wood.) So when you were transporting him to Phillips (sic) County, did Mr. Phillips, was he able to get out of his cuffs?

A. We transported him to Crawford County.

Q. Was he able to get out of his cuffs during that transport?

A. He was able to get one arm out.

Q. All right. Thank you. Let's talk about what happens when somebody gets free in the back of a police car.

I believe your testimony was while ago, if they just get free, then they can't go nowhere. It's just -- we'll just keep going down the road. Now, is that your testimony?

A. Yes.

Q. But your partition that you had was plexiglass, right?

A. Yes.

11:53AM Q. So if an individual were to get his leg shackles off, he could kick the plexiglass out of the cage, correct?
A. I don't believe there is enough room.
Q. You don't?
11:53AM A. No.
Q. Well, what about the doors? I know you said they had bars on the doors and that you couldn't open them from the inside, is that correct?
A. Correct.
11:53AM Q. But it's true that only -- those doors, they are just secured with regular child locks, aren't they?
A. Correct.
Q. So we're not talking about some armor-plated inside of a vehicle that, if I get loose, that I can't do any damage
11:53AM to the vehicle, are we?
A. Can you repeat that? I'm sorry.
Q. Well, the question is, if I get loose, would I be able to kick the rear doors open?
A. I don't believe so.
11:53AM Q. You don't think so. You just testified that they only have just regular child safety locks?
A. Correct.
Q. So that just means that the button doesn't work?
A. That the handle doesn't work.
11:54AM Q. That the handle doesn't work. But they are not

reinforced any other way than a regular vehicle, are they?
A. Correct.
Q. So would it be fair to say that if somebody got loose, got their leg shackles off, that they, in fact, might be able to kick the door open?
A. I've never seen it.
Q. So you drop him off. Ya'll drop him off at Crawford County. And I think your testimony was that he was good to go. He didn't have a mark on him, right?
A. Not that I recall, no.
Q. And he wasn't complaining of any injuries?
A. Not at that time.
Q. Well, do you recall him saying, "Look, I've got to go to the doctor right now, I've got X, Y, or Z wrong with me"?
A. No.
Q. And, in fact, if you take a prisoner to a detention facility and they are injured, they will usually reject them, correct?
A. Sometimes.
Q. Well, if you brought him in and he was all beat up and he was saying that, "My arm is broke, I've got to go to the hospital," it's more likely than not Crawford County would not accept that inmate, would they?
A. If he had a broken arm?

11:55AM Q. Correct.
A. Yeah, I don't think they would.
Q. There's a precedent, or there's rules. If injured inmates are brought in, the detention facilities can reject them and not take them in, correct?
11:55AM
A. They can reject them, yes.
Q. So at that point in time, you say Anthony, Sheriff Boen, called you on your cell phone while you were in the parking lot?
11:55AM A. Correct.
Q. You indicate that Zach English was with you when that phone call occurred?
A. I had a deputy with me.
Q. Well, okay. Who was it?
11:56AM A. At that time, I'm not 100 percent sure, because we had already gone back to Franklin County and then back to Crawford County.
Q. So let's back up then. When you dropped him off at Crawford County the first time -- he had escaped. You go to Franklin County, you get him, you take him to Crawford County, right?
11:56AM
A. Uh-huh.
Q. You drop him off. Okay. They take him in, right?
A. They take what?
11:56AM Q. They take him in. He gets booked into the Crawford

County Detention facility?
A. Uh-huh.
Q. At that point in time, now you're saying that you went back?
A. We went back to Franklin County.
Q. And who was "We"?
A. Me and another deputy. Me and Zach English went back.
Q. And so how long after you got back before you got a call to go back up to Crawford County?
A. It wasn't very long at all.
Q. And who gave you that call?
A. I believe it was Sheriff Boen.
Q. So you get that call. You head back up to Crawford County. Why did you go to Crawford County?
A. Initially?
Q. Look, when you got the call from Sheriff Boen after you had come back. All right?
A. Uh-huh.
Q. Why were you being dispatched back to Crawford County?
A. To sit with Mr. Phillips at the hospital.
Q. So did you go straight to the hospital?
A. Yes.
Q. You and what deputy?
A. I don't recall which deputy.
Q. When you met with the U.S. Attorney to prepare for

your testimony today, did ya'll go over this particular part of your testimony about who was with you?
A. Yes.
Q. And the reason you did that is because before, you have said emphatically that it was Zach English, correct?
A. Zach English was with me during the first transport.
Q. During the first transport. But before, prior statements that you've made, you said Zach English was still with you and went back up there with you?
MR. SONGER: Objection, Your Honor. Same objection. It's not proper impeachment.
THE COURT: Well, he's laying the foundation, so it's overruled.
Q. (By Mr. Wood.) In prior testimony, haven't you said that Zach English is the one that went back up there with you to go to the doctor?
A. I said I believed that Zach English was with me.
Q. So we'll get that, at least. You have said you believed it was Zach English before, correct?
A. Yes.
Q. So now it's not that you don't know who it was. Now you believe that it was Zach English?
A. Yes.
Q. And you made that change in your testimony right now after you met with the U.S. Attorney's Office to go over

11:58AM those problems, correct?
A. No. Just said that there was a deputy with us.
Q. That's what they decided to say. That's what ya'll decided to say. Just say, "There was a deputy with us" to
11:59AM try to get around those prior statements?
A. There was a deputy with me.
Q. That's what you and the U.S. Attorney's Office came up with in preparing for your testimony today, right?
A. I'm not going to lie.
11:59AM Q. Well, I would hope not. So you met with them, you had a problem with your testimony, and now we're to that part, and you said it was a deputy and you didn't know who it was?
A. I had a deputy with me, and I believe it was Zach
11:59AM English.
Q. But that's not what you said while ago. While ago, you were clearly trying to avoid the question, and you were clearly trying to manipulate your testimony, weren't you?
A. No.
11:59AM Q. When you met with the government the other day to go over your testimony, was there any other problems that ya'll came up with solutions for?
A. I don't understand the question.
Q. Any other inconsistencies -- and we're going to get to
12:00PM many more -- in your prior testimony that ya'll worked out

in preparation for this hearing?
A. Not that I can think of.
Q. So the deputy, when you came back to Crawford County after -- I mean, Franklin County -- after dropping Mr. Phillips off. Are you with me?
A. Uh-huh. Yes.
Q. You got a call, we've got to go back, right?
A. Yes.
Q. And as you sit here today, you have no reason to believe that the deputy that was with you was anyone other than Zach English, correct?
A. I believe it was Zach English.
Q. So you and who you believe was Zach English go back to Crawford County. You pull into the hospital. What happened then?
A. We went to the hospital and sat with Mr. Phillips.
Q. All right. He got released at some point in time?
A. Yes.
Q. So then what did you do?
A. We brought him to Crawford County Detention Center.
Q. And you dropped him off?
A. Yes.
Q. And you and Mr. English left?
A. Yes.
Q. Where did you go after that?

12:01PM A. Well, as I was pulling out of the sally port, I parked out in front of the Crawford County Sheriff's Office.
Q. And I understand, is that where you received a phone call from Sheriff Boen?
12:01PM A. Yes.
Q. And Mr. English, Deputy English, was in the car with you?
A. Yes.
Q. And the Sheriff allegedly says, "Hey, are you by
12:01PM yourself?" And you say, "I'm not." And you stepped out of the vehicle, correct?
A. Correct.
Q. So Mr. English was in there when this phone call happened?
12:02PM A. In the vehicle.
Q. He wasn't in the detention center, were you all?
A. No, we were in --
Q. Mr. English, Deputy English, was in the same vehicle you were in when Sheriff Boen allegedly called your phone?
12:02PM A. Yes.
Q. Zach English, Deputy English, was in the same vehicle you were in when you subsequently stepped out to take that phone call, correct?
A. Correct.
12:02PM Q. All right. And how long did the phone call last?

A. Not very long.
Q. About what time was this?
A. 10:00. Maybe 9:30.
Q. And at any point in time -- let me rephrase that. At no point in time did you tell the Sheriff where you were at, did you?
A. I don't believe so.
Q. So he calls and he says, "Hey, we've got to go get Justin Phillips." And at no point did you tell him, "Hey, I'm sitting in the parking lot"?
A. No.
Q. So he says, "We've got to go get Justin Phillips because" -- whatever his reasonings are. And so you just get back -- you said, "Okie-dokie, 10-4." You get in the car and you head back, correct?
A. Correct.
Q. When you picked up, or, actually, when you got back to Franklin County, what did you do then?
A. Dropped off the deputy and then went back to Sheriff Boen's house.
Q. So on the way back from Crawford County -- let me make sure -- after you dropped him off from the medical facility, you took him to Crawford County Jail.
When you and Zach English were on your way back to Franklin County, did you tell Zach English anything about

12:04PM what the Sheriff had called and talked about?
A. No.
Q. You didn't tell -- in fact, you didn't tell Zach English that, "Hey, I've got to go all the way back to get
12:04PM the Sheriff and then turn around and go all the way back to Crawford County to pick up Justin Phillips," did you?
A. I don't recall, no.
Q. Well, if it was such a fishy, bizarre, strange call from this deputy, or from the Sheriff, it seems like you
12:04PM would probably have talked about that on your 30 to 45-minute ride back to Franklin County, wouldn't it?
A. Yes.
Q. So it seems like it might be more fishy that your testimony is that you received this call and the Sheriff
12:04PM somehow had some nefarious conduct that he wanted you to engage in, correct?
A. Can you rephrase that?
Q. I think -- wouldn't you agree your testimony now sounds more fishy than the Sheriff's call did, correct?
12:05PM A. No.
Q. All right. So the whole ride back, you never tell Zach what's going on. You drop him off where?
A. I believe at the Sheriff's Office.
Q. Well, I mean, did you drop him off at the Sheriff's
12:05PM Office or not?

12:05PM A. I dropped him off at the Sheriff's Office.
Q. And then you went where?
A. To Sheriff Boen's house.
Q. How far is it to Sheriff Boen's house from the SO, from the Sheriff's Office?
A. 10 miles, maybe.
Q. Do you know what time you got there?
A. I don't.
Q. Do what?
12:05PM A. I don't know an exact time.
Q. When you met with the government to prepare your testimony for today, ya'll didn't go over any information about what time that you were at different locations on that night?
12:06PM A. We didn't go over exact times. I mean, I have an app on my phone that tracks where I'm at, but we didn't go over exact times.
Q. Is there any reason as we sit here today that you're not wanting to answer the simple questions that I'm asking?
12:06PM A. What simple questions?
Q. What time did you get to the Sheriff's Office? I mean, to the Sheriff's house?
A. I don't recall what time exactly.
Q. But you will agree that you and the government sat
12:06PM down and went over your information from your app about

12:06PM where you were at different times that night?
A. Yes.
Q. All right. Whatever time you got to the Sheriff's Office, I mean, to the Sheriff's house, you picked him up,
12:07PM right?
A. Yes.
Q. And you testified here today, "Oh, my God," I think you testified, you "smelled intoxicants"?
A. Yes.
12:07PM Q. And then today, you said that he was "intoxicated," is that correct?
A. I said that I smelled intoxicants.
Q. No, no, no. Earlier, under questioning, you said that the Sheriff was intoxicated, correct?
12:07PM A. Seemed intoxicated.
Q. No. You said -- they asked you -- sir, you've been a deputy for how long, and have you had an opportunity to conduct DWIs?
A. Have I?
12:07PM Q. Yeah.
A. Yes.
Q. And the questioning was, "And, sir, as a police officer, you have been around intoxicated people a lot, have you not?"
12:07PM A. Yes.

Q. Right. And when they asked you that question, you said that Sheriff Boen was intoxicated?
A. I said that he was not having problems walking, but --
Q. No, no. Well, that's not what I heard. Okay. You indicated he was intoxicated. Now you're saying that that's not true, correct?
A. I remember saying that he wasn't having problems walking and that he -- I smelled alcohol, but he knew what he was doing.
Q. Would it be fair to say that in your statements originally to the FBI and in your Grand Jury testimony that you never asserted in those two events that Sheriff Boen was intoxicated when you picked him up at his house?
A. I believe I mentioned that you could smell intoxicants.
Q. That's not my question. We just went over the fact, you're a police officer. Okay? You know what it means to be intoxicated, correct?
A. Uh-huh. Yes.
Q. You have obviously probably arrested people for public intoxication, correct?
A. Yes.
Q. Have you ever handled any DWIs?
A. Yes.
Q. Were you field sobriety certified?

12:10PM
A. Yes.
Q. So you've had special training and skill and knowledge about 5how to identify intoxicated people, correct?
A. Yes.
12:10PM
Q. So now, as we sit here today, you can't get your answer straight about my question, isn't that correct?
A. What was your question again?
Q. My question was, as you picked up the Sheriff, was he intoxicated?
12:10PM
A. He seemed intoxicated, yes.
Q. So we're back to the intoxicated. Okay. Now, do you recall giving testimony in front of the Grand Jury?
A. Yes.
Q. And at the Grand Jury, were you asked about alcohol
12:11PM
and the Sheriff?
A. I believe so.
Q. Obviously, this is another issue where your testimony has been inconsistent in the past.
Did you all discuss this when you met with the U.S.
12:11PM
Attorney's Office to get you prepared for what you needed to say?
A. We did discuss --
Q. Okay. That explains a lot of it. I don't understand why you won't answer the simple questions.
12:11PM
Isn't it true at the Grand Jury that the most you said

12:11PM is that, "I could smell what I thought was an intoxicant"?
A. Yes.
Q. Now, today, you've come up here and said -- well, five things -- but, "He was intoxicated." Then it was, "Well, he could walk still." Then it was, "Well, I smelled something." Now you're back to, "I believe he was intoxicated," correct?
12:12PM
A. Yes.
Q. And this is after law enforcement training on how to determine if somebody is intoxicated? This is the training you used to come up with this?
12:12PM
A. Well, not specifically.
Q. You didn't stop right there and say, "Look, we've got some issues here because I smell alcohol, so we don't need to be going anywhere and picking anybody up," correct?
12:12PM
A. Correct.
Q. Again, it's you apparently allegedly seeing some wrong happening and doing nothing about it, correct?
A. Correct.
Q. So you picked the Sheriff up. And today you testified that he was on the phone on the way up there some, but then he got off the phone and laid out the grand plan of beating on Justin Phillips, correct?
12:13PM
A. Well, that he was going to escape, yes.
Q. Well, that's what it all means, right? Your
12:13PM

12:13PM testimony, your allegations here today, is that, "We were going to say he escaped, that the Sheriff was going to say that he escaped" so that he could beat him up, right?
A. At that time, I didn't know that.
12:13PM Q. Well, I understand that at that time that you didn't know. But as we sit here today, your testimony has been implying the Sheriff was engaged in some sort of nefarious conduct by saying, "Oh, he's going to escape," right?
A. Correct.
12:14PM Q. Do you recall talking to the Grand Jury about this very subject, talking on the phone?
A. Yes.
Q. Before we go any further, is this a subject that you discussed and prepared your testimony with the government
12:14PM for today?
A. Which part?
Q. Did you and the government sit down and look at all your prior statements about the Sheriff talking on the phone on the way back up to Crawford County and go over it
12:14PM to get it squared away for today?
A. We talked about some stuff, yes.
Q. Doesn't that seem like a theme to you? Everything that you have inconsistent statements about that are not true is stuff that you covered with the government, and now
12:15PM you're up here telling a different story?

A. I don't understand.
Q. Do you think that's coincidence?
A. I don't understand what you're saying.
Q. I understand. You remember talking to the Grand Jury. In fact, you were given a question by Mr. Songer. You guys are talking about picking up the Sheriff and you're going down the road. And then he says, "All right. So what happened next?"
And then you tell him, "Sheriff Boen was on the phone the entire time," is that correct?
A. Yeah, from the Sheriff's Office to when we got to Crawford County.
Q. But earlier, you testified that he was on the phone some, and he got off the phone, and then he went over his master plan to get Justin Phillips, correct?
A. As we were going to the jail, correct.
Q. But I'm just saying, you told the Grand Jury he was on the phone the whole time?
A. Well, he was on the phone the whole -- most of the way up there.
Q. Well, no. Would you agree that, "Most of the time" is not the same as, "The entire time?"
A. Yes.
THE COURT: Mr. Wood, I want to give you a heads-up. This has ended up going longer than you

12:16PM anticipated, I'm sure. By 12:30, we need to take a break. We've been going a long time, so I just wanted to give you a heads-up so you can find a good place to stop.

MR. WOOD: I think that's fine. I'm ready. I 12:16PM can stop right here, Your Honor, if you want to go ahead and do it now.

THE COURT: Okay. So Ladies and Gentlemen, it's 12:15, 12:20. If we came back at 1:30, would that be enough time, or would you rather have a few minutes longer? 12:17PM Is 1:30 okay?

Remember the recess instruction, Ladies and Gentlemen. You can't discuss with anyone the evidence in this case, and that includes your fellow jurors. You can't discuss the case with your fellow jurors until it's time to 12:17PM deliberate. And do not allow anyone to come up to you and discuss the case with you or within your hearing. Only you have been chosen as jurors in this case and only you have been sworn to uphold the law. No one else has been chosen to do this.

12:17PM You can't talk about it on the phone or by e-mail or any electronic means or Tweet or blog or what have you. Also, you can't do any research. Remember that all of the evidence that comes into this courtroom, that's the only evidence that you can rely on. And if you were to do any 12:18PM outside research, that would be a violation of your oath

12:18PM and unfair to the interest of justice. So we'll be in recess until 1:30.

(Jury out at 12:18 p.m.)

(Jury in at 1:32 p.m.)

1:20PM THE COURT: You may continue when you're ready, Mr. Wood.

MR. WOOD: Thank you, Your Honor.

MASON BERRY

CROSS EXAMINATION (cont'd)

1:30PM BY MR. WOOD:

Q. Mr. Berry, returning from the lunch break, during the lunch break, did you meet with the government to discuss your testimony?

A. No.

1:31PM Q. Did you meet with anybody to discuss your testimony?

A. No.

Q. So let me figure out where we were at here. So you just picked up the Sheriff. He's on the phone the entire time up to Crawford.

1:31PM All right. So now this is, you've picked up the Sheriff, and now the two of you are on your way back up to Crawford County to get Justin Phillips. So you understand where we're at?

A. Yes.

1:31PM Q. Tell me what happened when you first arrived back at

1:31PM the Crawford County Detention Center.
A. We pulled into the sally port and got out of the vehicle to go get Mr. Phillips.
Q. And when you got out of the vehicle, the Sheriff got
1:32PM out of the vehicle also?
A. Correct.
Q. And he went inside and went to the rest room, correct?
A. I don't know where he went.
Q. Well, once you got out of the vehicle, tell me again,
1:32PM what did you do?
A. We went inside to take Mr. Phillips, and I shackled his ankles and hands.
Q. Did they already have him right there in the -- most of the detention centers, you walk in from the sally port
1:32PM and you have the booking area right there?
A. Correct.
Q. Did they already have him ready to go in the booking area for you?
A. Yes, he was sitting in the booking area.
1:32PM Q. He was just sitting on a bench?
A. Yes.
Q. And so you had him stand up, and then you put leg shackles on him?
A. Yes.
1:32PM Q. You put handcuffs on him?

1:32PM A. Yes.
Q. And you also put the belly chains on him, correct?
A. Yes.
Q. Now, again, was this a leather belly wrap, leather one, or was it an actual chain?
1:33PM
A. It was a chain.
Q. All right. And did you bring those with you or were they Crawford County's?
A. We brought them with us.
1:33PM Q. And when did you pick those up?
A. At the Sheriff's Office.
Q. You didn't already have them from dropping him off?
A. I don't believe so.
Q. You didn't still have the ones that he had on when you took him up there?
1:33PM
A. The leather ones?
Q. Yes.
A. No, I believe those were brought inside.
Q. To the Franklin County Sheriff's Office?
1:33PM A. Yes.
Q. So you handcuff him, you leg shackle him, you belly wrap him. And then you connect his handcuffs to the belly chain, correct?
A. No.
1:33PM Q. Well, you did write a report about this, correct?

1:34PM A. Yes, I did.
Q. And that report was filled out as a normal course of being a deputy, correct?
A. Correct.
1:34PM Q. You write reports all the time?
A. Correct.
Q. And to your knowledge, is it a crime to file a false police report?
A. Yes.
1:34PM Q. So as part of being a deputy sheriff, it's expected that you will write true and accurate police reports, correct?
A. Correct.
Q. And that's what you do, correct?
1:34PM A. Correct.
Q. Because you've wanted to be in law enforcement your entire life, and now here you are, and you do it to the best of your ability, correct?
A. Correct.
1:34PM Q. So your report from that day says that you chained up his hands?
A. It does.
Q. But now you're saying that that's a lie?
A. Yes.
1:35PM Q. So you'll admit that under certain circumstances, you

will lie, correct?
A. I had to do -- I did what I had to do at a certain time.
Q. I understand. My question though is, under certain circumstances, you will lie?
A. That's not a fair statement.
Q. You lied under these circumstances, did you not?
A. Yes.
Q. All right. We'll just call it a push. When you feel pressure that's uncomfortable, you will make up stories and lie, correct?
A. No.
Q. To alleviate that pressure, correct?
A. No.
Q. So tell me exactly why you did not secure his hands to the belly chain when you went to pick him up?
A. In case he needed to protect himself.
Q. In case he needed to protect himself. Okay.
So at this point in time, you were so scared for his safety that you decided not to properly restrain him?
A. Yes.
Q. And I want to go back to your experience on chaining people up, restraining them for transport in particular.
Earlier, you testified you've transported some, correct?

1:36PM A. Uh-huh. Yes.
Q. In fact, you were the transport deputy for Faulkner County (sic) for a period of time, correct?
A. No.
1:36PM Q. You are telling me that you did not serve as the transportation -- a transportation deputy for the Franklin County Sheriff's department?
A. I don't believe so, no.
Q. So you didn't properly restrain him for his -- because you had so much concern for his protection, right?
1:37PM
A. Yes.
Q. Now, this is the same person that you brought to Crawford County for breaking out of the Franklin County Jail, correct?
1:37PM A. Yes.
Q. This is the same person that, on their way to Franklin County, I mean, to Crawford County Jail, after he broke out of the jail, being transported to Crawford County, slipped out of his cuffs, correct?
1:37PM A. Yes.
Q. The same guy who can dislocate his thumbs and get out of cuffs whenever he wants to, correct?
A. Yes.
Q. And he's the same guy that was trying to get his leg shackles off on the way to Crawford County the first time,
1:37PM

1:37PM correct?
A. Yes.
Q. All right. Despite all of that, in all of your wisdom, you decided to leave him unrestrained as far as
1:38PM connecting him to the belly band, correct?
A. Correct.
Q. Have you ever transported Justin Phillips when he didn't try to escape?
A. No.
1:38PM Q. So now you've got Justin Phillips. You've allowed him to be in an unsecured configuration, correct?
A. I wouldn't completely say that, no.
Q. Well, if he can get out of his cuffs whenever he wants, that's not real secure, right?
1:38PM A. Yes.
Q. And we don't have the -- we don't have him restrained, have his hands in his cuffs attached to his waist on the belly band, correct?
A. Correct.
1:39PM Q. And you did not at any point in time tell the Sheriff that you did not hook up the belly chains, correct?
A. Correct.
Q. So there's no dispute, you can't testify that the Sheriff had any knowledge that you had failed to properly
1:39PM secure him?

A. Can you say that again?
Q. There's not going to be any testimony by you that the Sheriff knew that you didn't chain the guy up properly?
A. No.
Q. Your report that we've talked about here today, I think the government put it on the screen there. It says, "I secured his belly chain with the lock in the rear." So that's not true, correct?
A. Correct.
Q. Well, let's back up. But that is true? You put the belly chain on him?
A. I did put the belly chain on him, yes.
Q. So that is true?
A. That I put the belly chain on him?
Q. Yeah.
A. Yes.
Q. Your thing says, "I secured his belly chain with the lock in the rear." You put it on him, correct?
A. Correct.
Q. You just didn't put his handcuffs right there. You didn't lock his cuffs into it?
A. Correct.
Q. So when I just asked you that you didn't do that, you said, "Yes." So my first question is, Mr. Berry, are you sure that you have actual knowledge of what actually

1:40PM occurred on that evening?
A. Yes.
Q. Would you agree that it sounds like you'll change your story to fit whatever it is that you think you need to say?
1:41PM A. No.
Q. No, you don't think so? Okay. Then it says, "And cuffed his hands to the belly chain." Now, that's not true, is it?
A. No.
1:41PM Q. It says, "We secured Mr. Phillips in the passenger rear of my patrol unit." That's not true either, is it?
A. Secured him in the passenger rear?
Q. When you say "We," who were you talking about?
A. Sheriff Boen and I.
1:41PM Q. But Sheriff Boen did not secure him in the rear of that vehicle, isn't that correct?
A. No. I did.
Q. So if we just go a couple of words down. The next sentence, it's not true, correct?
1:41PM A. What sentence is that?
Q. The one that we were just talking about, the one that says "We" -- as in you and the Sheriff -- "secured him in the back of the vehicle?"
A. Uh-huh. Yeah.
1:42PM Q. The Sheriff didn't have nothing to do with that, did

1:42PM he?
A. No.
Q. Then it says, "You were driving down the road and Mr. Phillips began rustling around in the rear." Do you
1:42PM remember that?
A. Yes.
Q. You remember him rustling around in the rear?
A. No.
Q. It's your testimony that he wasn't doing anything back
1:42PM there?
A. Correct.
Q. He was just sitting back there, just enjoying the ride?
A. Yes.
1:42PM Q. Then you say, "I heard a bang," and then Sheriff Boen said, "Justin, sit back." Do you recall that?
A. I recall hearing, "Sit back, sit back".
Q. And, "Sit back, sit back" is really, really important in this situation, isn't it?
1:43PM A. Yes.
Q. And it's because when prisoners try to escape, they hide behind the partition, don't they?

MR. SONGER: Objection.

THE COURT: Sustained.

1:43PM Q. (By Mr. Wood.) "Sit back, sit back" is really

1:43PM important. You just admitted that. When you heard, "Sit back, sit back," what does that mean to you?
A. Can you clarify?
Q. Well, I mean, it's your report. I'm asking you to
1:43PM clarify. I can't clarify.
A. When the Sheriff said, "Sit back, sit back?"
Q. "I heard a bang," and then Sheriff Boen said, "Justin, sit back." What does that mean to you? What does that tell you?
1:44PM A. That Justin needed to sit back.
Q. Well, you just told me that there was a significance in that phrase. Let me ask you this:
If I'm in the back of your patrol car, right, and you've got me back there and I'm cuffed, I'm not belly
1:44PM chained, so I can do anything I want to with my hands, right? Correct?
A. Uh-huh. Yes.
Q. Is that a yes? Okay. If I lean forward in the seat, if I lean forward up against that cage, can you see my
1:44PM cuffs?
A. No.
Q. That is why, "Sit back, sit back" is so important. That's why in the legal environment, you know exactly what that meant, correct?
1:44PM A. Yes.

1:44PM Q. All right. We're getting somewhere. Now, "Sit back, Justin" would tell you, if the Sheriff said that, what would that tell you as a police officer who has transported people and driven this car with this cage around? What 1:45PM would that tell you?
A. Well, that somebody was trying to escape, if we hadn't already talked about it.
Q. All right. I understand. I understand what your story is. I heard the story. Okay. I was sitting over 1:45PM there.
If I'm in the back of your vehicle and I'm cuffed and I lean forward, that cage is solid up to a certain point, right?
A. Uh-huh. Yes.
1:45PM Q. And then it's plexiglass for the last third, correct?
A. Correct.
Q. If I lean forward, neither you nor the Sheriff or anybody in the front seats of those vehicles can look back and see what that inmate is doing with those cuffs and his 1:45PM hands, correct?
A. Correct.
Q. And, in fact, at that time, Justin Phillips was up against the cage when the Sheriff said, "Sit back," correct?
1:46PM A. I don't recall him being up there.

1:46PM
Q. Well, we're getting somewhere. You don't recall. But as you sit here today, you cannot remember if he was up against the cage to where you couldn't see the cuffs, correct?
1:46PM
A. Correct.
Q. And on top of that, you were driving, right?
A. Correct.
Q. And it was dark, correct?
A. Correct.
1:46PM
Q. And it had started to rain?
A. I don't believe so.
Q. We'll get back to that. The next thing that you wrote in your report, you said, "A short time later, Boen yelled at Mr. Phillips that he needed to sit down." That's kind
1:46PM
of important too. Do you recall putting that in your report?
A. Yes.
Q. You didn't secure his hands, right? Let me rephrase that. You didn't secure his handcuffs to his belly chain,
1:47PM
right?
A. Correct.
Q. The partition in your vehicle is a plexiglass partition, right? Correct?
A. Yes.
1:47PM
Q. And you've already said that you don't think you can

1:47PM kick that plexiglass out, correct?
A. Correct.
Q. But it has a sliding window in it, doesn't it?
A. I believe so.
1:47PM Q. You think so? How long did you drive this unit?
A. I said I believe so.
Q. You believe so. How long had you driven that unit?
A. It was brand new.
Q. How long did you drive it? How long, while you were a patrolman, did you have that vehicle?
1:47PM
A. A couple of months.
Q. And you're telling me that transporting arrested people and everything else, that you don't know if it had a sliding plexiglass window so that you can open it up and talk to people and then shut it again?
1:47PM
A. I believe it did.
Q. Those don't lock, do they?
A. I don't believe so.
Q. No. So if he's free with his hands, still cuffed, or if he slips them out, dislocates his thumbs, takes his hand out, he can just open that plexiglass window, grab you around the throat while you're driving, correct?
1:48PM
A. I don't believe so.
Q. Well, what would -- well, how far -- the plexiglass window, how far is it from, we'll say your ear? If you're
1:48PM

1:48PM driving, how far is that plexiglass window from your ear?
A. Six, eight inches maybe.
Q. So you don't think that if he slips his cuffs, if I'm free in the back of your car, that I couldn't open that door and reach around and grab you by the throat?
1:48PM
A. From the back, I don't believe so.
Q. Do you think I could reach around and grab anything in there in the front?
A. From the back?
1:49PM Q. Yeah.
A. I don't believe so.
Q. Then in your report, you put that, "Mr. Phillips then started hitting and kicking the partition of my patrol unit, causing damage to the glass," is that correct?
1:49PM A. That I wrote that?
Q. Yes. Is that correct that you wrote that?
A. Yes.
Q. So if an inmate is free in the back of a patrol unit, and he starts kicking and hitting the partition and causing damage to the glass, would that be a safety concern of
1:49PM
yours?
A. Yes.
Q. If you can't kick the plexiglass out, how did he damage it?
1:50PM A. I don't believe he did.

1:50PM Q. Then in your report, you said, "The Sheriff then stated that he was out of his cuffs." Now, is that what you wrote?
A. Correct. Yes.
1:50PM Q. And, in fact, that's what you saw, correct?
A. No.
Q. And you didn't see that because you didn't see anything, did you?
A. No.
1:50PM Q. As we sit here today, you are not testifying that he did not -- that Justin Phillips did not get out of his cuffs, are you?
A. Can you repeat that?
Q. As we sit here today, you cannot testify that he did 1:51PM not escape those cuffs?
A. Correct.
Q. So regardless of whatever your story is today, okay, no matter who planned what, no matter what the nefarious intent was, you cannot say that when ya'll pulled over, 1:51PM that Justin Phillips was still in his cuffs?
A. Can you repeat that?
Q. Well, no matter what your story is today, that there was a plan and the Sheriff, he come up with this nefarious plan and you guys were going to go pick him up, then you 1:51PM all were going to pull over and then ya'll were going to

beat the snot out of him. Okay? Regardless of whatever the plan was, whatever bad intent there was by the Sheriff, by you, or whatever it is you have alleged today, okay, there will be no evidence, you cannot provide any evidence that Justin Phillips was not out of his cuffs?
A. Correct.
Q. So would it be a safety and security issue if Justin Phillips got his handcuffs off?
A. Yes.
Q. Let me ask you this. If you would have secured him to the belly chains, right, at Crawford County before ya'll left, if you would have secured him to the belly chains and an inmate gets one cuff off, right, is the other hand still cuffed --
A. Yes.
Q. -- to the belt? So if I slip one cuff, I've got one hand that I can use. The other one is still cuffed to the belt, correct?
A. Well, not with the chain.
Q. Well, tell me how that works.
A. They are slipped through. The cuff is slipped through the center of the chain.
Q. So we'll go back to, if you've got a cuff off, that's a safety issue, correct?
A. Correct.

Q. And escape is one of the most serious crimes or conduct or actions that an inmate could partake in, correct?
A. Correct.
Q. That's a serious situation, correct?
A. Correct.
Q. Your report says that at that point in time, you radioed in to dispatch that we need assistance, 24-mile marker, Interstate 40. And that's the Mulberry Exit?
A. Correct. Yes.
Q. Your report says that, correct?
A. Yes.
Q. Now, that, in fact, is true according to you, right?
A. Yes.
Q. You did, in fact, radio in, "Oop, we've got an escape going on, he's trying to escape," or whatever it is that you said, correct?
A. Yes.
Q. So that part of the report you say is not a lie, correct?
A. Yes.
Q. Next, you say in your report that Phillips was, "Tearing up the rear of my patrol unit, so Sheriff Boen and I pulled over to secure him so we could proceed to the jail." You put that, right?

1:54PM A. Yes.
Q. So you're going along, you call for escape. "Franklin County, he's escaping, he slipped his cuffs," whatever you said. And then you broadcast that over the radio, right?
1:55PM A. Yes.
Q. And then when that happens, because that is a -- that's a all-hands-on-deck situation for law enforcement agencies all around you, correct?
A. Yes.
1:55PM Q. The radio started lighting up with deputies, city officers, game and fish, whoever it was. The radio started lighting up with people dispatching that they were headed your way, right?
A. That they were headed to the jail.
1:55PM Q. But they were also -- well, now, wait a second. They also said they were headed to your location, correct?
A. They might have, yes.
Q. Well, it was my understanding of your previous testimony that you said, hey, we need to hurry up and get 1:55PM out of here, because you didn't want all those people showing up. You wanted to let them know you were back on the road?
A. I don't believe so.
Q. All right. At a minimum, you broadcast this SOS -- my 1:56PM words, not yours -- and you immediately hear officers from

1:56PM all sorts of agencies are responding somewhere, correct?
A. I don't believe there was any radio transmission like that.
Q. We'll come back to that, then. So you pulled over at
1:56PM Mulberry. And at this point in time, you've already testified the Sheriff has said, "He's slipped a cuff," right?
A. Yes.
Q. And you just testified that you have no idea whether
1:56PM that's true or not, correct?
A. Yes.
Q. The Sheriff gets out of the car. You stop the truck. First of all, you're driving a Tahoe, or is it an Expedition?
1:57PM A. Explorer.
Q. Explorer. I'm sorry. So you pull over in your vehicle, your patrol car, your patrol SUV, and the Sheriff jumps out, right?
A. Yes.
1:57PM Q. And it's dark, correct?
A. Yes.
Q. It's rural, correct?
A. Yes.
Q. There's no lamp posts or anything like that around,
1:57PM was there?

1:57PM A. No.
Q. You pulled on down the exit ramp, so that would have been away from the -- off of the interstate, right?
A. Yes.
1:57PM Q. No headlights coming from the interstate and all that stuff, right?
A. Not from the interstate, no.
Q. Your vehicle has tinted windows, right?
A. I don't recall if it does or not.
1:58PM Q. Let's talk about police vehicles and how the dome lights are set up.
Now, on a police vehicle, a dome light like a regular person would have in their vehicle that comes on when you open the doors, that's not the way police cars work, is it?
1:58PM A. No.
Q. In fact, because of the dangers of law enforcement, you don't want to be lit up and silhouetted at night when you open your doors, so you all disconnect, or the department or whoever, disconnects those dome lights,
1:58PM correct?
A. I'm not sure how they do it.
Q. Well, they don't come on when you open the door, do they?
A. No.
1:58PM Q. And that's for officers' safety, correct?

1:59PM A. I guess.
Q. And instead, what they do is you mount some big, round lights, usually just right here above your center console, right?
1:59PM A. Yes.
Q. And you as a deputy or a police officer or whoever is in that vehicle, if you want the dome light on, you reach up and turn it on, correct?
A. Correct.
1:59PM Q. So you pull over. You put it in park, I guess. But the Sheriff jumps out, and he immediately opens up the back passenger door, correct?
A. Yes.
Q. So when he opened that door, there was no dome light
1:59PM or any light for you to see what's going on back there, was there?
A. No.
Q. He opens that door. Your testimony is that you jump out and you're running around the front or the back. Did
1:59PM you run around the front?
A. I believe it was the front.
Q. Your testimony was that the Sheriff hit him seven or eight times in the face or the head -- I'm not real sure -- but seven or eight times up here, and maybe more while you
2:00PM were running around, coming to the other side of the

vehicle, correct?
A. I think I said six or seven.
Q. Six or seven. I'll go with six or seven. You're getting out of the vehicle. There's no dome light. There's no parking lights. I think you even said you turned your headlights off, didn't you?
A. No, I turned my blue lights on.
Q. So you've got the strobes going and all that stuff up top, right?
A. Yes.
Q. The blue lights?
A. Yes.
Q. And everybody knows at night when you're right up against blue lights and stuff, they will mess with your eyes and your vision, won't they?
A. I don't believe so.
Q. Have you ever been standing in front of blue lights at night?
A. I have.
Q. Right beside them?
A. I have.
Q. And it's your testimony that they have no impact on your vision?
A. I don't believe so.
Q. Well, when you were an officer, you said you got DWI

2:01PM certified, right?
A. Correct.
Q. Well, isn't it part of your training, in fact, it's required, that if you conduct field sobriety tests on a
2:01PM potential DWI person, right? Are you with me?
A. Uh-huh. Yes.
Q. And you are going to perform the horizontal gaze and nystagmus or any of those other types of vision tests that you see on T.V. -- hey, follow my pen, we're going to do
2:01PM this, we're going to do that -- it is required that you have the person face away from those blue lights, is it not?
A. Correct. Yes.
Q. It's because they mess with your vision, correct?
2:01PM A. Okay.
Q. You can't see at night with those blue lights flashing in your eyes, correct?
A. I can see.
Q. Well, you may be the exception. But your training is,
2:02PM you don't let anybody look at those blue lights while you're trying to check their vision, right?
A. For DWI, correct.
Q. It's pitch black, you've got your blue lights on, and you're running around the vehicle. There's no light in the
2:02PM vehicle. There's no dome light and there's no nothing.

2:02PM So it's your testimony as we sit here today that, "Man, I know I saw six or seven punches by the Sheriff. He was just whamming him in the face," correct?
A. Correct.
2:02PM Q. So you come and it's a very dark environment. You come around the patrol unit. You circle -- the door is open, rear passenger door is open, right?
A. Yes.
Q. You come running around there. And what was the first
2:03PM thing you saw?
A. Sheriff Boen striking Mr. Phillips.
Q. Well, that's pretty broad. Where was Mr. Phillips?
A. In the back passenger seat.
Q. Was he just sitting there in an upright position, just
2:03PM sitting there by the door?
A. He was sitting in an upright position.
Q. And what was the Sheriff doing?
A. Striking Mr. Phillips.
Q. So Mr. Phillips is just sitting there in an upright
2:03PM position like he was just -- ya'll were still riding down the road and the Sheriff is just beating his brains out right there on the side of the road?
A. He was striking him.
Q. Well, where was the Sheriff? Was he still standing in
2:04PM the doorjamb?

2:04PM A. Yes.
Q. And at that point in time, you didn't do anything to help Mr. Phillips, correct?
A. I stepped in between Mr. Phillips and the Sheriff.
2:04PM Q. Well, that was eventually. You said eventually. I know you were the hero a few seconds later, but initially when all this is going on, you didn't stop it, did you?
A. I got in between the Sheriff and Mr. Phillips.
Q. So you're telling us now that as soon as you made it
2:04PM around there, you jumped in?
A. As soon as I didn't get hit.
Q. You said that, "I pulled over to secure him. Mr. Phillips then started fighting Sheriff Boen and I." You wrote that, didn't you?
2:04PM A. Yes.
Q. And is this the part, is this where you held Justin Phillips' head so that the Sheriff could hit him?
A. That's incorrect.
Q. That didn't happen. So is this the part where you
2:05PM joined in with the Sheriff hitting Justin Phillips?
A. That's incorrect.
Q. So if there's any allegations of that effect, that's wrong, right?
A. Correct.
2:05PM Q. That did not happen?

A. Correct.
Q. Because you're the hero in this story, correct?
A. I didn't say that.
Q. You said, "Then I was able to secure the cuffs, but not to his belly chain, after a brief struggle."
So you admit you were able to get the cuffs back on his hands?
A. That was false.
Q. Well, I'm sorry. You admit that that's a lie, that you did not re-cuff him, but you were unable to get it on the belly chain?
A. Yes.
MR. SONGER: Object to the form of the last question. I don't know what was asked.
THE COURT: Overruled.
Q. (By Mr. Wood.) All right. So when it's all said and done, ya'll got Justin Phillips, got him all corralled up, cuffed up. I know your version is, you stepped in, saved the day, got him back in the car, got the Sheriff rounded up and put him in the front seat and then ya'll went to Franklin County Jail, correct?
A. Correct.
Q. How tall are you?
A. 5'11".
Q. Now, when you got to the jail, Franklin County Jail,

2:06PM there were a number of other officers there, correct?
A. Correct.
Q. Officers, deputies, policemen, correct?
A. Yes.
2:07PM Q. And that was a result of you calling out on the radio that Justin Phillips was trying to escape, correct?
A. Yes.
Q. And when you pulled into the sally port, there's a bunch of these officers waiting to help you with Justin
2:07PM Phillips, right?
A. Yes.
Q. And at this point in time, Justin Phillips -- excuse me, let me back up. They attempted to remove him from the vehicle, correct?
2:07PM A. I didn't see that part.
Q. You didn't see any part of them removing him from the vehicle?
A. No. I had exited and went to the front of the vehicle.
2:07PM Q. My understanding of your testimony is that you were so distraught, you were so upset, that you couldn't even look at anybody, so you just walked up to the front of your car?
A. Correct.
Q. And then looked in a different direction, right?
2:07PM A. Correct.

Q. No questions. That's what you did?
A. Yes.
Q. You didn't see anything that happened from the time that you pulled in there and you got out, you went to the front of the car, you didn't see anything that happened with them removing him from the vehicle or after that?
A. No.
Q. Let's go back to the Grand Jury testimony again, since we had a break. You remember going to the Grand Jury, right?
A. Yes.
Q. You remember that at the Grand Jury, you're sworn in. You've got to tell the truth, right?
A. Yes.
Q. Mr. Songer asked you at the Grand Jury, he says, "Well, what was Sheriff Boen doing as Justin Phillips was taken into the jail?" And you said, "He -- I was in front of the vehicle and then went into the dispatch area, which is directly to the right after you enter the sally port door. And they walked Justin into the booking room and then Sheriff Boen came in."
Do you recall making that statement?
A. Correct. Yes. I exited the vehicle. I was up front, and then Sheriff Boen went into the dispatch area.
Q. So the fact of you saying that you watched them walk

2:09PM him into the jail, that wasn't true, correct?
A. I saw a group of officers walking into the jail.
Q. No, no, no. I'm sorry. I couldn't hear what you said. You said you saw a group of officers walking into the jail?
2:09PM
A. Yes.
Q. But at the Grand Jury, Mr. Songer says, "What was Sheriff Boen doing as Justin Phillips was taken into the jail?" And you go on and you say, "They walked Justin into the booking area," correct?
2:10PM
A. Correct.
Q. So you're either -- this was either a lie then, or it's a lie now. You just testified you never saw Justin Phillips from the time that you pulled in there and they started getting him out of the car, because you were so distraught that you went up to the front, correct?
2:10PM
A. Correct.
Q. But you told the Grand Jury that you walked -- you watched them walk him into the booking room?
2:10PM A. I watched a group of officers walk into the booking room.
Q. So it was just a misunderstanding between you and Mr. Songer in front of the Grand Jury?
A. I don't -- I don't know.
2:10PM Q. For the purposes of this trial and your truthful

2:10PM testimony today, you realize that your testimony is going to be gauged on how credible you are, correct?
A. Correct.
Q. For the purposes of this trial, your testimony now,
2:11PM today, is from the time you pulled in, you walked to the front of your car, that you did not see anyone removing Justin Phillips from the car or anything that occurred from the car to the detention facility?
A. Correct.
2:11PM Q. I'll accept that. All right. Let's see here.
Do you know where they took Mr. Phillips once they went into the jail?
A. The booking area.
Q. Well, did you see him any other time after you walked
2:12PM to the front of your car? Did you see him any other time?
A. No.
Q. That day? I'm sorry. That day?
A. That day, no.
Q. So you would agree that this alleged beating happened
2:12PM on the side of the road in a dark rural area, correct?
A. Correct.
Q. You would agree that it remained dark inside of your patrol unit from the time you left there until the time you got to Franklin County, right?
2:12PM A. Yes.

Q. You would agree that you were so distraught and ashamed that you couldn't look Justin Phillips in the eye after what happened on the side of the road, correct?
A. Yes.
Q. And, in fact, you didn't look at him from the time that the beating occurred, the brutal beating occurred, until the time that they got him out of your car and took him in? You never looked at him, correct?
A. That evening, no.
Q. That evening. I'm sorry. You're right. I need to be more accurate. That evening.
When was the next time you saw him?
A. Whenever I returned to work.
Q. And when was that?
A. A few days later.
Q. So how many days off do you usually get?
A. Normally three.
Q. And so do you recall what day it is that you saw him?
A. I don't recall specifically, no.
Q. Well, if you get three days off -- we'll come back to that. I'm sorry. We'll come back to that.
After you stood in the front of your car, distraught, you subsequently went around somewhere and ended up back in the Sheriff's Office, right?
A. In the dispatch area.

2:14PM Q. And in that area, you actually got to see -- you ran into the Sheriff again, right?
A. Correct.
Q. What were you doing in dispatch?
2:14PM A. I was just standing there.
Q. Well, it was your day off, right?
A. Yes.
Q. I mean, that's what you're alleging, correct?
A. Yes.
2:14PM Q. Well, why didn't you just leave? Why would you go hang out in dispatch?
A. This was within a few minutes.
Q. How long did you hang out in dispatch?
A. Until I asked the Sheriff if I needed to fill out my
2:14PM report or if I could go.
Q. And at that point in time, you saw the Sheriff come in and he had some blood or a cut or something on his hands, right?
A. Correct.
2:15PM Q. He went to the -- I don't know -- the med cart, whatever you said was in there and was over there cleaning his hands or fixed his hands or whatever, right?
A. Yes.
Q. And do you recall what you saw on his hands?
2:15PM A. No.

2:15PM Q. All right. So you know that he had some sort of a cut or abrasion or something?
A. Yes.
Q. But you didn't actually get to see it?
2:15PM A. There was abrasions on his hand.
Q. Well, I thought that's what I just asked. So how close were you to him?
A. Ten feet.
Q. And so were they abrasions or cuts? What did they
2:15PM look like? How big was it?
A. They were just cuts.
Q. How many?
A. I didn't count.
Q. More than one?
2:16PM A. I'm not sure.
Q. Bleeding?
A. I didn't pay that close of attention.
Q. Not any kind of catastrophic injury, right?
A. I don't know.
2:16PM Q. It wasn't an injury where you had to pull out your tourniquet and try to apply it to keep him alive, was it?
A. No.
Q. Couple of small little abrasions or nicks on his hands, right?
2:16PM A. Okay.

Q. I'm asking you. Correct?
A. I mean, like I previously stated, I didn't pay that close of attention to it.
Q. So let's go back to, the next time you saw him was three days later?
A. Correct.
Q. Because you had three days off, right?
A. Yes.
Q. And is that when -- I want to make sure that I'm accurate here -- is that when his attorney was coming up to meet with him?
A. They were taking pictures.
Q. And was that his -- that was his public defender?
A. It was an attorney.
Q. A female?
A. Yes.
Q. Do you know Ms. Sarah Capp?
A. I do.
Q. It was Sarah Capp then, right?
A. Yes.
Q. And did you talk to Ms. Capp?
A. I did not.
Q. Now, as I understand it, your testimony was that you were happy that somebody was going to take his pictures so that somebody might do something?

2:17PM A. I believe I said that I wished that they would take pictures of our hands.
Q. Whose hands?
A. Mine and Anthony Boen's.
2:17PM Q. And why would you want them to take pictures of your hands?
A. To show that there weren't any marks on my hands.
Q. And you wanted them to take pictures of Sheriff Boen's abrasions?
2:18PM A. Correct.
Q. Well, did you go tell them?
A. No.
Q. Were they supposed to read your mind?
A. No.
2:18PM Q. Did you take any pictures of your hands?
A. No.
Q. But, I mean, we've got smartphones. We've got all kinds of stuff now that you can take pictures and see what time and date and all that stuff. This was so
2:18PM catastrophically a problem for you that you didn't even take a single picture of your hands?
A. No.
Q. You just hoped that somebody else would take pictures of your hands?
2:18PM A. Yes.

Q. What about these phone calls -- let me go back just a little bit -- these phone calls with the Sheriff. He called you and told you to take Justin Phillips to Crawford County. Then he called you at Crawford County, told you to come back. Did he call your cell phone?
A. Yes.
Q. Have you got any cell phone records showing that those phone calls happened?
A. I don't believe so.
Q. I mean, on your cell phone, you get cell phone records, right? You get a cell phone bill?
A. Yes.
Q. You have the ability to go check, see who has called you and who you have called and text messages?
A. I've never done that.
Q. And you didn't do it in this situation, did you?
A. No.
Q. And when you were meeting with the federal government and you get your story straight, did they say, "Hey, let's get your phone records so that we can show that he called you?" Did that happen?
A. No.
Q. Because that would have been a pretty good deal to show that these phone calls actually happened, right?
A. Yes.

2:19PM Q. Are you certain that Sheriff Boen is the one who called you to tell you to transport Justin Phillips the first time to Crawford County?
A. Yes.
2:19PM Q. You could have pulled that record, right?
A. Yes.
Q. Are you sure, as sure as you have been on the rest of your testimony here today, that it was not another person from the jail that called you?
2:20PM A. Yes.
Q. And are you certain -- I'm talking as certain as you've been on the rest of your testimony here today -- that Sheriff Boen then called you again while you were sitting in Crawford County?
2:20PM A. Yes.
Q. You could have got that record, phone call record, right?
A. Yes.
Q. Isn't it true -- well, let's go back. Your testimony,
2:20PM it is true that the Sheriff promoted you within the department after this happened, correct?
A. Yes.
Q. And it's also true that you were the next in line to be promoted, correct?
2:21PM A. Yes.

2:21PM Q. I mean, there was Travis Ball. He may have had more overall seniority in law enforcement, maybe even at that department than you, correct?
A. Yes.
2:21PM Q. But he had left and come back and left and come back, and you had been there the longest continuously, so you were the next in line for the position, correct?
A. Correct.
Q. And it's a position that you wanted, right?
2:21PM A. Yes.
Q. Well, I mean, because earlier, it sounded like you were trying to imply that the Sheriff gave you that position to buy you off or so that you would tell your story, is that correct?
2:21PM A. I don't believe I said that.
Q. So you're not implying that the Sheriff gave you that position to keep you quiet or buy you off, are you?
A. I hope not.
Q. I understand you hope not, but you're not implying
2:22PM that today, are you?
A. No.
Q. Because it kind of sounded like -- the questioning from Mr. Songer kind of implied that that was what your belief was?
2:22PM A. No, I don't believe it was given to me for that.

2:22PM Q. And then you got the position. He gave you the position. And you had it for, what, a couple of months?
A. Yes.
Q. And it didn't work out well for you, did it?
2:22PM A. I went to a different agency.
Q. Yeah, but that's not all that happened, correct?
A. Yes.
Q. All right. I understand you went to another agency. But when it was all said and done, hmm, you may have not
2:22PM been experienced enough or qualified enough for that position, correct? Let me ask you. There were problems, right?
A. Problems as far as what?
Q. Your performance?
2:23PM A. Well, after this incident, I was never at the Sheriff's Office. I was looking for another position.
Q. All right. I don't know what that means, so let's figure out what that means.
After this incident with Justin Phillips, you're
2:23PM telling this Jury that you were never at the Sheriff's department again?
A. I showed up, but I was looking for other positions.
Q. That's not what you said. You said you was never there?
2:23PM A. Okay.

2:23PM
Q. Like you left, right? Like you quit, right?
A. I didn't quit.
Q. Yet you worked there for another two months, correct?
A. Correct. Yes.
2:23PM
Q. All right. Now, let's go back, if I can remember what my original question was.
You ultimately left that position because there were issues with performance. I'm going to be generous and say experience maybe was a factor, and it just didn't work out
2:23PM
for you, correct?
A. No.
Q. That's not correct?
A. No.
Q. So the only reason you left was because you were just
2:24PM
beside yourself, couldn't sleep at night over what happened?
A. I left because of what happened, yes.
Q. Back to the Grand Jury testimony. You told the Grand Jury that Sheriff Boen was super -- let me see if I can
2:24PM
find this, I just saw it -- that he was, "super muscular, very tall, and intimidating." Isn't that how you described him to the Grand Jury?
MR. SONGER: Objection.
THE COURT: Sustained.
2:24PM
Q. (By Mr. Wood.) Do you recall talking about the

2:24PM Sheriff's physical descriptors to the Grand Jury?
A. Yes.
Q. And at any point in time, did you describe him as "muscular"?
2:25PM MR. SONGER: Objection. There's no foundation for this.
THE COURT: Sustained. You can't read prior testimony unless you've laid a foundation for impeachment.
MR. WOOD: Yes, sir.
2:25PM Q. (By Mr. Wood.) How did you describe Sheriff Boen to the Grand Jury?
MR. SONGER: Objection.
MR. WOOD: I'll move on.
THE COURT: Sustained.
2:25PM Q. (By Mr. Wood.) Mr. Berry, isn't it true that when you're put under pressure, and you get scared, that you'll make stories up to try to -- that may be in your best interest?
A. Not necessarily, no.
2:26PM Q. Well, not necessarily, but it happens from time to time, doesn't it?
A. This time, yes.
Q. So this is the first time that this has ever happened to you where you felt pressure from the FBI?
2:26PM A. Incorrect.

2:26PM
Q. Let me look at my notes just a second. I may be close to finished.
I want to talk about the recorded phone calls for a second, because we heard some recorded phone calls. Your
2:27PM
testimony is that you had already met with the FBI and told them your story, right?
A. Correct.
Q. And then subsequent to your meeting with the FBI, you made a series of recordings, or you in conjunction with
2:27PM
Mr. Ferguson made those series of recordings, right?
A. Correct.
Q. And we listened to them and it talks about, "Hey, you alone," correct?
A. Yes.
2:27PM
Q. "Hey, FBI may be talking to you," is that correct?
A. Yes.
Q. "Hey, we need to all be on the same page," right?
A. Yes.
Q. At no point in time -- let me back up. You obviously
2:27PM
knew these were being recorded, right?
A. Yes.
Q. You knew the story that you had told to the FBI, correct?
A. Yes.
2:28PM
Q. You knew that you were alleging that the Sheriff was

just out there beating the snot out of people, right?
A. I mean --
Q. You knew that you had alleged that the Sheriff did beat the snot out of Justin Phillips, right?
A. Yes.
Q. And that he was handcuffed and the Sheriff just commenced to hitting him, and that it was a grand plan that was prefabricated, premeditated, and you were going to do some recorded phone calls to capture that, right?
A. Yes.
Q. So you got these phone calls, and there's a series of them. I guess there was two of them in total.
At no point in time in those recorded phone calls, did you say, "Hey, Sheriff, what are we going to say about the fact that we just pulled over and you just beat the snot out of this guy? What am I supposed to tell the FBI?" You didn't ask him that, did you?
A. No.
Q. You didn't say, "Sheriff, what am I supposed to tell them when they say -- about this plan, and Justin Phillips is saying that I held his head? What am I supposed to tell the FBI?" You didn't ask him that, did you?
A. No.
Q. You didn't ask him any probing questions about this big story that you've come up with, did you?

2:29PM A. No.

Q. I mean, you were a police officer, right?

A. Yes.

Q. Investigating crimes and stuff. That's part of your job, right?

2:29PM

A. Yes.

Q. And your big investigatory efforts was these recorded phone calls, and you did not ask the Sheriff about, "Hey, Sheriff" -- about drinking, did you?

2:29PM A. No.

Q. You didn't say, "Sheriff, what am I supposed to do? Justin Phillips is talking about you smelled like alcohol. What are we supposed to do? What am I supposed to tell them?" You didn't ask him that question, did you?

2:29PM A. No.

Q. "Sheriff, what are we supposed to say about how he got all these injuries on his face? What are we supposed to say?" You didn't ask him that, did you?

A. No.

2:30PM Q. You didn't ask him that because you knew the Sheriff would have said, "What in the world are you talking about?"

MR. SONGER: Objection.

THE COURT: Sustained.

Q. (By Mr. Wood.) You didn't ask him any of these probing questions, did you?

2:30PM

2:30PM A. No.
Q. You said, "I don't remember. Don't get me lying."
Did the Sheriff ever prevent you from wearing your body camera?
2:31PM A. No.
Q. Did he ever tell you, "Don't wear that in my presence"?
A. He had asked me if it was on.
Q. All right.
2:31PM A. At certain instances.
Q. As a former police officer, don't we say that to each other all the time?
A. Say again.
Q. Don't police officers ask each other all the time,
2:31PM "That thing is off, isn't it," talking about body cameras?
A. Nobody else had a body camera. I was the only one that had one.
Q. But other agencies that you work with, they had body cameras, right?
2:31PM A. Yes.
Q. And you don't want to get caught with a hot mic talking about something, making some jokes or something like that. Police officers say that to each other all the time, don't they?
2:31PM MR. SONGER: Objection.

THE COURT: Sustained.

MR. WOOD: That's all that I have. Pass the witness, Your Honor.

THE COURT: Thank you, Mr. Wood.

REDIRECT EXAMINATION

BY MR. SONGER:

Q. Mr. Berry, you were just asked a number of questions about things that were said in that recorded call that you had with Sheriff Boen?

A. Yes, sir.

Q. How were you feeling when you were making that call?

A. I was very nervous, very scared.

Q. Who were you scared of?

A. Sheriff Boen.

Q. And did the FBI give you any instructions about what to say during that call?

A. No.

Q. Did they just tell you basically be quiet and go with the flow of the conversation?

A. Just act natural, yes.

Q. You were asked a number of questions about what you could see with Justin Phillips during that transport with Sheriff Boen from Crawford County back to Franklin County. Do you remember that?

A. Yes, sir.

Q. Because it was dark outside?
A. Yes, sir.
Q. Now, first of all, tell us -- I mean, how close were you to Justin Phillips inside your vehicle?
A. Front seat to back seat.
Q. A couple feet?
A. Yes, sir.
Q. Could you hear what was happening in the back seat too?
A. Yes, sir.
Q. At any point during that transport, did you hear Justin Phillips rustling with his cuffs?
A. No, sir.
Q. Did you hear him banging on anything?
A. No, sir.
Q. Did you hear him kicking on anything?
A. No, sir.
Q. Did you ever see him move around to try to get out of his cuffs at all?
A. No, sir.
Q. Now, when you stopped the car at the Mulberry exit, and you went around and you told us that you saw the defendant punching Justin in the face six or seven times, at that point you could see Justin, correct?
A. Correct.

2:33PM Q. At that point, while the Sheriff was hitting him in the face, were his handcuffs on?
A. Yes.
Q. Were his legs shackled?
2:33PM A. Yes.
Q. Was Justin Phillips doing anything threatening to the Sheriff at all?
A. No.
Q. Now, you talked about how, a few minutes before that,
2:34PM the Sheriff had yelled out something like, "Lean back, he's escaping from his cuffs," is that correct?
A. Sit back, yes.
Q. Sit back. Thank you. Is that what the Sheriff had told you he was going to do on the ride over to get Justin?
2:34PM A. Yes.
Q. So were you surprised when the Sheriff then carried out that plan?
A. No.
Q. Did you think Justin was actually escaping?
2:34PM A. No.
Q. You were also asked a number of questions about when Justin got his handcuffs off on different trips that you took with him. And there were a lot of double negatives. I just want to make sure we're clear about the timing of
2:34PM everything.

2:34PM So you transported Justin three different times, is that correct?
A. Yes.
Q. You transported him originally from the Franklin
2:34PM County Sheriff's Office over to Crawford County?
A. Yes.
Q. And during that transport, did Justin get one of his handcuffs off?
A. Yes.
2:35PM Q. Then later, did you take Justin from the hospital back to the Crawford County Jail?
A. Yes.
Q. And were there any incidents at all during that transport?
2:35PM A. No.
Q. And then a little bit after that, did you and Defendant Boen take Justin from Crawford County back to Franklin County?
A. Yes.
2:35PM Q. And is that the trip where everything we have been talking about happened?
A. Yes.
Q. And during that trip, did Justin ever try to take his handcuffs off?
2:35PM A. No.

2:35PM
Q. You got asked a lot of questions about that first trip, about when you took Justin from Franklin County out to Crawford the first time. Do you remember that?
A. Yes.
2:35PM
Q. You were asked whether Zach English was with you or whether it was another deputy. Do you remember that?
A. Yes.
Q. You were asked whether Justin got a hand out of his cuffs. You were asked whether you saw blood on Justin's
2:36PM
ankle or his heel or something. Do you remember all that?
A. Yes.
Q. Just to be crystal clear. Was Defendant Boen on that trip with you?
A. No.
2:36PM
Q. It was later that night that you picked up Sheriff Boen to get Justin, right?
A. Yes.
Q. You were also asked a number of questions about the route that you took that day. And you mentioned that
2:36PM
there's an app on your phone that you had on to track where you were going?
A. Yes.
Q. What type of app is that?
A. Google maps.
2:36PM
Q. And is that an app that's run through Google that

2:36PM automatically records the GPS location of where you're going?
A. Yes. It's called Google timeline.
Q. Did you enter any information into that app, or is it
2:37PM recorded automatically?
A. It's recorded automatically.
Q. And after this happened, did you go in and access and save that information?
A. I did later once I had forgotten. It just stays on
2:37PM all the time, so later, I accessed that information just to show where I was.
Q. And did you save that information and then provide it to the FBI?
A. Yes.
2:37PM Q. Would you turn, please, to tab 16 in your binder? Do you recognize what's there?
A. Yes.
Q. What is that, sir?
A. That's the Google timeline.
2:38PM Q. Is that the data from Google that you were just talking about?
A. Yes.
Q. Does it appear to be a true and correct copy of the data that you downloaded from Google?
2:38PM A. Yes.

2:38PM MR. SONGER: The government would offer what's been marked as Exhibit Number 16 into evidence.

MR. WOOD: No objection.

THE COURT: Government's 16 is received.

2:38PM (Government's Exhibit 16 received)

Q. (By Mr. Songer.) Mr. Moon, could we please bring up the eighth page. I'm sorry. I don't think they are numbered, but I think it's the eighth page in that document. Thank you.

2:38PM Mr. Berry, what is the blue on this map that we're looking at?

A. The blue is the route that I took that day, for the entire day.

Q. Does that show you going back and forth from Crawford

2:39PM County to Franklin County, just like you described it to us?

A. Yes.

Q. And this is automatic data that is saved by Google maps, right?

2:39PM A. Yes.

Q. You didn't have anything to do with creating this document?

A. No.

Q. Thank you. You can take it down.

2:39PM You were also, sir, asked a number of questions about

Sheriff Boen's intoxication. Do you remember those?
A. Yes.
Q. I think you were asked several times whether you merely smelled alcohol or if he was actually fully intoxicated. Do you remember that discussion?
A. Yes.
Q. Did you smell alcohol on Sheriff Boen that night?
A. I did.
Q. Are officers permitted to punch someone in the face if they've had a few drinks?
A. No.
MR. WOOD: Objection.
THE COURT: Sustained. Rephrase.
Q. (By Mr. Songer.) Well, Mr. Berry, let me just ask you about the significance of that testimony. You said that you smelled that alcohol on the way to Crawford County while the Sheriff was in the car with you, is that right?
A. Correct.
Q. And I think you said on direct that you hoped the officers at Crawford County, before they turned Justin Phillips over to you, would smell that alcohol. Do you remember that?
A. Yes.
MR. WOOD: Object to leading.
THE COURT: Hang on. This is signposting.

Overruled.
Q. (By Mr. Songer.) Why were you hoping that the Crawford County officers would smell the alcohol on Sheriff Boen?
A. So they wouldn't allow Mr. Phillips to come with us.
Q. What did you understand was going to happen if Mr. Phillips was allowed to get in that car with you and the Sheriff?
A. Something bad.
Q. And why did you know that?
A. I'm sorry?
Q. Why did you know something bad was going to happen?
A. Just the situation of everything that was going on.
Q. What the Sheriff had told you on the drive over?
A. Correct.
Q. You were also asked a number of questions about your meetings and conversations with the FBI. Do you remember that?
A. Yes.
Q. Now, I think you testified on direct that you met with the FBI for the first time in July of 2019, is that right?
A. Yes, around that time.
Q. And you also talked to us about how, shortly after this incident back in 2017, you got a big promotion, and then a couple months later when you found a new job, you

2:41PM left the Sheriff's Office. Do you remember that?
A. Yes.
Q. When did you leave the Sheriff's Office?
A. The end of 2017, beginning of 2018.
2:41PM Q. You turned down the promotion and left the Sheriff's Office end of 2017?
A. I resigned from that promotion.
Q. And you didn't talk to the FBI until July of 2019?
A. Correct.
2:42PM Q. So at the time that you resigned from the Sheriff's Office, had anyone at the FBI ever tried to talk to you?
A. No.
Q. Did you have any idea the FBI would even start investigating this one day?
2:42PM A. I didn't even know we had an FBI.
Q. Did the FBI have anything to do with why you said, "I don't want to work at Franklin County anymore"?
A. No.
Q. Now, when you did meet with the FBI in 2019, did they
2:42PM threaten you in any way?
A. No.
Q. Did they make you any promises?
A. No.
Q. Mr. Wood said, "Oh, they must have told you, you can
2:42PM either be a witness or a defendant." Did anybody ever say

2:42PM anything like that?
A. Not at all.
Q. Did anybody ever say anything about charging you if you didn't cooperate?
2:43PM A. No.
Q. Did you ask for any promises in order to cooperate with the FBI?
A. No.
Q. Did you ask to get a lawyer first?
2:43PM A. No.
Q. Did you just voluntarily tell them everything you told us today in court?
A. Yes.
Q. With no promises?
2:43PM A. No promises.
Q. Now, at that point, was there someone you were scared of?
A. Yes.
Q. Who?
2:43PM A. Sheriff Boen.
Q. The person you had seen punch Justin Phillips in the face seven times?
A. Yes.
MR. SONGER: That's all I have. Thank you, sir.
2:44PM THE COURT: Anything else, Mr. Wood?

2:44PM MR. WOOD: No questions.

THE COURT: May this witness be excused?

MR. SONGER: Yes, Your Honor.

THE COURT: Sir, you may stand down. You're free to go. Government may call its next witness.

2:44PM MR. CARTER: The United States calls Carolyn McCain.

THE COURT: Ma'am, if you would please come forward. Come between the two counsel tables. If you would pause about right there and raise your right hand, please.

2:44PM (witness sworn)

THE COURT: If you can wind your way to the witness box. You may inquire.

2:45PM CAROLYN MCCAIN, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CARTER:

Q. All right. Ms. McCain, you can, I believe, take your mask off if you're more comfortable speaking with your mask off.

2:45PM A. Thank you.

Q. Tell us your name for the record, please.

A. Carolyn McCain.

2:45PM Q. And spell your last name, would you?

2:45PM A. M-C-C-A-I-N.
Q. What do you do for a living right now?
A. I'm retired. Currently -- oh, I'm sorry. Currently, I'm a Justice of the Peace for Franklin County.
2:45PM Q. Where did you retire from?
A. The Franklin County Sheriff's Office.
Q. What did you do for the Franklin County Sheriff's Office at the time of your retirement?
A. I was a Chief Deputy.
2:46PM Q. Do you remember about when your retirement was?
A. I believe it was in October, maybe mid-October of 2017.
Q. How long had you been in law enforcement prior to your retirement?
2:46PM A. Ten years.
Q. Had you worked for any other agencies?
A. Yes, sir.
Q. Where?
A. Alma Police Department.
2:46PM Q. How long was your law enforcement career total, do you think?
A. Probably close to 11 years.
Q. During the course of your law enforcement career and prior to your law enforcement career, did you receive any training to become a certified law enforcement officer?
2:46PM

2:46PM A. Yes, sir.
Q. Did you receive any training on the use of force?
A. Yes, sir.
Q. Did any of your training ever teach you that it was okay to use force to punish someone in your custody?
A. No, sir.
Q. Did any of your training ever teach you that it was okay to use force to retaliate against somebody in your custody?
2:47PM A. No, sir.
Q. For something they had done?
A. No, sir.
Q. You were the Chief Deputy at the Franklin County Sheriff's Office?
2:47PM A. Yes, sir.
Q. I think you grabbed a binder out of that seat when you sat down. Do you have that handy?
A. Yes.
Q. If you would please turn to the sixth tab in there, tab 6.
A. Okay.
Q. Did the Franklin County Sheriff's Office at the time of your retirement, or for that matter the whole time you worked there, have a use of force policy?
2:47PM A. Yes, sir.

Q. Do you recognize Government's Exhibit 6?
A. Yes, sir.
Q. What do you recognize Government's Exhibit 6 as?
A. It's our use of force policy for Franklin County.
Q. Is that an accurate copy of it?
A. Looks to be. Yes, sir.
Q. Any modifications to it at all other than the yellow exhibit sticker in the bottom right-hand corner?
A. No, sir, I don't believe so.
MR. CARTER: Your Honor, I would move to admit Government's Exhibit 6.
MR. WOOD: We would object.
THE COURT: Mr. Carter?
MR. CARTER: I don't understand the nature of their objection.
THE COURT: I think it's a hearsay objection. What's the objection?
MR. WOOD: Your Honor, I don't think that the use of force policy is admissible in this case. Number one, it is hearsay. Number two, it doesn't matter what the policy is because it's the law, the federal law that rules. Counties and cities all across the state have different use of force policies. They are not consistent.
THE COURT: Let's move to side bar.
(bench conference)

MR. WOOD: So cities and counties across the state make up their own use of force policies. And these policies, having represented law enforcement all over the state, these policies differ from department to department, agency to agency. Whatever is in there is irrelevant and it's prejudicial and it's potentially confusing to the Jury as to what is to be considered and to know what the use of force standard is. The Court already laid that out. We already got that situated, and it's objectively reasonable force. These are just individual policies created by the department. We don't even know, they may or may not be legal. They may be a lot less force than what is objectively reasonable. So it is confusing to the Jury. It will create what we believe is a separate burden of proof in the eyes of the Jury as to what the government has to prove. That's prejudicial. They want to say some arbitrary policy that each department makes up somehow controls my client's use of force, and they are using that to say he violated Franklin County policy. So what? Who cares? Doesn't matter. That's the basis of our objection.

THE COURT: Is there a hearsay issue here?

MR. WOOD: Yes, I believe that it's a hearsay issue also. I don't know who created the policy. I don't know what the policy says as far as the legality of what their use of force is. I can tell you that it is the

association of Arkansas counties that policies for their county members, there's the municipal league that creates policies for police departments.

THE COURT: I don't know if that has anything to do with the hearsay issue. Mr. Carter?

MR. CARTER: It's not being offered for the truth of the matter asserted. It's offered to go for the willingness element, which the government has an obligation to prove.

THE COURT: I understand you have to prove that, but how is --

MR. CARTER: We're not offering that exhibit for the proof of the matter asserted. We're offering it to show the Sheriff was willful in his conduct, and he knew it was willful because he violated the department's policy in using force in the manner in which he did.

THE COURT: What is the particular --

MR. CARTER: "Under no circumstances will a person in custody ever be struck in the head, neck, or groin."

MR. PRATER: This is an issue that comes up in all these cases.

MR. SONGER: This evidence is being offered to prove the willfulness, as Mr. Carter explained. The Court, at the close of the evidence when the Court would feel it

2:52PM appropriate, could give a limiting instruction to willfulness to avoid the issue that Mr. Wood laid out, that it can be confusing on what the Constitutional standard is.

THE COURT: Is it also evidence of objective reasonableness, or is it just offered --

MR. SONGER: It is just being offered for willfulness. It's his own department policy. He had knowledge of it, and he violated his own department's policy.

2:52PM THE COURT: How do we get over the hearsay issue?

MR. SONGER: That's not hearsay because it's not being offered for the truth of what the document says; just that those were the policies that were in place in the department.

2:53PM THE COURT: To that extent, you're offering it for its truth.

MR. SONGER: Whether, in fact, the officers should or should not hit someone in the head is not what it's being offered for. It's being offered for the fact that that rule was in place at the department, so it was known and communicated. He violated that standard.

THE COURT: Do you have any witnesses that can testify that this was the policy that was not fully -- I guess this witness could, if this was actually in effect in 2017.

2:53PM MR. CARTER: I believe she already testified to that, Your Honor.

THE COURT: So then the issue is, to the extent that it is hearsay, is this a proper witness for it to come in through since she is no longer with the department? Do you have any other current employees?

MR. CARTER: If I may, Your Honor. She testified that was their policy in 2017 at the time of her retirement when this incident happened.

2:54PM THE COURT: Well, I'm not sure that that makes her presently a proper custodian if it's an 803.6 issue. And if it's a public records issue, there's a similar issue. I'm not saying that what you are saying isn't correct. I'm just wondering if the Court could conditionally receive it into evidence subject to a limiting instruction, do you have any other witness who can testify in the role of custodian that that is, in fact, from the files of the Franklin County Sheriff's Office? You may be able to stipulate to that part of it. I understand you don't want to agree that it comes into evidence.

MR. CARTER: The witness that gathered the documents pursuant to the Grand Jury subpoena that produced that at some point will testify in this trial. Now, they did that back in 2019, so I don't know that their current

2:55PM policy has any bearing.

THE COURT: Is the person still employed?

MR. CARTER: No.

THE COURT: They are not?

2:55PM MR. WOOD: Your Honor, if I may, so I can get this on the record. Once that bell is rung, then I don't think a limiting instruction is going to help. They are offering it for the truth of the matter asserted that he violated the policy, that he violated this particular 2:56PM prohibition, and that is highly prejudicial because it's potentially confusing with what the standard is that the Court will do later. And I think it would be unnecessarily confusing to the Jury. The policy is not legally binding. It has no authority, and all it is is simply to prejudice 2:56PM the defendant so if they can't meet their burden, they are hoping that one of these jurors will replace it with, "Well, he violated his own policy, oh, my gosh."

THE COURT: I will allow this witness to testify as to what the policy was in -- was she there in 2017?

2:56PM MR. CARTER: She was.

THE COURT: I know we've already got that foundation, but I will allow this witness to testify to what the policy is.

Mr. Wood, if you would like a limiting 2:56PM instruction, the Court will offer one, but it's received

for the sole purpose of establishing the willfulness that's part of the government's proof. If you don't want that because it might accentuate something, I'm not going to give it over your objection.

MR. WOOD: No, I would want a limiting instruction.

THE COURT: Okay. Then if you want to lay a foundation to get the actual document into evidence later, you can, but I'm not comfortable that there's a foundation that this witness can get it in. But she can testify to it. If she needs to refresh her recollection, you can lay a foundation to do that. If she can't, I'll just leave it at that.

MR. CARTER: Do you want me to lay some more foundation, or do you want to give the limiting instruction?

THE COURT: I'll give the limiting instruction when I get up there. You can go into it. But you've offered the exhibit. I'm not --

MR. CARTER: Not admitting?

THE COURT: I'm not admitting it.

MR. WOOD: In light of that, Your Honor, it won't come in until later on and I'll bring it back up with the Court. But if we are going to admit that for willfulness violation, then I think we should be allowed to refer to

2:58PM and enter the state statute showing what the State of Arkansas law is to show the evidence is that he did not intentionally violate it.

THE COURT: We'll cross that bridge when we get
2:58PM to it. I'm not sure how to wrap my mind around that at the moment.

MR. WOOD: And we will. But under the facts and circumstances as he understood them when he was engaged in this physical force, I think it's relevant. But I
2:58PM certainly would --

THE COURT: I'm not at that bridge yet.

MR. CARTER: Just to be clear so I don't step on my own feet when I get up there, the Court would prefer I don't publish that section to the Jury and just have her
2:58PM testify?

THE COURT: Yeah. Yeah.

MR. CARTER: As to what it is? I just don't want to create a havoc. Thank you, Your Honor.

(bench conference concluded)

2:59PM THE COURT: Subject to the Court's ruling at side bar, the Court will not receive Exhibit 6 at this time, but the Court will allow this witness to testify about the policy that Mr. Carter and Ms. McCain were discussing before our side bar conference.

2:59PM But, Ladies and Gentlemen, you will recall in the

2:59PM Court's instructions at the beginning of the trial that I explained that sometimes evidence would be received for one purpose, but not other purposes. This is one of those instances.

3:00PM This particular line of inquiry of Ms. McCain about the Sheriff's Office policy may be considered by you for the purpose of that element of the charged offenses that goes to element two about whether Mr. Boen acted willfully when he committed such acts. It may not be used

3:01PM by you for any other purpose. Mr. Carter?

MR. CARTER: Thank you, Your Honor.

Q. (By Mr. Carter.) All right. Ms. McCain, I believe you've already testified, but I'm going to ask you again just to make the record completely clear. This was the use

3:01PM of force policy that was in place in 2017 when you were the Chief Deputy at Franklin County?

A. Yes, sir. This is a jail policy, but, yes.

Q. And is it a requirement that all Sheriff's Office personnel follow this policy?

3:01PM A. Yes, sir. And they are given a copy of it.

Q. Does the policy anywhere in it allow an officer to use force to punish someone?

A. No, sir.

Q. Does the policy anywhere in it say it's okay to use

3:01PM force to retaliate against someone?

3:02PM
A. No, sir.
Q. Does the policy anywhere in it allow someone -- does it have any commentary on strikes to the head?
A. No, sir.
3:02PM
Q. I want you to, if you would, turn to the second page of Government's Exhibit 6.
A. Okay.
Q. And there's some language about midway down the page that starts with, "Note." I want you to read that to
3:02PM
yourself silently, please.
A. Okay.
Q. Is there a policy, or was there a policy at the Franklin County Sheriff's Office in 2017 that dealt with whether someone in custody that's restrained can be struck
3:02PM
to the head?
A. Yes, it was a policy.
Q. Is there a policy for it or against it?
A. Against it.
Q. And what is your best recollection of what that policy
3:03PM
is in your own words?
A. It is basically when a prisoner is restrained, you're basically limited as to what you can do with them. Mostly it's just verbal. You can't hit them in the head, neck, groin area. There's limitations.
3:03PM
Q. In your training, is there ever an occasion that

3:03PM you're trained that it's okay to hit someone in the head?
A. No, sir.
Q. All right. Let's talk about the duties you had as the Chief Deputy. Now, what does the Chief Deputy for the
3:03PM Franklin County Sheriff's Office do? What are your day-to-day duties, back before you retired?
A. Well, you're basically over every department of the Sheriff's Office. You have criminal investigations, you have a jail dispatch, and you have patrol.
3:04PM Q. And as Chief Deputy, you're in charge of all those things?
A. Yes, but I had immediate supervisors in each one of those departments.
Q. Supervisors who worked for you?
3:04PM A. Yes.
Q. Who did you answer to?
A. Sheriff Boen.
Q. I want to take you back to right before you retired, to September of 2017. Do you recall when an inmate by the
3:04PM name of Justin Phillips was transferred from Franklin County to Crawford County?
A. Yes, sir.
Q. Do you recall becoming aware that Justin Phillips was coming back to Franklin County?
3:04PM A. Yes, sir.

3:04PM Q. How did you become aware that Justin Phillips was going to come back to Franklin County?
A. Sheriff Boen called me. It was after hours. He called me on the phone to tell me that apparently Crawford
3:04PM County had contacted our department to tell us that Justin Phillips either was being transported or was going to be transported to the hospital and that we needed to send an officer there to sit with him. And the Sheriff told me that he was going to go get Justin Phillips because we were
3:05PM short on manpower. We're a very small department. We only had one deputy on, so it was very common for the Sheriff to do transports after hours or during the day.
Q. Was there anything noteworthy about the Sheriff's tone of voice when he was --
3:05PM A. He was angry. He was very angry.
Q. How did you know he was angry?
A. Oh, he was cursing and stating that he didn't think that there was anything wrong with Justin. And he thought that Justin just wanted to come back to Franklin County.
3:05PM Q. Did Justin Phillips eventually return to Franklin County?
A. Yes, sir.
Q. When did you learn of that?
A. The next morning.
3:06PM Q. How did you learn of that?

3:06PM A. It was the next morning. It was early. I had just came in to work. And the Sheriff came into my office and told me that he had brought Justin back to the jail, and that he would not be giving us any more problems. And I
3:06PM was not happy about that.
Q. So what was the Sheriff's -- what was his demeanor like when he told you that Justin Phillips wasn't going to give you any more problems?
A. It was like he was happy about it. I mean, he was
3:06PM glad that he was back at the jail.
Q. What did you take that to mean, that "Justin Phillips wasn't going to give you any more problems"?
A. Well, I really didn't know what it meant at the time.
Q. Did this conversation remind you of any other
3:06PM conversations you had had with the Sheriff around this same time?
A. As far as transports or --
Q. As far as the criminal justice system?
A. Oh. Yes. Sheriff and I had numerous discussions
3:07PM regarding the justice system. We were a small department and our hands were basically tied while we had inmates that was giving us problems. We didn't have the luxury of separating them or whatever, and they would tear up the jail and then the prosecutor wasn't prosecuting it.
3:07PM Q. Was there any frustration on the Sheriff's part during

3:07PM this conversation?

A. Sure.

Q. And how did he express that frustration?

A. He said that he guessed he was going to have to start going Bob Pritchard on them.

3:07PM

MR. WOOD: Objection, Your Honor.

THE COURT: What's the objection? I'm not sure I understand the answer, but what's the objection?

MR. WOOD: Side bar?

3:08PM THE COURT: Yes.

(bench conference)

MR. WOOD: So in prior testimony, she referred to Bob Pritchard. This is an individual who was some sort of an urban legend, a Sheriff or law enforcement person in that area. They are trying to elicit him saying that. This information would be prejudicial. She wants to say he was known for beating people on the side of the road and stomping them out and doing all kinds of stuff. It's nothing but to inflame the Jury and prejudice the defendant.

3:08PM 3:09PM

She also just testified that he made a statement while ago, and she didn't know what that meant.

THE COURT: Well, he moved on to the next question. What's your response? I take it you weren't necessarily trying to elicit that particular response?

3:09PM

3:09PM MR. CARTER: I knew she was going to say, "Go Bob Pritchard." "Going Bob Pritchard" is a verb. I believe she will testify that Bob Pritchard is a former Sheriff who frequently took matters into his own hands when Sheriff Boen said, "I'm going to go Bob Pritchard" on someone.

THE COURT: Her testimony is that that was what he actually said?

MR. CARTER: Yes.

THE COURT: Not her opinion?

3:09PM MR. CARTER: No. So it's an admission.

THE COURT: Okay. Objection overruled.

(bench conference concluded)

Q. (By Mr. Carter.) All right. Ms. McCain, the last thing you said was something about the Sheriff was going to

3:10PM go, "Bob Pritchard" on people. Is that what you said?

A. Yes, sir.

Q. Did you know an individual named Bob Pritchard?

A. I did.

Q. Who was Bob Pritchard?

3:10PM A. Bob Pritchard was a Sheriff of Franklin County prior to the late 80s for several years.

Q. And what was Bob Pritchard's reputation with you?

A. With me?

Q. Yeah. What did that mean to you when the Sheriff

3:10PM said, "I'm going to go Bob Pritchard on people?" How did

3:10PM you take that?
A. Well, Bob Pritchard had a reputation of taking care of the prisoners himself.
Q. What do you mean by, "Taking care of the prisoners
3:10PM himself"? What do you mean by that?
A. Well, there was rumors that he beat on them, that he just took the law into his own hands.
MR. WOOD: Objection.
THE COURT: Overruled. This is reputation
3:11PM testimony, the knowledge and opinion of this witness. Tread carefully.
MR. CARTER: I'm about done, Your Honor.
Q. (By Mr. Carter.) So when the Sheriff said, "I'm going to go Bob Pritchard on people," what did you take that to
3:11PM mean based on your knowledge of Bob Pritchard's reputation?
A. Taking the law into his own hands.
Q. How so?
A. Putting his hands on the prisoners.
Q. All right. You mentioned earlier -- and I kind of cut
3:11PM you off, I'm sorry -- that you're retired, but I understand now you're a Justice of the Peace?
A. That's correct.
Q. All right. For what county?
A. Franklin County.
3:11PM Q. And how long have you been a Justice of the Peace with

3:11PM Franklin County?
A. Four years. I believe three or four years.
Q. Is that something you took up since you retired from the Sheriff's Office?
3:12PM A. Yes, sir.
Q. Have you had to take up any matters in your role as a Justice of the Peace that deal with the Franklin County Sheriff's Office since the indictment in these charges came about?
3:12PM A. I have.
Q. Well, what?
A. It was regarding Sheriff Boen's pay.
Q. What was the matter regarding Sheriff Boen's pay that you took up as a Justice of the Peace?
3:12PM MR. WOOD: I would object to that.
THE COURT: All right. Side bar.
(bench conference)
THE COURT: Before I forget, would you put a microphone in front of you? My court reporter is not
3:12PM hearing some of your objections.
MR. WOOD: I'm sorry. I would object to the relevance of what his pay and her duties on the quorum court have to do with whether or not he can use excessive force. There's been a lot of contention between him and
3:13PM the quorum court over his pay, them wanting to stop his pay

3:13PM so they can use it for something else.

THE COURT: What is the relevance?

MR. CARTER: Let me ask this. I'm sort of previewing cross. Are you not going to cross-examine her on the votes?

3:13PM

MR. PRATER: As to the quorum court?

MR. CARTER: If you are not going to cross-examine her, I'll withdraw the question. But if you're going to cross-examine her on those votes, I'm going to get it out first.

3:13PM

THE COURT: Well, they are representing that they are not going to go there. If they end up going there, then, obviously, you can come back.

MR. CARTER: I'll redirect.

3:13PM THE COURT: I'm not trying -- they haven't yet, but I'm not -- I don't see how this preemptive strike is presently relevant.

MR. CARTER: I mean, I tend to agree. I'm just trying to inoculate the witness.

3:14PM MR. WOOD: I will tell you we are not going to cross-examine her about that.

MR. CARTER: So my question is, are you going to cross-examine on it?

MR. WOOD: On the votes of the quorum court to cut off his pay?

3:14PM

3:14PM MR. CARTER: To cut off his pay. And there was some votes that I recall about taking him --

MR. WOOD: No.

MR. CARTER: Then this is settled.

3:14PM (bench conference concluded)

THE COURT: All right. We have been going far too long without a break, so we're going to take a 20-minute recess at this time. We'll be in recess until 3:35.

3:14PM (Jury out at 3:14 p.m.)

(Jury in at 3:38 p.m.)

THE COURT: Mr. Carter, you may reset the table and continue your examination.

MR. CARTER: I'm almost done, actually, Your 3:37PM Honor.

Q. (By Mr. Carter.) Ms. McCain, you testified previously you retired from the Sheriff's Office?

A. Yes, sir.

Q. And when did you retire, again?

3:37PM A. 2017, I believe it was in October.

Q. Not very long after the events you testified to today?

A. Correct.

Q. Why did you retire?

A. Well, I had some medical issues. And then I started 3:38PM to get concerns that I might wind up where I am today.

3:38PM Q. Elaborate on that. Concerns how so?
A. Some of the statements that the Sheriff had made and stuff. I was just concerned.
MR. CARTER: Your Honor, I'll pass the witness.
3:38PM THE COURT: Thank you. Mr. Prater, you may inquire.
MR. PRATER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. PRATER:
3:38PM Q. Good afternoon, Ms. McCain.
A. Good afternoon.
Q. So earlier on the stand, you said you weren't happy that Justin Phillips was brought back, and you didn't elaborate on that. Can you explain what you meant by that?
3:38PM A. Well, we were having issues in our jail. We were having a lot of rioting going on. They were tearing up our facility, throwing trays out in the hallway. And I had listened to several phone calls of the prisoners trying to figure out who was initiating all of this.
3:39PM MR. CARTER: Objection, hearsay.
THE COURT: Mr. Prater?
MR. PRATER: I'll rephrase my question and be more specific, then.
THE COURT: Thank you.
3:39PM Q. (by Mr. Prater.) Did you specifically, based on your

3:39PM personal knowledge, have any indication that Justin Phillips was one of your troublemakers?
A. Yes.
Q. And that's what you meant by being unhappy, is that correct?
3:39PM
A. Yes.
Q. Thank you. Now, you stated you retired in 2017. And that's correct?
A. Yes.
3:39PM Q. So you were only employed during the time of the Phillips' alleged assault, correct?
A. Correct.
Q. But you weren't actually present for any of that, were you?
3:39PM A. No, sir.
Q. And you didn't witness any alleged assault, did you?
A. No, sir.
Q. And you never saw any injuries on Phillips, did you?
A. No, sir.
3:40PM Q. You never spoke to Justin Phillips about this alleged assault, did you?
A. No, sir.
Q. And you stated that Sheriff Boen said that Phillips would not cause any more problems. That was the quote, correct?
3:40PM

3:40PM A. Correct.
Q. And when Justin Phillips came back, he was put into solitary confinement, isn't that correct?
A. I don't recall.
3:40PM Q. If you have problem prisoners, don't you put them in solitary confinement?
A. When we could.
Q. So if a prisoner was put in solitary confinement, that would kind of resolve the problems with prisoners, wouldn't
3:40PM it?
A. If we had the luxury of doing that.
Q. He never told you that he beat up Phillips, did he?
A. No, sir.
Q. So, basically, you took a statement the Sheriff made,
3:40PM and looking back after the fact, you are assigning a meaning to, "He won't cause any more problems," aren't you?
A. Correct.
Q. Because that statement could have meant, "I put him in solitary, he can't cause any more problems," couldn't it?
3:41PM MR. CARTER: Objection, speculation.
THE COURT: To the extent that you're asking this witness to opine about what was in the defendant's head, the objection is sustained. You may ask her what she understood.
3:41PM Q. (by Mr. Prater.) And based on your personal

knowledge, if a prisoner was in solitary, then they could not cause any more problems, isn't that correct?
A. Not necessarily.
Q. But they certainly couldn't cause rioting in the general population if they were in solitary, correct?
A. They could instigate it, yes, sir.
Q. From solitary, they still have a way to talk to everyone around the prison?
A. Yes, sir. Yes, sir.
Q. Now, you made some comments about Bob Pritchard. I want to get back to that. You mentioned Bob Pritchard and said he was a former Sheriff, correct?
A. Correct.
Q. And this reputation you talked about, that was just rumor, wasn't it?
A. Yes.
Q. Because you never personally witnessed Bob Pritchard beat anyone up, did you?
A. No, sir.
Q. And you are not aware personally of any time that Bob Pritchard was ever charged for beating anyone up, were you?
A. No, sir.
Q. And isn't that a recurring, running joke with law enforcement around there, that they are going to go Bob Pritchard on somebody?

3:42PM MR. CARTER: Objection, Your Honor.
MR. PRATER: I'll rephrase the question.
Q. (by Mr. Prater.) Did you ever personally hear anyone else use the phrase, "Go Bob Pritchard on someone"?
3:42PM A. No, sir.
Q. Only Sheriff Boen ever?
A. Correct.
Q. Did you know Bob Pritchard personally?
A. I did.
3:42PM Q. Did he ever tell you that he beat up on anyone?
A. No, sir.
Q. All right. Now, I want to get to this use of force policy you talked about too. You testified to what that policy said, but that policy is not what you were taught
3:43PM regarding use of force at the academy, is that correct?
A. It's not what I was taught?
Q. That's my question.
A. Is that your question? Basically, it is.
Q. They told you that if someone is cuffed, then you
3:43PM can't use any physical force against them?
A. Yeah, basically.
Q. So if a prisoner -- excuse me. Go ahead.
A. That there was no need to use physical force on them if they are handcuffed.
3:43PM Q. So if a prisoner is escaping and running, you are

3:43PM telling me you can only say, "Stop"?
A. No, sir.
Q. So you can use force in some situations?
A. Limited.
3:43PM Q. But you just said you can't use force if they're restrained?
A. Depends on the circumstances, sir.
Q. So there are circumstances in which you can use force, even if they are restrained?
3:44PM A. Yes.
Q. So if you've got an escaping prisoner, can you use deadly force against them, in your experience and based on your training?
A. Could you repeat the question, please?
3:44PM Q. Sure. If you have an escaping prisoner, are you authorized to use deadly force against them?
A. No, sir.
Q. So if you've got a prisoner escaping from prison, and he's running, the guards couldn't shoot at him?
3:44PM A. I'm not sure about a prison, sir. I'm not sure about that.
Q. So I want to back up and I have just one other question. Do you remember talking to the FBI, giving statements and testimony to the FBI when they were
3:45PM investigating?

3:45PM A. Yes.
Q. Thank you. And didn't you state that you didn't like the Sheriff because he wouldn't let you run the prison, or the jail the way you wanted to, the Sheriff's department
3:45PM the way you wanted to?
A. I don't recall saying I didn't like him because of that.
Q. But you are saying it upset you?
A. We disagreed on things, yes, sir.
3:45PM Q. So it upset you that you weren't able to run the Sheriff's Office and the jail the way you wanted?
A. Not necessarily the way I wanted.
Q. But you were upset by the policies, or him overriding your policies. Would that be a fair statement then?
3:45PM A. That would be a fair statement, yes, sir.
MR. PRATER: I think that covers it. Thank you.
THE COURT: Does that prompt any redirect?
MR. CARTER: Just a little bit, Your Honor.

REDIRECT EXAMINATION

3:45PM BY MR. CARTER:
Q. All right. You were asked about specific instances of when you could use force on cross?
A. Correct.
Q. How about when somebody is in the back of a patrol
3:46PM car, cuffed and shackled? Can you use force on him at that

point?
A. No, sir.
MR. CARTER: Nothing further, Your Honor.
THE COURT: All right.
MR. PRATER: Nothing else, Your Honor.
THE COURT: May this witness be excused?
MR. CARTER: Yes, Your Honor.
THE COURT: Thank you very much for your time, ma,am. You're free to go.
The government can call its next witness.
MR. SONGER: Thank you, Your Honor. The government calls Justin Phillips.
THE COURT: Mr. Phillips, if you would please come forward. Come down in between the two counsel tables, pause about right there and raise your right hand, please.
(witness sworn)
THE COURT: Sir, would you please have a seat in our witness box.
THE WITNESS: Yes, Your Honor.
THE COURT: You may inquire.
JUSTIN PHILLIPS, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SONGER:
Q. Good afternoon, sir.

3:48PM A. Hello.
Q. To start off, can you please -- well, let me tell you first, Mr. Phillips, if you'd like to take your mask off, you may.
3:48PM A. Okay.
Q. And can you please tell us your full name?
A. Justin Harold Phillips.
Q. Could you spell your last name for us, please?
A. P-H-I-L-L-I-P-S.
3:48PM Q. Are you currently doing anything for work, Mr. Phillips?
A. Yes, sir. I was working for a landscaping company out of Oklahoma.
Q. Did you used to work in law enforcement?
3:48PM A. Yes, sir.
Q. When did you start working in law enforcement?
A. Officially full-time as an officer, May 1st of 1999.
Q. So May 1st, 1999. How long did you stay working in law enforcement?
3:49PM A. Late summer of 2012, sir.
Q. And which agencies did you work for?
A. Multiple agencies. Ozark, Franklin County Drug Task Force, LeFlore County.
Q. Where did you grow up?
3:49PM A. Ozark, Arkansas.

3:49PM Q. So was 2012 the last year that you worked as a police officer?
A. Yes, sir.
Q. Why did you stop working as a police officer?
3:49PM A. I was arrested for a criminal charge, hindering apprehension.
Q. Were you later convicted of that charge?
A. Yes, sir.
Q. Was that a felony?
3:49PM A. Yes.
Q. Did that conviction cost you your career in law enforcement?
A. Yes.
Q. Now, over the next few years after 2012, did anything
3:50PM else significant happen in your life?
A. Several things, yes, sir.
Q. Tell us a little bit about those.
A. My grandmother passed away. I went through a divorce.
Q. Did you at times abuse drugs during that time too?
3:50PM A. Prescription medication, yes, sir. I was involved in an accident and got my prescription medication from a doctor.
Q. And during this time from around 2016 through, say, 2018, were you convicted of several more felony offenses?
3:50PM A. Yes, sir.

3:50PM Q. Were you convicted of felony theft of property during that period?
A. Yes.
Q. Were you convicted of third degree escape?
3:50PM A. Yes.
Q. Were you convicted of criminal impersonation?
A. Yes, sir.
Q. And were you convicted of a residential burglary?
A. Yes.
3:51PM Q. For all those offenses, did you plead guilty and accept responsibility?
A. I did, sir, yes.
Q. Have you been convicted of any felony offenses since 2018?
3:51PM A. No, sir.
Q. Now, in 2017, were you taken to the Franklin County Jail at some point?
A. Yes.
Q. And what did you do when you were being booked in to
3:51PM the Franklin County Jail?
A. I left.
Q. And when you say, "You left," what do you mean?
A. I escaped from their custody.
Q. And, specifically, what did you do to escape?
3:51PM A. Acted like I needed medical assistance and coerced two

employees into the medical office part of the facility and shut the door and locked it. I had already placed a cell phone in the waistband of my pants. And then I went through the booking room window, across the desk, and out the north door of the building.

Q. And when you went out the north door, what did you do?

A. I ran.

Q. Did officers from the jail catch you as you were running away?

A. Yes.

Q. About how far did you get from the jail before they caught you?

A. Not very far. About 100 yards or so, if that.

Q. About one football field?

A. Yes, sir.

Q. Did you have a weapon with you?

A. No.

Q. Now, was Sheriff Boen, did you see him at the jail that day when you escaped?

A. No, sir.

Q. So where were you taken after you briefly escaped from the Crawford County Jail?

A. It was Franklin County.

Q. I'm sorry. Franklin County. Thank you for correcting me.

3:53PM
A. Yes, sir. From Franklin County, I was transported by a deputy to Crawford County, Van Buren/Alma.
Q. Do you remember which deputy transported you to Crawford County?
3:53PM
A. Mason Berry.
Q. And when you got to Crawford County, where were you put up?
A. The medical isolation in their facility.
Q. Now, at some point, were you taken from Crawford
3:53PM
County to the hospital?
A. Yes.
Q. Do you remember which hospital you went to?
A. I believe it's called Summit now. I'm not for sure. It's the Crawford County Hospital there on the hillside.
3:53PM
Q. And why were you taken to the hospital?
A. For complications with my heart.
Q. It was all just internal issues?
A. Yes.
Q. And when you were at the hospital, were there officers
3:54PM
who stayed with you to watch you while you were there?
A. Two Crawford County officers were there briefly, and then the guys from Franklin County came to relieve them.
Q. Which guys from Franklin County came to relieve them?
A. Deputy Berry. And I think there was a jailer, last
3:54PM
name Lewis. I don't know his first name.

3:54PM
Q. Do you remember about how long you stayed at the hospital?
A. Probably a little over two hours.
Q. And then what happened when you were released from the hospital?
3:54PM
A. I was transported back to Crawford County by the officers.
Q. Did you want to go back to Crawford County or were you hoping to go somewhere else?
3:55PM
A. I was hoping to go back home, to Franklin County. I asked the officers there to do that for me.
Q. And how did the officers respond?
A. He gave me a water, a bottle of water, and said he would if he could, but he couldn't take me back.
3:55PM
Q. Did he say why he couldn't take you back?
A. No, sir, not that I recall.
Q. So once you got back to Crawford County, the jail there, how long did you stay there?
A. No more than an hour.
3:55PM
Q. What did you do while you were there?
A. I was feeling really bad still. After one of those spells, you get real tired and weak. Just go back off and sleep.
Q. You were sleeping because you were tired and weak?
3:56PM
A. Yes.

3:56PM
Q. At some point, were you woken up?
A. Yes.
Q. Who woke you up?
A. It was a jailer from Crawford County.
3:56PM
Q. What did the jailer do with you?
A. He escorted me up, or he told me to get my belongings, my blanket and mattress and other items and told me I was going -- that Franklin County was there to pick me up. He walked me up to the front of their office.
3:56PM
Q. And was there anybody else up at the front of the office when you got up there?
A. Yes.
Q. Who was? Who did you see up front?
A. I don't recall them by name. Just a male, couple
3:56PM
male/female employees, jailers, at that time.
Q. At some point, did you see anyone from Franklin County to pick you up and take you back there?
A. Yes. Deputy Berry and the Sheriff, Sheriff Boen.
Q. What did you think when you saw that Sheriff Boen was
3:57PM
there?
A. Can you ask that again?
Q. What did you think when you saw that Sheriff Boen was there to pick you up?
A. Nothing good was going to come out of that. I don't
3:57PM
want to say -- it wasn't any good, what I was thinking. It

wouldn't be appropriate to say in front of these people.
Q. Why did you think that nothing good was going to happen when you saw the Sheriff was there?
A. I could just tell. I could just tell by his demeanor. And then, obviously, I had asked to go back prior to that and they said I couldn't. And it was late at night, so I knew. I just knew.
Q. Did you have any interaction with Sheriff Boen while you were in that area waiting to be transported back?
A. The employees of Crawford County had buzzed him through the door of their jail, their facility, because he asked to use the rest room. And when he walked past me, I spoke to him, and he didn't say anything to me.
Q. What did you say to the Sheriff when he walked past you?
A. I don't remember verbatim. Just a greeting, "Hello," something like that. Just a friendly -- just a friendly greeting. Nothing condescending or anything like that.
Q. How did the Sheriff respond?
A. He didn't.
Q. Did he look at you?
A. I don't recall.
Q. Do you remember what date this happened, what the date was?
A. 14th of September.

3:59PM Q. Do you remember the year?
A. 2017.
Q. And do you know about what time it was at night?
A. Between 10:30, 10:45 p.m.
3:59PM Q. Now, you talked to us a little bit about your heart issue that made you go to the hospital. Did you have any injuries at this point on the outside of your body?
A. No, sir.
Q. Did you have any cuts or bruises on your face?
3:59PM A. No, sir.
Q. Any bruises or marks anywhere else on your body?
A. No.
Q. When you had been at the hospital, did you get in any fights with anybody?
3:59PM A. No.
Q. When they took you back to Crawford County that night for an hour or so, did you get in any trouble there?
A. No.
Q. Nothing that had injured you in any way?
4:00PM A. No, sir.
Q. Now, before you left the Crawford County Jail, were you processed out of the jail?
A. I was, yes. I was fingerprinted and photographed by one of the jailers. They are required to do that when they
4:00PM book you in or when they do the processing.

Q. Had they did that when they booked you in when you had gotten there earlier?
A. No.
Q. So they were doing it on the way out?
A. Yes.
Q. Did that photographs and fingerprints, did that happen right before you were taken back to Franklin County?
A. About 10 minutes before they took me back.
Q. Do you see a black binder, I believe, that's up on the -- by where you are sitting up there?
A. Yes.
Q. Could you open that and turn to tab 2?
A. Yes, sir.
Q. And do you see the two photographs that are marked 2(a) and 2(b)?
A. I do.
Q. What are those photographs from?
A. My booking intake process pictures from Van Buren.
Q. Are those the pictures that were taken 10 minutes before you were taken back to Franklin County?
MR. WOOD: Object to leading.
A. Ten or 15 minutes, roughly estimating.
THE COURT: Sustained. Reask that question in a non-leading manner.
MR. SONGER: Certainly, Your Honor.

4:01PM
Q. (By Mr. Songer.) Mr. Phillips, do you know when those pictures were taken?
A. They were taken before I was booked out of Crawford County to go back to Franklin County that night on the 14th, after I got out of the hospital.
4:01PM
Q. Mr. Moon, could we bring up picture 2(a), Exhibit 2(a)? Excuse me. It's been previously admitted.
Mr. Phillips, the picture we're looking at now, is that what the front of your face looked like at the time you were picked up by Officer Berry and Sheriff Boen to be taken back to Franklin County?
4:02PM
A. Yes, sir.
Q. Mr. Moon, could we show picture 2(b), please, Exhibit 2(b).
Mr. Phillips, is that what the side of your face looked like at the time you were picked up to be taken back to Franklin County by Sheriff Boen?
4:02PM
A. Yes, sir.
Q. Thank you. Take that down.
Were you put into any restraints for the transport to Franklin County?
4:02PM
A. I was placed into shackles around my ankles, a belly chain that went around my waist area, and then my wrists were restrained by handcuffs that are attached to the belly chain assembly.
4:03PM

4:03PM
Q. What happened after you were placed in handcuffs and shackles?
A. Walked through the corridor out to the sally port. I was put in the back seat of the deputy's vehicle behind the driver's seat.
4:03PM
Q. Can you describe what the car was like, what that vehicle was like?
A. It was just a dark-colored SUV with stripings and the emblems that Franklin County used.
4:03PM
Q. What was the compartment in the car where you were seated, what was that like?
A. I guess a regular car seat, but had a metal cage with a mesh top, the wiring, see-through screen.
Q. The divider in the car, the mesh divider, was there
4:04PM
any way for you to reach into the front seat?
A. No, I couldn't scratch my nose or anything if I wanted. You can't lift your hands up at all when you're subdued like that, in that type of restraint.
Q. Could you still hear what was happening in the front
4:04PM
seat?
A. Yes.
Q. And who was driving the car?
A. Deputy Berry.
Q. Where was Sheriff Boen sitting?
4:04PM
A. In the front seat, passenger side.

4:04PM
Q. Did Sheriff Boen have anything with him in the car?
A. I know he was wearing jeans and a black shirt with yellow writing. And he had, like, a drink, like a metal cup. I don't know what brand it was, like a Yeti-brand looking cup, metal.
4:05PM
Q. Could you smell what was in the cup?
A. I mean, I smelled something. I know that I smelled something coming from the front of the vehicle.
Q. What did you smell coming from the front of the vehicle?
4:05PM
A. The odor of intoxicants.
Q. What kind of intoxicants?
A. Alcohol.
Q. When you first got into the vehicle, did Sheriff Boen say anything to you?
4:05PM
A. Yes.
Q. What did he say?
A. I spoke to him first, kind of break the air, you know. Real somber, kind of. You could feel the tension. I spoke to him, asked how he was doing. And then he was -- that's when he started talking back.
4:06PM
Q. What specifically did he say when he was talking back to you?
A. When I asked how he was doing, he said, "I could be at home fucking my wife, but I'm dealing with pieces of shit
4:06PM

like you." He said, "If you live through tonight, you'll never forget it. You're going to the twilight zone." He goes, "You want some beer?" I said, "No." He said, "You want some pills?" I said, "No, sir." He said, "You want some dope?" "No, sir." Then he held up his cup.
Q. What had you said to Sheriff Boen before he told you "If you live through this, if you live through tonight, you will never forget it"?
A. I just spoke to him, asked how he was doing. I wasn't being a smartass or anything.
Q. And you said he told you that, "You're going to the twilight zone"?
A. Yes.
Q. What did you understand that to mean?
A. Pretty much just confirmed in my gut what I already knew when that jailer opened the door and said, "Come on." But I still thought he was joking around, just trying to scare me.
Q. What was his tone of voice when he said it?
A. Angry. Abrupt. Just loud.
Q. So what happened next?
A. They opened the gate. We started driving. Highway 64, started going back east on 64 Highway towards Alma. And they turned -- Deputy Berry turned up the music real loud. And they started talking back and forth. I couldn't

4:08PM hear what they were saying. It was just loud. They put the speakers, faded the speakers to the back of the car and I couldn't hear what was being said, just loud music. There were no words to it. It was just like beats, just
4:08PM techno music, loud music.

Q. What happened after you saw them turn up the music and talk in the front seat?

A. He turned the radio back down, the Sheriff did. And he just started saying basically the same stuff again
4:08PM repetitively.

Q. What specifically do you remember him saying that time?

A. He said, "I was gone when you did that." I'm not verbatim on this, but, "You're not going to make my guys
4:09PM look stupid anymore. You will never pull this shit again. No one is going to believe a piece of shit like you." And he confirmed again what he was fixing to do, just said -- he reiterated that, "If you live through tonight, you'll never forget it." Then he turned the music back up. Then
4:09PM we hit I-40 right there in Alma. We started going back to Ozark, then we stopped.

Q. At some point, did you reach around the Mulberry exit on that drive on I-40?

A. Yeah, we did. It started raining, sprinkling, right.
4:10PM But he started putting his gloves on, like these neoprene

looking, looked like driving gloves kind of, but they got a -- they got like hard knuckles, you know what I mean, almost like lead. I don't know what they are made of. He started putting those gloves on. And he turned the music back up. But then he started yelling, "You're going to the twilight zone." And then he got on the radio, and I still thought he was, like, just trying to scare me still, you know. But he got on the radio and he said, "10-15," which is inmate, prisoner, the 10 code for that he slipped his cuffs off. And I was like -- I just sat back there, and I was seat-belted in and everything. I was, like, he's not joking around, so trying to get my mind ready, getting ready to go. And they exited off 24 right there at Mulberry. They went up almost all the way to the end of the off-ramp, and then they pulled over in the gravel.

But when I heard the lady come back on the radio, I was, like, I knew -- I still thought, well, maybe he was just, like, talking and then he'll maybe click to make it sound like it transmitted. But then when she was, like, "All units," started sending cops that way and everything, I knew it was for real.

Q. When you heard the call go out on the radio that an inmate was slipping his cuffs off, what were you actually doing?

A. Just sitting, waiting, praying.

4:12PM Q. Did you still have your cuffs on?
A. Yes.
Q. Were your legs still shackled?
A. Yeah.
4:12PM Q. Were you seat-belted in in the back seat?
A. Yes.
Q. How were you feeling at that point? You had been out of the hospital for, what, a couple of hours?
A. Yeah. Pretty miserable.
4:12PM Q. After you took that exit in Mulberry, did the car stop somewhere?
A. Yes, sir. I could take you right to the spot right now where we were out there, but just guessing, probably 20, 30 feet from the actual -- I think it's 215 right
4:13PM there, running north and south.
Q. And what's that spot like where the car stopped?
A. Just big holes, big chunk holes. A lot of gravel, muddy kind of most of the time. Just dirt, gravel. There's puddles.
4:13PM Q. Are there any street lights right there?
A. No.
Q. Were there any people around?
A. No.
Q. Any other cars around?
4:13PM A. No. It just started raining a light mist, but more

4:13PM than a light mist, but not rain. Not heavy rain or anything.
Q. When the car came to a complete stop, what happened?
A. Tried to get out of there as far as like, tried to get
4:14PM over to the other side of the car, but my feet got stuck up under that damn -- sorry -- cage. And the shackles got hung. I thought if I could get to the other side, it was going to benefit me better, you know, but I got stuck.
Q. You were trying to slide across the back seat?
4:14PM A. Yes.
Q. Why were you trying to do that?
A. Because the door came open.
Q. Who was at the door when it came open?
A. Both of them.
4:14PM Q. And what happened then?
A. I remember Berry grabbed me up by the face and the head and just pulled me out, or just pulled, like, my -- he pulled me up and then out. Just held my face out the window, or out the door, and started -- at first, that
4:15PM first one, it was right there, and it just automatically started leaking right there, blood. I mean, instant.
Q. I want to make sure the record is clear. You said the first one was right there?
A. Right here.
4:15PM Q. What was? The first what?

4:15PM A. The first fist to the face.
Q. Who threw that fist to your face?
A. The Sheriff.
Q. Sheriff Boen?
4:15PM A. Yeah.
Q. And where did it hit you exactly?
A. Right here. Right in this area.
Q. In your nose and your lips?
A. Yeah.
4:15PM Q. What happened after Sheriff Boen punched you in the middle of the face?
A. He just kept doing that. And I couldn't squirm out. I couldn't hold my hands up, so I -- he was -- I couldn't understand what he was saying. He just kept saying -- I 4:16PM couldn't understand what he was saying. But he rung my bell pretty good the first few times, but after that, it was, like, "Get that son-of-a-bitch out of the car, uncuff him, pull him out and uncuff him." But Berry wouldn't do it. He said, "He's had enough, he's had enough, let's get 4:16PM the hell out of here." But they didn't argue. They just kind of got loud, got loud with each other.
Q. You heard Sheriff Boen and Deputy Berry arguing with each other?
A. Yeah.
4:16PM Q. What were they arguing about?

4:16PM
A. The Sheriff was wanting him to uncuff me and pull me out, and Berry wouldn't do it. He was, like, "No, let's get the hell out of here, let's just go." He said, "Well, let me get one more in."

4:17PM
Q. Who said that?
A. Sheriff. I counted more than one on that last part.
Q. So after the Sheriff said, "Let me get one more in," what did the Sheriff do then?
A. He just kept hitting me, but he started getting body

4:17PM
shots pretty good towards the last part of it.
Q. About how many times did Sheriff Boen hit you in the face?
A. Six, eight. Four, five is where I lost count, just quit thinking about it. Started thinking about other

4:17PM
stuff, you know what I mean. Because I knew I had to stay in the car, for sure. And that made me feel better when Berry was, like, "Hell, no, let's just get out of here." I was, like, at least -- I don't need to get out of that car. I knew that.

4:18PM
Q. Why did you want to stay in the car?
A. Because I was safer there than outside.
Q. And the Sheriff was trying to get you out of the car?
A. Yeah.
Q. Would Deputy Berry let the Sheriff pull you out of the

4:18PM
car?

4:18PM A. No.
Q. You said that the Sheriff took some body shots too?
A. (Nods affirmatively.)
Q. How many times did he hit you in the body?
4:18PM A. Not as many as there was to my face and head. More than two, less than 10, probably. Like I said, I couldn't -- I could feel them, but I couldn't see anymore, you know.
Q. Why couldn't you see anymore?
A. My eyes were already shut. I just couldn't see.
4:19PM Q. Tell us about that. Why were your eyes shut?
A. I wouldn't call it tears. I don't know what it was, in your face, in your eyes, blood. And then just swelled shut.
Q. Were you bleeding from your face?
4:19PM A. I could taste it, yeah.
Q. During the time that Sheriff Boen was punching you in the face and the body, were you handcuffed the entire time?
A. Yeah.
Q. Were your feet shackled the entire time?
4:19PM A. Yes, sir.
Q. Were you in the back seat of the car the entire time?
A. Yes, sir.
Q. Did you ever try to hit Deputy Berry or hit Sheriff Boen?
4:19PM A. No.

4:20PM
Q. What was going through your head when you were getting hit in the face?
A. Just different things. All kinds of stuff.
Q. What kind of things?
4:20PM
A. I mean, like we -- I've known him pretty much all my life, you know. And I just -- I kept thinking it didn't look like him, because when I looked up that first time, he just didn't look the same. So I was like -- then I thought, well, sheez, I can't believe it's really happening kind of deal, you know. Then you just think about different things real fast, like real fast through your head, just kids and different things. Kept thinking about the rain. I don't know why I kept thinking about the rain. I kept thinking about, stay in the car, do your best to stay in the car. And then I thought about the shit that I done to screw up. He's right, no one is going to believe me, you know. So, like, stuff like that. Felt like a pussy, you know.
Q. And how did the beating stop?
4:21PM
A. Because of Berry.
Q. What did Berry do to make it stop?
A. He was just defiant, "No," and hollering at him. And then I don't know what happened to make him stop except for -- yeah, he grabbed my head and all that stuff and held me, but he saved my ass too, you know.
4:22PM

4:22PM
Q. What did you think was going to happen to you before Deputy Berry made the beating stop?
A. Nothing good. That he was going to kill me. Pretend like I had escaped, beat the shit out of me worse than that, or kill me. And just say that, you know, he's already got a history for it.
Q. Did you think nobody would ever believe you because of your history?
A. Yeah. Yeah, for sure. I mean, I was, like, I agreed with him, 100 percent.
Q. Did Deputy Berry ever hit you during this entire incident?
A. Honestly, I don't recall. I don't think so. I never -- he just held my head still, my face. I don't remember him getting any blows in.
Q. So what happened after this beating stopped?
A. Just glad it was over with. I remember I looked out the cage, seen the lights, and we got back on the interstate, then drove like hell, whatever. We drove fast, like 90, 120. We did 90 down 3rd Street. And I remember pulling into the jail, that north side of the jail. The gate was closed, so we came into the south side. And all them -- all the guys were lined up, goon squad, you know. I knew it was fixing to happen again, because they were thinking that I really did escape, or try to escape.

Q. Let me ask, when you arrived at Franklin County, were you booked into the jail?
A. Well, which time, sir?
Q. I'm sorry?
A. Which time are you talking about? Like, that night?
Q. That night, after this happened, after they drove, you said 90, 120 miles an hour to get back to Franklin County, when you get there, were you formally booked in, processed in?
A. Huh-uh.
Q. Did anyone take pictures of you?
A. No.
Q. So where were you taken when you got to the Franklin County Jail?
A. I remember they drug me out. I don't know which cops they were, because I didn't know all of them. But I remember there was one dude with a tattoo on his arm, because I was facing down towards the ground. They were ramming my head into the walls, the concrete. And he was just talking a lot of crap. And I remember -- I couldn't really see that good, but I looked down and I saw his tattoos. He had like a cherry-looking tattoo on him, and then this dagger, like a knife/dagger thing. I kept thinking, I need to find out who that is because at that time, I didn't have any good thoughts about him. I

4:25PM remember that, for sure.

Q. Where were you taken when you got to the Franklin County Jail?

A. They drove me back there and put me in the hole. From 4:25PM working there and stuff, there is like the two main cells, 30 and 33, then there's -- on the same side as 30, there's like an old metal door. They just call it, "The hole," most of us called it that. I was 18 years old when I worked there, you know.

4:26PM Q. Was Sheriff Boen around when you were put in the hole?

A. Yes.

Q. Did you hear him say anything to any of the officers who were around when you were put in there?

A. Yeah, he was acting crazy, just screaming. He said, 4:26PM "What did you say? What did you say?" First, I didn't know who he was talking to. "Did you all hear that? Did you all hear that? He's suicidal. Yeah, he's suicidal."

Q. He said you were suicidal?

A. He said, "Are you suicidal?" I shook my head no. He 4:26PM said, "Ya'll heard that." He said, "Strip him down." So they did that.

Q. Had you ever said anything about being suicidal?

A. No. No, sir. No.

Q. So what happened after Sheriff Boen told the officers 4:26PM around that, "This guy is suicidal"?

A. They stripped me down, took my clothes off. Then they threw me on this, like a metal bed, had like hair and piss on it, all kind of stuff. And then he kept screaming. He was, like -- he was, like, "Ya'll show him any special treatment, it's your ass. I'll fire you. That goes for you all too." And he started yelling at the inmates. I couldn't hear what they were saying back. And he just said some crazy stuff after that. And then he walked out.
Q. So when Sheriff Boen said, "If you all give this guy any special treatment, I'll fire you," who was he saying that to?
A. The other jailers, I guess, and the cops. He was just, like, looking out the door, like, in their vicinity. He wasn't just, like, calling them out by name. He was just looking in that area.
Q. Did you see or hear Sheriff Boen say anything to inmates who were around?
A. Yeah, he threatened them too. He said, "Don't give him anything, nothing, nothing, or I'll lock you down."
Q. Did you have -- had you even been given any clothes at this point?
A. Huh-uh.
Q. Were you just naked in your cell?
A. (No response.)
Q. Sorry, sir. Could you answer the question?

A. Yes. Yes. Yes.
Q. At some point, did somebody bring you some clothes?
A. An inmate slipped me some pants a little while after that. And they come in there and got them. I was trying to get the blood off me, so I went to the shower, felt around, found the knob, pushed the button. But it wouldn't drain, you know, for whatever reason. And one of the guys -- I don't know who it was -- one of the jailers came back there raising hell thinking I was flooding the cell on purpose. And I was, like, it won't -- I was just trying to get some water, you know, so I could see. And it wouldn't stop flooding. It was like it was on a timer or something like that. I just remember I couldn't get it to turn off. They came back there raising more hell, you know. I wasn't trying to cause nobody no nothing.
Q. Once you had your clothes stripped off and you were put in the hole in that cell?
A. Yes.
Q. Did Sheriff Boen come and say anything to you?
A. Not then, no. Not that I can recall.
Q. At some point that night, did he come and talk to you more about -- tell you about how you would remember that night?
A. Not that I remember. We talked a couple days later in the drunk tank. They did -- they did -- after that kid,

after he gave me a pair of pants, a little while later, they came in there and somebody -- I don't know who it was, had my back turned to the wall, or the door -- and they threw one of those turtle suits, like, just threw it on me. So they did give me something to wear after that.
Q. Now, when you were back at Franklin County at that point, did you have any injuries on your body, your face?
A. Yes.
Q. Can you describe, what kind of injuries did you have on your face at that point?
A. I know I had a -- like, I had a cut up on my lip. And some of my teeth were, like, missing. My forehead was real -- had a bunch of knots on it and stuff, you know, just goose eggs and stuff, whatever. My lips hurt real bad.
Q. How did your ears feel?
A. They was like, hot, real hot and swelled up, fat. Fat skin. And, like, my ribs, my sides hurt pretty good.
Q. Did you have any trouble urinating after that beating?
A. Yeah. Yeah, I did. It just looked funny, you know. You know your body. You know when something is not right. It just wasn't working right.
Q. All those injuries you talked about on your face and your ribs, what caused those?
A. And my left eye, I remember that for some reason. I

kept thinking -- even right there on this side more, seemed like, I don't know why that one. Kind of like mashed it in. I can hear a squish, like wrapping paper, like a bow wrap, just mashed it back. I couldn't figure out how he got that one. I don't know.
Q. Your left eye had been bashed in?
A. No. Bashed out, basically. It was like -- felt like it was bulging, right. I just took it and mashed it in and it made some crackly noise. It was blurry for a long time. It's still blurry sometimes. I don't remember feeling that one, you know.
Q. Were you bleeding from your face?
A. Yeah.
Q. And what caused those injuries on your face?
A. Anthony.
Q. Anthony Boen?
A. Yes.
Q. When you got to the jail, did Sheriff Boen offer to get you any medical attention?
A. No. I didn't ask him either, you know.
Q. Tell me about that. Why didn't you ask to get any treatment?
A. I just -- I seriously wanted that door shut and nobody come back in there. Because every time the door opened, you were going to get your ass whooped or something. And

4:33PM it wasn't worth asking to go nowhere. I wasn't going to ask him. So that's the main reason. So it wasn't them just not taking me. I didn't ask.
Q. You wanted to stay inside the cell where it was safe?
4:34PM A. Yeah. Yeah.
Q. When you were in there, did Sheriff Boen come and ask if you needed any medical attention?
A. Huh-uh. No.
Q. Did he give you a rag to wipe up or any bandages or
4:34PM anything like that?
A. No, sir.
Q. At some point, did you meet with the attorney that you had?
A. Yes.
4:34PM Q. When was that? Was that this night or was that a little bit later?
A. Couple, three, four days later. I don't remember exactly the date. Just a couple days later.
Q. Do you remember your attorney's name?
4:34PM A. Ms. Capp, or Judge Capp, Sarah Capp.
Q. Was Sheriff Boen around when she came to the jail to meet with you?
A. Yeah, he was. I thought she was part of it too, and I felt bad later because she really helped me. She helped
4:35PM me, or she believed me, you know.

Q. At that point, before you met with Ms. Capp, were you given real inmate clothes to wear?
A. Yes. They got me a -- they got me -- they let me have clothes that day, like the full attire, you know.
Q. Did they allow you to wash up before you met with her?
A. Uh-huh.
THE COURT: You need to answer audibly.
A. Yes. I'm sorry.
Q. (By Mr. Songer.) During that meeting, did she take any pictures of you?
A. Yes, she did.
Q. And how long do you think this was after the beating had happened?
A. At least two or three days, at least. You lose track of time in those places, but it was a few days.
Q. Mr. Moon, could we put up Exhibit 1(a). This has been previously admitted.
A. Yeah.
Q. Is that one of the pictures that your attorney took?
A. Yeah.
THE COURT: Is that a yes?
A. Yes. Yes. That's a yes.
Q. (By Mr. Songer.) Just a moment ago, you were describing knots on your forehead. Do you see those in this picture?

4:36PM
A. Yeah. Yes.
Q. What caused those knots on your forehead?
A. Anthony Boen.
Q. You also described an injury to your left eye. Do you see that in this picture?
4:36PM
A. Yes.
Q. Appear to be bloody to you?
A. Appears such.
Q. And what caused that injury?
4:36PM
A. Anthony.
Q. Can we put up Exhibit 1(b), please.
Is this also a picture that Ms. Capp took of you a few days later?
A. Yes.
4:37PM
Q. And do you see cuts on your cheek and knots on your head?
A. Yes.
Q. Were you bleeding from those cuts the night you came to the Franklin County Jail?
4:37PM
A. I assume. I really didn't know. I couldn't see. I could taste blood, so I don't know which ones they were coming out of.
Q. Can we pull up Exhibit 1(c), please.
And what are we looking at in this picture?
4:37PM
A. First place he hit me.

4:37PM
Q. Right on your lip and your mouth?
A. Yeah.
Q. Thank you, Mr. Moon.
At some point after this happened, did you file a civil lawsuit against Sheriff Boen?
4:38PM
A. Yes.
Q. And does that suit ask for money damages based on what Sheriff Boen did to you?
A. Honestly, I've never seen it.
4:38PM
Q. Did you write up some kind of complaint or did an attorney just do it for you?
A. It was an attorney.
Q. Have you ever seen the lawsuit that was filed?
A. No, sir.
4:38PM
Q. Do you know what it asks for?
A. I never even met my lawyer, really.
Q. Why did you agree to have that lawsuit filed on your behalf?
A. I didn't want him to be Sheriff anymore, or a cop, or anything like that, whatever. Whatever could make that not happen, you know. Because I wasn't pissed off at him anymore. After I went down, did my time, I mean, there was a long time there, I was, thought some crazy stuff. But after that, I wasn't even mad anymore. It just kind of hurt my feelings more than anything as far as that goes,
4:39PM

because I've known him a long, long time. He's a nice guy; was, you know. So it was just -- I don't know. Just to make sure he wasn't ever a Sheriff again, or a cop.

Q. Did you think filing a lawsuit would bring attention to it and make it so that he wouldn't be a cop anymore?

MR. WOOD: Object.

THE COURT: What's the objection?

MR. WOOD: Leading.

THE COURT: Sustained. Wait, he's going to rephrase the question.

THE WITNESS: Yes, sir.

Q. (By Mr. Songer.) I think you already answered it. I'll ask you one other thing.

You mentioned a moment ago that you did remember another time when the Sheriff came back and spoke to you again. Was that after you had met with your attorney at the jail, Ms. Capp?

A. Yeah. Yes, sir, it was.

Q. During that meeting, did Sheriff Boen say anything to you about whether you should report what he had done to you?

A. We had a long talk, you know, going into the drunk tank, you know. So I just -- I waited a little bit. But then the guy that I used to work with was there. And I was like -- I just asked him not to leave me.

4:41PM

Q. I'm sorry. What?
A. I asked him not to leave me there with him by myself.
Q. Who did you ask not to leave you by yourself?
A. Another cop, Travis.

4:41PM

Q. Do you remember that cop's last name?
A. Travis Ball.
Q. Why did you ask him not to leave you alone?
A. Because so far, he's the only one that hadn't put hands on me. And I knew him. I used to work with him. He was, like, one of the only friendly faces I recognized.

4:41PM

Q. And then did the Sheriff come and talk to you?
A. He did.
Q. Did he say anything about whether or not anyone would believe you?

4:41PM

A. No. He was nice that time. He was nice, and he just said -- he said a bunch of stuff. We talked a long time, seemed like. He was basically like, you just drop -- like he said, "I hate how shit went down, but you needed it. You need to get your mind right. I shouldn't have done what I did, but" -- you know, then he started, like, saying nice things, like, just bragging on like my prior work ethic and stuff and things, my accomplishments. So he said all that stuff. And then he was, like, "Just go down there and do your time, keep your ass out of Ozark, and I'll make this go away."

4:42PM

4:42PM MR. SONGER: Those are all the questions I have for you right now. Thank you, sir.

THE COURT: What's the estimate on how long the cross is?

4:43PM MR. WOOD: Your Honor, probably the same duration as my last cross. There's a lot to cover with this individual.

THE COURT: All right. Thank you. Ladies and Gentlemen, we're going to recess about 15 minutes early

4:43PM today. If you will report by -- Ms. Craig, is 8:20 sufficient, or 8:25?

MS. CRAIG: I haven't been checking them in, so I think 8:15. Have you all been coming in at 8:15? I think 8:15 to check in.

4:43PM THE COURT: So if you will be here at 8:15 or a little bit earlier if you want to get a cup of coffee or something like that, we'll be ready to begin promptly at 8:30.

Let me remind you of the recess instruction.

4:44PM Remember that you can't talk with anyone or let anyone talk to you about this case. That can be a difficult thing to do, but you need to remember that and comply with this rule. Remember also that you can't do any research. You can't look up anything on the internet. You can't try to

4:44PM get online and visit places that you've heard about today

4:44PM or do any other type of research. This is very important. You've taken an oath to comply with this instruction and I expect you to comply with it.

We're in recess until tomorrow morning.

4:44PM (proceedings adjourned at 4:44 p.m.)

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 19th day of September 2021.

______________________________
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

