IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA PLAINTIFF

v. CASE NO. 2:19-CR-20037

ANTHONY BOEN DEFENDANT

---

JURY TRIAL, VOLUME 3 OF 6

BEFORE THE HONORABLE TIMOTHY L. BROOKS

AUGUST 4, 2021

FAYETTEVILLE, ARKANSAS

---

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL J. SONGER
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-1762
michael.songer@usdoj.gov

MR. BRANDON T. CARTER
United States Attorney's Office
414 Parker Avenue
Fort Smith, Arkansas 72901
(479) 783-5125
brandon.t.carter@usdoj.gov

Also Present: Special Agent Matthew Ferguson
Federal Bureau of Investigation

IT Technician: Mr. Kenneth Moon

FOR THE DEFENDANT:

MR. RUSSELL A. WOOD
Wood Law Firm
501 East 4th Street, Suite 4
Russellville, Arkansas 72801
(479) 967-9663
rwood@woodlawfirmpa.com

MR. PAUL PRATER
Prater Law Firm
4700 Edgemere
North Little Rock, Arkansas 72116
(870) 543-9064
paul@praterlawfirmpllc.com

I N D E X


| | Page |
|---|---|
| Preliminary Matters .............................. | 471 |
| Jury Enters Courtroom............................. | 480 |
| JUSTIN PHILLIPS (cont'd) | |
| Cross Examination by Mr. Wood ................ | 480 |
| Redirect Examination by Mr. Songer ........... | 561 |
| JASON EARP | |
| Direct Examination by Mr. Carter ............. | 569 |
| Lunch Recess ..................................... | 573 |
| In-Chambers Discussion with Juror Number 16 ..... | 573 |
| In-Chambers Discussion with David Vaughn ........ | 588 |
| KEVIN HUTCHISON | |
| Direct Examination by Mr. Songer ............. | 596 |
| Cross Examination by Mr. Wood ................ | 622 |
| Redirect Examination by Mr. Songer ........... | 639 |
| BRANDON ENGLISH | |
| Direct Examination by Mr. Carter ............. | 644 |
| Cross Examination by Mr. Wood ................ | 652 |
| TRAVIS BALL | |
| Direct Examination by Mr. Carter ............. | 659 |
| Jury Dismissed for the Day ....................... | 725 |
| Evening Recess ................................... | 734 |
| Reporter's Certificate ........................... | 735 |

E X H I B I T S

| | | Received |
|---|---|---|
| Court's Exhibit 1 | E-mail Exchange with David Vaughn | 584 |
| Court's Exhibit 2 | Still Photo of Security Footage of David Vaughn | 588 |
| Court's Exhibit 3 | Thumb Drive of Audio Calls Introduced by Government, with Captioning | 728 |
| Govt's Exhibit 5(a) | Photo, FCSO Facility | 698 |
| Govt's Exhibit 5(b) | Photo of FCSO Deputy's Office | 608 |
| Govt's Exhibit 5(c) | Photo, FCSO Facility Interior | 698 |
| Govt's Exhibit 5(d) | Photo, FCSO Facility Interior | 698 |
| Govt's Exhibit 5(e) | Photo, FCSO Facility Interior | 698 |
| Govt's Exhibit 5(f) | Photo, FCSO Facility Interior | 698 |
| Govt's Exhibit 5(g) | Photo, FCSO Facility Interior | 698 |
| Govt's Exhibit 5(h) | Photo, FCSO Facility Interior | 698 |
| Govt's Exhibit 5(i) | Photo, FCSO Facility Interior | 698 |
| Govt's Exhibit 5(j) | Photo, FCSO Facility Interior | 698 |
| Govt's Exhibit 6 | Franklin County Use of Force Policy | 711 |

E X H I B I T S (cont'd)


| | | Received |
|---|---|---|
| Govt's Exhibit 7 | Franklin County Inmate Rights Form | 689 |
| Govt's Exhibit 8 | Justice Solutions Expense Reports (Proffered Page 571) | 693 |
| Govt's Exhibit 9 | Audio Recording, Excerpt Phone Call, 6-20-19 | 718 |
| Govt's Exhibit 17 | Photo, Brandon English | 651 |
| Govt's Exhibit 21 | Medical Records of Justin Phillips | 506 |
| Defendant's Exhibit 4 | Conviction Records of Justin Phillips | 482 |
| Defendant's Exhibit 5 | Travis Ball's Wedding Photo | 559 |
| Defendant's Exhibit 7 | Brandon English's Conviction Records | 654 |

(Outside the Presence of the Jury)

THE COURT: The record will reflect that we are proceeding outside the presence of the Jury at this moment. The record will also reflect that it's 8:29 and our witness is not quite here. Ms. Craig relays that she has been informed that he's on his way. The Court is not real happy that he's not here, but we have some matters to take up anyway so we'll see if he arrives.

Last night, the government filed a motion to admit Exhibit 6, and then they also made reference to Exhibit 7 that they will seek to introduce later in the trial. And their motion is effectively a brief in support of the arguments that they made at our bench conference yesterday. The Court was able to review the motion and vet the cases that were cited. It was filed kind of late last night, so I didn't want to -- Mr. Wood, wanted to make sure that ya'll had had a chance to review that. And I don't know that we need to take it up right now, but just wanted to draw the fact of its filing to your attention so it didn't come as a surprise to you later when we do take it up.

MR. WOOD: Yes, sir.

THE COURT: Were you aware that it was filed?

MR. WOOD: Yeah, we saw it come through sometime last night.

THE COURT: Now, did you have another matter that you wanted to take up?

MR. WOOD: We had two matters, Your Honor. One has been stipulated to with the government. It's come to our attention, we have a variety of certified copies on the convictions for Mr. Phillips. It's come to our attention that he had a felony conviction in Oklahoma that we weren't aware of, that we have just become aware of. So what the agreement is, just like the Court's order, that I will ask him, has he been convicted of domestic assault and battery with a dangerous weapon in 2016 in LeFlore County -- they call them district courts, I think -- a felony. And then he will say yes or no or whatever he's going to say, versus us sending somebody over there to get it.

THE COURT: That's fine.

MR. WOOD: Number two, a witness that will come up a little bit later, Mr. Hutchison, Kevin Hutchison, I want to question him about his bias concerning a matter. He received a DWI while he was working for Sheriff Boen. The trooper on that scene that pulled him over called the Sheriff. Mr. Hutchison said, "I work at the Sheriff's office, call the Sheriff." Called the Sheriff and said, "Hey, he's out here, he's drunk, what do you want me to do with him?" And the Sheriff said, "He is just like any other person in the community and you do whatever it is

that you feel is appropriate."

As a result, Mr. Hutchison got that DWI. He got demoted at the Sheriff's department. He was a patrol deputy. He got sent, busted all the way back down to dispatch and had to work his way back up over a significant amount of time to be able to go back on the road as a deputy.

Two months after he got put back on the road as a deputy, which that took -- I'll have to talk to my client to get -- six months to a year, however long it was, he got wrapped up in another sobriety checkpoint issue where his -- actually, him and his buddy were both drunk, but his buddy was driving his car this time, so he wasn't driving. But they were both drunk and the Sheriff busted him back down again for another alcohol-related incident where he was allowing his drunk buddy who got a DWI to drive the vehicle around.

My position is that certainly shows a bias, it goes towards his credibility when he's making these allegations against the Sheriff. And so --

THE COURT: A bias because he got busted in rank twice?

MR. WOOD: A bias against the Sheriff, animosity against the Sheriff, that would go to his bias or credibility to get back at the Sheriff for not protecting

him, for not telling the trooper, "Hey, I'll come get him, let him go, call him a cab" or whatever.

My position is that's a credibility issue and we should be able to raise that for the Jury to consider Mr. Hutchison's credibility when it comes to making these adverse allegations against Mr. Boen.

THE COURT: Okay. Is he on our -- trying to find my witness list for today. So we may potentially get to him today. What's the government's position?

MR. SONGER: Your Honor, our position is that any minimal relevance of bias here is strongly outweighed by the prejudicial effect of putting these on. One of them is not even an arrest or an adjudicated offense. It sounds like he was just riding in a car. The other one is a very old misdemeanor offense that is not relevant to honesty. It's the type of impeachment evidence that is typically excluded. And I think the probative value here is particularly minimal because both of these incidents happened years ago, and after they happened, he continued to work at the Sheriff's office. The defendant promoted him multiple times, promoted him up to sergeant, promoted him to detective. He continued to work there for years. So these old incidents that precede those promotions have little, if any, relevance to bias, but they are very inflammatory and prejudicial towards him. So under 403 and

the impeachment rules, the government would ask you to exclude that.

THE COURT: The one that he was apparently convicted, the misdemeanor conviction, what year was that?

MR. SONGER: Your Honor, off the top of my head, I don't know. I apologize. I want to say it was like 2010.

MR. WOOD: '11.

THE COURT: 2011?

MR. WOOD: Yes, sir.

MR. SONGER: A '10 arrest; '11 conviction.

THE COURT: Hutchison is a witness with regard to which count?

MR. SONGER: For Count Two, Brandon English.

THE COURT: So 2018. So seven years prior, the misdemeanor?

MR. SONGER: Eight years prior, yes, Your Honor.

THE COURT: And then the other incident, he was not arrested for or convicted of?

MR. WOOD: He was not arrested for or convicted of DWI or public intox, PI or anything like that. But he was demoted again by the Sheriff because it was another alcohol-related offense and poor judgment. He got demoted down again and had to start the process over.

THE COURT: Was he on his own time in his own

vehicle?

MR. WOOD: (Nods affirmatively.)

THE COURT: All right. All right. Well, Mr. Wood, thank you very much for bringing this to the Court's attention. I don't know that I can -- I'd like to see it in context. He may testify to something on direct that would influence the Court's decision, so I'll take it under advisement. If you get to that point of your cross examination where you would like to inquire on that point or impeach with what you have outlined here, in some manner indicate to the Court that you would like to go there and I'll make a ruling in context.

MR. WOOD: And out of an abundance of caution, we have one other incident with Mr. Hutchison that we would like to inquire into. And that is, Mr. Hutchison wanted to be Sheriff. And when the Sheriff was indicted in this case, Mr. Hutchison immediately started running for Sheriff while he was on the clock. He actually got terminated by Travis Ball, who was the interim Sheriff for campaigning immediately, okay. And he made these comments in front of a group of people where it's actually on, my understanding, it's on video. We haven't been able to put our hands on the audio portion of it, still trying to get the video portion, but I don't think I would mess with it anyway. I just want the opportunity to cross-examine him whether that

occurred.

THE COURT: What's the alleged statement that he made?

MR. WOOD: That he was terminated -- well, no, that he was campaigning for Sheriff. "I'm going to announce that I'm running for Sheriff." Travis Ball was the interim Sheriff who wanted to be Sheriff also. He fired him for that political activity while on the clock, and I think that that --

THE COURT: Was that before or subsequent to the three count, the dates of the three counts?

MR. WOOD: It was after he gave testimony, after he started working, provided Grand Jury testimony and a 302 to the FBI.

THE COURT: So he announced he was running for Sheriff after 2018?

MR. WOOD: Yes. It was immediately after the defendant was indicted. So he was indicted.

THE COURT: 2019?

MR. WOOD: He was indicted in 2019. So he made the statements in mid to late '18 against the Sheriff. Then the Sheriff gets indicted, and then that creates the opportunity, in our position, that he was looking for. And he then immediately, in violation of policy law, whatever it is, started campaigning and got terminated for it.

THE COURT: You're not going to -- are you going to ask him questions about whether he announced that he was going to run for Sheriff for purposes of inferring bias, or are you going to take it one step further and suggest that he violated the law by announcing that he was running for Sheriff while on the clock?

MR. WOOD: Not violating the law. My position is, "You gave a self-serving statement to the FBI that subsequently cleared the field for you and you immediately started running for Sheriff."

THE COURT: Okay.

MR. SONGER: Your Honor, there's an awful lot of speculative assumptions baked in there. But I think the key point is that to the extent this is relevant to bias against someone, it's bias against Travis Ball who fired him, or asked him to resign, however it was characterized; not against the Sheriff. At that point, the Sheriff was no longer in charge of the day-to-day operations of the office.

THE COURT: All right. My tendency at this point is to agree with Mr. Wood, given the temporal timeline that he laid out. But let's see how it plays out, and you may certainly object as you hear him attempt to lay a foundation for that particular line of inquiry and we'll take it up in context.

MR. SONGER: Your Honor, would it be possible to discuss perhaps before Mr. Hutchison starts his testimony?

THE COURT: Sure.

MR. SONGER: For both of these issues, if they are going to be inquired about in cross examination, I would like to discuss them in direct. But I certainly don't want to unnecessarily do that and then open the door.

THE COURT: You'd like a chance to inoculate?

MR. SONGER: Correct.

THE COURT: Yeah. So I'm not exactly sure where he is going to be in the lineup, but let's try to find either the lunch break or a recess and we'll take a little bit longer recess and we can take this up on the record at that time.

MR. SONGER: Thank you, Your Honor.

THE COURT: Do we have a witness?

MR. SONGER: Yes. The government's witness is here. We'll bring him in.

THE COURT: All right. Mr. Phillips, I wanted to address you before we bring the Jury in.

Yesterday, I was having a hard time hearing your testimony. You've been a little bit soft-spoken and you've kind of hung your head. And between being soft-spoken, hanging your head, kind of sitting back from the microphone and all the plexiglass, I suspect I'm not the only person

that's having a hard time hearing you. So if you would, would you please try to keep your head up if you can and get closer to the microphone?

THE WITNESS: Yes, Your Honor.

THE COURT: Can you do that?

THE WITNESS: Yes, sir. Thank you.

THE COURT: Please bring the Jury in and everyone please stand.

(Jury in at 8:43 a.m.)

THE COURT: Good morning, Ladies and Gentlemen of our Jury. I apologize for getting a late start. We had the best of intentions of getting started right at 8:30 today. Had some issues come up that the Court needed to take care of some business. And in the long run, we saved some time, I think. So I apologize for that, but we are trying to be efficient and we are mindful of your time.

We left off with the government concluding their direct examination of Mr. Phillips. It's now the defense's opportunity to cross-examine.

Mr. Wood, you may inquire when you're ready.

MR. WOOD: Thank you, Your Honor.

JUSTIN PHILLIPS (cont'd)

CROSS EXAMINATION

BY MR. WOOD:

Q. Good morning, Mr. Phillips.

A. Good morning, sir.
Q. My name is Russell Wood. I represent Sheriff Boen in this matter. So obviously you had your opportunity to provide your testimony yesterday?
A. Yes, Mr. Wood.
Q. And you got to say everything that you wanted to say about the alleged incident with the Sheriff?
A. As far as I know, yes, sir.
Q. You got to provide all the testimony that you wanted to regarding any injuries that you allegedly received?
A. That I was asked, yes.
Q. So this morning, the first thing that I want to do is talk about your prior criminal convictions, okay?
A. Yes, sir.
Q. The government touched on a few of them yesterday, but we're going to go through each one of them. I want to make sure that you in fact were convicted of these offenses and that we don't have -- and that you don't have -- that we don't have something wrong, okay?
A. Yes.

MR. WOOD: Your Honor, this is Defendant's Exhibit 4 that has been stipulated to by the parties. And I would ask for permission to publish that to the Jury.

THE COURT: All right. Exhibit 4 is the collective records of convictions for Mr. Phillips?

MR. WOOD: Yes, Your Honor.

THE COURT: The Court finds that these documents are self-authenticating public records under seal and that the parties are stipulating their receipt into evidence. So Defendant's collective Exhibit Number 4 is received.

MR. WOOD: Thank you.

(Defendant's Exhibit 4 received)

Q. (By Mr. Wood.) We're going to put on the screen -- have you got your screen in front of you there?

A. Yes, sir.

Q. Can you see it?

A. Yes.

Q. All right. And so we're going to go through these real quick and I just want to ask you a few questions about them, about whether or not you recall that.

So in September, on September the 20th, 2017, in Franklin County, Arkansas, you were convicted of criminal impersonation, first degree, and that was a D felony, correct?

A. Yes, sir.

Q. Then the next one that we have is September the 20th, 2017. You were convicted of -- and this was in Franklin County also -- you were convicted of residential burglary, which was a B felony, correct?

A. Correct.

Q. All right. The next one that we have is -- I don't have the date on it the way that it got redacted. The next one is also in Franklin County, and that was on the same, the conviction date was the same date, September the 20th, 2017. You were convicted of theft of property, which was a D felony, correct?
A. Yes.
Q. Then we'll go to the next one. Again, in Franklin County, Arkansas, you were again convicted of theft of property, and that was a D felony also, correct?
A. I'm not aware of that one. Appears as such.
Q. But it appears that that's correct?
A. Yes. I don't know if this is a conviction or whatever. I didn't take it to trial. I pled to that.
Q. Let's go to the next one. The next one was 5-2-13, so May the 2nd, 2013. And that was in Franklin County also. And in that case, you were convicted of drug paraphernalia, and that was a D felony, correct?
A. Yes, sir.
Q. The next one was also May the 2nd, 2013, in Franklin County. You were convicted of hindering apprehension or prosecution, correct?
A. Yes, Mr. Wood.
Q. And that was a D felony also, correct?
A. Yes.

Q. All right. Let's go to the next one, please. That one is September the 12th, 2018, in Crawford County.

You were convicted of residential burglary again. And that was a B felony, correct?

A. Yes, sir.

Q. Also on that same sentencing order, you were convicted of escape in the third degree, which was a C felony, correct?

A. Yes, that's correct.

Q. On that same sentencing order, you were convicted of failure to appear. And that was also a C felony, correct?

A. I don't recall that one, sir, but it appears as such on the paperwork.

Q. You have no information or evidence to dispute that, do you?

A. I do not.

Q. And it's also come to our attention, in 2016, in LeFlore County, Oklahoma, which is -- where is that? Is it right over the border?

A. Yes.

Q. You were convicted of, domestic assault and battery with a dangerous weapon. And that was a felony, wasn't it?

A. Yes, it was.

Q. So let's talk about your testimony yesterday because I think that it's important that we get this timeline

situated.

According to your testimony yesterday, you were booked into the Franklin County Detention Center on September the 11th, 2017, correct?

A. Yes.

Q. According to your testimony yesterday, I've put together this timeline just as a demonstration for us to be able to look at, okay. I'm going to go through this with you and I want to make sure that this is correct. Is that good?

A. Yes, sir.

Q. So you said yesterday on September the 11th, 2017, you were booked in the Franklin County Jail?

A. Yes.

Q. And you also said, on the same day that you were booked in, September the 11th, that that was the day that you escaped from the Franklin County Jail?

A. Yes.

Q. You said that you came in. Did they actually book you in, or were they trying to book you in?

A. They were attempting to, sir.

Q. So that's when you fled on the 11th, same day you got there?

A. Yes.

Q. On the 11th, September the 11th, 2017, you testified

you were also transported to Crawford County Detention Center?
A. Yes, sir.
Q. Then you were at the detention center, Crawford County Detention Center, from 9-11-17 -- hold on. Do you remember what time they got you up there?
A. It was probably between 5:00 and 6:00 p.m.
Q. So you got there 9-11 in the afternoon or early evening, correct?
A. Early evening, yes.
Q. And then you stayed at the Crawford County Detention Center until the night of September the 14th, 2017?
A. I believe so, sir. Like I said, it was either the 13th going into the 14th, or the 14th going into the 15th, my recollection from memory. But it was the 14th, I believe.
Q. Let's back up, because I'm not sure what the 13th was. So if I told you that you went to the hospital at Baptist Health over in Van Buren on September the 14th, was that the same day that you were subsequently transferred from Crawford County back to Franklin County?
A. Yes.
Q. So we're going to look at some medical records here in a second. So if you went to the hospital on the 14th, then an hour or two later, that's when you were transported back

by Mason Berry and the Sheriff back to Franklin County?
A. I believe so, sir, yes.
Q. I'm not trying to trick you or anything. The 14th is the date that Mason Berry says that you were transported. Does that sound right?
A. It does, yes.
Q. Then on the 14th -- so on the 14th you were transported to the hospital in Van Buren. Then they transported you back to Crawford County, correct?
A. Yes. Crawford County officers took me to the hospital, stayed with me until the Franklin County officers got there. And the Franklin County officers transported me back to Crawford County.
Q. On then on that same day, about 10:30 or so, according to your testimony, the Sheriff and Mason picked you up and took you back to Franklin County?
A. Yes. Like I said, it was between -- my recollection, it was getting close to midnight, like from 10:30 on to midnight.
Q. I'm not concerned about that. So on the 14th, that night, 10:30 to midnight your testimony is, they come and got you and took you back to Franklin County?
A. I just knew it was late.
Q. All right. So you were at Crawford County, according to your testimony or some prior, for 72 hours?

A. Give or take, yes, sir.
Q. And you've obviously been in jail before, correct?
A. Yes.
Q. So you know what three days in jail feels like, correct?
A. Yes.
Q. It's not like you got in there and just was new to it and didn't have a clue and didn't know if you was in there two days or 10 days, correct?
A. I mean, I'm not incompetent. I've got an idea of how many times they feed you.
Q. All right, then. So let's go back. I wanted to just kind of get that timeline situated.
Let's go back to when you were booked in. We'll go through your testimony from yesterday. Let's go back to when you were being booked in, or attempting to be booked into the detention center in Franklin County, okay?
A. Yes, sir.
Q. There's been plenty of testimony so far that you jumped through the window there in booking, over into dispatch, and you said headed out the north door, correct?
A. Okay.
Q. No, I'm asking you. I mean, it's not even that important. They were booking you in, you got your hands on a cell phone, and then you were able to get out of the jail

and take off running, correct?
A. Yes.
Q. And the jail is downtown Ozark, isn't it?
A. Yes.
Q. Couple of blocks from the town square, in fact, right?
A. Yes.
Q. So after they got you captured, they got you back to the detention facility, at some point in time, it was decided you would be transferred to Crawford County, correct?
A. Yes.
Q. Now, when you were transferred to Crawford County, who put on your restraints at Franklin County Detention Center?
A. I believe it was a jailer, a male jailer, but I couldn't testify under oath 100 percent.
Q. And so who was it that picked you up?
A. Deputy Berry.
Q. So he comes up in his patrol vehicle. And where were you at? Did they have you up at booking or did he go back in the back and get you or what?
A. They already had me up front, yes, sir.
Q. So Deputy Berry takes you and he puts you in his vehicle?
A. I was placed in his vehicle by someone. I don't recall.

Q. And after that, you guys get on the road, right? Was there anybody else with Mason Berry when he transported you to Crawford County?
A. I don't recall. I don't believe so.
Q. Now, on the way to Crawford County -- well, I've got a question. I mean, you were Ozark PD and you worked over at the Sheriff's office in dispatch or whatever.
What type of patrol unit was Mason Berry driving, the make and model? Was it a Tahoe or was it a Ford Explorer?
A. I'm not for sure, sir. It was an SUV type.
Q. So you guys head off to Crawford County. Now, on the way to Crawford County, you in fact slipped one of your cuffs off, correct?
A. It wasn't a cuff, no, sir.
Q. What was it?
A. Best of my recollection, it was like a leather restraint of some sort. I was new to that, which, I mean, yes, I mean, I was familiar with their procedure having been in law enforcement. That's why the time of night when they picked me up, I found it odd. That's what alarmed me as well, because in my 14 years of law enforcement, we never picked anyone up that time of night.
Q. Now, we're talking about you going from Franklin County to Crawford County, right?
A. I'm not sure what you're talking about now, sir.

Q. Well, after you escaped from Franklin County.
A. Okay.
Q. They decided to send you to Crawford County because it's a more secure facility, correct?
A. Yes.
Q. When Mason Berry picked you up in Ozark, Arkansas, in Franklin County, to take you to Crawford County, what time do you recall him picking you up? Do you know what time of day that was?
A. Late afternoon, between 5:00, 4:45 to 5:00.
Q. So it's not unusual for Sheriff's departments or police agencies to transport people between 4:30 and 5:00, is it?
A. No. I was talking about around midnight, it is.
Q. I understand. That's why I was asking you. I thought we might be confused.
A. No, sir.
Q. We're talking about from Franklin County, after you escaped, to Crawford County, okay?
A. Okay.
Q. According to your testimony, you and Mason Berry, just the two of you, were headed to Crawford County.
Now, on that ride, you slipped off one of your cuffs, correct?
A. No, sir.

Q. Were you able to get out of the belly chain?
A. I don't recall the belly chain, sir.
Q. Do you recall a leather strap?
A. Yes.
Q. So you were in law enforcement. You know we've got kind of some different kinds of restraints. You've got the metal chain, belly chains, and then you have the leather belt-looking thing they put around you, correct?
A. Yes.
Q. So you were able to get out of the leather belt restraint, correct?
A. Yes.
Q. Isn't it true that you have the ability to do something with your thumb, dislocate it or something, and be able to get out of cuffs whenever you want?
A. I don't really know how to answer that. I'm not double-jointed or anything like that.
Q. But you have the ability to get out of cuffs whenever you feel like it, correct?
A. No, I wouldn't say when I feel like it or anything like that. Just when I feel in danger or if it's something accessible. But, no, not every time. If they are placed on there correctly with a finger between the subject's wrist and the metal part of the cuff, if they are placed on there correctly, you are not getting out of them, and they

are not tight enough on you in the first place. They are locked in, secure, and it's comfortable, without any kind of marks or abrasions on you, if you know what you're doing and you're trained right and following procedure.
Q. But if somebody doesn't follow procedure, doesn't do it right, then you've definitely got a shot at getting out of them, correct?
A. Or being uncomfortable.
Q. So just to explain to the Jury what you were talking about just then when you said you put your finger in the cuffs. As part of your training as a law enforcement officer, you were trained about how to properly restrain suspects, correct?
A. Yes.
Q. And you were taught the proper way to put handcuffs on a prisoner or a detainee or a suspect, correct?
A. We are, yes.
Q. And, of course, if you put them on too loose, well, then lots of people can get out of them, correct?
A. I would assume, yes.
Q. But there's also an issue of, you don't want to put them on too tight if you can help it. And why would you not want to do that?
A. Because at that time, I would be acting in a professional capacity and I was trained to properly do it

correctly. I can't speak for anybody else's handcuffing skills.
Q. Sure. But I'm saying, pursuant to your training, you said you stick your finger in between there. So part of your training, you were trained that when you put the handcuffs on, if you can still get your finger between the inside of the cuff and the person's hand, well, then that was acceptable for not being too loose or too tight, correct?
A. General rule of thumb, yes.
Q. Because if you put them on too tight, I mean, you don't want to just clamp them down because that's real painful, right?
A. I would assume, yes.
Q. Well, you've been in handcuffs before, right?
A. I have.
Q. And have they ever put them on -- I mean, let's do a hypothetical. If a person was fighting with the police and the police are fighting with them trying to get the handcuffs on. And by the time it's all over with, wham, click, click, click, click, the police get that handcuff on?
A. Obviously, I've been arrested from several different agencies throughout the past few years, but never experienced anything except Franklin County, to be honest

with you.
Q. All right. My point is -- would you agree with this -- that you were trained, what you're talking about is, if you put your finger in between the handcuffs, then they are generally not too tight or not too loose?
A. For the most part, yes.
Q. And so you are going down the road. Your testimony is that you did not get out of your handcuffs, either both of them or one of them, on the trip, your first trip, the trip to Crawford County?
A. My testimony was I didn't get out, or attempt to get out of any handcuff or belly chain or anything like that on the way home from Crawford to Franklin.
Q. And I know that you are wanting to get to that part because you want to -- you've got your story to tell, but I'm asking you about the trip up there.
A. Right. I didn't testify to that.
Q. You didn't testify to that?
A. I didn't testify to what you just asked me.
Q. Well, then let's do it right now. On the way up to Crawford County, isn't it true that you were able to slip off one of your cuffs?
A. No, sir.
Q. Isn't it true on the way to Crawford County, that you were able to get out of the leather belt restraint?

A. Yes.
Q. And then wouldn't it be true, once you get the leather belt restraint off, now you can lift your arms up and you can do this number, correct?
A. Yes.
Q. So at that point in time, you have the ability to start grabbing stuff and to move around a lot more, correct?
A. You basically have the ability to cover your face, because last time, it didn't work out so well.
Q. I know. We're going to get to that part and you're going to get an opportunity to talk about that, okay?
Let me ask you this. What kind of cage, what kind of partition did Mason Berry have in his vehicle?
A. Best of my recollection, it's like a black mesh, but it's a wire, hard wire, just crisscross, like a diamond pattern, I guess. There's a portion that maybe it's fiberglass. I don't know for sure, I didn't design the vehicle, but to my knowledge, it's something like that.
Q. Could it have been plexiglass?
A. Possibly, yes. That sounds more correct.
Q. Now, as a police officer, you've probably been in several different kinds of police cars with cages in them, haven't you?
A. Yes.

Q. And some of those cages that are plexiglass, right here, there's a window that slides back and forth so that you can open it up and you can tell somebody to do whatever you are wanting them to do and you can close it so that they can't necessarily hear what you're saying up front, correct?

A. I've heard of those, yes. I've seen them.

Q. Have you ever seen one?

A. I said, I have heard of those and seen them. I just never had one like that.

Q. That's fair. While you're being transported up to Crawford County, you got out of your restraint belt, and then you started working on getting your leg shackles off, correct?

A. I don't recall that, sir. They should have a video on that if it was true, if I did do that.

Q. But as you sit here today, you're telling us that you don't know whether you did that or not?

A. I don't recall doing that, no.

Q. So it's possible that you did do it?

A. I'm not going to lie. I just don't -- I can't recall. I don't know why I would do that to begin with. I know why I did the leather is so I could just keep my guard up, you know. Give me a little bit of fighting chance.

Q. From Mason Berry?

A. Yeah. Absolutely.
Q. We're going to get to that part about Mason Berry later. So your testimony here is that you escaped from at least one portion of your restraints, the belt, because you were concerned that Mason Berry was going to do you some physical harm?
A. I mean, yes. They're not going to catch me slipping like that, you know what I mean, if I can keep from it.
Q. I understand. I gotcha. I gotcha.
A. I don't want to do it twice.
Q. Gotcha. But this was before, right? This was before you allege that you got caught slipping with Anthony, right?
A. I'm sorry?
Q. We'll move on. So you got those restraints off. You may or may not have been working on your leg shackles, and they got you to the detention center, correct?
A. Yes.
Q. In Crawford County, I'm sorry. Crawford County?
A. Yes, sir.
Q. All right. So when you got to Crawford County, tell me what happened.
A. Pretty insignificant, I guess. They just transported me back to the medical isolation where they usually keep me because of my health problems and my former, I guess,

employment, and they keep me out of population. Just that. Pretty uneventful.
Q. Even if you're in, we'll call it isolation or a medical cell, whatever, you still have to have interaction with the guards, right?
A. There is a -- in that certain facility, when you are in that environment, there is like a sky roof or a window that they -- you can see up to them, and they are looking down on you.
Q. Somebody has got to bring you some food, right?
A. Yes.
Q. Somebody has got to bring you blankets, if you ask for some, or a pillow or a mat, correct?
A. Common practice for most places, yes.
Q. When you're in an isolation cell like that, did they take your mat away from you each morning?
A. Don't recall. I really don't.
Q. But you would agree that detention facilities will take mats from prisoners during the morning and then give them back to them at night to keep them from doing whatever, tearing the mats up or whatever they are going to do to them, correct?
A. I mean, I can't speak for somebody else's policies. I've never been involved in anything like that.
Q. So when you got to Crawford County, you testified

yesterday that you didn't have anything wrong with you, correct? You didn't have any injuries, correct?
A. To my knowledge, no, not at all.
Q. I think the government asked you, they went through, you didn't have a mark on you, you didn't have any bruises or cuts or lacerations or rashes or anything like that, correct?
A. No. I don't act up to get my mat and stuff taken away.
Q. I'm asking you that, yesterday, the government asked you, when you got to Crawford County, you didn't have any cuts or bruises or any injuries on you at that time, did you?
A. No, not then. Not to my knowledge, no, sir.
Q. And the reason that was an important question is, in order to set up your later story, we've got to show that you showed up there without any injury, correct?
A. Okay.
Q. Is that correct?
A. I would assume.
Q. So they put you in the isolation cell. You're in there for two or three days, and you make your first medical request, is that correct?
A. It was more like a medical emergency. I didn't request anything because there's proper paperwork you fill

out to request something.
Q. So you were in there two or three days, and then you had some sort of medical event that you needed help with, correct?
A. Yes.
Q. And this is going back to Franklin County when you were being booked in. You testified yesterday -- because I wrote it down -- that while they were checking you in, you had asked to see the nurse at Franklin County. You said yesterday you faked medical assistance to escape, correct?
A. Yes. I don't remember saying anything about a nurse, though.
Q. I'm sorry. I looked at my stuff here. I wrote down that you said, "Faked medical assistance to escape Franklin County," is that correct?
A. I just faked it to get them inside of the room, yes. That was my ultimate goal, yes.
Q. And your medical condition, you've got some kind of medical condition with your heart, correct?
A. Yes.
Q. Isn't it true that that's your go-to move to try to find opportunities to escape?
A. No, sir.
Q. Well, you consistently and constantly allege that you have medical issues when you are in jail, do you not?

MR. SONGER: Objection. It's argumentative. There's no facts in evidence to support that.

THE COURT: Sustained. Rephrase.

MR. WOOD: I'll just move on.

Q. (By Mr. Wood.) When you were at Crawford County, you were there a little while, and then you told them you needed to go to the doctor, correct?

A. Yes, sir.

Q. And you knew that meant with your heart condition, that now they would have to transport you to the hospital, correct?

A. I mean, I was hoping they would, because, I mean, I've had this problem since I was three years old. It's all documented from Children's Hospital all the way up until I was an adult. It's all there.

Q. Yeah, I'm not contesting that. I mean, I think you have a legitimate medical issue. But you made the medical request knowing that the heart condition -- and it's called SVT, correct?

A. No, sir.

Q. What's it called?

A. Atrial fibrillation and then brachycardia.

Q. Supraventricular tachycardia, correct?

A. No.

Q. Okay.

A. I have a cardiologist you can speak with.
Q. We'll come back to that.
A. To confirm what I know I have.
Q. We'll come back to that in a second. You had a heart condition. You knew that would get you transported to the hospital, correct?
A. I was hoping so, yes.
Q. And you knew that the hospital was a much less secure place than the isolation cell you were in at the time you made the request, correct?
A. Didn't even cross my mind.
Q. So you go to the hospital, and Crawford County sent two deputies with you, right?
A. I can't remember if it was two or one. Obviously, it was one, but I don't remember how many there was.
Q. They sent some police with you and they took you to the hospital, correct?
A. Yes. I want to say my heart rate was 221, I think.
Q. Yeah. I mean, like I said, I think you've got some sort of heart condition. And so that was Baptist Health, correct?
A. I don't know what they call it now, sir. It's just the one on the hillside in Van Buren.
Q. And I wanted to touch on a couple of things that you said yesterday. You said that the beating that you took

from Sheriff Boen caused you kidney failure or kidney problems, correct?
A. I never said kidney failure, sir.
Q. You said it caused you kidney problems, right?
A. I don't recall saying kidney, anything about kidneys. I'm not a doctor to diagnose myself. I know I was pissing blood, and I wasn't before that.
Q. Well, the government asked you, "Mr. Phillips, because of this vicious beating, you had problems urinating, right?" Do you recall that?
A. It was painful, yeah.
Q. Yeah. And you said something to the effect, "Yeah, my kidneys were messed up and I was peeing blood," right?
A. I didn't say that yesterday. I try to leave that kind of stuff out, to be honest with you.
Q. But you did say that you were peeing blood?
A. I don't recall saying that yesterday. I'm saying it now, yeah. If you want to get detailed about it, yeah.
Q. Do you recall your testimony from yesterday?
A. Yes.
Q. Will you at least admit that the government asked you if you were having problems urinating after this beating?
A. I said yes.
Q. So you go to the hospital in Crawford County and they do their thing on you, some tests and whatnot.

MR. WOOD: Your Honor, we have Defendant's Exhibit -- pull it up. Take it off just a second. This has been stipulated to by the parties. What number is it?

MR. SONGER: For the record, it's Government's Exhibit 21. Not Defendant's.

MR. WOOD: Okay. I missed them entering it yesterday. So it's Defendant's Exhibit Number 21 stipulated to by the parties.

MR. SONGER: So the record is clear, this is Government's Exhibit 21, and it has not been offered into evidence yet.

THE COURT: Mr. Wood, you are offering Government's Exhibit 21, which is a set of records from Baptist Health with a cover affidavit from the custodian, making it self-authenticating. Have I described that correctly?

MR. WOOD: Yes, Your Honor. It was stipulated to. It was identified as Government's 21. They did not offer it. We can make it Plaintiff's whatever, or we can leave it as Government's 21 if you want.

THE COURT: Well, I suppose it doesn't really matter to me, but I just need to know what you want to refer to it as so I can admit it on the record.

MR. WOOD: Government's 21.

THE COURT: Government's 21 is received by

stipulation.

(Government's Exhibit 21 received)

MR. WOOD: May we publish that, Your Honor?

THE COURT: You may.

Q. (By Mr. Wood.) So what we have here is your medical records from Baptist Health. And do you see that document?

A. Yes, sir.

Q. So at the top of it next to the Baptist Health, it says, Justin Phillips. Do you agree with that?

A. Yes.

Q. Blow it up just a little bit. On the right-hand side, it says, admit date, 9-14-2017, at it looks like 5:46 p.m. Do you see that?

A. I think it was 1800 hours, 1846. Yes, I see it.

Q. You would agree that the medical records says 5:46?

A. I mean, no, but you can call it what you want.

Q. Do you understand, you see there that it says the discharge date, 9-14?

A. Yes, sir.

Q. And it says your discharge time was 8:01. And the file mark, there's some kind of file mark over it, but that's p.m. Do you agree with that?

A. Appears as such, yes.

Q. So this is the medical record. And I assume that you told the doctors when they brought you in truthfully and

accurately what was wrong with you, correct?
A. To the best of my ability. I told them my symptoms.
Q. Good deal. And so it says, "Presentation, presenting complaint. Patient states he has a history of SVT." Do you see that?
A. Yes.
Q. Do you dispute that?
A. I do not.
Q. So let's go back to SVT. You actually have a condition known as supraventricular tachycardia, correct?
A. To my knowledge, not anymore. That's what it started out when I was a kid, and that's how they diagnosed it. I was going to get an ablation on it and get it fixed, but then I went to another cardiologist and they overruled that.
Q. All right, then.

MR. SONGER: Your Honor, I apologize. We have no objection to this testimony, but I just want the record to be clear, Government's Exhibit 21 that was admitted is a nine-page document. I think Mr. Wood has just put a sticker on one page of that that he's showing. And the page that we have been showing is page 5 of the full admitted exhibit, so I just wanted to make sure that the record is clear on that.

THE COURT: Thank you. Yes. If that's accurate,

what's being displayed is page 5, and that's helpful.

MR. WOOD: That's correct, Your Honor. The other pages are not relevant to my --

THE COURT: That's fine. Just for the record, so we know what's being displayed to the Jury.

MR. WOOD: Thank you, Your Honor. May I?

THE COURT: You may.

Q. (By Mr. Wood.) So you go in there. You're complaining of chest pain, correct?

A. I don't recall chest pain.

Q. You went in there, and you also complained of fracture of clavicle, isn't that true?

A. I never said anything about that.

Q. Well, they gave you a sling to put your arm in, didn't they?

A. Yes.

Q. They didn't give you the sling to put your arm in for your heart condition, did they?

A. No.

Q. Are you trying to tell me that the people at Baptist Health just made up the fact here that you come in here complaining of a fracture of your clavicle?

A. I didn't complain about it.

THE COURT: Mr. Wood? Mr. Wood, you're misrepresenting that document. You're referring to the

diagnosis, and you're questioning him about what he said. So there's no foundation for this line of questioning.

MR. WOOD: Okay.

Q. (By Mr. Wood.) You would agree that they diagnosed you with a fractured clavicle?

A. They took my shirt off to put the leads and the heart, the nodes or whatever, on my chest. And my clavicle sticks out about three inches where it's supposed to. And the nurse said, "Ew, that's gross." And I guess they just diagnosed it on their own.

Q. And then they also diagnosed you of having, "Impaired renal function," correct?

A. That's what it says.

Q. And that "Impaired renal function" diagnosis occurred before you were ever transported by Sheriff Boen, correct?

A. The what? Do what?

Q. This diagnosis from Baptist Health occurred before you were ever picked up and transported by Sheriff Boen?

A. Yes, sir.

Q. So at the hospital, they give you a sling to put your arm in for your alleged fracture, fractured clavicle, correct?

A. Yes.

Q. And then what happened?

A. I mean, I never got to put it on. They just gave it

to me.
Q. At some point in time, did Mason Berry show up?
A. Yes.
Q. Was he with somebody?
A. Yes.
Q. He was with a reserve?
A. A nice kid, young kid. I think it was a Lewis boy. But, I mean, he was a jailer, dispatcher. I don't know what they had him doing then. But, yes, I'm pretty sure it was him.
Q. All right. And so they transported you from the hospital back to Crawford County, correct?
A. Yes, sir.
Q. Now, how were you restrained and shackled when they took you from the hospital to Crawford County?
A. I don't really remember that.
Q. Did they put handcuffs on you?
A. I don't know.
Q. Did they put leg shackles on you?
A. I don't think so, but I couldn't testify one way or another. I know he gave me a bottled water. That was nice of him.
Q. You don't recall whether they put handcuffs and shackles on you when you left the hospital, correct?
A. Correct, I do not.

Q. So during the transport, if they put anything on you, did you try to get out of -- would you have tried to get out of those restraints because you were being transported by Mason Berry again?
A. Not that time, no, sir.
Q. So you weren't concerned that Mason Berry was going to physically injure you on that particular transport?
A. It was a coin toss, because after those spells, and they run consecutively 2 and 300 beats a minute, you don't feel much like anything. You're wiped out about three days, takes about three days to get feeling back to normal.
Q. So then would it be fair to say that if you made statements to the hospital personnel for purposes of diagnosis, that those statements recorded by the hospital personnel would likely be more accurate than your memory here today?
A. I can't speak on their behalf. I know it was wrong -- I've done so many. It's done it five times since last Friday. Haven't gone to the hospital yet. Sometimes it stops on its own; sometimes it doesn't. It has done it since I was a kid so I can usually -- I feel when it comes on. I mean, it's like knowing when you have to go to the rest room, you know.
Q. But when it happens, then it totally messes you up, correct?

A. Absolutely.
Q. Now, on the way back to Crawford County, isn't it true that you actually told Mason Berry that you wanted to go back to Franklin County versus Crawford County?
A. That's true.
Q. Because at Franklin County, you've always been treated well, correct?
A. For the most part, yes.
Q. They get you back to the Crawford County Sheriff's office, and then what did they do? Did they take you into booking or what?
A. You walk through booking, yes, sir.
Q. Who did?
A. I don't know. One of the employees there. They just walk you through booking and take you back through the back, like a tunnel.
Q. But, I mean, they pull up in -- Mason and this reserve deputy pulls up in the sally port. They just hand you off to Crawford, right?
A. Yes.
Q. Crawford County, they just take you in, put you wherever you came from, isolation cell or whatever?
A. Medical, yes.
Q. Couple hours later, three hours later, whatever it was, they wake you up and say, "Franklin County is here to

get you," correct?
A. Yes, they did.
Q. And so in preparation for you to be transported, did Crawford County shackle you up, restrain you, put anything on you?
A. I don't think so. I think it was -- I'm pretty sure it was Deputy Berry, but I don't want to swear to that. Because usually, it's the agency that's picking them up, they use their own equipment. So the other county is not going to use their equipment, see what I mean?
Q. No, I think you're right. They brought you up and probably put you in the drunk tank or an isolation cell up front, did they not?
A. No.
Q. You are saying Mason come back through the jail and shackled you up in your isolation cell?
A. I didn't say that.
Q. They walked you up front to meet Mason and he shackled you up, or whoever, Mason or the Sheriff?
A. The Crawford County deputy, or the Crawford County jailer brought me up. He and I talked briefly. Like I said, the Sheriff got buzzed through the door. He went into the rest room. And then they were -- the book-out process, or the book-in process that they didn't do a few days before that, on the AFIS system, it's an automated

fingerprint identification system. They take your picture and your fingerprints. Then once they got their paperwork finished, they give me over to Franklin County. The only two guys from Franklin County that were there that I saw was Mason Berry and Anthony Boen.

Q. So at some point in time, somebody restrained you, shackled you?

A. Yes.

Q. It may or may not have been Mason Berry, correct, according to you?

A. Correct. I'm pretty sure it was him, but I don't want to lie under oath and say it was 100 percent.

Q. I know. How did he restrain you? What restraints did he put on you?

A. I didn't say he did. I said, I'm pretty sure he did. But whomever put them on, it was shackles, belly chain, set of handcuffs. And then something that ties your wrists to your waist right above your -- right at your abdomen, give or take.

Q. And was that the chain or was that the leather belt?

A. The chain.

Q. Did they subsequently take your handcuffs and attach them to the belly chain?

A. I don't know how they did it, but it was done.

Q. Once they got done, let me make sure I understand your

testimony. Your testimony is, once whoever put this stuff on you was done putting it on you, you had a belly chain around your waist, correct?
A. Yes.
Q. And your hands were handcuffed or attached to the belly chain in some form or fashion?
A. Yes.
Q. And once that happened, how far can you move your hands once they get attached to your belly chain?
A. Not far enough.
Q. Well, would it be fair to say that you can only --
A. An inch, two inches at best.
Q. So once that stuff gets on you, then that's about all you can do right here, is that correct?
A. Yes.
Q. Did they have leg shackles on you?
A. Yes.
Q. Did they have the chain that goes from the belt or from the handcuffs down to the leg shackle chain?
A. I don't know, sir. I don't think so. I don't remember that, but I don't think so.
Q. Well, I mean, you know what I'm talking about, the chain that goes from the handcuffs to the leg shackles?
A. I do.
Q. Your testimony is, you don't think you had that, or

you don't recall that, correct?
A. Right.
Q. So who put you in the car?
A. I got in on the Sheriff's side in the back seat, but I don't remember who opened the door, who put me in.
Q. When you're in those restraints, the belly chain, and the restraints are right here, this is all you can do. You can't even scratch your nose with them things on, can you?
A. It never fails, it always itches when that happens.
Q. Yeah. But my question is, in fact, you can't even scratch your nose or anything with those belly chains on, can you?
A. I can't.
Q. You can?
A. I can't.
Q. So you get in the car. Somebody places you in the back passenger seat. Your training as a law enforcement officer, is that standard practice to put a prisoner or suspect in the back passenger seat?
A. Just depends.
Q. So you guys are in the vehicle and you hit the road. So you all are driving down the road. And at some point in time, the decision is made to pull over at the Mulberry exit by Mason or the Sheriff, correct?
A. Yes.

Q. And isn't it true that during the ride, that the Sheriff told you to, "Sit back," to "Sit back" a couple of times?
A. I don't recall that. I sat back as far as I could go. Have you ever been locked in a seat belt against the seat? You can't go very far.
Q. We're going to get to that too.
A. I wasn't giving him no nonsense, because he was upset.
Q. That's right. You were on high alert, correct?
A. Just minding my Ps and Qs.
Q. But during the trip, you kept leaning forward and hiding behind the partition, didn't you? Hiding your hands behind the partition, correct?
A. No.
Q. During the trip, after the Sheriff told you to, "Sit back, sit back" a few times --
A. He didn't say anything like that.
Q. At some point in time --
A. I wish there was a video of it. It would answer a lot of questions, a lot of doubt. Make your job easier.
Q. I think that it would.
A. I do. I do too.
Q. At some point in time, you were able to get one of your cuffs off, correct?
A. No, sir.

Q. Well, wait a second. You just testified that when you're in danger, you're not going to get caught slipping. When you think you're in danger, you get those cuffs off, correct?

MR. SONGER: Objection. Mischaracterizes his testimony.

THE COURT: Sustained. Rephrase.

Q. (By Mr. Wood.) You just testified that when you feel threatened or in danger, that you will take those cuffs off?

MR. SONGER: Objection.

THE COURT: Sustained. Rephrase.

A. I just got told, "If you live through tonight, you piece of shit, you will remember it forever." And thus far, he's been correct. "You're going to the twilight zone. And no one is going to believe a piece of shit like you." So, yeah, you bet your ass that I sat against that seat with my hands where they were tied and I didn't say a word or make a move.

Q. (By Mr. Wood.) But isn't it true that if you feel you're in danger, that you'll take actions to protect yourself?

A. To the best of my ability, yes, sir.

Q. And isn't it true that you have the ability to get out of the handcuffs?

A. At times, yes.
Q. And if you felt in danger, would that be the type of situation where you would want to get out of your handcuffs?
A. You would think.
Q. So we're going down the road. And at some point in time, then you started attempting to tear the rear -- to cause damage to the rear of the patrol unit, correct?
A. No.
Q. You didn't do any -- did you do any banging around back there?
A. No.
Q. Did you do any hitting of the plexiglass partition?
A. No.
Q. Did you break the plexiglass partition?
A. I felt like hell. Just got out of the hospital, and I didn't have it in me. Even if I would have or felt in danger or anything, I mean, there was nothing you can do. I thought he was bluffing. I really did. I thought he was just trying to scare me, all the stuff he was saying.
Q. So at some point in time, they pull over, right?
A. (nods affirmatively.)
Q. So tell me again, when they pull over, what were the surroundings like?
A. Started misting rain. It was dark. Kind of chilly.

Q. Was it rural?
A. Yes.
Q. Were there any street lights?
A. No.
Q. Was there any traffic coming?
A. No.
Q. It was off of an exit, kind of down off the interstate some?
A. Yeah.
Q. When the Sheriff opened the back door, did the dome light come on?
A. I don't remember the dome light or anything. I don't know who opened the back door.
Q. Would it be fair to say that it was pitch dark?
A. Pretty dark.
Q. And it was raining?
A. (nods affirmatively.)
Q. Were the blue lights on?
A. Not that I can remember.
Q. I'm sorry. I couldn't hear that.
A. Not that I can remember, no. I don't know.
Q. So we're talking dark, dark?
A. Pretty dark.
Q. Hey, I don't know if I asked you this. Was Mason Berry's unit, did he have tinted windows on the side doors?

A. I don't know. I don't know.
Q. So ya'll pull over. You come to a stop. Tell me, what was the next thing you saw?
A. Sheriff Boen to my right. Like here's the car door. Mason is coming around here. He's a bigger guy, so he's kind of squeezed in. Next thing I saw was Sheriff over here. And then a fist in my face. Not much after that.
Q. So let's back up. So we come to a stop. First of all, who called in that you were escaping on the radio?
A. The Sheriff.
Q. Sheriff Boen made that call?
A. (nods affirmatively.)
Q. And of that, you're certain?
A. 100 percent.
Q. 100 percent certain. If that didn't happen, then none of this happened, right?
MR. SONGER: Objection.
THE COURT: Sustained. Argumentive.
Q. (By Mr. Wood.) Sheriff Boen, no doubt, made the call in to dispatch?
A. Without a doubt.
Q. And when he made that call, you heard the radio just light up, didn't you?
A. When I heard the -- when I heard the response, like I said, I thought he was still joking, because you can key up

a microphone sometimes and make it sound like you transmitted. But then when I heard someone come back on there, I thought I was going to puke in my mouth.
Q. And that's because you heard lots of other police officers saying on the radio they were headed to ya'll's position, correct?
A. I just remember hearing the lady say something about, copying the traffic. And then I just heard the rest of them, whomever was on duty that responded and said, they was 10-19, their location. Then they were asking, best of my recollection, asking exactly where were we at.
Q. So you stop --
A. But they wouldn't answer them.
Q. So you stop. And I wasn't real clear about who did what at that point in time. Did the Sheriff jump out?
A. They both got out.
Q. But Mason Berry and the Sheriff both bailed out of the vehicle at the same time?
A. Pretty close to the same time, yes.
Q. Did Mason go around the front, or did he go around the back?
A. I was trying to get over to the other side of the car. I wasn't really paying attention to which way he came. But when he came, he came.
Q. But the Sheriff was there on your side. So he just

opens his door and he's right there at your door, correct?
A. Yes.
Q. And then do you know who opened the door?
A. I don't.
Q. Now, prior to the Sheriff jumping out, was he doing anything that caused you some serious concern?
A. He was putting on some like neoprene-type gloves with some lead, I guess, bars in them. That concerned me.
Q. So we'll talk about that a second. You're saying that the Sheriff put -- what color were they?
A. Grayish. Dark, charcoal gray.
Q. Could it be that you've called them black in the past?
A. I don't know what I called them in the past, but I'm telling you that's what they were.
Q. So you're telling me that he put on a pair of dark-colored gloves. When did he put those on?
A. Right before he kicked my ass.
Q. And how did you see that if it was so dark?
A. Because we were on the interstate. There's lights there.
Q. All right. So he puts on these gloves. How do you know that they have got lead and metal strips in them?
A. One reason is because I felt it when it made contact with my face, my body. And, two, there's like little pockets. Like if I were to lay something down here and

then put a piece of cloth over that, you can see the protrusion from that. And plus, I was a cop 14 years. I know what a pair of ass-kicking gloves look like.
Q. And these ass-kicking gloves, where was all this lead and metal strips at?
A. The knuckle portion.
Q. How wide were they? I mean, were they just little strips or did they cover the whole swath of the knuckles?
A. About the size -- a little smaller than a domino, about the same size, shape. Little wider than a domino, but not as long.
Q. And so you saw him putting these ass-kicking gloves on?
A. Yes.
Q. And then he jumped. And then what did you think then? When you saw him putting the ass-kicking gloves on, what did you think then?
A. I was hoping he was still just trying to scare me.
Q. So then the Sheriff got out of the vehicle. Your door opens up. And did you know who opened the door? I think I've already asked that, but I forgot.
A. I do not.
Q. So when the door opens up, who is the first person that you see?
A. Pretty much both at the same time. Mason is the first

one that I felt.
Q. Now, I think I may have this wrong. Did I hear you testify yesterday that they opened the door and drug you out?
A. They didn't.
Q. Who else -- who would have drug you out?
A. Just Mason Berry, drug my face out, my head.
Q. I'm sorry. I didn't mean to step on you there.
A. You're fine.
Q. So they -- somebody opens the door. You see them both about the same time. And then Mason Berry reaches in and pulls you out?
A. He reaches in and grabs me like that. And he pulls my face out with my body attached and holds my face, positions it.
Q. So when they opened the door, whoever opens the door, somebody opens the door, did you try to kick them?
A. I don't think I had enough time. I was trying, I was trying to get over to the other side of the car. But, yeah, you bet, I would have done anything I could.
Q. But it's kind of important, okay? It's kind of the whole reason that we're --
A. I couldn't get my legs up to kick, or I would have. I would have done anything I could at that point, but it wasn't practical. It wasn't possible. Not enough time.

My feet were stuck up under there.
Q. Would it be fair to say that you were trying to kick them?
A. No, I wasn't trying to. I wasn't in the process of trying to kick them. I said, you bet your ass I would have kicked them, or whatever it took to avoid what happened, but I couldn't at that time.
Q. So would it be fair to say -- so as I understand your testimony, you weren't even trying to kick them?
A. No.
Q. Do you recall testifying in front of the Grand Jury?
A. Yes.
Q. Do you recall testifying in front of them on June the 26th, 2019?
A. I don't know what day it was, sir. Sounds right.
Q. Do you recall that you were administered an oath or sworn in or something and told to tell the truth, correct?
A. I would assume, yes, sir.
Q. But of course you told the truth, correct?
A. Yes, absolutely, I told the truth.
Q. So I'm looking here at your Grand Jury testimony. And just now, you testified that you were trying to get to the other side of the vehicle. When then opened the door, you was trying to get to the other side, correct?
A. As far away from them as possible, yes.

Q. So if you're sitting in the vehicle, and the door is on your right-hand side, and you're sitting there, and they swing the door open, and you're trying to get to the other side, right? That means you turn and was trying to get laid back to scoot over to the other side, correct?
A. I mean, I don't know all the techniques. Apparently, it didn't work very well for me.
Q. Was it that you were -- I'm trying to figure out what that means, trying to get to the other side. Did you lean to your side and try to lay your head down in the seat, what would be the rear passenger seat of the back of the unit?
A. I don't know my -- how my physique was or how my posture was. These charges that we read about, I mean, I would have agreed to anything to get out of that jail. If they would have said, "You're a child molester if you will sign this," I would have signed it. If they would have said, "You're a murderer if you sign that," I would have taken any deal they had, and I would have got away from them any way possible to get away from them at that time, and to get out of their jail at that time.
Q. I just need to know what your testimony was and meant. When you say, "I was trying to get to the other side," when you say -- when you testified here, "Trying to get to the other side." You're sitting there. What does that mean?

What did you do? What were your actions?
A. I felt like I was just running in place, basically. Just trying to slide over, get away from him.
Q. Would it be fair to say that if somebody opens your door here, they yanked it open, and they got ass-whooping gloves on, that you're going to lean in or try to get your head as far away from that as possible?
A. I was just trying to get away from that opening door.
Q. How did you do that? That's my question.
A. I didn't, apparently.
Q. So you remember testifying to the Grand Jury; yes?
A. Okay.
Q. And you were asked about this exact situation. Let me see. I don't know if it was Mr. Songer or Mr. Carter.
Mr. Songer asked you, question, "Let me jump in for just -- just a minute. You said you were trying to get to the other side of the car. Why were you trying to do that"?
Your answer was, "I was -- because I knew they were coming in this door. I'm trying to get to the other side to get at least -- at least I was going to at least try to kick them off my feet because I couldn't -- I couldn't -- I couldn't even put my hands up," which I assume means you couldn't do this, because your hands were restrained.
Do you recall that testimony?

MR. SONGER: Object, Your Honor. He's just reading Grand Jury testimony. It's also not inconsistent with what this witness said.

THE COURT: That wouldn't be inappropriate if there were an inconsistency there.

MR. WOOD: Your Honor, he testified that he did not try to kick them. And right here, he says, "I was -- I was at least trying to kick them off my feet."

THE COURT: So you've now read it. Ask him if that was his testimony, and then you can move on to your next question.

Q. (By Mr. Wood.) Was that your testimony?

A. It's just jumbled words. I mean, it's the same -- it's the same story each time, but it's not -- it's going to be consistently the same, whether they put different pronouns --

THE COURT: Mr. Phillips? Mr. Phillips?

THE WITNESS: Yes, Your Honor.

THE COURT: The question is, do you agree or disagree that that was your testimony to the Grand Jury?

THE WITNESS: It was my testimony, yes.

Q. (By Mr. Wood.) All right. So the first thing that happens once the door opens, your testimony is Mason Berry grabs you by the face and pulled you out of the vehicle?

A. The face and head.

Q. How far out of the vehicle did he pull you?
A. I mean, across the roof threshold. I mean, my head was out and my body was still in.
Q. And then what happened?
A. I was hit in the face.
Q. With what?
A. Sheriff's fist.
Q. Well, it would have been the Sheriff's ass-whooping gloves, right?
A. That helped him, yeah.
Q. He had the gloves on at this time, right?
A. Absolutely.
Q. He hit you in the face. What happened then?
A. I started bleeding.
Q. And Mason just continued to hold your head?
A. Not the whole time, no.
Q. So tell us what happened. Mason grabbed you?
A. He got out of his way. Mason got out of the Sheriff's way so he could get some better shots, I assume. I don't know. Maybe he didn't want to do it. Maybe he changed his mind. I don't know what he did. I can't think for Mason Berry.
Q. I'm not asking you to do that.
A. I know if it wasn't for Mason Berry, we probably wouldn't be having this conversation, though.

Q. Well, you said yesterday Mason Berry saved your life?
A. That's what I'm saying.
Q. He's your hero. He saved your life, right?
A. Not my hero, no.
Q. He saved your life. At some point in time, Mason releases you. And your testimony is the Sheriff is just still beating on you, correct?
A. That's correct.
Q. And then at some point in time, Mason Berry jumps in and stops the assault?
A. He slows it down. He doesn't stop it.
Q. I thought he got in between you guys?
A. No. They got into a verbal disagreement, altercation, who knows what you want to call it, back and forth. And the Sheriff is like, "Uncuff this piece of shit. Uncuff him, get him out of the car." Mason was like, not verbatim, but, "Let's get the hell out of here before someone comes. He's had enough. Let's get the fuck out of here."
"Let me get one more hit on him, at least." He makes good with that, and then we get in the car and we leave.
Q. So everybody gets loaded back up into the car after it's over with?
A. I never got out of the car. Just my face.
Q. Those two get loaded back up into the car?

A. Okay.
Q. And you guys head off to go to Franklin County Detention Center, correct?
A. Yes.
Q. When you got to the detention center, and they tried to get you out of the car, in fact, what happened was you were resisting those officers, correct?
A. I mean, that makes the report sound better, but that's not the way I see it. That's not what happened. I just had my ass handed to me, and I was already sick, and I wasn't putting up much of a fight. About six or eight of them, and they drug me in like a hog-tie. They opened the door with my head.
Q. We're going to get to that. I'm going to let you tell all that.
A. I remember.
Q. But actually what you said was that, when they got you out of the vehicle -- let me ask you this. When they got you out of the vehicle, was there a gauntlet, a line of officers and deputies there?
A. Yes.
Q. And in fact, your testimony, or you have said that you were dragged through this gauntlet of officers and deputies, correct?
A. I didn't say that. You changing my words up and

rolling your eyes isn't going to make the story change at all. You understand that?
Q. I understand it just fine. Haven't you told people that you were pulled through --
A. When I pulled -- when they pulled up, I was barely able to see out of the slits of my eyes. I saw all the officers. Just knowing they're -- because they've been misled to think I tried to escape again.
Q. Well, I didn't ask -- I'm not --
A. You're asking about --
Q. You can testify when the government -- they will have a chance to redirect you. You can get all this stuff in that you want to tell everybody, okay.
My question is, whenever they got you out of the car, didn't you say that there was a line of deputies and officers there that all took shots at you and hit you as you were going into --
A. You're out of there, man. I didn't say any of that. You're just adding your own story.
Q. Well, yesterday --
A. Yesterday, I said the same thing that I said yesterday and the day before and a year ago and two years ago, and the same thing I will say tomorrow. I mean, it doesn't change. The characters don't change. The story doesn't change. It doesn't get added to, it doesn't get taken away

from, when I saw the officers standing there.
Q. Yesterday, you testified that when you got out of the car, there was a, "Goon squad." That's what you said.
A. That's nicer than what I think of them. Figured it more appropriate just to call them that than what I really think.
Q. I know. You have a lot of animosity for law enforcement, don't you?
A. I do. Because I know it can be done without -- I know it can be done properly without doing all that, because I did it for 14 years.
Q. Well, do you recall talking to the --
A. That's why I stayed unhurt for four months being in population in the same county that I worked for all those years. I didn't get a hair on my hair touched. It's not because I'm just tough. It's because I didn't treat people like that.
Q. I understand. Do you remember talking to the FBI? This is not the Grand Jury testimony, this is the FBI interview that you did with FBI Agent Ferguson?
A. I don't know what you're talking about.
Q. You don't recall ever being interviewed by the FBI about this incident?
A. I recall being interviewed, yes.
Q. Well, then you do know what I'm talking about?

A. I don't know what -- I don't know what time you're talking about, which time you're talking about. It wasn't just, you know, Agent Ferguson.
Q. Well, let's talk about, how many times have you been interviewed by the FBI about this allegation?
A. Twice that I -- twice, for sure. You can ask them. I didn't want to talk to them, either.
Q. And the two times that you were interviewed by the FBI, who interviewed you?
A. The first two times? What did you say? Which two times are you even talking about?
Q. Both times. You said you were interviewed twice. Both times, in each one of those, who interviewed you?
A. Matt and Reuben.
Q. Do what now? Who?
A. Matt and Reuben.
Q. Agent Ferguson and then Agent Reuben Gay, correct?
A. Right. That's correct.
Q. And it's your testimony that they have interviewed you twice?
A. I said at least twice, because I was incarcerated in prison the first time we spoke. And to be honest with you, I didn't really want to talk to them about anything because I made a deal with Anthony that I would keep my mouth shut. And I try to keep -- I try to be good on that because --

Q. I understand that you've got a story that you want to tell, but I didn't ask you anything about that, okay? Do you understand that?
A. Honestly, I don't even want to tell this story. I'd rather not even be telling this story.
Q. Then we won't tell it, but I'm just trying to ask you the questions that I --
A. But I've answered it twice. I don't know what's confusing to you about it.
THE COURT: Mr. Phillips?
THE WITNESS: Yes, Your Honor.
THE COURT: Listen to his question.
THE WITNESS: Yes, sir.
THE COURT: If you can fairly answer the question directly, answer it directly and stop with the additional editorial comments.
THE WITNESS: Yes, Your Honor.
THE COURT: If he asks a question that can't be fairly answered directly, that's different, okay?
THE WITNESS: Yes, Your Honor.
THE COURT: But answer the question and stop, because a lot of your comments are nonresponsive to the questions being asked.
THE WITNESS: Yes, sir.
MR. WOOD: May I, Your Honor?

THE COURT: You may.

Q. (By Mr. Wood.) Let's try to clean this up a little bit.

At the time that you arrived at the Sheriff's department, you were drug through a group of police officers that took shots at you and hit you, correct?

A. I was drug by a host of police officers.

Q. From the car until you get into the doorway of the detention center, you've said you were drug or went through a group of officers who all hit you, is that correct?

A. I didn't say that.

Q. And then -- okay. At some point in time, you came in contact with some jailers who were bringing you in the facility or taking you back, correct?

A. They were all cops. They were badge-wearing, gun-toting cops.

Q. So it's your testimony you deny that you have ever said that you were taken out of the vehicle and drug or walked through a group of police officers who were all taking shots at you?

A. Rephrase your question. I don't understand what you're even asking at this point.

Q. You pull up into the sally port. You're in the back. They open up the door. And you said there was a lot of police officers there, correct?

A. Six to eight, yes.
Q. "Goon squad," correct?
A. Yes.
Q. And at that point in time, they removed you from the vehicle. And you were dragged, and a group of them, some of them took shots at you and hit you, is that correct?
A. I was drug and carried, like you're being hog-tied from the car into the building. From that, I recall my head getting hit against the cement wall.
Q. I'm going to stop you right there. We're not to that part just yet. I'm just asking you from the vehicle to the entrance of the facility, is it your testimony today that nobody hit you? Nobody did anything?
A. That's not what I'm saying. You're not listening to me.
Q. So from the car to the entrance door of the facility, tell me what happened.
A. Again, I was drug and carried six to probably about eight or nine feet, from the passenger side of the cop car that I was in, to the right, parallel to the trunk, up on the little curb through the metal door, like basically used as a battering ram when my head got in the way. The only officer I remember -- obviously, I could feel things, it was uncomfortable -- was the guy with the tattoo on his arm and his hand. Because in my mind, at least, he was the one

that was responsible for the majority of my head hitting the walls.
Q. I didn't ask for inside the facility. Would it be fair to say that your testimony is, from the vehicle to the doorway of the jail, that you're saying nobody --
A. I was never given the opportunity to walk or get out on my own.
Q. You were dragged, correct?
A. And carried.
Q. From the car to the detention facility doorway, while you were being dragged or carried, did anyone take shots at you or hit you?
A. To my knowledge, no. That didn't happen until we got inside.
Q. I'm trying to get to that part. Inside the facility, are you still being dragged? What did you say, dragged or walked? Or what did you say?
A. Carried.
Q. Carried. So once you get in the facility, you're being dragged or carried, and you only remember one specific person, right? The identity of one of those specific persons?
A. Yeah, because I couldn't see very well. And my hearing is bad in one ear, so there's single pairs of feet. I can hear them loud back and forth, back and forth. But

he was the one closest to this left side of me, because I was looking down at the ground.
Q. I think I'm getting the picture. They go into the detention facility. You're still being carried and dragged, right? And there's still a group of them that's taking you through the facility, correct?
A. Yes.
Q. Now, your testimony today, or yesterday, is that during that portion, that one of the officers was, at every corner, was ramming your head into the walls as you all went around every corner, correct?
A. He was at least part of it, yes. But I could only identify him by what he had on his arm. I'm not saying he was the only one doing it, but that's the only one I needed to remember.
Q. Well, let's just do this. While you were being taken through the facility, you're being -- at every corner, somebody in the group, one or more of them, is ramming your head into the walls as you go, correct?
A. Hence the reason I refer to them as the "goon squad."
Q. Okay. Great. Now, the Sheriff wasn't part of any of the carrying or dragging you through the facility, correct?
A. I don't know.
Q. You have no evidence as you sit here today that you could provide this Jury that says the Sheriff was part of

the group carrying you or dragging you, correct?
A. There should be video of that, so I don't know. I know that my face is pointing towards the ground. So now if you will look down at the ground, and then they stand above you, unless you got eyes in the back of your head, how are you going to see? If you can do that, I mean, that's --
Q. I understand. I'm just saying, as you sit here today --
A. I don't know if he was or not. There was several of them.
Q. Thank you. And so they are taking you through the facility, banging you around. And where did you end up? What part of the facility did you end up in?
A. In the hole.
Q. All right. When you got to the hole, how long were you in the hole?
A. Until I saw Ms. Capp three or four days later, because that's when they let me have some clothes and dressed me up.
Q. Let me ask you this. When the "goon squad" was carrying and dragging you through the detention facility, and members of that squad were ramming your head into the walls around every corner through the facility --
A. I didn't say every one of them, but, yeah.

Q. This obviously caused you a lot of different injuries to your face and head, correct?
A. Just my head.
Q. At a minimum, it caused injuries to your head?
A. I mean, yeah, up here. Sure did.
Q. Well, are you testifying that during all of these actions of slamming your head into the walls, that you didn't hit your face anywhere?
A. No.
Q. And you're certain about that despite not --
A. 100 percent, sir, on that one.
Q. 100 percent on that one. They got you into the holding cell, so I'm going to assume like, what, midnight or something?
A. I don't know.
Q. Well, let's think about it. If you left Crawford County -- can I see that timeline, please? If you left Crawford County around, you said 10:30 to midnight, correct?
A. Yes.
Q. So you got there. You would have got in the holding cell, how about we just call it approximately 2:00 the morning of the 15th?
A. Whatever sounds good to you.
MR. SONGER: Objection.

THE COURT: The objection is sustained. I mean --

MR. WOOD: I'll withdraw the question.

THE COURT: You're not testifying. You need to ask the witness a question, and he either knows it or doesn't know it, or he agrees with you or not. But that was improper. Sustained.

Q. (By Mr. Wood.) So do you recall what time you finally got settled in and the door shut on the isolation cell?

A. I don't.

Q. Do you recall what day that you met with your attorney, Ms. Sarah Capp?

A. I don't. Three or four days later.

Q. And she took some photographs, is that correct?

A. Yes, sir.

Q. And I think you all looked at the photographs yesterday. But it's true that yesterday, when you identified those photographs, you said all of those injuries were the result of the beating that you took from Sheriff Boen, correct?

A. Yes.

Q. You didn't say anything to the Jury yesterday, or let me rephrase that. Isn't it true that you didn't testify that you received injuries from this alleged incident where the jailers, or whoever, are banging your head on the wall?

A. It was a cop.
Q. But isn't it true that you didn't testify to any of those injuries yesterday?
A. No, sir, I didn't testify. You didn't show me any pictures of that. You didn't show me pictures of the top of my head.
Q. So you're saying, is it your testimony still that those injuries didn't come from this --
A. No. They came from Anthony Boen.
Q. Okay. That's what I needed to get at.
A. Yeah.
Q. And so you testified after it was all said and done, couple of days later, something, you saw Sheriff Boen and another person, and you told whoever that other person was that the Sheriff had beat on you, is that correct?
A. I didn't ever say that.
Q. After you were in the isolation cell, did you ever tell anybody that the Sheriff had been beating on you on that transport?
A. Yes.
Q. Who was that?
A. I told one of them inmates to call my dad.
Q. Did you tell anybody else?
A. Didn't really have the opportunity to. I just told Travis not to leave me with him alone.

Q. And why did you tell Travis?
A. Because he was right there beside me. And of the two, I'd rather pick him than Anthony.
Q. All right.
A. These guys were all my friends, man. Coworkers and friends. And --
Q. I understand, but I haven't asked you any of those questions.
A. You don't.
Q. You'll have an opportunity if the government decides.
Who contacted -- let me back that up. Isn't it true that Travis Ball contacted you about the FBI investigation?
A. I don't ever remember being contacted by Travis Ball about anything.
Q. Let's talk about your testimony yesterday and today. Did you meet with the government to prepare your testimony before you started yesterday?
A. I meet with them what? What did you ask?
Q. Did you meet with the government, Mr. Songer, Mr. Carter, anybody else with the federal government, to prepare and go over your testimony from yesterday?
A. Yes, I have.
Q. And how many times have you met with them to talk about your testimony yesterday and today?
A. We didn't talk about my testimony. Because I've even

asked them things about something else, and they won't tell me anything.
Q. So ya'll met and didn't talk about anything?
A. They didn't talk about anything that I want to know about.
Q. And did you all talk about the expected testimony that you gave yesterday?
A. They just talked about a lot of stuff. Mainly like rules of the Court and what to wear and just to go over my -- the times and stuff, you know.
Q. To go over your testimony to prepare you for yesterday, correct?
A. I assume, yes.
Q. It's not that -- I mean, did they talk to you about any of the issues that might be brought up with your -- any of your prior statements or anything?
A. No. In fact, it was just the opposite.
Q. Did you meet with them anytime yesterday after your testimony?
A. After I -- after he asked me stuff?
Q. Yesterday when we got finished.
A. Yes, sir.
Q. And we stopped, and the Court was in recess, after that, but before this morning, have you met with any representative of the federal government, including

Mr. Carter or Mr. Songer?
A. We were in the same room together after all this was over.
Q. I know you're reluctant.
A. No, I just -- I wanted to -- I asked them if they would take me into a room so they could clear out before I left.
Q. Did you discuss any part of the testimony that you gave yesterday?
A. I did not.
Q. Did they ask you about, or did you discuss, any of your expected testimony today?
A. Did not.
Q. Ya'll didn't talk about anything?
A. They won't tell me anything.
Q. That's not my question. Ya'll didn't talk about anything, did you?
A. I talked about if I wanted a water. Talked about getting a hotel room. Talked about what time to be here tomorrow, or today.
Q. Yesterday, I think that you testified that you were -- well, strike that.
We talked a little bit yesterday -- you did -- about your civil lawsuit, correct?
A. Yes, sir.

Q. And your testimony, as I understood it, was that you don't know what the lawsuit is about, correct?
A. Correct.
Q. You haven't or barely have met with your attorney in that lawsuit, correct?
A. Never met him. I spent three hours, exactly three hours, on the phone with him one time. It was horrible.
Q. That's fine. I can understand that. Did you read the lawsuit?
A. I have not seen the lawsuit.
Q. You understand that it's been filed?
A. That's what I heard.
Q. Do you think that it would come as a surprise to your other attorney to find out that you said that you --
MR. SONGER: Objection. "Does he think it would surprise his other attorney?"
THE COURT: Rephrase.
MR. WOOD: I'll withdraw the question.
Q. (By Mr. Wood.) You testified earlier that Mason Berry saved your life, right?
A. I felt like he had a big part in that, yes.
Q. But you also have sued Mason Berry. He's a defendant in that civil lawsuit also, correct?
A. I don't know.
Q. And you're hoping to get money from that lawsuit,

correct?
A. I never even thought about it.
Q. You never even thought about it?
A. No, I haven't.
Q. Man. Did I hear you say you filed it just so that the Sheriff just will never be in law enforcement again? That's why you filed it?
A. That's my hope.
Q. So you don't have any -- it doesn't matter to you one way or the other if you get any money out of it or not?
A. It really doesn't, no.
Q. And is it your understanding that a conviction --
MR. WOOD: May we approach, Your Honor?
THE COURT: Yes.
(bench conference)
MR. WOOD: Your Honor, I want to ask him if he has any knowledge or he understands that a criminal conviction by this Court will operate as a bar to the Sheriff attempting to dispute liability in the civil case. In other words, *Heck v. Humphrey*, you are convicted of a crime for which you are subsequently sued in a civil capacity, then you are barred, because you're at a higher burden of proof here, from disputing liability, so then it's just a matter of damages. That is extremely motivating for him to lie and give his highly -- it

potentially affects his credibility.

THE COURT: Well, you can certainly ask him if he has knowledge of what the effect of a not guilty verdict in this case would have on his civil lawsuit. If he expresses knowledge, you can go down that path. If he says he doesn't have knowledge, you can't go down that path.

MR. WOOD: All right. May I phrase it, "Do you have any knowledge of what the impact of a guilty or conviction sentence would have on your civil lawsuit?"

THE COURT: Sure.

MR. WOOD: All right. Just wanted to make sure so we wouldn't have any problems.

(bench conference concluded)

THE COURT: I think that some folks probably need a break, but if you're within a few minutes -- I'll let you get your next question out here, but if you're within a few minutes of closing or finishing up here, I'll give you five, six, seven minutes. Otherwise, we need to find a break point.

MR. WOOD: Let's just take a break now. I'm fine with a break now if you would like.

THE COURT: How much more do you have?

MR. WOOD: Not a lot. I would say 15.

THE COURT: Let's go ahead and take our morning recess. The actual time is 10:30. We'll be in recess

until 10:50.

(Jury out at 10:28 a.m.)

(Jury in at 10:58 a.m.)

THE COURT: Everyone be seated. Ladies and Gentlemen, I do my best to remember to repeat the recess instruction to you before every recess. This last time, I forgot, but as I previously explained, it applies at every recess so let me do it a little bit backwards anything.

Does anyone have anything to report to the Court from its last recess? Any issues? Any problems?

All right. Thank you. You may proceed, Mr. Wood.

Q. (By Mr. Wood.) Mr. Phillips, I just have a few questions left.

When you testified either yesterday or in our exchanges today, you may have testified that you were seat-belted in to Mason Berry's vehicle on the way back to Franklin County, is that true?

A. Yes.

Q. But you know -- do you know how to get out of the seat belt whenever you are in your handcuffs and belly chains and those types of things?

A. It depends on where your hands are positioned.

Q. But would it be true that you can undo your seat belt when you're belly chained and you have your hands cuffed?

A. Yes.
Q. I wanted to talk a little bit more about these gloves, the metal gloves with the lead and the metal strips on them, correct? That's what you testified to?
A. Like I said, I didn't design them. I don't know if they are metal or if it's lead. It's just a hard substance inside of them.
Q. And were those gloves made out of neoprene?
A. That's just what I always called it. Like I said, again, I didn't make them. I don't know what they are made of. I assume that.
Q. And are they just regular police gloves?
A. I know you can get them out of -- technology, the way it is now, you can get them anywhere, I guess. But like Galls Magazine, used to get them out of, things like that, if you wore them. I never wore them. I never had to.
Q. Who is Stacy Valiant?
A. I don't know. I'd have to see a picture of her, or him, whatever it is.
Q. You had a girlfriend at the time that you were an inmate or prisoner or whatever there at Franklin County. Do you recall what her name was?
A. Sarah.
Q. Sarah. And what's her last name?
A. I don't know, sir.

Q. But that was your girlfriend while you were there in Franklin County?
A. Okay. Yes.
Q. And what do you know about the telephone system at detention facilities? Do you know anything about those?
A. Like what do you mean? How they work? How they ring? How to answer them? What are you talking about?
Q. Do you know if they are recorded or not?
A. Yes, they are.
Q. Did you ever have a conversation with your girlfriend, Sarah, where you told her that you had a stolen vehicle stashed by the detention center?
A. No.

MR. SONGER: Objection, hearsay. Also violates the Court's order in the motions in limine.

THE COURT: Side bar.

(bench conference)

THE COURT: It's hearsay because he's asking him about an out-of-court statement, but he could rephrase it to say, Is it true that you had a vehicle waiting outside? Is that your point? And which motion in limine, really, does it violate?

MR. SONGER: I believe it's a specific -- I'm not sure exactly where we are going. But, A), it's hearsay, it's an out-of-court statement. And B), it's some

extrinsic evidence of some prior bad act.

THE COURT: Well, we've let in all this testimony about the escape. Are we talking about the same evidence?

MR. SONGER: Perhaps we can clarify this. Is this just going to the original escape from the Franklin County Jail a couple days before, the incident charged in that case? Is that the only place we're going with this?

MR. WOOD: No. It's got a couple of different issues. Number one, after he escaped from the jail --

THE COURT: On the 11th?

MR. WOOD: -- on the 11th. Between the 11th and the Sheriff going and getting him to transport him back on the 14th, the Sheriff was advised by one of our witnesses, who is on our witness list -- she was the jail administrator or something to that effect -- that she listened to his telephone calls with that girlfriend wherein he told her that, "I have a vehicle stashed, a stolen vehicle stashed, and when I get away this time, they will never catch me."

THE COURT: Well, you can ask him whether he has ever made that -- you can ask him whether, prior to his escape, he had stashed a vehicle there. And if he says, no, you can ask him whether he's ever told anyone that.

MR. WOOD: Okay.

THE COURT: But that's about as far as you can go

at this point. And then you can produce your other testimony. I mean, this is intrinsic to what is already in evidence.

MR. SONGER: Your Honor, my understanding is this call, this recorded conversation happened after, and it's not related to the original escape attempt from Franklin County. So this is a separate, just a hearsay statement about some other possible bad act that should be inadmissible and is hearsay.

MR. WOOD: Well, a couple of issues. It goes to, again, ultimately what the Sheriff -- the facts and circumstances that the Sheriff knew at the time. He had been advised that he had this vehicle. He was transporting him back and there's issues of whether or not he was trying to escape or whether he just beat him up. I will also say while it is also being offered -- well, I think it is also offered not for the truth of the matter asserted, just that he said it and that the Sheriff was aware of it. Not whether or not he actually had a vehicle stashed out there.

MR. SONGER: Let me just say that, until the Sheriff can testify to what he was aware of and what his mental state is, no objection to that. But this witness can't testify to what the Sheriff knew or did not know.

THE COURT: No, he's not going there. He's talking about when he gets to the next part. I'll let you

ask those two question now, and we'll cross the other bridge when we get to it.

MR. WOOD: Whether he stashed it and whether --

THE COURT: Whether he did, and whether he told anyone that.

(bench conference concluded)

MR. WOOD: Your Honor, may I?

THE COURT: You may proceed.

Q. (By Mr. Wood.) Mr. Phillips, did you ever stash or place a vehicle anywhere around the -- or anywhere in anticipation of using it at a later date in an escape?

A. No, sir.

Q. Did you ever tell anyone that you had stashed a vehicle to use in a later escape?

A. No, sir.

Q. Yesterday, you testified -- we were talking about -- oh, you were talking about Travis Ball. You were discussing that you were in the isolation cell and that Travis Ball came around. I think you said that you told him that the Sheriff beat you up or hit you or did something and that he was the one that you trusted, correct?

A. No.

Q. Well, let's just look at it, then. We have some transcripts from -- the transcript from yesterday's

testimony, because I don't want to misrepresent that. So do you have this on your monitor?
A. I assume that's what it is. I'll need to read it.
Q. Do you see something on your monitor?
A. Yes.
Q. Do you see it says, "Justin Phillips" at the top?
A. Yes.
Q. And on the left-hand side, do you see where it says, "Transcript from 8-3-21"?
A. Yes.
Q. And so Mr. Songer was talking to you. And if you go down to line, I guess we'll start at 12. He said, "Who did you ask not to leave you by yourself?"
And you said, "Another cop, Travis." Do you see that?
A. Uh-huh.
Q. And Mr. Songer said, "Do you remember that cop's last name?"
And you said, "Travis Ball."
And then he asked you, "Why did you ask him not to leave you alone?"
And your answer was, "Because so far, he's the only one that hadn't put hands on me, and I knew him. I used to work with him. He was like one of the only faces that I recognized."
A. Friendly faces, yeah.

Q. Friendly faces that you recognized?
A. Yeah. I don't have to look at that. I noticed that.
Q. But that's not really the extent of you and Travis Ball's relationship, is it?
A. From which point? When I worked with him?
Q. You guys are very good friends, are you not?
A. We were, yes.
Q. And you still are to this day, correct?
A. I like to think so.

MR. WOOD: Your Honor, we have stipulated exhibit, it is Defendant's Number 5 is stipulated. We would like this to be introduced and published, please.

THE COURT: For the record, you need to lay a foundation for what the exhibit is on the record, and then the Court will receive it by stipulation.

Q. (By Mr. Wood.) Did you attend Travis Ball's, one of Travis -- any of Travis Ball's weddings?
A. Yes, I have.
Q. And were you the best man at any of his weddings?
A. Yes. One.
Q. My understanding is maybe there's been three weddings, but you were only the best man in one?
A. Honestly, we lost contact when I left the state 2012. Unfortunately, Travis and I -- I don't social media or do any of that.

Q. I understand that you've got a narrative you want to put out. My question is, were you his best man at his wedding?
A. And I answered that yes.
Q. And, in fact, you and Travis Ball, like you said, remain friends to this day?
A. I would like to think so, yes.
Q. And in fact, you stay in communication with him, correct?
A. No.
Q. And as a result of the Sheriff being indicted, Travis Ball became the interim Sheriff, isn't that correct?
A. I have no idea.
Q. Well, you don't know if he became interim Sheriff?
A. I don't. I thought he worked for the drug task force. I've seen Travis twice.
Q. My question is, did you not know --
A. Seven or eight years.
Q. -- that he was the interim Sheriff?
A. I did not.

MR. WOOD: Your Honor, I don't know if we put the prior picture --

THE COURT: Court will receive Exhibit 5 by stipulation.

(Defendant's Exhibit 5 received)

MR. WOOD: Thank you. Can we put that up?
Q. (By Mr. Wood.) What is this a picture of?
A. Travis's wedding.
Q. And who is that on the left?
A. Be myself.
Q. On the far left?
A. Of Travis?
Q. The person in the white suit?
A. That's Travis.
Q. Who is the person immediately to his left?
A. That's me.
Q. Now, does that picture fairly and accurately represent his wedding that you served as best man?
A. Yes.
MR. WOOD: We would offer to publish that, Your Honor.
THE COURT: Well, it's already being published and it's already in evidence.
MR. WOOD: Thank you.
Q. (By Mr. Wood.) So in fact, he's not just somebody that you recognized, isn't that correct?
A. That guy right beside me to the left, that was best friend.
Q. But I'm saying you told this Jury yesterday that you saw Travis Ball and that he was just somebody that you

recognized, isn't that correct?

MR. SONGER: Objection. Misrepresents his testimony.

THE COURT: Sustained.

MR. WOOD: That's all that I have for this witness, Your Honor.

THE COURT: All right. Thank you. Redirect?

REDIRECT EXAMINATION

BY MR. SONGER:

Q. Good morning, Mr. Phillips.

A. Good morning, sir.

Q. You look pretty young in that picture.

A. Yes, sir.

Q. When did that wedding happen?

A. I'd be lying if I told you. Early 2000s.

Q. I think you said this a minute ago, that after you left the Ozark Police Department in 2012, you kind of lost touch with Travis, is that right?

A. Yes, I have. Unfortunately, yeah.

Q. How many times have you talked to him in the last eight years?

A. Once at the Sheriff's department when he was in the drunk tank by the door. And I wouldn't swear to it, but maybe around him one time, maybe twice. Maybe that time that he's talking about. And then seems like I talked to

him on the phone, but I can't really remember. I wouldn't want to swear by it.
Q. When you say the night when you were in the drunk tank, is that the night that you were beaten that you have been talking about?
A. No. This is when they let me see my lawyer, Ms. Capp.
Q. A few days later?
A. Yes, sir.
Q. Back in 2017?
A. Yes.
Q. Have you talked to Travis Ball since 2017?
A. I think once, but like I said, I wouldn't want to be under oath about it. I can't remember if I talked to him or somebody said, "Hey, Travis said hi," in passing, but I don't remember.
Q. Have you ever talked to him about this case?
A. No.
Q. Just a minute ago, you were asked a few questions about whether you would be able to get your seat belt off when you had restraints on your hands. Do you remember that?
A. Yes, sir.
Q. When you were stopped on the side of the road at that exit when the Sheriff was taking you back to Franklin County, did you take your seat belt off?

A. No. I don't recall doing that, no.

Q. And why were you trying to get away from the door at that point?

A. I didn't want to go out with them. I didn't want to go out that door with them.

Q. Why not?

A. Scared.

Q. You were also asked some questions about who took you or carried you from the vehicle into the jail. Do you remember that?

A. Uh-huh. Yes.

Q. I think you told us that you didn't know one way or another whether the Sheriff was one of those people who carried you in?

A. I don't know.

Q. Is that because your eyes were swollen shut with blood?

A. I could see just a little bit of light, just a little bit. Not very much. But my head was facing the ground.

THE COURT: Mr. Phillips, can you speak into the microphone, please? I'm having a hard time hearing you.

A. Just had little slits in my eyes, you know. I could see a little bit, but not clear enough to know. Like I said, I remember those tattoos.

Q. (By Mr. Songer.) And why couldn't you see clearly

when they were getting you out of the patrol car and taking you into the jail?
A. My eyes were swelled shut.
Q. Your eyes were swelled shut?
A. Yeah.
Q. And why were your eyes swelled shut?
A. Because I got hit by the Sheriff at Mulberry exit.
Q. When you arrived at the jail, were you bleeding from your face?
A. Yes.
Q. And what caused those injuries, caused you to bleed from your face?
A. Anthony.
Q. You were also asked a number of questions about your medical records from Crawford County, from the hospital you were taken to when you were at Crawford County. Do you remember that?
A. Yes.
Q. When you had the heart condition?
A. Yes.
Q. All right. Mr. Moon, could we please put up Government's Exhibit Number 21. And if we could please go to the sixth page of that document, and zoom in on that middle paragraph. Perfect.
Do you see halfway down or so on that report that it

says that your "head shape is normal"?
A. Yes.
Q. Do these observation notes say anything about you having any swelling or knots on your head?
A. I don't see anything.
Q. And if you look down near the bottom, three lines up from the top -- maybe Mr. Moon can highlight this for us -- you see where it says your "skin is intact"?
A. Yes.
Q. In these observation notes, does it say anything about you having cuts on your face?
A. I don't see anything, no, sir.
Q. Does it say anything about you having bruises on your face?
A. No, sir.
Q. And if you look at sort of the top left, do you see the date of the assessment as September 14th, at 1857, or approximately 7:00 at night?
A. Yes, sir, I do.
Q. That's just a couple of hours before Sheriff Boen picked you up, right?
A. Yes.
Q. And this is an official medical record that shows you have no injuries on your face, right?
A. Yes.

Q. We can take that down. Thank you.

In addition to being asked about Detective Travis Ball, you were also asked some questions earlier about Deputy Mason Berry. I'm sure you remember those.

A. Yes.

Q. Since this happened, have you talked to Mason Berry --

A. No.

Q. -- about it?

A. No.

Q. Have you talked to Mason Berry a single time since this happened?

A. No.

Q. Have you ever discussed your testimony with him?

A. No.

Q. Do you have any idea what he says happened?

A. I don't know what he says about anything. We used to talk all the time before this happened. Not since then.

Q. You were also asked about meeting with me and the other folks here at the table to prepare for your testimony today. Do you remember that?

A. Yes.

Q. Did anyone from the government ever tell you what to say?

MR. WOOD: Objection.

THE COURT: Overruled.

A. No.
Q. (By Mr. Songer.) Did they tell you to tell the truth?
A. Yes.
Q. And the first time you ever met with Special Agent Ferguson with the FBI a couple years ago, did you tell him anything different about what happened than what you told the government during your meeting to prepare for your trial testimony?
A. No.
Q. Same story?
A. Same story.
Q. A little bit ago before we took the break, I could tell you were getting a little upset up there during the cross examination. Could you tell us, why does this incident upset you so much?
A. Several reasons, you know, but doesn't really matter I guess much. It's embarrassing, some of it, you know. Telling someone you're scared. Or, like I said, we was friends, you know. Used to work together and respected a lot of them, you know. And then just having to -- I just don't like dealing with everything. I don't know. It's like talking about something that don't make you feel good.
Q. You told Mr. Wood a minute ago that as the Sheriff was transporting you back to Franklin County, he told you that, "If you live through this, you will never forget it."

Do you remember telling him that?
A. Yes.
Q. Have you ever forgotten what happened that night?
A. No. I've tried to. But I don't like going over it.
MR. SONGER: Thank you, sir.
THE COURT: Does that prompt anything else, Mr. Wood?
MR. WOOD: No, Your Honor.
THE COURT: May this witness be excused?
MR. SONGER: Yes, Your Honor.
MR. WOOD: Yes, Your Honor.
THE COURT: Thank you for your time, Mr. Phillips. You are excused. You're free to go.
THE WITNESS: Thank you.
THE COURT: Government can call its next witness.
MR. CARTER: The United States calls Jason Earp.
THE COURT: Mr. Earp, if you would please come forward and wind your way in between the two counsel tables. Stop about right there and raise your right hand.
(witness sworn)
THE COURT: Sir, if you would please now wind your way around and get in our witness box.
Sir, if you would like, you may remove your mask, but you're not required to. You may proceed.
MR. CARTER: Thank you, Your Honor.

JASON EARP, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CARTER:

Q. State your name for the record, please?
A. Jason Earp.
Q. And spell your last name.
A. It's E-A-R-P.
Q. My understanding is you have been designated of the keeper of records for a company called Justice Solutions?
A. That is correct.
Q. Just briefly, what does Justice Solutions do?
A. We are a records management system for law enforcement. So basically, any kind of records that are kept within a law enforcement agency, we have applications for automation of those.
Q. Does Justice Solutions employ sales personnel to sell these applications to Sheriff's offices?
A. Yes, we do.
Q. When a sales personnel for Justice Solutions sells these things, do they incur expenses?
A. Yes, they do.
Q. Do they make reports of their expenses?
A. Yes, they do.
Q. Are the reports of their expenses made

contemporaneously at the same time as the expenses are incurred?
A. Yes.
Q. And those expenses go into a report?
A. That is correct.
Q. And that's a regular practice that Justice Solutions practices as it relates to expense reports?
A. Yes, it is.
Q. There should be a binder sitting on the witness stand somewhere there.
A. Okay.
Q. If you would open that to tab 8, please.
A. Okay.
Q. All right. Do you recognize Government's Exhibit 8?
A. Yes, I do.
Q. Government's Exhibit 8, is that an expense report like we have just been talking about?
A. Yes. That is a detailed report from our expense management application.
Q. And for what employee?
A. Chris Roberson.
Q. And for what date and year?
A. That would have been for November 2018.
Q. Are there expenses from December of 2018 on there?
A. Yes. It would have been dated for, but, yes, those

are December expenses.
Q. Very well. Is that a true and accurate copy of it?
A. Yes, it is.
MR. CARTER: Your Honor, at this point, I'd like to proffer Exhibit Number 8. I have not put on any relevance yet, but I would like the Court to make a finding that we have laid the proper foundation for it once we do call a witness to put on relevant evidence about that report.
THE COURT: The Court finds that you have laid a 803.6 foundation.
MR. CARTER: Pass the witness then at this point, Your Honor.
MR. WOOD: I have no questions.
THE COURT: Is this witness free to go?
MR. CARTER: I'm sure he would like to go back to Texas, so, yes.
THE COURT: Sir, you're free to go back to Texas. Appreciate you coming here and testifying.
THE WITNESS: Thank you.
THE COURT: You may call your next.
MR. SONGER: Your Honor, we're ready to proceed with our next witness if you would like. This is the witness we discussed earlier about possibly taking a break to sort out some issues. So it's 11:30. I just bring that

to the Court's attention.

THE COURT: Thank you. Ladies and Gentlemen, we are going to take our lunch break early today. It's 11:30. There is some business that I need to take up with the attorneys. And again, this is in an effort to save time and also it gives us an opportunity to do some work while you're not sitting in the jury box cooling your heels. So we're going to take a little bit longer of a recess than we did yesterday. Court is going to be in recess until 1:00. I do wish to remind you of the recess instruction.

During this recess and every other recess, you must not discuss this case with anyone, including the other jurors, members of your family, people involved in the trial or anyone else. Do not allow anyone to discuss this case with you or within your hearing. Only you have been chosen as jurors in this case, and only you have sworn to uphold the law. No one else has been chosen to do this. You should not even talk among yourselves about the case before you have heard all the evidence and the case is submitted to you by me for deliberations, because that could affect your final decision.

If anyone tries to talk to you about this case, please let me know about it immediately. Remember that you should not be reading any news accounts, watching any news accounts on T.V. or doing any research of any kind,

including internet research. That is prohibited because you must keep your mind open and free of outside information. Only in this way will you be able to decide the case fairly. Remember that you have taken an oath to do these things.

So I would ask that everyone stand as the Jury recesses. Court will remain in session.

Mr. Juror Number 16, would you please stay behind.

(Jury out at 11:30 a.m.)

THE COURT: Ms. Barden, would you please set up in the library, please. I would like counsel and Mr. Juror Number 16 to come back to the library in chambers, please. Sir, if you would come out this door, they'll show you where to go.

(In-chambers proceedings)

THE COURT: The record will reflect that we are proceeding in chambers with counsel. The Court has asked Mr. Juror Number 16 to come to chambers.

Sir, are you Mark Randolph Ferguson?

JUROR NO. 16: Yes.

THE COURT: Mr. Ferguson, on the morning recess break, did you go outside to get some fresh air and perhaps smoke a cigarette?

JUROR NO. 16: Yes.

THE COURT: Did anyone approach you?

JUROR NO. 16: Not that I remember.

THE COURT: Did a gentleman in a short-sleeved blue shirt with a button-down collar and kind of rusty, sandy hair approach you?

JUROR NO. 16: Like I said, I don't remember talking to anybody. The only person I think I talked to was on the elevator about my magnetics and sports.

THE COURT: Did you go outside at this last recess and smoke a cigarette?

JUROR NO. 16: Yes.

THE COURT: Did anyone approach you while you were outside?

JUROR NO. 16: No. Like I said, when I come back inside, I got on the elevator, and that's the only person that I spoke to other than the jurors who were sitting out there that were smoking.

THE COURT: All right, sir. Thank you. You're free to go.

(Juror Number 16 exits)

THE COURT: Jerry, will you stay, please. The Court has information from Court Security Officers, if they have directed the Court's attention to the proper person, that Mr. Juror Number 16 was out in front of the courthouse and he was approached by the person as I have described.

It's a male, blue, short-sleeve shirt, button-down collar, sandy, rusty red hair. A person matching that description is situated on the second row in the courtroom. I think I have seen him here through other portions of the trial.

Court Security Officers say this is the same individual who on day one of the jury brought a box of donuts for the CSOs. The CSOs report that the conversation was several minutes long. If that is true -- and I will get the video footage -- it concerns me greatly that this witness would lie about that to the Court and it would be my intention to strike him if in fact this is the person that's on the video.

Let me ask the defense whether they know who this person is on the second row.

MR. WOOD: Is it the same person --

MR. CARTER: It's not the person I asked you about this morning, no, it doesn't sound like. The description the Judge just gave is not --

MR. WOOD: I don't know anyone in the audience. Now, we had an individual that was a supporter of the Sheriff who is a little off, admittedly, kind of a groupie, really. He's been up here. That's the one that you asked us to --

MR. PRATER: Stay seated.

MR. CARTER: There is a gentleman that continues

to stand and stare at our witnesses as they testify. I think now, having observed him, he probably has a back problem and wasn't trying to intimidate anyone. He started going to the back of the room. He does not meet the physical description of what you just described at all, though.

MR. PRATER: That's the only person we are aware of. We don't know him.

MR. WOOD: On the second row on our side, or the Jury's side?

THE COURT: On your side. He's the person in the gallery that would be closest to Mr. Boen. Now, maybe there are other people that are wearing blue shirts that have buttons on them.

Jerry, can you describe for the attorneys what the person working in the CSO control room saw?

CSO CORKEN: Officer CSO McCutchen, he -- that's all right if I take this down -- said that while he was watching the videos, he saw the juror go out front to smoke a cigarette. We have several that go out there, so we keep an eye on them. While he was out there, he saw the gentleman approach him, strike up a conversation. He said they talked for several minutes, maybe up to five. And then finished their cigarette, the juror finished his cigarette and they came back in.

THE COURT: And it was about how long?

CSO CORKEN: Three to five minutes, probably, of them conversing is what the CSO in the control room advised me.

THE COURT: Based on the information you have -- and you've been in the courtroom -- does it sound like the person that approached him was the gentleman that is sitting on the second row closest to Mr. Boen, or is it another gentleman that's kind of been up and down in the courtroom standing up against the back wall?

CSO CORKEN: When I watched them both come back in the room, even though I was told the gentleman had reddish-colored hair, neither one of them had reddish-colored hair to me. And both of them have jeans. One were faded and one were new blue jeans, and both of them have button-up shirts. So I could get CSO McCutchen to give us a better idea, but both of those people fit the description.

THE COURT: Okay. Is there video footage that we can get?

CSO CORKEN: I don't know the ins-and-outs of Ft. Smith's video system, but --

THE COURT: Will you inquire?

CSO CORKEN: Yes, I will. Would you like me to do that now?

THE COURT: Yes, since they are -- I thought it was the guy on the second row, but now I'm not quite as certain. So let's look at the video before we approach anyone else.

MR. CARTER: Judge, I will say, the red hair is what made me say it doesn't fit the description. The clothing description is accurate. The clothing description is pretty accurate, and with Jerry saying not sure on red hair, it may be the fellow that's been standing up for parts of the proceedings.

THE COURT: Well, I got the description from Jerry, and I was thinking it was the person on the second row. So I'm not sure whether I added any details to the person's description or not. So let's look at the video first.

Not that you have any other input, but I'll give anybody an opportunity to make any other record you'd like to on this issue.

MR. CARTER: I'd like to see the tape before I come to any conclusions.

MR. WOOD: Text us a screenshot of it or something, just a still shot of it.

CSO CORKEN: I will take care of that.

THE COURT: See what we can get video-wise.

MR. WOOD: If it's that guy that --

MR. CARTER: If it's that guy, we may have some things to talk about.

MR. WOOD: If it's that guy, kick him out. I mean, the Sheriff said he's known him for a long time and he just kind of shows up at different political --

THE COURT: The Court has received -- well, I sent you all a copy of a communication that I received. Is it that same guy? That guy kind of fit the description of a groupie.

MR. PRATER: I don't think either one of us know that guy's name. Do you? I don't know his name.

MR. WOOD: I don't know that guy's name.

MR. PRATER: I don't know him. I've seen him, but I don't know him. I've never met him.

MR. WOOD: Those people get attracted sometimes. But if it's that guy, I say get him out and not have to worry about him anymore.

THE COURT: So we'll get some more information before we do anything else. But it really concerns me that Mr. 16 would not answer my question.

Do we want to talk about Hutchison?

MR. SONGER: Yes, sir.

THE COURT: Let's talk about it.

MR. SONGER: Our position is, particularly as it relates to these two very old DWIs, that's old information.

It's prejudicial. And the probative value is minimal given that for years following the most recent one, he stayed at the Sheriff's office, continued working for the Sheriff, was promoted by the Sheriff. So allowing that information in would just smear the witness without I think a proper probative value in particular.

I think in all candor the issue connected to the election is a closer call. I don't think the facts are exactly what Mr. Wood said earlier, but that perhaps is something that can be hashed out when he's on the stand.

THE COURT: Okay. It's obviously, if I understand correctly, it's not proper 609 material because one was a mere arrest. The other was a misdemeanor conviction.

MR. SONGER: One is a misdemeanor conviction and was not even an arrest. He was just in a vehicle.

THE COURT: Right. So then if it's a prior bad act, I think that prior bad act -- what is this witness's role?

MR. SONGER: He's an eyewitness to Count Two. He was in the room when the Sheriff --

THE COURT: Was he the detective or just --

MR. SONGER: He was the detective, yes, sir.

THE COURT: Well, I think that he certainly, subject to cross examination about any bias that he may

have, but these don't come in under 609. To the extent that 404(b) would have any application, the Court would find that it's either not proper 404(b) or that the balancing test under 403 would weigh in favor of excluding the DWI part of it.

Having said that, I think it's fair game for the defense to inquire about whether, when you're going through his timeline of his employment as a Deputy Sheriff, to inquire about whether the Sheriff -- whether he was ever demoted by the Sheriff for unprofessional conduct or some categorical description that does not involve DWI.

MR. WOOD: Unprofessional conduct.

MR. SONGER: The government has no objection to that characterization, Your Honor.

THE COURT: On the election thing, I think it is fair for purposes of demonstrating bias to ask whether he has ever stated an intention to run for Sheriff and whatever proper follow-up question may be to that. I don't really know the facts. But the point would be that he would be running against -- he would possibly be running against Sheriff Boen, who is still the sitting Sheriff in Franklin County. And then you can argue that. You can certainly argue the implication in closing if that's what it is, but I don't want you to be argumentive with this witness. You can just establish the facts.

MR. WOOD: Yes, sir.

THE COURT: Does that get us through Hutchison?

MR. SONGER: Thank you, sir. I think that resolves our issue.

THE COURT: All right.

(pause)

THE COURT: So apparently the actual story is number 16 was downstairs smoking, came back, and had the encounter either on the elevator that it then extended into the hallway right in front of the jury room, or that's where the entirety of the encounter occurred. And I'm not clear on that part. Is that Mr. Vaughn?

MR. WOOD: I believe so.

MR. PRATER: Looks like it.

MR. WOOD: That appears to be him. I just saw him. The photo didn't come up when I was sitting there with the Sheriff. I was already on my way back here. But, yes, that appears to be him. I'll verify.

THE COURT: There's a video clip as well.

(security video played)

THE COURT: Looks like they are practicing some sort of golf swing.

MR. PRATER: Yeah, it does.

MR. CARTER: Talking about sports.

MR. PRATER: That's got to be what that is, is

golf.

MR. SONGER: Which is what he says, he was talking about sports.

THE COURT: So I need to get number 16 back here and take the hit for all of this and explain to him why I was blunt and didn't follow up earlier. And then let him see this, and then in that context ask him what the interaction was. I'm no longer concerned about dismissing number 16 unless he says that the contact was more than what it was earlier. But I am inclined to get rid of, or to order that Mr. Vaughn not be permitted on the courthouse property for the duration of this trial and not to have any contact whatsoever with any of the jurors on or off the courthouse property.

MR. WOOD: I say get rid of him. He ought to know. He's been in the courtroom. He knows.

THE COURT: Yeah.

MR. WOOD: He knows he's not supposed to be messing with them. The guy, he's off a little.

MR. CARTER: While we're waiting on Juror 16. I want to just, for the record, this is the individual that has been standing and staring at our witnesses as they testify.

THE COURT: He is?

MR. CARTER: He is indeed that individual. We

also, and a member of our staff, when we talked about it, said that he has tried to talk to several jurors actually out in the hall in similar situations.

THE COURT: Okay. And while we're making a record, I'm going to mark this Court's Exhibit 1.

(Court's Exhibit 1 marked)

MR. WHITE: We did -- maybe not at trial -- our recorded statement mark-up, we marked it as Exhibit A when we filed that order.

THE COURT: We'll take care of that later. We'll make this Court's Exhibit 1. This is the e-mail from July 16th that I forwarded on to counsel from this David Vaughn, which for lack of a better term is a little creepy. And it doesn't really accurately reflect the conversation that he had with my law clerk, Erika Esterbrook. He actually was abusive towards her and then he sends this e-mail trying to say how wonderful she was. So there's something not right about this guy.

MR. WOOD: May I, Your Honor?

THE COURT: Yes.

MR. WOOD: Apparently, the Sheriff grew up, knew this guy when they were kids or something. He kind of reappeared in the last couple of years. But we did not request that he attend the trial with us or support us or anything else, just for the record.

(Juror Number 16 enters)

THE COURT: Okay. Mr. Ferguson?

JUROR NO. 16: Yes, sir.

THE COURT: I would like to apologize to you for leaving our prior conversation in the manner that I did. And I want to tell you the information that I had and why I stopped the conversation abruptly and said that you could go.

I had received information from a Court Security Officer, and they have cameras around the building on the outside and on the inside. And anytime a juror goes outside to get fresh air or to smoke or what have you, they keep an eye on them just to be sure -- really to be sure there's no violence done to them or anything improper.

So then in the sequence of events, I'm informed that you had -- the contact was observed between you and an individual that had been seated in the gallery. But that contact on video apparently occurred on the third floor. But by the time this story was conveyed to me two or three times, there was confusion about you being on your way back from smoking and the encounter occurring on the third floor. And it got to me as the encounter occurring outside. So I'd like to very much apologize to you for framing my questions to you, but I hope you will understand that I was acting on the information that I had. And when

I dismissed you, I ordered the Marshals Service to get me a copy of the video so I could see what in fact happened.

I hope you will accept my apology.

JUROR NO. 16: Oh, no problem.

THE COURT: Here, I'm going to show you the video of the interaction from the third floor. I'd like for you to look at the gentleman that's engaging in a conversation.

JUROR NO. 16: Oh, the guy in the blue shirt?

THE COURT: Yes.

JUROR NO. 16: I was showing him a golf swing. You know, he was saying he's got bad disks in his back, et cetera. And I told him, they want to operate on my back. And I told him, well, I do a lot of exercise, try to play a lot of golf, so keep my mobility.

THE COURT: Where did you first encounter this gentleman today?

JUROR NO. 16: First floor elevator, at the elevator.

THE COURT: So you'd been on a smoke break. You come back to the elevator?

JUROR NO. 16: Right.

THE COURT: And he's on the elevator with you riding up?

JUROR NO. 16: Yeah. And I was putting these magnetic stuff back on. And he said, "Do those actually

work?" And I said, "Well, they seem to work for me. I've been wearing them for about 10 years." Told him, "When you get 70, a lot of things hurt."

THE COURT: And so you get off on the third floor and that moves into a conversation about a golf swing or something?

JUROR NO. 16: That's what I told him. I said, "When you're swinging, you rotate your back." And I said, "It's good for your disks. Your spine aligns you back out."

THE COURT: Okay. Did he mention anything about the trial or which side he favors or anything like that?

JUROR NO. 16: No.

THE COURT: Okay. All right. That's all I have for you. I appreciate your service on this Jury. I just wanted to close that loop, and I wanted to apologize if I left you with any --

JUROR NO. 16: Like I was saying, I didn't talk to anybody except for the guy in the elevator and talked about golf.

THE COURT: No, you were exactly right.

JUROR NO. 16: And my magnetics, et cetera.

THE COURT: Thank you, sir. I appreciate it.

JUROR NO. 16: You're welcome.

(Juror Number 16 exits)

THE COURT: I think the interest of due process are best served by me having the Marshals to bring Mr. Vaughn back so I can tell him why he is not welcome for the remainder of this trial. Would you have Jerry bring him back here?

While she is getting him back here, Mr. English, we need to take a Jury recess before you put him on the stand.

MR. CARTER: He'll be on the stand when the Jury comes in? Thank you, sir. That was going to be my preference anyway.

MR. SONGER: For Your Honor's information, we anticipate he will be our second witness here after lunch.

MR. CARTER: The direct is not very long.

MR. WOOD: The cross won't be very -- his interaction is brief.

THE COURT: I will mark the still photo that I've been referring to as Court's Exhibit 2.

(Court's Exhibit 2 marked)

(David Vaughn enters)

THE COURT: Hello, sir. Are you David Vaughn?

MR. VAUGHN: Yes, I am, sir.

THE COURT: Let me show you what I have marked as Court's Exhibit 2, which is a still image from the Court's security system.

MR. VAUGHN: Uh-huh.
THE COURT: Is that you in that frame?
MR. VAUGHN: Yes, it is.
THE COURT: Do you recognize the gentleman in the red --
MR. VAUGHN: I do.
THE COURT: -- sweater vest?
MR. VAUGHN: I do.
THE COURT: Did you ride the elevator up with him?
MR. VAUGHN: Yes.
THE COURT: On the elevator and then continuing on to the third floor lobby area, were you engaging him in a conversation?
MR. VAUGHN: Well, we engaged in a conversation on the way up.
THE COURT: Pardon?
MR. VAUGHN: We engaged in a conversation as we was waiting for the elevators and went up and got off.
THE COURT: That was my question.
MR. VAUGHN: Yes, exactly.
THE COURT: So you did engage in a conversation?
MR. VAUGHN: Yes.
THE COURT: What was your conversation about?
MR. VAUGHN: I've got back issues. He has copper

bracelets on. I asked him about the copper bracelets. He told me he had a back issue where he had to like lean over. And I said, hey, I had surgery and stuff on mine, and I get you. And talked about that. I think when we're there, coming down there, he was like talking about getting back into golf. And I quit golf partly because of my back. Just, how is it going for you with your back problems, I'd like to get back into it myself, but I'm a little nervous about getting back into it. It all had to do with my back. That's all.

THE COURT: Have you engaged any other jurors in conversations?

MR. VAUGHN: I'm a very chatty person.

THE COURT: That's not my question, sir.

MR. VAUGHN: Yeah, I have. Me and him have talked -- me and him talked the other day about the Razorbacks. He seemed like a guy I'd like. The rest of them, the rest of the people I've talked to, just like, hey, what's going on, or the weather is nice, that sort of thing.

THE COURT: You've been in the courtroom for a lot of the trial, have you not?

MR. VAUGHN: Yesterday and today.

THE COURT: All right. Were you here on the first day for jury selection?

MR. VAUGHN: I showed up, but they said it was jury selection. I was just going to read in the newspaper that it was going to start Monday, so once I found out it was jury selection, I left.
THE COURT: Did you come back on Tuesday morning?
MR. VAUGHN: Yes.
THE COURT: Were you here when I gave instructions to the Jury before opening statements?
MR. VAUGHN: No, I got here -- I thought the trial was going to start at 9:00, so I got here at 9:00 and the trial was already underway.
THE COURT: All right. Are you the same Mr. Vaughn that sent to chambers --
MR. VAUGHN: Yes.
THE COURT: -- an e-mail that I have marked as Court's Exhibit 1?
MR. VAUGHN: Yes.
THE COURT: And prior to that e-mail, did you have phone contact with a member of my staff?
MR. VAUGHN: Yes.
THE COURT: All right, sir.
MR. VAUGHN: That was about the mask thing. I have a medical exemption.
THE COURT: Yeah.
MR. VAUGHN: And she was very nice.

THE COURT: Yes. First of all, there's a strict prohibition on the Jury speaking with anyone; the attorneys, anyone, about the case.

MR. VAUGHN: Right. I have not done that.

THE COURT: I appreciate that. When I explain it to the Jury, and perhaps you weren't here that day, I explain that not only must there be no contact because of actual fairness, but there must not be any contact for appearance's sake, because if the jurors are seen speaking with anyone else who may or may not have some connection with a party, it raises concern and suspicion. And the concern and suspicion can impugn the appearance of fairness. And so I don't have any reason to question that you were talking to this gentleman about back issues and about golf swings.

MR. VAUGHN: Uh-huh.

THE COURT: But I can't have you talking to our Jury. And if I understand what you told me, you have engaged other jurors in small talk. And I am going to ban you from this trial. And in fact, I'm going to ban you from this federal courthouse property for the duration of this trial.

MR. VAUGHN: Wow. Okay.

THE COURT: And I am going to order that you not have any actual contact, or attempted contact, with any of

the jurors in this case, at least not until after the trial is over, at which point they can talk to whomever they want to. That is my intended course of action. I'll give you an opportunity to tell me any reasons why I shouldn't do that.

MR. VAUGHN: I did not know there was a prohibition on talking to jurors. They had been coming and going. They are the most numerous people in there. There's not a lot of us in the actual -- where the public, the reporters and everybody is at. I've talked -- I have talked to the security guards. I've talked to -- I'm just a chatty person. I don't know if this is why, but I have anxiety. When I get a little nervous, I talk. It helps me get aware of my surroundings and kind of come to some type of situations. I'm will not talk to any jurors. I'm not going to be rude, but I won't talk to any jurors. I think sometimes they have badges; sometimes they don't. But I recognize them now, which ones are and which ones aren't. I won't speak to them anymore. I won't speak to anybody on the Jury. I sure don't want to cause any problems for the defense or the prosecution.

THE COURT: Are you the same guy that brought donuts for the CSOs?

MR. VAUGHN: I did. I did, because they were so helpful with me Tuesday, or Monday when I came in.

THE COURT: Well, I appreciate that gesture, and I appreciate your explanation. I appreciate your willingness to do all those things.

MR. VAUGHN: I won't talk to any more jurors. It's not -- I'm just a chatty person.

THE COURT: Well, that's fine. You're going to have to chat somewhere else because I've given you a chance to speak your peace to this and I'm not persuaded that I should change my mind.

So I'm going to give a directive to the Marshals Service that you are not to be allowed on this courthouse property for the duration of this trial. And I'm sorry to do that, but I'm just not going to risk it. I'm just not going to risk it.

MR. VAUGHN: I understand your position, sir. I didn't mean any disrespect to you or the Court or anybody else. Like I said, it's your decision. It's your decision, sir.

THE COURT: All right. Thank you so much.

MR. VAUGHN: You're welcome.

THE COURT: You may leave.

(In-chambers proceedings concluded)

(Jury in at 1:28 p.m.)

THE COURT: Ladies and Gentlemen, number one, thank you for your time and I do appreciate your time

serving as jurors, and I do not wish you to get the impression that we're not mindful of the time and sacrifices that you're making, so I once again apologize for not starting promptly at 1:00 like I told you earlier. There were some collateral issues that I had to resolve, and it took a little while to do that, but I apologize that I consumed your time in dealing with that.

I'll give you a heads-up that I don't know how long this next witness will be, but I'm going to have to address another separate issue after this next witness, so we'll probably be taking our afternoon break a little bit earlier than we normally would. Not sure about that, but I suspect that's the case. So again, thank you.

You may call your next witness.

MR. SONGER: Thank you, Your Honor. The United States calls Kevin Hutchison.

THE COURT: Sir, if you would please come forward and meander through the two counsel tables in between them and pause about right there and raise your right hand.

(witness sworn)

THE COURT: Sir, if you would please have a seat in our witness box. You may inquire.

MR. SONGER: Thank you.

KEVIN HUTCHISON, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SONGER:
Q. Good afternoon, sir.
A. Hello.
Q. To start off, can you give us your full name, please?
A. Kevin Hutchison.
Q. And do you mind spelling your last name?
A. H-U-T-C-H-I-S-O-N.
Q. Mr. Hutchison, how are you employed right now?
A. I am retired. I do taxidermy work, but I'm basically retired.
Q. Before you were retired, did you work in law enforcement?
A. I did.
Q. How many years did you work in law enforcement?
A. Total, a little over 17 years.
Q. Why did you decide to have a career in law enforcement?
A. Just something I had always wanted to do. I was in the military prior to it, so it was kind of something that I wanted to do as far as helping people.
Q. I'd like to briefly walk through some of your background. What was the first agency you worked for?
A. The Ft. Smith Police Department.
Q. When did you join up with the Ft. Smith PD?

A. It was in 2002, I believe is when I was with them.
Q. How long did you work for them?
A. A little over six years.
Q. At some point, did you join the Franklin County Sheriff's Office?
A. I did.
Q. About when was that?
A. I believe it was in 2009.
Q. And who was the Sheriff when you joined?
A. Reed Haynes.
Q. And what was your first position there?
A. I started off as dispatch and jailer.
Q. At some point, did you move out of the jail?
A. Yes. Approximately three and a half months later, I was -- a position opened as a deputy and I went on the road for Reed Haynes.
Q. Then do you remember when Sheriff Boen came in and became the Sheriff of Franklin County?
A. I believe it was the next election, so probably 2011.
Q. Why did you leave Ft. Smith and go back to Franklin County Sheriff's Office?
A. Franklin County was where I was born and raised. That's my home. So I thought that when I first got into law enforcement, I didn't really want to be in a department that was really big. I didn't realize how big Ft. Smith

was. So I decided to go back to Ozark, because mainly it was my home, and I thought that having a little bit of law enforcement, six years of law enforcement under my belt and the military, that I could sometime or another run for Sheriff down there.

Q. Were you ever planning to run against Sheriff Boen?

A. I wasn't.

Q. Did you decide to run for Sheriff at some point after you had been at Franklin County for a while?

A. I did.

Q. When was that?

A. It was after the fact that I knew that the Sheriff had got in trouble. And I wasn't for sure if he was going to be able to run again. Plus, after talking to him some prior to that, he would always vocalize to me that he was tired of it and he didn't want to run anymore. At that point, I kind of wanted to run more seriously.

Q. So was that just in the last year or two?

A. Yeah.

Q. Did you wait until you thought that you wouldn't have to run against Sheriff Boen?

A. Right.

Q. So I'm going to walk through what you've done at the Franklin County Sheriff's Office.

You talked about moving out after about three months

on to patrol. At some point, were you then demoted based on some off-duty issue?
A. Yes, I was.
Q. What were you demoted back to?
A. Back to the jail, a jailer.
Q. Did you keep working at the Sheriff's office, though?
A. I did.
Q. And then at some point, were you promoted again?
A. Yes.
Q. When was that?
A. I don't remember the exact date, but I was allowed to go back into patrol.
Q. And then what was your rank when you were out on patrol?
A. Just a regular deputy at that time.
Q. At some point, were you promoted to sergeant?
A. Yes, whenever I went to CID.
Q. Who promoted you to sergeant?
A. It would have been the Sheriff.
Q. Which Sheriff?
A. Anthony Boen.
Q. And you said when you went to CID. What is CID?
A. That's Criminal Investigation Division.
Q. Does that basically mean you're a detective?
A. Yes.

Q. And who made you a detective?
A. That would have been Anthony.
Q. Sheriff Boen?
A. Yes.
Q. Now, when did you leave the Franklin County Sheriff's Office?
A. In 2019, I believe it was, towards the end of 2019.
Q. And were you still a detective at that point?
A. Yes.
Q. And why did you resign?
A. Because of all the incident that was going on. There was lots of backlash between employees and I just felt that it was my time to leave at that point.
Q. Is that when you were thinking about running for Sheriff after you thought Sheriff Boen was not going to be there anymore?
A. Yes.
Q. And did you want to not campaign while you were on the job?
A. It's illegal. You can't do it.
Q. Is that part of the reason you left?
A. Yes.
Q. I'd like to turn the clock back just a little bit now to 2018. Were you a detective then?
A. Yes.

Q. Well, first tell us, what are your basic duties as a detective?
A. Just investigate all the crimes that happen within the county, whether it be burglaries, theft of property, murder, sexual assaults, anything that happened.
Q. Do you investigate people as part of those investigations?
A. Yes.
Q. Excuse me. Interview people?
A. Yes, I did.
Q. Thank you. All right. Do you remember one of your investigations that involved someone named Brandon English?
A. Yes, I did.
Q. Can you describe Brandon English's physical appearance for us?
A. He's a small-statured guy. Real skinny, probably about 140 pounds. Long, straight hair. Kind of reminds me of one of those little skate guys, a skater, riding skateboards all the time. That's what he reminds me of.
Q. Do you know him from one of your investigations?
A. I do.
Q. Did you ever observe him to be violent or aggressive during your interactions with him?
A. No, I did not.
Q. Did you ever know him to be involved in any violent

crimes in the county?
A. No.
Q. So what type of case was it that you were investigating that you came across Brandon English?
A. Some thefts and a commercial burglary. Theft of some lottery tickets, two vehicles, theft of fuel.
Q. And what was your role in that investigation?
A. I was the lead investigator.
Q. Was anybody else helping you with the investigation or was it just your show?
A. It started off that, yes, my immediate supervisor, which was Lieutenant Travis Ball, was helping until we found out that one of the individuals he was related to, I think a first cousin maybe, or second, so he recused himself from that investigation. And I was the only one working on it then.
Q. So Travis Ball recused himself just to make sure there wasn't any conflict?
A. That's correct.
MR. WOOD: Objection.
THE COURT: What's the objection?
MR. WOOD: To his leading.
THE COURT: Well, I think he was repeating more than he was leading, but let's watch the leading.
MR. SONGER: Certainly. I'll move on, Your

Honor.
Q. (By Mr. Songer.) At some point during that investigation that you were doing, was Brandon English arrested?
A. Yes.
Q. Do you remember about when that happened, what time of year it was?
A. October, November. Towards the later part of the year.
Q. Of 2018 still?
A. Yes.
Q. And do you remember the charges that Mr. English was brought in on?
A. The first charge he was brought in on was possession. Or, I'm sorry. Yeah. It was possession of stolen property, yes.
Q. And after his arrest, was he taken to the Franklin County Jail?
A. He was.
Q. Did you see him while he was there?
A. Yes. I conducted an interview on him.
Q. Now, does the Sheriff's office have a formal interview room?
A. Yes, we do.
Q. Were you able to use that room for this interview of

Brandon English?
A. I wasn't at that time due to the fact of another case that we were working had a bunch of evidence in the room, so we weren't able to use it.
Q. So where did you interview Brandon English?
A. Interviewed him in my office.
Q. Before that interview, did you read Brandon's rights?
A. Yes.
Q. Did you record that interview?
A. I did. I have a handheld recorder, digital recorder, that records voice.
Q. So it's not video?
A. No.
Q. Just audio?
A. That's correct.
Q. Do you always use that in your interviews?
A. Yes.
Q. And why is that?
A. Just for protection of my sake and the victim's sake, or suspect's sake. Plus it helps me to take better notes later down the road because I don't take a whole lot of notes when I do my interviews.
Q. When you say one of the things it does is it provides protection for your sake, what do you mean by that?
A. That way, the individual that I'm doing the interview

on wouldn't be able to come back and say, "Well, the detective said this," or, "He promised me this" or something like that. It would be on audio recording.
Q. Did Brandon English provide information to you in that interview that was really useful for your investigation?
A. He did not.
Q. Now, at some point, did you try to interview Brandon English a second time?
A. Yes, I did.
Q. About when did that happen?
A. Probably two or three days later.
Q. And where did that interview take place?
A. In my office again.
Q. Same place as the first one?
A. Yes.
Q. Did you record that interview?
A. Yes, I did.
Q. Same way you recorded the first one?
A. Yes.
Q. Did you read Mr. English his rights before that interview?
A. Yes, I did.
Q. Now, in that second interview, did Brandon English provide any information that was useful to you guys?
A. No.

Q. Now, after you finished that second interview, at some point, did you update Sheriff Boen on the status of that investigation?
A. Yes, I did.
Q. What did you tell him?
A. Just the fact that, who the individuals were that I thought was involved. Some of the crime that had taken place that I thought that those individuals were involved in, one of them being a commercial burglary. So, yeah, and updating him on that stuff.
Q. Did you update him that you had tried to interview Brandon English, but he hadn't really told you anything?
A. Yes.
Q. Now, at some point, was there a third interview with Brandon English?
A. Yes.
Q. When did that happen?
A. Probably the next day or maybe two days after.
Q. And how did that start? How does that interview come about?
A. I was in the office doing some paperwork catching up on some stuff. And next to my office was Travis's office, which adjioned mine by a door. At that point in time, Travis and the Sheriff, Anthony Boen, was in his office. Anthony came to my office and told me to go get Brandon

English for an interview.
Q. Do you remember exactly what Sheriff Boen said?
A. I don't. Exact words, no.
Q. But something to the effect of, "Go get Brandon English"?
A. Yes.
Q. Did he tell you why he wanted you to get Brandon English?
A. Just for another interview.
Q. So then what happened next?
A. I went into the jail, had one of the jailers go back to the back and get Brandon, bring him up to me, and then I escorted him into Travis's office.
Q. Why did you put him in Travis's office this time?
A. It's just where they were at.
Q. Where who was?
A. Travis and the Sheriff.

MR. SONGER: Your Honor, I'd like to now show Government's Exhibit 5(b). I think the parties have stipulated this exhibit is admissible, but it hasn't been offered into evidence yet.

THE COURT: Can you describe Exhibit 5 for the record, or 5(b) for the record?

MR. SONGER: Certainly, Your Honor. It's a photograph of the inside of the detective's office where

this interview took place.

THE COURT: Exhibit 5(b) is received.

(Government's Exhibit 5(b) received)

MR. SONGER: Thank you. Mr. Moon, can we publish that?

Q. (By Mr. Songer.) Mr. Hutchison, do you recognize this picture that's in front of you on the screen there?

A. Yes, I do.

Q. Is this the office that you were just talking about where you took Brandon English -- excuse me -- where the jailer took Brandon English?

A. Yes, that's where I took Brandon English. Yes, this office.

Q. Is this what it looked like when you were in there?

A. It is not. It had an L-shaped desk that went along the wall where the calendar is and then protruded out from that wall, I guess to the right, if you're looking at the picture.

Q. Was the floor the same?

A. Yes.

Q. What kind of floor is that?

A. I believe it's just a linoleum floor.

Q. Is it hard?

A. Yes.

Q. Now, we can see part of the room in this picture, but

are there any windows in this office?
A. No, there's not.
Q. Is there any recording equipment in this office?
A. Other than audio recorders.
Q. What do you mean? What kind of audio recorders are in here?
A. It would be the same as just a handheld little digital recorder like what I've got it.
Q. Only if someone brought a handheld in? There's no permanent recording equipment?
A. That's correct.
Q. When the door to this office is closed, can anyone from other parts of the jail see inside of this room?
A. No.
Q. So when you brought Brandon English into this room, can you describe who was there and where they were situated?
A. Behind the desk. And I'll have to correct myself on the desk shape. The desk was actually a C-shape, so it went along the back wall as well. Travis was sitting behind the desk in his chair. There was two chairs on the outside of the desk. The Sheriff was sitting in the one furthest from the door, Anthony Boen. And then there was a chair that was closest to the door, which is where Brandon had sat.

Q. How far apart were the Sheriff and Brandon English?
A. Probably an arm's length away.
Q. When you came in -- or, excuse me -- when this group was together and Brandon English was sitting there, what was he doing?
A. Just sitting kind of almost not really facing the Sheriff, Anthony, but just sitting there, just nonchalant.
Q. At any point, did Brandon English try to get up and get out of his chair?
A. No.
Q. Did he make any threatening gestures at anybody?
A. No.
Q. Did he say anything threatening to anybody?
A. No.
Q. He was just sitting in the chair?
A. Correct.
Q. Was the door open or closed to the office at this point?
A. It was closed.
Q. So then what happened next?
A. After I closed the door, I stood in behind him next to the wall, which the wall was really close, maybe a good step, three feet or so away. I stood there. And Anthony started talking, the Sheriff started talking to Brandon about him stealing in the county, and he called him a

"piece of shit" because he was stealing all the time, but he would never admit to it. He wouldn't help try to get any of the property back or anything like that.

Q. Was anybody recording this encounter with Brandon English?

A. Not that I'm aware of. I don't know.

Q. Did anyone read Brandon English his rights this time before the interview started?

A. No.

Q. So after you heard the Sheriff yelling and cursing at Brandon English, then what happened?

MR. WOOD: Your Honor, I would object. And may we approach?

THE COURT: Yes.

(bench conference)

MR. WOOD: Your Honor, the testimony that he's fixing to elicit, that the witness does not have any knowledge and has testified to the Grand Jury that he does not remember what happened at this point. He specifically says, I can't remember exactly how it went down, if the Sheriff pushed him over or if Brandon pulled back and did this and that. He's not competent when it comes to his testimony. He's already testified to the Grand Jury that he cannot remember. "I can't remember," and then he again reiterates a little bit later, "I can't remember if the

Sheriff went to grab him or if English pulled back and flipped back in his chair."

So as far as my objection, he's not a competent witness to these facts. And I don't know if we need to be allowed to voir dire him, or if the Court is satisfied with that information.

THE COURT: Well, I'm certainly not going to let him testify without the government laying 602 knowledge, which is to say that he absorbed the information that he's testifying to through one of his five senses, okay. But just because he may testify to something inconsistently today than he did previously, that is not a ground on which I would say he couldn't testify. That's a reason for impeachment.

MR. WOOD: And my objection is that he's not a competent witness. He does not have that knowledge. He's testified under oath and stated twice that he does not have that knowledge. And if he's going to sit here and say, "Okay, the Sheriff grabbed him and did this," then the bell is rung and we can't get that back out of the jurors' minds.

THE COURT: Mr. Songer?

MR. SONGER: That's not a fair characterization of his prior testimony. Defense counsel can explore his prior testimony on cross examination. I'm happy to lay a

foundation that he was capable of perceiving the facts that he's about to testify to. I don't think that will be an issue.

THE COURT: Well, you've already -- you got him in the room. You've got him where the Sheriff is starting to have whatever conversation the Sheriff had. You need to lay a good 602 foundation that he recalls what happened and that he was watching and observing what happened before you ask him what happened. And if he does that, then that's impeachment material.

MR. WOOD: Yes, sir. Thank you.

(bench conference concluded)

Q. (By Mr. Songer.) Detective Hutchison, we have this cool technology here, and it might help all of us follow this. It's a touch screen. Can you kind of draw for us on the screen in front of you with your finger where the different individuals you talked about are situated?

A. Yeah. That would be the desk. Travis was right here. Brandon was right there. And Sheriff Anthony Boen was right there. And I stood back here behind them.

Q. I think you have a future as an artist.

So how far would you say you're standing from Brandon English?

A. Probably three feet, three or four feet.

Q. From where you were standing, could you hear what the

Sheriff was saying to him?
A. Yes.
Q. Could you see both Brandon English and the defendant, Sheriff Boen?
A. Yes.
Q. Do you remember seeing what happened next after you all were situated this way?
A. Yes, I do.
Q. Can you please tell us what you remember happening?
A. After a few seconds of him accusing him of being a thief and wanting him to get out of the county and take his thieving elsewhere, the Sheriff, like I said before, I'm not exactly sure if it was a combination of a push and Brandon leaning back in his chair, but the chair overturns with Brandon in it. He was still in a seated position with his feet up over the chair. And at that point, the Sheriff was kneeling down next to him on his right side on the floor as well.
Q. Let me break in and just break that down a little bit.
What did you see Sheriff Boen do first?
A. Grab ahold of him, probably his shirt.
Q. And then what happened to Brandon English? What did you see happen to him?
A. The chair tipped over with him in it. And whenever it went to the floor, Brandon was on his back on the floor,

still in a seated position in the chair.
Q. And once Brandon was laying on his back on the floor, could you see him at that point?
A. Yes. He was right at my feet.
Q. What was the Sheriff doing once Brandon was laying on his back on the floor?
A. He had grabbed him by the hair with his left hand and was poking him in the chest with his right hand, telling him to get out of his county, take his thieving elsewhere, calling him, "a piece of shit" and that.
Q. What was the Sheriff's tone and demeanor like when he was doing that?
A. He sounded pretty angry. Elevated voice, just angry. Sounded angry.
Q. And how long did the Sheriff stay next to Brandon English while he was on his back yelling at him and jabbing his finger and grabbing his hair?
A. Ten seconds. Not very long. Ten or 15 seconds.
Q. What was Brandon English doing while the Sheriff was on him, yelling at him?
A. Nothing. Just laying there.
Q. Was he trying to fight back in any way?
A. No.
Q. Was he trying to squirm and get out of the chair?
MR. WOOD: Object to leading.

THE COURT: Yeah, it's a little bit leading. Let's try to ask open-ended questions.

MR. SONGER: Certainly.

Q. (By Mr. Songer.) Can you just describe what exactly was Brandon English doing?

MR. WOOD: Objection, asked and answered.

THE COURT: We're going to make one more pass at this, and then no more, okay? You may proceed.

Q. (By Mr. Songer.) Detective, what was Brandon English doing while he was laying on the ground?

MR. WOOD: Objection. It's been asked and answered, Your Honor.

THE COURT: Overruled. I said he could have one more pass.

A. He was not doing anything.

Q. (By Mr. Songer.) Could you see the expression on Brandon's face while the Sheriff was down next to him?

A. Yes.

Q. What did that look like?

A. Shock. Wide-eyed. Didn't quite know what was going on. That's how I would explain it.

Q. And what was your reaction when you saw this happen right in front of you?

A. I was also shocked. Didn't -- couldn't quite grasp what was going on at the moment, at the second.

Q. Why did it shock you?
A. Because it went from just kind of yelling at him to, I mean, then all of a sudden he was there on the ground. And I just -- I couldn't believe he went to the ground.
Q. Based on your training and experience as a law enforcement officer, did you see Brandon do anything that would justify using any force on him at that moment?
A. No, I did not.
Q. So how did you feel as you watched the Sheriff do that?
A. Like I said, first of all, it was shock. Then it was disappointment. A little bit scared, because I didn't -- at the time, I knew what to do, but I didn't know what to do.
Q. What do you mean by that?
A. I knew that what was happening was wrong, but I was afraid that if I stepped in or said something, that the anger would have been towards me after that. I was afraid to either -- because, in my opinion, I thought it might have embarrassed him in front of this gentleman that he was doing this to and either told me to leave and/or fired me afterwards.
Q. Were you an at-will employee in the Sheriff's office?
A. Yes.
Q. And what does that mean?

A. At-will employment means that, pretty much for any reason, you could be fired.
Q. And who had the authority to fire you for any reason?
A. The Sheriff, Anthony Boen.
Q. Were you scared of that at the time?
A. Yes.
Q. Could you see Travis Ball when this was all happening, Detective Ball?
A. Yes.
Q. Could you see the look on his face?
A. He just sat in his chair, just kind of was leaning back, I guess shocked too. I mean, I don't know. I couldn't --
Q. Did you all make eye contact at any point?
A. Yes.
Q. And how did he look to you when you guys locked eyes?
A. To me, it would be like wide-eyed, like, "Wow, that just happened," I guess you would say.
Q. After this stopped, did you see Brandon still in the room after that?
A. Yes.
Q. What did you see him doing?
A. After we got him sat back up in his chair, I believe Anthony, the Sheriff, was talking to him some more. And he was rubbing the side of his head, kind of, I guess where he

had ahold of his hair or something as if to say it hurt or something maybe.
Q. Did he appear to you to be in any pain or distress?
MR. WOOD: Objection.
THE COURT: Well, I will ask that you rephrase the question and try to further refine your question with regard to what attribute he was observing that would have led to this opinion.
MR. SONGER: Certainly, Your Honor.
Q. (By Mr. Songer.) What part of Brandon's body did you see him rubbing?
A. He was rubbing the right side of his forehead where his hair was at, his hairline, which is where I'd seen the Sheriff holding onto his hair.
Q. When an interview is finished, do you typically write up a report summarizing the interview?
A. Yes.
Q. Those first two interviews we talked about with Brandon English that you conducted and recorded, read him his rights, did you document those in a report?
A. Yes.
Q. This third interview we just talked about, did you write up any report to document this one?
A. No.
Q. Why not?

A. It was just kind of a -- I felt like, once again, if I documented something, then it would have been discarded or encouraged not to.
Q. Did you know any way to document this without making the Sheriff look bad?
A. No.
Q. Were you afraid of what would happen if you wrote a report that would make the Sheriff look bad?
A. Yes.
Q. Now, at some point, did you talk to the FBI about what you had seen happen in that room?
A. I did.
Q. And did Sheriff Boen ever ask you about if you had talked to the FBI?
A. I don't know if he actually asked me about it or if it just came up as we were talking, but it came up during one of our conversations, yes.
Q. And after it came up, did Sheriff Boen tell you anything about the incident?
A. He had just made statement of, "Well, they don't have anything with Brandon English." And as he was saying that, he kind of was shaking his head yes and mentioned the word, "Right." "Correct, right," as he looked at me shaking his head.
Q. How did you take that?

A. I insinuated that he was wanting me to agree with him that there wasn't anything to be said or done with that incident.
Q. What was his body language like as he was doing that?
A. In an insinuating gesture, like, "Correct?"
Q. And how did that make you feel?
A. Uncomfortable.
Q. And why is that?
A. Because knowing that the fact that it was wrong, what happened, and talking to my boss, it made me uncomfortable because I just knew that it was wrong and I didn't want to say yes or no at that time.
Q. Have you been trained on how to be a criminal investigator?
A. Yes.
Q. Are you trained that people who are in your custody have a right to remain silent and not talk to the authorities?
A. Yes.
Q. Are you ever trained to use force or hit someone if they are not willing to talk to you?
A. No.
MR. WOOD: Objection, Your Honor.
THE COURT: Overruled.
A. No, I'm not.

Q. (By Mr. Songer.) Do you consider that principle to be pretty fundamental, pretty basic?
A. Yes.
Q. And how long in total did you tell us you had worked in law enforcement?
A. A little over 17 years.
Q. In those 17 years, have you ever seen another officer do anything like this?
A. No.
Q. I'm sorry?
A. No, I have not.
Q. Those are all my questions for now. Thank you, sir.
A. Thank you.
THE COURT: Mr. Wood, you may inquire.
MR. WOOD: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WOOD:
Q. Good afternoon, Mr. Hutchison. My name is Russell Wood. I represent Sheriff Boen. You and I have never met before, have we?
A. No, sir.
Q. We have never talked before, have we?
A. No, sir.
Q. In preparing for your testimony today, did you ever meet with the government or the government attorneys?

A. Yes.
Q. And when did you meet with them?
A. I met with the FBI, I don't know the exact dates. It was after the incident had taken place. And then probably maybe a month or so later, I come up for another interview with the indictment, or the courts.
Q. But did you meet with them recently, within the last 30 days or so, to prepare and go over your testimony here in court?
A. Yes.
Q. But you didn't tell us that just a second ago, correct?
A. No.
Q. And when you met with the government about your testimony today, did anybody go over with you the elements of the crimes that the Sheriff has been charged with?
A. No.
Q. Did they ever talk about what they were required to prove in order to convict the Sheriff?
A. No.
Q. Did they ever go over the issue of bodily injury with you?
A. No.
Q. What did ya'll talk about?
A. The incident that I witnessed.

Q. That's pretty broad. Tell me what it is about the incident that they talked to you about.
A. Basically, what I had seen and what I had witnessed and heard during the incident that we had just talked about.
Q. And did they discuss any of your prior statements with you?
A. Yes.
Q. And did they discuss any contradictions in your prior statements with you?
A. No.
Q. At any point in time since the Brandon English event occurred, have you ever said that he was rubbing the side of his head?
A. Yes.
Q. And when was that?
A. When I talked to the FBI.
Q. Do you recall talking to the Grand Jury?
A. Yes.
Q. And at any point in time, did you tell the Grand Jury that he was rubbing the side of his head?
A. I don't recall.
Q. So it's possible that you didn't?
A. That's correct.
Q. You did not?

A. That's correct.
Q. Did you and the government talk about that specific reaction by Brandon English in preparation for this trial?
A. Yes.
Q. Of course. And we talked about just a second ago what the substance of those communications were.
Specifically about him rubbing his head, the part that you may not have told the Grand Jury, what were ya'll's discussions about that?
A. Just if he had any reactions of what had taken place.
Q. And what was your response to that inquiry?
A. That, yes, he was rubbing his head.
Q. Did they ask you that at the Grand Jury?
A. I don't recall.
Q. Let's talk about the demotion that you received while you were at the Sheriff's office.
Now, which demotion are you talking about?
A. The first one.
Q. And you were -- before you were demoted, what was your position?
A. Deputy.
Q. After you were demoted, what was your position?
A. Dispatch and jailer.
Q. And who demoted you?
A. That would have been the Sheriff, Anthony Boen.

Q. How long did it take you to work your way up the chain back to deputy?
A. Six months, maybe. Seven, eight.
Q. You said the first demotion. Was there other demotions?
A. One other, yes.
Q. And who demoted you?
A. The Sheriff.
Q. And at the time of that demotion, what was your position?
A. Deputy.
Q. After the demotion, what was your position?
A. Dispatch/jailer.
Q. Dispatch/jailer. If I understand things -- tell me if I'm wrong -- is dispatch/jailer the entry-level position for most people at a Sheriff's department?
A. Yes.
Q. Am I also correct that dispatch/jailer means you work in the dispatch room, and you may also have duties as a jailer?
A. That's correct.
Q. So it's dispatch/jailer, but that's the job title that combines dispatch and jailer?
A. Yes, that's correct.
Q. How long did it take you this time to work your way up

from dispatch/jailer back to the deputy position?
A. Probably four or five months. I don't know the exact time frame.
Q. I understand. I understand. Prior to Sheriff Boen's indictment, had you ever stated to anyone that you wanted to run for Sheriff?
A. Yes.
Q. Let's say in the two years -- we'll say a year prior to the Sheriff's indictment, who all did you tell that you wanted to be Sheriff?
A. You said -- what was the time frame again?
Q. I'm sorry. Within a year prior to Sheriff Boen's indictment?
A. A year?
Q. Yeah. Who all had you told that you wanted to be Sheriff?
A. Probably two or three people.
Q. You met with the FBI prior to the Sheriff being indicted, correct?
A. I guess, probably so. I mean, I don't think he had actually gone to court yet, but, yes, that's correct.
Q. You said it earlier. You met with the FBI prior to him actually getting in formal trouble?
A. Correct.
Q. So you advised or provided the FBI with this version

of events on Brandon English, correct?
A. Yes, that's correct.
Q. After the Sheriff was indicted, did you again state or tell people of your desire to run for Sheriff?
A. Yes.
Q. After the Sheriff was indicted -- let me back up. Do you know the Sheriff's sister, Amanda?
A. Not personally, I don't guess.
Q. Well, have you ever been to Amanda's house?
A. I don't know.
Q. Did you not work a case where there was a stolen four-wheeler that ya'll were dealing with?
A. Yes.
Q. And you went out to her house on more than one occasion, correct?
A. Who is her husband? I probably know her husband more than I know her.
Q. Do you know Mr. Darren Walker?
A. Oh, yes, I do.
Q. And then his wife is Amanda?
A. That's correct.
Q. So you've been out to that residence on more than one occasion?
A. Yes.
Q. Are you familiar with home security systems?

A. Yes.
Q. And they can have video?
A. Uh-huh.
Q. And they can have audio?
A. Uh-huh.
THE COURT: Sir, will you please verbalize your answers, "yes" or "no"?
THE WITNESS: Yes.
Q. (By Mr. Wood.) At any of the times that you were out at that location after the Sheriff was indicted, did you ever state to Darren or Amanda your intentions to run for Sheriff?
A. Yes.
Q. And in fact, while you were out there working the stolen four-wheeler case, you asked them for their vote, correct?
A. No, that's not correct.
Q. So you just simply told them that, "Hey, I'm going to run for Sheriff?"
A. Not in those words, no.
Q. Well, tell me what you said.
A. As we were -- as we were just talking, Darren and I, he had mentioned something about the race for Sheriff and asked if I would run. And I told him, I said, "I may throw my hat in the mix, yes."

Q. And at any time, did you ask either one of them, "So I can count on your vote." Right?
A. No, I did not.
Q. But just to be clear, you had voiced your desire to return for Sheriff prior to the indictment of Sheriff Boen?
A. That's correct.
Q. You expressed it after the indictment, correct?
A. That's correct.
Q. Now, was Sheriff Boen, vote percentage-wise, a popular Sheriff?
A. Yes.
Q. And are you aware that in the 2018 voting cycle, that he received 90 percent of the vote?
A. I don't know what it was, but I just knew that he won.
Q. Well, did you know that he won by a lot?
A. Yes.
Q. It was no secret that he was a very popular Sheriff in the county?
A. Correct.
Q. If you wanted to run for Sheriff prior to the indictment or after, did you believe that you could actually beat him?
A. No.
Q. As a result of the statements that you made to the FBI, Sheriff Boen, a Sheriff that you admit that you could

not beat, was basically removed from office, correct?
A. Correct.
Q. And within the Sheriff's department, who did that leave that -- who did that leave that was voicing their desires to be -- to run for Sheriff?
A. Me and another person.
Q. Yeah. Who was the other person?
A. Travis.
Q. You would agree that the criminal charges that were filed against the Sheriff has now allowed you to possibly have, or could allow you, if he's convicted, to have a successful campaign for Sheriff?
A. Possibly.
Q. All right. Talking about Brandon English, okay. You listed off a laundry list of stuff you guys were investigating him for in the county, right?
A. That's correct.
Q. You testified that you have been in law enforcement for 17 years. And you were in the military?
A. That's correct.
Q. What branch were you in?
A. Army National Guard.
Q. And what was your MOS?
A. 13 Bravo, which was a cannon crewmember, full artillery.

Q. When you became an officer 17 years ago, and you were sworn in, correct?
A. Yes.
Q. And you took an oath to uphold the laws of the State of Arkansas, correct?
A. Yes.
Q. Those include protecting people from being harmed or injured, correct?
A. That's correct.
Q. Now, in your training, did you become aware of the idea or duty to protect others from excessive force of other police officers?
A. Yes.
Q. And you swore that you would protect people from excessive force by other police officers, correct?
A. That's correct.
Q. Now, 17 years in law enforcement, I assume, or after 17 years in law enforcement, you still understood that you had that duty, correct?
A. Yes.
Q. As a CID officer, Criminal Investigations Division, correct?
A. Yes.
Q. You guys interview suspects all the time, is that true?

A. That's correct.
Q. And it's not uncommon for the CID officers to interview suspects or detainees, or even pretrial detainees or even post-conviction people. It's not uncommon for ya'll to interview them with more than one CID officer present, correct?
A. Correct.
Q. And you record these interviews for whose protection?
A. Both.
Q. You recorded the first interview with Brandon English, according to your testimony, right?
A. Yes.
Q. And you recorded the second one, correct?
A. Yes.
Q. And as you sit here today, you have testified that you did not record the third interview, correct?
A. Correct.
Q. But are you testifying that the Sheriff didn't allow you to record that interview?
A. No, I'm not.
Q. Between you and Travis Ball, the two of you just didn't get it recorded, correct?
A. Correct.
Q. So the idea that not getting the third interview recorded was somehow the Sheriff's decision or plan, that

would not be your testimony today, correct?
A. Correct.
Q. Thank you. Is it your testimony today that yelling at a suspect is illegal?
A. No.
MR. SONGER: Objection. Asking for a legal conclusion.
THE COURT: Rephrase your question, Mr. Wood.
Q. (By Mr. Wood.) Is it your testimony today that yelling at a suspect is a tactic that is not permitted?
A. Correct. That is correct, yes.
Q. So are you saying that you are not permitted as a detective when you're interviewing somebody to yell at them?
A. No, not really. I mean --
Q. I mean, have you ever heard of good cop/bad cop?
A. Yes.
Q. So one detective, he goes in there and he's really nice to the guy, he tries to become friends with him. And do you understand that to be the good cop?
A. Yes.
Q. And then another one comes in, and he's going to yell at him and he's going to huff and puff. He will be mean to them. And do you understand that that's the bad cop in that scenario?

A. Yes.
Q. And you are not testifying today that good cop/bad cop doesn't go on all the time in the interview rooms?
A. Correct.
Q. That's just one of the interview tactics and techniques that you're taught, isn't that correct?
A. Yes.
Q. Obviously, the most important part of your testimony is what happened when the Sheriff got there, he grabbed him, and what happened after that. Do you understand that?
A. Yes.
Q. So at the point that the Sheriff grabbed English's shirt, tell me exactly what happened.
A. When he grabbed him by the shirt, either the -- I don't actually recall how it happened, whether it was two different -- whether it was Brandon jumping back into the seat, or the Sheriff pushing him, or both of them combined. Somehow or another, when he grabbed his shirt, the chair tipped over with Brandon English in it. And then ended up with Brandon on his back in the chair.
Q. Thank you for that. So the operative part of that statement is, you don't know, or you don't remember if, when the Sheriff just grabbed his shirt, if Brandon pulled back and the chair went backwards, right?
A. Yes.

Q. Or if when he grabbed him, the Sheriff's momentum, or whatever happened, caused the chair to go backwards?
A. Correct.
Q. So you are not going to sit here today and tell this Jury that your testimony is definitive on what happened right then?
A. Correct.
Q. Could have went one way; could have went the other way?
A. That's correct.
Q. Happened real fast?
A. Yes.
Q. At the time that the chair fell over, Brandon didn't yell out in pain, did he?
A. Not that I recall, no.
Q. Well, you testified earlier that he didn't do nothing, right?
A. Right.
Q. So he didn't start crying, right?
A. No.
Q. He wasn't bleeding?
A. That's correct.
Q. He didn't bash his head on the ground and do all that business, correct?
A. That's correct.

Q. He didn't do anything; that's correct?
A. Correct.
Q. You testified that he had long hair?
A. Correct.
Q. How long was his hair?
A. A little longer than shoulder length.
Q. And I listened to your testimony today compared with some statements that you've made before. Would it be fair to say that he just grabbed his hair, according to you?
A. Can you -- say that again, please.
Q. Well, what I'm getting at is, pursuant to your version of the events, he grabbed his hair, right?
A. Who did?
Q. Sheriff Boen grabbed Brandon English's hair?
A. Oh, yes. That's correct.
Q. But you are not testifying that he jerked it around, slammed it around or anything like that, are you?
A. No.
Q. And he had long hair, right?
A. Yes.
Q. And so simply just grabbing somebody with shoulder-length hair, just grabbing their hair, that's not necessarily painful, is it?
A. Wouldn't be for me.
Q. Well, because you don't have any hair, so that

wouldn't be a real issue, right?
A. Right.
Q. But I'm saying, are you married?
A. Yes.
Q. If your wife is laying there and you just come up and grab her hair, is she going to start screaming and yelling and crying in pain?
A. No.
Q. And then the Sheriff got the chair back up for him, right?
A. Yes.
Q. Put the chair back up. Isn't it true that the Sheriff attempted to grab his shirt and yell at him to scare him?
A. I don't know.
MR. SONGER: Objection.
THE COURT: Sustained.
Q. (By Mr. Wood.) Have you stated to anyone that it is now your intention to run in the next Sheriff election?
A. Yes.
MR. SONGER: Objection. It's been asked and answered repeatedly.
THE COURT: All right. Let's move on.
Q. (By Mr. Wood.) And did you report this alleged assault to anyone?
A. No.

Q. Did you make a report about it?
A. No.
Q. Did you get charged by any agency for failing to protect Mr. English's civil rights?
A. No.
Q. So there was no repercussion to you for failing to do the duty that you swore an oath to?
A. No.
MR. WOOD: One moment, Your Honor.
THE COURT: That's fine.
MR. WOOD: I'll pass the witness, Your Honor.
THE COURT: Thank you. Redirect?

REDIRECT EXAMINATION

BY MR. SONGER:
Q. Mr. Hutchison, you were asked a few questions about recording interviews?
A. Yes.
Q. I think you told us it was your practice to always record your own interviews, is that right?
A. That's correct.
Q. Was it your practice to record interviews that were run by other people in other offices?
A. No.
Q. Whose obligation is it to record the interview?
A. The individual giving the interview.

 

Q. And who was it who set up this particular interview with Brandon English where the Sheriff grabbed his hair while he was on the ground?
A. My assumption is the other detective, Detective Ball, or the Sheriff himself.
Q. Who asked you to get Brandon English to start the interview?
A. The Sheriff, Anthony Boen.
Q. You also said that, of course there are times when, during interrogations, detectives yell at people, right? Do you remember that?
A. Yes.
Q. And you said that's of course permitted in your training, right?
A. Yes.
Q. Were you ever trained to knock anyone to the ground?
A. No.
Q. Were you ever trained to rip at their hair?
A. No.
Q. You were asked questions about not intervening to stop this. How do you feel about that now, that you didn't step up and stop it?
A. I should have, regardless of the repercussions on myself.
Q. You were also asked questions about how the Sheriff

was so popular and powerful. Do you remember that?
A. Yes.
MR. WOOD: Objection.
THE COURT: Sustained.
Q. (By Mr. Songer.) Do you remember being asked about the Sheriff getting 90 percent of the vote, being unbeatable in elections? Do you remember being asked that?
A. Yes.
Q. And did he have the power to fire you at any moment?
A. Yes, he did.
Q. Is that one of the reasons you were scared to do anything?
A. That's correct.
Q. You were also asked a bunch of questions about meeting with the Department of Justice to prepare for your testimony in court today. Do you remember those?
A. Yes.
Q. At any time during any of those meetings, did anyone at the Justice Department tell you what to say?
A. No.
Q. Did they instruct you to tell the truth?
A. Yes.
Q. And how did it come about that you first talked to the FBI about this incident?
A. I believe they had came down to the Sheriff's

department talking to people, interviewing some people.
Q. You didn't run off to the FBI to report the Sheriff so he would be out of office?
A. No.
Q. The FBI came to you?
A. That's correct.
Q. When they came to you, did you truthfully tell them the full story?
A. Yes, I did.
Q. Did you ask for any promises from the FBI?
A. No, I did not.
Q. Did you agree to speak with them voluntarily?
A. Yes.

MR. SONGER: With the Court's indulgence, just one moment, Your Honor.

THE COURT: Sure.

MR. SONGER: I think that's all I have. Thank you, sir.

THE COURT: Thank you. May this witness be excused?

MR. SONGER: Yes, Your Honor, he may.

MR. WOOD: Yes, Your Honor.

THE COURT: You're free to go, sir. Thank you for your time.

As promised, Ladies and Gentlemen, we are going

to take our afternoon recess at this time. I'll remind you of the recess instruction. The point I would like to emphasize at this opportunity is that not only should you not talk with anyone, but you should not allow anyone to approach you and speak with you, certainly not about this case. But, remember, even if you're approached by somebody and they are merely wanting to discuss the time of day or the Razorbacks, it could appear to others that you're discussing something else. So if anyone approaches you, just say, "I'm sorry, I'm a juror, and I'm not allowed to speak with you," and go about your business, all right?

We will be in recess for, let's say until five minutes before the hour.

(Jury out at 2:37 p.m.)

(Jury in at 2:59 p.m.)

THE COURT: The government may call its next witness.

MR. CARTER: The United States calls Brandon English, Your Honor.

THE COURT: All right. To expedite things, we had Mr. English go ahead and take the seat, but we need to get him sworn in. Would the Clerk please administer the oath?

Sir, please stand and raise your right hand.

(witness sworn)

THE COURT: Sir, if you would like, you may remove your mask, but you're not required to.

MR. CARTER: May I proceed, Your Honor?

THE COURT: You may.

BRANDON ENGLISH, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CARTER:

Q. Please tell us your name.
A. Brandon English.
Q. Can you spell your last name for us?
A. E-N-G-L-I-S-H.
Q. And where do you live?
A. Ozark, Arkansas.
Q. How long have you lived in Ozark?
A. Probably the last 15 years.
Q. How old are you?
A. 35.
Q. So most of your adult life?
A. Yeah.
Q. Do you work?
A. Yeah. I work for Post Winery.
Q. What do you do at Post Winery?
A. I'm just a vineyard keeper, I guess. Just upkeep the whole vineyards, keep everything cut, and just maintain the

vineyards and help the grapes produce the best they possibly can.
Q. Do you like eating grapes?
A. I like grapes.
Q. I want to talk a little bit of your history. I know you may not be proud of some of these things. I want to talk about the last 10 years, some of your felony convictions.
A. Okay.
Q. October 4th of 2012, is it true you were convicted of felony drug possession back then?
A. That's true.
Q. And you pled guilty to that?
A. Yes.
Q. Back in June of 2019, you were convicted of felony theft by receiving and criminal mischief?
A. Yeah, that's true.
Q. And you pled guilty to that?
A. Yes.
Q. I asked you about that one last because I want to ask about some events surrounding that.
A. Okay.
Q. You were convicted in June of 2019. Do you recall when you were arrested for those offenses?
A. Not off the top of my head, I don't.

MR. CARTER: May I approach the witness, Your Honor?

THE COURT: You may.

Q. (By Mr. Carter.) Mr. English, I'm going to give you two piece of papers that I want you to read to yourself.

A. Okay.

Q. Look at them. Tell me when you have kind of finished reviewing.

A. Okay.

Q. By looking at those documents, do you remember around when you were arrested for that last felony, theft by receiving?

A. Yeah. Looks like November 20th, 2018.

Q. Now, associated with that offense, were you interviewed? Did the police interview you at any point?

A. If so, it was vaguely, but, yeah.

Q. All I'm asking is if they interviewed you?

A. Yes.

Q. Multiple times? Was it once? Was it twice? Was it three times? How many times were you interviewed?

A. Probably multiple times, I guess.

Q. Do you recall -- I want to direct your attention to the last interview, the very last time you were interviewed. Do you recall that interview?

A. Yes.

Q. Where did that interview take place?
A. It took place in Travis Ball's office.
Q. Who was in the office?
A. Me, Travis Ball, Anthony Boen, and two other deputies were standing in the doorway.
Q. Had they brought you from outside the jail, or in the jail, to go to the office to do that interview?
A. They had brought me from the cell inside the jail to the office for the third time to do that interview within the last couple of hours.
Q. Were you standing or did you sit?
A. I took the same seat that I had took the previous two times that I had went into the office.
Q. Where was Travis Ball seated?
A. He was across the desk from me.
Q. Who was seated to your left?
A. No one was seated to the left.
Q. Who was seated to your right?
A. Anthony Boen.
Q. The other people in the room, were they seated or standing?
A. They were standing in the doorway.
Q. Were there any windows in that office?
A. No.
Q. Was the door shut?

A. No, it was cracked open. They were both standing, there were two officers standing in the doorway.
Q. Do you recall having your rights read to you?
A. No.
Q. What happened after you sat down? Did you say anything or did anything happen?
A. It was all pretty brief. I sat down. I said, "So what's up?" And that's about it. Anthony Boen stood up, and he grabbed me by my chest and slammed me down on the floor. And he held me down for 60 seconds or better, and said, "You're going to stop stealing in my fucking county or you're going to get the fuck out of here."
Q. While you were being yelled at -- well, first let me ask you, is the man that did that to you in the courtroom here today?
A. Yes, I guess so.
Q. And that's Sheriff Anthony Boen that did that?
A. (nods affirmatively.)
Q. While he was yelling at you after you were on the ground, was he doing anything else to you at that point?
A. No, he was just holding me down.
Q. What's the floor made of in there?
A. Same thing that's -- well, it's not like this floor. It's made of tile and concrete, I would say.
Q. Is it a hard floor?

A. Yeah.
Q. Did you hit your head when you went to the ground?
MR. WOOD: Object to leading.
THE COURT: Sustained.
A. I hit pretty much everything when I hit the ground.
THE COURT: Stop. Stop.
Q. (By Mr. Carter.) Let me rephrase. Any parts of your body impact that ground?
A. Yeah. My head, my back.
Q. Did you lose any hair in that incident?
A. I lost a substantial amount of hair, I would say.
Q. What happened next?
A. After that, I was pretty much able to pick myself up, and they just escorted me back to my cell like nothing happened.
Q. Were you in the jail for very long after that?
A. Probably like within a day or so, I got out. After that 24 hours, I would say maybe.
Q. Did you have any contact with the defendant, Sheriff Boen, before you got out of jail?
A. I seen him briefly when I was bonding out. And he just kind of said, "Hey," to me. And he acted like, you know, everything was okay or nothing has happened, you know.
Q. All right. There's a binder I think sitting on the

floor in front of you. Do you see that kind of leaning against the witness stand?
A. Yes.
Q. Can you pick it up, please? If you open the cover, there's numbered tabs inside. I want you to go to the 17th one, 17. Tell me when you're there.
A. Okay, I'm there.
Q. Is that a photograph?
A. Yeah.
Q. Do you recognize the guy in that photograph?
A. Yeah, that's me.
Q. When was that photograph taken?
A. That was taken about, I don't know, probably two days, or two days after the incident. At least two, maybe three.
Q. So several days after the incident?
A. Yeah.
Q. Was it after you bonded out of jail?
A. Yeah, it was after I bonded out of jail and got released and went over to a friend's house. And they instructed me that I should probably take pictures of that.
Q. Is that a fair and accurate depiction of the way you looked two or three days after you bonded out of jail?
A. Yeah. That's me.
MR. CARTER: Judge, I would move to admit Government's Exhibit 17.

MR. WOOD: I didn't hear his last response when he said, "Is that a fair and accurate depiction?"

THE COURT: He said, "Yeah, that's me."

THE WITNESS: Yes, that's me. That's fair and accurate.

MR. WOOD: Okay. All right. I'm sorry. No objection.

THE COURT: Government's 17 is received.

(Government's Exhibit 17 received.)

Q. (By Mr. Carter.) Mr. Moon, can you please place Government's 17 on the viewing screen. All right. Mr. Moon, will you zoom in to, it would be the right side of the picture, be Mr. English's left.

Mr. English, do you see that area that's been blown up there on the screen?

A. Yes, I do.

Q. That screen you have up there is a touch screen. Can you circle the area we're talking about?

What did you just circle?

A. I circled some of the handprints that were on my chest still and bruising from days prior.

Q. And who put those handprints and bruising on you?

A. Anthony Boen.

Q. Mr. Moon, you can take that down.

MR. CARTER: Just a moment, Your Honor. Your

Honor, I'll pass the witness.

THE COURT: Thank you. Mr. Wood, when you're ready.

MR. WOOD: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WOOD:

Q. Mr. English, my name is Russell Wood and I represent Sheriff Boen today.

So this photograph -- may I have that photograph back up, sir? I think it's number 17. Thank you.

This photograph was from two or three days after you were released from jail?

A. Yes. It was -- that was two or three days after the incident, but that was within an hour of me being released from jail, though.

Q. But the incident occurred two or three days prior to this photograph?

A. Correct.

Q. Sorry. And I looked at the photograph and I saw what you circled. And I assume -- I think you circled this horizontal, almost horizontal mark on your skin, is that correct?

A. Uh-huh.

THE COURT: You need to answer "yes" or "no" as opposed to "uh-huh" and "huh-uh."

THE WITNESS: Okay.
A. Yes, sir.
Q. (By Mr. Wood.) It looks from the photograph that that's still a little red mark almost running horizontal across your chest, is that correct?
A. Yes. That's actually bruised skin is what that is, kind of like when you get a hickey or something like that.
Q. Wouldn't you agree that if you were to take yourself and hit yourself on the chest like that with your fingers, that that might cause a horizontal mark like that?
A. I'm sure it could, yeah.
Q. And two or three days later, after the Sheriff's interaction with you, you had all sorts of time to do -- to create any kind of marks that you wanted, correct?
A. Correct, but I have no gain in doing that.
Q. You've been arrested a few times, correct?
A. Correct.
Q. You've been convicted a few times?
A. That's right.
Q. I want to talk about those just a second.
MR. WOOD: Your Honor, Defendant's Exhibit Number 7 has been stipulated to by the parties. I would move to admit that at this time.
THE COURT: By stipulation, Defendant's Exhibit 7, which are certified, self-authenticating

judgments of conviction, will be received as Exhibit 7.

(Defendant's Exhibit 7 received)

Q. (By Mr. Wood.) Now, I'm just going to ask you about those. We're going to go over them real quick.

On June 6th, 2019, in Franklin County Circuit Court, you were convicted of theft by receiving, and that was a felony, a D felony, correct?

A. Correct.

Q. On that same sentencing order -- excuse me -- on June the 6th, 2019, in Franklin County, you were also convicted of theft of property, and that was a D felony, correct?

A. Correct.

Q. Next. And on October the 4th of 2012, in Franklin County, Arkansas, you were convicted of another felony, and that one was for possession of a controlled substance?

A. That's correct.

Q. Is that correct?

A. Correct.

Q. Next. And on October the 4th, 2012, part of that same sentencing order, you were also convicted of possession of drug paraphernalia, and that was also a D felony, correct?

A. Correct.

Q. You said something while ago in your testimony that was new to me. You said that when they brought you into Travis Ball's office, there was -- of course the Sheriff

was there, and Hutchison was there, correct?
A. Correct.
Q. But now you said that there were two other jailers that were standing in the doorway?
A. Hutchison was one of the two COs that was in the doorway. I just say COs as correctional officers.
Q. And who was the other one?
A. I'm not for sure. I would say he was probably just someone that was dispatching at the time or something.
Q. So the entire time that you were in that office, Hutchison was over in the doorway?
A. As far as I remember, yes. The last time that I was in that office, I'm pretty sure he was in the doorway the entire time.
Q. Is there some confusion in your mind -- because you were interviewed three different times over there, is there confusion about what happened in what interview?
A. No. It's just once everything had took place at the last one, you know, I wasn't looking around to see who was around me at that point in time.
Q. And you said the Sheriff, when you sat down, the Sheriff was to your right or left, I can't remember?
A. He was to the right of me.
Q. To your right. And where was Travis Ball?
A. He was across from me, across, sitting in his desk.

Q. At any point in time after this event with the Sheriff, did Travis Ball call you and advise you that there was an FBI investigation?
A. No. He stopped me later on down the road. It was probably like a week or two later maybe.
Q. A week or two after this investigation, or a week or two after the --
A. After the incident. After me getting out of jail.
Q. So a couple of weeks after. Can we just say a couple weeks after the Sheriff grabbed you by the shirt?
A. Okay.
Q. You were stopped by Travis Ball?
A. Correct.
Q. And what do you mean by stopped? How did that happen?
A. I was just on my way to the Dollar Store and he blue-lighted me and pulled me over in the Dollar Store parking lot.
Q. And were you advised -- let me back up. Had you done -- had you committed any traffic offenses?
A. No.
Q. What was the purpose for being pulled over?
A. Just to inform me that there might be some people come and talk to me about the incident that happened in his office.
Q. Were you ever advised to contact the FBI?

A. No, I never contacted the FBI.
Q. Was there ever -- let me ask you. That's all ya'll talked about on the stop?
A. Yes.
Q. So he pulled you over for no violation or anything?
A. That's correct.
Q. Have you had any communication with Travis Ball up to today?
A. No.
Q. Since then?
A. None.
Q. You testified a while ago that you picked yourself up off the ground?
A. Yes.
Q. So it's not accurate to say that the Sheriff picked you up off the ground?
A. No. I picked myself up.
Q. Is it possible that when the Sheriff grabbed your shirt, that you pulled back away from him?
A. No. No, he threw me straight down.
Q. I'm sorry?
A. He threw me straight down.
Q. I don't understand what that means, "He threw you straight down."
A. He stood up, reached over and grabbed me by the chest

and slammed me to the ground.
Q. You were down on the ground after that for, would you say 45 seconds?
A. At least.
Q. You got yourself up off the ground?
A. Correct.
Q. And then they took you back into your cell?
A. Correct.
MR. WOOD: That's all I have, Your Honor.
THE COURT: Any follow up?
MR. CARTER: No further questions, Your Honor. Your Honor, I would ask that this witness be released.
THE COURT: All right. Mr. English, you are released. You are free to go out this door to the hallway.
THE WITNESS: Okay. Thank you.
THE COURT: The government can call its next witness.
MR. CARTER: The United States calls Travis Ball.
THE COURT: Mr. Ball, if you would please pause about right there and raise your right hand.
(witness sworn)
THE COURT: Sir, you can have a seat in our witness box over here now. While you're in the witness box, you may, but are not required to, remove your mask.
MR. CARTER: May I proceed, Your Honor?

THE COURT: You may.

TRAVIS BALL, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CARTER:

Q. Please state your name for the record.
A. Travis Ball.
Q. And spell your last name.
A. B-A-L-L.
Q. What do you do for a living now, Mr. Ball?
A. I am a truck driver for Maverick Transportation.
Q. How long have you been a truck driver for Maverick?
A. Since August of 2020.
Q. What were you doing for a living before that?
A. I was the Chief Deputy Sheriff at Franklin County.
Q. You're a law enforcement officer for the State of Arkansas?
A. Yes.
Q. When did you begin your career as a law enforcement officer in the State of Arkansas?
A. 2007.
Q. Where?
A. At Ozark Police Department.
Q. What did you do for the Ozark Police Department?
A. I was a patrolman.

Q. How long did you work for Ozark?
A. Up until 2013.
Q. Did you attend the Arkansas Law Enforcement Training Academy?
A. I did.
Q. And got certified as a law enforcement officer as part of that process?
A. Yes.
Q. When did you leave the Ozark Police Department?
A. In 2013.
Q. And what did you do for a living when you left Ozark?
A. I went to work for the Sheriff's office as a criminal investigator.
Q. Which Sheriff's office?
A. Franklin County.
Q. And what Sheriff?
A. Sheriff Anthony Boen.
Q. And how long did that, I'm going to call it a "tour," with the Sheriff's office last?
A. Two years.
Q. Were you a criminal investigator that entire time?
A. Yes.
Q. When did you leave?
A. It would have been 2015, I went to work for the drug task force.

Q. What's a drug task force?
A. It's just a multi-agency, or multi-county agency, that investigates drug crimes.
Q. How long were you with the drug task force?
A. Eight months.
Q. When did you leave the drug task force?
A. I want to say it was in September of 2015, somewhere in there.
Q. And what was your next stop?
A. The Franklin County Sheriff's Office.
Q. What was your job at Franklin County this time?
A. Criminal investigator.
Q. Who hired you?
A. Sheriff Anthony Boen.
Q. And how long were you with Franklin County that tour?
A. Until 2017.
Q. Why did you leave?
A. My father had became ill and I took a better paying job to help him and my mother.
Q. What kind of job was that?
A. Millwright.
Q. What's a millwright?
A. We installed conveyor systems in Amazon factories.
Q. So you got clear out of law enforcement?
A. Yes.

Q. And how long were you out of law enforcement?
A. Up until my father had got worse, which was maybe September, October of 2017.
Q. And did you change jobs again?
A. Yes.
Q. What did you do?
A. I went back to Franklin County.
Q. All right. To the Sheriff's office?
A. Yes.
Q. Who hired you this time?
A. Sheriff Anthony Boen.
Q. So at this point, you have been hired by the defendant how many times?
A. Four.
Q. What did you start as -- was that your last tour of duty with the Franklin County Sheriff's Office?
A. Yes.
Q. And what position did you start in?
A. I started as a patrol deputy.
Q. How long were you a patrol deputy with Franklin County that last tour there?
A. I think until December of 2017.
Q. Did you move out of patrol to something else?
A. I did.
Q. To what?

A. The lead criminal investigator.
Q. Is that a promotion at the Franklin County Sheriff's Office?
A. Yeah.
Q. So who promoted you?
A. Sheriff Boen.
Q. When you left law enforcement and went into the private sector, what was your -- can you describe for the Jury your relationship with the defendant?
A. We were very close. Like family.
Q. Describe further. What are some of the things you did that made it like family?
A. We visited all the time. I went to his house. I had given him some building supplies from my old house that he and an individual had used. I mean, we were close friends.
Q. And you were also his employee?
A. Yes.
Q. I want to take you back to when you first started back with Franklin County in 2017, I think you said. What month was it?
A. September, October.
Q. Are you familiar with an individual named Justin Phillips?
A. I am.
Q. How long have you known Justin Phillips?

A. Since 2005.
Q. Describe your relationship with Justin Phillips.
A. I was very close with Justin Phillips. Justin Phillips was my field training officer whenever he was a law enforcement officer with Ozark Police Department.
Q. So you originally met him when you were an Ozark police officer?
A. Well, I worked in the jail at Franklin County in 2005, and he was an Ozark police officer.
Q. But you became friends?
A. Yes.
Q. Would you describe it as close friends?
A. Yes.
Q. Mr. Moon, will you publish Defendant's Exhibit 5 that's already been admitted?
Who are those guys?
A. I'm on the left. Next to me is Justin Phillips. Next to him would be Mark Ross, and next to him would be Jonathan Little.
Q. What's going on here?
A. It was my wedding.
Q. When was this wedding?
A. 2008.
Q. Is this when you were close friends with Justin Phillips?

A. Yes, it was.
Q. Why is he the one immediately to your left?
A. He was the best man at my wedding.
Q. Why do you look so concerned in that photograph?
A. Getting married.
Q. You can take that down, Mr. Moon.
Have you continued to be friends with Mr. Phillips up until this day?
A. No.
Q. When did your -- did your friendship with Mr. Phillips stop?
A. Yes.
Q. When did that stop?
A. Probably 2012, 2013.
Q. So in September of 2017, that's a few years after your relationship with Mr. Phillips stopped?
A. Yes.
Q. Did you encounter Mr. Phillips sometime in 2017?
A. I did.
Q. What was the -- how did that come about?
A. Sheriff Boen had asked me to go with him to move Justin Phillips from the solitary confinement area of the jail to the drunk tank.
Q. And when was the last time you had seen Justin Phillips prior to that day?

A. It had been years.
Q. So you were tasked with moving him from one cell to another cell within the jail?
A. That's correct.
Q. What else did the Sheriff tell you about Mr. Phillips, or about Mr. Phillips on this occasion?
A. That Mr. Phillips had escaped from the Franklin County Jail. And he and another deputy had transported him back from Crawford County and he thumped his head. He wasn't going to be a problem anymore.
Q. Who had thumped his head?
A. That Sheriff Boen had.
Q. Thumped whose head?
A. Justin Phillips.
Q. Had you laid eyes on Justin Phillips yet when the defendant told you this?
A. No, I had not.
Q. How soon after that exchange did you see Justin Phillips?
A. I don't recall if it was the same day, but it was definitely within a day or two.
Q. Where did you first lay eyes on Justin Phillips?
A. In the solitary confinement section of the Sheriff's office.
Q. How was he dressed?

A. To my recollection, he wasn't wearing anything.
Q. He was completely naked?
A. Yes.
Q. What was his demeanor like when you encountered him that day?
A. Worried. Scared.
MR. WOOD: Objection.
THE COURT: Well, the question is, "What was his demeanor?" I think that a foundation has been laid under 701 for him to answer that question, so overruled.
Q. (By Mr. Songer.) What things about him, how was he acting, that made you think he was worried and scared? What was his demeanor like, physically?
A. I'm kind of at a loss for words on that. He was -- I hate to use this word, "cowered down" once we entered the cell.
Q. Did you notice any injuries on him?
A. I did.
Q. What kind of injuries?
A. He had a black eye and some bruising to his face area.
Q. Mr. Moon, would you please put up on the screen what's already been admitted as Government's 1(a).
Can you see that, Mr. Ball?
A. Yes.
Q. Looking at Government's 1(a), is that what Justin

Phillips looked like when you saw him that day in September?
A. It is.
Q. And you were a patrolman at that point, weren't you?
A. Correct.
Q. Mr. Moon, you can take down 1(a).
How much longer were you a patrolman with the Franklin County Sheriff's Office?
A. Maybe three months.
Q. What was your next post within Franklin County?
A. The lead investigator.
Q. I kind of want to fast forward you then to the fall of 2018. So about, what, a year later?
A. Yes.
Q. What's your job at the Franklin County Sheriff's Office at that point?
A. It is still the lead investigator.
Q. Do you know an individual named Kevin Hutchison?
A. I do.
Q. What was his job at Franklin County at that point?
A. He was an investigator as well.
Q. Are you peers? Are you his superior? Is he your superior?
A. I was his supervisor.
Q. Are you familiar with an investigation that was

occurring in the fall of 2018 into an individual named Brandon English?

A. I am.

Q. Were you a participant in that investigation?

A. Somewhat, yes.

Q. What do you mean by "somewhat"?

A. Kevin was the lead investigator on the case.

Q. Can you physically describe Brandon English for me as you remember him back in the fall of 2018?

A. Slender build. Long hair. Long beard. Maybe 6'2".

Q. How tall are you?

A. I'm 5'10", so he's taller than me.

Q. Did you find yourself ever involved in an interview of Mr. English?

A. Yes.

Q. Was it your interview?

A. No.

Q. Was it Mr. Hutchison's interview?

A. No.

Q. Who wanted to conduct an interview of Mr. English?

A. Sheriff Boen.

Q. How did that come about?

A. Sheriff Boen was in my office, as well as Detective Hutchison and me. And Sheriff Boen said he was going to have Brandon brought in to talk to him.

Q. Brought in from where?
A. The jail area.
Q. Now, when somebody is brought in from the jail, just kind of physically how does that work? Who brings them?
A. The jail staff would bring them, go to the back and get them, or from wherever they're at inside the facility and bring them up there.
Q. And in this case, where was Mr. English brought?
A. He was brought to my office.
Q. Mr. Moon, will you please put Government's Exhibit 5(b) on the screen. It's been previously admitted. And please zoom in the picture.
This has previously been admitted. What are we looking at a picture of there, Mr. Ball?
A. My office at that time.
Q. It's empty here. Why is it empty?
A. We had moved to another facility.
Q. Could you for me, using your finger -- you've got a telestrator up there -- show me where your desk was. Can you just draw how your desk was set up in that photograph? So where do you sit?
A. Back here.
Q. Let me ask you this. You've drawn a rectangle. Was your desk a rectangle?
A. Yes. Well, it actually had another side to it that

went up against the wall, so it was more of an L-shape.
Q. Did you have guest chairs in your office?
A. I did.
Q. How many?
A. Two.
Q. Where were they situated?
A. They were in front of the desk, so one on each side.
Q. Now, at your office, did it have any windows?
A. No.
Q. My Arkansas just came out, didn't it, "win-das." Windows.
Is there one way in and out, or multiple ways in and out?
A. There's two ways in and out. There's a door on each side of the room.
Q. Where does each door go?
A. One door goes out into the garage or sally port area. The other one goes into Investigator Hutchison's office.
Q. So get to your office, you have to walk through Investigator Hutchison's office?
A. Correct.
Q. Is your office equipped with any kind of built-in recording equipment?
A. No.
Q. So let's go back to the day that Mr. English was

brought to your office. Where were you situated?
A. I was behind my desk.
Q. Where was the defendant situated?
A. He would have been to the -- me sitting behind my desk, he would have been in the chair to my left.
Q. Where was Brandon English placed?
A. The chair to my right, so next to him.
Q. Are all the chairs used up at this point?
A. Yes.
Q. Where did Kevin Hutchison go?
A. He was in the corner of the room by the doorway, behind Mr. English, or somewhat behind Mr. English.
Q. Mr. Moon, you can take down the exhibit.
From your perspective behind the desk, could you see what was going on and hear everything?
A. Yes.
Q. What happened when Mr. English was brought into the room?
A. Mr. English was sat down in the chair, and Sheriff Boen grabbed him by the shirt area, went backwards with him to the floor.
Q. I should have asked this earlier. What's your floor made out of?
A. Laminate. It's more of a laminate-style floor.
Q. It's a hard floor?

A. Yes.
Q. Had Brandon English said anything yet?
A. No, not that I can recall. He hadn't said anything.
Q. Had the Sheriff said anything yet?
A. Not to my recollection, no.
Q. How soon after Brandon English was brought to your office that you saw him on the floor?
A. Almost instantly.
Q. Did you see how he got to the floor?
A. Yes.
Q. How?
A. Sheriff Boen grabbed him by the shirt area and went backwards with him.
Q. Could you see what was happening once they went to the floor?
A. Not really. My view was blocked by the desk, kind of like I can't see the desk here in front of me.
Q. Well, you're talking about the court reporter?
A. Yes.
Q. Could you hear what was going on at that point?
A. Yes.
Q. What did you hear?
A. I heard Sheriff Boen tell Mr. English that he was tired of his damn thieving and he needed to get the hell out of his county.

Q. What went through your mind when you saw and heard those things?
A. I was shocked. I mean, I was expecting him to do an interview.
Q. How long did it go on?
A. Maybe 30 seconds.
Q. Did it stop?
A. It did.
Q. Did you have to intervene?
A. No.
Q. At any point, did you think you were going to have to intervene?
A. If it proceeded, yes.
Q. But it stopped before you had to do anything?
A. Yes.
Q. What was the Sheriff's tone of voice like when he was talking to Mr. English during this incident?
A. He was yelling at Mr. English.
Q. Was it just yelling in a command voice, or did he seem angry?
A. He seemed angry.
Q. After it stopped, how long did the interview go on?
A. It wasn't very long at all. Maybe five, 10 minutes, best of my recollection.
Q. What happened at the end of the interview?

A. Mr. English was taken back to his cell.
Q. How long had you been a law enforcement officer, at that point? This is 2018.
A. So it would have been about 10 to 11 years, actual law enforcement, yes.
Q. In that 10 or 11 years, had you ever seen something like this occur?
A. No.
Q. While this was occurring, did you exchange any looks with Investigator Hutchison?
A. I did.
Q. Can you describe his look?
A. Yeah. Investigator Hutchison seemed shocked, like he seemed like he didn't know how to react, as well as I didn't either.
Q. Have you received training during your law enforcement career on the use of force?
A. I have.
Q. Have you received any training that says you should strike someone as part of an interview?
A. No.
Q. Have you received any training --
MR. WOOD: I would object to the mischaracterization of the testimony and the evidence that's before the Court.

MR. CARTER: Your Honor, I was eliciting the testimony.

THE COURT: The question was, "Have you received any training that says you should strike someone as part of an interview?" That was a question. Answer was, "No." Then the question was, "Have you ever received any training" -- then you make the objection. I'm not sure I understand.

MR. WOOD: I'll withdraw the objection.

THE COURT: Objection withdrawn. You may proceed.

MR. CARTER: Thank you, Your Honor.

Q. (By Mr. Carter.) Are you aware if Franklin County had any policies against such uses of force?

A. I was, yes.

Q. This policy, you worked for Franklin County for a number of years. Was this policy in place the entire time you worked there?

A. Yes.

Q. Was it changed at any point while you worked there?

A. Not to my knowledge, no.

Q. Is it a known policy to every deputy in the Sheriff's office?

A. Yes.

Q. How do they know about it?

A. They are given a copy of it.
Q. When?
A. Whenever they are hired.
Q. Do inmates in the detention center know about this policy?
A. They are given -- they are given a list of their rights. I don't know if they know our specific policy or not.
Q. Is there a binder sitting up there, thereabouts on the floor?
A. There is.
Q. I'm going to direct you to the seventh, number 7 tab, in that binder.
A. Okay.
Q. Do you recognize what you're looking there at?
A. I do.
Q. At Government's 7?
A. Yes.
Q. What is it?
A. It's a -- it's the inmate's rights at the detention center.
Q. And is this posted at the detention center?
A. It is.
Q. Was it posted there as far as you can remember the whole time you ever worked in that facility?

A. I can't say that it was posted there the whole time that I worked in the facility, but I know that it had been posted there for a lengthy period of time.
Q. That copy you're holding, is that a true and accurate copy of that policy?
A. It appears to be.
Q. Now, is that a photocopy or a photograph of that policy?
A. It appears to be a photocopy.
Q. But it's a true and accurate copy of it?
A. Yes.
Q. A little bit of housekeeping I want to do with you here.
When you were Chief Deputy of the Franklin County Sheriff's Office back in 2019, do you recall the Sheriff's office receiving a subpoena?
A. I do.
Q. What did that subpoena request?
A. Various items. Our policy and procedure on use of force. Personnel files, such as mine, Sheriff Boen's, and some other law enforcement officers.
Q. So it was a subpoena for a bunch of documents?
A. Correct.
Q. And it was served on you, or on the Sheriff's office?
A. On the Sheriff's office.

Q. Did you have any job as it related to that subpoena?
A. I did.
Q. And what was your job as it related to that subpoena?
A. To gather those documents and turn them over to the FBI.
Q. Who gave you that job?
A. Sheriff Boen, once he was aware of the subpoena.
Q. So essentially, you became the keeper of records back in 2019 for the Franklin County Sheriff's Office?
A. Yes, sir.
Q. First, let's talk about Government's 7.

MR. CARTER: I'd move to admit it, Your Honor.

MR. WOOD: Your Honor, I would object.

THE COURT: All right. Side bar, please.

(bench conference)

MR. WOOD: Your Honor, I believe that the prejudicial value is higher than the probative value. This is an administrative notice, at best, giving these inmate rights. It doesn't appear that it's part of the policy and procedure manual. There's not a number on it or anything else. I don't believe it's a regularly-conducted business activity document. I'm not sure what the business activity would be in this particular circumstance. But, again, this would tend to cause confusion with the Jury also, because now, we're admitting another document that is going to

cause confusion with the Jury such that if he violated this piece of paper, looks like it's just a piece of paper typed up in a Word document with no indication it came from any policy and procedure manual, or what the policy and procedure is in reference to. It would again cause confusion with the Jury about, what application are we supposed to apply to this case? Is it the law that's going to be administered by the Court and the Jury instructions, or is some issue about the violation of this policy going to influence them?

THE COURT: First of all, is there a foundation as to this inmate rights? Is this in a file folder, or was it posted in the jail and is that -- is there testimony --

MR. CARTER: It was posted in the jail. I believe he testified that it was posted in the jail, and was for the vast majority of the time that he worked there.

THE COURT: Okay. So the government filed a brief on this exhibit, and also the other policy, Exhibit 6?

MR. CARTER: It is, Your Honor.

THE COURT: And so this goes to -- the law that they briefed is whether policy and training is relevant to the issue of willfulness, separate and apart from the issue of objective reasonableness. The Court has vetted the cases cited in the brief. I believe they are accurately

cited. I can't remember whether it was one of the cases that the government cited or the Court's own research revealed, but it was a Seventh Circuit case. There's even a suggested limiting instruction from that case.

So I'll ask whether you have any argument that you would like to make under 401 to its relevance to the willfulness element, and then we'll take up your other objections.

MR. WOOD: My understanding from yesterday's discussion that we had about this, and I haven't physically seen the motion that they filed last night. I haven't had an opportunity -- obviously, we've been here today -- to research that. But my understanding was that it was being offered not for the truth of the matter asserted, but I think the government is going to argue that the fact that he violated the policy, or one of these policies, whether it's the inmate or the other one, they are offering that to establish that fact, that he in fact violated the policy. So I don't think it should be included because it's not offered for the truth of the matter asserted, because that's what they are going to ask them to determine, did he violate these policies.

And so the relevance of it, again, it's not relevant to whether the defendant violated this individual's Constitutional rights. It is not relevant at

all to whether he acted either objectionably reasonable, which he grabbed his shirt, we're not disputing that. But whether any injury was intentional, and in fact whether he had any bodily injury. So I don't think that this, whether it was -- whether he violated this particular statements on this inmate rights is probative of that issue.

THE COURT: All right. Well, as to 401, as I said, the Court has examined the brief that was filed last night. And in fact consistent with the ruling yesterday, the Court finds that it is relevant to the willfulness prong of the mental state required as part of the government's burden of proof. We'll save 403 for last.

As to 801, 802 issue, that was also part of the briefing. Yesterday, when we took up this issue with regard to Exhibit 6, I wasn't exactly sure where the government was going and whether they were trying to prove the truth of any particular provision, or, in the terms of 801, any particular assertion.

And looking at this further, I've kind of changed my thinking. I think the government's argument yesterday was correct. It's not being offered to prove the truth of any particular assertion. It's being offered to prove the existence of a policy. It's like sometimes a statement, especially in criminal cases, that otherwise sounded like hearsay, something that a witness might tell law

enforcement that causes law enforcement to take a particular cause of action, the statement in that case is not being offered to prove that what the witness told them was true, it's being offered to prove the subsequent course of action.

This is similar and analogous in the sense that it's being offered to prove the existence of the policy. It's not being offered to prove any particular assertion within the document. So I do not think that it qualifies as hearsay under 801. To the extent that I'm wrong about that, based on the testimony as to this exhibit anyway, and also with regard to Exhibit 6 that we discussed yesterday, the Court believes the residual exception would be appropriate. But, again, I don't think that it is hearsay.

So that leaves us with the other objection which I've heard, which is 403. There are two grounds articulated by Mr. Wood. One is unfairly prejudicial. The other is tendency to confuse. The standard is whether the probative value is significantly outweighed by either unfair prejudice, or as Mr. Wood suggests, confusion. While it may be prejudicial, especially in the sense that I think the government is going to argue it, so I can understand why the defendant would think it's prejudicial, I don't think that its probative value as to the willfulness prong is substantially outweighed by its unfair

prejudice.

As to confusion, I think that's probably your best argument here, but the Court believes that that is capable of being cured with a limiting instruction.

MR. WOOD: May I make one comment?

THE COURT: Yes, sir.

MR. WOOD: Just for the record so I make sure that I cover all of my bases. I alluded to it a few seconds ago. The document doesn't appear to be from the policy and procedure manual. It's not got a section on it or anything that indicates that it's ever been adopted by the County or the Sheriff's department and actually a part of the policy and procedure manual. So I'm not sure -- and my argument would be that -- and I know the Court's ruling -- there has not been a proper foundation to say that this is actually a policy and procedure of the Franklin County Sheriff's Office because they would all have to be approved and adopted. And that should be noted on any policy or procedure that is going to be attributed to the department. This is just a piece of paper with some stuff written on it. And it may have been around for a while, I don't know, but that doesn't mean that the Sheriff wrote it or it's been adopted by the County.

THE COURT: Okay. Well, I think the safest thing to do here would be to ask Mr. Carter to re-lay the

foundation as to the -- if you want, I can go back and look at the -- maybe you don't want to reinforce that in front of the Jury -- I can go back and look at the real time. But I think what would be helpful here, because the timeframe here is 2017 and 2018. I think his employment covers that period. It would be important that you lay a foundation that would cover the two time periods in question.

MR. CARTER: I'll do it again if the Court wants me to, but I believe that he has testified that during the entire time he was employed with the Franklin County Sheriff's Office, that inmate rights form was part of their policy, and it was posted publicly throughout their facility for several years, and certainly at the time of the incidents alleged in the indictment. I think that foundation has already been laid, Your Honor.

THE COURT: You want him to do it again, or do you want me to check the real time?

MR. WOOD: Whatever is the preference of the Court. If that's the case, then I would -- I think I should be allowed on my cross examination to cross-examine him on the document, that it's not got any official indication.

THE COURT: Absolutely. Absolutely.

MR. CARTER: Just for housekeeping. Is the Court

granting the government's motion to admit it at this point?

THE COURT: It would be more expedient if you would just re-lay that foundation and then move forward. The defendant's objection will be understood and I will receive it. I'm not receiving Exhibit 6. There's a couple of other issues with regard to Exhibit 6.

MR. CARTER: That's where I'm headed next. So do you want to take care of that now?

MR. WOOD: Which one is 6?

MR. CARTER: Six is the use of force policy manual that Carolyn McCain laid some foundation for yesterday.

THE COURT: I think that portions of Exhibit 6, including the paragraph that the government wants to get in that is in bold type and underlined, is appropriate for the same reasons that I've articulated with regard to 7. The second or the last part of that policy talks about reporting. And I don't know that that's exactly the same issue. I mean, I don't know how compliance or noncompliance with reporting uses of force on a detainee -- I mean, is that the same as the one part that's highlighted in bold?

MR. SONGER: We could sever that portion if the Court has concerns about it, but our position would be that the same principle applies. It would be offered to show

willfulness, because we anticipate the evidence will show that the defendant, even though he was aware of the obligation to report force as evidenced by that policy, did not report any of the force he used on these inmates. And that shows, that is evidence from which the Jury could infer his willfulness, that he knew he was wrong, so he did not follow the reporting requirements that were in place.

THE COURT: Do you plan to examine the witness on that last part of Exhibit 6?

MR. CARTER: I really only planned to examine him on the bold, underlined part.

THE COURT: Okay.

MR. CARTER: And let me also add for the record. The bold, underlined part was not done by the government. That's how it appeared.

THE COURT: I understand that. I understand that. So I think that we need to establish -- I mean, you have -- there was some foundation from the witness yesterday. I think you need to have more foundation today. It would be my inclination, unless something else comes up, for the reasons we've stated, the defendant's objection will be noted as an ongoing objection to Exhibit 6 and 7. But I would be inclined to admit it, but I want to reserve making a decision on whether to redact the last portion of it. So don't display that section to the Jury until I've

made a decision on that part.

MR. CARTER: I would agree. Really, all I would like to display to the Jury on the screen is the bold, underlined portion that we've been talking about.

THE COURT: Sure you would.

MR. CARTER: Absolutely, Your Honor.

THE COURT: Okay. That's fine.

MR. CARTER: Thank you, Your Honor. I acknowledge that I've not laid any foundation with this witness on 6, so I plan to do that as well. Will the Court be reading a limiting instruction?

THE COURT: Yes. Unless for some reason you don't want it, but I think it's necessary.

MR. WOOD: Yeah. Yeah.

MR. CARTER: Just logistically, do you want me to wait until I've gotten through both so that you can read it once, or do you want to do it for each one?

THE COURT: Each one.

MR. CARTER: Very well, Your Honor.

(bench conference concluded)

Q. (By Mr. Carter.) Mr. Ball, have you still got Government's Exhibit Number 7 in front of you there?

A. I do.

Q. What is that document?

A. The Franklin County Detention Center inmate rights.

Q. And how is this document used in the Franklin County Detention Center?
A. It's posted, or was posted, in the booking area. And then it's already given to them whenever they are first booked in.
Q. How long does that practice go back?
A. As long as I can recall.
Q. And did that practice continue until you severed your employment for the last time with the Franklin County Sheriff's Office?
A. Yes.
Q. And you say it was posted. What do you mean when you say it was posted?
A. It was on the wall in the booking area.

MR. CARTER: Your Honor, I would move to admit Government's Exhibit 7.

THE COURT: Subject to the Court's rulings at side bar, Exhibit 7 will be received.

(Government's Exhibit 7 received)

THE COURT: Ladies and Gentlemen of the Jury, you will recall that I explained that sometimes evidence is received for one purpose, but not others. This is again a situation where that applies.

So you are about to hear evidence, or see what has been received into evidence as the inmate rights policy

as just described, Government's Exhibit 7. In considering this inmate's rights policy in place at the Franklin County Jail as described, you should not consider this inmate rights policy when you decide whether the defendant's use of force was objectively reasonable or unreasonable, but you may consider the inmate rights policy when you decide what the defendant intended at the time that he acted, which is to say as proof of the second element on willfulness, and that's the same second element in each of the three counts.

MR. CARTER: May I proceed, Your Honor?

THE COURT: You may proceed.

Q. (By Mr. Carter.) Mr. Moon, will you please display Government's Exhibit Number 7. Mr. Moon, if you would please explode letter (f) on that list.

Mr. Ball, will you just read that out loud, please, for the record?

A. "Inmates have a right to be secure from self-incrimination and shall not be subjected to unlawful attempts to obtain statements and/or confessions while they are incarcerated."

Q. Mr. Moon, you can please take that down.

Mr. Ball, that's a policy that was in place at the time that you witnessed the defendant assault Mr. English?

A. Yes.

Q. I want to move on to another incident. After this incident, as a signpost, I'd like to use a period of time when the jail and Sheriff's office was getting new software installed. Do you recall that time?
A. I do.
Q. How long after the incident with Mr. English was the jail and Sheriff's office getting new software installed?
A. Approximately a month to two months.
Q. And do you remember about when that was?
A. Yes.
Q. When?
A. December, close to -- the first part of December.
Q. So really it was just a couple of weeks later then, wasn't it?
A. Yes.
Q. Who was the software representative that was dealing with Franklin County on this software?
A. Christopher Roberson, or Roberson. I'm not sure how to pronounce his name.
Q. And what was the name of the company that he worked for?
A. Justice Solutions.
Q. And how long did the install of the software take?
A. About a week. In fact, it was a week, best of my knowledge.

Q. During this week, did Justice Solutions do anything to treat the employees of the Sheriff's office?
A. They did. They held a dinner and they took some of us out to dinner.
Q. Did you attend such dinner?
A. Yes.
Q. Where did you go to dinner?
A. Bricktown Brewery.
Q. Where is that at?
A. Here in Ft. Smith.
Q. It's like right over there?
A. Yes.
Q. Couple of blocks away from this courthouse?
A. Correct.
Q. I want you to turn to the eighth tab of the binder, tab 8, please. Tell me when you're there.
A. I'm there.
Q. Go to the last page of Exhibit 8, please.
A. Okay.
Q. What are you looking at there?
A. A receipt for Bricktown Brewery.
Q. And does that -- I'm not asking you the date -- but does the receipt display the date?
A. It does.
Q. Does it display the time?

A. It does.
Q. And you were in attendance at the dinner that that receipt represents?
A. Yes.
MR. CARTER: Your Honor, at this point, I believe I have established relevance, so I move to admit Exhibit Number 8.
MR. WOOD: No objection.
THE COURT: Government's Exhibit 8 is received.
(Government's Exhibit 8 received)
Q. (By Mr. Carter.) What was the date of that dinner, Mr. Ball?
A. December 3rd, 2018.
Q. Who else was at that dinner?
A. Scout Simpson, the Sheriff, the Sheriff's girlfriend, me and my wife.
Q. So a total of how many?
A. Six.
Q. How did you get from Franklin County to the Bricktown Brewery restaurant?
A. Scout Simpson drove.
Q. Whose vehicle?
A. Mr. Roberson's.
Q. Who is Scout Simpson?
A. She was a jailer for the Franklin County Sheriff's

Office.
Q. And why did she drive?
A. Because Mr. Roberson, the Sheriff and I, were intending on consuming alcohol, so she was just the driver.
Q. You were playing it safe?
A. Yes.
Q. Did the Sheriff receive any phone calls during this meal?
A. He did.
Q. Once the Sheriff got off that phone call, did he tell you what it was about?
A. He did.
Q. Was it early in the meal? Late in the meal?
A. It was as we arrived at the restaurant.
Q. Still in the car or parking lot?
A. We had just exited the car whenever I found out about it, yes.
Q. What did the Sheriff tell you the call was about?
A. That jailer Kambrie English had called him and told him that Mr. Zachary Greene had bitten a trustee.
Q. Was there an emergency at the jail at that point?
A. No, sir.
Q. So what did you all do upon receiving that call?
A. We went inside and had dinner.
Q. Do you remember what you had for dinner?

A. I want to say I had a hamburger.
Q. Did you drink alcohol?
A. I did, yes.
Q. What did you have to drink?
A. Beer.
Q. Were you intoxicated?
A. Not intoxicated, no.
Q. Do you know how many you drank?
A. I think it was somewhere around three or four.
Q. Do you remember what the Sheriff had for dinner?
A. I do not recall what he had for dinner, no.
Q. Do you remember what he had to drink?
A. He and Mr. Roberson were drinking what they called cans of water, which to my understanding is vodka and tonic.
Q. Do you recall how many the Sheriff had?
A. No, I do not.
Q. Was it more than one?
A. I believe so.
Q. How long do you think this meal took?
A. Couple of hours. Maybe hour and a half to two hours.
Q. Mr. Moon, will you please put the last page of Exhibit 8 on the screen. And will you zoom in on the top left-hand corner, please. The whole top is fine.
What time is the time on that receipt?

A. 8:30 p.m.
Q. Is there any reason to believe that that's inaccurate?
A. No, sir.
Q. So a couple hours since you received this call at this point?
A. Yes. Hour and a half to two hours, yes.
Q. Mr. Moon, you can take down Government's 8.
When you left the restaurant, did everybody get into the same car?
A. Yes.
Q. Who drove it?
A. Scout Simpson.
Q. Whose car was it?
A. Mr. Roberson's.
Q. Where did you go?
A. We dropped the Sheriff's girlfriend off at her residence and then we went to Ozark.
Q. What did you do in Ozark?
A. First, we stopped by the liquor store on 23 North where I had purchased a 12-pack of beer.
Q. How long do you think that stop took?
A. Five minutes.
Q. Had you been to the jail yet at this point?
A. No.
Q. What was your next stop?

A. The Franklin County Sheriff's Office.
Q. How did you get into the Sheriff's office?
A. We went through the front entrance.
Q. Who all went in through the front entrance?
A. Mr. Roberson, Sheriff Boen, Scout, me, and my wife.
Q. And how long do you think it took you to get from Bricktown Brewery restaurant until the time that you walked through the front door of the Sheriff's office?
A. Maybe 45 minutes to an hour.
Q. So at this point, how long has it been since the Sheriff received the call at the beginning of the dinner?
A. Two and a half, three hours.
Q. Where did you go when you got into the jail?(
A. We went into the dispatch and jailer area. And then I followed the Sheriff and Mr. Roberson down the hallway toward the kitchen area.
Q. Did you make it to the kitchen?
A. No.

MR. CARTER: Before we get to the next piece of your testimony, I want to do a little housekeeping, Your Honor. I don't believe we have admitted Government's 5(a), 5(c), 5(d), 5(e), 5(f), 5(g), 5(h), 5(i), and 5(j). I purposely omitted 5(b), it's been admitted already. The government and the defense have stipulated that these are admissible. I'd like to admit them, but I'll read what

each one is into the record, however the Court would like me to proceed.

THE COURT: By stipulation, Exhibit 5 denoted by the sub-exhibit numbers will be received.

MR. CARTER: Thank you, Your Honor.

(Government's Exhibit 5(a) through 5(j) received)

Q. (By Mr. Carter.) Did you make it all the way into the kitchen?

A. No.

Q. Where did you go?

A. To the shower room.

Q. Who all went to the shower room?

A. The Sheriff, Mr. Roberson, and I.

Q. What's the shower room?

A. It's basically a small room where we detained individuals. It's got the shower room, name shower room because there's a shower curtain that blocks it from the hallway.

Q. And you say it's an area where you detain individuals?

A. Yes, temporarily.

Q. Is that the intended purpose for that room?

A. The intended purpose for the room would be if you brought in a husband and wife for domestic battery, you can keep them separated. One would be in there while they were waiting to get processed.

Q. So the shower room, is it your testimony that it's not a jail cell?
A. No, it's not.
Q. Mr. Moon, will you please display Government's 5(j), 5 jet.
All right. Mr. Ball, what are we looking at in Government's 5(j) there?
A. What is considered the shower room.
Q. You said there was a bench. There's no bench in this picture. Can you explain that?
A. Yeah. It had been removed whenever we moved to the other facility.
Q. So this photograph was taken after Franklin County vacated this facility and moved to another one?
A. Correct.
Q. Describe the bench that used to be there.
A. It was approximately three feet long, about a foot off the ground.
Q. How was it affixed to the shower room?
A. It was bolted to the floor.
Q. Can you use your telestrator there and kind of draw for us where it was at? How long of a bench is that?
A. About three feet.
Q. And how low to the ground is it?
A. About a foot.

Q. Now, you said occasionally inmates are housed there. When an inmate is housed there, how are they held? How do you keep them in that spot?
A. They are shackled to that bench.
Q. When you say "shackled," what do you mean by that?
A. There's two legs that come down from the bench. And then there's a shackle that goes around the inside leg of the bench and then it attaches to the individual's ankle.
Q. How long is the chain on the shackle?
A. About a foot long.
Q. So where can the inmate go when they are shackled to this bench?
A. Just right there in that room.
Q. Do they sleep on the bench?
A. No. Most generally, they will sleep in the floor.
Q. Just on the hard floor, or are there accommodations made?
A. Well, there's accommodations made, like they will have a mattress, blanket, stuff like that.
Q. Can an inmate, when they are housed in the shower room, can they get out in the hall?
A. To my knowledge, no.
Q. You say to your knowledge. Have you ever known an inmate to get out in the hall?
A. Not in the hallway, no.

Q. There's a door we're looking at in Government's 5(j). What's that door that's in the back of the shower room?
A. It goes to the -- where we have all the radios for dispatch. It's just -- that's all it is, electronic room.
Q. Is it locked?
A. Yes, with a padlock.
Q. Can the inmate get in there?
A. No.
Q. Can they even open that door?
A. No.
MR. WOOD: Your Honor?
THE COURT: Yes.
MR. WOOD: May we approach just a second, please?
THE COURT: Yes.
(bench conference)
MR. WOOD: I apologize. My understanding is that the courtroom technology will not allow us to take a screenshot of what he just drew on the screen and on the photograph. What I am requesting is to be able to take, with my phone, take a snapshot of it so that we can e-mail it so that we can have that preserved and use in our cross examination.
MR. CARTER: I don't object to that.
MR. WOOD: I didn't want to get my phone and start taking pictures of stuff and then get arrested.

MR. CARTER: Don't worry about it.

MR. WOOD: And so I just understand that when they draw on that screen, we can't preserve that in any way, and I'd like to talk to him about that a little bit more.

THE COURT: No. And you can do that. I have no problem with that. But you can also -- there's nothing inappropriate about you taking an exhibit that has been received and asking the witness to annotate it. So you can take the physical exhibit and have him draw on it to make whatever point you want. But if you want that frame of reference, you can take a picture. That's fine.

MR. WOOD: I think it would be easier for us to do it that way. I just wanted to make sure that was okay.

THE COURT: That's fine.

MR. CARTER: Now, I will object if you try to admit it later, the photograph.

MR. WOOD: No, no. Just to talk to him about what he's drawn on there right now and for his cross examination of that presentation.

MR. CARTER: That's sounds reasonable.

MR. WOOD: Thank you.

(bench conference concluded)

MR. CARTER: Have you got what you need?

MR. WOOD: Yes. Thank you.

MR. CARTER: Mr. Moon, you can take that down.
Q. (By Mr. Carter.) On the evening of December 3rd, who walked back to the shower room with you?
A. The Sheriff and Mr. Roberson.
Q. So there's three of you there?
A. Yes.
Q. Who was housed in the shower room at that point?
A. Zachary Greene.
Q. This is the individual the phone call had been about several hours earlier?
A. Yes.
Q. What was Mr. Greene doing when you saw him in the shower room?
A. Lying on his mattress with his head propped up against the metal door.
Q. Was he saying anything?
A. No.
Q. Is he affixed to this bench in the same manner that you described an inmate gets affixed to this bench?
A. He was shackled to the bench, yes.
Q. So Mr. Greene couldn't walk out into the hall?
A. To my knowledge, no.
Q. Are there video cameras in this area?
A. There is in the hallway.
Q. Is there a video camera that shows the inside of the

shower room?
A. No.
Q. Mr. Moon, will you please put up Government's Exhibit 5(a). And make it bigger for us, please.
Mr. Ball, what are we looking at with Government's Exhibit 5(a)?
A. The hallway that leads into the kitchen.
Q. You said there's a camera in the hallway. Where is that camera at?
A. Just about where the camera would have been to have taken this picture.
Q. So this is the point of view from that camera?
A. Yes.
Q. Can you see into the shower room in that photograph?
A. Barely, just inside the doorway.
Q. Mr. Moon, you can take that down, but I would like you to rephrase it with Government's Exhibit 5(e), please. E, echo. 5(e), echo.
What is this view, Mr. Ball?
A. This is a view if you was looking from the kitchen back into the hallway.
Q. Where is the shower room from this perspective?
A. It would be on the right.
Q. That bar at the top of the shower room door, is that what the shower curtain hung from?

A. It is.
Q. The night that -- on December 3rd when you were at the shower room and Mr. Greene was there, was there a shower curtain on it?
A. I don't recall.
Q. Can you see the camera in this photograph that you were talking about earlier?
A. Yes.
Q. Use your finger and circle it for us.
A. Well, I think I just covered it up.
Q. Can we clear that? Thank you. You can take that down, Mr. Moon. But I would like you to replace it with Government's Exhibit 5(a), alpha.
So using this photograph, how were yourself, the defendant, and Mr. Roberson positioned around the shower room?
A. I was standing on this side of the doorway. Sheriff Boen was here in the doorway. And Mr. Roberson was right here in the -- with his back towards this door.
Q. Is the hallway crowded with the three of you at that point?
A. Yes.
Q. Could you see and hear everything that was going on okay?
A. I could.

Q. What did you see happen?
A. Once we arrived, Sheriff Boen began speaking to Mr. Greene and had told Mr. Greene, it had something to do with what he was charged with. And if I recall correctly, he said it was his eviction notice. And Mr. Greene had a cup of water that was sitting on the bench, which Mr. Boen had picked up and threw the water in Mr. Greene's face.
Q. Did Mr. Greene have a reaction to that?
A. He laid there. If I recall correctly, he said that he didn't do anything.
Q. Did he get up?
A. No.
Q. What did you think when you saw that?
A. I figured we would go on into the kitchen area and speak to the trustees.
Q. What happened next?
A. Sheriff Boen then struck Mr. Greene in the right side of his face.
Q. Describe how Sheriff Boen struck Mr. Greene.
A. With his right hand. He had it closed and used the back part of his hand.
Q. So closed fist?
A. Yes, like this.
Q. But used the back surface of the hand to strike Mr. Greene?

A. Yes.
Q. And where did he hit Mr. Greene?
A. On the -- what would have been Mr. Greene's -- the right side of Mr. Greene's face.
Q. How many times?
A. I want to say it was close to four or five. I know it was more than two.
Q. You weren't counting?
A. No.
Q. What did you think when you saw that?
A. I knew things had gotten pretty serious and that's whenever I walked off.
Q. I want to talk about before you walked off. Was the Sheriff saying anything as he struck Mr. Greene?
A. The only thing I remember him saying, to the best of my recollection, was that -- it involved Mr. Greene, the type of crime Mr. Greene was in jail for.
Q. Maybe I should ask this question. What was the Sheriff's voice like? Do you remember how he was speaking to Mr. Greene?
A. He was angry, sounded angry.
Q. How did you know he was angry?
A. By the tone of his voice.
Q. Was he in a speaking tone or was he at an elevated tone?

A. Elevated.
Q. Would you call it yelling?
A. Yes.
Q. What did Mr. Greene do after the Sheriff struck him these times?
A. He continued to lay there, said that he didn't do anything. He may have been more sitting up at that point, but he wasn't standing or coming up off the mattress.
Q. Did he ever stand up during this series of events?
A. Not that I witnessed, no.
Q. When you first stepped back there and saw Mr. Greene, did you notice any injuries on him?
A. I did not.
Q. Didn't see, or just didn't notice?
A. I didn't notice any.
Q. Did you notice anything after the Sheriff struck him?
A. I noticed that Mr. Greene had some blood around his mouth area, or what appeared to be blood.
Q. And what did you do after you saw this?
A. I walked into the kitchen area and began speaking with trustees.
Q. You can take that down, Mr. Moon. Wait, don't do it yet.
MR. CARTER: Mr. Wood, have you gotten the photograph you need?

MR. WOOD: Oh, yes.

MR. CARTER: You can take that down, Mr. Moon.

Q. (By Mr. Carter.) Mr. Ball, how long had you been a police officer at this point?

A. It would have been 10, 11 years.

Q. Did you receive a lot of training in that 10 or 11 years?

A. I did.

Q. And you had a lot of experience in that 10 or 11 years, don't you?

A. Yes.

Q. Was there any part of that training or experience that taught you that it was okay to strike an inmate out of punishment?

A. No.

Q. Was there any part of that training or experience that has taught you that it's okay to strike an inmate to retaliate at them for something?

A. No.

Q. Do you still got that binder?

A. I do.

Q. Can you pick it up and turn to tab number 6. Are you there?

A. Yes.

Q. Does the Franklin County Jail have a use of force

policy?
A. They do.
Q. Do you recognize Government's Exhibit 6 as that use of force policy?
A. I do.
Q. Now, you worked at Franklin County for a number of years. Was this the use of force policy that was in place the entire time you were employed there?
A. I can't say that it was the same one for the entire time, but it's the only one that I recall.
Q. Let me ask you this. Was this use of force policy in place on December 3rd, 2018?
A. Yes.
Q. Now, I asked you earlier about a subpoena that was served on the Sheriff's office. Do you recall that?
A. I do.
Q. And you said one of the things that subpoena asked for was a policy and procedure manual?
A. Yes.
Q. And is this indeed one of those policies and procedures that you provided pursuant to that subpoena?
A. It is.
Q. And this is a true and accurate copy of it?
A. It appears to be, yes.
Q. With the exception of that yellow sticker in the

bottom right-hand corner?
A. Yes.
MR. CARTER: Your Honor, at this point, I'd move to admit Government's Exhibit 6.
THE COURT: Subject to the Court's rulings at side bar conference, it will be received to the extent so discussed.
(Government's Exhibit 6 received)
MR. CARTER: Your Honor, I'm about to publish it, so I will pause for you to give an instruction.
THE COURT: Ladies and Gentlemen, you are about to see and hear further testimony about a Franklin County use of force policy pertaining to the jail and relating to the use of force by detention officers. This is another situation where the Court is receiving this evidence for one purpose, but not others. You may not consider this use of force policy when you decide whether the defendant's use of force was objectively reasonable or unreasonable, but you may consider this use of force policy when you decide what the defendant intended at the time he acted, which is to say you may consider it for purposes of the second element of the offense charged, but not for any other purpose.
You may proceed.
Q. (By Mr. Carter.) Mr. Moon, will you please publish

just the second page of Government's 6. And about midway down, there's some bold, underlined text. Please explode that for us.

Mr. Ball, will you please read that into the record?

A. "Under no circumstances will any officer use kicks or blows to the head, neck, groin, or any other potentially lethal area of the detainee's body to subdue or restrain any detainee or will any officer use physical force against any detainee who is physically restrained."

Q. Now, just to be perfectly clear, that is bolded and underlined. Is that how it appears in the policy?

A. Yes.

Q. That's not something that's been done for court?

A. No.

Q. You can take that down, Mr. Moon.

So you said that you walked away after you watched the Sheriff strike Mr. Greene?

A. Yes.

Q. How much longer were you at the Sheriff's office after that?

A. 30 minutes to an hour, maybe.

Q. And where did you go after that?

A. The Sheriff's residence.

Q. Who all went to the Sheriff's residence?

A. Scout Simpson, Mr. Roberson, my wife and I, and

Sheriff Boen.
Q. And you're not installing software at this point. Why did Mr. Roberson go out there?
A. He was staying with the Sheriff.
Q. Do you have an estimate on about what time it was when you got to the Sheriff's residence?
A. Estimating 11:00.
Q. Late?
A. Yes.
Q. What happened at the Sheriff's residence after you returned there?
A. Deputy Dalton Miller arrived.
Q. Let me ask this. That was a poor question on my part. What was the atmosphere like there?
A. Normal. I mean, it was -- I guess nothing really out of the ordinary.
Q. You had bought some beer previously?
A. Yes.
Q. Were you all drinking that at this point?
A. Yes.
Q. Conversations being had?
A. Yes.
Q. Now, who showed up at the residence?
A. Deputy Dalton Miller.
Q. How long do you think you were there before he showed

up?
A. He arrived pretty much the same time we did.
Q. Did you find yourself at any point during this time at the Sheriff's house in the company of Dalton Miller and the Sheriff?
A. I did.
Q. Did you hear the Sheriff say anything noteworthy to Dalton during this conversation that you were a part of?
A. I did.
Q. What did he say?
A. "That's what they elect us to do, is to take care of business."
Q. And he was saying that in reference to what?
A. What had taken place at the jail.
Q. How long did you stay at the Sheriff's house?
A. Between an hour to two hours.
Q. How were you able to leave there?
A. My wife.
Q. She drove you?
A. Yes.
Q. Would you consider yourself intoxicated?
A. At that point, I mean, I drank quite a bit, but not -- I had too much to drive a vehicle.
Q. What were you thinking about? You've seen two incidents in a couple of weeks. What's going through your

mind at this point?
A. How things are starting to escalate, get out of hand.
Q. So what are you considering doing?
A. Speaking with the FBI.
Q. Did the FBI approach you or did you approach them?
A. I approached them during a meeting we was having over another case.
Q. And during that meeting, you gave them information about the defendant?
A. Correct.
Q. So essentially, you began cooperating in the investigation?
A. Correct.
Q. At some point, did you become aware, or, I'm sorry. At some point, did you become aware that the defendant was aware he was under investigation by the FBI?
A. I did.
Q. Were you public with the fact that you were cooperating with the FBI?
A. No.
Q. Why didn't you want people to know that?
A. Because I need to keep my job and I was also asked not to be public about it.
Q. How did you become aware that the Sheriff was aware that he was under investigation by the FBI?

A. Whenever there was some subpoenas issued for people to come, I believe it was to Grand Jury.
Q. And did you ever have any conversations with the Sheriff about the FBI's investigation into his conduct?
A. I did.
Q. Did you have any conversations that were specific to Mr. Greene?
A. I did.
Q. Tell us about that conversation.
A. Sheriff Boen had said that it was just me, him, and Mr. Roberson there, and that it was our word against everyone else's. And that if anyone had asked, that Mr. Greene jumped up and got in his face and he had put him back down.
Q. And is that what happened?
A. No.
Q. Why do you believe the Sheriff told you that?
A. I'm sure he was worried about the consequences.
Q. Did he want you to tell anybody that?
A. Yes.
Q. Who?
A. The Grand Jury.
Q. And did you?
A. No.
Q. Did you tell them about this conversation, though?

A. I did.
Q. At some point during your cooperation with the FBI, did you ever record any of your conversations with the Sheriff?
A. One. I was asked to record one.
Q. I want to direct your attention to June 20th of 2019. Did you record a conversation on that date?
A. Yes.
Q. Now, was this an in-person conversation or something over the telephone?
A. It was over the telephone.
Q. Were you nervous to do this?
A. Absolutely.
Q. Why were you so nervous to record these conversations, or this conversation? I don't want to misrepresent.
A. Because of my involvement in cooperating with the case and as well as -- I mean, it's against someone who I considered at one time to be a real close friend. And also he's the Sheriff. He's my boss.
Q. At some point during the conversation that was recorded, did the conversation turn to the incident with Mr. Greene?
A. It did.
Q. Was there any talk about the security footage?
A. I believe so.

Q. What about that?
A. That there's nothing on camera.
Q. Can you open that binder again?
A. Yes.
Q. I want you to go to tab 9. Tell me when you're there.
A. I'm there.
Q. Now, 9 isn't a document. It's a thing. What's the thing you're looking at there?
A. It's a -- I guess a thumb drive that's got a recording on it.
Q. You've listened to that recording?
A. Yes.
Q. And it fairly and accurately depicts a portion of the conversation you had with the Sheriff on June 20th?
A. Yes, sir.
Q. How do you know that that's the one you listened to?
A. It has my initials on it.

MR. CARTER: Your Honor, I would move to admit Government's Exhibit Number 9.

THE COURT: Subject to the Court's earlier rulings, Exhibit 9 will be received.

(Government's Exhibit 9 received)

MR. CARTER: Mr. Moon, can you publish number 9, please.

THE COURT: Hang on just a second.

MR. CARTER: You have an instruction to give. I'm sorry, Your Honor.

THE COURT: Yes. Are there multiple clips with separate exhibit numbers?

MR. CARTER: Not for this witness. This is the only one, Your Honor.

THE COURT: Ladies and Gentlemen, you are about to hear a recording of a conversation. This conversation was legally recorded and you may consider the recording just like any other evidence. There is a transcript of the conversation similar to what we saw the other day. The transcript is actually the superimposition of the words being spoken onto essentially a video portion of the conversation, but it's actually an audio recording.

The superimposed wording is the government's, is what the government hears when they listen to the recording. They may have also identified who is speaking as part of the superimposed transcription. This transcription as explained is offered for your assistance in understanding and your aid in understanding this evidence, as well as who is speaking. But I need to instruct you that what is evidence here is the spoken words in the conversation, not this transcript. So if you hear something different, it's what you hear, not what you see, that is evidence.

I would also note and instruct you that since this is really just a demonstrative aid to your understanding of this evidence and it is not itself evidence, only the recorded portion without the superimposed transcript will be available to you in the jury room.

You may proceed.

MR. CARTER: Thank you. Mr. Moon, will you please publish Government's Exhibit 9.

(Government's Exhibit 9 played)

VOICE NUMBER 1: Yeah. Well, me and you and Chris was the only witnesses there, right?

VOICE NUMBER 2: Just us three.

VOICE NUMBER 1: And there wasn't anything on camera.

VOICE NUMBER 2: There was trustees, but --

VOICE NUMBER 1: Yeah.

VOICE NUMBER 2: One of those I guess died over the weekend.

VOICE NUMBER 1: Yeah. And Huck is the one he supposedly bit.

VOICE NUMBER 2: Yeah. Well, if it comes down to it, we'll just have to talk to them, but maybe it won't.

VOICE NUMBER 1: I'd rather not. I mean, it's just my -- you know what I mean, it's mine and your word

against, you know, everybody else's, I guess. But, I mean, nobody was even there when it, you know -- when we did that.

VOICE NUMBER 2: No. No, it was just me, you and Chris and then --

VOICE NUMBER 1: Yeah.

(end of audio)

MR. CARTER: Thank you, Mr. Moon.

Q. (By Mr. Carter.) Mr. Ball, over the course of this investigation, did you ever receive a promotion?

A. I did.

Q. To what?

A. Chief Deputy.

Q. Who does the Chief Deputy report to?

A. The Sheriff.

Q. At the time you received the promotion, what's your relationship like with the Sheriff at that point?

A. Distant, I guess.

Q. But he still promoted you?

A. Yes.

Q. Are you still friends and doing the things that you did years ago?

A. Not really, no.

Q. Why is that?

A. I guess the things that had taken place. I mean, we

did still see each other. We went to Sheriff's convention, stuff like that together, but I guess it wasn't as frequent.

Q. You said earlier you struggled with the decision to go to the FBI?

A. Yes.

Q. Why was that such a struggle for you?

A. Me and the Sheriff were close for a long time. And, I mean, things just kept escalating. And I've got kids, I've got family, some of them who has been locked up in the jail. And it was getting to the point that, you know, you almost see your family there.

Q. Did you have to wrestle with that decision at all before you did it?

A. Yes, very -- very much so.

Q. Between the time of the incident with Mr. Greene and the incident with -- and going to the FBI, how often do you think you thought about that?

A. Every day.

Q. When was the last time you saw Justin Phillips?

A. It would have been whenever we moved him that time from the solitary confinement area to the drunk tank.

Q. Haven't seen or talked to him since?

A. No.

Q. Can you tell the Jury why you wanted to be a law

enforcement officer?
A. I've always wanted -- I mean, I always wanted -- originally, I wanted to be an attorney. But as far as law enforcement, I mean, it was -- once I got to working in the jail and seen how beneficial what I felt I could be in law enforcement, that's what made me want to get into law enforcement. And as far as me working as a criminal investigator, a lot of the things that we ended up arresting people for were serious crimes. It makes it worth it.
Q. Thinking back on the Zachary Greene incident on December 3rd, is there anything you wish you would have done different that night?
A. I wish I would have intervened.
Q. How often do you think about that?
A. A lot.
Q. Still today?
A. Yes.
Q. Thank you, Mr. Ball.

MR. CARTER: I have no more questions for the witness at this time, Your Honor.

THE COURT: All right. Well, it is almost 5:00 so we will take our evening recess at this time.

Ladies and Gentlemen during this recess and every other recess you must not discuss this case with anyone,

including your fellow jurors on breaks. You're not supposed to do that and are not allowed to do that because if you start discussing the case and what you have heard up to a certain point, you start solidifying your thoughts about the case in your head. So it's very important that you not discuss the case with your fellow jurors until I tell you it's time to do so. Obviously, and for obvious reasons, you shouldn't discuss the case with anyone else. And as I have been saying, don't let anyone else talk to you about the case. If anyone should attempt to approach you, you should report that to me either through the Court clerk or by notifying a court security officer.

You should not do any research. That means you shouldn't get on the internet and look up any of the subjects that have been discussed, any of the places that have been discussed, any of the people or witnesses involved in this case or any of the participants in the trial.

And you must keep an open mind. You should not and must not watch the news, read the newspapers about this. And that's very important because sometimes there's the potential that something in the news may be from a source that did not come into the courtroom, that did not raise their right hand, that was not placed under oath. You've watched the Rules of Evidence in action here. Not

just anything can get into evidence in a courtroom. And so if you were to contaminate your thoughts in your head by reading other things that may be reported about the case, you'll be doing an injustice. You've taken an oath to follow these rules, and I trust and know that you will.

If you would report again at 8:15 tomorrow, I'm going to do my dead-level best to make sure we start at 8:30 tomorrow. Court will be in recess, or the Jury is in recess and are dismissed. Court will remain in session.

(Jury out at 4:54 p.m.)

MR. CARTER: Your Honor, may Mr. Ball leave the witness stand?

THE COURT: I'm sorry, Mr. Ball. Sir, if you would be back tomorrow in time to take the stand so that we can start promptly at 8:30, that would be good.

THE WITNESS: Yes, sir.

THE COURT: So Ms. Craig is pointing out, Mr. Wood, that there's some discrepancy about the defendant's exhibit numbering system as it relates to the records of conviction for, is it just Mr. English, or is it Mr. Phillips too?

MS. CRAIG: No, just Mr. English. They referred to Exhibit Number 7, which in our notebook and on the list are Zachary Greene's records.

MR. PRATER: It should be Exhibit Number 10.

MS. CRAIG: So we introduced them as 7, so we can just change them up on the list and in the notebooks to clean that up.

THE COURT: All right. So for the record, what has been received are Brandon English's judgments of conviction, not Zachary Greene's records of conviction. And so regardless of how they were denominated earlier, they are being received as Defendant's Exhibit 7.

So what we need to do, because the jurors may already have notes referring to it as Exhibit 7. So what we need to do is just have you remark the Jury's copy of this exhibit as Defendant's Exhibit 7. If you have any questions about that, Ms. Craig can assist.

I would ask the government where we are in terms of how many witnesses after Mr. Ball.

MR. CARTER: Three.

THE COURT: Three witnesses. Who are they?

MR. CARTER: And two of them -- one of them is this guy.

THE COURT: Ferguson.

MR. CARTER: I'll just give you the order right now to everybody. Matt Ferguson will testify. Dakota Cowens will testify. Dalton Miller will testify.

THE COURT: Remind me of Dakota's connection?

MR. CARTER: He was a jailer, Franklin County

jail.

THE COURT: Which count?

MR. CARTER: Count Three. I expect his testimony to be rather brief. I expect Special Agent Ferguson's testimony to be brief as well.

THE COURT: So we'll wrap before -- well before lunch tomorrow?

MR. CARTER: Mr. Miller's testimony may take some time. Not as much time I believe as Mr. Ball's probably did today. It largely will depend on Mr. Wood's cross, but I expect us to rest tomorrow mid-day. I'd like to do it before lunch, depending on how it works out.

THE COURT: All right. Any other matters that the government would like to take up?

MR. CARTER: No, thank you, Your Honor.

THE COURT: Couple housekeeping things. Will you be sure that the physical exhibit is straight with Ms. Craig on the recordings and that the ones that are going back, or the ones that are actually received in evidence as an exhibit, do not have the superimposed transcript on them?

MR. CARTER: Your Honor, the original exhibits are the ones that are in the binder that the witness has been referring to with their initials on them, and they do not have the superimposed transcript.

THE COURT: So then separately, the superimposed -- a thumb drive with the superimposed exhibits that have been received will be marked as Court's exhibit next in order, which would be what?

MS. CRAIG: Three.

THE COURT: That thumb drive will be received as Court's Exhibit Number 3. And if you have an extra one, just get it or you can harvest it out of the Court's copy or however you want to do it. We just need to be sure we have it.

(Court's Exhibit 3 received)

MR. CARTER: We can make it before we leave the room today, I think.

THE COURT: Either way. Just get with Ms. Craig and be sure that we have that for the record.

With regard to Exhibit 6, I want to study overnight Government's Exhibit 6 on that last section of the exhibit, starts on the bottom of the next to last page, and I will make a ruling on that either -- well, I will make a record on it tomorrow.

So the government will -- sounds like they will rest tomorrow. We'll obviously then begin the defense case, to the extent that the defendant elects to put on evidence and to the extent that the charges survive any motion practice.

I would like to alert Mr. Wood and Mr. Boen and Mr. Prater, for that matter, that at some point in your defense case, a decision must be made about whether Mr. Boen will testify or not. You don't have to reveal that today. But at the appropriate time when a decision is made one way or another, the Court will want to engage Mr. Boen in a colloquy outside the presence of counsel. And I would like for you to prepare him for the Court's colloquy as to his rights under the Fifth Amendment and his right to waive his Fifth Amendment rights. And that that's obviously -- he can get advice and he can listen to advice, but at the end of the day, it's his decision and his alone, not Mr. Wood's decision, not Mr. Prater's decision, that sort of thing. So if you would please prepare Mr. Boen for that.

Any other issues the defense would like to take up?

MR. WOOD: One other issue. On my cross examination of Mr. Ball tomorrow, it's my belief that he has opened the door with his testimony today to some issues. He has testified as to the reason he left the Sheriff's department, that it was to take a job for better pay and some other stuff. That was his testimony.

THE COURT: That was in connection with one of the multiple times that he left.

MR. WOOD: My understanding is that was in connection with the last time that he left. He's now a truck driver. He said he took it for more pay and personal things.

THE COURT: I'll go back and look at that. I thought, to the extent that the testimony was developed in a linear fashion -- and I thought that it was -- I thought that there was testimony about going back to the Sheriff's department after the truck driving company or whatever.

MR. WOOD: If then I subsequently question him about that, depending on his answer, I believe it will open the door because there are issues about his leaving the Sheriff's department that I believe would be relevant. If he testifies, "I left because I got a new job and it was higher pay, and it was my decision to leave and it was the greatest thing for me and my family," I believe that that will open the door up to cross-examine him on facts about what the defense will allege is why he left.

THE COURT: Well, I've got it marked here, so let me just look at it.

MR. CARTER: Your Honor, I believe your recollection is how I elicited the testimony. I don't think Mr. Ball was ever asked why he left the last time. He was asked why he left and went to an industrial company that did things for Amazon, but I never asked him why he

was working as a truck driver at this point, I don't believe.

THE COURT: Well, I have that testimony marked around 15:21.

(Reviewing Real-Time Transcript)

When did you begin law enforcement? 2007, at Ozark. Was a patrolman through 2013. Certified. Left Ozark 2013. Went to Sheriff's office as criminal investigator, Franklin County, for Sheriff Boen.

Question, How long did that, I'll call it a tour, with the Sheriff's office last? Two years. Were you a criminal investigator the entire time? Yes. When did you leave? Would have been 2015. Went to work for the drug task force. Explains what the drug task force is. That was eight months. Left drug task force September 2015.

Next stop, Franklin County Sheriff's Office again. This time criminal investigator. Sheriff Boen hired. Was there until 2017. His answer was simply, "Until 2017." Why did you leave? My father had become ill and I took a better paying job to help him and my mother. What kind of job was that? Millwright. What's a millwright? We installed conveyor systems in Amazon facilities. So you got clear out of law enforcement? Yes. How long were you out? Until my father got worse, which maybe September, October of 2017. Did you change jobs

again? Yes. What did you do? Go back to Sheriff's office. Who hired you? Boen. So at this point, you have been hired four times? Yes. What did you start the last tour as? Patrol deputy. How long were you patrol? Until December of 2017. Did you move out of patrol? I did, to lead criminal investigator. That was a promotion. Sheriff Boen promoted him.

When you left law enforcement and went into the private sector, can you describe your relationship with the defendant? I'm not exactly sure what time period is being referred to there, but he said, very close, et cetera, visited all the time. And you were also -- in addition to being friends, you were his employee? Yes.

Then signpost back to when he first started in Franklin County, I guess the last time in 2017, September, October 2017. And then we segue into Justin Phillips. After Justin Phillips, how much longer were you a patrolman? Maybe three months. What was your next post? Lead investigator.

Kind of want you to fast forward to fall of 2018, about a year later. What's your position at that point? Still lead investigator. Did you know Hutchison, or do you? Yes. He was an investigator as well. I was his supervisor. Then we get into Brandon English. Describes him. Describes the English incident.

So how long have you been a law enforcement officer as of this, as of 2018? So it would have been about 10 or 11 actual years. Had you ever seen -- I guess that's just in relation to whether he had ever seen anything like that before. Then we start talking about policy.

So then we get to December of 2018, Bricktown Brewery. Get all the way through the Zach Greene incident. Back at the Sheriff's house. Phone calls.

Over the course of this investigation, did you ever receive a promotion? I did. Chief Deputy. That reports to the Sheriff. Was distant at that point in time. Still promoted him. Still friends, though. Just don't hang out as much. Why he went to the FBI. Wish I would have intervened, thinking back on it. That's it.

(End of Real-Time Transcript Review)

I don't see where he ever asked him about why he left after the Zach Greene incident.

MR. WOOD: Your Honor, well, in my mind, my recollection was in the portion where he was talking about his father, the trucking, the logistics or the millwright, when he was a millwright, that's where I thought --

THE COURT: That's the conveyor belt.

MR. WOOD: Yes, for Amazon. But in that section right there, in my mind, I thought that that's where that

he had also discussed why he left the Sheriff's department. That's fine. I'll talk to him tomorrow about it and then we'll wait and see what he says. And then if I have a --

THE COURT: Okay. Well, you're certainly welcome to check your notes. You heard me go over it, and I don't see where the door has been opened.

MR. WOOD: Okay.

THE COURT: I'm not saying that that's the end-all, be-all. I'm just saying I don't see where -- you described it as the door being opened. I don't see that.

MR. WOOD: In my mind, it was. However, apparently, I may have added some stuff.

THE COURT: Well, if you find something in your notes, I'm happy to go back.

MR. WOOD: I appreciate that.

THE COURT: If anything else comes up overnight, let us know, and otherwise, please be in your seats ready to go at 8:30. We're in recess.

(proceedings recessed at 5:14 p.m.)

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 6th day of September 2021.

____________________________________

PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

