IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA PLAINTIFF

v. CASE NO. 2:19-CR-20037

ANTHONY BOEN DEFENDANT

---

JURY TRIAL, VOLUME 4 OF 6

BEFORE THE HONORABLE TIMOTHY L. BROOKS

AUGUST 5, 2021

FAYETTEVILLE, ARKANSAS

---

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL J. SONGER
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-1762
michael.songer@usdoj.gov

MR. BRANDON T. CARTER
United States Attorney's Office
414 Parker Avenue
Fort Smith, Arkansas 72901
(479) 783-5125
brandon.t.carter@usdoj.gov

Also Present: Special Agent Matthew Ferguson
Federal Bureau of Investigation

IT Technician: Mr. Kenneth Moon

FOR THE DEFENDANT:

MR. RUSSELL A. WOOD
Wood Law Firm
501 East 4th Street, Suite 4
Russellville, Arkansas 72801
(479) 967-9663
rwood@woodlawfirmpa.com

MR. PAUL PRATER
Prater Law Firm
4700 Edgemere
North Little Rock, Arkansas 72116
(870) 543-9064
paul@praterlawfirmpllc.com

I N D E X


| | Page |
|---|---|
| Preliminary Matters ................................ | 741 |
| Jury Enters Courtroom .............................. | 743 |
| TRAVIS BALL (cont'd) | |
| Cross Examination by Mr. Wood .................... | 743 |
| Redirect Examination by Mr. Carter ............... | 812 |
| Recross Examination by Mr. Wood .................. | 824 |
| DAKOTA COWENS | |
| Direct Examination by Mr. Songer ................. | 827 |
| Cross Examination by Mr. Wood .................... | 840 |
| Redirect Examination by Mr. Songer ............... | 848 |
| MATT FERGUSON | |
| Direct Examination by Mr. Carter ................. | 850 |
| Lunch Recess Taken ................................. | 870 |
| Direct Examination by Mr. Carter (cont'd) ....... | 880 |
| DALTON MILLER | |
| Direct Examination by Mr. Songer ................. | 883 |
| Cross Examination by Mr. Carter .................. | 908 |
| Redirect Examination by Mr. Songer ............... | 917 |
| Government Rests ................................... | 918 |
| Motion for Directed Verdict by Mr. Wood ........... | 920 |
| Response by Mr. Songer ............................. | 925 |
| Court's Ruling on Directed Verdict Motion .......... | 926 |

I N D E X (cont'd)


Page

RONICA YOUNG

Direct Examination by Mr. Wood ............... 931

Cross Examination by Mr. Carter .............. 944

WILLIAM GILBREATH

Direct Examination by Mr. Wood ............... 948

Cross Examination by Mr. Carter .............. 960

Jury Dismissed for the Day ...................... 967

Preliminary Jury Instruction Discussion ......... 972

Evening Recess Taken ............................ 976

Reporter's Certificate .......................... 977

# E X H I B I T S

| | | Received |
|---|---|---|
| Govt's Exhibit 4 | Floor Plan of FCSO | 835 |
| Govt's Exhibit 6 | Franklin County Use of Force Policy (Sub-Part C Redacted) | 918 |
| Govt's Exhibit 18 | Anthony Boen Oath of Office | 881 |
| Defendant's Exhibit 5(a)-TB | Annotated Copy of Govt's Exhibit 5(a) | 809 |
| Defendant's Exhibit 5(b)-TB | Annotated Copy of Govt's Exhibit 5(b) | 809 |
| Defendant's Exhibit 5(c)-TB | Annotated Copy of Govt's Exhibit 5(c) | 809 |
| Defendant's Exhibit 5(j)-TB | Annotated Copy of Govt's Exhibit 5(j) | 809 |
| Defendant's Exhibit 6 | Photos of Zachary Greene | 939 |
| Defendant's Exhibit 12 | Photograph of FCSO Interior | 825 |

(Outside the Presence of the Jury)

THE COURT: The record will reflect that we are proceeding outside the presence of the Jury. I really want to bring the Jury in at 8:30 today to at least keep one promise to them, but if I could slide in just a couple of housekeeping items.

The government e-mailed the Court this morning some comments about Mr. Woods' prior cross examinations, et cetera, et cetera. I think that cross examination is the most important part of truth-seeking, and I have a very traditional view and thought about that, and so I am very hesitant to constrain anyone's ability to cross-examine.

That said, there are rules. And so what I see are two things: 613 says that you don't have to show the impeachment testimony to the witness on the stand, so nothing improper about how that technique has been used. But you do have to show it to adverse counsel. And so what the government is proposing is that if you're getting ready to impeach with a particular segment of a Grand Jury transcript, for example, you have to show it to them. And I think they have a copy of it, so if you would just give them which one and the page and line, that's fine. That's what 613 requires. They are making a point of requesting that. Secondly, and all that assumes that a proper predicate has been laid. There has to be a statement with

which the Grand Jury testimony, or any other sworn testimony, would be inconsistent.

The other thing that I have noticed, and I want to say this now so I don't say it in front of the Jury if I don't have to, but the editorial comments are not proper, and you've got to stop the editorial comments. I'll let you be as aggressive on cross. I'll help you control the witness if they are not being responsive, do whatever you want. But you need to ask questions and stop the editorial comments.

The government has provided a certification, a 902.11 certification, but there was another document that I don't understand that you've added.

MR. CARTER: Your Honor, the government has added, I'm going to call it three exhibits, but it's really two and a half to its presentation. Exhibit 22 are electronic phone records that we received from AT&T last night. I provided to Mr. Wood about 20 minutes after I received them. 22(a) is the certificate of authenticity for those phone records. 23 is one single record from Exhibit 22.

THE COURT: So that exhibit is part -- is covered by the 902 certificate?

MR. CARTER: Yes, Your Honor.

THE COURT: Any other matters that ya'll would

like to take up today?

MR. WOOD: Are we going to address the additional exhibit that they are proposing when they get ready to use it, or is the Court going to rule on that now?

THE COURT: I want to get the Jury in here. I'm not receiving it now.

MR. WOOD: Okay.

THE COURT: I'm not receiving it now, absolutely. I was just indicating that they have provided a certificate that purports to comply with 902.11 and 803.6.

Let's bring the Jury in, please. Everyone please stand.

(Jury in at 8:30 a.m.)

THE COURT: Mr. Ball can take the stand.

Good morning. Does anyone have anything to report from our evening recess? All right.

We finished the direct examination of Mr. Ball yesterday. It's now the opportunity for the defense to cross-examine. Mr. Wood, when you're ready.

MR. WOOD: Thank you.

CROSS EXAMINATION

BY MR. WOOD:

Q. Good morning, Mr. Ball.

A. Good morning.

Q. My name is Russell Wood and I represent Sheriff Boen

in this matter. I wanted to talk to you a little bit about your testimony yesterday, go over a few things.
How long were you a detective, an investigator?
A. Probably about five years total.
Q. As an investigator, did you receive any additional training for the requirements of that job?
A. I did.
Q. And where do you get that type of training?
A. Through various things such as the Criminal Justice Institute, the Arkansas Law Enforcement Training Academy.
Q. So do you get some of it when you're going through the academy?
A. Well, no, the academy has advanced courses.
Q. Okay, I'm sorry. And then the Justice Institute?
A. Yes.
Q. What is that?
A. It's through the U of A. They have programs that you can go take.
Q. How many of these programs -- after you became an investigator, how many of these programs did you attend?
A. Maybe 10. I would have to look at my transcript.
Q. I mean, I'm not asking for -- I'm not going to, "aha." Approximately how many do you think you've had?
A. Between seven and 10, I guess.
Q. And in these courses, do they teach you various

techniques for interviewing suspects or prisoners?
A. Yes.
Q. And I have never been through one. Do you do role-playing or how do you all practice that or train for that?
A. Most of it is textbook, and then there is practice as far as like role-playing.
Q. Have you ever had any training about conducting recorded phone calls of suspects?
A. Some, yes.
Q. And what did that training consist of?
A. More or less just the legality of it.
Q. Did they go over any techniques or anything like that?
A. I can't recall.
Q. So we'll start with your testimony yesterday on Zachary Greene situation.
A. Yes, sir.
Q. You started off by meeting at the Sheriff's house, is that correct?
A. Yes.
Q. And from there, it's my understanding you were driven to Bricktown?
A. Yes.
Q. And there, you had dinner, correct?
A. I need to correct myself. We did not meet at the

Sheriff's house. The Sheriff, Mr. Roberson and Ms. Simpson picked my wife and I up at our house.

Q. And prior to the Sheriff, and is it Scout Ingram or Scout Simpson?

A. I think her maiden name is Ingram.

Q. I've referred to her as Ingram throughout all this, so I'm going to use Ingram. Will you understand that's who I'm talking about?

A. Yes.

Q. So my understanding of your testimony is that Scout and the Sheriff picked you and your wife up, and Chris?

A. Yes.

Q. And isn't it true that you had already been drinking when Scout picked you up at that time?

A. I don't believe so. If I had, it would have probably been maybe a beer, because I had to rush home and get ready.

Q. But as you sit here today, you cannot tell us that you had not been drinking?

A. No, I cannot.

Q. There were a total of six of ya'll that went to Brickhouse (sic), correct?

A. Correct.

Q. Now, did Chris order appetizers for the table?

A. I can't recall.

Q. But everybody ordered meals?
A. To my knowledge, yes.
Q. Did ya'll have any desserts?
A. I don't believe so. I know I didn't. I don't know if anyone else did.
Q. As you sit here today, you can't -- you don't have any recollection or memory of whether appetizers were ordered?
A. Correct.
Q. And what time did you all get there?
A. I want to say it was around 6:00.
Q. And what time did you all leave?
A. I'd say it was between 8:30 and 9:00.
Q. So according to your testimony yesterday, you received, or the Sheriff received, a phone call from the jail at the beginning of that dinner?
A. Yes.
Q. And did anybody, or did the Sheriff tell you what the substance of that phone call was?
A. He did.
Q. And did he tell you that you and the Sheriff were going to go down to the Sheriff's Office after the dinner?
A. He did.
Q. And when he made that statement to you, what was your understanding of what ya'll's duties were going to be when you get to the jail?

A. Probably go down there and find out what actually took place.
Q. Would it be fair to say that you would be investigating whatever happened down there?
A. Yes. Getting information, yes.
Q. And it would be fair to say that knowing that you were going down there to investigate an incident at the jail, that you subsequently commenced to start drinking?
A. Yes, sir.
Q. It's my understanding from your testimony -- and tell me if this is not true -- that you had four, five beers?
A. Somewhere in there, yes.
Q. Did you have any mixed drinks?
A. I did not, no.
Q. Do you routinely drink mixed drinks?
A. No.
Q. Do you drink whiskey and Cokes type mixed drinks ever?
A. No, I do not. Not that I can recall, anyways.
Q. Well, no. No. My question is --
A. I have in the past, yes. I don't routinely drink them, no.
Q. Because I just asked you if you do, and you said no.
A. I apologize. I have in the past. I do not routinely drink them, no.
Q. And did you change your answer just then because you

thought, well, maybe Scout is going to be coming later?
A. No.
Q. That's not what you were thinking about?
A. Absolutely not.
Q. What you were thinking about that caused you to change the answer?
A. The part where you said, "routinely."
Q. Did you have any frozen type drinks?
A. No.
Q. Did you have any shots?
A. No.
Q. As we sit here today, do you -- well, strike that. Well, let me ask that. As we sit here today, do you know how many drinks Chris Roberson consumed?
A. I do not.
Q. Now, you've been around Mr. Roberson before, correct?
A. Yes.
Q. And would you agree that it's no secret he likes to drink?
A. That is correct.
Q. And he is a heavy drinker, correct?
A. That's correct.
Q. How long have you known him?
A. For a very short period of time. Just while he was working around the Sheriff's Office and dealing with

Justice Solutions.
Q. But it's my understanding you had been out with him more than just this one time at Bricktown?
A. Yes.
Q. Would it be fair to say that when he orders drinks -- well, first of all, what's his drink?
A. The can of water.
Q. What is your understanding of what he calls, "a can of water"?
A. Vodka and tonic.
Q. And did you ever observe him at a restaurant or at any of ya'll's prior social engagements ordering those two at a time?
A. I have.
Q. Have you ever observed him request those two at a time?
A. Yes.
Q. And are they continuous? Does he drink them continuous from the beginning of the event to the end of the event?
A. Yes.
Q. And he was treating all of ya'll to a social dinner that night, correct?
A. Correct.
Q. And that's not unusual, is it?

A. No.
Q. Vendors, or whatever you call people that may do work or whatever for different agencies, will often take leadership or administrative positions out for events, correct?
A. Correct.
Q. Had you ever been to the Sheriff's Association meetings when Chris was there also?
A. I have.
Q. And that's another event where he will treat various heads of departments or administration to a night out or dinner or drinks or whatever?
A. Correct.
Q. And you've also been with him when he did that at those Sheriff's events, correct?
A. That is correct.
Q. And was his alcohol consumption similar during those types of events?
A. It was.
Q. Was Chris Roberson intoxicated at the meal at Bricktown?
A. I believe he was.
Q. Am I saying that right, is it Bricktown?
A. Yes.
Q. Was he intoxicated at Bricktown?

A. He appeared to be, yes.
Q. And I'm going to jump ahead just for a question or two. Later in the evening, after the Greene incident, you were around Chris again, correct?
A. Briefly.
Q. And was he still intoxicated?
A. Yes.
Q. How many hours later was that?
A. Probably three hours. Well, it would be after the incident. It would have been an hour, maybe, after the incident, because he went in early.
Q. So he continued with his festivities until he went to bed?
A. That's correct.
Q. So we'll go back to Bricktown. So the meal is over with. Everybody is done with their stuff. What did ya'll do after that?
A. We went to drop the Sheriff's girlfriend off.
Q. And I understand from your testimony yesterday that you weren't -- at Bricktown, you weren't writing down or keeping track of who was drinking what, correct?
A. I was not, no.
Q. And so you, as you sit here today, you don't know how many drinks that the Sheriff had?
A. No, I do not.

Q. And I think you testified yesterday that he did not appear intoxicated?
A. As far as intoxication, I mean, none of us need to be driving a vehicle.
Q. So you guys load up in the vehicle. Scout is driving, correct?
A. Correct.
Q. And you head back to the Sheriff's department, correct?
A. We went and dropped the Sheriff's girlfriend off first.
Q. At some point in time, you get to the Sheriff's department?
A. Yes.
Q. And which door did you all enter?
A. The front main entrance.
Q. And is that where dispatch is at?
A. Well, there's a lobby, and then it goes into dispatch.
Q. So ya'll entered the front lobby. Was it all of you?
A. Yes.
Q. And you entered the lobby. Where did you go first?
A. Into the dispatch area.
Q. And who was in there?
A. Kambrie English. Adam Eckelhoff. And I can't recall the other individual's name. I want to say his first name

is Fisher.
Q. So what did you do at dispatch?
A. Walked in. Was maybe in dispatch just a few seconds, and then went down the hallway.
Q. Anybody go with you?
A. Mr. Roberson and the Sheriff.
Q. Anybody else?
A. Not that I recall.
Q. At this point in time, the three people in dispatch and the three of you -- you, Sheriff, and Roberson -- that's the only people that you recall being there?
A. Correct.
Q. So how far is dispatch from the shower room?
A. Maybe a total of 20 feet, 30.
Q. Is there a door in between there?
A. Between where, sir?
Q. Between dispatch and the shower room?
A. There is.
Q. What all goes on in dispatch?
A. Radio traffic. Answering 9-1-1 calls. Dealing with incidents inside the jail. There's a lot of things that go on in that room.
Q. Does dispatch receive telephone calls from the public?
A. They do.
Q. Do they receive a lot of telephone calls from the

public?
A. They do.
Q. And then also in dispatch, that's where they talk to the other police cars, correct?
A. Yes.
Q. And as Chief Deputy, I assume that you would be familiar with how all that system works also?
A. Yes.
Q. How many agencies does the dispatch, did the Franklin County Sheriff's department dispatch center dispatch for?
A. Law enforcement, there was about eight agencies. That would be local, state, if they needed us, as well as federal. And then all the fire departments in the county, and two EMS stations.
Q. And would it be fair to say that those people are, different agencies and people that work for them, are calling in on the radio to dispatch all the time?
A. Yes.
Q. So whoever is in dispatch, they are doing -- they are multi-tasking, correct?
A. That's correct.
Q. Is dispatch kind of a noisy environment?
A. At times, yes.
Q. If there's phone calls and radio traffic and whatnot, it can get loud in there?

A. Yes.
Q. And the person who is working the dispatch center, they've got to be focused on what they're doing, correct?
A. Correct.
Q. I've seen them before. I've been in a dispatch place before. But would you describe the panel or whatever you're looking at whenever you're sitting there and you're working dispatch?
A. You have about three to four computer screens that you're looking at monitoring, as well as multiple cameras which show different various areas of the facility. And then you have -- there's a box there with probably 12, 13, different buttons, which each button answers a different agency.
Q. And then do you also have the entire phone system --
A. Yes.
Q. -- gear right there that you have to run?
A. Yeah. I think that it's like four landlines.
Q. Are there buttons to where, if you have to call other places that would be of necessity for a dispatch to contact?
A. Yes.
Q. Would it be fair to say that there are numerous -- there's numerous buttons all over this console that you have to be familiar with?

A. Yes.
Q. So once you leave dispatch, tell me what you did.
A. We went down the hallway to the shower room.
Q. And why did you stop at the shower room?
A. The Sheriff stopped, Mr. Roberson stopped, and I stopped. I don't know exactly why.
Q. I think I may have missed this yesterday, but we've got a photograph of it. Can you put up a picture of the horizontal lines?
Do you recognize this image?
A. I do.
Q. That was from yesterday. And my understanding is that this represents where the three of you were standing when you stopped at the shower room?
A. Correct.
Q. And the doorway on the left here is the shower room?
A. Yes.
Q. And I may not have been paying attention yesterday, but who was -- these three lines, which one of you all is that? That's not a very good question.
MR. CARTER: Your Honor, I'm sorry. I just want to make -- are we going to mark this as some sort of defendant's exhibit? I don't know if the record is going to reflect what the witness is looking at because of the method in which this is been displayed.

THE COURT: I was just looking through to find out which particular exhibit to get that on the record. Was it 5(a)? Looks like 5(a) to me.

MR. WOOD: It is, Your Honor. And what I would propose is, I have a hard copy of this image. May I approach?

THE COURT: You may.

MR. WOOD: I'll have to have him draw on this physically, and then I will offer this, his drawings on that as an exhibit. May I approach?

THE COURT: You may. So for the record, you have handed the witness a copy of Exhibit 5(a), is that right?

MR. WOOD: Yes, Your Honor.

THE COURT: You may proceed.

Q. (By Mr. Wood.) Mr. Ball, do you see the photograph that I've handed you?

A. I do.

Q. That is marked on your copy as Defendant's -- I mean, excuse me -- Government's Exhibit 5(a). Do you see that?

A. Yes.

Q. Could you draw on that photograph where you were standing, where the Sheriff was standing, and where Mr. Roberson was standing? And if you would, on the top of each line, would you just put your initials where you were, "AB" for Anthony Boen and "CR" for Christopher Roberson,

please?
A. Okay.
Q. So I'm going to let you hang on to that for just a second. So looking at the monitor, which one of these lines would be you?
A. I would be in what would be the left area of the doorframe.
Q. So you were just before the shower room?
A. Yes.
Q. Standing up against the wall?
A. Right there at the doorway, yes.
Q. Then is that the Sheriff in the middle of the doorway?
A. More to the right. More to the right of the center, toward the frame.
Q. And then that's Mr. Roberson on the back side?
A. Correct.
Q. So you guys stop. You're standing in this position. And at some point in time, there was an interaction between the Sheriff and Mr. Greene, correct?
A. Correct.
Q. Tell me again what that interaction was.
A. The Sheriff had threw water in Mr. Greene's face and then struck him on the right side of the face.
Q. Struck him on -- he struck him on the right side of the face?

A. Yes.
Q. On Mr. Greene's right side?
A. Correct.
Q. Isn't it true yesterday you testified that Mr. Greene was laying down in that cell?
A. Yes.
Q. And you were testifying that his head was propped up against the back wall, or there's actually a door there?
A. Metal door, yes.
Q. His head was propped up on the metal door?
A. Yes.
Q. And it was propped up. Did he have a pillow under his head?
A. I don't recall. I think his mattress was somewhat folded up behind him.
Q. And it's my understanding of your testimony yesterday that the Sheriff was in the doorway?
A. Correct.
Q. And in fact, the room is not big enough for a bunch of people in there and the Sheriff stayed in the doorway, correct?
A. Yes.
Q. We're going to take that one down. I want to direct your attention back to the monitor again. You see the photograph on there?

MR. CARTER: Your Honor, I again would ask for the record to be cleaned up on this.

MR. WOOD: I'm working on it. May I approach, Your Honor?

THE COURT: You may. Is this 5(h)?

MR. WOOD: This is 5(j).

THE COURT: 5(j) is on the display monitor with the markings on the telestrator from yesterday.

Q. (By Mr. Wood.) So I've handed you a document. Do you recognize that document?

A. I do.

Q. It's a photograph. Do you recognize that photograph?

A. I do.

Q. And you were questioned about that photograph yesterday, correct?

A. That is correct.

Q. And you drew on your monitor to identify the location of a bench that used to be in there?

A. Correct.

Q. Now, if we look at the monitor, do you see the drawing from yesterday?

A. I do.

Q. Now, is that the drawing that you made?

A. It is.

Q. And does it represent on the -- let me back up. As

you're looking into the shower room, does it represent your drawing of a bench on the left-hand side?
A. It does.
Q. And your drawing has, what I'm going to call the top of the bench, correct?
A. Yes.
Q. The seat portion of the bench, correct?
A. That's correct.
Q. And then you have two legs coming down from that. And would it be fair to say that those are the legs of the bench?
A. Correct.
Q. Now, the drawing on the monitor, is that fair and accurate of where that bench was placed?
A. I mean, it's not precise.
Q. Sure.
A. But, yeah.
Q. Would you take your pen and would you draw on Government's 5(j), would you draw the bench on that one, please. And did you draw the legs on it also?
A. I did.
Q. How long was that bench?
A. Maybe three feet.
Q. All right. And you see how the bench kind of starts at the doorway?

A. Yes.
Q. And then it goes, it runs for three feet into the room there. You see that?
A. Yes.
Q. How much space is left at the end of that bench to the actual door?
A. I know it has to be enough to get the door open to the room, so maybe one to two feet.
Q. So that's three feet for the bench, correct?
A. Yes.
Q. We'll say -- you okay if I say two feet for the additional space?
A. Yes.
Q. So would it be your testimony that the room was approximately five feet in depth?
A. Approximately, yes.
Q. Now, are you telling this Jury that the Sheriff stood in the doorway, reached into this room that's five feet in depth, and hit Mr. Greene while he was laying down with his head up against this back door?
A. Yes.
Q. And he never went in the room?
A. Well, he leaned into the room.
Q. His feet never went in the room?
A. I'm not 100 percent sure. I wasn't watching his feet.

Q. So you don't know -- as we sit here today, you can't testify that his feet went in the room?
A. No, I can't.
Q. But you are certain that he stood in this doorway and was able to reach Zachary Greene's head that was all the way at the back of the cell up against the wall?
A. Yes.
Q. Why was Zachary Greene being housed in this particular holding cell?
A. I do not know.
MR. CARTER: Objection, Your Honor. This has been -- this testimony has been prohibited by the Court's order in motion in limine.
THE COURT: Well, the motion in limine ruling remains the same, but I'm not sure that's where you were headed or not. If your question is going to categorically the purpose why a person would be held in that room as opposed to some other room, that's fine, but you can't violate the motion in limine ruling.
MR. WOOD: No, we're just going to talk about generally what the purpose of that room is and why a person would be in that room.
THE COURT: That's fine.
Q. (By Mr. Wood.) So, I'm sorry. I don't know if you got your testimony out. Do you know why he was there?

A. No, I do not.
Q. You were Chief Deputy of the Sheriff's dept at that time, correct?
A. That's correct.
Q. And does that mean that you're over the jail operations?
A. Can I answer that question, your previous question again? I was not Chief Deputy at that time.
Q. I'm sorry. At that time, you were CID?
A. Correct.
Q. But the Franklin County Detention Center is not a big detention center, is it?
A. No, it's not.
Q. I mean, nobody is going to confuse it with the LA County Detention facility, are they?
A. Absolutely not.
Q. Would it be fair to say that ya'll's jail had very limited space?
A. Yes.
Q. Let's talk about the layout of the jail generally, then. How many general population pods did ya'll have?
A. Around 33.
Q. How many general population holding cells?
A. We had two for males; one for females.
Q. Kind of describe what a general population holding

cell is.
A. It's just where the general population of the jail is held.
Q. Describe the layout.
A. It's got a bigger room with picnic tables or benches. It's got two outside showers, kind of like a community area. And then down the hallways, it's got cells that's got three bunks in it for three prisoners per cell.
Q. So each general population -- do you call the whole thing a cell or a pod? I call it a pod. I'm sorry. A cell or a pod? What do you call the whole thing?
A. Cell, pod. I mean --
Q. Each general population cell is basically a big room, correct?
A. Yes.
Q. And inside that room, then you will have some benches for them to sit at and read the newspaper or whatever, correct?
A. That's correct.
Q. And then somewhere inside there, you have, you said, 33 pods, which are individual rooms that they can go into when they sleep at night, correct?
A. Correct.
Q. And are they locked into those individual cells at night?

A. No.
Q. Would it be fair to say that the doors just stay open?
A. Yes, open facility.
Q. So when you're in a general population cell, then basically ya'll are just all in there together?
A. Yes.
Q. And you had two of those?
A. Yes.
Q. And how many people did each of those cells hold?
A. We were overcrowded at the time, so there may be 20 in one of those.
Q. How many are they supposed to hold?
A. About 12. I think 12 in 33. And then you're looking at somewhere around nine in cell 30.
Q. So if we had nine in 30, and you said 12 in 33?
A. Yes.
Q. And when you say 30 and 33, that's the room designations or something?
A. That's what we call them, yes.
Q. And then at the time that this happened, the Zach Greene incident, how many people, approximately, to the best of your memory, were in 30 and 33?
A. I would say there was probably around 20 people in 30 and 15 in 30 -- let me rephrase that -- 20 in 33 and then 15 or so in 30.

Q. And would it be fair to say that that overcrowding issue was an ongoing issue?
A. It was.
Q. I'm not implying anything about Franklin County or how ya'll run it. It's everywhere, is that correct?
A. Yes, sir.
Q. Would it be fair to say that all of the surrounding counties all deal with these overcrowding issues?
A. Yes.
Q. And do you guys swap prisoners from county to county and stuff trying to alleviate this overcrowding issue?
A. We do.
Q. And so would it be fair to say that when you reach a breaking point -- I won't say breaking point -- when you reach a certain amount that is just untenable, would the county then try to pay another county to house those inmates?
A. Yes.
Q. And that's not an uncommon situation either, is it?
A. No.
Q. Would it be fair to say that if a county does get some space, that they will house people because they will get paid for it?
A. Yes.
Q. And if Franklin County has to send somebody such as

Justin Phillips to another county, who pays for that?
A. Franklin County.
Q. And then you had one female cell, correct?
A. Yes.
Q. That one is irrelevant because we're not dealing with any females, right?
A. Right.
Q. What other holdings cells did you have at the time?
A. We would have had the two in the very back, which each one of those have two bunks in them.
Q. Hold on. The two in the very back. What are those referred to as?
A. They have numbers. I can't recall the numbers off the top of my head, but they are more of a separation cell. In fact, back in the day, we used them for sex offenders and things like that.
Q. Would it be fair to categorize those, or name those for the purposes of our talk here today, those are two isolation cells?
A. Yes.
Q. Well, let me back up. How many bunks did you say was in each one?
A. There's two.
Q. Two bunks in each one. So they may not necessarily be isolation cells for one particular inmate, correct?

A. Right.
Q. But they were segregated?
A. Yes.
Q. And you could put two -- let me back up. How many inmates did you usually keep in the two, I'm going to call them segregation cells, not isolation cells, how does that sound? Would that be more accurate?
A. Yes.
Q. Two segregation cells. How many people did you all usually keep in that?
A. That all depended on different -- I guess different factors.
Q. At the time that we're dealing with here with Zach Greene, do you recall how many inmates were housed in the two segregation cells?
A. I do not, no.
Q. Would it be unusual for you -- for the Franklin County Detention Center to have more than two people in one of those cells?
A. No, it would not.
Q. What was the maximum number that you have seen in those cells?
A. Three.
Q. So would it be fair to say that it's designed for two, but it was not unusual for it to have three?

A. Correct.
Q. And we don't have any information that it had four or more, right?
A. No.
Q. And would it be fair to say that you have three people in that two-person segregation cell, because, again, you simply don't have room anywhere else, correct?
A. Correct.
Q. So what types of decisions have to be made by the jail, okay, when they are considering whether to keep people in these, the big cells -- the big cells, the two big cells -- or the two segregation cells?
A. If there's any conflict with that individual to be put in a different cell with another individual. That's one of the biggest factors. Are they sick? Do they have some kind of contagious illness?
Q. When you're making housing decisions -- I want to make sure you understand, when I say housing decisions, I'm talking about decisions ya'll make on who is going to get put in what place. When you're making these housing decisions, are there inquiries that you have to make or information that you need to be aware of regarding certain types of inmates, or certain types of charges or convictions that inmates have?
A. There are.

MR. CARTER: Objection. Approach, Your Honor?

THE COURT: Yes.

(bench conference)

MR. CARTER: Your Honor, we suspect Mr. Wood is trying to open the door himself to Mr. Greene's charges. I object to that. Again -- let me finish making my record, please.

MR. WOOD: That was my last question.

MR. CARTER: I would ask the Court to enforce the motion in limine. I would also ask the Court to ask the Jury to disregard that last question, because he's making an implication as to Mr. Greene is being housed somewhere because of the type of charges he had, which is prejudicial in and of itself. As I understand the Court's order, Mr. Greene is to be treated just as an inmate, like any other inmate. And the heavy insinuation to this line of questioning is that he's a prisoner in a special spot because there's something special and different about him.

MR. WOOD: May I respond?

THE COURT: You may.

MR. WOOD: Excuse me, Mr. Carter. That was actually my last question on that subject matter. The reason that I asked these broad questions about inmates in particular is to show why they have to house inmates in different locations, because you still have other places in

the facility, okay. And then to get to the issues of housing, there are different groups of people that they must consider cannot be together, okay. In this particular instance, they had some sex offenders, okay. They had violent inmates. They had a mentally ill inmate who had killed his parents. And those different groups of people were all occupying all of the other cells, so that is why there was a reason why he was in that cell.

The issue, just like I have been saying from the beginning, is that they are wanting it to look like that we somehow tortured this guy, put him in some kind of concentration camp with a cubicle just because we were pissed off at him or just because we were mean to people. Just trying to give some context about why anybody -- anybody, not Zach Greene or somebody, not even going to say him -- any inmate would be housed in that little, bitty room shackled to a bench.

THE COURT: All right. So he's not asking any more questions. I'm not going to instruct the Jury to disregard that. I think there's been prior testimony about the shower room by whichever witness you brought in 5(a) to begin with and generally what the purpose of it was. I don't know that this testimony is inconsistent with that.

The Court also doesn't know what the testimony is that's coming in the defense. There's some reference to

some trustee getting bitten or whatever. I don't know where all these different things happened. I don't know if that was in a general population and then that's why they moved him over there. I mean, I don't know a lot of these facts and I don't know where he's going. But certainly the Court's prior rulings on motions in limine remain true. No doors have been opened. One of those is, you can't get into the purposes of why Zach Greene was there, the underlying whatever.

The other one was, I thought, you're not supposed to be having gratuitous references to overcrowded conditions. There was a ruling that said context-specific, fine. And I think we're probably still in context-specific, but we need to avoid talking about, "This was a problem everywhere."

MR. WOOD: Okay. Here's what I was planning on doing. Go again, and then saying, "What different facilities did you have? You put various inmates in those places for various reasons." And then, "Why would you need to house an inmate, any inmate, in the shower room?"

MR. CARTER: That's been asked and answered already, Your Honor.

THE COURT: It has. So let's move on.

(bench conference concluded)

Q. (By Mr. Wood.) So you, the Sheriff, and Mr. Roberson

are in the hallway outside of the shower room. You've testified that the Sheriff leaned in and hit Mr. Greene?
A. Correct.
Q. But you do not know, as you sit here today, how many times?
A. A total number, no, I do not.
Q. And as you sit here today, you cannot tell the Jury where the Sheriff struck Mr. Greene?
A. Yes. On the right side of the face.
Q. When you arrived at the jail -- and you had an opportunity to see Mr. Greene before the Sheriff allegedly struck him?
A. Yes.
Q. And did you see any injuries on him?
A. I did not, no.
Q. Did you see a bloody lip?
A. No, I did not.
Q. Did you see any bruising?
A. No, I could not.
Q. Did you see anything wrong with his mouth area at all?
A. I did not, no.
Q. After you say that the Sheriff struck Mr. Greene, what did you do?
A. I walked into the kitchen area.
Q. How long had you been a police officer at this time?

A. Ten to 11 years.
Q. Ten to 11 years, with just this agency or different agencies?
A. Different agencies.
Q. And I apologize if we covered it. What other agencies did you work for?
A. The Drug Task Force. Ozark Police Department.
Q. Was that it?
A. Paris Police Department. Worked for them part-time.
Q. Any others?
A. No.
Q. Prior to becoming a law enforcement officer, or when you became a law enforcement officer, you had to take an oath, didn't you?
A. I did.
Q. And you took an oath to uphold the Constitution of the United States, correct?
A. That is correct.
Q. The laws of the State of Arkansas, correct?
A. Correct.
Q. And you took that oath serious, right?
A. Yes.
Q. What could happen to you as a law enforcement officer if you observed excessive force by another officer against an inmate?

A. I could be charged.
Q. Have you ever heard the term, "failure to protect"?
A. I have.
Q. And what does that mean to you?
A. That you failed to protect someone.
Q. And if a person, an inmate, was being beaten, would it be your duty to protect them?
A. Yes.
Q. And your failure to protect them would be a crime?
A. Yes.
Q. And it's your testimony here that the Sheriff beat this guy and then you just walked away?
A. Yes.
Q. And in your mind, what was the gravity of that type of situation?
A. It was serious.
Q. Did you think Zach Greene was in risk of serious physical injury?
A. Serious physical injury, no.
Q. Did you think he was at risk for any injury?
A. I mean, being struck in the face, yes.
Q. And you just simply went to the -- you just walked off and went to the kitchen?
A. Yes.
Q. Then after that, you went to the Sheriff's house and

drank your 12-pack, correct?
A. Incorrect.
Q. Did you stop and get a 12-pack?
A. We did.
Q. But after this monumental event, you just went to the Sheriff's house and sat out there at the gathering, correct?
A. I did.
Q. Had some more drinks, correct?
A. I did.
Q. Did you get charged by the federal government for your failure to protect Mr. Greene's civil rights?
A. No, I did not.
Q. Did that have anything to do with your eagerness to participate in their investigation?
A. I can't answer why I haven't been charged, no.
Q. Were you ever advised that you could be charged?
A. Yes.
Q. And when were you advised by the government that, "Hey, you could be charged as a defendant in this case"?
A. I guess it would have been at the beginning of the investigation.
Q. The very first time they met with you, they told you that, "You can cooperate, or you can be a defendant and be charged right over here with Sheriff," correct?

A. Correct.
Q. And that's when you gave them your first statements in this case, correct?
A. Correct.
Q. Because they were operating off only the allegations of Mr. Greene at that time, right?
A. I'm not sure.
Q. And you made the calculated decision that you would rather be a witness than a defendant?
A. Yes.
Q. That you would rather take the role that you've taken today than sit over here and prove your innocence?
A. Yes.
Q. And in fact, you met with the FBI a bunch of times, didn't you?
A. I did.
Q. I mean, it was almost like you were eager to bring them information, right?
A. I wouldn't say eager. I just did what I was asked.
Q. When was the first time you met with the FBI?
A. To the best of my recollection, it was in February of 2019.
Q. February of 2019. Prior to the Zach Greene incident, had you ever told anybody that you wanted to be Sheriff?
A. Yes. Me and the Sheriff had a conversation about it.

Q. Would it be fair to say that you told a lot of people that you wanted to be Sheriff?
A. Yes.
Q. And at that time, you were aware of the popularity of the Sheriff, correct?
A. Yes.
Q. I mean, he received a large percentage of the vote each election cycle, correct?
A. Yes.
Q. You met with the FBI the first time around February of 2019. Was that your testimony?
A. Yes.
Q. Let's back up for just a second. After the Zach Greene alleged attack, you walked off and went to the kitchen?
A. Yes.
Q. And who all was in the kitchen?
A. Trustees.
Q. Do you recall which ones?
A. I don't. I know one of them has since passed away and then there was one that they called, "Huck," but I can't remember exactly. We always had a large amount of trustees.
Q. Do you know a trustee named Marshall Elmore?
A. I do.

Q. And was he in the kitchen that evening?
A. Not that I recall, no.
Q. And when you went to the kitchen, what were you doing then?
A. Just asking them what had taken place about the biting.
Q. And did you collect statements from those inmates?
A. Just verbally what they said.
Q. You didn't collect any written statements?
A. No.
Q. And when you collected all of this information from the inmates, then what did you do?
A. Nothing. I mean, there was nothing productive that came out of the conversation of it after what had taken place.
Q. So you're done. You've talked to the inmates, or the trustees. Let's back up just so the Jury understands. What's a trustee?
A. Someone who is at our facility, kind of given free rein of all the property. Can kind of just go do whatever they want, work on things, go to the store, things of that nature.
Q. Would it be fair to say that they are people who have been in prison for some, probably extended period of time?
A. Not necessarily the trustees. The 309s would.

Q. I'm getting confused. Were there any 309s there?
A. I don't believe so. I believe they had already been pulled.
Q. If I'm an inmate, how do I become a trustee?
A. The Sheriff appoints you as a trustee.
Q. Well, I mean, there's got to be some criteria, right?
A. Not at our facility, no.
Q. Well, when you were Chief Deputy, you just appointed whoever?
A. No, I did not appoint trustees.
Q. So after you got finished talking to the trustees, then where did you go?
A. The Sheriff was back there. And I believe me, him, and Mr. Roberson all walked back up front.
Q. And then what?
A. We left.
Q. Ya'll rounded up, I guess Scout and your wife, maybe?
A. Yes.
Q. And then ya'll took off?
A. Correct.
Q. Your testimony is you got there with the Sheriff, right?
A. Yes.
Q. Ya'll went down the hallway to the shower room with the Sheriff, right?

A. Yes.
Q. There was this incident with Zach Greene?
A. Yes.
Q. And the Sheriff was there. And then you went to the kitchen, right?
A. Yes.
Q. When you went to the kitchen, then the Sheriff subsequently came in there, right?
A. He did.
Q. Ya'll milled around, talked to the trustees?
A. Yes.
Q. And then the two of ya'll headed back up front. You got Scout, your wife, and then ya'll took off?
A. Yes.
Q. That was the entirety of what happened on that evening?
A. Yes. To the best of my recollection, that is it.
Q. You guys went to the Sheriff's house after that?
A. We did.
Q. I want to go back to the FBI. So you started working for the FBI February of 2019 approximately, correct?
A. Yes.
Q. What was going on? Was it a Christmas party for the department? No, it wouldn't be a Christmas party. What was going on there? Why did you all -- just strike all

that.

Why were you all having this gathering?

A. The gathering would have been because of Justice Solutions installing our software.

Q. Because I never was clear on that. So this was another social event put on by Justice Solutions?

A. Yes.

Q. And how many people were there?

A. At the -- are you referring to the dinner?

Q. No, I'm sorry. When ya'll leave the jail and go back to the Sheriff's house.

A. There was -- the same group, with the exception of Dalton Miller is now with us.

Q. And you were there for another two hours, approximately?

A. One to two hours, yes.

Q. Is that the closest you can narrow that down to?

A. Maybe closer to an hour and a half to two hours.

Q. Hour and a half to two hours, you were at the Sheriff's house. And you were enjoying the festivities, correct?

A. Yes.

Q. Everybody was having fun and cutting up and at the event, right?

A. Yeah. Sitting around talking, yes.

Q. And do you recall what time you left?
A. It would have been between midnight and 1:00, to the best of my knowledge.
Q. Well, and then that was that, correct?
A. Yeah.
Q. Now, after this incident, we've already talked about, you just walked away. Did you write a report to anybody about this?
A. No, I did not.
Q. I mean, did you call the State Police to report this?
A. No, I did not.
Q. I mean, is that pretty -- let me ask you this. Who is it in your line of work -- police agencies, the counties, the cities, the whatever within the State of Arkansas -- who do you report this stuff to?
A. Typically would be the State Police.
Q. And in your experience, are they the ones that then would investigate this type of stuff?
A. There's a lot of things that depends on.
Q. But you certainly knew that you could report this to the State Police?
A. I could, yes.
Q. But you did not?
A. No.
Q. Do you have any -- you haven't produced any e-mails or

letters or anything that you sent at that time to anybody -- friends, family, other police officers -- says "Oh, my gosh, you're not going to believe what I just saw," correct?
A. Correct.
Q. You don't have a text message where you texted your dad or your mom and said, "I can't believe this. You're not going to believe what I saw," right?
A. That's correct.
Q. A text message -- were you married at the time?
A. Yes.
Q. Not a text message to your wife right after that, "Oh, my gosh, this is crazy?"
A. Text message, no.
Q. I want to talk about your audio recording telephone call that you made, or I should say recorded, between you and the Sheriff. Do you recall that?
A. I do.
Q. Now, was the FBI agent or a representative of the government with you when you made that recording?
A. Yes.
Q. And where were you all at when you made that recording?
A. In my vehicle.
Q. Now, how did the FBI -- excuse me. Was it an FBI

agent?
A. Yes.
Q. And who was that agent?
A. Matt Ferguson.
Q. Do you see Mr. Ferguson here today?
A. I do.
Q. How was it that he ended up in your vehicle at the same time -- well, let me back up. I'm getting confused. Who called who? Did you call Anthony or did he call you?
A. I called him.
Q. So you meet up with the FBI. You've told them your story, correct?
A. Yes.
Q. And they said -- whose idea was it to record a phone call with Anthony?
A. I believe it was suggested that we go out and make a phone call.
Q. That doesn't answer my question. Who decided that this is what we're going to do?
A. I can't recall. It was one of the individuals in the room during the meeting.
Q. Was it you?
A. No.
Q. So the FBI comes up with the idea, "Hey, let's get set up, let's do our thing, we're going to call him, I'm going

to have you call him, and you are going to record ya'll's conversation"?

A. Essentially, yes.

Q. Because this was your opportunity, and the FBI's opportunity, to get him on tape admitting everything that he had done, correct?

A. Yes.

Q. Get him on the phone, it's going to be the smoking gun, right?

MR. CARTER: Objection, Your Honor. Calls for a conclusion that the Jury is supposed to make; not the witness.

THE COURT: Sustained.

Q. (By Mr. Wood.) Did you hear the video, or, excuse me, the audiotape that was played yesterday during your direct examination?

A. I did.

Q. And do you recall how long -- strike that. In that, there's some statements by the Sheriff, correct?

A. Yes.

Q. And he says, "Hey, there was no video of it," right?

A. Correct.

Q. The witnesses that were there, are the ones that were there, right?

A. Yes.

Q. Did you hear any admission of any of the facts that you've testified to here in court by the Sheriff?
A. No. As far as an admission, no.
Q. Well, we've already covered the fact that you're a trained investigator, right?
A. Yes.
Q. I mean, you've been trained how to interrogate people to get the information out of them that you want, right?
A. Yes.
Q. I mean, you've had -- ya'll have even had acting out scenarios of it and everything, correct?
A. Yes.
Q. On that video, or, excuse me, on that audiotape, did you ever ask him, "Sheriff, what are we going" --
MR. CARTER: Your Honor, objection. He's asking about hearsay statements that are not in evidence.
THE COURT: Rephrase the question, Mr. Wood.
MR. WOOD: Your Honor, then I would like to play -- they've played it. It is an exhibit that's been provided to us. Then we would like to offer it as the defendant's exhibit.
MR. CARTER: Your Honor, we'll publish Exhibit 9 again if that's what the defense is asking for.
THE COURT: Yes, you can cue up and examine him all you want about any of those excerpts. It's just that

you can't -- the problem is with the summary of what he didn't say or what he did say.

MR. WOOD: I'll rephrase.

THE COURT: If it's not an accurate depiction of what is in evidence.

Q. (By Mr. Wood.) Did you ask the Sheriff if he had been drinking?

MR. CARTER: Same objection, Your Honor.

THE COURT: Side bar.

(bench conference)

THE COURT: Mr. Wood, I don't understand how to rule on the objection for two reasons.

One, I read all of the transcripts that were provided, and I don't recall any such question.

Secondly, in ruling on the motions in limine about the recordings and your objections and your request for additional material, I don't recall that you requested any material about whether he asked him. So is this an argumentive point? Or did, in fact, is there a place where he asks about whether Mr. Boen was drinking on the phone call?

MR. WOOD: Well, I think that I should have the right to -- he's already -- he's a police officer. He's a trained investigator. He is conducting essentially an investigation with the FBI. I don't understand why I

cannot ask him questions. You could have asked him about, "Why did you beat Mr. Greene," but you didn't. You could have asked him about, "What are we going to do about the injuries?"

THE COURT: But what is the relevance of what he could have asked in a controlled recording, but did not? In other words, this is a hypothetical, as I understand it, of sorts, that he could have asked these questions, but didn't. What is the relevance of that? Why can't you just --

MR. WOOD: I can argue in closing, but --

THE COURT: Well, I mean, I guess you could ask him, "In the recordings, there was no discussion about whether Boen had been drinking?" "No." "In the recordings, there was no discussion about this?" And then in closing, you can argue that.

MR. WOOD: Okay. That's fine.

THE COURT: But putting him in this weird position of being a co-investigator and why he didn't ask better questions, that's pretty odd, and I don't think it's relevant in the way it's being phrased.

MR. WOOD: So there was no discussions of this, there was no discussion of that.

THE COURT: That's fine. That's fine.

MR. WOOD: I just didn't know how to ask the

question. I just needed Brandon's help.

(bench conference concluded)

MR. WOOD: May I?

THE COURT: You may proceed.

Q. (By Mr. Wood.) On the recording that you made, there was no discussion of drinking, correct?

A. Not that I recall, no.

Q. There was no discussion of hitting anyone, correct?

A. No.

Q. There was no discussion of yelling at anyone, correct?

A. No.

Q. Thank you. How many times, total, did you meet with the FBI in this case?

A. I don't recall.

Q. Do you think it was more than five times?

A. No.

Q. You do not?

A. I do not, no.

Q. Did I understand yesterday that you testified that the Sheriff called you at some point to talk about either your testimony or the FBI investigation?

A. Yes.

Q. And because I forget, what did he tell you in that conversation?

A. Which one?

Q. Whatever you testified about yesterday. You said, I think, that the Sheriff called you to talk about your testimony, is that correct?
A. Me and the Sheriff had multiple phone calls over my testimony.
Q. Well, do you recall talking about it yesterday?
A. Yes.
Q. Well, which phone call was that?
A. That was where he had said that, if anyone asked, that Zach Greene had jumped up in his face and he had to put him back down.
Q. Well, that's the one that I'm trying to talk about. When was that made?
A. Whenever the first person, I believe, had gotten subpoenaed for Grand Jury testimony. Somewhere around that time.
Q. It was after you were working for the FBI?
A. Correct.
Q. Did you happen to record this statement?
A. I did not.
Q. So the only evidence that this statement ever occurred is your testimony?
A. Correct.
Q. Have you ever provided anyone your phone records to show that this phone call was made?

A. I don't believe so.
Q. Did you send an e-mail or a text message to anybody saying, "The Sheriff just called me and said he wants me to make up this stuff and lie in my testimony"?
A. I informed, I believe, Mr. Ferguson about it.
Q. Did you send anybody an e-mail or a text?
A. I don't recall if there was an e-mail or text.
Q. As we sit here today, did you inform anybody about this alleged communication?
A. The FBI, yes.
Q. Well, you said just while ago you believed you did?
A. I did.
Q. Now, you're certain of it?
A. Yes.
Q. While ago, you were not certain of it?
A. I am certain of it.
Q. Thank you. Is it true that during the Greene incident, that Dalton Miller was in the next room?
A. I do not know that.
Q. Talking about the shower room. Isn't it true that it's not big enough for anybody to really go in there while an inmate is in there?
MR. CARTER: Your Honor, I'm going to make a 611 objection. This has been asked and answered. It's repetitive at this point.

THE COURT: Well, he hasn't asked it specifically that way, but it is starting to become some ground that's been plowed before. So I'll let you ask the question, but let's get through it and move on.

Q. (By Mr. Wood.) Isn't it true that the room isn't big enough for anybody to really go in there except for an inmate?

A. It would depend on the positioning of the inmate. We've had jailers go in there with someone while they were dressed out before.

Q. Are you saying it is possible for somebody to go in there when it's already occupied by an inmate?

A. Yes.

Q. Do you recall giving testimony in your Grand Jury, to the Grand Jury?

A. Yes, I recall testifying before the Grand Jury.

Q. And do you recall being asked that same question?

A. I do not.

MR. CARTER: Your Honor, I would ask counsel to identify which page and line.

MR. WOOD: And I was fixing to do that. The Grand Jury testimony transcript that I was provided by the government does not have page numbers on it, but it is lines 17 through 22.

THE COURT: Is that the first transcript, or the

second transcript?

MR. WOOD: I believe it is going to be -- it's the August 14th, 2019.

THE COURT: All right.

MR. CARTER: Your Honor, I'm looking at every copy I have of it here, and there's page numbers in the upper right-hand corner.

MR. WOOD: Every copy that I was provided by the government has no page numbers. And I've got them right here if you'd like to see them.

THE COURT: All right. Well, you can take the Court's copy if you like.

MR. WOOD: Okay. Well, in case I have reference to some other ones, I may need a copy.

THE COURT: So you can just find the page number. You can just page through there and figure it out.

Q. (By Mr. Wood.) It's page 24, lines 17 through 22. You recall giving testimony to the Grand Jury, correct?

A. I do.

Q. And we've covered it. Your testimony was that the room is not -- isn't big enough for anybody to really go in except Mr. Greene, correct?

A. The way Mr. Greene was positioned in the room, yes, it would just be big enough for Mr. Greene.

Q. Well, do you recall this question being asked of you

at the Grand Jury. This is by the Grand Juror:

"So you were in the room with Greene and Sheriff or standing in the doorway so you could clearly see?"

Your answer: "The room isn't big enough for anybody to really go in except Mr. Greene," period.

Do you recall making that statement?

A. Yes.

Q. And was that an accurate testimony by you at the Grand Jury?

A. Yes.

Q. What kind of camera -- we talked about it. There was cameras that were looking at the hallway of the shower, what the shower room is in, correct?

A. Correct.

Q. A camera, correct?

A. Yes.

Q. It's fair to say that that camera system is on a 30, 40 -- whatever the time frame is -- loop, correct?

A. Yeah, it's on a loop.

Q. And what does that mean?

A. The cameras are motion activated, so the more traffic that goes by a camera, the more it records. And it only stores so much record, and then it would start to record over it.

Q. Do you recall as your time there how long that camera

system, how many days it keeps on it before the oldest ones start dropping off?

A. No. Each camera is different.

Q. Do you have an educated guess, about? Are we talking 30 days, or two months, or a year?

A. I don't. Usually, the jail administrator, or the jail sergeant, was in charge of that camera system, so I really don't know.

Q. Did you go and get a copy of that video camera system after this occurred?

A. No, I did not.

Q. Let's talk about, Mr. English, Mr. Brandon English. Do you recall who that is?

A. I do.

Q. So do you recall when the Sheriff allegedly violated Mr. English's rights, what the date was?

A. It would have been in December or November of 2018. I don't recall the exact date off the top of my head, no.

Q. So there's been testimony about Mr. English and why he was being investigated or interviewed or what.

So tell me what was the first -- when was the first time that you had any interaction with Mr. English on that day? I'm sorry. That involves the alleged incident. I don't care if you met with him in the morning, you know.

A. That would have been -- to the best of my

recollection, that would have been whenever he was brought into my office.
Q. And we looked yesterday at pictures of your office. And you drew some stuff there also, correct?
A. Yes.
MR. WOOD: May I approach, Your Honor?
THE COURT: You may.
Q. (By Mr. Wood.) Do you recognize that photograph?
A. I do.
Q. And in the bottom right-hand corner, there's a yellow sticker. What does it say?
A. Government Exhibit 5(b).
Q. And what is that?
A. It's a photograph of my office.
Q. Same one we looked at yesterday?
A. Yes.
Q. Now, this is the same one that we looked at yesterday?
A. Appears to be, yes.
Q. For the record. On the monitor, we've pulled up the photograph that I've just handed you, correct?
A. Yes.
Q. What I'd like for you to do is, with your pen up there, will you draw like you did yesterday the picture of your desk.
A. Okay.

Q. And would you also put an "X" with your initials where you were sitting? And then put an "X" and the initials for Brandon English and Anthony Boen where they were sitting.
A. Okay.
MR. WOOD: May I approach, Your Honor?
THE COURT: You may.
Q. (By Mr. Wood.) So I've put up on the monitor here the drawing that you just made.
A. Yes.
Q. Now, yesterday, I thought that you said your desk was more L-shaped. There was another piece to it.
A. There is. It runs along the wall, but the wall is not in the picture.
Q. It runs along -- where would the wall be?
A. Down here toward the bottom. I mean, there's another wall there.
Q. So correct me if I'm wrong, yesterday, did you not draw the picture to where the piece ran along that back wall on the right and then turned to the left?
A. I'm not sure which wall is what in this photograph. I mean, they are all white walls, so, I mean, I'm just assuming this was taken from the doorway.
Q. But you drew -- this is the same picture you drew on yesterday, right?
A. That's correct, yes.

Q. You didn't say yesterday that you didn't know what was what, did you?
A. No. I'm saying that all the walls are white. I'm assuming that it was taken from the doorway.
Q. I think I may be confused.
A. I'm confused now.
Q. You remember a photo of your office being presented to you yesterday, correct?
A. I do.
Q. Was this the photo?
A. Yes.
Q. And you drew on that photo with your finger, correct?
A. Correct.
Q. But you did not mention that you didn't understand the orientation of the photograph at that time, did you?
A. No. I was assuming it was taken from the doorway. I mean --
Q. What you have drawn here, did you assume it's taken from the doorway?
A. Correct.
Q. Now, we're back to where we began. I thought yesterday you drew an L-shape. Is that not correct?
A. I referred to my desk as being L-shaped, but, I mean, it would go along the wall that's not pictured to the left.
Q. My question, was your desk out in the middle of the

office?
A. The front of it was, yes.
Q. And it was orientated just like this right here?
A. I mean, it would have -- the front of it was in the middle of the office. It wrapped around and had an L-shape to it. That's -- I mean, that's all I know.
MR. WOOD: May I have just a moment, Your Honor?
THE COURT: You may.
Q. (By Mr. Wood.) So according to your drawing that we have here today, you were on one side of the desk, and Brandon and the Sheriff were on the other side, correct?
A. Correct.
Q. Where was Mr. Hutchison?
A. He was -- so you come through the door, the doorway that comes out of his office into mine. He would have been standing in the corner where the wall and the doorjamb meet.
MR. WOOD: May I approach, Your Honor?
THE COURT: You may.
Q. (By Mr. Wood.) I'm going to show you what's been marked as Government's Exhibit 5(c), see if this one makes any more sense, gives you an orientation.
Do you see the document that I just handed you?
A. Yes.
Q. On the bottom right corner, what does it say?

A. Investigations office.
Q. On the bottom right corner, is there an exhibit sticker?
A. There is.
Q. And what does it say?
A. 5(c).
Q. All right. So on 5(c), what is that a picture of?
A. It appears to be my office.
Q. On that photograph, I would like for you to draw your desk again. And let's see --
MR. WOOD: May I approach, Your Honor?
THE COURT: You may.
Q. (By Mr. Wood.) That may give us a little better reference. So what have you drawn on the photograph that we are looking at right now, which is Government's 5(c)?
A. The way my desk would have been.
Q. And you would have been seated behind the desk?
A. Correct.
Q. And then the Sheriff and Mr. English would have been out in front of your desk, correct?
A. That's correct.
Q. Now, this is looking in from the doorway, right?
A. Yes.
Q. Where was Officer, or Investigator Hutchison?
A. Once Mr. English was in there and the door was shut,

he would have been behind Mr. English and Sheriff Boen, back here in the corner by the doorjamb.
Q. And was there anybody else present?
A. No.
Q. So the door was -- is it true that the door was not open?
A. Correct.
Q. And was there any other jailers present?
A. No.
Q. So Mr. English is brought in, sat down in his -- now that we've got the orientation -- we're looking at Government's Exhibit 5(b) again that you have drawn on.
So Mr. English sits down and the Sheriff sits down beside him?
A. Yes.
Q. And so tell me what happened then.
A. That's whenever the -- once Mr. English was sat down -- the Sheriff was already sitting. That's whenever the Sheriff had grabbed Mr. English and went backwards with him.
Q. All right. But after the Sheriff grabbed his shirt and they started going backwards, you couldn't see anything after that?
A. No. It was -- where my desk was would block the view of what was going on down there.

Q. So the totality of your testimony today is that the Sheriff grabbed his shirt and they went backwards?
A. Correct.
Q. And do you know why they went backwards? Could you see why they went backwards?
A. The Sheriff had grabbed him by the shirt and pushed him backwards in the chair.
Q. Now, is that what you saw?
A. Yes.
Q. That was clear in your mind?
A. Yes.
Q. Have you ever expressed doubt about what you saw before?
A. No.
Q. Have you ever expressed your belief that the only way that could happen was by him being pushed backwards?
A. I don't know if I have ever verbally said that.
Q. And, again, you recall giving testimony to the Grand Jury?
A. Yes.
Q. This is page 10, lines 5 through 9.
MR. CARTER: Which day, please?
MR. WOOD: Of the second one, October the 2nd, 2019. Page 10, line 5 through 9.
Q. (By Mr. Wood.) Back to the Grand Jury testimony. You

don't recall ever telling anyone that the only way it could have happened is him pushing him backwards?
A. I'm not saying I haven't. I don't recall it.
Q. Let's see if this helps you. The Grand Jury question was, "And you said Mr. English went down. How did that occur? Did the Sheriff push him, or did he fall, or do you know"?
And you said, "The only way it could have happened is him being pushed backwards." Is that true?
A. Yes.
Q. And isn't it true that that indicates that you are not -- that you didn't see it, that you are inferring it?
A. No. I mean, I seen the Sheriff grab him, push him backwards. I mean, I -- that's --
Q. If that were true, wouldn't you have told the Grand Jury, "No, I saw him"?
MR. CARTER: Objection, argumentive, Your Honor.
THE COURT: Well, sustained, unless you want to read a sentence above that and put it in context.
Q. (By Mr. Wood.) "And did you see the Sheriff strike Mr. English or anything like that?"
A. No.
Q. And then when it was all over, Brandon English was on the ground. Would it be fair to say that he was -- or was he still sitting in the chair?

A. At what point?
Q. After he went to the ground?
A. No. I mean, he wasn't sitting in the chair.
Q. The chair fell over and he was just on the side of it or something?
A. I mean, he may have still been in the chair, but it was on its back.
Q. That's what I'm saying. When it was all said and done, what did it look like on the ground? Where was Brandon English?
A. As far as on the ground, I don't know. I couldn't see from my desk.
Q. Did you see the Sheriff help him up?
A. I did.
Q. So the Sheriff, did he pick Brandon English and the chair up and sit them up, or just Brandon?
A. Both.
Q. Let me just go through my notes. Who was the lead investigator on the English investigation?
A. Detective Hutchison.
Q. And who would have been in charge of recording interviews with the suspect?
A. Detective Hutchison. However, if I can comment on that.
Q. Well, I just asked you who would be in charge. And

you provided an answer, right?
A. Yes.
Q. At any point in time, did you ever advise Brandon English that there was an FBI investigation?
A. No. Not to my recollection, no.
Q. As you sit here today and you testify, you don't recall having any communication with Brandon English about the investigation?
A. I don't recall that, no.
Q. And what was the result, what position did you take over once the Sheriff was indicted?
A. Chief Deputy.
Q. Were you also the interim Sheriff?
A. No, I was not.
Q. You may not have had the title, but were you running the Sheriff's department?
A. In a sense. I got a lot of guidance from the quorum court and I had to get a lot of approval through the -- I mean, not really. I still kept the same thing. A lot of things, I ran by the County Judge on a lot of things.
Q. Who was the ultimate authority at the Sheriff's department after Sheriff Boen was indicted?
A. That would have been me.
Q. Exactly. Strike that. And how long did you serve as the ultimate authority at the Sheriff's department after

Sheriff Boen was indicted?
A. I guess until August of last year, sometime in August.
MR. WOOD: Your Honor, I would move to introduce Mr. Ball's drawings on Government's Exhibit 5(c), or 5(a), 5(c) and 5(j) and would offer those as defendant's exhibits with the new drawings on them.
THE COURT: Let me help you with that. What about 5(b)?
MR. WOOD: 5(d), as in dog, or --
THE COURT: (b) as in bravo.
MR. WOOD: And 5(b). I'm sorry. I had left it on the Elmo.
THE COURT: So here's the deal. These were received as Government's Exhibits 5(a), (b), (c), and (j). This witness, Travis Ball, has annotated those documents. So the Court is going to receive the annotated versions through Mr. Ball as Exhibits 5(a)-TB, 5(b)-TB, 5(c)-TB, and 5(j)-TB.
(Defendant's Exhibits 5(a)-TB, 5(b)-TB, 5(c)-TB and 5(j)-TB received)
MR. WOOD: Thank you. I'll pass the witness, Your Honor.
THE COURT: Does the government have redirect?
MR. CARTER: I will, Your Honor. I want to make sure you don't want to take your mid-morning.

THE COURT: That's what I was -- just making sure you had redirect.

MR. CARTER: I do have redirect.

THE COURT: Ladies and Gentlemen, we will take our morning recess at this time. Remember the recess instructions. Do not talk with anyone about the case, including your fellow jurors, until it's time to deliberate. We'll take a 20-minute break, so we will reconvene at 10:40. Everyone please stand as the Jury exits. Court will remain in session.

(Jury out at 10:18 a.m.)

THE COURT: As we go into this recess, I just want to give counsel something to think about, and then we can discuss it whenever we take our lunch recess.

One of the questions is going to be, is the government still on track to complete their case today?

MR. CARTER: (Nods affirmatively.)

THE COURT: We are? Okay. So here's the part we need to think about. To the extent that there's going to be a defense case, and I have three witnesses listed for the defense. I'm trying --

MR. CARTER: Your Honor, should we excuse the witness?

THE COURT: Yes.

MR. CARTER: I'm sorry to interrupt you, Your

Honor.

THE COURT: It's not really going to implicate the witness.

Let me start at the back end of where I'm needing to end up, and then ya'll can think about this and we can talk about it over the break. I need to figure out when we are going to have a jury instruction conference. We will do that theoretically the night before we would be instructing the Jury and having closing arguments. This is Thursday, tomorrow is Friday, so I need to get a sense of whether this is going to go into next week or not. So I don't need your answer now, but please be thinking about that.

As part of that, the Court had e-mailed ya'll last Sunday, I think, with its discussion draft of final jury instructions. We had solicited you for any comments or legal authorities on your positions by Tuesday. We didn't hear anything. I'm not being critical, you all have had a whole lot to do. But I just need to know whether by your silence we're on the right track, or whether you've been busy and just haven't had a chance to look at that. And that's fine, but we need to get a game plan to be productive about our final set of jury instructions. So if you would just kind of think about that and where we are and then we'll take it up, the logistics portion of it,

over the lunch break. We're in recess.

(recess taken from 10:22 a.m. to 10:44 a.m.)

MR. CARTER: While the Jury is coming in, I wanted to alert the Court, the witness order we provided yesterday, we're going to flip-flop and call Mr. Cowens next because he has had some sort of an emergency that we would like to get him on and get him off.

(Jury in at 10:44 a.m.)

THE COURT: Okay. Everyone may be seated. Mr. Carter, you may redirect.

REDIRECT EXAMINATION

BY MR. CARTER:

Q. Mr. Ball, a few questions for you on redirect here. At the very beginning of your cross examination, you were asked a number of questions about your training as it related to interviews. Do you recall that?

A. Yes.

Q. Did any of your training ever teach you to use physical force against a subject in an interview?

A. No, it did not.

Q. In your cross examination, you were asked a number of questions about the dinner at the Bricktown restaurant on December 3rd. Do you recall that?

A. Yes.

Q. You were asked questions about getting that telephone

call?
A. Yes.
Q. Was it an emergency that required you all to leave the restaurant right then and go back to Franklin County?
A. No.
Q. Would other deputies -- did other deputies respond to that?
A. I assume so, yes.
Q. So was it your investigation, or was it somebody else's investigation?
A. It was someone else's investigation.
Q. Do you recall being asked a lot of questions about Mr. Roberson and his alcohol use?
A. Yes.
Q. Can you tell the Jury what Mr. Roberson was doing during the Zachary Greene incident?
A. He was standing there watching. In fact, kind of taunting it.
Q. Now, during the Zachary Greene incident, you were asked a lot of questions about getting to that shower room. Do you recall that?
A. Yes.
Q. Who led the way down there?
A. Sheriff Boen.
Q. And who stopped, like who stopped the proceeding?

A. Sheriff Boen.
Q. Mr. Moon, would you please publish what's already been introduced as Government's 5(f).
While Mr. Moon is doing that, let me ask you, when you arrived at the shower room, were there any trustees at the shower room?
A. No.
Q. Were there any persons at all at the shower room aside from Mr. Greene?
A. No.
Q. Were there trustees in the kitchen?
A. Yes.
Q. What are we looking at on Exhibit 5(f)?
A. The kitchen area, or one side of it.
Q. And does that show the hallway?
A. Yes.
Q. Does it show the shower room?
A. Yes.
Q. Where on that -- in that photograph, are we looking at the shower room? So from the kitchen, can one see into the shower room?
A. Not into it, no.
Q. Essentially, the view in 5(f), that's the view you have from the kitchen of the shower room?
A. Yes.

Q. Mr. Moon, you can take down 5(f), but I'd like you to replace it, please, with 5(h), hotel. And can we remove that blue line, please?
Mr. Ball, we're looking at Government's Exhibit 5(h), which has already been introduced. What are we looking at here?
A. The shower room.
Q. Slightly different angle?
A. Yes.
Q. This is a straight-on angle of it?
A. Yes.
Q. Can you see the door frame for the shower room in this picture?
A. Yes.
Q. Where?
A. In the corners here and here. Well, it kind of jumped around.
Q. Can we clear all that? If you would for me, let's draw that bench again from this angle so we can get a better perspective of it. And when an inmate is housed there, they are shackled to that bench?
A. Yes.
Q. And I believe you've testified that they are provided, like a mattress. Was there a mattress there that night?
A. Yes.

Q. Can you fill in the area of the mattress?
A. This thing is jumping all over, so it's kind of hard.
Q. I think we get the general idea. So is it fair to say the mattress doesn't take up the entire floor?
A. No, it does not.
Q. Can you approximate where Mr. Greene's head was leaning against the door? I think that will just take a single dot of your finger.
A. Except to the center.
Q. Except more to the center?
A. Yes.
Q. Now, you were asked a lot of questions, if you recall, about, did the Sheriff step in. Do you remember that?
A. Yes.
Q. And you didn't see his feet, did you?
A. No.
MR. WOOD: Object to leading.
Q. (By Mr. Carter.) Did you see his feet?
A. No, I did not.
Q. Did the Sheriff lean in?
A. Yes.
Q. Now, why didn't you see his feet? What were you looking at?
A. His upper body, hands area.
Q. Why were you looking at the Sheriff's upper body and

hand area?
A. Because that's where he was making all the motions and yelling, things like that.
Q. What else was he doing with his hands?
A. Striking Mr. Greene.
Q. And that's why you weren't looking at his feet?
A. Correct.
Q. You can take that down, Mr. Moon. Thank you.
You were asked a number of questions about your desire to run for Sheriff?
A. Yes.
Q. When did you get a desire to run for Sheriff?
A. After Sheriff Boen and I had had a conversation about it.
Q. Was this prior to the investigation?
A. Yes. Quite a bit prior, yes.
Q. Was it ever your intention to run against Sheriff Boen?
A. No, not at all.
Q. You were asked a number of questions about that oath you took as a law enforcement officer?
A. Yes.
Q. Did that oath have anything to do with the reason you went to the FBI?
A. It did.

Q. And just to be clear, did the FBI come to you or did you go to them?
A. I went to them during one of our meetings over another case.
Q. Was that a spur of the moment decision to talk to them while you had them there, or had you planned it?
MR. WOOD: Objection, leading.
THE COURT: Sustained.
MR. CARTER: I'll rephrase, Your Honor.
Q. (By Mr. Carter.) Was that a spur of the moment decision?
A. No, it was not.
Q. Had you planned it?
A. Yes.
Q. Did the FBI, when you met with them, ever make you any kind of promises?
MR. WOOD: Object to leading.
MR. CARTER: That's a yes or no question.
THE COURT: That's an open-ended question. Overruled.
Q. (By Mr. Carter.) Did the FBI ever make you any kind of promises?
A. No, they did not.
Q. Did the FBI ever present you with a scenario of, "You could be a defendant or a cooperator in this case"?

A. No.
Q. Those are Mr. Woods' words, not the FBI's?
A. Correct.
Q. You were asked some questions about Marshall Elmore. Do you remember that?
A. Yes.
Q. Was he a trustee at the jail?
A. He has been. I don't know if he was during that time.
Q. Does he have a friendship with the defendant?
A. He does.
Q. Do you know if that has any bearing on why he's a trustee?
A. I believe it does, yes.
Q. You were asked a number of questions about the interview with Brandon English and whether it was recorded or not. Do you recall that?
A. Yes.
Q. How soon after that interview started did the Sheriff lunge at Mr. English?
A. It was instantly, as soon as Mr. English was put in the chair.
Q. So was there a chance to even start a recorder?
A. No.
Q. And finally, you were asked a lot of questions about Government's Exhibit 9, that recorded call?

A. Yes.

MR. CARTER: Your Honor, at this time, I'd like to publish Government's Exhibit 9 again. Do you need to read the limiting instruction?

THE COURT: Yes. Ladies and Gentlemen, you are about to hear the recorded conversation that's introduced as Exhibit 9. This conversation was legally recorded and you may consider the recording just like any other evidence.

Let me remind you again about the superimposed transcription. That was provided by the government, but it is the words that you hear, not the superimposed print that you see on the screen, that is evidence. And so if you believe there's any inconsistency, please understand it's the words that are evidence. I will also remind you that you're only going to have the recordings with you in the jury room. You will not have the superimposed transcript. You may proceed.

MR. CARTER: Thank you. Mr. Moon, please publish Government's Exhibit 9.

(Government's Exhibit 9 played)

VOICE NUMBER 1: Yeah. Well, me and you and Chris was the only witnesses there, right?

VOICE NUMBER 2: Just us three.

VOICE NUMBER 1: And there wasn't anything on

camera.

VOICE NUMBER 2: There was trustees, but --

VOICE NUMBER 1: Yeah.

VOICE NUMBER 2: One of those I guess died over the weekend.

VOICE NUMBER 1: Yeah. And Huck is the one he supposedly bit.

VOICE NUMBER 2: Yeah. Well, if it comes down to it, we'll just have to talk to them, but maybe it won't.

VOICE NUMBER 1: I'd rather not. I mean, it's just my -- you know what I mean, it's mine and your word against, you know, everybody else's, I guess. But, I mean, nobody was even there when it, you know -- when we did that.

VOICE NUMBER 2: No. No, it was just me, you and Chris and then --

VOICE NUMBER 1: Yeah.

(end of audio)

MR. CARTER: Thank you, Mr. Moon.

Q. (By Mr. Carter.) Now, circling back to where we started, do you recall being asked a bunch of questions about your training?

A. Yes.

Q. And you've been trained to conduct interviews?

A. Yes.

Q. When you're trained to conduct interviews, are you trained to look for answers that show a person's consciousness of guilt?

MR. WOOD: Object to the leading.

THE COURT: Sustained.

THE WITNESS: Yes.

THE COURT: No.

MR. WOOD: Objection.

THE COURT: The Jury will disregard that answer. And counsel may rephrase.

Q. (By Mr. Carter.) When you do an interview, what things are you looking for other than an outright confession?

A. Inconsistencies in their stories. Loopholes in their stories. Also their demeanor. I mean, there's several factors.

Q. Are those things that overall go to someone's consciousness about the situation or not?

MR. WOOD: Object to leading.

Q. (By Mr. Carter.) What are you looking for those things for? Why are you looking for those things when you interview someone?

A. To later on obtain a confession from them using what they said.

Q. Does it help build the case later?

A. It does.
Q. How would you classify the things the Sheriff said about cameras and about who was there that night?
A. As things that would -- I guess things that would be used later as -- to obtain a confession.
Q. Now, you were asked a number of questions, weren't you, about a phone call you had with the Sheriff that wasn't recorded. Do you recall that?
A. Yes.
Q. And they asked if you preserved your phone records, didn't they?
A. Yes.
MR. WOOD: Object to leading.
THE COURT: Well, that's a signpost. That's okay. Overruled.
Q. (By Mr. Carter.) And it's not recorded, is it?
A. No.
Q. But you testified under oath at Grand Jury about it, didn't you?
MR. WOOD: Object to leading.
Q. (By Mr. Carter.) Did you testify under oath about it previously?
A. Yes.
Q. Have you testified under oath about it multiple times?
A. Yes.

MR. CARTER: Just a moment, Your Honor. Nothing further, Your Honor.

THE COURT: Does that prompt any further questions?

MR. WOOD: A few, Your Honor.

THE COURT: All right.

MR. WOOD: May I approach the witness, Your Honor?

THE COURT: You may.

RECROSS EXAMINATION

BY MR. WOOD:

Q. Mr. Ball, I've handed you a photograph that's been marked for identification purposes as Defendant's Exhibit Number 12. Do you have that document in front of you?

A. Yes.

Q. Do you recognize -- I'm sorry, I keep calling it a document. Do you recognize that photograph?

A. I do.

Q. And tell me what that photograph is.

A. It's part of the kitchen area of the jail.

Q. And is that photograph similar to the photograph you just reviewed with the government?

A. Yes.

Q. And does this photograph that I handed you that's marked as Defendant's Exhibit 12, does that fairly and

accurately represent the kitchen and what it portrays to represent?

A. Yes.

MR. WOOD: Your Honor, we would offer this as Defendant's Exhibit Number 12.

MR. CARTER: Your Honor, we already stipulated to its introduction, so we have no objection.

THE COURT: Defendant's Exhibit 12 is received.

(Defendant's Exhibit 12 received)

MR. WOOD: They did not stipulate to it. That's why we had to lay the foundation.

May I publish it to the Jury, Your Honor?

THE COURT: You may.

Q. (By Mr. Wood.) This is a photograph of the same area that you just testified about, okay? Is that what you recognize?

A. Yes.

Q. We're going to look at both photographs here in a second. So this fairly and accurately represents the kitchen, correct?

A. Yes.

Q. Can you see the shower room in this photograph?

A. In this photograph? No.

Q. And would it be fair to say that this photograph is taken from the middle of the kitchen?

A. Around there, yes.
Q. This is the photograph that you were just shown that's been marked as Government's Exhibit 5(f). Do you see that?
A. Yes.
Q. And would it not appear that this photograph has been taken by someone leaning over the stove?
A. I don't believe so, because at the end of the stove, there's also an area that opens up that goes into another room.
Q. But you would admit that there is a counter below it, correct?
A. Yes, a small one.
Q. So depending on where you're at in this kitchen can determine whether or not you can see -- let me ask you this. Isn't it true that depending on where you're standing at in this real small area will determine if you can see the shower room?
A. Yes.
Q. And on your redirect by Mr. Carter, and as part of your training, what you look for in investigating circumstances, you testified that you looked for inconsistencies, correct?
A. That's part of it, yes.
Q. And pursuant to your training, inconsistencies in stories is critical, is it not?

A. Yes, can be.

MR. WOOD: That's all that I have.

THE COURT: Thank you. May this witness be excused?

MR. CARTER: Yes, please, Your Honor.

MR. WOOD: Yes, Your Honor.

THE COURT: All right. Mr. Ball, thank you very much for your time today. You're free to go.

Government can call its next witness.

MR. SONGER: The United States calls Dakota Cowens.

THE COURT: Mr. Cowens, if you would please come forward and try to weave your way in between the counsel tables. Stop about right there and raise your right hand to be sworn.

(Witness sworn)

THE COURT: If you would wind your way around here to our witness box. While you're providing testimony, you may remove your mask if you like, but I won't require you to do it.

MR. SONGER: May I proceed, Your Honor?

THE COURT: You may.

DAKOTA COWENS, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SONGER:
Q. Good morning, sir.
A. Good morning.
Q. Would you please tell us your full name?
A. Dakota Cowens.
Q. Do you mind spelling your last name for us?
A. C-O-W-E-N-S.
Q. Mr. Cowens, how are you currently employed?
A. I work for Black Hills Energy.
Q. What do you do for Black Hills?
A. I'm a gas maintenance tech.
Q. At some point, did you work for the Franklin County Sheriff's Office?
A. Yes, sir.
Q. When did you start working there?
A. I believe it was November or December of '18.
Q. And what was your role when you started?
A. It would be dispatcher and jailer.
Q. What do you do as a dispatcher and jailer at the Franklin County Jail?
A. You correspond with all the officers, take license plates and stuff, as well as take care of the inmates.
Q. Is your work done physically inside of the jail?
A. Yes, sir.
Q. Now, when you're working in the jail, do you sometimes

have to deal with inmates who can be disruptive?
A. Yes.
Q. Have you received training and guidance on when it's appropriate to use force and how to respond to disruptive inmates?
A. Yes.
Q. Are you familiar with the standards in place at the jail relating to using force?
A. Correct, yes.
Q. Now, after a disturbance at the jail is over, are officers trained to use force to punish an inmate who was involved in what just happened?
A. No, sir.
MR. WOOD: Object to leading.
THE COURT: Rephrase.
Q. (By Mr. Songer.) Are officers ever trained to use force as punishment?
A. No, sir.
Q. Are officers ever trained to use force to retaliate against inmates who had done something earlier?
MR. WOOD: Object to leading.
MR. SONGER: It's a yes or no question.
THE COURT: It's open ended, so calls for a yes or a no. Overruled.
A. No.

Q. (By Mr. Songer.) Are you familiar with an area inside the jail that's commonly known as the "shower room"?
A. Yes, sir.
Q. Can you describe what that area is like?
A. It's near the kitchen. It's a small room with a shower curtain on it as the door, which has a bench inside that is bolted to the ground.
Q. Are inmates sometimes housed in that room?
A. Yes, sir.
Q. And how are the inmates secured so they stay in the room when they are there?
A. By a leg shackle.
Q. About how long is the chain on that leg shackle?
A. Probably about two-foot long.
Q. Mr. Moon, could we please put up Government's Exhibit 5(j), which has previously been admitted.
Mr. Cowens, do you recognize this picture that's on the screen?
A. Yes, sir.
Q. What is that?
A. That's the shower room.
Q. Is that what the shower room looked like when you worked at the jail?
A. No, sir. It had a bench in there when I was there.
Q. Can you just show us with your finger, where was the

bench in this picture? You can actually draw right on that screen, like it's a football telestrator.
A. Right there.
Q. And you described a moment ago the shackle with the chain that inmates were secured with. What was that attached to?
A. The bottom of the bench that was bolted to the ground.
Q. When inmates are shackled to that bench, can they get out of the shower room and go out into the hallway?
A. No, sir. They have minimal kind of space to move around.
Q. Thank you, Mr. Moon. We can take that down.
When working as a jailer or dispatcher, is one of your duties to monitor the surveillance cameras that are in the jail?
A. Yes.
Q. Are you familiar with the areas of the jail that surveillance cameras show?
A. Yes.
Q. Are there any surveillance cameras that are around the shower room?
A. I believe there's one.
Q. Mr. Moon, would you put up Exhibit 5(e), please. And could we take the blue off the screen? Thank you.
Is the shower room in this picture?

A. Yes.
Q. Where is it? Can you just describe it for us?
A. Slightly to the right, where the light is coming from.
Q. With the shower rod across the top?
A. Correct.
Q. Do you see the surveillance camera in this picture?
A. Yes, sir.
Q. Could you circle it for us with your finger?
Now, does that camera -- what does that camera show?
A. From the hallway into the kitchen.
Q. Does it show into the inside of the shower room?
A. No, sir.
Q. Thank you, Mr. Moon. We can take that down.
Mr. Cowens, do you remember an inmate at the jail named Zach Greene?
A. Yes, sir.
Q. Was he housed in the shower room at some point?
A. Yes.
Q. Do you remember an incident that occurred involving Mr. Greene while he was in the shower room?
A. Yes, sir, I do.
Q. Do you remember about when that happened, like what time of year, what day?
A. I believe it was toward the end of the year. I couldn't be exact on date.

Q. The end of what year?
A. 2018.
Q. And do you remember about what time of day that happened?
A. It was after dinner time, so we serve dinner time at 6:00, so sometime after that.
Q. And what shift were you working back then?
A. 3:00 to 11:00.
Q. Was it sometime during your shift?
A. Yes.
Q. You think around dinner time?
A. Yes.
Q. Where were you when you first realized that something was happening with Zach Greene in the shower room?
A. I was in the dispatch room.
Q. And how did you learn that something was happening?
A. I heard a commotion from -- coming from that way.
Q. Are you always able to hear what happens in the shower room?
A. Not always.
Q. Only if it's loud enough?
A. Yes.
Q. So what did you do that night when you heard a commotion?
A. I ran in there and pulled a trustee off Zach Greene.

Q. Specifically, when you got to the shower room, what did you see?
A. The trustee was on top of Zach Greene, punching him.
Q. And what was Zach Greene doing while the trustee was punching him?
A. Trying to defend himself, cover his face.
Q. And what did you do after you saw this?
A. I separated them and put them in different rooms.
Q. Where did you put Zach Greene?
A. I left him in the shower room.
Q. Was he still shackled in there?
A. Yes.
Q. And what about the trustee?
A. We put him in the booking room.
Q. Was the incident resolved at that point?
A. Yes.
Q. Did you notice any injuries on Zach Greene after you separated him from the trustee?
A. That I recall, he had a bloody lip.
Q. Did you see any bruises on his face?
A. Not that I recall.
Q. See any cuts on his face?
A. Just his lip.
Q. Any other redness around his forehead or the side of his face?

A. Not that I remember.
Q. I believe there's a black binder up in the witness stand next to you. Do you see that?
A. Yes.
Q. Can you take that out, please, and turn to tab number 4. Do you recognize what that is in front of you?
A. Yes. The outlay of the jail.
Q. Floor plan of the jail?
A. Yes.
Q. Does it appear to be a fair and accurate representation of what the jail's floor plan was like in 2018?
A. Yes.
MR. SONGER: Your Honor, we move to admit Government's Exhibit 4.
MR. WOOD: No objection.
THE COURT: Government's 4 is received.
(Government's Exhibit 4 received)
Q. (By Mr. Songer.) Mr. Moon, could you please publish Government's 4 to the Jury.
Mr. Cowens, can you show us where the shower room is in this picture?
A. Right there.
Q. And what about the dispatch office where you were when you heard that commotion?

A. Right here.
Q. From the dispatch office, can you physically see the shower room?
A. No, sir.
Q. Is there any other way for you to know what's going on in there?
A. No, sir.
Q. Are there monitors in the dispatch room that show the surveillance cameras?
A. Yes, sir.
Q. Does that include the camera we talked about a minute ago that shows that hallway in front of the shower room?
A. Yes, sir.
Q. But it doesn't show inside of it, correct?
A. Correct.
Q. We can take that down, Mr. Moon. Thank you.
So when you had to respond to this disturbance between the trustee inmate and Zach Greene, was Sheriff Boen at the jail then?
A. No, sir.
Q. Did he arrive later that evening?
A. Yes, sir.
Q. Do you remember -- well, do you remember if anyone was with him?
A. Yes. It was a gentleman named Chris, and Scout

Simpson.
Q. At the time that the Sheriff and the gentleman named Chris and Scout Simpson arrived, was the incident with Zach Greene and the trustee still resolved?
A. Yes, sir.
Q. Did you need the Sheriff to do anything related to that incident at that point?
A. No, sir.
Q. And do you know who Chris was?
A. He was our IT tech, did our book-ins program.
Q. Do you remember the name of the program that he was responsible for?
A. Justice Solutions.
Q. So what happened when that group got to the jail?
A. Sheriff Boen and Chris walked in, and they stopped at the shower room. And Scout Simpson walked into the dispatch room.
Q. Where were you when that happened?
A. The dispatch room.
Q. So you were up there with Scout?
A. Correct.
Q. How do you know that the Sheriff and Chris from Justice Solutions walked down to the shower room?
A. You could see them on the surveillance video.
Q. Were you watching that?

A. Yes.
Q. And when they got to the shower room, what did you see?
A. I seen Sheriff talking in the hallway to Zach, and Chris was leaned up against the left wall with his back turned.
Q. Did you ever see Sheriff Boen lean into the shower room?
A. No, sir.
Q. While they were -- while Chris and the Sheriff -- after they walked down the hall to the shower room, did you hear any sounds?
A. Yes, sir.
Q. What were those sounds like?
A. They were arguing and yelling at each other.
Q. In addition to voices, did you hear any other sounds?
A. I heard a slapping sound.
Q. What type of slapping sound?
A. It sounded like skin to skin.
Q. And how many times did you hear that?
A. I only heard it twice.
Q. And where were you when you heard that sound?
A. In the dispatch.
Q. And those surveillance monitors that you mentioned that were in the dispatch office, did they have any sound

on them, like a T.V. does?
A. Not all of them do.
Q. Did the one that went by the shower room have any sound on it?
A. No.
Q. So the sound you heard was just sound coming down the hallway, not something through the screen?
A. Correct.
Q. And about how far is the dispatch office where you were from where the shower room is?
A. Roughly 30 to 50 feet.
Q. So you could hear those slapping sounds from 30 to 50 feet away?
A. Correct.
Q. Did you see -- well, at some point, did the Sheriff leave the jail?
A. Yes.
Q. And did you see Zach Greene again that night after this incident occurred?
A. Yes.
Q. How did Zach Greene look to you when you saw him later that night?
A. Scared.
Q. Did you notice any injuries on him?
A. That I recall, just a bloody lip.

Q. Thank you, sir.

MR. SONGER: Those are all the questions I have for now.

THE COURT: Thank you, Mr. Songer. Mr. Wood, you may inquire.

MR. WOOD: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WOOD:

Q. Good afternoon. My name is Russell Wood. I represent Sheriff Boen in this matter. Nice to meet you.

Have we ever met before?

A. No, sir.

Q. Have we ever talked before?

A. No, sir.

Q. Did you say that you began working in the Sheriff's department in the fall of '18?

A. November and December of '18, yes, sir.

Q. So would it be fair to say that you were a brand new employee at this time?

A. Yes.

Q. And who was working in dispatch with you?

A. I don't remember the female dispatcher, but the other one would be Fisher Elder.

Q. And was he a dispatcher/jailer?

A. Yes.

Q. And were you a dispatcher/jailer?
A. Yes.
Q. So you had multiple roles also?
A. Correct.
Q. Isn't it true that the dispatch room has carpeting around it so that it's soundproof?
A. Correct.
Q. And you've got to do that -- well, let me ask you this. Do you know why it has to be soundproof?
A. So you could hear your officers better over the radio.
Q. Do you know if it has anything to do with the sensitivity of the equipment and all that business?
A. Yes.
Q. And is there a door between dispatch and the hallway that leads to the shower?
A. Yes.
Q. And if I understood your testimony right, there is no audio from the camera that looks down at the shower room?
A. Correct.
Q. Let me rephrase that. There's no audio from the camera that looks down the hallway that the shower room is in?
A. Correct.
Q. Sorry. If an inmate was sitting on the bench in the shower room with a leg shackle on, would that inmate still

be able to reach outside the shower room?
A. Yes.
Q. Would it be possible for that inmate to put at least one foot outside the shower room?
A. Yes.
Q. I want to be clear. When an inmate is shackled in there, can they still get parts of their body outside the doorway?
A. Yes.
Q. So if a person is standing in the doorway of the shower room, would I be able to touch that back wall?
A. No, sir.
Q. How deep is this room?
A. Enough to lay down in it.
Q. If a person was laying down in the shower room with their head against the back wall, from the doorway itself, would a person be able to hit somebody?
A. From outside of the room?
Q. That was a terrible question. If an individual was laying down in the shower room with their head propped up against that back wall, and I stood in the doorway, would I be able to hit that person in the head?
A. No, sir.
Q. Mr. Moon, could I trouble you for Government's 5(a), please? Thank you.

Mr. Cowens, do you see the monitor in front of you?
A. Yes.
Q. And do you see that photograph?
A. Yes.
Q. And it says it's Government's Exhibit 5(a), as in alpha. And the bottom of it, it says, "Camera POV." Now, does that mean "Point of view"?
A. Yes.
Q. "Of hallway, shower room left, and kitchen." Do you recognize that?
A. Yes.
Q. Now, is that the same view that you have from your camera in dispatch?
A. Yes.
Q. When the Sheriff and Chris and Scout got to the Sheriff's Office, where did they enter the Sheriff's Office at?
A. From the back.
Q. So according to your recollection, would it be wrong that they came in through dispatch?
A. Yes, they did not come through dispatch.
Q. And when you say from the back, what does that mean? Tell me what the door situation is back there.
A. It's on the other side of the kitchen. It has a code to get in. You push the code and you walk in from the back

door where they usually park.
Q. Would that be called the back north door?
A. It would be the south door.
Q. Oh, south. Okay. What's it referred to at the Sheriff's department?
A. Just the back door.
Q. Back door?
A. Yes, sir.
Q. So the Sheriff and Scout and Chris came in the back door. And then where did they go?
A. I believe that Chris and Sheriff stopped at the shower room, and Scout came into the dispatch room.
Q. So I think -- because I haven't tried this yet -- that you can take your finger. Where was Chris Roberson standing? And I think you can touch the screen and put a mark or a line or circle or something.
A. Right in here.
Q. Now, describe Chris Roberson physically.
A. He's a bigger build, about 6' tall.
Q. And when he was standing here where you've put this circle, what orientation was his body? Meaning, was his back to the wall, his left shoulder to the wall, or what?
A. Back to the camera.
Q. And did Chris -- let me rephrase that. Wouldn't it be true that with Chris standing in that location, some or all

of your view of the shower door would have been obscured?
A. Yes.
Q. When you -- I'm sorry, you heard the altercation?
A. Yes.
Q. And you're the one who broke it up?
A. Yes, between the trustee and Zach Greene.
Q. And the moment that -- you left dispatch, I guess then?
A. Correct.
Q. The moment that you come into the hallway and you turn left and look into the shower, tell me exactly what you see.
A. When the trustee and Zach Greene are fighting?
Q. Yes, sir.
A. It's the trustee punching Zach Greene in the face.
Q. Where was Zach Greene at?
A. Laying down.
Q. And was his head towards the back wall, or his head towards the doorway here or what?
A. The back wall.
Q. Now, will you describe the trustee's physical characteristics?
A. He was reaching inside the shower room on top of him, punching him.
Q. I'm asking his physical description. Was he big?

Little? Muscular? What?
A. Tall and skinny.
Q. And so he was punching him in the face, is that what your testimony is?
A. Correct.
Q. Did you see him hit Mr. Greene anywhere else?
A. Not that I recall.
Q. The moment that you separated the two, what did Mr. Greene look like?
A. That I recall, he had a bloody lip.
Q. Do you recall any other injuries?
A. Not to my memory.
Q. So as you sit here today, is it possible that he had some other injuries that you didn't see?
A. Yes.
Q. Would it be fair to say you were the most concerned with getting them separated and getting them apart?
A. Correct.
Q. After the altercation with the Sheriff -- Mr. Greene and the Sheriff -- you subsequently saw Mr. Greene?
A. Yes, after I did my routine jail check.
Q. And at that time, it's your testimony that the only injuries you observed at that time was a bloody lip?
A. Correct.
Q. Now, when you made your rounds, did you have an

opportunity to talk to him?
A. I did not speak to him.
Q. You had an opportunity to observe him closer and better than you did the first time?
A. Correct.
Q. And upon your second inspection of Mr. Greene, it's your testimony that he still only had a bloody lip?
A. Correct.
Q. After the incident between -- after the alleged incident between the Sheriff and Mr. Greene, what did you see the Sheriff do? Where did he go?
A. He left.
Q. Did he leave immediately?
A. Not that I remember.
Q. How much longer after that did he leave?
A. I don't recall.
Q. Would you say that he left soon after?
A. I couldn't give you a good time when he left.
Q. Do you have any recollection of him being there for a long time?
A. No, sir.
Q. Thank you, Mr. Cowens. I appreciate it.
MR. WOOD: Pass the witness, Your Honor.
THE COURT: Any follow up?

## REDIRECT EXAMINATION

BY MR. SONGER:
Q. Mr. Cowens, just a few quick questions to follow up on what Mr. Wood asked you.
I believe you just told him that when you responded to the shower room, you saw the trustee reaching into the cell and punching Zach Greene?
A. He was on top of Zach Greene.
Q. What part of Zach's body was he hitting?
A. His face.
Q. And what was Zach doing at that point? How was he positioned?
A. He was trying to -- had his arm over his face trying to defend himself, but he was laying down, head toward the back of the shower room.
Q. And I believe you said -- you were asked some questions about, at the time that you heard these slapping sounds, how Chris was positioned in the hallway. Do you remember that?
A. Correct. Yes.
Q. And you said he was positioned in front of the door, is that right?
A. In front of the camera to, I guess the east of the building.
Q. So it blocked your view on the camera of what was happening right at the door?

A. Correct.
Q. So you said you weren't able to really see what happened at the door, but that you heard something, right?
A. Correct.
Q. And that was this multiple slapping sounds?
A. Two that I remember, yes, sir.
Q. And you heard those even though there was soundproofing in the dispatch office?
A. Yes, sir.
Q. Thank you, sir.

THE COURT: May this witness be excused?

MR. SONGER: Yes, he may.

THE COURT: Sir, you're free to go. Appreciate your time.

THE WITNESS: Thank you.

THE COURT: The government can call its next witness.

MR. CARTER: The United States calls Matt Ferguson.

THE COURT: Agent, will you please raise your right hand to be sworn.

(witness sworn)

THE COURT: Assume the witness box.

THE WITNESS: Thank you, Your Honor.

THE COURT: You may inquire.

MR. CARTER: Thank you, Your Honor.

MATTHEW FERGUSON, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CARTER:

Q. Please state your name and spell your last name for the record.

A. Matthew Ferguson. F-E-R-G-U-S-O-N.

Q. And where are you employed?

A. The FBI.

Q. What's your job there?

A. I'm a Special Agent.

Q. Special Agent Ferguson, how long have you done that job?

A. Approximately 12 years.

Q. What's it take to be an FBI agent? What kind of training do you get?

A. When you're hired, you go to a 21-week academy, approximately, where you learn to investigate federal crimes.

Q. What was your first posting after the academy?

A. Upon completion of the academy, I was assigned to the Tulsa resident agency out of the Oklahoma City field office.

Q. And how long were you in Tulsa?

A. Five years.
Q. Did you transfer somewhere?
A. I did.
Q. Where?
A. San Juan, Puerto Rico.
Q. And how long were you in Puerto Rico?
A. Three years.
Q. What was your next posting?
A. The Little Rock field office, Ft. Smith resident agency.
Q. Where you currently are today?
A. Yes, sir.
Q. So how long have you been an agent here in Ft. Smith across the street?
A. Since November 2018 when I arrived here.
Q. Now, with your FBI training, do you get certified as some sort of a law enforcement officer?
A. Yes, sir.
Q. Describe that.
A. You complete enough training in various investigative methods and interviewing and use of force and firearms, all those things that you have to be to legally be a certified law enforcement officer. And at the end of that, you are certified as a federal law enforcement officer.
Q. What were you before you were an FBI agent?

A. I was a police officer with the North Little Rock, Arkansas, Police Department.
Q. And how long did you do that job?
A. Five years.
Q. Tell me what jobs you had while you were with North Little Rock PD.
A. I began as a patrol officer. When I was a newly appointed patrol officer, I picked the short straw and ended up working three months at the Pulaski County Northside Jail booking facility, which is a 24-hour holding facility where we intake, or they intake inmates, arrestees, before they transfer to either court or to the Pulaski County Detention Center, which is in Little Rock.
Then I became a field training officer, which is an officer that trains other rookies, or rookie officers, in an on-the-job type training, so they ride along with you in your car and you teach them the practical methods of being a police officer, how to do the job after they have graduated from the academy.
I did a short stint in narcotics as a narcotics investigator, then I returned to the streets prior to my resigning my position and going to the FBI.
Q. To be a North Little Rock police officer, did you have to be certified as a law enforcement officer as well?
A. Yes, I did, with the State of Arkansas.

Q. And you went through training for that to happen?
A. I did.
Q. What academy did you attend to get certified in Arkansas?
A. I went to the Arkansas Police Corps, which was a federally funded program that was held in Little Rock, but it was a State of Arkansas approved police academy that lasted approximately 15 to 18 weeks. I don't recall exactly.
Q. So total, how much law enforcement experience do you have in your career?
A. I've been doing this job since 2004.
Q. And I think you mentioned earlier, have you been trained on the use of force?
A. Yes, I have.
Q. Has any of your training taught you when it's suitable to strike someone in the head?
A. Yes, it has.
Q. When?
A. In a deadly force scenario where it's either me or them.
Q. Did any of your training teach you to strike someone to retaliate?
A. Never.
Q. How about to punish?

A. No.
Q. When did you become involved in this investigation into the defendant, Anthony Boen?
A. February 2019.
Q. The first thing I want to ask you is, did you ever become aware of any photographs taken of Zachary Greene?
A. I did.
Q. Tell me what you became aware of.
A. Through my investigation, I found that photographs were taken of Zachary Greene after the Zachary Greene incident occurred. So we issued a subpoena to the Franklin County Sheriff's Office, which included a request for those photographs.
Q. And who did you learn took those photographs?
A. I believe it was the jail nurse. Her name was Ronica Young.
Q. And you served a subpoena on the Franklin County Sheriff's Office?
A. I did.
Q. When did you do that?
A. I believe it was June 2019.
Q. And did you specifically ask for those photographs?
A. Yes, we did.
Q. And what did you get back?
A. We did not receive photographs back.

Q. Did you ask why?
A. I did.
Q. What did you find out?
A. My investigation revealed that the camera that had taken the photographs was broken and no longer available, so they were unable to download the photographs.
Q. Now, in this investigation, did you have a chance to ever interview Travis Ball?
A. I did.
Q. How did that come about the first time?
A. In February of 2019, we were assisting a Franklin County Sheriff's Office with a missing persons investigation that was ongoing. Travis Ball scheduled a meeting with us to discuss that investigation, and as far as we knew, that's what he was coming to discuss. During the meeting, we did discuss the ongoing --
MR. WOOD: Objection, hearsay.
THE COURT: Mr. Carter?
MR. CARTER: I'll ask more questions.
THE COURT: All right.
Q. (By Mr. Carter.) Did you discuss that -- I'm not asking what you discussed, I'm asking if you discussed that situation?
A. Yes, we did.
Q. Did the conversation turn to one about the defendant?

A. Yes, it did.
Q. How did -- what was Mr. Ball's demeanor like when the conversation turned to one about the defendant?
A. He grew extremely nervous.
Q. How could you tell?
A. He was -- his voice grew quiet. He had a paper in his hand and he was clutching it closely to his chest. I watched as his carotid artery began to pump blood, and you could visibly see that. And I know from my training and experience that that is an indication of nervousness.
Q. And did that continue throughout the entire first interview with Mr. Ball?
A. As he broached the subject of what he wanted to discuss, he grew less initially -- less nervous than he was initially, but he was still very nervous about the situation.
Q. Just to be clear, did you seek out information from Travis about the defendant, or did he bring it to you?
A. He brought it to us.
Q. Have you had an opportunity to interview Mason Berry in this investigation?
A. Yes, sir.
Q. How did it come about that you first interviewed Mason Berry?
A. We sought out Mason Berry. I contacted him via phone

and told him we wanted to speak with him. And I asked him to come to the Ft. Smith FBI office to be interviewed.

Q. And did he do so?

A. He did.

Q. What was Mason Berry's demeanor like when you first encountered him at the Ft. Smith FBI office?

A. He, too, was extremely nervous and I would classify him even as scared to speak with us.

Q. What was it about his demeanor that makes you draw that conclusion?

A. He was quiet. He expressed nervousness. And he cried during the interview.

Q. Did his demeanor change after he told you his account of what happened?

A. He seemed relieved.

Q. Did he seem anything else to you based upon his body language and demeanor?

A. Not that I recall.

Q. Now, let me ask you some questions. Did you ever make him any promises that he would not be charged?

A. No, sir.

Q. Did you ever offer him immunity from prosecution officially on this?

A. No, sir. We can't do that.

Q. Did you ever, in the course of interviewing him, use

the phrase, "You can be a witness, or you can be a defendant?"
A. No, sir.
Q. Do you ever use that phrase?
A. No, sir.
Q. Did you sense from Mason Berry's body language and demeanor that it was difficult for him to tell you the information he relayed there?
MR. WOOD: Object to leading.
THE COURT: Overruled.
A. Yes.
Q. (By Mr. Carter.) How?
A. Like I said, he cried during the interview. His head was hung down between his leg, or down. His hands were on his knees. Those are all indications that an individual that's being interviewed is reluctant, or it's difficult for that person to be telling me what -- the story that they are telling me, the testimony, or the interview, the information that they are providing to me.
Q. At any point in this interview with Mason Berry, or any interview you have had with Mason Berry, did you provide him any details you learned from Justin Phillips?
A. No, sir.
Q. Why do you not do that?
A. That would affect the story that he would tell us.

And my objective is to get to the truth of the matter.
Q. Did you ever have an opportunity to verify any aspects of Mason Berry's story with outside evidence?
A. Yes, I have.
Q. What were you able to verify?
A. Mason later provided us with the Google maps recording of his locations during the time period that he told us about.
Q. And you're referring to Government's Exhibit 16?
A. That is correct. We also were able to subpoena and review subpoenaed telephone records from the night that he was at Crawford County.
Q. What night was that?
A. The night that he picked up Justin Phillips.
Q. Mr. Moon, will you please display what's already been admitted as Government's Exhibit 16. Put the second page of that exhibit on the monitor.
Special Agent Ferguson, can you see the exhibit?
A. I can.
Q. All right. About mid-way down, does it indicate that Mr. Berry was at Baptist Health in Van Buren?
MR. WOOD: Object to leading.
MR. CARTER: I'm signposting, Your Honor.
THE COURT: Well, this is an exhibit that is in evidence and he's calling his attention to a portion of the

evidence. Overruled.

A. Is there a way to expand this? My eyes are not as good as they used to be. Yes.

Q. (By Mr. Carter.) And from what time to what time was Mr. Berry at Baptist Health? And let me ask you, for those of us that haven't been in the military, could you convert it to regular 12-hour time, please?

A. Yes, I will. It shows that he was at Baptist Health in Van Buren from 19:12, which is 7:12 p.m., until 20:08, which is 8:08 p.m.

Q. Mr. Moon, can you take the explosion down. Can you now please explode the next section. Down a little further, please. No, you were on the right place.

And what is that entry, Special Agent Ferguson?

A. It shows Mason Berry's location to be Crawford County Detention -- I believe that's Detention Center, which is 4235 Alma Highway, which I know to be Crawford County Detention Center's address, from the times of 20:13, which is 8:13 p.m., to 20:52 p.m., which is 8:52 p.m.

Q. Mr. Moon, you can take down Government's Exhibit 16.

Special Agent Ferguson, you mentioned earlier about phone records. Can you pick up that binder that's there on the witness stand?

A. Yes, sir.

Q. Please turn to tab 22.

A. I'm there.
Q. What is Government's 22?
A. I'm looking at a thumb drive labeled Government Exhibit 22 with my initials on it as well.
Q. Because it has your initials on it, do you know what's on that thumb drive?
A. Yes, I do.
Q. What's on it?
A. The subpoenaed telephone records, the return of those telephone records from AT&T, which I have reviewed.
Q. And how did you receive those records from AT&T?
A. Electronically.
Q. And you just moved them onto this thumb drive?
A. Yes.
Q. Government's Exhibit 22(a) is there as well?
A. Yes, sir.
Q. Is that something you received with AT&T from the records?
A. Yes, it is.
MR. CARTER: Your Honor, I'd move to introduce Government's Exhibit 22, based on the foundation in 22(a).
MR. WOOD: Objection.
THE COURT: Side bar, please.
(bench conference)
MR. WOOD: What are you offering this under?

What Rule? Is this 602.11?

MR. CARTER: 902.11.

MR. WOOD: Under 902.11 -- first of all, we just got this information last night at 8:00 or 9:00. The plaintiffs have had four years to put the case together, and we have been set for trial multiple times, and we get here, and then because of a result of cross examination, they are attempting to -- they went out and got these records overnight, which is -- I don't even know how you do that from a phone company anymore. But they produced these late last night. The Rule says that these have to be produced before the trial or the hearing.

Is that what it says, Paul?

MR. PRATER: My understanding is, before the trial or hearing, they must give written notice of their intent to produce, as well as produce a copy so that we can object. They didn't produce a copy of this before trial or hearing. In fact, we got these last night. So it's not sufficient time under the Rule. And it says, "So the party has a fair opportunity to challenge them." And I don't think the night before the introduction of evidence is a fair opportunity to challenge. And if they look at 803 not only 11, but they're also referencing 803.14, it says --

MS. CRAIG: Paula can't hear him.

MR. PRATER: Under 803.14, it still has to comply

with that notice requirement of 3.11.

MR. WOOD: Your Honor, I would say that there is a history of this with the government trying to sandbag us with stuff. As you will recall, they wouldn't even provide us the day before the trial would start. This is repeated conduct, by the way.

THE COURT: So your objection is untimeliness under 902.11?

MR. WOOD: 11, and then 13 refers back to 11. We were not provided written notice before the trial. We were not provided a copy of this before the trial. And we were not provided a copy of this until 9:00, three days into the trial, after cross examination of the witness, whose phone records they now want to introduce.

THE COURT: So untimeliness under 902.11. What else?

MR. WOOD: I think that's my argument.

THE COURT: Okay. I don't understand substantively what the records are. Can you explain that?

MR. CARTER: The records are Mason Berry's phone calls, his incoming and out-coming calls, for the entire day of just September 14th, 2017.

THE COURT: And what prompted you to acquire those?

MR. CARTER: The cross examination of Mason

Berry. I provided them, for the record, at 6:48 p.m. last night, after having received them at 6:20 p.m.

MR. WOOD: But not requesting them for the four years prior. But the issue is that they put on all this evidence about phone calls to Mason Berry, phone calls to Mason Berry. And they did not have this information after this case has already been set for trial, I assume, and prepared for. And it wasn't until we raised a legitimate question. They hadn't produced any phone records of this. And now it is highly prejudicial to the defense.

Number one, we've already cross-examined him on it. He's already been released as a witness. I don't know what he has watched or heard or anything else, if we call him back up here. They want to introduce it through Ferguson. Timeliness, it's prejudicial, and it's against the administration of justice. It should not be allowed to be -- a jury trial for this man's life should not be allowed to be conducted like this, sending us stuff in the evening time after the witness has already testified and been released.

THE COURT: What is the point of the particular record that you have singled out?

MR. CARTER: The particular record I have singled out, Your Honor, shows that Mason Berry received a 6-minute and 19-second telephone call from Anthony Boen on

September 14th. That phone call came in while Mason Berry was at the Crawford County Detention Center, the time stamps that were on the government's exhibit, the Google map government's exhibit. And these records will show that phone call ended at the exact moment Mason Berry left the Crawford County Detention Center per exhibit -- what exhibit is that?

MR. SONGER: It's consistent with his testimony that he received a phone call from the Sheriff, which is what prompted him to drive back to Franklin County. He was attacked on cross examination that there were no records to verify that phone call occurred, so we subpoenaed the records.

THE COURT: Why were telephone records not -- first of all, you didn't previously subpoena records for Mason Berry until last night?

MR. CARTER: No, sir.

THE COURT: I've watched the government prosecute a lot of cases. Why were telephone records not requested until last night?

MR. CARTER: We didn't believe it was an issue until we listened to Mr. Wood's cross examination of Mason Berry.

MR. WOOD: Your Honor, they knew they were going to introduce a bunch of telephone stuff. It is reasonable

and logical that you would want -- well, I made my --

THE COURT: Have you had time to review what it was that you received last night at 6:00?

MR. WOOD: No, I haven't looked at it, because we were preparing for today, obviously. And my next concern is, how many more of these, as we go along and their witnesses get in trouble, how many more times are we going to end up getting productions in the middle of the night?

THE COURT: The plaintiff has the ability to put on a rebuttal case. And, I mean, think of it this way. If you had recalled Mason Berry in the defense case, subject to the Court allowing you to do that, but let's suppose you did, and asked those questions, surely the government would be able to put on a rebuttal case, right?

MR. WOOD: But I didn't.

THE COURT: You didn't. They called him. But you made a record with Mr. Berry on your cross examination. I think the question is whether it was -- whether the government should have reasonably anticipated that Mason Berry would be cross-examined on this issue. And that goes to whether it would be proper rebuttal or not. This is still their case, though. It's not a rebuttal case.

Other than the untimeliness, what is the prejudice to the defendant? Because we may have remedies for untimeliness. Help me understand what the other

prejudice is.

MR. WOOD: Well, are we going to put Mason Berry back up on the stand, or are we just going to get these entered without my opportunity to ask him anything?

THE COURT: I would give you an opportunity to recall Mason Berry.

MR. WOOD: He has already been released. Has he been viewing stuff about the trial? Has he done stuff as a witness he wouldn't have otherwise been doing?

THE COURT: Well, that's a fair point.

MR. CARTER: As it relates to the ability to review the records, I can actually shed some light on this. I received them at 6:20 yesterday. They are not so voluminous that I didn't review them before I sent them to Mr. Wood at 6:48. So 28 minutes, it took me.

THE COURT: What's on the phone bills?

MR. CARTER: The actual electronic records from AT&T. So it's every call that Mason Berry made and received that day.

THE COURT: That day?

MR. CARTER: Yes. Government's Exhibit 23 is just the one call with Anthony Boen. And they appear on a spreadsheet format similar to this that's in Government's 23. They are not difficult to review.

THE COURT: The Court is going to find that an

appropriate foundation for the receipt of these documents has been received based on 902.11, but I'm not going to actually receive them at this time.

We'll take an extended lunch break, and I want Mr. Wood or Mr. Prater to have an opportunity to review the entirety of the information that is on that thumb drive, and then be able to articulate the prejudice that the defendant would suffer from this information.

And one of the issues that the Court thinks is significant is, this is mechanically generated information. It's automated information. It's not like it contains hearsay that you have to sort through. This trial is a search for the truth, and to the extent that timeline information is important, this would appear to be neutral, objective data. But all I know is Mr. Carter's representation about what it shows, and so the defense needs to have an opportunity to see all of it and to further argue what prejudice they would receive.

There is something to the untimeliness argument here. I can't really understand why this would have been overlooked. But let's start with what the prejudice to the defendant would be, and then we'll go from there.

MR. WOOD: Yes, sir.

MR. CARTER: Your Honor, are you going to recess now? I'm at kind of a stopping point if the Court cares

to.

THE COURT: Do you have more with Ferguson?

MR. CARTER: I have a little more, but not much.

THE COURT: Okay. We'll go ahead and recess.

(bench conference concluded)

THE COURT: I have an idea, Ladies and Gentlemen, that I wish I had about 15 minutes ago. We should take our noontime recess at this point.

We're going to take an extended lunch break today, so it's about noon time. We're going to be in recess until 1:30 today. So let me remind you of the recess instruction. Don't speak with anyone about the case, don't conduct any research about the case, and don't allow anyone to approach you with information about the case, or really to discuss anything with you.

So everyone please stand while the Jury is in recess. We'll reconvene at 1:30. Court will remain in session.

(Jury out at 12:03 p.m.)

THE COURT: We'll go back on the record at 1:15. Mr. Wood and Mr. Prater, do you have whatever it is that you need to be able to view those? Do you have a printed copy? Can we help you to get a printed copy?

MR. PRATER: They are not printed. I have them electronically on my computer, Your Honor.

THE COURT: Is that acceptable to you?

MR. WOOD: Yes.

THE COURT: Please be back in your seats at 1:15.

(Recess from 12:05 p.m. to 1:14 p.m.)

(Outside the presence of the Jury)

THE COURT: The record will reflect that we're proceeding outside the presence of the Jury. Let me tee up the issue as I understand it.

Mason Berry was the government's first witness. On direct exam, he was asked about the Justin Phillips' count, and in particular, the part about having to go up to relieve the deputies at the hospital. And then when Phillips is discharged, there's an explanation that Berry and Deputy English transported Phillips back to the Crawford County Jail.

Questioned by the government, "So what happened after you dropped Justin off?"

"Went back out to the sally port and exited the jail." Answer, "Got a phone call."

"Who was the phone call from?"

"Anthony Boen."

"And what did Sheriff Boen say?"

"He asked me if I was alone. I told him no, I had a deputy with me. He asked me to step out of my vehicle."

"Did you do that?"

"Yes."

"What did he say then?"

"He told me to come get him and then they were going to go back and pick up Justin."

Question, "Where exactly were you when Sheriff Boen called and told you to come and get him?"

"In the parking lot of the jail."

"Did Sheriff Boen tell you any reason on that call why you needed to drive 45 minutes to pick him up and then come right back to where you were standing?"

"No, he just told me to come pick him up."

"How did that request seem to you?"

In Berry's words, "Seemed pretty fishy."

So then there's cross examination. On cross, Mr. Wood works his way up to this point in the timeline. So they've dropped Phillips off at the jail.

Mr. Wood asks, "Where did you go after that?" And basically, Mr. Wood gets him to commit to the same exact story that he told on direct, and specifically, the answer is, "I was pulling out of the sally port. I parked out in front of the Crawford County Sheriff's Office."

Question -- this is Mr. Wood -- "And I understand, is that where you received a phone call from Sheriff Boen?"

"Yes."

So Mr. Wood has committed him to the same testimony that he gave on direct. And then Mr. Wood goes on to make this point about where Deputy English was during this phone call, and what Berry and English discussed afterwards.

Question, "Deputy English, was he in the same vehicle you were in when Sheriff Boen allegedly called your phone?"

"Yes."

"How long did the call last?"

"Not very long."

"About what time was it?"

"10:00, maybe 9:30."

Question, "At no point in time did you tell Sheriff Boen where you were?"

"Don't believe so."

"At no point did you tell" -- Boen is the context here -- "hey, I'm sitting in the parking lot?"

"No."

"When you and Zachery English were on your way back to Franklin County, did you tell Zach English anything about what the Sheriff had called and talked about?"

"No." Kind of a follow-up question. "I don't recall, no."

Then Mr. Wood has one of his editorializing moments, and basically makes the point that that story sounds more fishy than what Berry thought was fishy. And Berry said, "No, I don't think that that is more fishy."

Against that backdrop, the government has apparently subpoenaed records from the cell phone provider. There is a certificate for authentication purposes. There's a thumb drive that has been offered. I understand that the thumb drive contains the entirety of Mr. Berry's cell phone call log data from 12:01 a.m. on 9-14 through midnight. And so that's marked. I'm not real sure if the government wants the actual thumb drive, but what they have specifically printed and are wanting the Jury to see is Government Exhibit 23, which is a call of a little over six minutes in duration that was placed from some phone number, apparently to Mr. Berry's phone number, although that's not -- I can't -- I don't know how this document is organized, but I assume that's the case. That call was at 8:46.

So this is -- the nature of this record is an electronic record of the type that would be covered by 901.13 or 14, but the real point is, even under 13 and 14, you still have to get through the requirements of 902.11. 902.11 requires that the proponent, "Must give an adverse party reasonable written notice of the intent to offer the

record and must make the record and certification available for inspection so that the party has a fair opportunity to challenge them." So that's the context.

Over the recess, I wanted to make sure that Mr. Wood and Mr. Prater had an opportunity to look at the entirety of the data. And I'll now give you an opportunity to make any further comment. I'm particularly -- you can say anything you like for purposes of the record, or for purposes of persuading the Court. But in particular, I am interested in understanding prejudice in the sense of, is there anything suspicious about the authenticity of the records that you would be prejudiced if you did not have more time to review and challenge?

MR. WOOD: As to the authenticity?

THE COURT: Yeah. And this is where I'm coming from. The advisory committee comments say the purpose of the notice requirements is to give the opponent of the evidence a full opportunity to test the adequacy of the foundation set forth in the declaration.

MR. WOOD: Your Honor, I think at this point, I reviewed them. The defense will just stand on the objection previously made at the side bar where we were at, and I think that we'll just stand on that.

THE COURT: Let me ask you this. Do you have Sheriff Boen's cell phone records?

MR. WOOD: No.

THE COURT: So do you still find it suspicious that the government didn't acquire Mr. Berry's cell phone records until this week, or yesterday?

MR. WOOD: Sure. Yeah. I mean, after four years to prepare, not until after we cross-examine their witness on the evidence, the testimony that they elicited, that all of a sudden that this is requested. So like I said, we'll stand on the objection that we made earlier and go forth from there.

THE COURT: I'm going to sustain the objection for the time being. Having the benefit of reviewing the transcript over the recess, I don't think Mr. Wood has really made any point that was not capable of being logically anticipated. This seems to the Court to be an attempt to bolster Mr. Berry's testimony on this point. And the cross examination allowed Mr. Berry to reinforce the notion that the call was received, that the call was received when he was in the parking lot of the jail. And really the impeaching point was this notion that he didn't tell Deputy English anything about it.

To the extent that there's some opening the door concept that needs to allow the government to bolster it or rebut it, you can certainly call a witness to do that. But this particular method of getting around the hearsay, the

authenticity and hearsay issue, requires advance notice. And I don't know of any reason why you couldn't have obtained, couldn't have anticipated the need to bolster his testimony. You went to the trouble of getting his Google records. If you felt like you needed to bulletproof it, I don't know why you wouldn't have gotten the phone records as well.

All of that said, if the defense case presents testimony that is directly contrary to the electronic evidence that they have now been provided, the Court would entertain a motion to receive the documents at that point in the government's rebuttal case. So the objection is sustained.

MR. SONGER: Your Honor, can we just say something briefly for the Court's consideration?

THE COURT: Yes.

MR. SONGER: I do believe that there is a point in the cross examination that Your Honor referenced where Mr. Wood specifically cited Mason Berry's failure to get records as a reason to doubt that this call happened. And that is what specifically prompted the government to obtain those records. And I do not believe there's any unfair surprise or notice issue here, because the records we obtained and seek to introduce are records of a call made by the defendant, a record that the defense clearly had

access to. And they clearly recognized its importance because they prepared a cross examination about a call the defendant made. So this is not a situation where perhaps there was some communication between government witnesses that the defense wouldn't have been privy to that was subpoenaed. So I don't think that the notice concern applies here for that reason.

THE COURT: Well, except that 902.11 uses the word "must." There's not a whole lot of case law out there. Couldn't find anything in the Eighth Circuit. We did find a Fifth Circuit case, *United States v. Daniels*, and a Second Circuit case, *United States v. Komasa*, K-O-M-A-S-A. Both of these deal with objections pertaining to lack of notice under 902.11. Neither case is squarely on point. But the big picture take-away is, these cases are debating situations whether three days' advance notice is enough in one case. And then the other one was a little more on point in that the Court there allowed it in without any proper notice, any proper written notice, but it's distinguished by the government had placed the opposing party on oral notice several weeks, or whatever, in advance and they just didn't put it in writing. And the Court there under those circumstances let it in.

So, I mean, the Rule sounds mandatory. I agree that I don't see a tremendous amount of prejudice because

I'm not certain what further examination into the authentication of these records -- I don't know what more time to do that would provide, but the Rule sounds pretty mandatory. The government didn't comply with it. It's something that's kind of obvious. You've pursued acquisition of other types of electronic information. So I think this is something that you could have thought of before, and that the bolstering here, what additional marginal benefit that would provide I don't think is worthy of setting aside the sort of mandatory notice language in the Rule.

Now, that calculus could change if the government tries to present evidence or present argument that's obviously contrary to this. So that's the Court's ruling.

MR. SONGER: Thank you, Your Honor. On that last point, we would just request this evidence never does come in before the Jury. We would just ask the defense could not argue an inference from the lack of records in their arguments at the end of trial, as they did during cross examination.

THE COURT: Well, I won't make that ruling now because I don't know what other evidence may be before the Court. But certainly the Court would take a dim view of a lawyer making -- who is an officer of this Court making an argument to the Jury that the lawyer knows to be

demonstrably untrue. But I can't make that ruling now.

So very, very quickly. Mr. Wood, is there a chance this case will go to the Jury tomorrow? What I'm asking is, do we need to have a jury instruction conference tonight?

MR. WOOD: No, Your Honor. The e-mail that I sent last night was the proposal for the defense, three witnesses today. We have probably another three to six witnesses. So my plan, depending on how far we get today would be, we might could finish up by the end of Friday.

THE COURT: Get the proof in, but no way we would have time to --

MR. WOOD: Yes, sir. Yes, sir. Those three witnesses today, because I think we'll be able to get through two of them, probably. The third one, I don't think so. And then tomorrow, we would be left with four, five, six, depending on how it all shakes out. But I don't anticipate any of them being significantly long. So I would like to be done by tomorrow afternoon so that we can move on to the final part.

THE COURT: All right. Well, let's bring the Jury in, please.

(Jury in at 1:33 p.m.)

THE COURT: We were in the middle of Agent Ferguson's direct testimony.

Mr. Carter, you may inquire.

MR. CARTER: Thank you, Your Honor.

MATTHEW FERGUSON

DIRECT EXAMINATION (cont'd)

Q. (By Mr. Carter.) Special Agent Ferguson, as an FBI Agent, and for that matter, when you were a North Little Rock police officer, were you a sworn law enforcement officer?

A. Yes.

Q. What's it mean to be a sworn law enforcement officer?

A. That means I raised my hand and swore an oath to protect and defend the Constitution of the United States and the State of Arkansas.

Q. Did your investigation reveal that the defendant, Sheriff Boen, had taken a similar oath?

A. Yes.

Q. Have you got that binder up there in front of you?

A. I do.

Q. Can you turn to tab 18?

A. Yes, sir.

Q. Are you there?

A. Yes, sir.

MR. CARTER: Your Honor, Government's Exhibit 18 are two self-authenticating documents that I would move to introduce at this time.

THE COURT: What's the defense's position?

MR. WOOD: We didn't stipulate to those. We would object on relevance.

THE COURT: Well, there's been cross examination of at least two witnesses involving taking oaths, and so if the defense believes it's relevant through its questioning, the Court understands the relevance here. The objection is overruled.

MR. CARTER: Can I publish, Your Honor?

THE COURT: Government's 18 is received.

(Government's Exhibit 18 received)

Q. (By Mr. Carter.) Mr. Moon, will you please put up on the viewer Government's Exhibit 18, the first page. And the language in the middle begins, "I, Anthony Boen." Will you please explode that for us?

Special Agent Ferguson, will you read that into the record, please?

A. "I, Anthony Boen, do solemnly swear or affirm that I will support the Constitution of the United States and the Constitution of the State of Arkansas, and that I will faithfully discharge the duties of the office of Franklin County Sheriff upon which I am about to enter."

Q. Mr. Moon, can you take down the explosion. Can you put up the -- explode the date in the lower part, just to the right of the seal, towards the bottom.

And what day was this oath administered, Special Agent Ferguson?
A. "On this, the 1st day of January 2015."
Q. Mr. Moon, will you please put up the second page of Government's Exhibit 18.
And is this the same oath, Special Agent Ferguson?
A. Yes, it is.
Q. Mr. Moon, will you please put up the same portion you put up in the previous page of Government's Exhibit 18. The lower portion, please.
And what is the date of this oath that Sheriff Boen took?
A. The 1st day of January 2017.
Q. So based upon these documents, at all the times between Count One and Count Three of the indictment, the defendant was operating under this similar oath?
A. Yes, he was.
Q. And you took a similar oath to this when you were a state police officer and an FBI Agent?
A. Yes, sir.
Q. What does that mean to you?
A. It means everything. It means that I'm to protect and defend the Constitution and the rights of those who cannot protect themselves.
MR. CARTER: Pass the witness, Your Honor.

THE COURT: Thank you.

MR. WOOD: No questions, Your Honor.

THE COURT: Thank you. Agent, you may stand down.

THE WITNESS: Thank you, sir.

THE COURT: You may call your next witness.

MR. SONGER: The United States calls Dalton Miller.

THE COURT: Mr. Miller, if you would please make your way in between counsel tables, and then pause about right there and raise your right hand.

(witness sworn)

THE COURT: Then wind your way even more around the court reporter and step up into our witness box. Officer, you are permitted, but not required, to remove your mask while testifying. You may inquire.

DALTON MILLER, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SONGER:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Mr. Miller, could you please state your full name for us?

A. Dalton Miller.

Q. And would you spell your last name?
A. M-I-L-L-E-R.
Q. How are you currently employed, Mr. Miller?
A. I am currently employed through the Franklin County Sheriff's Office. I just transferred over from Johnson County.
Q. I see that you're wearing your Sheriff's department vest today?
A. Yes, sir.
Q. When did you first go into law enforcement?
A. I first started law enforcement around October 2017.
Q. What did you do before that?
A. I worked at CV's grocery store. I was a sacker and a stocker.
Q. Why did you go into law enforcement?
A. I went into law enforcement to help people. I wanted to be a cop ever since I was a kid. I went to college for it because I knew that that's what I wanted to do.
Q. Can you just walk us through the timeline of your law enforcement career? When did you get your first law enforcement job?
A. I first started around October 2017 as a jailer and a dispatcher.
Q. And where were you a jailer and a dispatcher?
A. At the Franklin County Sheriff's Office.

Q. At some point, did you move out to be a patrol deputy on the road?
A. Yes, sir, I did.
Q. About when was that?
A. That was about a year later, about late November, early December of 2018.
Q. Were you excited to be working out on the road?
A. Oh, absolutely.
Q. Who promoted you to get out of the jail and work as a patrol deputy?
A. Sheriff Boen did.
Q. And then how long did you stay at the Franklin County Sheriff's Office?
A. When I got certified, I went to the academy from about January to April. And about a month or two later, I went to Johnson County.
Q. Just to be clear, what year was that that you left to go to Johnson County?
A. 2019.
Q. Why did you leave the Franklin County Sheriff's Office and go over to the Johnson County Sheriff's Office?
A. Because of the incident that I saw regarding the Sheriff at the Sheriff's Office.
Q. And just generally speaking, what did you see involving the Sheriff that made you want to leave?

A. I saw the Sheriff strike an inmate, shackled to a bench, three or four times.
Q. And then at some point, it looks like you came back to the Franklin County Sheriff's Office?
A. Yes, sir, I did.
Q. Why did you do that?
A. I came back December 1st because they had a new administration, and things are just better than ever, really. The morale is just a lot better.
Q. You mentioned just a moment ago that you went to a training academy, is that right?
A. Yes, sir.
Q. Tell us a little bit about that.
A. Well, it's just where you go to get certified as a law enforcement officer through the State of Arkansas.
Q. How long does that academy last?
A. Approximately three months.
Q. And what types of topics are taught at that training academy?
A. Self-defense. Of course, the laws. And just basic procedures.
Q. Does it include training on when officers are permitted to use force and when they are not?
A. Yes.
Q. Were you taught that it's permissible for officers to

use force to punish someone?
A. No, that is not allowed whatsoever.
Q. Were you taught that officers are allowed to use force to retaliate against someone in their custody based on something that happened earlier?
MR. WOOD: Object to the leading.
THE COURT: Rephrase.
Q. (By Mr. Songer.) At that academy, were you ever taught to use force to retaliate against someone?
A. No, sir.
Q. When you worked at the Franklin County Sheriff's Office, your first stint there, was there a place inside the Franklin County Jail that people called the "shower room"?
A. Yes, sir.
Q. Describe that room for us.
A. It's a small room that's connected to a long hallway.
Q. Why is it called the shower room?
A. It's where they used to change inmates into their inmate attire from their regular clothes whenever they were first being booked into the jail.
Q. Is there a shower in there?
A. I don't believe so, no.
Q. So are inmates ever held in that room? Were they when you worked at the Franklin County Sheriff's Office?

A. Yes, sir.
Q. Does that room have a door on it?
A. I'm sorry. Can you repeat?
Q. Sure. Does that room have a door that closes it in?
A. No, sir.
Q. So how are inmates held inside that room?
A. They are shackled from their ankle to the bench that was bolted down.
Q. How long is that shackle that holds inmates in there?
A. Approximately a foot, maybe two feet.
Q. So when inmates are shackled inside the shower room, are they able to get out of that room and go into the hall or other parts of the jail?
A. No, sir, not unless they are extremely tall.
Q. Mr. Moon, can we please put up Government's Exhibit 5(j), which is already in evidence.
Deputy Miller, do you recognize this?
A. Yes, sir.
Q. What room are we looking at here?
A. That is the shower room.
Q. Is that what it looked like when you were there?
A. No, sir. It's missing the bench that was attached to the wall.
Q. And that's the bench with the shackle attached to hold the inmates?

A. Yes, sir.
Q. Which wall did that bench go along?
A. It would be the one where the camera is looking at. It's the one to the left of the door.
Q. Thank you, Mr. Moon. You can put that down.
Are there surveillance cameras inside the jail?
A. Yes, sir, there are.
Q. When you worked in the jail, was one of your duties to monitor those cameras?
A. Yes, it was.
Q. Are you familiar with what parts of the jail they show and what parts they don't show?
A. Yes, sir.
Q. Now, did the surveillance camera show the inside of the shower room?
A. No, not entirely. Maybe a fraction.
Q. Mr. Moon, can we put up Exhibit 5(e)?
Is the shower room in this picture?
A. Yes, sir. It's off to the right, whenever you're facing the picture.
Q. The one with the light coming out of it?
A. Yeah.
Q. And do you see where the surveillance camera is in this picture?
A. Yes, sir. It's towards the top right, top middle of

the picture.
Q. Could you circle it for us with your finger? All right. And what is the view like from that camera?
A. It goes towards the -- towards the kitchen. And it gets part of the shower room right in this area.
Q. Is that the view you were talking about just a second ago?
A. Yes.
Q. Mr. Moon, can we take this down, but replace it with Exhibit 5(a), please.
Do you recognize this, Deputy?
A. Yes, sir.
Q. Is this the view you were just talking about?
A. Yes, sir, that's the view.
Q. Just to be clear, where is the shower room in this picture?
A. The shower room is right there.
Q. So is that about how much of the shower room you can see from that surveillance camera?
A. Yes, sir.
Q. You can take that down. Thank you, Mr. Moon.
Deputy Miller, do you remember an inmate who was at the jail named Zach Greene?
A. I do.
Q. Was there a time where he was held in the shower room?

A. Yes, sir.
Q. About when was that?
A. That was around mid-November, early December, in that area.
Q. Mid-November, early December of what year?
A. Of 2018.
Q. Now, did you know Zach before he was brought into the jail?
A. I went to high school with him, but we didn't really talk much. And he was a janitor at the college I went to.
Q. Did you ever have a chance to talk to him while he was working as a janitor?
A. Yeah, once in a while. Just small talk, say, "Hi, how are you doing?"
Q. Were the two of you friends?
A. No.
Q. Did you ever hang out with him outside of his work?
A. No, sir.
Q. Do you remember an incident at the jail where you were out on patrol and you got called back in to deal with something involving Mr. Greene?
A. Yes, sir.
Q. Where were you when you got a call to come back in?
A. I was patrolling Altus, which is near -- about a town away from the jail, nearby.

Q. And what type of incident was it that you got called back to deal with?
A. I got called out for an emergency at the jail.
Q. And what specifically, what type of thing was it?
A. They said it was a 10-24, which in 10 code, that means emergency at the jail.
Q. Right. But what was happening?
A. Oh. Well, when I got there, there was just two city officers inside that were standing around, and nothing that I could see at first, until I was approached by a dispatcher.
Q. You saw two officers standing around?
A. Yeah.
Q. Was there any fight happening?
A. Not at the moment, no.
Q. Any rioting? Any officers responding to anything?
A. No, sir. They had already responded.
Q. By the time you got there, was this still any kind of urgent situation?
A. No.
Q. So what did you do when you showed up?
A. Well, I entered through the lobby room door. And the dispatcher, Kambrie English, told me that there was a fight that occurred between two inmates. So I continued on and started to investigate.

Q. Why was it your job to investigate it?
A. Well, I was one of the on-duty deputies at the time and I didn't see another deputy until William Gilbreath showed up, so it was just part of standard procedure.
Q. So what did you do to investigate this incident that you had been called there for?
A. I started to talk to the trustees, and they were in the kitchen. And they told me that a trustee by the last name of Huckleberry was trying to feed Zach Greene, who was in the shower room. And I talked to Huckleberry and he said that he pulled him in and bit his hand, and then that's whenever he punched Zach Greene in the face.
Q. Did you collect statements from people who were involved?
A. Yes, sir.
Q. What did you do with those statements?
A. I gave them to William Gilbreath.
Q. Did you collect a statement from Zach Greene?
A. No, sir, I don't believe so.
Q. Do you know where he was when you were going around getting statements?
A. He was in the shower room still.
Q. Was he shackled in there?
A. Yes, sir.
Q. Was anybody in there with him?

A. No, sir.
Q. And what about the trustees, did you get statements from any of them?
A. Yes.
Q. Including the trustee that had allegedly been involved in this incident?
A. Yes.
Q. And where was that person when you got a statement from him?
A. They were walking back and forth from the kitchen area, just doing their job. It was about to be dinner time.
Q. Had they all been separated from Zach Greene at that point?
A. Yes.
Q. Did you do anything else to investigate what happened?
A. No, sir.
Q. What did you do after that?
A. Went into the deputy room. And it's not too far from the shower room or the kitchen. It's down the hallway to the left from the kitchen.
Q. Was anybody else in the -- you said the deputy's room, right?
A. Uh-huh.
Q. Was anybody else in there with you?

A. I remember there being a couple of other people. I thought maybe William Gilbreath, and I thought maybe the city officers were in there, but I can't recall at the time.
Q. Did you see Sheriff Boen in there at some point?
A. Yes, sir. Whenever I was in there talking to them, he ended up showing up and he came into the room.
Q. Do you know when he showed up at the jail?
A. It was shortly afterwards.
Q. And was anybody with him?
A. At the moment, no, sir. But there was a Travis Ball, and I believe another individual who worked for Justice Solutions, that was on the premises.
Q. Had they come to the jail with the Sheriff?
A. Yes, sir.
Q. But they weren't with him at this point?
A. No, I hadn't seen them just yet.
Q. So what happened when Sheriff Boen came into the deputy's room and you saw him?
A. He just started talking about some personal matters.
Q. Did he say anything else to you?
A. Yes, sir. He pointed me out and he asked me if he could talk to me real quick.
Q. Did he ask to talk to anybody else who was in there or did he single you out?

A. He singled me out.
Q. So what happened after he told you he wanted to talk to you?
A. Well, he kind of gave me a shrug to come out in the hallway, so we started walking into the hallway. And I can't remember the full-fledged conversation. It wasn't long, because it was right around the corner is where we were going. I thought we were going to the booking area, and he stopped me right at the shower room.
Q. Then what happened when he stopped you at the shower room?
A. He grabbed my sleeve and he pulled me towards the wall.
Q. Can we put up Exhibit 5(a) again, Mr. Moon.
Deputy Miller, can you show us with your finger here exactly where Sheriff Boen positioned you when he grabbed your sleeve?
A. Yes, sir. It was right here.
Q. And this image that we're looking at right now, where is this taken from, can you tell?
A. I can tell that this was taken from the camera's view.
Q. This is the view the camera has looking down the hallway towards the shower room?
A. Yes, sir.
Q. So from where Sheriff Boen positioned you, what's the

significance of that as it relates to this camera?
A. It appears since, if you will, I'm a bigger guy. I think it would probably block any kind of view you would have of the shower room.
Q. And I don't mean to pry, but just for the record, about how big are you?
A. I'm 6'4" and approximately 240 pounds. Or 340 pounds.
Q. All right. Now, after Sheriff Boen positioned you there, blocking the view of the camera, did he say anything to you?
A. He said, "Dalton, can I trust you?"
Q. How did you take that?
A. I just thought, I was like, "Yeah." I was like, "Yeah, you can trust me."
Q. He's your Sheriff, right?
A. Yeah. Didn't expect anything else.
Q. At this point, where was Zach Greene?
A. He was shackled to the bench and he was sitting down in the corner of the shower room.
Q. Did you observe any injuries on him at this point?
A. Yes, I did. There was a small laceration on his lip and some minor blood on his nose.
Q. Now, had you seen Sheriff Boen go by the shower room earlier that night?
A. No, sir, I didn't.

Q. Now, you said Zach Greene was sitting down and was shackled to that bench. Was he saying anything?
A. No, sir. He was just looking at the Sheriff and looking at me.
Q. Was he making any threatening gestures?
A. No, sir.
Q. Did he try to jump up or anything?
A. No.
Q. Based on your training as a law enforcement officer, at that point, did you see any reason at all to use force on Zach Greene?
A. No, sir.
Q. So what did Sheriff Boen do next?
A. Well, after he asked me the question -- and it happened pretty fast -- he leaned in towards Zach Greene and he hit him approximately three to four times.
Q. Can you describe how Sheriff Boen hit him three to four times?
A. He hit him closed fist at least one, two, and three.
Q. And just for the record, can you describe what you're doing with your hand?
A. I'm demonstrating what I saw the Sheriff do towards Zach Greene, striking him in the face area, in the head area.
Q. And what type of a motion were you making with your

arm and fist?
A. Pretty much a left and right swing action as if it would be like a punch towards Zach Greene.
Q. And where did he contact Zach Greene?
A. Zach Greene was trying to defend himself, so he was holding his hands up like this. But he collided into the left temple and right temple area.
Q. And I think you indicated that Zach Greene was holding his hands up like on his face, is that right?
A. Yes.
Q. Was Zach Greene trying to fight back or hit the Sheriff at all?
A. No, he was just trying to duck and cover in the corner.
Q. So what did you do when you saw the Sheriff hitting Zach Greene with his fist in the face?
A. At that point, I was kind of in shock. I didn't know what to expect. I was almost like a deer in the headlights. I just, I was like, "What are you doing?" And then he stopped and then he spat on Zach Greene.
Q. I'm sorry. What was the last thing you said?
A. He spat on Zach Greene, or in the general direction.
Q. He spit on him?
A. Yeah.
Q. How did you feel as you watched that?

A. I was -- well, I mean, there was only really one word. I was pretty disgusted.
Q. So did the beating stop?
A. Yes. After that, it stopped, yes, sir.
Q. Do you know why it stopped?
A. I have no idea.
Q. And what did you say to the Sheriff?
A. I'm sorry?
Q. What did you say to the Sheriff?
A. I was like, "What are you doing?"
Q. So what did you do next?
A. So we went from there. And I was just still like in shock. And at this point, I wanted to leave the jail, period. So I eventually went back to the booking area and the dispatch area and the Sheriff eventually followed towards me.
Q. And why did you want to leave? Why were you trying to get out of there?
A. I just felt very uncomfortable and I just did not want to be there.
Q. So then what happened as you tried to leave?
A. He started making conversation with me while we were in the booking rooms, in the dispatch area. And he began to ask me, like, "Dalton, can I trust you," repeatedly.
Q. How many times did the Sheriff ask, "Can I trust you,"

while you were trying to leave?
A. I can't remember the exact number. I just know it was multiple times.
Q. What did you understand that to mean?
A. Pretty much like he wanted me to sweep everything under the rug.
Q. And how did that make you feel for your boss to ask you that?
A. Well, it was a man that I looked up to and I always thought he was a good man. I just was very distraught.
Q. Did that night change your opinion of him?
A. Yes.
Q. And are you an at-will employee at the Sheriff's Office?
A. I'm sorry?
Q. Are you an at-will employee? Do you have any employment protections, or can the boss fire you any time he wants?
A. From my understanding, he can probably fire us at any moment.
Q. So then what happened after that?
A. So from there, I eventually was able to leave. And I got back in my patrol vehicle and I started patrolling towards Altus. But before I left, the Sheriff wanted me to come to his house. And I just said, "Yeah, sure." But

then whenever I was patrolling, I got a phone call from Travis Ball and he said, "Hey, you need to come to the Sheriff's house right now." And it sounded urgent.
Q. Let me break that down. Did the Sheriff ask you to come to his house while you were still at the jail?
A. Yes, sir.
Q. And how did you respond to that?
A. I was like, "Yeah, sure, if I can make time."
Q. Were you intending to actually show up?
A. No. No, I was not.
Q. Why not?
A. Because I did not feel comfortable and I just wanted to be away from him.
Q. And then you said you went back on patrol and you got a call from Travis Ball?
A. I did.
Q. So what did you do after you got that follow up?
A. I turned around and I went to the Sheriff's house.
Q. Why did you do that? Why did you go?
A. Because I was afraid that I was going to possibly be fired. Scared for my own safety, pretty much.
Q. So what was the scene like when you showed up at the Sheriff's house that night?
A. Well, they were just drinking. I believe Travis is the one that opened the door. And he said, "Oh, I'm just

kidding, we just wanted to talk to you." And they just talked about other matters. And then there was a Scout Ingram and the Justice Solutions guy was there as well. And they ended up leaving the house eventually. And Travis and the Sheriff were sitting at their living quarters table, and I was standing right next to them.
Q. You said people were drinking. Did you have any alcoholic drinks?
A. No, sir.
Q. Were you still on duty?
A. Yeah.
Q. Actually?
A. Yeah.
Q. Is it pretty well known you don't drink on duty?
A. Correct. Yes, sir.
Q. Was the Sheriff drinking?
A. Yes, sir, he was.
Q. Did he seem intoxicated to you?
A. Yes, sir, he did to me.
Q. What about earlier that night at the shower room, the incident with Zach Greene, did the Sheriff seem intoxicated then?
A. He didn't seem as intoxicated as he was at the house. He was a little off, but it wasn't extremely abnormal, or like what you would see at the house whenever he was

drinking.
Q. When you saw him outside the shower room, did he appear to be able to function okay to you?
A. Yeah. Yeah.
Q. Did he seem to know what he was doing?
A. Yeah.
Q. But by the time you got to his house, he looked pretty intoxicated?
A. Yes.
Q. So who is at the house? I think you told us Travis, the Sheriff, you said Scout?
A. Uh-huh. And then the individual that worked for Justice Solutions. I can't remember his name.
Q. Anybody else there?
A. No, just besides me.
Q. Now, at some point, was it just you, the Sheriff, and Travis Ball left?
A. Yes, sir.
Q. And at that point, did the Sheriff say anything to you?
A. Well, he asked me repeatedly, like he asked me if I could -- if he could trust me, but then he went into a line of talking about Justin Phillips. And --
Q. Let me just ask you first. He asked you if he could trust you again?

A. Yes. He said this multiple times while I was at the house.
Q. How did he say it?
A. Almost like, it was intimidating. Like he wanted to make sure, almost like he was questioning me almost.
Q. How long had you been working in law enforcement at this point?
A. Not very long. I had just started.
Q. Was it intimidating to you?
A. Very.
Q. Then you were starting to tell us about something the Sheriff also said about Justin Phillips, is that right?
A. Yes, sir.
Q. What did the Sheriff say to you about Justin Phillips?
A. He -- you know, I can't remember the exact conversation, but it was along the line of insinuating that he did something similar to Justin Phillips like he did to Zach Greene. He talked about a transport he did with Justin Phillips in the back and that the shackles were moving.
Q. And he did something similar to what he had just done to Justin -- Zach Greene in front of you?
A. Yes.
Q. What was the Sheriff's tone like when he was telling you about doing that thing to Justin Phillips?

A. It was almost like it was cocky, or like he was prideful about it.
Q. How did that make you feel?
A. Did not make me feel very safe. I was just very distraught about the whole situation.
Q. Did you take an oath when you became a sworn law enforcement officer?
A. I sure did.
Q. Does that oath swear you to uphold the Constitution of the United States?
A. Yes, sir.
Q. Did what you had seen and heard the Sheriff do give you any concerns?
A. I'm sorry?
Q. Did what you had seen the Sheriff do and heard him say to you, did that give you any concerns?
A. It did, yes, sir. But with him being my boss, I didn't know what to do. I had just been hired on as a deputy. I didn't know the proper procedure.
Q. So what did you do when you left the Sheriff's house that night?
A. Well, it was close to the end of my shift. I just continued patrolling, trying to get it out of my head. And I eventually went home crying.
Q. Why did you cry when you got home?

A. Because this was a man that I looked up to as a hero, and I always thought he was a good man and a good role model as a law enforcement officer. And then for something like that to happen, it just opened my eyes.
Q. Looking back on that night now, do you wish you had done anything differently?
A. Yes.
Q. What's that?
A. I wish I would have stopped the Sheriff from hitting Zach Greene.
Q. Why is that?
A. Because it's not right.
Q. Now, after this happened, did you want to continue working for Sheriff Boen?
A. No.
Q. So what did you do?
A. I went on and got certified. With me doing that, I didn't have to return to the Sheriff's Office. I got up from my house, I went to the academy, and then I went back to my house. I never returned except for one time, and it was late at night when nobody was there. From there, I got certified. And about a month or two later, I was able to get a job at Johnson County Sheriff's Office.
Q. And why didn't you want to ever go back up to the Sheriff's Office?

A. Because I was afraid that either the Sheriff or somebody that was involved in the incident was there.
Q. Thank you, sir. Those are all the questions I have for right now.
A. Yes, sir.
THE COURT: Thank you. Mr. Wood, you may inquire.
MR. WOOD: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WOOD:
Q. Good afternoon. My name is Russell Wood. I represent Sheriff Boen.
A. Good afternoon.
Q. All right. Mr. Moon, can we have Government's 5(a) back up again. It was the last one, I think.
All right. Deputy Miller, do you see your monitor in front of you?
A. I'm sorry?
Q. Do you see the monitor in front of you?
A. I see the picture that's in front of me, yes, sir.
Q. Right. That photograph that's on the monitor?
A. Yes, sir.
Q. You were just looking at that and it's identified as Government's Exhibit 5(a). Do you see that?
A. Yes, sir.

Q. And this is the view from the camera that was up on the ceiling, correct?
A. Around that general area, yes, sir.
Q. So on that evening, where was Zach Greene in the shower room?
A. He was in the back right corner, sitting down.
Q. So the back -- would it be as you were looking into the shower room, he was on the back right corner?
A. Yes, sir. If you were in the hallway looking into the shower room, it would be the back right corner.
Q. From this view right here, would you have been able to see Zach Greene in the shower room?
A. No, sir.
Q. So the camera would not have captured any aspect of Zach Greene's person, right?
A. No, sir.
Q. If you're standing in the doorway of the shower room, how deep is that room?
A. Approximately four feet.
Q. If you're standing in the doorway, right there in the doorway, would you be able to touch that back wall?
A. If you had a long reach, yes, sir.
Q. Well, how long of a reach?
A. Well, I could do it, but a normal person, probably not.

Q. All right. Can you see -- would you be able to see the bench from the security camera here?
A. No, sir.
Q. And was he sitting in the back right corner?
A. Yes, sir. He was on the floor.
Q. How wide do you think that the room is?
A. Not that wide. Maybe two and a half, three feet, maybe.
Q. All right. So that evening, your testimony is that the Sheriff came through the lobby entrance, correct?
MR. SONGER: Objection. Misstates his testimony.
THE COURT: Sustained.
Q. (By Mr. Wood.) I'm sorry. I mean, where did the Sheriff -- what entrance did the Sheriff come in that night?
A. I'm not sure, sir. I was in the deputy room when I first saw the Sheriff come into the deputy room.
Q. Did you hear the call go out as an emergency in the facility?
A. Whenever I was out patrolling, yes, sir.
Q. And how long did it take you to get back to the Sheriff's Office?
A. Approximately five to 10 minutes. I was running lights and sirens.
Q. And then once you got back to the Sheriff's Office,

approximately how long was it until you saw the Sheriff?
A. It was not long afterwards.
Q. Would it be fair to say within 10 minutes?
A. Approximately, yeah.
Q. When you got to the facility and you came in, where was the first place you went?
A. I went into the lobby and I went to the booking and dispatch area, that doorway right there.
Q. So when you first saw the Sheriff, where were you at?
A. I was in the deputy room.
Q. So is it my understanding you went -- you came in the lobby and then you went into the dispatch room?
A. Yes, sir.
Q. I'm sorry. I must have wrote that down wrong earlier. And how long were you in the dispatch room?
A. Not long.
Q. And then you proceeded to the deputy's room?
A. No, I proceeded towards the kitchen area where the trustees were, trying to get statements and investigate what happened.
Q. And how long did that investigation last?
A. Not too long. Approximately maybe five, 10 minutes.
Q. And then after you concluded your questioning and statements or whatever you were doing, where did you go then?

A. After everything was collected and everything was handed to William Gilbreath, I went to the deputy room.
Q. And how long were you in the deputy room before the Sheriff showed up?
A. Not long. It was just a couple of minutes, approximately.
Q. And then that's when the Sheriff said, "Hey, come here, I want to talk to you," or something to that effect?
A. Something to that effect, yes, sir.
Q. He said, "Hey, come here, let's go out here, I want to talk to you," or something, correct? Is that correct?
A. Yes, sir. He pointed me out, singled me out, and said, "I want to talk to you."
Q. And then you and the Sheriff went where?
A. To the hallway just outside the deputy room. And then we were working towards the booking area.
Q. And did you continue on to the shower room?
A. We were walking past the shower room and he stopped right at the shower room, yes, sir.
Q. So from the deputy room to the shower room, you guys were together?
A. Yes, sir.
Q. The incident with Zach Greene that you've testified about occurs. And then where did you and the Sheriff go after that?

A. After we went to the shower room?
Q. Yes.
A. Well, he stopped there and he was talking to me still. And then that's whenever he grabbed my sleeve and put me to the wall. And then that's whenever he continued talking to me.
Q. And then after that, after you testified that he hit Zach Greene, where did you and the Sheriff go?
A. I walked back towards the booking room.
Q. And where did he go?
A. I'm not sure, but he eventually went back to the booking room to talk to me.
Q. And how long was it between the time that ya'll parted ways at the shower room until ya'll met back up again, or the Sheriff met you again in the deputy's room?
A. I can't recall. It wasn't that long.
Q. Are we talking a matter of a few minutes?
A. Yeah.
Q. After ya'll got into the deputy's room for the second time, you were in the deputy's room, you left, ya'll came back to the deputy's room?
A. No.
Q. Okay. After ya'll left the shower room, you went to the deputy's room?
A. No. After we got done with the shower room, I went to

the booking room.
Q. Booking room. Okay.
A. Yes, sir.
Q. And then what happened?
A. That's whenever I was approached by the Sheriff. That's whenever he started asking me, "Can I trust you?"
Q. So when you left the shower room and went to the booking room, it was only a couple more minutes before the Sheriff joined you there?
A. Like I said, I can't remember, it's been a while, but it was around a few minutes.
Q. I'm just -- I heard deputy's room is where you all reconvened at, and it must have been the booking room. That's all I'm saying.
A. Yes, sir. It was the booking room.
Q. So you guys got back together at the booking room. He's asking you questions. And then what happened from there?
A. From there, he asked me to go to his house. And I said, "Yeah, sure." And then I eventually left and went in my patrol vehicle.
Q. And after you were talking at the booking room, where did the Sheriff go?
A. He remained there, I believe.
Q. So when you left, the Sheriff was in the booking room?

A. I can't recall where he was when I left, but it was in the general area.
Q. It's your testimony that -- well, let me ask you this. When was the first time you saw Zach Greene?
A. It's whenever I went in to investigate and I was going past to talk to the trustees.
Q. And at that time, it's true that he had a small laceration on his lip and a little bit of blood, or some blood coming from --
A. Yes, sir, on his nose.
Q. From his nose?
A. Yes, sir.
Q. At any point in time, did you go to the dispatch area?
A. Well, the dispatch area is the same as the booking area, so it's kind of one area.
Q. Well, let me back up because that was confusing to me, obviously, a little bit earlier.
A. Yeah.
Q. So when ya'll were at the -- you and the Sheriff were at the shower room and everything occurred, you testified that he hit Zach Greene and you went to the booking/dispatch room?
A. Yes, sir.
Q. And then some short amount of time later, the Sheriff was back in there in dispatch with you?

A. Yeah. The dispatch/booking area, yes, sir.
Q. In dispatch, who else was there?
A. Kambrie English was the dispatcher.
Q. Was Scout Ingram-Simpson there?
A. Yes, sir.
Q. Who else was in there?
A. I can't remember everybody else, but I'm pretty sure that was it. I think it was Kambrie, Scout, the Sheriff and me.
Q. Did you happen to talk to any of those people?
A. Scout was right behind the Sheriff whenever he was asking me if he could trust me.
Q. Scout was where? I'm sorry.
A. Right behind the Sheriff.
Q. In the dispatch room?
A. Dispatch/booking area, yes, sir.
Q. And then it's from that location, the dispatch/booking room, that's where you left out one of those doors?
A. Yes, sir. I went out to the lobby and through the front entrance.
Q. Your testimony while ago, is it my understanding, or would you agree that the Sheriff did not appear intoxicated?
A. Not at the time at the jail.
Q. Yes, sir. And did he have slurred speech or anything

to that effect?
A. Not at the jail.
Q. Did he have an unsteady gait or an indication like that that he was intoxicated?
A. No, sir.
Q. Was Travis Ball there with you and the Sheriff at the shower room when this occurred?
A. No. He was not directly at the shower room, no, sir.
Q. Do you recall where Travis Ball was at?
A. No.
Q. Do you know if Travis Ball was there?
A. He was somewhere on the premises, I believe.
Q. Was Travis Ball intoxicated?
A. I don't know, sir. I spoke to him at the Sheriff's house.

MR. WOOD: That's all the questions I have.

THE COURT: Thank you, Mr. Wood. Redirect, Mr. Songer?

REDIRECT EXAMINATION

BY MR. SONGER:
Q. I think I just have one question, Deputy Miller. Totally, you've been in law enforcement now for about four years?
A. Approximately, yeah.
Q. Is there any other time in your career you have seen

someone hit a shackled person in the head?

A. No, sir.

Q. Thank you, sir.

A. Thank you.

THE COURT: May this witness be excused?

MR. SONGER: Yes, he may.

MR. WOOD: Yes, Your Honor.

THE COURT: Officer, thank you for your time. You're free to go.

THE WITNESS: Thank you, Your Honor.

THE COURT: Can I see counsel at side bar?

(bench conference)

THE COURT: Subject to confirming with the Clerk that all of your exhibits are in, are you resting at this point?

MR. CARTER: We are, Your Honor.

THE COURT: Okay. With regard to Exhibit 6, the portion at the bottom of page 62 labeled point (C), "Documentation of use of force," I'm not going to receive that portion of the exhibit at this time. It may be that in the defense case, you establish a basis for it to come in, but at this point, the Court will receive Exhibit 6 with sub-point (C) redacted. I think that the issues raised here present a different take on the willfulness issue of the portions above that. And I also think that

that it's a different 403 confusion analysis. So it's not received at this point. That's not to say that you can't try again later.

(Government's Exhibit 6, Redacted, Received)

MR. CARTER: If in the event it doesn't come in later, may I provide a redacted copy to the Court to replace later?

THE COURT: Yes, yes, yes.

MR. CARTER: And may I confer with the Clerk?

THE COURT: I'm going to recess the Jury. Are you going to make any motions?

MR. WOOD: Yes.

THE COURT: Okay. So I'll recess the Jury and you can take a few minutes with Ms. Craig to make sure everything is in, and then we'll take up motions.

MR. CARTER: Thank you, Your Honor.

MR. WOOD: Thank you, Your Honor.

(bench conference concluded)

THE COURT: Ladies and Gentlemen, we are going to take our afternoon recess at this time. There is a little business that we need to take care of, so we're going to take a full 20 minutes at this point. So we'll be in recess, let's go ahead and take 25 minutes. We'll be in recess until 2:50 p.m. The Court will remain in session, but the Jury is in recess. Everyone please stand.

(Jury out at 2:25 p.m.)

THE COURT: You are free to move about and to confer with Ms. Craig, and then as soon as the government has confirmed that all their exhibits are in --

(off-the-record discussion with Ms. Craig)

THE COURT: Are you straight with your exhibits?

MR. CARTER: We are, Your Honor. Thank you.

THE COURT: I understand that when we go back on the record in front of the Jury, that the government intends to rest?

MR. CARTER: We do, Your Honor.

THE COURT: Very well. While we're on this break, the Court will take up any motion practice that the defense may wish to make at this time.

MR. WOOD: Your Honor, we would make a motion for a directed verdict at this time. We don't believe that the government has provided the evidence to meet their burden of proof, specifically on Justin Phillips. The government's witnesses are completely contradictory on what happened throughout that time period of that entire event.

Mason Berry says that the transport of Justin Phillips started on September the 14th and ended on September the 14th. That he picked him up on the afternoon of the 14th, they went up there, did their medical stuff, was on his way back. The Sheriff called him, they went

back up, they got Justin Phillips, and the alleged incident occurred. They took him back to Franklin County.

Justin Phillips testified that he was transported up on September the 11th of 2017, that he was there for 72 hours. And then on the 14th, after he got out of the hospital, he was transported back to Franklin County, and that's when an altercation occurred.

The accountings of the actual alleged beating itself are contradictory by the government's own witnesses. Mason Berry says, "I didn't touch the guy." Justin Phillips says that Mason Berry come over, grabbed his head, pulled it out to the doorjamb area so that the Sheriff could beat on him. Those two scenarios are not congruent. They can't happen together. That is impossible. One of the government's witnesses, or both of the government witnesses, from the evidence proven, or provided, could be lying.

Mason Berry would say that Justin Phillips is lying. Justin Phillips would say that Mason Berry is lying. Justin Phillips would say that Mason Berry is lying about taking him up on the 14th. Mason Berry would say that Justin Phillips is lying about taking him up on the 14th.

The stipulated report from the government from Mason Berry recounts a completely different situation where

Justin Phillips says -- I mean, Mason Berry says Justin Phillips started creating a bunch of chaos in the back -- I'm summarizing this -- banging around, causing cracks and problems, breaking or something the plexiglass back there, slipped off a handcuff. They opened the door. He starts fighting them. They had to fight with him. They are finally able to get him under control. They finally get the handcuff back on him. They are finally able to get the vehicle secured, and then they hightail it back to the Sheriff's department.

Justin Phillips tells a story where the Sheriff was allegedly wearing gloves with lead, had lead in them and had metal strips on the outside along the knuckles and that he beat him with those gloves. They had lead in them, metal on the outside. Mason Berry says when he got there, that he saw the Sheriff go over to the medical cart and he had some cuts and stuff on his hands from the fight that they were in trying to get Justin secured and he had to doctor his hand because he had cuts. That is completely opposite. Both of the government's witnesses, they told completely opposite stories again.

There's three different stories that are presented in this one scenario by the government. The one that Mason Berry wrote on his report, that he had a legal duty to ensure was right and not lie on. Justin Phillips'

story. And then Mason Berry's story. Assuming, or if you take the evidence submitted from the report that Mason did, that doesn't meet any of the elements of the count of the charge, other than he was acting under color of law. He wasn't -- it certainly wasn't a violation of the guy's rights, therefore, it couldn't have been willful. It wasn't excessive force. We have a person that's escaping custody, and if you have to strike them, there's nothing wrong with that. The level of force is determined by the conduct of the suspect. And these Arkansas lawyers (sic) are trained that when you -- when you are presented with active aggression, active resistance, that they are allowed to use hard strikes, they are allowed to use defensive tactics, and they are allowed to use impact weapons as batons, tasers, chemical spray. They are allowed to use all of that stuff, especially when they are dealing with an escaping prisoner. So there is nothing about the amount of force that the Sheriff used at that time that is excessive. It's completely lawful. Basically, it's used to protect society. We can't allow him to escape.

The government, their own witnesses just by themselves, just their testimony, you couldn't figure out who did what. It's not beyond a reasonable doubt just with their own witnesses. The government hasn't even put forward a story, a consistent story yet. They haven't made

the decision of actually which one of these stories is allegedly true. That's not enough evidence to go forward.

Zach English. I'm sorry, Brandon English. There's no evidence that he was even injured. There's no evidence that the Sheriff acted willfully trying to violate his civil rights. The testimony has been that the Sheriff tried to grab his shirt. And there's a 50/50 chance that Zach English either pulled back away from that causing the chair to collapse, or the Sheriff pushed it over. The picture that's presented four, five, three or four days after the alleged incident is no evidence at all. No proof that that is the injury that was caused allegedly by the Sheriff.

When we get to Greene, there's been no indication that Greene sustained any injury, no matter what happened. There has been evidence -- and a lot of it -- that he was involved in an altercation prior to the Sheriff arriving. That that altercation resulted in the damage to his lip, I guess maybe to his nose, had a bleeding nose according to Deputy Dalton. And there's been no evidence of any injury to Mr. Greene outside of what was caused by Huckleberry. And that is a requirement for the government to have to meet before they can go forward.

So I think based on those three issues, Your Honor, we would move for this matter to be dismissed.

THE COURT: Mr. Songer?

MR. SONGER: Thank you, Your Honor.

I'm happy to provide as much of a response as would be useful for the Court, but I would certainly say at the outset, there's more than enough evidence for a Jury to conclude each count was proven beyond a reasonable doubt viewing the evidence in the light most favorable to the government, as must be done at this stage.

On the specific issues raised by the defense, the contradictory testimony they discussed are the prototypical Jury questions, not the basis of a Rule 29 motion. The contradictions about how the Justin Phillips' incident may have started a couple days earlier aren't even charged in the indictment. That's not an issue before the Jury. The testimony cited by the defense was consistent on how that incident ended, and that is what is charged here. Both Mason Berry and Justin Phillips testified that the Sheriff repeatedly punched Justin Phillips in the face. Whether Mason Berry held his head while it happened or not is immaterial to whether the defendant is guilty.

On the Brandon English incident, the defense claimed that there was no evidence that he was injured. Of course, that's not right. Pictures were introduced showing an injury on Brandon English's body, which he identified on the stand as an injury. And there was testimony those

injuries were caused by the Sheriff. Brandon English testified he was slammed to the ground by the Sheriff and lost some of his hair. Travis Ball, just a couple hours ago, said that the Sheriff pushed Brandon English over backwards onto this hard ground. So there's more than enough evidence from which a Jury could infer injury, and the only injury that's required of course is physical pain, a bruise, a cut, any physical injury. Clearly, that is met in this case.

On the Zach Greene incident, again, the defense said there's no indication that he sustained any injury. There was testimony from multiple witnesses that Zach Greene was punched in the face with a closed hand. That is certainly evidence from which a Jury could infer that he suffered pain, especially when those punches were loud enough to have been heard in a soundproof room down a different hallway, so I don't think there's any merit to that contention as well.

If it would benefit the Court to have additional argument on any of the other elements, I would be happy to offer it, but I want to be sensitive to our time as well.

THE COURT: Thank you. The Rule 29 motion will be denied as to each of Counts One, Two, and Three. The Court finds as to each of the four elements for each of Counts One, Two and Three that there is sufficient evidence

before the Jury from which a reasonable Jury could find that the government had established and carried its burden beyond a reasonable doubt.

With regard to the specifics, Count One, Justin Phillips, I agree with the government. Well, first of all, I agree with the defense. There certainly is some testimony that the witnesses recall differently. And to the extent that that creates inconsistencies, I agree with that. But the Court's jury instructions, in particular the one on credibility of witnesses, specifically envisions that it's the Jury's role to determine the issue of credibility and which witness's version of events to believe when such inconsistencies present themselves. And the Jury is specifically instructed that they should consider the reason that the testimony might be different. And the passage of time, inability to recall things, is a perfect example of that.

I would note, though, that there are certain things on which the testimony is not inconsistent. There is testimony that Sheriff Boen was in the vehicle on the ride between Crawford County Detention Center and the Franklin County Detention Center with Mr. Phillips in the back seat. The testimony is consistent that the vehicle pulled over at the Mulberry exit. And the testimony is consistent that Mr. Boen struck Mr. Phillips multiple times

about the head and face.

As to the incident report, it certainly is inconsistent with the facts that Mr. Berry testified to, and for that matter, that Mr. Phillips testified to. But it is also consistent with Mr. Berry's testimony that the defendant instructed him to write a falsified police report. So, again, that is fodder for the Jury. That's their job.

With regard to Count Two, Brandon English, one of the specific contentions here is that there's no evidence of injury. Certainly the evidence of injury here is not as significant as the evidence of injury in the other two counts, but the Court can't agree with the proposition that there is no evidence of injury. Of the witnesses who testified, Mr. English, Travis Ball, I believe it was Hutchison, while there were some differences, there is certainly testimony in the record that Mr. English had no more been situated in the chair in front of the desk when Mr. Boen basically grabbed his shirt and forced him backwards onto the hard surface of the floor. There's also this deal about pulling hair. And so while the holding of one's hair might not be painful, there's also evidence of pulling of hair. Setting aside anything having to do with the hair, the evidence that the Court believes a reasonable Jury could find is that Sheriff Boen intentionally,

willfully, launched himself into Mr. English and took him to the floor, along with his chair, and that they encountered the hard surface of the floor along the way. The Court believes that a Jury could find and be within their right to find that that would produce the sort of injury that would qualify. Viewing the evidence in the light that the Court must at this point would cause the Court to allow it to proceed to the Jury. Now, the Jury may not be convinced of that. Mr. Wood and Mr. Boen may have a very good argument about that, but the Court can't grant a Rule 29 motion based on the current state of the evidence.

With regard to Zachary Greene, the notion that there's no evidence of bodily injury is similar except there are some contradictory -- not contradictory -- there are people who have testified to different recollections. But the ultimate point of facts, facts in the record of close-fisted strikes upon Zachary Greene is in the record from several witnesses. And the intensity of those blows has been testified about. There is testimony from one person that was in a different room 30 feet away that heard it. So the Court believes that there is evidence in the record from which the Jury could find that bodily injury resulted. Any differences in the testimony about who was present, when and where, again, those are facts that the

Jury is going to have to resolve. That's their job.

So for those reasons, the Court finds that the Rule 29 motion should be dented.

What time did I tell them we would start back up, Ms. Craig?

MS. CRAIG: 2:50.

THE COURT: We're going to probably end up being a little bit late. If everyone could be back in their positions and ready to go at five minutes before the hour, that will give everyone time to take a quick rest room break.

I'll allow the government to rest in front of the Jury, although to be clear for the record, the government has rested here during our recess, but I will let them rest again in front of the Jury. And then the defense may proceed with its first witness. We'll be in recess until five until.

(recess taken from 2:47 p.m. to 3:01 p.m.)

(Jury in at 3:01 p.m.)

THE COURT: Does the government wish to call any other witnesses at this time?

MR. CARTER: Your Honor, the United States rests its case.

THE COURT: All right. Ladies and Gentlemen, the government has rested its case. We will now hear from the

defense.

Mr. Wood, the defense may call its first witness.

MR. WOOD: Call Ronica Young.

THE COURT: Ms. Young, if you would kind of come right in between these two counsel tables and pause about right there and raise your right hand.

(witness sworn)

THE COURT: Ma'am, then if you would please kind of continue to wind around the front of the counsel tables and the bench, around to the side, behind the court reporter. Don't trip, please. Get yourself situated.

You can put your purse next to your chair, just don't forget to take it with you. I will also you tell you that you may remove your mask while testifying if you want to, but I won't require you to.

You may proceed when you're ready, Mr. Wood.

MR. WOOD: Thank you, Your Honor.

RONICA YOUNG, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOD:

Q. Ma'am, would you please state your name for the record?

A. Ronica Young.

Q. And Ms. Young, where are you currently employed?

A. Mercy.
Q. I'm sorry?
A. Mercy.
Q. Is that here in Ft. Smith?
A. Ft. Smith, yes, at Free Ferry Clinic.
Q. At any point in time in the past, were you ever employed as a contract nurse with the Franklin County Sheriff's Office?
A. Yes.
Q. And who was your actual employer?
A. I believe it was ACH.
Q. And what is ACH?
A. I would have to -- I don't remember. I don't remember.
Q. Well, what did ACH do for a business?
A. They employed nurses for correctional facilities.
Q. And do they assign you to a facility?
A. Yes, but you can go to other facilities too if you're needed. So like my home facility was one, and then I could go to another if they offered me the position.
Q. While you were serving as a nurse at the Franklin County Jail, did you ever have an opportunity to encounter an inmate named Zachary Greene?
A. Yes.
Q. And your duties as the nurse for the jail, tell me

what those included.
A. There would be sick calls. I would have to tend to those. Anytime that an inmate came in, I had to do an intake assessment to see if they had any kind of medical issues that we had to make sure we maintained, such as like heart problems. Anything that would cause them to have problems in the jail if we didn't maintain it like they were maintaining on the outside.
Q. So how does it work? As far as -- I know if I go see the doctor -- was there a doctor there also?
A. There was a doctor that came by on certain days, but that was who I reported to anytime I had to question or inform him of whatever patient I was working with.
Q. And so what are the extent of your abilities medically as a nurse at a facility like that?
A. I treat. I make sure they have the proper medications that are needed. And should there be an injury if they fall or get hurt, then I have to assess that and see if we need to send them out. Or if they have, like with diabetes, you can have low blood sugar and bottom out, or you can have too high blood sugar and we have to figure out what we need to do with them, whether we need to send them to the hospital or not. Or if I can treat it there on the spot, I'll call my doctor and get those orders.
Q. How often were you at the facility?

A. Usually three times a week.
Q. And do you recall when you started?
A. I started with ACH on September -- no, October -- September or October of 2018, I believe.
Q. Were you working at the Franklin County Detention Center in December of 2018?
A. Yes.
MR. WOOD: May I approach, Your Honor?
THE COURT: You may.
Q. (By Mr. Wood.) Give you some photographs there.
A. Okay.
Q. Ma'am, I've handed you a group of photographs, is that correct?
A. Correct.
Q. And on the front page of those photographs on the bottom, there's a green sticker. What does it say?
A. Exhibit 6.
Q. All right. Now, have you had -- will you look at those photographs for me, please?
A. Uh-huh.
Q. Do you recognize the individual in those photographs?
A. Yes, I do.
Q. Is that the individual that you know as Zach, or Zachary Greene?
A. Yes, it is.

Q. Do you recall having a medical call or medical checkup with Mr. Greene on December the 5th, 2018?
A. I've had several of them, yes.
Q. Do you recall him requesting medical treatment or assessment as a result of an altercation with another inmate?
A. Yes.
Q. And how does an inmate make the request to you to come to medical?
A. There was two ways, because halfway in between me being there, we changed to a computer. But usually it was written form. It was on a piece of paper. It was like a sick call request. And I can't remember if we had switched over by that time or not. So it was either through the sick call request, or they were able to log into a computer, and it was a notification I got on my computer in my room.
Q. And how often did you have an opportunity to see Zachary Greene?
A. He was in my office weekly.
Q. And on December the 5th, you have indicated he reported for a sick call. Do you recall that sick call?
A. Yes. When I had walked in that morning, the deputies had said that I needed to assess Zachary Greene. There was an altercation the night before. And so it was like, with

the sick calls, you kind of have to do "most needed" to, you know, "Does he just need a Tylenol." In other words, most severe to the least severe. And with altercations, we usually have to see them first to make sure that they don't need to go out or if there's nothing I can -- they need to be assessed first before everybody else.

Q. And so as part of this assessment, what type of activities or information do you gather?

A. When they walk in my office, my first question is, "How can I help you today, what do you need to be seen for, what's going on?" And then that's when they proceed to tell me whatever it is that they need to be seen for.

Q. And do you do these assessments in the routine scope and course of your --

A. Yes. Every patient gets the same questions.

Q. And so did you do this assessment of Mr. Greene?

A. Yes.

Q. And tell us how your assessment went.

A. So I just -- he came into my office with an officer. And I asked him, "What can I do for you, how can I help you today?"

MR. CARTER: Your Honor, I'm objecting because it calls for hearsay.

THE COURT: Why would the exception for statements made for purposes of medical treatment not

apply?

MR. CARTER: Well, it is several days later.

THE COURT: Well, Mr. Wood?

MR. WOOD: Yes, sir.

THE COURT: What is your response to the objection?

MR. WOOD: Your Honor, it's clearly statements made for medical treatment, diagnosis, and those types of issues. And that covers the history, the assessment, the diagnosis. The fact that it was a day or two later, I'm not aware of the rules limiting that.

The other issue is, because of the way the jail systems are structured, it is not uncommon for a person to put in a medical request -- because they can't go anytime that they want to go -- and then them have to wait until the nurses or the doctors actually come over to the jail.

THE COURT: The Court finds this is proper 803.4 inquiry.

Q. (By Mr. Wood.) As part of your assessment, you had to talk to Mr. Greene?

A. Correct.

Q. So tell us how your assessment went.

A. So I basically asked him what he needed to be seen for. And he said that he had got punched in the face, I believe it was the night before is what he said, if I

remember correctly. He said -- and I said, "Were you injured? Did you get hurt? Did you get hit with somebody's fist, hand, or was it an object?"

He told me that it was somebody's fist and it was one of the other inmates. And so then he showed -- he pointed to his face where he got hurt, which was his -- I believe it was this eye and this eyebrow and eye, and possibly this eye. But it was basically facial, right around the eye socket area is where he was pointing to. And then I asked if -- then I did my other assessment where I checked his pupils, made sure that there was no bulging of the head in any area to make sure that there was no damage that I could see visibly from any kind of contusion of the brain or eye problems or such.

Q. And why is this information important to your assessment?

A. Because if he has any kind of damage, then that's something I have to report to the doctor and let him know. And then we need to decide, does he need to go to the hospital and be seen, or is it something that we can monitor and treat.

Q. So the photographs in front of you, do they fairly and accurately represent Mr. Greene and his physical condition on December the 5th, 2018, when you assessed him?

A. Yes, very accurate. This is what he looked like when

I came in. The eyebrow was probably a little more red or pink, but that was really about it. The eyebrow on this photograph.

THE COURT: Wait a second. Let's get them in evidence.

MR. WOOD: Your Honor, we would offer this as Defendant's Exhibit 6 and would ask to be able to publish these to the Jury.

MR. CARTER: We don't have an objection. I just want to be sure, you have four pages?

THE WITNESS: Yes.

MR. CARTER: No objection, Your Honor.

THE COURT: Defendant's Exhibit 6 is received. You may publish.

(Defendant's Exhibit 6 received)

MR. WOOD: Thank you, Your Honor.

Q. (By Mr. Wood.) Let's look at the first picture. And we're going to put one of those pictures up here on the monitor for you, okay?

A. Okay.

Q. So this is the first photograph of Mr. Greene that we just discussed?

A. Uh-huh.

Q. Now, when you assessed him the next morning, is this what his mouth and lips looked like?

A. Yes, but they always look like this. He had really bad mouth. The only thing that might be different would be at the bottom of the lip where the glove is at, that's a little more red than normal, but the rest of his lips was pretty much like that at all times.
Q. But he come and said that he had been in an altercation and his lip was hurt, correct?
A. Right. Right.
Q. So looking at this, can you tell the Jury what portion of the lip is actually hurt or he indicated was hurt?
A. He just said, "My lip," and pulled the lip down. He didn't really point to a specific part of the lip. He just said, "My lip," and kind of pulled his bottom lip down.
Q. At the time, did you believe that you saw a portion that may be a fresh injury?
A. Not at the time, no.
Q. So you testified they always look like this. Why do his -- why does his mouth and his lips always look like this?
A. He had gingivitis real bad, in that aspect. And then just very dry lips, didn't hydrate well. I mean, it was a constant battle that I was constantly telling him, "You have to drink water." He wouldn't, and it was always -- when he came in, it was like this. Every single visit that I saw with him, he had the same kind of -- because I was

concerned about it and needed to see if we needed to do something about it as far as antibiotics or something, if there was something wrong. The doctor said, "No, there's not really much we can do with it."
Q. Anything on this photograph that is different to your recollection than he presented any time before?
A. Just right there above the glove may be a little more red than normal, but that's really about it. Everything else looks the same.
Q. Well, let's look at the spot you're talking about. So you can touch that monitor.
A. Uh-huh.
Q. And it will make lines and stuff. Circle with your finger what parts you think may be a new injury.
A. New?
Q. It's difficult.
A. That right there. Sorry.
Q. And so I'm not a doctor. You see leading down into the corners of the mouth from the top lip, leading down to the corner of the mouth and the bottom lip?
A. Like here and here?
Q. Yes, ma'am.
A. Yeah, that's normal. That's the way his lips always were. Even this. There. All that on his teeth, that was always there. Normal, for him.

Q. Can we look at the next picture, please.
Here's another photograph of Mr. Greene. And is this how he also looked whenever you assessed him on the next day?
A. He was probably a little more purplish-blue, but, yes, same injuries. There wasn't anything other than what this is showing. This is just the lighter version of it. It was a little bit darker.
Q. And did he indicate to you for medical assessment how he got -- well, let me ask you this. What are his alleged injuries here?
A. That he got punched in the eyes, punched in the face.
Q. And as part of his assessment, did he tell you how he got those alleged injuries?
A. He said that the other inmate punched him in the face.
Q. Let's look at the next one. Now, what is this a photograph of?
A. His ear, and like where he got punched in the ear trying -- with the other inmate. It made a bruise on the cartilage of the ear.
Q. And could you mark where that's at, please? And to the best of your recollection, did he complain of any other injuries that would have been captured by this photograph?
A. No.
Q. Let's look at the next one, please. Can you tell us

where the injuries are that he complained of in this photograph?
A. I believe it was right above the eyebrow and the eyebrow area, the edge of the eye.
Q. Could you circle that for me, please? All right.
Are there any other injuries in this photograph that he complained of in your assessment?
A. All of it was from the same thing, is what he kept saying. "I got hit in the face and the side of the head," where the ear was.
Q. That was a bad question. That was a great answer, but it was maybe a bad question.
Are there any other places in this photograph that he alleged was an injury as a result of that fight?
A. No.
Q. And what was your treatment for Mr. Greene?
A. I believe we treated him with Tylenol or Ibuprofen, one of the two. I don't remember.
Q. Did you see any other injuries on Mr. Greene that were not captured by these photographs that we just showed you?
A. No, not that I can remember. Huh-uh.
MR. WOOD: I'll pass the witness.
THE COURT: Thank you, Mr. Wood.
Mr. Carter, when you're ready.
MR. CARTER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CARTER:

Q. Good afternoon, Ms. Young.

A. Good morning. Afternoon.

Q. Do you work at night?

A. No.

Q. I was going to say, is this morning for you?

A. Yeah, I'm just -- I always just say morning. Even in the afternoon, I'm telling my patients it's morning time so --

Q. Thank you for being here, then.

A. Yeah. Thank you.

Q. My understanding is you worked a shift at the jail three days a week, 9:00 to 2:00. That's right, isn't it?

A. That's what my schedule was, but it was never 9:00 to 2:00. I usually had to stay later.

Q. Did you stay there late-late at night?

A. No. No, not normally. I usually tried to be out of there by 5:00.

Q. Very well. Now, December 3rd of 2018, that was a Tuesday. Would you have been at work on a Tuesday?

A. Possibly. I don't remember my schedule.

Q. Well, how about this. If you will agree me, won't you, that it was December 5 that you assessed Zachary Greene, wasn't it?

A. I believe so. I don't know the exact date.

MR. CARTER: Your Honor, may I approach to refresh the witness's memory?

THE COURT: Yes, you may.

Q. (By Mr. Carter.) I'm going to hand you a document. Don't read this out loud to the Jury. Just read it to yourself and see if that helps you remember what the date was.

A. Yes.

Q. Thank you. All right. After refreshing your memory, do you remember what the date was that you assessed Zachary Greene?

A. December 5th, 2018.

Q. And these photographs, I would like you to -- you're still holding them?

A. Yes.

Q. Defendant's number 6?

A. Uh-huh.

Q. Hold up for the Jury this one.

A. This one?

Q. Now, you noted when you held up that page of Defendant's Number 6 -- you can put it down now -- that when you saw him in person, it actually appeared more bruised, didn't it?

A. A little bit.

Q. And in fact, when you were assessing Mr. Greene, you noted, "Bumps, bruises to his face and head, as well as a black eye and swelling around his eye socket," is that right?
A. Uh-huh. Uh-huh.
THE COURT: Ma'am, you need to --
A. Yes. I'm sorry. Yes. Sorry. Yes.
Q. (By Mr. Carter.) And you were concerned enough about these injuries that you took photographs?
A. It's protocol.
Q. So is that a yes?
A. Yes.
Q. Now, while you were doing this assessment of Mr. Greene, the defendant was in there, wasn't he?
A. No. No.
Q. At some point while you were treating Mr. Greene, the defendant was in there, wasn't he?
A. No, he was not.
Q. May I approach you?
A. Yes.
THE COURT: Yes, you may.
MR. CARTER: Thank you, Your Honor.
THE WITNESS: Sorry.
THE COURT: In fairness, it wasn't clear who that question was directed to.

THE WITNESS: Sorry about that.
A. I mean, I know what this is about, but I can explain why -- what you're asking.
Q. (By Mr. Carter.) There was a period of time during your dealing with Zachary Greene on the 5th of December that the defendant was there, wasn't he?
A. Yes.
Q. Now, you testified a lot about the cause of these injuries, but the reality is, you have no actual knowledge, do you, about the events that occurred that caused these injuries, do you?
A. I only have the knowledge that the patient told me of.
MR. CARTER: Nothing further, Your Honor.
THE COURT: All right. May this witness be excused?
MR. WOOD: Yes, Your Honor.
THE COURT: Ma'am, thank you so much for being here today. Appreciate your time. You're free to go. You can hand those to the Court Clerk as you leave.
Call your next witness.
MR. WOOD: Call B.J. Gilbreath.
THE COURT: Mr. Gilbreath, if you could please come forward. Pause about right there and raise your right hand.
(witness sworn)

THE COURT: Sir, please wind your way around the court reporter. Step up into the witness box. Sir, I will tell you that you may remove your mask if you like, but I won't require you to.

MR. WOOD: May I, Your Honor?

THE COURT: You may.

WILLIAM GILBREATH, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOD:

Q. Sir, would you please state your name for the record?

A. William Joe Gilbreath.

MR. WOOD: May I approach, Your Honor?

THE COURT: You may.

Q. (By Mr. Wood.) Show you here what's been marked as Defendant's Exhibit Number 6, four photographs of Mr. Zachary Greene. Do you recognize those photographs?

A. Yes, I do.

Q. So tell me where you work at.

A. I work for the Franklin County Sheriff's Office.

Q. And how long have you been there?

A. I've worked for the Franklin County's Sheriff's Office for four years now.

Q. And did you have prior law enforcement experience before that?

A. I worked as a correctional officer for Sebastian County.
Q. And do you recall on December the 3rd, 2018, being on duty that night?
A. Yes, sir, I do.
Q. And what was your position with the Franklin County Sheriff's department as of December the 3rd, 2018?
A. I was a patrol deputy.
Q. And what shift were you on?
A. I was on the evening shift.
Q. So tell me, you obviously ended up at the Sheriff's department. How did you end up at the Sheriff's department on the evening of December the 3rd, 2018?
A. Heard a radio call for a 10-24, which would be a riot at the jail.
Q. A riot at the jail?
A. Yes, sir.
Q. And how often do you get one of those?
A. Not very often.
Q. So do you recall where you were at when you got it?
A. I know I was in my car. I do not recall where exactly I was at.
Q. And as a result of that call out, what did you do?
A. I turned on my lights and siren and went straight to the jail in an emergent status.

Q. Do you recall who the dispatcher was that sent that 10-code out?
A. Kambrie English.
Q. So do you know how long it took you to get to the SO?
A. Probably five or 10 minutes.
Q. And when you arrived at the Sheriff's Office, how did you enter the Sheriff's Office?
A. I entered in from the back door where we parked our patrol cars. I pulled into the driveway and entered in the back door and come through the kitchen area.
Q. And when you entered the kitchen area, who was in there?
A. Couple of the trustees was in there. And as I walked through the kitchen area, Zach Greene was in the shower room there by the bench.
Q. Do you recall the names of the trustees that were in there in the kitchen area?
A. I was going to say, the trustees that was there at the time was Huckleberry Beehner, Zach Mills, Marshall Elmore, and I think there was one more, but I cannot recall his name.
Q. So once you enter the kitchen, where did you go?
A. I went straight to the shower room, and my first contact was with Zach Greene.
Q. How did you know to go straight to the shower room?

A. I didn't. It was just, whenever I was walking through, they were kind of, "He's over there, he's over there."
Q. And so tell me what happened when you got to the shower room.
A. I got to the shower room. I had Zach Greene stand up and I placed handcuffs on him behind his back, had him sit back down until I could figure out what all was going on.
Q. You had him sit back down on the bench?
A. On his mat that he had there.
Q. And what was Zach Greene's physical condition at that time?
A. Kind of disoriented, kind of distraught.
Q. And so once you put the cuffs on and put him on his mat, then what did you go do?
A. That's whenever one of the jailers at the time told me that the other party that was involved was in here in the booking room, and I went in and checked on him.
Q. So the booking room. Was the other trustee already in there?
A. Yes, sir.
Q. Was he secured?
A. Yes. Yeah, he was sitting on the bench whenever I got there.
Q. So I'm not asking you to tell me what he said to you,

but what did you do next?
A. Next, that's whenever I seen our other deputy that was on duty that night, Dalton Miller, he come in. And I said that, I was telling him, we need to get pictures of the injuries, because by that time, the jailers had already told me what was going on. I told him, "Hey, we need to get pictures of the injuries and we need to get statements from everybody."
Q. And so did I hear that right, you and Dalton split up to go do statements?
A. Correct. Yes, uh-huh.
Q. Do you know which statements he got?
A. I don't recall. I remember -- I started helping the jailer at the time. He was having trouble with the jail camera, so I went and grabbed my camera. And that's whenever we were taking pictures of the injuries of Zach Greene, and then we took pictures of Huckleberry Beehner.
Q. When you say you went and got the jail camera, what are you talking about?
A. They keep a little digital camera there at the jail, but at that time, that one wasn't working. They couldn't get it to turn on. I don't know if the batteries were dead or what, so I just went and grabbed my camera out of my car.
Q. Have there ever been problems, to your knowledge, out

of that camera before?
A. If the batteries were dead or they didn't have spare batteries for it.
Q. So you went and got your camera?
A. Yes, sir.
Q. And what kind of camera did you have?
A. It was a little, I think it was a Coleman. Just a little digital camera is all I had.
Q. Just that anybody can get at Walmart or whatever?
A. Yeah. Just one of the small ones you can buy from Walmart.
Q. And so once you went and retrieved your camera, what did you do?
A. That's whenever we went to Zach Greene, took pictures of his injuries. By that time, everything was calmed down enough, we took him out of handcuffs. And then we went and got pictures of Huckleberry Beehner's injuries.
Q. Once you got Greene's photographs, you went and got Mr. Beehner's photographs in the booking room?
A. Yes.
Q. And was anybody in the booking room at that time?
A. I was going to say, Mr. Beehner was in the booking room. I can't -- I don't remember if -- I think it was one of the jailers. It was -- Fisher Elder was the one that was helping me take the pictures.

Q. Once you took the photographs of Mr. Beehner, what did you do?
A. After that, I gathered everything up and I asked Mr. Beehner, since he seemed to be the victim in it, I asked him if he was wanting to press charges or whatnot. And he said no. So I just gathered all the statements up and put them up and headed out.
Q. When you say you gathered up all the statements, did you get written statements?
A. Yes, I had written statements.
Q. Do you recall who all you went and got written statements for?
A. I don't recall. It was just -- we was all just kind of doing everything, so I just gathered up the statements that they had brought me.
Q. And from the time that Dalton Miller got there until the time you were talking to Mr. Huckleberry Beehner and gathering up all the statements, how long did that take you?
A. Oh, probably 10, 15 minutes, I would say.
Q. And did you tell me that it took you about 10 or 15 minutes to get to the SO after the emergency call?
A. Yes. Yes. Well, I said probably five to 10, because I was pretty close. I think I was in the Webb City area.
Q. Did you and Deputy Miller get there about the same

time?
A. I believe so. I remember whenever I walked in, he wasn't too far behind me.
Q. Let's look at some of these photographs. Can you put the first one up for me?
Can you look at your monitor there? Do you see that photograph?
A. Yes, sir.
Q. It's a picture of a mouth marked as Defendant's Exhibit Number 6?
A. Yes, sir.
Q. Is this a photograph that you took?
A. Yes, it is.
Q. Is that your hand in the blue glove?
A. Yes, it is.
Q. And on the top left hand portion of that photograph, is that your handwriting?
A. Yes.
Q. And what did you write in there?
A. "Zach Greene mouth, bloody lips and gums."
Q. And when during all of this did you take this particular picture?
A. Honestly, I can't -- I think that was the first one, because that was his chief complaint was his -- I think he was complaining about his mouth bleeding.

Q. So this picture fairly and accurately represents what you saw, his injuries that night?
A. Yes.
Q. Can I see the next one? And where did you take this photograph at?
A. This photograph was taken in the shower room where he was still at at that time.
Q. And what does the top left-hand side say?
A. Without the hole punch, it would say, "Zach Greene, bruising on the right eye."
Q. And what portion -- you can actually touch that screen and it will draw lines. Will you draw a circle around the portion that you're referring to?
A. Yes, sir.
Q. So as I understand this, your testimony is he was complaining of this spot under his right eye?
A. Yes. If I can remember correctly, that is where he was complaining at. There was starting to get some discoloration right there.
Q. Let me ask you this. What would be more accurate; your memory today or what you wrote on the photographs at that time?
A. What I wrote on the photograph at that time would have been more accurate of what he said.
Q. So does this picture, anything about this picture not

accurately represent what you saw when you took it?
A. No. I was going to say, the lighting is darker, but to me, I could see discoloration underneath his right eye.
Q. Can I see the next one, please? Did you take this photograph?
A. Yes, I did.
Q. So where was this one taken at?
A. In the shower room.
Q. And when you took this one, what is it that you were taking a picture of in particular?
A. He was saying that he got hit in the ear. And whenever I looked at that particular ear that he was pointing at, the only thing that I could see was the discoloration right in this area.
Q. Anything else in this photograph that's different than what you observed that night?
A. No.
Q. We're going to look at one more. All right. So where was this one taken at?
A. We was still in the shower room area.
Q. On the left-hand side down at the bottom quadrant, is that the bench?
A. I can't really tell.
Q. I guess it doesn't matter. I just saw it down there. So tell me what it is in this photograph. It says,

"Discoloration above the right eye." Tell me what it is that he was complaining about in this photograph.
A. He was saying that he got hit in the side of the head. Now that I see I wrote "right eye," it's actually his "left eye."
Q. Well, circle the part that he was complaining about.
A. The discoloration that I was talking about was right in this area, is where he was saying that the inmate had hit him at.
Q. Anything about this photograph -- were there any injuries that you observed that's not included in this photograph?
A. No, not that I know of.
Q. So this accurately reflects what you saw when you were taking it?
A. Yes.
Q. How did you get the photographs in this part of the file?
A. After it was done, after the fight was over and I was clearing out of the area and everything, I went and -- I want to say I took them back to my desk and put them in my desk, because that's where all my paperwork was. And then I left out that night. And then later on whenever I heard that the Sheriff had been indicted and the FBI talked to me, I remembered, I was like, "Hey, I still have those

pictures and the statements that I took." I didn't do a report on it, because no charges were going to be pressed and it was just a jail fight. And then that's whenever they asked to see them.

Q. While you were at the Sheriff's Office that evening --
A. Uh-huh.
Q. -- did you see the Sheriff at any point in time?
A. No, I do not remember seeing the Sheriff that night.
Q. Were you ever in the booking room with the Sheriff?
A. No, not that night.
Q. Were you ever in the booking room with the Sheriff and Dalton Miller? Or, no. With Dalton Miller?
A. Yes. With Dalton Miller, yes.
Q. At any point in time while you were in the booking room with Dalton Miller, did the Sheriff ever come and call Dalton Miller out?
A. I don't recall hearing that or seeing that.
Q. So as you sit here today, did the Sheriff ever come to the booking room and call Dalton Miller out?
A. Not while I was there.
Q. Thank you.

MR. WOOD: That's all I have, Your Honor. Pass the witness.

THE COURT: Thank you, Mr. Wood. Mr. Carter, when you're ready.

MR. CARTER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CARTER:

Q. Good afternoon, Deputy Gilbreath.

A. Afternoon.

Q. Mr. Moon, will you put Government's 6, page 2, the bold version on the screen, the bolded language on the screen.

And while he's doing that, Deputy Gilbreath, you're aware that the Franklin County Jail has a use of force policy, aren't you?

A. Yes, that is correct.

Q. And I'm putting a portion of that policy on the screen right now. This is their policy, isn't it?

A. Yes.

Q. And that policy says that under no circumstances --

MR. WOOD: Your Honor, I'm going to object to this line of questioning.

THE COURT: On what basis?

MR. WOOD: It's beyond the scope of direct examination. They have already rested their case. It's not anything that was brought up in direct.

THE COURT: Mr. Carter?

MR. CARTER: I mean, I suppose I can ask for leeway.

THE COURT: Well, it certainly is beyond the scope. I don't know that any territory that has been established would make this witness's testimony proper rebuttal, that I can think of. And so that only leaves credibility for you to explore. So I don't see the tie-in to credibility here.

MR. CARTER: I'll move on. I'll withdraw.

THE COURT: Objection sustained.

Q. (By Mr. Carter.) So on December 3rd, 2018, you were a patrol deputy at that point, weren't you?
A. Yes, sir.
Q. And you received a 10-24, which I understand is a call for a riot at the jail?
A. Yes, sir.
Q. And when that 10-24 riot call came in, it took you five, 10 minutes to get to the jail?
A. Correct.
Q. And when you got to the jail, there wasn't a riot, was there?
A. No, there was not.
Q. There wasn't a fight going on?
A. Not at that point whenever I arrived.
Q. There weren't inmates on top of each other?
A. No, sir.
Q. There wasn't an emergency at all, was there?

A. No.
Q. And it sounds like -- you described this as, "Just a jail fight?"
A. Yes, sir.
Q. But it's not a jail fight that you witnessed in any way, shape, or form, is it?
A. I did not witness the fight.
Q. In fact, you didn't write a report on it because it was just not a big deal, right?
A. Correct.
Q. And it sounds like, listening to your testimony, that you were there maybe a half hour, tops?
A. Maybe, tops.
Q. And my understanding is that call came in a little bit after 6:00 p.m.?
A. If I can remember correctly, yes. It was around 6:00.
Q. So you were certainly out of the jail and gone before 7:00 p.m., weren't you?
A. Yes.
Q. So you never saw the Sheriff arrive?
A. No, I do not remember seeing the Sheriff there.
Q. Never saw Travis Ball arrive?
A. No, I do not remember seeing Travis Ball there.
Q. Never saw a guy named Christopher Roberson arrive?
A. No, sir.

Q. Never saw a woman named Scout Simpson or Ingram arrive?
A. No.
Q. Never saw Travis Ball's wife arrive?
A. No.
MR. CARTER: Nothing further, Your Honor.
THE COURT: Thank you. Can this witness be excused?
MR. WOOD: Yes.
THE COURT: Sir, thank you very much for your time. You're free to go.
THE WITNESS: Thank you, Your Honor.
THE COURT: Defense may call its next witness.
MR. WOOD: May we approach, Your Honor?
THE COURT: Yes.
(bench conference)
MR. WOOD: Our next witness is on his way. He's the last one that we were going to have here today. Marshall Elmore is on his way up here, apparently. We expected this to go a little bit longer, so those other three that we had anticipated using today are going to be fairly short, though. And so that's where we're at.
THE COURT: Well, Mr. Wood, the Court is not pleased with what you just said. As of last night, the government was indicating that they would be finishing

their case by noon. It didn't quite happen, but you should have understood that you needed to have witnesses available. This Jury is giving up their time to come be jurors for us this week. And if I have to recess them early because you don't have a witness here, I just cannot stress enough how inappropriate that is. And you've been doing this a long time. You need to have your witnesses ready. You knew when this was going to happen. It's not like you're caught off base.

Why is Mr. Elmore not here? What time did you tell him to be here?

MR. WOOD: I told him to be here earlier, however, I did not believe that we were going to get this far. So I told him that it would probably be tomorrow so we would call him back.

THE COURT: You should have understood from the representations by the government that they would be finished by noon. You've put on two witnesses to describe the same four photographs, essentially. How long were you expecting that to take?

MR. WOOD: I actually thought Travis Ball's testimony and Dalton Miller would take a lot longer than what it did. We have been completely trying to juggle the schedule the best that we could in light of the government not giving us, or unwillingness to tell us who they were

going to call and when they were going to call them. We have done everything that we could --

THE COURT: Well, that would have been a good excuse until the Court resolved that issue for you.

Where is Mr. Elmore now?

MR. WOOD: We can call him back. He's on his way, is my understanding.

THE COURT: Where is he? Where is he coming from? I mean --

MR. PRATER: Ozark.

THE COURT: Ozark? Step out into the hall and call him.

MR. CARTER: May I step to counsel table?

THE COURT: You may.

(pause)

MR. PRATER: Mr. Elmore says he's at Mulberry.

MR. CARTER: There's construction in Alma.

(bench conference concluded)

THE COURT: Ladies and Gentlemen, the next witness that was scheduled to be called today is hung up on the interstate, apparently. He's between here and Ozark. I don't know how long it will take for him to complete his journey here. It is 10 minutes to 4:00. We don't have a backup witness that can step in to fill the time. So my thought is, rather than you cooling your heels here the

rest of the afternoon, we'll just recess early. But I want to leave that up to you, whether you would like to stick around and get this testimony in today or not.

Before I kind of get your input, let me give you a little bit of an idea of where I think we are overall. Now, this is just an educated guess on my part. I can't predict this. But I think that we will be in a position to submit this case to the Jury, it's conceivable that it could be tomorrow, but more likely on Monday. I guess there's an off-chance that it would be Tuesday, but I think the most likely probability is that the case will be argued and submitted to the Jury on Monday. That's completely an educated guess on my part. I can't tell you that for certain. But assuming that that's the game plan, I don't think that recessing early today will affect that timeline. That timeline is going to be the same regardless.

So that's the half-time report. Would you all like to stay and wait on the next witness who has encountered some problems getting here, or would you like to recess early? Recess early? Am I seeing hands? Okay.

JUROR: I was just going to ask, if he's stuck in traffic and he makes his way here, would he still be able to be interviewed? Like if we wait 30 minutes and he shows up then, would he still be able to be examined?

THE COURT: Well, is this a 30-minute witness,

direct and cross?

MR. WOOD: Probably so, Your Honor. The problem is that construction there, when I come through at this time, or when we came down here, it was pretty stop-and-go.

THE COURT: So it is probably a 30-minute witness, so I don't know. I can't gauge that. All right. Stay? Go? Go. All right.

We will recess the Jury until -- if you could be in your positions and ready to go by 8:15 or 8:20, we'll try to start very promptly at 8:30 tomorrow.

Let me remind you of the recess instruction again. Don't talk to anyone, don't read the paper, don't watch any T.V. news. Do not let anyone approach you and talk to you about the case. Don't do any research on your own.

Everyone please stand while the Jury is in recess.

(Jury out at 4:56 p.m.)

THE COURT: Mr. Wood, who are your witnesses after Mr. Elmore tomorrow?

MR. WOOD: Mr. Elmore. We have Scout Ingram. We are going to have Allison Testerman.

THE COURT: Allison?

MR. WOOD: Yes.

THE COURT: Testerman?

MR. WOOD: Testerman. T-E-S-T-E-R-M-A-N.

MR. CARTER: Your Honor, I don't believe that person has ever appeared on a witness list.

THE COURT: Well, let's let him get through his list, and then we'll take that up.

MR. WOOD: Marguerite Stout. Kim Nichols. Possibly Christy Sanders.

THE COURT: All right. Who is Allison Testerman?

MR. WOOD: It would be either Allison Testerman or Lieutenant Dowdy.

Allison Testerman works for the Crawford County Sheriff's Department, both her and Lieutenant Dowdy. There has been testimony from Justin Phillips regarding his Crawford County booking photo, that that is the photo that was taken when he was released.

THE COURT: Processed out?

MR. WOOD: Yes. Their testimony will be, no, that is the photo that was taken when he was booked in, not when he processed out.

THE COURT: Because that's the normal procedure, or because they have 602 knowledge of that fact?

MR. WOOD: Both. Both. They researched it. Ms. Testerman was actually on the booking report. Ms. Dowdy is actually over the jail and pulled the records for us. We'll just present one of them to testify about

when it was taken.

THE COURT: Not that that's not relevant, but of what consequence is that, whether it was taken when he came in versus when he was taken out?

MR. WOOD: When he came in, he had no injuries. He testified about that. Sometime between when he was booked in and when we picked him up, he was diagnosed with a broken clavicle. He got into some sort of altercation between the time that he was booked in, had never reported an injury. They said he had no injuries. And when he left, in between that time, he went to the doctor and was diagnosed with a broken clavicle.

THE COURT: All right. What's the government's position on the booking deputy from Crawford County?

MR. SONGER: Your Honor, I guess we would like clarification. Is this person going to actually say that they took the picture that's been entered into evidence?

MR. WOOD: Ms. Testerman will testify that that is the photo she took of him booking in on the book-in date.

MR. SONGER: Okay. I'm not sure that's a particularly relevant piece of information, nor does it sound like a very long witness.

MR. WOOD: Well, it's relevant because they went out --

THE COURT: I understand the relevance. All right. Do you continue to believe that you will finish your case by tomorrow?

MR. WOOD: It is anticipated that we will finish our case tomorrow. That is my goal, and that's what we anticipate, barring some unforeseen, long testimony or cross. So that's where we're at today.

THE COURT: So is the present anticipation -- and not that you can't change your mind -- but is the present anticipation that you will not be calling Mr. Boen?

MR. WOOD: That decision just simply has not been made at this time.

THE COURT: Has that decision been factored in to whether you will get your case in tomorrow or not?

MR. WOOD: Yes, sir. And if he decides to testify, I believe that we would still, I would still be able to get that in, because these other ones I think are going to be fairly quick. But, obviously, he's the wild card as far as whether or not it may go another day, because he could turn out to be --

THE COURT: That's why I ask. But you have factored in, that's baked into the cake of your opinion that you can be finished with your case by tomorrow?

MR. WOOD: I'm kind of thinking that with Testerman and a few of those other ones before, we will be

done by noon. And then a decision if Mr. Boen wants to testify. Then that would give us a significant amount of time for him to testify and cross examination, or possibly go into some of the next day. It's hard for me to tell. But I've tried to play all the scenarios out in my head.

THE COURT: So here's the deal. Can't have a repeat of today tomorrow. I took the bullet today. I will not take it tomorrow.

MR. WOOD: Yes, sir.

THE COURT: If we end up at 11:00 or 11:30, and all of your proof is in, and a decision is made that Mr. Boen is not going to testify, I'm not going to send the Jury home at noon on Friday. I mean, we will roll over into instructions and closing arguments.

Obviously, if it gets later in the afternoon and they wouldn't have several hours to at least -- a couple hours to begin deliberations, that might be different. But I'm not going to be happy if I have to send the Jury home, or I won't send the Jury home at 11:00, 11:30 tomorrow. So you need to be ready to finish the case if that scenario plays out. Obviously, if you call Mr. Boen, I can understand how that would take the balance of the afternoon.

Let's talk about jury instructions. So we sent out the discussion draft of the Court's proposed final

instructions. Those were annotated with the Court's comments and legal reasoning. We also annotated the proposed instructions. And our thought was that the annotations there would give you insight to the Court's thinking on the instructions that the Court was rejecting and was not giving. I think that the instruction set, as far as I know, remains good with the exception of, I intend to insert two limiting instructions with regard to Exhibits 6 and 7, Government's 6 and 7, which will be essentially a written version of the oral instruction previously given.

So that's what my thinking is. Can someone from the government comment on your thoughts on the Court's discussion set? Not that you agree with it, necessarily. You will have a chance to make a formal record when we have the jury instruction conference. But have you looked at them? Have you had a chance to look at them? Do you have any feedback for us?

MR. SONGER: Yes, Your Honor, we have had a chance to review them. Apologize that we haven't had a chance to formally respond in writing.

Generally, they all look fine to the government. The additional proposed limiting instructions, of course we have no objection to.

The one minor issue we wanted to flag was, there

are a handful of instances in the instructions that refer to a violation of a detainee's "civil rights." We request that be changed to just a "violation of rights," or a "violation of Constitutional rights," to track the statutory language. I think the term "civil rights" is not in the statutory language and has different meanings to different people.

THE COURT: We'll take a look at that. Mr. Wood?

MR. WOOD: I've had an opportunity to review those, Your Honor. Generally, like the government said, generally, I think you've got them all hashed out.

We would obviously maintain our objections to the inclusion of the Arkansas rule, or the incorporation of it into the objectionably reasonable. We'll make that record. Otherwise, I think they have pretty much been hashed out.

THE COURT: So we'll push out -- we'll take a look at the issue the government raises. We'll push out what we call our final-final draft. This will continue to be an annotated version. This would be the copy that you're going to make a formal record against. You will need to proffer any proposed instructions that the Court rejected.

Once we get through the jury instruction conference, because I guess there potentially could be some changes. But assuming there are no changes -- well, once

we get through the jury instruction conference, we will prepare a Jury set of the final-final instructions. Those will not have any annotations. It's the Court's practice to provide a copy of the Jury instructions to each juror. It's the Court's practice to instruct the Jury immediately prior to closing argument with every instruction, with the exception of the deliberation instruction, and then I'll read the deliberation instruction immediately after closing arguments.

What are we thinking about time limits for closing argument?

MR. SONGER: Your Honor, we would request one hour in total for both the original closing and rebuttal.

THE COURT: One hour. So two hours?

MR. SONGER: No, Your Honor. Combined for the government.

THE COURT: That seems like a long time. Mr. Carter did the opening in 38 flat.

MR. CARTER: I think it was 28, Your Honor.

THE COURT: 28 flat. How would you propose to split the times?

MR. SONGER: Approximately 40 minutes and 20 minutes.

THE COURT: Are you going to do the open and the closing, or are you all going to split?

MR. SONGER: I intend to do both, Your Honor.

THE COURT: Mr. Wood, how long are you thinking for closing argument?

MR. WOOD: Your Honor, I'd like to have one hour so that I can have equal time with the government.

THE COURT: Oh, you will have equal time. My question was, what do you think? I wanted to be sure you didn't want more than that.

MR. WOOD: No, no. I think an hour is a long time.

THE COURT: It's a very long time.

MR. WOOD: I probably anticipate -- sometimes time goes by quicker than what you think. I would say somewhere around -- I would request an hour. And I would say somewhere around 45 minutes, 40 minutes, surely would be the longest that I could --

THE COURT: 45 minutes?

MR. WOOD: Surely. And then just give me a little extra cushion in case I get on a roll or something.

THE COURT: You getting on a roll is not too farfetched of a concept. I'll absorb all that and we'll push out further information.

Any other matters the parties would like to take up?

MR. SONGER: Not for the government, Your Honor.

THE COURT: Mr. Wood?

MR. WOOD: Nothing from the defense, Your Honor. Other than, I'd like to apologize for the witness issue. Trying to juggle them and keep them close and keep those people themselves trying to work, federal or state agencies. My fault, I apologize. We should have had one or two more here today, okay.

THE COURT: Well, I appreciate that. If it was just the Court, no real harm, no foul. I just am very conscious of the "ask" that we're making of our jurors' time, and I want to be respectful of it. And this is not respectful of it. And so that's why I had the reaction and statements that I had. But it's okay. I got it.

MR. WOOD: Understood. Thank you.

THE COURT: We're in recess.

(proceedings recessed at 4:12 p.m.)

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 12th day of August 2021.



______________________________________
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

