IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA PLAINTIFF

v. CASE NO. 2:19-CR-20037

ANTHONY BOEN DEFENDANT

---

JURY TRIAL, VOLUME 5 OF 6

BEFORE THE HONORABLE TIMOTHY L. BROOKS

AUGUST 6, 2021

FAYETTEVILLE, ARKANSAS

---

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL J. SONGER
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-1762
michael.songer@usdoj.gov

MR. BRANDON T. CARTER
United States Attorney's Office
414 Parker Avenue
Fort Smith, Arkansas 72901
(479) 783-5125
brandon.t.carter@usdoj.gov

Also Present: Special Agent Matthew Ferguson
Federal Bureau of Investigation

IT Technician: Mr. Kenneth Moon

FOR THE DEFENDANT:

MR. RUSSELL A. WOOD
Wood Law Firm
501 East 4th Street, Suite 4
Russellville, Arkansas 72801
(479) 967-9663
rwood@woodlawfirmpa.com

MR. PAUL PRATER
Prater Law Firm
4700 Edgemere
North Little Rock, Arkansas 72116
(870) 543-9064
paul@praterlawfirmpllc.com

I N D E X


Page

Preliminary Matters ................................ 983

Colloquy with Defendant Regarding Right to Testify. 991

Jury Enters Courtroom ............................ 993

MARSHALL ELMORE

Direct Examination by Mr. Wood ................. 994

Cross Examination by Mr. Carter ................ 1002

SCOUT INGRAM

Direct Examination by Mr. Wood ................. 1006

Cross Examination by Mr. Songer ................ 1014

ZACHERY ENGLISH

Direct Examination by Mr. Wood ................. 1020

Cross Examination by Mr. Songer ................ 1038

JOSHUA STARNES

Direct Examination by Mr. Wood ................. 1042

Cross Examination by Mr. Songer ................ 1046

Redirect Examination by Mr. Wood ............... 1049

ALLISON TESTERMAN

Direct Examination by Mr. Wood ................. 1050

Cross Examination by Mr. Carter ................ 1055

Redirect Examination by Mr. Wood ............... 1058

Defense Rests ..................................... 1059

I N D E X (cont'd)

REBUTTAL BY THE GOVERNMENT:


| | Page |
|---|---|
| MATTHEW FERGUSON | |
| Direct Examination by Mr. Carter ............. | 1063 |
| Cross Examination by Mr. Wood ................ | 1067 |
| Redirect Examination by Mr. Carter ........... | 1072 |
| Government Rests Rebuttal Case ................. | 1075 |
| Final Jury Instruction Discussion .............. | 1077 |
| Lunch Recess Taken ............................. | 1083 |
| Jury Instructions Read by the Court ............ | 1084 |
| Closing Argument by Mr. Songer ................. | 1097 |
| Closing Argument by Mr. Wood ................... | 1117 |
| Final Closing Argument by Mr. Songer ........... | 1147 |
| Final Instruction Read by the Court ............ | 1158 |
| Jury Retires to Deliberate ..................... | 1162 |
| Discussion with Jury Regarding Partial Verdict .. | 1165 |
| Jury Dismissed for the Evening ................. | 1170 |
| Proceedings Adjourned for the Day .............. | 1171 |
| Reporter's Certificate ......................... | 1172 |

E X H I B I T S

| | | Received |
|---|---|---|
| Court's Exhibit 4 | AT&T Certificate of Authenticity | 1076 |
| Court's Exhibit 5 | Defense Jury Instruction Proffer | 1079 |
| Court's Exhibit 6 | Discussion Draft of Jury Instructions | 1081 |
| Court's Exhibit 7 | Draft of Final-Final Jury Instructions | 1081 |
| Court's Exhibit 8 | Final Jury Instructions | 1081 |
| Defendant's Exhibit 13 | Crawford County Booking Report for Justin Phillips, 9-13-2017 | 1053 |
| Government's Exhibits 22(a) and 23 | AT&T Phone Records of Mason Berry | 1061/ 1064 |

(Outside the Presence of the Jury)

THE COURT: The record should reflect that we are proceeding this morning outside the presence of the Jury for a few moments. A couple of housekeeping matters.

We were covering the witness list when we went off the record yesterday. The Court received some information from defense counsel last night. The witness list grew a little bit. But also one of the new additions, Chris Roberson, can you update me on whether he is going to be called or not called today, and can you give me an update on what his COVID status is?

MR. WOOD: Your Honor, the last text that I received from his attorney last night was a document, a letter, and I believe that they sent it to the government also, where he tested preemptively positive. And he has a letter that says that he's supposed to go into a 10-day quarantine or something, while it's being sent off to PRC, whatever that is, to have it confirmed or whatever. His wife did test positive for COVID. And so that's -- the last I heard from him, he said he was going home to quarantine.

THE COURT: Where is home for him?

MR. WOOD: Little Rock.

THE COURT: So you won't be calling him?

MR. WOOD: I won't be able to call him at this

particular time, no, sir.

THE COURT: So he's off your witness list?

MR. WOOD: I mean, the defendant would like to call him. This is obviously part of the pandemic. It's something that we have no control over, nor the witness. He has relevant information to issues that the government has put before -- has introduced into this trial, so we want to call him. He has relevant testimony that's important to us. With that said, I don't know what the rules are for this situation if somebody tests positive, a witness tests positive for COVID.

THE COURT: Do we know his vaccination status?

MR. WOOD: No, sir.

THE COURT: Well, from the Court's perspective, he's your witness. He is a defense witness. And you are either going to call him and figure out a way to get his testimony, or you're not going to call him. Or you're going to make some sort of argument that he's unavailable and seek some other remedy. But you need to tell me what you want to do and what you're seeking.

MR. WOOD: I want to call him. He is unavailable as a result of no fault of either side. I don't think the defense should rest until his testimony is introduced. And so we would ask the Court either for an opportunity to get with him and figure out if maybe we can take his testimony

remotely or some other way to go about that. Now, I will tell you his testimony will be brief.

THE COURT: Well, what about this. Let's start with the lowest hanging fruit, the easiest thing to do here. You could proffer what Mr. Roberson would testify to, if called. And I could ask the government whether they would stipulate to that or not.

MR. WOOD: That would be fine with us.

THE COURT: All right.

MR. WOOD: So if he was called, what he would testify to is his level of drinking on a daily or weekly basis. He would testify that he is part of the software group. He does the entertainment of the potential clients and they are always -- he's always taking people out. He's a heavy drinker. It's not uncommon, he says, it's actually routine on one of the evening dinners for him to drink anywhere from 10 to 14 Ketel Ones and tonic water.

THE COURT: Wow. Now, that's what I call a liver.

MR. WOOD: Or more. And we even talked to Mr. Ball about it on his cross examination. And he said, "Oh, yeah, he's a drinker." And the reason that's important is because this dinner receipt from the night of the Greene incident was $320 or something. And so his testimony is important so that there is no argument or

inference by the Jury that this $350 bill, somehow the Sheriff was involved in some --

THE COURT: And what would his testimony be about the type and number of drinks that the Sheriff had in his presence?

MR. WOOD: His testimony on that would be he doesn't remember, for obvious reasons. But his testimony would be -- and ours is -- his drinks, he drinks a premium. It's Ketel One. It's a premium drink, so they are fairly expensive. And even for the Brickhouse (sic), they are probably 8 or $9 a piece. So, obviously, it just goes down to breaking down the numbers. There were six people and they have got to eat. They had appetizers.

THE COURT: I get it. So would he testify that Mr. Boen was drinking at that meeting, he just doesn't remember how much?

MR. WOOD: I think he would testify that he doesn't know.

THE COURT: Either way?

MR. WOOD: Either way.

THE COURT: All right. What else? Is that the only -- his testimony is about Bricktown Brewery?

MR. WOOD: That's about all he can remember, Your Honor.

THE COURT: I'll let the government ponder on

that. We would need to refine that stipulation a little bit, but I'll hear from them.

While they're cogitating on that, I would like the record to also reflect that Mr. Wood informed the Court clerk this morning that he would like to -- the defense would like to amend their witness list and that Mr. Boen does intend to testify. So I would like to have the colloquy -- what?

MR. WOOD: He does not intend to testify. I'm sorry.

MS. CRAIG: I thought you said yes.

MR. WOOD: No. I thought you asked me, do I want you to go ahead and advise the Judge for me instead of me meeting with him. I'm sorry.

MS. CRAIG: My apologies. I misunderstood.

THE COURT: Well, we can have the colloquy that way as well.

MR. WOOD: And we have culled our witness list down by three or four people, so we expect to be done by noon or before.

THE COURT: So what is the witness list now in order?

MR. WOOD: It will be Marshall Elmore. Scout Ingram-Simpson. Zach English. Joshua Starnes. Allison Testerman. And Lieutenant Dowdy is out there, if needed.

D-O-W-D-Y.

MR. CARTER: I may be able to offer some assistance as it relates to her. I'm assuming you're bringing her to establish a foundation for a public record on the booking report?

I'm satisfied that they can lay the foundation for the booking report. They added an exhibit last night. I don't know if it's been presented to the Court or not.

THE COURT: I'm just on witnesses.

MR. CARTER: Trying to eliminate one. Sorry.

THE COURT: Well, we're down to Testerman, and he's not sure about Dowdy. What about Stout and Nichols?

MR. WOOD: They will not be testifying.

THE COURT: And then Roberson is a question mark of how we approach that. Then that's it.

MR. WOOD: That's correct. And I'd like to add on Roberson. They entered the receipt. I'm not sure for, to say it was a big number, a big amount so everybody was drinking a bunch, or for the date and the time that the receipt was paid out to establish a timeline.

If they are not offering it for the amount of money to argue that there was a bunch of drinking going on, then that would be fine with me. If they just limit it to the date stamp and the time stamp to prove their timeline, I think is what they are mainly using it for.

THE COURT: So an alternative would be if the government would stipulate that they are not going to make argument to the Jury that the size of the bill indicates -- the size, that the dollar amount of the receipt indicates that defendant Boen had had a lot to consume?

MR. WOOD: Yes, sir.

THE COURT: And the only purpose they are going to argue the receipt for is the time, date and time?

MR. WOOD: Yes, sir.

THE COURT: What's your position on the possibility of crafting a stipulation on Roberson?

MR. CARTER: We're reviewing his Grand Jury testimony right now to see if there are some things. I don't believe his testimony at Grand Jury was, "I don't remember anything from that night," particularly as it relates to the dinner. I think he does remember a few things.

As it relates to the receipt, we put it in for date and time. I have no problem stipulating that we won't argue dollar amount is indicative of anything when we close this case.

THE COURT: Is that good?

MR. WOOD: Yes, sir.

THE COURT: So you won't call Roberson?

MR. WOOD: That's correct.

MR. CARTER: That solves that issue.

I'd like to talk about the foundation on a new exhibit as well, if we could get to it. What is that exhibit number? You guys presented it to us, but you didn't tell us what the number was. Sorry.

MR. WOOD: 13. Defendant's Exhibit 13.

MR. CARTER: Have you presented it to the Court?

MR. WOOD: No. We presented it to you late last night when we e-mailed it to you, but we did not e-mail it to the Court at that time.

MR. CARTER: If you can provide it to the Court, I would like him to look at it while we're talking.

So, Judge, we were presented with Defendant's Exhibit 13 last night. Not surprised by getting that exhibit. That's a booking report for Justin Phillips from the Crawford County Jail. It's hearsay, but I do think it meets the public records exception of hearsay. I've talked with people that would lay a foundation for that. I'm satisfied they could lay a foundation for it.

I'm assuming that the reason they are introducing this is for time and date, which the government's position is that makes page 1 and page 2 relevant, but it was a seven or eight page document that was e-mailed to me. So I can offer a stipulation that page 1 and page 2 come in, but the remainder of the document is irrelevant. There's some

prejudicial things in there, quite frankly. And I think that may eliminate Lieutenant Dowdy from your witness list.

MR. WOOD: Yeah. The second, or the third or fourth page, I assume that we wouldn't be talking about that where it says that he's an escape risk and whatever. So yeah, I'm fine with the stipulation for page 1 and page 2. We only wanted it to show book-in date and release date.

THE COURT: Okay.

MR. CARTER: We'll stipulate to that document's admission if it's those first two pages.

THE COURT: So that eliminates Dowdy.

MR. CARTER: As far as I'm concerned, it does.

THE COURT: Is this the Court's copy or your copy?

MR. WOOD: You can have that.

THE COURT: I need to have a colloquy with Mr. Boen. Anyone have anything else before I do that?

Mr. Boen, good morning.

THE DEFENDANT: Good morning.

THE COURT: So one of the bedrock principles -- going back to voir dire, one of the bedrock principles in Constitutional criminal law is the notion under the Fifth Amendment that a defendant has a right not to testify and to not make self-incriminating statements. The government

cannot force you, for example, to take the witness stand.

However, as part of your defense, you do have the absolute right to testify. You can waive your Fifth Amendment right, in other words, and testify if you want to. The choice is entirely yours. You have good attorneys. Have they counseled you about this?

THE DEFENDANT: I'm completely satisfied, yes. We have gone over it.

THE COURT: Have they answered any and all -- you need to speak up, if you could, or speak into that microphone.

THE DEFENDANT: I'm sorry, Your Honor.

THE COURT: Have they answered any and all questions you may have had about your Fifth Amendment rights?

THE DEFENDANT: Yes, they have.

THE COURT: So a person should consult their attorney in these situations and get advice. But at the end of the day, the decision is yours about whether you testify, not your attorney's decision. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: That being the case, have you made a decision as to whether you would like to testify as part of your defense?

THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: What is your decision?

THE DEFENDANT: I do not wish to testify.

THE COURT: All right. Thank you very much.

THE DEFENDANT: Thank you.

THE COURT: Anyone have anything else? All right. Would you please bring the Jury in.

(Jury in at 8:49 a.m.)

THE COURT: This is starting to sound like a broken record and I'm afraid that you have lost faith in me, but I promise you while you have been waiting past 8:30 to come out here, the attorneys and I have been working in an effort to save time, and I promise that that's the case here.

So we are now ready to continue with the defense case. Mr. Wood, you may call your next witness.

MR. WOOD: Your Honor, the defense calls Marshall Elmore.

THE COURT: Sir, if you would please pause about right there and raise your right hand.

(Witness sworn)

THE COURT: Sir, you may have a seat in our witness box over here. Sir, if you would like, you may remove your mask while testifying in the witness box, but I won't require you to do that. One step ahead of me,

obviously. You may inquire.

MARSHALL ELMORE, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOD:

Q. Good morning, sir. My name is Russell Wood. I represent Sheriff Boen. Could you tell the Jury your name for me, please?
A. Marshall Elmore.
Q. Mr. Elmore, where do you reside?
A. Booneville.
Q. I'm sorry?
A. Booneville.
Q. Have you ever been a resident of the Franklin County Detention Center?
A. Yes, sir. Multiple times.
Q. So I don't think it will be a secret. Do you have a criminal record?
A. Yes, sir.
Q. And are you a convicted felon?
A. Yes, sir.
Q. And approximately how many times do you think you have been incarcerated at the county jail?
A. Multiple.
Q. In Franklin County?

A. Yes.
Q. Have you got a rough guess?
A. 15.
Q. And were you incarcerated at the Franklin County Detention Center in approximately December the 4th of 2018?
A. Yes, sir.
Q. Do you recall how long -- do you recall approximately when you got there during that stint and maybe when you got out?
A. I'm not sure. I was there for eight months.
Q. And did you have any special assignment or duties or title while you were at the detention center?
A. Yes, sir. I was trustee.
Q. And what does that mean?
A. Get out and work and serve food, make food.
Q. Would it be fair to say that trustees kind of work around the jail?
A. Yes, sir.
Q. Would a trustee mow the yard?
A. Yes, sir.
Q. Clean the facility?
A. Yes, sir.
Q. Maybe work on the facility?
A. Yes, sir.
Q. Do you recall an inmate named Zachary Greene?

A. Yes, sir.
Q. And do you recall another trustee named Huckleberry Beehner?
A. Yes, sir.
Q. On December the 3rd or 4th, there was an incident between Huckleberry Beehner and Zach Greene. Do you recall that?
A. Yes, sir.
Q. And I don't think we need to go over the incident anymore. But after the incident occurred, can you tell me what happened?
A. I was on the phone with my lawyer. And I heard, "He bit me, he bit me." And then I heard a bunch of scuffling. And next thing I know, there was officers in there.
Q. We were going to move past that. You're talking about the incident between the inmates?
A. Yes.
Q. And then once the officers started coming, tell me what happened.
A. Later on that night, the Sheriff and Travis Ball and the IT guy came up.
Q. And where were you at whenever you encountered the Sheriff and Travis Ball?
A. In the kitchen.
Q. And had you been in the kitchen since the incident

between the inmates at that time?
A. Yes, sir.
Q. Who else was in there?
A. Huckleberry Beehner, Eric Mills. I can't recall who else.
Q. Do you recall what officers come up there?
A. Yes, sir. Anthony and Travis Ball. And the IT guy.
Q. And did you have an opportunity to interact with Travis Ball?
A. Yes, sir.
Q. And have you ever been around intoxicated people?
A. Yes, sir.
Q. Have you ever observed or smelled alcohol?
A. Yes, sir.
Q. And when you were interacting with Travis Ball, what did he -- how was -- what was his appearance like?
A. He was just really happy and he talked a lot, which he never does. He just kept talking and just making jokes and stuff.
Q. And did you make any other observations about him?
A. No.
Q. Did you smell any intoxicants?
A. Yes. I mean, clearly, he was intoxicated.
Q. And did Mr. Ball make any statements to you about intoxication?

A. Yes.

MR. CARTER: Objection, hearsay.

THE COURT: Sustained.

Q. (By Mr. Wood.) Did you have an opportunity to interact with the Sheriff?

A. Yes, sir.

Q. And did you smell any intoxicants on him?

A. No, sir.

Q. Have you had an opportunity to interact with the Sheriff a lot over your stints in the Franklin County Sheriff's Office?

A. Yes, sir.

Q. And did you observe any demeanor about the Sheriff that was different than you had observed before?

A. No, sir.

Q. Did he appear intoxicated to you?

A. No, sir.

Q. How long was the Sheriff and Travis Ball in the kitchen area with you?

A. Good 45 minutes.

Q. And at that point in time, whenever they exited, do you know where they went?

A. Like when they left?

Q. Uh-huh.

A. I don't know, sir.

Q. Did you see them -- did you see the Sheriff leave by himself?
A. No.
Q. Who did he leave with?
A. I think he left with everybody else. They rode there together.
Q. Did you observe the Sheriff over at Mr. Greene's shower room cell at any time?
A. Yes, sir.
Q. And what was going on there?
A. He was just talking and I had give him a glass of water. He asked me to give him a glass of water and I gave him a glass of water.
Q. And who is "he"?
A. Zach.
Q. Who asked you to give --
A. The Sheriff.
Q. Let me clean that. Is it my understanding the Sheriff asked you to get Zach a glass of water?
A. Yes, sir.
Q. And what did you do with that water?
A. I gave it to the Sheriff.
Q. And what did he do with it?
A. Handed it to Zach.
Q. And what did Zach do with it?

A. I don't know.
Q. All right. At any point in time, did you see anybody throw any water?
A. No. There was water in the hallway, but I don't know who did it.
Q. Did you observe any altercations between Mr. Greene and the Sheriff?
A. No, sir.
Q. And were you able to see the Sheriff the whole time he was in that hallway at the shower?
A. Yes, sir.
Q. And then where did he go once he left that shower area?
A. He went to the drunk tank.
Q. Okay. I understand.
A. The Sheriff, he went to the booking room.
Q. And did you see him anytime after that?
A. Yes, sir.
Q. And when was that?
A. When we moved Zach Greene to the drunk tank.
Q. Is it my understanding they came back -- somebody came back to get Mr. Greene?
A. Yes, sir.
Q. I don't think we need to talk about that. Was that the Sheriff?

A. I don't remember if he -- he moved him or the dispatchers moved him, or jailers moved him. I'm not sure.
Q. At any point in time, did you see the Sheriff himself after the movement to the drunk tank?
A. Yes, sir.
Q. When was that?
A. When they were leaving.
Q. And who was leaving?
A. Travis and Sheriff.
Q. And did you have an opportunity to look, to observe Mr. Greene after the Sheriff left?
A. Yes, sir.
Q. And let me ask you this. Did you go and see Mr. Greene after the Huckleberry Beehner incident?
A. Yes, sir.
Q. And then you had a chance to see Mr. Greene after the Sheriff left --
A. Yes, sir.
Q. -- the facility?
A. Yes, sir.
Q. Were there any additional injuries or anything like that on Mr. Greene the second time you saw him from the first time?
A. No, sir.
MR. WOOD: Pass the witness.

THE COURT: Thank you, Mr. Wood.

CROSS EXAMINATION

BY MR. CARTER:

Q. Good morning, Mr. Elmore.

A. Good morning.

Q. My name is Brandon Carter. I'm an Assistant United States attorney.

A. Yes, sir.

Q. It's my job to cross-examine you here. Couple of things that I want to ask you about.

So it's true, then, that the Sheriff gave inmate Greene a glass of water?

A. Yes, sir.

Q. And it's true that you saw that same water all over the floor then later?

A. Yes, sir.

Q. Now, from the view of the kitchen, it's true, isn't it, that you can't see into the shower room, can you?

A. Depends on where you're standing.

Q. But you don't have a clear view into that shower room?

A. No, sir.

Q. And that room gets even worse if there's a bunch of people crowded around it, doesn't it?

A. Yes, sir.

Q. I want to talk about being a trustee. Being a

trustee, I think you said you've been in the Franklin County Jail about 15 times?
A. Yes, sir.
Q. Being a trustee is a desirable job to have in the jail, isn't it?
A. Yes, sir.
Q. Because you kind of get the run of the place, don't you?
A. Yeah.
Q. You're not locked down in your cell. You're not bored in the day room all day?
A. Right.
Q. So one wants to be a trustee when they are in the jail?
A. Yes, sir.
Q. It's sounds like you're on a first-name basis with the Sheriff. You called him Anthony just a second ago.
A. I didn't know if I should call him Sheriff or Anthony. I didn't know.
Q. But you're comfortable calling him Anthony, it sounds like?
A. No, I call him Sheriff. That's what I call him.
Q. The Sheriff is the one that decides who the trustees are, aren't they?
A. Yes, sir. Well, he has the end part of it, yes, sir.

Q. He can end you being a trustee, can't he?
A. Yes, sir. He has.
Q. And it's fair to say, isn't it, that most of the time, if not all of the time, when you're in the Franklin County Jail, you get to act as a trustee, don't you?
A. Yes, sir.
Q. The Sheriff allows you to be a trustee even though you have been convicted, by my count, of seven felonies?
A. Yes, sir.
Q. The first of those felonies is a residential burglary from there in Franklin County from May 6th of 2005. Do you remember that felony?
A. Yes, sir.
Q. The second of those is a theft of property. You were convicted the same day, May 6th of 2005, but it was in Crawford County, wasn't it?
A. Yes, sir.
Q. Then the next one of those felonies was in 2013. It was a theft of property on August 20th in Crawford County of 2013?
A. That's right.
Q. And then another residential burglary, a felony, that you were convicted of on July 21st, 2014. This one in Garland County?
A. Yes, sir.

Q. Went down to Hot Springs for that one, didn't you?
A. Yes, sir.
Q. And then on July 2nd, 2014, you got convicted of theft by receiving an item valued at more than $25,000, didn't you?
A. Yes, sir.
Q. And then you didn't appear for court. You got convicted of a failure to appear on December 29th, 2017, in Crawford County, is that correct?
A. Yes, sir.
Q. And most recently, on February 22, 2019, you were convicted back in Franklin County of possession of a controlled substance, weren't you?
A. Yes, sir.
Q. And despite all those felonies, this man still allows you to be a trustee in his jail, doesn't he?
A. Yes, sir.
Q. This incident with Zach Greene happened right around dinnertime, didn't it?
A. Yes, sir.
Q. And you recall, you filled out a statement for that, didn't you?
A. Yes, sir.
Q. And the statement, the time on your statement, you would agree that's 6:12 p.m. That's correct, isn't it?

A. Yes, sir.
Q. So that's the time you filled out the statement?
A. Yes, sir.
Q. So the incident with Zach Greene and the trustee, Beehner, occurred before that, didn't it?
A. Just minutes before it.

MR. CARTER: Pass the witness. Thank you.

THE COURT: May this witness be excused?

MR. WOOD: Yes, Your Honor.

THE COURT: Mr. Elmore, thank you very much for your time. You're free to go.

The defense may call its next witness.

MR. WOOD: Scout Simpson, Scout Ingram-Simpson.

THE COURT: Ma'am, if you would please raise your right hand to be sworn.

(witness sworn)

THE COURT: Ma'am, would you please wind your way around our court reporter, up the stairs to our witness box. I will tell you that you may remove your mask if you like, but you're not required to.

SCOUT INGRAM, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOD:

Q. Ma'am, would you please state your name for the

record?
A. Scout Ingram.
Q. And Ms. Ingram, have you ever worked for the Franklin County Sheriff's Office?
A. Yes.
Q. And were you working for the Sheriff's Office in December of 2018?
A. Yes.
Q. And tell us what you were doing.
A. Dispatcher and jailer.
Q. We're here to talk about the evening of December, it was either the 3rd or the 4th, of 2018.
Do you recall going to the jail over an incident with Zach Greene?
A. Yes.
Q. Tell me -- back up in the day. Tell me what you did after you got off work that day.
A. We went out to eat dinner.
Q. Who is "we"?
A. Me, the Sheriff, Travis Ball, his wife, Kelsey, Terri, and Chris.
Q. And where did you all meet?
A. At the Sheriff's house.
Q. And who all met at the Sheriff's house?
A. Me, Travis, the Sheriff, Kelsie, I think Terri, and

Chris.
Q. And after ya'll met, whose vehicle did you take?
A. Chris.
Q. And is that Chris Roberson?
A. Yes.
Q. And is he the individual that was the IT person for Justice Solutions?
A. Yes.
Q. And what kind of vehicle did he have?
A. A black, I don't know, SUV, big. I don't know what it's called.
Q. But ya'll were able to all fit in there, so you took his vehicle?
A. Yes.
Q. So who drove?
A. I did.
Q. And where did you all go?
A. Bricktown here in Ft. Smith.
Q. And when ya'll got there, do you recall if Chris -- well, let me back up. Who was going to pay for this meal?
A. Chris.
Q. And why was he going to do that?
A. He bought several meals while he was down doing the training.
Q. Would it be your understanding that that's kind of his

entertainment budget?
A. I guess. I don't know.
Q. So you got to Bricktown. Do you recall if the group ordered drinks?
A. They did.
Q. And Chris, did he order drinks?
A. Yes.
Q. And did everybody order appetizers?
A. I believe so.
Q. Do you recall what time ya'll got there?
A. No.
Q. Do you recall what time ya'll left?
A. I don't know the exact time, no, I don't.
Q. Do you recall if the Sheriff was drinking while ya'll were there?
A. Yes.
Q. And do you recall how much the Sheriff had to drink the whole time that ya'll were there?
A. I believe he had like half a glass of wine.
Q. Do you recall how much his wife had to drink? Or, excuse me, his girlfriend had to drink?
A. Half a glass of wine.
Q. And looking back on that, it was quite a long time ago. Do you recall how much Chris had to drink?
A. A lot.

Q. And then what about you?
A. I didn't drink anything.
Q. And when ya'll were at this dinner, did the Sheriff receive a phone call from the detention facility?
A. Yes.
Q. And do you recall on the time frame of the dinner where that phone call fell? The beginning? The middle? The end?
A. I believe it was at the end of the dinner.
Q. And then once ya'll left the restaurant, where did you all go?
A. To the Sheriff's Office.
Q. Do you recall what time you got to the Sheriff's Office?
A. I don't know the exact time, no.
Q. And so what happened when you got to the Sheriff's Office -- or let me back up. Which door did you all go in?
A. The main front door.
Q. And when you go through the main front door, where does that lead to?
A. The dispatch room.
Q. So did all of you enter the dispatch room at the same time?
A. Yes, I believe so.
Q. And then tell me what happened.

A. Travis, Chris, and the Sheriff went back to the shower room. And me and Kelsey stayed up in the dispatch room.
Q. And while you were up in the dispatch room -- and is this the same dispatch room you work in?
A. Yes.
Q. Or you worked in?
A. Uh-huh.
Q. While you were up there, did you have an opportunity to see any monitors?
A. Yes.
Q. And what do those monitors show?
A. Just video of the jail.
Q. Do any of them show the hallway where the shower room is?
A. Yes.
Q. And did you have an opportunity to look at that monitor while the Sheriff and Travis and Chris walked down that hallway?
A. Yes.
Q. And tell me, when they started walking down that hallway, what did you see?
A. I just saw -- I couldn't really see much. I could just see the back of Chris. And then I saw Sheriff and Travis, like at the door of the shower room.
Q. And tell me what you observed. Did you observe

anything that appeared to be an altercation?
A. I couldn't really see what was going on. I heard them screaming at each other.
Q. And who is "they"?
A. I just heard yelling. I don't know. I guess the Sheriff and Zach Greene, Travis.
Q. I'm sorry. Let's talk about jail environment.
A. Uh-huh.
Q. Is hearing yelling in a jail common or uncommon?
A. It's common.
Q. And when there's yelling in a jail, are you able to definitely tell where that's coming from?
A. Sometimes you can't.
Q. And why is that?
A. It gets loud in there sometimes.
Q. And what are the acoustics like inside of a detention facility?
A. What do you mean?
Q. I mean, is there echoing inside of the jail?
A. Yeah. I guess so, yeah.
Q. You heard the yelling. Were you able to tell if it was the Sheriff and Zach or coming from a different cell?
A. I mean, it was coming from the left side general area, so I think it was them.
Q. So after you heard some yelling, what happened then?

A. There was like a thud-like sound that had came from that area as well. So I had walked down the hallway and I asked if they needed a male jailer. And Chris had told me, no, that they had gotten it handled. So I came back up to the dispatch room.
Q. And then how much -- once you come to the dispatch room, what did you do?
A. I stepped outside the front door so I could take a phone call.
Q. And how long was that phone call?
A. It wasn't very long.
Q. Give me -- I mean --
A. Maybe a couple of minutes.
Q. After the phone call, what did you do?
A. I came back into the dispatch room.
Q. And after you entered the dispatch room, how long was it before the Sheriff and Travis come back into the dispatch room?
A. It wasn't very long.
Q. Can you give me an estimate?
A. Maybe a couple more minutes before they came back up there.
Q. Then what happened?
A. We left.
Q. Now, you left and you went where?

A. Back to the Sheriff's house.
Q. And did you ever see Dalton Miller at the Sheriff's house?
A. I don't think so, no.
Q. Did the Sheriff ever approach you with Dalton Miller and ask, "Can I trust him"?
A. I don't remember seeing Dalton Miller at all that night.
Q. So would it be your testimony today that the Sheriff did not approach you with Dalton Miller asking you if he could trust Dalton?
A. No.
Q. Did you observe Dalton Miller at the Sheriff's department while you were there?
A. No, I don't remember Dalton Miller being there.
Q. At the Sheriff's department?
A. No.
MR. WOOD: I'll pass the witness.
THE COURT: Thank you. You may inquire when you're ready, Mr. Songer.
MR. SONGER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. SONGER:
Q. Good morning, Ms. Ingram.
A. Good morning.

Q. How are you doing today?
A. I'm good. How are you?
Q. Doing well. Just so the record is clear, because we have heard from a lot of people who I think knew you at different times over the years this week. Did you used to go by Scout Simpson?
A. Yes. My maiden name.
Q. Thank you. Ms. Ingram, you consider Sheriff Boen to be a friend of yours, right?
A. Yes.
Q. Now, the night you talked about when you were at the Bricktown Brewery and you came back to the jail, why were you at the dinner with the Sheriff and his wife and Travis Ball and with Chris Roberson from Justice Solutions?
A. I was under 21, and so I was going to be their driver if they were drinking.
Q. And, in fact, did you drive them around that night?
A. I did.
Q. And you said before, right, that when you guys left the restaurant, that you wouldn't have trusted any of them to drive because they had been drinking, correct?
A. I mean, I wouldn't let anyone drive who had drank at all.
Q. Right. Now, when you got back to the jail after that dinner, you said you stayed up in the dispatch area?

A. Uh-huh.
Q. And from the dispatch area, you can't -- it's sort of down a different hallway, so you can't see into the shower room, is that right?
A. Correct.
Q. But there's some video monitors in there, and one of those shows the hallway that goes in front of the shower room?
A. Yes.
Q. Mr. Moon, can we bring up what's been admitted as Government's Exhibit 5(a), please.
Mrs. Ingram, is this basically the view that's shown on that surveillance camera down the hallway by the shower room?
A. Yes.
Q. And that's the shower room there on the left?
A. Yes.
Q. So you can just barely see any of it, right?
A. Correct.
Q. And if there's people standing sort of between the camera and the shower room, that's going to block a lot of the view of what's going on right in front of the door, right?
A. Uh-huh.
Q. Especially if they are bigger people, like Chris

Roberson?
A. Yeah.
Q. We can take that down. Thank you, Mr. Moon.
Now, when you were in the dispatch office, you said with Kelsey. Is that Travis Ball's wife?
A. Yes.
Q. When ya'll were up there, you said that the Sheriff and Travis Ball and Chris Roberson all walked down to where the shower room was, right?
A. Yes.
Q. And when you were down there, you heard a thud, right?
A. A thud, like. Like, I don't really know how to describe it, but, yeah.
Q. Right. And there's no sound on those monitors like when you watch T.V., right?
A. No.
Q. So you actually heard that sound all the way down to the hallway to where you were?
A. Yeah.
Q. And it was loud enough that you left where you were and walked down to see if they needed any assistance, right?
A. It was like the screaming and that as well, yeah. I just asked if they needed a jailer, a male jailer.
Q. Right. When you heard the thud, you walked down and

asked them if they needed any assistance, isn't that true?
A. Uh-huh.
Q. Is that a yes?
A. Yes. Sorry.
Q. Yeah, it's a strange system. And when you walked down after you heard the thud to see if they needed any assistance, Chris Roberson was there. And he turned and told you like, "We've got it, we've got it handled, we don't need anything," right?
A. Yeah. He said, "No, we've got it handled."
Q. And then he told you, you should just go back to the dispatch office?
A. Pretty much, yeah.
Q. And you agree that Chris Roberson is friends with the Sheriff too, right?
A. Yeah, I think they were, or are.
Q. I'm sure it's fair to say that you couldn't see, you never saw anything that happened inside the shower room that night, did you?
A. No.
Q. And then after you walked back -- you said you got a phone call, so you stepped outside for a few minutes, is that right?
A. Correct.
Q. So you don't know -- while you were outside talking on

the phone, you don't know what happened in the shower room then either, do you?
A. No.
Q. And do you know who Brandon English is?
A. Yeah. Yeah, I know him.
Q. He was an inmate who was at the jail at one point, right?
A. I didn't know him when he was in the jail. I just know him from my court, working in the court.
Q. You have never seen him do anything in the jail?
A. I don't think so, no.
Q. So then coming back to this night, I think you said that a little bit later, after you got that phone call, the group of you left and you went back to the Sheriff's house?
A. Yes.
Q. But then you left the house almost right away after you got there, correct?
A. Yes.
Q. So you don't know who came after you left?
A. No.
Q. You don't know if Dalton Miller came after you left?
A. Huh-uh. No.
Q. You don't know if Sheriff Boen was bragging to people at that party about beating inmates after you left, right?
A. I don't know what happened after I left, no.

Q. Thank you, ma'am.

MR. SONGER: Those are all the questions I have.

THE COURT: May this witness be excused?

MR. WOOD: Yes.

THE COURT: Ma'am, thank you very much for your time. You're free to go.

Call your next.

MR. WOOD: Zach English.

THE COURT: Sir, please come forward and pause about right there and raise your right hand.

(Witness sworn)

THE COURT: If you will wind your way around the court reporter, take a seat in our witness box. While testifying, you may remove your mask if you would like. You're not required to do so.

ZACHERY ENGLISH, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOD:

Q. Sir, would you please state your name for the record.

A. Zachery English.

Q. And Mr. English, are you a former employee of the Franklin County Sheriff's Office?

A. Yes, sir.

Q. Do you recall when you started working there?

A. September of 2016.
Q. And what did you start as?
A. Jailer/dispatcher.
Q. And then what was your next promotion?
A. From there, I started doing jail transports and then went on to become a patrol deputy.
Q. And how long were you a patrol deputy?
A. About two and a half years.
Q. Do you recall an incident where Justin Phillips escaped from the Franklin County Detention Center?
A. Yes, sir.
Q. And do you recall or do you remember that event occurring around September the 11th, 2017?
A. That sounds correct, yes, sir.
Q. And at that time, what was your job at the department?
A. I was a jailer.
Q. Would you ever go with any deputies for other matters?
A. Yes. I was doing that quite often.
Q. And what other stuff would you go and do?
A. We would take inmates anywhere across the state. If they were going to ADC or to a different county jail, I would ride with them to do that type of thing.
Q. And if you do that as your primary occupation there, what are you called?
A. Transporting is usually what it's kind of called.

Q. I'm sorry. Transport?
A. Like a transport deputy.
Q. And you said you worked as a transport deputy also?
A. Yes.
Q. Do you know if Mason Berry worked as a transport deputy at some point?
A. I'm not for sure.
Q. Well, after the Justin Phillips' escape from Franklin County Jail, did you become aware he was going to be transported somewhere?
A. Yes.
Q. And how did you become aware of that?
A. I was -- I had been working a shift in the jail. And Deputy Berry came in and told me that he needed me to go with him to Crawford County.
Q. And so then what happened?
A. We brought Phillips up to the booking area, shackled him, put him in the car, and took him to Crawford County.
Q. Do you know who shackled him?
A. I want to say it was me, but I'm not 100 percent sure if it was me or one of the jailers who was working in the jail.
Q. And so when you do a transport like that, how do you shackle an inmate?
A. For that particular transport, we used a belly belt

where the hands are cuffed in the front, and then leg shackles.

Q. And what was different about that particular transport?

A. Since he had escaped just the day before, we were worried that he would try to escape again, so we went ahead and took that precaution to keep him from doing so.

Q. And there's been some discussion about these apparatuses. He had the leather belt versus the chain?

A. Yes. This was a leather belt where the handcuffs go in the front of the belt, buckles in the back.

Q. How do the handcuffs attach to the belt?

A. There is like a D-ring or an O-ring in the front of the belt. And then you just run the handcuffs through it, and then they are placed on the wrist.

Q. And let me ask you a general question. If an inmate, any inmate, were secured in the belly belt, and they were able to get one cuff off, would they be able to get their other hand free?

A. Easily.

Q. Would they have to get the cuff off the other hand to get free?

A. No, sir.

Q. And how would that work?

A. You would just pull your hand back through the O-ring,

because the cuffs are not actually attached to the belt. They are separate from the belt.
Q. And so what happens -- for people that may not be aware of handcuffs -- the handcuff is this big around, right?
A. Yes, sir.
Q. How does it get through that O-ring?
A. It opens and then it becomes a hook. Like it's two parts.
Q. Would it be fair to say that, handcuffs, you can push it through and they will hinge and swing back around?
A. Yes, sir.
Q. So if an inmate were to get one hand out, he could get the other hand free and be totally unrestrained?
A. Yes.
Q. What about these leg shackles? The restraints that you put on, did it have the chain from the hands to the leg shackles?
A. This set did not.
Q. Do ya'll have other sets that do?
A. Yes.
Q. So somebody shackled him. Who put him in the car?
A. Berry.
Q. And where was he sitting at? Where was he positioned in the vehicle?

A. Behind the passenger seat.
Q. And why are -- why are inmates put behind the passenger seat?
A. It's easier for the driver to keep an eye on the inmate as they are driving.
Q. And what vehicle were you in?
A. Berry's patrol unit.
Q. Do you recall what kind of unit that was?
A. I believe it was a Ford Explorer.
Q. Did it have a cage in it?
A. Yes.
Q. And part of the cage, did it have the partition between the front seat and the back seat?
A. Yes.
Q. So ya'll put him in the back, hop in the vehicle, and take off to Crawford County, correct?
A. Yes.
Q. Anything happen on the way to Crawford County that was unusual?
A. About the time we got to Alma to get off -- we were preparing to get off the interstate, we began to hear Phillips moving in the back. And that was when we turned around and looked and noticed that he had actually become free of his belly chain and was attempting to slide his leg shackles off.

Q. And so we just discussed, when you said he became free of his belly chain, what does that mean?
A. The actual -- if I remember correctly, he had been able to get the belt undone and his hands were just free in front of him.
Q. So at that point in time, he was still cuffed?
A. Yes.
Q. How does a person get the belt off if it's fastened behind them and they are handcuffed?
A. Actually, in this instant, we could not understand that. So we actually -- I had actually gone back to the jail the next day, or several days after or whatever, and put it on myself to see if it was able to be done. And if a person has arms or is bendable enough, you can actually unfasten the belt from behind you, and then it just comes off.
Q. So you heard some rustling around and then he was free?
A. Yes.
Q. What happened then?
A. Berry radioed into our dispatch center and said, "Hey, he's free. Notify Crawford County we'll be there in just a couple minutes. Have somebody come out in the sally port and help us."
Q. Are you aware of Mr. Phillips having any special

abilities to get himself out of handcuffs?
A. I had heard rumors from working -- because he had worked there previously before I was hired and had been a law enforcement officer -- I had heard rumors that he would show that he could do things like that, but I had never seen anything before that date.
Q. And so once he was free, once the call was made to Franklin County, what happened after that?
A. So they notified Crawford County. We just drove fast and got to their jail. They opened the sally port. We pulled in. As we were pulling in, they had deputies coming out to meet us.
Q. And how many deputies did they have?
A. Five or 10. Somewhere between five or 10. I don't know the exact number. There were several.
Q. Was it more than normally would meet you for a prisoner exchange?
A. On a normal circumstance, they would not have the deputy come out and meet us. We would take the prisoner into their facility ourselves.
Q. And was it your testimony, or did you observe any injuries to Mr. Phillips' wrists or feet or something?
A. Not that I can remember.
Q. Once you got into Crawford County -- and who removed him from your vehicle?

A. I'm not 100 percent sure. There were several deputies there. I mean, we just opened the door and he got out.
Q. And so how do you all get ya'll's equipment back? Your gear? Your chains?
A. They take him into their facility, take that gear off of him, and then we get it back.
Q. And then once you and Mr. Berry return to your vehicle, what did you all do then?
A. Drove back to Franklin County.
Q. You drove back to Franklin County?
A. Yes.
Q. From Crawford County, you drove back to Franklin County?
A. Yes.
Q. And what did you do when you got to Franklin County?
A. I went home.
Q. He dropped you off at the jail?
A. Yeah, he dropped me off at the jail. My shift was over. He dropped me off at the jail. I went home.
Q. After you transported Justin Phillips to Crawford County because of his escape.
A. Yes.
Q. At any point in time when you were driving back to Franklin County, did ya'll get a call asking you to return to the hospital to watch Justin Phillips?

A. No.
Q. Nobody called you guys and told ya'll to go over and watch -- turn around and go watch him at the Baptist Health?
A. No. We left Crawford County, drove straight back to Franklin County, and that was it.
Q. So you did not -- so then you did not subsequently transport Phillips after his appointment over to -- back to Crawford County?
A. No, we didn't -- I mean, we took Phillips to the Crawford County Jail. That was the only place we took him.
Q. Are you aware of when -- just to be clear. After you took him to Crawford County, on that same day, you did not subsequently, you and Mason Berry did not subsequently bring him back to Franklin County?
A. No, sir.
Q. Are you aware of when Justin Phillips was brought back to Franklin County?
A. The next day, couple days later.
Q. Well, let's talk about this. So the next day, were you working?
A. Yes. I work day shift in the jail.
Q. So you would have went to work in the jail the next morning after dropping him off?
A. Yes.

Q. And did he show up that day?
A. Not while I was working, no.
Q. And did you work the next day?
A. Yes.
Q. And when you came into work the next day, was Justin Phillips in the detention facility?
A. Yes. He was in isolation.
Q. So would it be fair to say that he did not come in the day after -- well, let me take that back. The day after you dropped him off, he must have come in that night?
A. Yes, either evening shift or night shift. I don't know when.
Q. Because he was there --
A. The next --
Q. -- the next time you showed back up?
A. Yes.
Q. I guess my point is, he actually was transported to Franklin County a day or so later?
MR. SONGER: Object. That's not a question.
THE COURT: Sustained. Rephrase.
Q. (By Mr. Wood.) So to clean that up, when was he transported back to Franklin County?
A. It would have been some point the day after we took -- Berry and I took him to Crawford County.
Q. And did you go to Crawford County to retrieve him?

A. No.
Q. So if Berry Mason says he went to Crawford County to get Justin Phillips, and went to the hospital to sit with Justin Phillips, you would not have been with him?
A. No, sir.
Q. As a transport deputy, a road deputy, what are the hazards or dangers of an inmate or prisoner getting out of their cuffs or their belly restraints?
A. Several. Injury to themselves. Injury to you. The possibilities are endless, really. They can do whatever they wanted to at that point.
Q. Isn't there a cage back there?
A. Yes.
Q. Isn't there a plexiglass divider?
A. Yes.
Q. Now, do those plexiglass dividers have slide windows in them?
A. Yes.
Q. And how close -- when you're driving your vehicle, how close are those slide windows to you?
A. They are between the driver and passenger seat. They are just right there.
Q. But are they way back here?
A. No, they are up against the back of the seat. Your seat actually hits the divider when you're in the front

seat.
Q. Are you aware of any training materials that you have reviewed or seen about inmates freeing themselves and being able to open this cage divider?
A. Yes.
Q. Tell me about those.
MR. SONGER: Object, Your Honor.
THE COURT: Sustained.
Q. (By Mr. Wood.) Can an inmate open the cage divider?
A. It's possible.
Q. And if an inmate were to free himself and get that open, what could he do?
A. Ultimately, knock the driver unconscious, take their weapon, wreck the vehicle. Any of those things.
Q. Could an inmate actually put his arm through that window and reach a deputy?
MR. SONGER: Object to this entire line of questioning.
MR. WOOD: Your Honor, he's a transport deputy. He has specialized training and skill in this particular issue about transporting and these types of issues.
THE COURT: Well, I'm not going to allow the question as it is presently framed. If you can lay a foundation for a 701 opinion in the Explorer vehicle, I would let you do that.

MR. WOOD: Okay.
Q. (By Mr. Wood.) What type of unit did you have when you were a patrol deputy?
A. The first unit I was issued was a 2012 Chevy Tahoe. And then the second unit I was issued was a 2017 Ford Explorer.
Q. Now, as a transport deputy, did you have your own vehicle?
A. No.
Q. And what would you transport in?
A. Usually, the transport van or any spare unit that was sitting around.
Q. And when you were promoted to transport deputy, did you receive any specialized training regarding that aspect of your job?
A. Yes.
Q. And what did that training consist of?
A. Just how to properly shackle an individual, safety just in transporting. General transport safety.
Q. And did it also include any training on the actual mode of transport and the various safety issues of transporting inmates?
A. Yes.
Q. Did you all ever go over and receive training on the different types of safety issues or problems that could

occur as a result of transporting prisoners?
A. Yeah. I think it's pretty common in law enforcement for that to be covered.
Q. And how many transports have you done in your career?
A. I don't know. 100 or more probably. Several.
Q. Now, you also had the Ford Explorer, correct?
A. Yes.
Q. And was it a Tahoe?
A. Yes.
Q. A Tahoe before that. Approximately how many prisoners have you transported with those two vehicles?
A. Several. From arresting an inmate on the street to just going from county jail or ADC, over 100, probably, or more.
Q. And in those patrol vehicles, are there protocol that you are trained on regarding the transport of, I guess at that point suspects generally, but prisoners?
A. Yes.
Q. And what all does that protocol include?
A. So you have to keep your sliding glass shut. Make sure the individual is restrained, buckled, and things like that.
Q. The position of the prisoner in the vehicle, is that correct?
A. Yes. Yes.

Q. And you say, keep your sliding glass thing closed. Is there training about what could happen if that becomes compromised?
A. Yes.
Q. And what kind of training did ya'll go through or information were you provided when you were talking about the safety issues of a compromised partition?
A. We were given, or shown, scenarios where inmates who had become free in the back seat or who weren't restrained properly in the back seat were actually able to, some of them even get their entire body up into the front seat of the vehicle.
Q. From your personal observation, would an inmate be able to reach a police officer through that partition?
A. Yes, it's possible.
Q. Are there any other areas of the cage that a prisoner might also access an officer through?
A. Yes. The part -- almost in every cage I have ever seen, whether it's a Chevy Tahoe, Ford Explorer, Crown Victoria, whichever vehicle it is, there's always a gap between where the cage goes and the B pillar of the vehicle. There's a gap there. They usually put a piece of plastic there. I've seen those break. And you are actually able to -- you can get your entire arm through that part and just have access to the front of the vehicle.

Or vice versa, from front to the back, whichever way.
Q. And so if an inmate were to be able to access that area, could they reach you?
A. Easily.
Q. Also, could an inmate who got free and reached through the partition, would it be possible to reach your side arm?
A. Yes.
Q. And I guess it would be fair to say if you were right-handed, correct?
A. Depending on where -- if you're right-handed and the inmate was able to get through the glass partition, then, yeah, they could have easy access to your weapon there. As a left-handed officer, if they get through between the partition and the door where the pillar of the vehicle is, then they would have access there. So it just depends which hand you carry on, or which side they --
Q. But police officers carry special gun holsters, right?
A. Yes. Well, supposed to.
Q. Supposed to. Typically, police officers have special gun holsters?
A. Yes.
Q. Tell me what's so special about those holsters.
A. They have a locking mechanism which prevents you from just walking up and being able to pull the firearm out. You actually have to press levers and switches to get it

out.
Q. And if an inmate was former law enforcement, would that create an additional safety issue?
A. Yes, a very big safety issue. That individual would then know how to operate the mechanism to free that weapon, and it could be done in seconds or less.
Q. What about your long guns? Do most of those vehicles have long guns?
A. Yes.
Q. And would that include --
MR. SONGER: Your Honor, object to the relevance of this.
THE COURT: Sustained. You need to establish relevance.
Q. (By Mr. Wood.) How long did you know Mason Berry?
A. I met him when I was hired into the jail in 2016, and I worked with him until he left, whenever he left. I'm not sure exactly when he left the Sheriff's Office.
Q. And what is his reputation for truthfulness?
A. Mason is a good storyteller, but isn't known for his stories being very honest.
Q. Have you ever personally had any experience with that?
A. I can just remember stories that he had told from previous jobs he had worked. And you could just -- by the way he told the story, you could tell there were details in

it that were just too far out there to be true.

MR. WOOD: Pass the witness.

THE COURT: Thank you. Mr. Songer?

CROSS EXAMINATION

BY MR. SONGER:

Q. Good morning, sir.

A. Yes, sir.

Q. You testified a lot about this transport that you helped Deputy Berry with involving Justin Phillips, right?

A. Yes.

Q. I just want to be real clear. That's when Justin Phillips was transferred out to Crawford County, I think you said a day or two before he was brought back to Franklin County, correct?

A. Yes.

Q. And on that transport, you said when you got him to Crawford County, there were several officers there, I think you said, that met you and you just opened the door and he just got out, right?

A. Right.

Q. Just cooperatively walked out. When you dropped him off, when you left him at Crawford County, Justin Phillips didn't have any injuries on his body that you could see, right?

A. Not that I remember.

Q. Nothing on his face?
A. Not that I can remember.
Q. Right. And you weren't -- well, let me ask you this. Mr. Wood just asked you a whole bunch of like hypothetical, a parade of real risks that officers face?
A. Correct.
Q. An inmate could break through a divider, could reach into the front seat, could access a weapon, all those things?
A. Yes.
Q. Very real concerns, right?
A. Yes.
Q. But Justin Phillips didn't do any of those things while you were transferring him --
A. No, sir.
Q. -- to Crawford County, right?
A. No.
Q. And he cooperatively got out of the car when you got there?
A. I mean, yes.
Q. And you were not present when Justin Phillips was brought back to Franklin County a day or two later, right?
A. No.
Q. So fair to say that you don't know anything at all about how he was restrained during that trip?

A. Not on the way back, I don't.
Q. You don't know anything at all about it because you weren't there, correct?
A. Right.
Q. Is that right?
A. Yes.
Q. You don't know how Justin Phillips was acting during that transport?
A. No.
Q. You don't know what happened when they stopped at the Mulberry exit halfway back?
A. I don't know anything about that.
Q. No idea?
A. No, sir.
Q. But you did say that when you took Justin Phillips out to Crawford County a couple days earlier, that you heard rustling in the back seat, kind of struggling with his restraints, is that right?
A. Yes.
Q. And when you did that, you just continued on to Crawford County and dropped him off, is that right?
A. We were very close to the jail, so we just -- we were already in Alma, right there in between Alma and Van Buren. We were just a couple miles away.
Q. You didn't pull off the road?

A. No.
Q. You didn't pull off the road and go to the back seat to see what he was doing?
A. No.
Q. You didn't pull off the road, go to the back seat, and punch him seven times in the face?
A. No.
Q. You talked a lot about how you were trained?
A. Yes.
Q. I assume you received some training on use of force?
A. Yes.
Q. Were you trained never to use force to retaliate against inmates for something they had done earlier?
A. Right.
Q. That's a pretty basic rule in law enforcement, right?
A. Right.
Q. It's really important that officers follow that one?
A. Yes.
Q. Thank you, sir.
MR. WOOD: No questions.
THE COURT: All right. Is this witness free to go?
MR. WOOD: Yes, Your Honor.
THE COURT: Sir, thank you very much for your time. You're free to go.

Defense may call its next witness.

MR. WOOD: Joshua Starnes.

THE COURT: Sir, would you please pause right there and raise your right hand.

(Witness sworn)

THE COURT: Sir, if you would please come around our court reporter. Just going to wind around, take a seat in our witness box. Sir, you may remove your mask while testifying if you like, but you're not required to.

JOSHUA STARNES, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOD:

Q. Sir, could you please state your name for the record?

A. Yes. Joshua Starnes.

Q. And, Mr. Starnes, where do you currently work?

A. At the Franklin County Sheriff's Office.

Q. And how long have you been there?

A. Since June of 2017.

Q. Do you recall being on duty on September the 14th, 2017, when the Sheriff and Mason Berry brought Justin Phillips in?

A. Back from this county?

Q. Yeah. When they transported him from Crawford County back to Franklin County?

A. Yes.
Q. And what was your shift that evening, do you remember?
A. 3:00 p.m. to 11:00 p.m.
Q. And what was your job title then?
A. Dispatch and jailer.
Q. And as part of your jailer duties, what were you doing when they brought him in?
A. I was on my way out the door, actually.
Q. And so do you recall where they pulled up to the sally port?
A. Yes.
Q. Tell me what you observed once Mason Berry and the Sheriff pulled up to the sally port with Mr. Phillips.
A. What I had observed was, I remember them getting him out of their unit and bringing him in through the sally port. There's a hallway that goes from the sally port to our booking room, and then other hallways all the way back to the isolation tank where he was being held. And there was a struggle all the way there between him and a couple of other deputies that were there, and I think the Sheriff.
Q. When you observed this, did it appear that Mr. Phillips was being uncooperative?
A. Very, yes.
Q. When was the first time you actually laid eyes on him once they arrived? And that may be a bad question. Did

you see him once he got into the building or from the vehicle?
A. In the building. It was in the hallway in the window. There is a window about this size that I'm sitting in front of, in front of the hallway. Because there was a camera in the sally port, but I could not see them at that point.
Q. And did you observe him being uncooperative the entire time that they were transporting him?
A. The entire time that I could see him with my own eyes or on the camera, yes.
Q. Did you observe him -- well, let me ask you this. When I say uncooperative, tell me what you observed.
MR. SONGER: Can we be clear whether he's speaking of what he observed personally, or what he saw on a camera?
THE COURT: Can you lay that foundation, please?
Q. (By Mr. Wood.) While you were in the detention facility, you saw Justin Phillips through a window, correct?
A. Yes.
Q. And did you personally observe that, or were you looking at it on a camera?
A. No. I personally observed it through a window, yes.
Q. And so how exactly was Mr. Phillips acting while you were able to see him?

A. He was thrashing about. I don't know a good adjective. It would be more like a bull in a china shop. He was just thrashing around. And there was -- unwilling to be detained.
Q. Did you ever observe him running into walls?
A. That is possible.
MR. SONGER: Object, speculating about what's possible.
THE COURT: Sustained. That testimony, that answer will be stricken. The Jury should disregard it.
Q. (By Mr. Wood.) Could you hear Mr. Phillips?
A. Yes.
Q. And approximately how long did you get to observe him?
A. Less than 30 seconds.
Q. And then he went out of your view?
A. In front of the window with my own eyes, I saw him for two seconds. And then there was a window behind us to the booking window, and that was another two or three seconds. And the rest of that 30 was on camera.
Q. All right, then. And so where did they take him as far as you could see on camera?
A. To the isolation --
MR. SONGER: Object to him testifying what he saw on camera, not himself.
THE COURT: Overruled.

Q. (By Mr. Wood.) Were you viewing a live feed camera?
A. The camera was live at the time, yes.
Q. And when Mr. Phillips passed from your personal view to an area where he was on the camera, could you still see what he was doing?
A. Yes.
Q. And what did you observe on the camera?
A. It was very -- it was identical to what I saw through the window. It was thrashing about and being uncooperative with the law enforcement that was assisting him to the isolation tank.
Q. And on the camera, did they take him to this isolation tank, or did it just go off camera?
A. They took him to the isolation tank.
Q. Did they have any problems getting him in the isolation tank?
A. Not aside from the thrashing about. I don't -- I don't recall him giving them an issue once he was in the tank.

MR. WOOD: Pass the witness.

THE COURT: Thank you, Mr. Wood. Mr. Songer?

CROSS EXAMINATION

BY MR. SONGER:
Q. Good morning, sir.
A. Morning.

Q. You just shared with us a somewhat detailed account of what you remember Justin Phillips doing when he was brought to the jail on the night of September 14th.

Do you remember just almost exactly two weeks ago, you met with the FBI, or were interviewed about what you knew about this incident?

A. Uh-huh.

Q. July 21st, 2021?

THE COURT: Sir, you will need to answer yes or no.

THE WITNESS: Yes.

THE COURT: Instead of "uh-huh" or "huh-uh."

THE WITNESS: I apologize. Yes.

THE COURT: No problem.

Q. (By Mr. Songer.) You remember that meeting with the FBI just two weeks ago?

A. They came to my residence, yes.

Q. And you agreed to talk to them voluntarily, right?

A. Yes.

Q. And they explained to you that you have to be truthful if you chose to talk to the FBI. You knew that being a law enforcement officer too, right?

A. Yes.

Q. You can't lie to the FBI?

A. Yes.

Q. In fact, you know it's a crime to lie to the FBI, correct?
A. Yes.
Q. And you told them during that meeting two weeks ago that you cannot really remember the details of the night that Justin Phillips was brought back to Franklin County Jail, right?
A. I did tell him that, yes.
Q. Right. And you told him that you didn't have any interaction with Justin Phillips when they brought him to the jail because the other officers and deputies were able to take Phillips to the isolation cell without needing any help, correct? Do you remember saying that?
A. Yes.
Q. And then you emphasized again that you just don't recall much of anything about the night that Justin Phillips was brought in, right?
A. That's true.
Q. And to further show the FBI that you really didn't remember anything, you said that, you said, "Let me give you an example. I really like to eat carbs, but I can't even remember the last carb I ate. My memory is that bad." Do you remember saying that?
A. Yes.
MR. SONGER: That's all I have. Thank you.

THE COURT: May this witnessed be excused?

MR. WOOD: Your Honor, I have a couple follow-up questions.

THE COURT: All right.

REDIRECT EXAMINATION

BY MR. WOOD:

Q. Mr. Starnes, when the FBI showed up at your door a couple of weeks ago, were you sleeping?

A. Yes, sir.

Q. When had you gotten off work?

A. I got off at 8:00 a.m., as per usual. Home at around 8:30-ish.

Q. And when did they show up?

A. I couldn't recall.

Q. Would it be fair to say they woke you up from a dead sleep?

A. Yes.

Q. And in fact -- well, did you have any physical personal interaction with Justin Phillips?

A. No. No, sir.

Q. And how many officers were already escorting him to the isolation cell?

A. At least two and at least one jailer. There could have been more. This was a long time ago.

Q. And so did you feel that you needed to assist?

A. No.

MR. WOODd: That's all I have, Your Honor.

THE COURT: Is this witness free to go?

MR. WOOD: Yes, Your Honor.

THE COURT: Sir, thank you for your time. You're free to go.

THE WITNESS: Thank you, Your Honor.

THE COURT: Call your next.

MR. WOOD: Allison Testerman.

THE COURT: Ms. Testerman, if you would please come forward. Wind your way in between the two counsel tables. Pause about right there and raise your right hand.

(Witness sworn.)

THE COURT: Then if you would wind your way in front of this counsel table around our court reporter and take a seat in our witness box. Ma'am, while testifying, you are permitted to remove your mask, but you're not required to.

THE WITNESS: Okay.

ALLISON TESTERMAN, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOD:

Q. Good morning. How are you doing?

A. I'm great.

Q. Ma'am, would you please state your name for the record?
A. It's Allison Testerman.
Q. Ms. Testerman, where do you currently work at?
A. Crawford County Sheriff's Department.
Q. And what do you do there?
A. I'm a patrol sergeant.
Q. And did you work there back in September of 2017?
A. Yes, sir.
Q. And what was your job title back in September of 2017?
A. I was a detention deputy.
Q. And what does that mean?
A. I worked as a jailer taking care of inmates doing booking process, release processes, general jail procedures.
MR. WOOD: May I approach, Your Honor?
THE COURT: You may.
Q. (By Mr. Wood.) Ma'am, I've handed you a document that's identified as Defendant's Exhibit 13. Do you see that?
A. Yes, sir.
Q. On the bottom right-hand corner, do you see the green sticker that says "Defendant's Exhibit 13"?
A. Yes, sir.
Q. Can you tell me what this document is?

A. It's a booking report for Justin Phillips.
Q. And can you tell me who completed this booking report?
A. According to our records, I did.
Q. And can you tell me what date you booked Mr. Phillips into the Crawford County Detention Center?
A. September 13th, 2017.
Q. And does this document also tell you when he was released to Franklin County?
A. Yes, it will.
Q. If you look at the second -- is it on the second -- oh, that's the third page.
MR. WOOD: May I approach, Your Honor?
THE COURT: Yes.
Q. (By Mr. Wood.) Let me swap with you. This has actually got three of the pages instead of only two.
THE COURT: So this document isn't actually in evidence yet, so before we start testifying from it, we need to get it admitted.
MR. WOOD: Your Honor, I would move to admit this document number 13. It's been stipulated to by the parties and I would ask to be able to publish it.
THE COURT: Defendant's Exhibit 13 is how many pages in length?
MR. CARTER: Earlier, we were saying two. It's actually three, Your Honor. That's what Mr. Wood and I

have been discussing off the record here. And we have no objection to it being introduced.

THE COURT: The three-page exhibit, Defendant's 13, is received by stipulation.

(Defendant's Exhibit 13 received)

MR. WOOD: Thank you, Your Honor.

Q. (By Mr. Wood.) Ms. Testerman, looking at that document -- can we put this on the monitor, please?

Do you see the monitor there in front of you?

A. Yes, sir.

Q. This should be the same document that I've provided to you.

A. Yes, sir.

Q. So according to the booking report -- could we scroll down just a little bit -- he was booked in on September the 13th, 2017, correct?

A. Yes, sir.

Q. And you were the booking officer?

A. Yes, sir.

Q. So tell me -- scroll all the way back to the top. Tell me the process when an inmate comes into the Crawford County Detention Center.

A. When they come in, they come to our pre-booking. We do our initial pat down. We do a medical intake, a property intake, just ask what they come in with. Once we

get through that, if it's their turn to be booked, if there's not inmates before them to be booked, then they come right up to the counter. We ask them name, age, date of birth, social, all their bio info questions. And then we would move to what in this report would be our second page, which is our booking info is where we would click the booking time, the booking date.

Once we completed all of the booking side and the property entry, then we would move to taking the photos, signing all the paperwork. And then we would move -- if the inmate needed to make phone calls, we would let them make phone calls. And then we would move them to the back.

Q. As part of the intake process, do you take photographs of the inmates?
A. Yes, sir.
Q. And is that the standard practice and procedure of the County?
A. Yes, sir.
Q. And according to the document, he was released to Franklin County on what date?
A. September 14th.
Q. The next day?
A. Yes, sir.
Q. So as you sit here today looking at your booking report from your facility, the photographs of Mr. Phillips

would have been taken while booking in on the 13th, September the 13th?
A. Yes, sir.
MR. WOOD: Pass the witness.
THE COURT: Mr. Carter, you may inquire.
MR. CARTER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. CARTER:
Q. Sergeant Testerman?
A. Yes, sir.
Q. Did I botch your name?
A. Yeah.
Q. I did?
A. It's Testerman.
Q. Sergeant Testerman. My understanding is you work night shift?
A. I do.
Q. So this is like the middle of the night for you right now?
A. Yes.
Q. This booking report still -- well, let me ask you this. Do you remember booking this individual in, or are you just going off what you see in the report?
A. No, sir. I'm just going off what I see in the report.
Q. You have no memory whatsoever of this individual

coming into the jail or leaving the jail?
A. No, sir.
Q. In the photographs that you're looking at there on the booking report, there are no injuries on that individual, are there?
A. I don't understand the question.
Q. Let me make it bigger. Mr. Moon, well, I'll get to that in a second.
Read the address for me if you would off the top of the Crawford County Sheriff's Office booking report.
A. 4235 Alma Highway.
Q. Mr. Moon, if you would at this point -- can we please take this down? Mr. Moon, if you would please put up Government's Exhibit 16, page 2. And if you would zoom in, Mr. Moon, about midway down the page where it says, "Crawford County Detention."
Now, Sergeant Testerman, can you see Government's Exhibit 16?
A. Yes, sir.
Q. Do you recognize the address on Government's Exhibit 16?
A. Yes. It's our detention center's address.
Q. You can take down the explosion, but leave the exhibit up please, Mr. Moon.
Do you still have that booking report in front of you

there?
A. Uh-huh. Yes, sir.
Q. The booking report on, the third page, does it say what time Mr. Phillips was booked out of the Crawford County Detention Center?
A. It says 22:15.
Q. Mr. Moon, if you would please, the next entry down on Government's Exhibit 16, explode.
Can you see Government's Exhibit 16?
A. Yes, sir.
Q. Still the same address of the Crawford County Detention Center?
A. Yes, sir.
Q. And earlier, you said he was booked out at 22:16?
A. 22:15.
Q. 22:15?
A. Uh-huh.
Q. So 22:15 would be between 22:10 and 22:20, wouldn't it?
A. Yes, sir.
Q. Please take that down, Mr. Moon. Mr. Moon, if you would also put up Government's 2(a), please.
Sergeant Testerman, this is a blow-up of the photograph in the top right-hand corner of the booking report, isn't it?

A. Yes, sir.
Q. Do you see any injuries whatsoever on this individual in the picture?
A. No, sir.
Q. Will you please switch to 2(b), Mr. Moon.
And do you see any injuries on his side-view of this individual in Government's 2(b)?
A. No, sir.
Q. Mr. Moon, you can take that down.
So those photographs that we just talked about, they were certainly taken before it got dark on September 14th of 2017, weren't they?
A. Yes, sir.
MR. CARTER: Nothing further, Your Honor.
THE COURT: Thank you. Any follow up?

REDIRECT EXAMINATION

BY MR. WOOD:
Q. I may have missed that last question. Were the photographs on the booking photo taken on the 13th or the 14th?
A. They were taken on the 13th.
Q. Are you aware of any photographs that were taken on the 14th?
A. No.
MR. WOOD: That's all I have.

THE COURT: Anything further, Mr. Carter?

MR. CARTER: No, thank you, Your Honor. Please go get some sleep.

THE COURT: May this witness be excused?

MR. WOOD: Yes, Your Honor.

THE COURT: Ma'am, you are excused. You're free to go. Thank you for your time today.

THE WITNESS: Thank you, sir.

THE COURT: The defense may call its next witness.

MR. WOOD: That's all we have, Your Honor. We would rest.

THE COURT: All right. The defense has rested.

Does the government wish to call any rebuttal witnesses?

MR. CARTER: Your Honor, we'd like to approach on this because I think it will take our morning recess. Can we just approach?

THE COURT: Yes.

(bench conference)

MR. CARTER: Your Honor, at this time, the government would renew its motion to admit Government's 22 and 23. During the testimony of Zach English, they specifically asked him about the receipt of phone calls. That may also impeach Mason Berry's credibility with Zach

English. So in rebuttal, I would like to put on Government's 22 and 23, which are those phone records. In rebuttal, they wouldn't be entitled to notice at all on those. So I think now, because the door has been opened in their case, I can put Agent Ferguson on to elicit the testimony that I sought to do yesterday.

THE COURT: Specifically, what are you looking for? Just the one page or the whole thumb drive?

MR. CARTER: I would like to display the one page to the Jury, but I think the foundation for that is on the thumb drive and all of the records. But if we want to make it simple, I would be happy to just put in 23.

THE COURT: Mr. Wood?

MR. WOOD: Which one? Is that the 9-14 phone call, is that correct?

THE COURT: Yes.

MR. WOOD: Okay. The only thing he testified about was 9-13. He didn't talk anything about any 9-14 phone calls. He transported on the day before, the day that Phillips escaped. That's not the day of the phone records that you have provided. Those would have been a couple of days later. So I don't think that the information elicited from the witness has anything to do with phone records from a different day to Mason Berry.

MR. CARTER: I've made my argument, Your Honor.

THE COURT: Tell me what your argument is one more time.

MR. CARTER: All right. They elicited testimony from Zach English. I don't think the eliciting on their direct is very clear of what date they were talking about on when a phone call was received. They also impeached Mason Berry's credibility. This phone record now goes to bolster Mason Berry. It goes to impeach Zachery English, because he said they did not get a phone call. And they would not be entitled to the notice problems in a rebuttal case.

THE COURT: So is it the government's position that Zachery English was with Mason Berry at the hospital in Crawford County, and then taking --

MR. CARTER: That's what Mason Berry testified to, Your Honor.

THE COURT: Okay. That's not what this witness testified to, but I understand.

MR. CARTER: It's not, which is why I want to put on these records now.

THE COURT: Right. I think that that is fair rebuttal. The Court will receive the exhibit.

(Government's Exhibits 22(a) and 23 received)

THE COURT: I'd ask Mr. Wood if he would prefer that the thumb drive that has all of the data for the day

be received or only what's been marked as Exhibit 23. It has the one phone call at 8:46.

MR. WOOD: Can I confer with Mr. Prater?

THE COURT: Yes.

MR. WOOD: Your Honor, we would just go with the one phone call, would be fine.

MR. CARTER: Government's 23?

THE COURT: So 22(a) and 23?

MR. CARTER: 23 is only the certificate of authenticity. I don't see any reason to introduce it. I just wanted to, for the record, I move to introduce Government's 23 at this time. I think the foundation for it is laid through 22(a).

MR. WOOD: I would agree that if the Court rules that it will accept the exhibit, that I would stipulate to its foundation.

THE COURT: All right.

(bench conference concluded)

THE COURT: So back to our question. Does the government have a rebuttal case?

MR. CARTER: Your Honor, the United States would call Matt Ferguson.

THE COURT: Mr. Ferguson, you were previously sworn. You remain under oath. Would you please take a seat in our witness box.

MATTHEW FERGUSON, having been previously sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CARTER:
Q. Special Agent Ferguson, good morning.
A. Good morning, sir.
Q. Even though we have been sitting next to each other all morning.
A. Yes.
Q. Just state your name again for the record, please.
A. Matthew Ferguson.
Q. Yesterday, you testified about some things that you did to corroborate and verify Mason Berry's story. Do you remember that?
A. Yes, I do.
Q. And one of the things you said you did was obtained phone records, correct?
A. That is correct.
Q. Did you obtain phone records for September 14th, 2017, for Mason Berry?
A. Yes, I did.
Q. And what phone company were they from?
A. May I review the exhibit?
Q. Yeah. Please review Government's Exhibit 23.
A. It was AT&T, sir.

Q. Over the course of this investigation, did you learn what Mason Berry's telephone number was?
A. Yes, I did.
Q. What was that that number?
A. It was (479) 221-4848.
Q. And over the course of the investigation, did you learn what Sheriff's Boen's telephone was?
A. Yes, I did.
Q. And what is his telephone number?
A. (479) 209-7288.
Q. And you obtained records from AT&T for September 14th?
A. Yes, I did.
MR. CARTER: Your Honor, I don't know if we did it at side bar. If I didn't, I will do so now. I move to admit Government's Exhibit 23.
THE COURT: Pursuant to the record made at side bar, the Court will now admit Exhibit 23. The Court would note that it does so at this time because it finds it to be proper in rebuttal and that the record is appropriately received under 902.13 and/or 14, but principally through 902.11 and 803.6, and alternatively 807. Government's 23 is received.
(Government's Exhibit 23 received)
MR. CARTER: Thank you, Your Honor.
Q. (By Mr. Carter.) Mr. Moon, I'm not asking you to put

23 up yet. I'm asking you to put up the second page of Government's 16. And Mr. Moon, if you would please explode the first Crawford County Detention entry.
Special Agent Ferguson, do you have page 2 of Government's 16 in front of you?
A. I do.
Q. Do you recognize the address for the Crawford County Detention Center?
A. Yes, I do.
Q. Please, if you would, tell us what time that exhibit, Government's 16, indicates that Mason Berry was present at the Crawford County Detention Center?
A. Between the hour or the time of 20:13 and 20:52, which is 8:15 p.m. to 8:52 p.m.
Q. Mr. Moon, you can take that down. Please now replace it with Government's 23. Mr. Moon, if you would zoom in the far left area. That will work.
What are we looking at here, Special Agent Ferguson?
A. This is a single call pulled from the records that were subpoenaed from AT&T for Mason Berry's telephone.
Q. And what are we seeing there on 9-14?
A. You see that there was a phone call made, received from -- the originating number is the Sheriff's number, (479) 209-7288. The terminating number is the receiving number, the number on the receiving end, which is

Mason Berry's number, (479) 221-4848. The call occurred on 9-14-2017 at 20:46 CDT, which is the same as Central Time. And that is 8:46 p.m. And then the elapsed time is the time that the phone call took. And that is a six-minute and 19-second call.
Q. So if it's a six-minute and 19-second call, what time about would it have ended?
A. 8:52 p.m.
Q. Mr. Moon, please put Government's 16, page 2 back on the screen. Please explode the first Crawford County Detention entry. I'm sorry, the second Crawford County Detention.
That phone call, did it occur between these entries?
A. No. It occurred at 8:52. I believe it's the entry above that.
Q. I'm sorry. I had you do the wrong one.
So the call ended at what time?
A. 8:52 p.m.
Q. And what time did Mason Berry, according to this document, leave the jail?
A. 20:52, which is 8:52 p.m.
Q. So essentially the moment the phone call ended, Mason Berry left the Crawford County Jail?
A. That's correct.
MR. CARTER: Pass the witness, Your Honor.

THE COURT: Mr. Wood, you may inquire.
MR. WOOD: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WOOD:
Q. Can I have number 16 again, please. Thank you.
What date is this Exhibit Number 16 reflecting? I'm sorry, not the exploded part. Thank you.
What's the date of these entries?
A. I don't see a date, sir.
Q. Well, then how do you know that this is the day of those phone calls that you just testified about?
A. Based on the testimony of Mr. Berry.
Q. Based on the testimony. But you investigated this matter, right?
A. Yes, sir.
Q. My question is, what was the date of these entries?
THE COURT: Which page of Exhibit 16 are you displaying?
MR. WOOD: Page 2.
THE COURT: The second page?
MR. WOOD: That's my understanding yes, sir.
THE COURT: Okay.
A. I don't know that the page number is reflected on here.
Q. (By Mr. Wood.) What about the date?

A. That's what I'm saying. Not the page number. The date. I'm sorry. That's what I meant. I don't see the page number, or the date reflected on this page of the document.
Q. Where is the portion of this document that reflects the first time that Mason Berry transported Mr. Phillips to Crawford County?
A. Could I see page 1 of the document?
Q. Yeah.
A. I don't see the first time that he transported Phillips.
Q. But Mr. Berry's testimony was that he picked up Mr. Phillips from the Franklin County Detention Center and took him to Crawford County on this same day, correct?
A. That's correct.
Q. But you would agree with me that that trip is not on your exhibit?
A. That's correct.
Q. But his phone logs that stuff automatically, correct?
A. Yes.
Q. So if he showed up at the Crawford County Detention Center, or if he showed up at the Franklin County Detention Center to get Mr. Phillips, that should be on here, correct?
A. If it had occurred on that day, it would be on there.

Q. Exactly. If he would have actually went and got -- transported Mr. Phillips from Franklin County to Crawford County on the same day he brought him back as he testified, it would be on this record, wouldn't it?
A. Yes.
Q. In fact, Mr. Berry, pursuant to your investigation, did not go and get, or did not transport Mr. Phillips to Crawford County on the same day that him and the Sheriff brought him back?
A. That's correct.
Q. Well, any part of your investigation, when you were conducting that, cause you concern that one of your other government witnesses testified that he was actually transported up there on a different date than Mr. Berry said?
A. No, sir. Memory is like that. We don't always remember the dates things occur from years ago.
Q. But these were two or three days apart, correct?
A. I believe it's one day apart, sir.
Q. Well, did you actually go and research the Crawford County book-in stuff to find out that Mr. Phillips was booked in on the 13th, not the 14th?
A. Yes.
Q. So you were aware when Mr. Berry was testifying that he booked him into Crawford County, he took Phillips to

Crawford County on the 14th, was different and contrary to what the reports from Crawford County said?
A. I hadn't reviewed those reports in a year and a half since we received them through subpoena, sir.
Q. So it's your testimony that because you just simply forgot to review the reports, that you allowed Mason Berry to take the stand and testify to information that you knew was incorrect?
A. No, sir. I have no control of what Mason Berry said on the stand.
Q. But you knew that's what he was going to say?
A. No, sir.
Q. You did not interview him?
A. Yes, sir, I did.
Q. And he told you that he took Justin Phillips to Crawford County when he escaped, the same day he escaped, right?
A. Yes, sir.
Q. And he subsequently told you that on the way back, he got called back to Crawford County to go sit in the hospital with him, right?
A. That's correct.
Q. And then he subsequently told you that from the hospital, he took, with Zach English, he took Phillips from the hospital to Crawford County, right?

MR. CARTER: Your Honor, I object to the form of the question. I think there's a lot of questions going on in there.

THE COURT: Well, it is extremely compound.

MR. WOOD: I'll shorten it up.

THE COURT: You may proceed.

Q. (By Mr. Wood.) Through your investigation, did you determine that Mason Berry stated he took Justin Phillips from the hospital in Van Buren, after the hospital appointment was over, back to the Crawford County Detention Center?

A. Yes, I did.

Q. And that was still the same day that he had transported Justin to Crawford County initially?

A. That is how he remembered it.

Q. And then pursuant to your investigation, you determined that Mason Berry said he was coming back to Franklin County and he got a call from the Sheriff, or he was fixing to leave Crawford County, right?

A. Correct.

Q. Got a call from the Sheriff to come pick him up?

A. Yes.

Q. Your investigation concluded that Mason Berry then -- Mason Berry's statement would be, he picked up the Sheriff and they went back to Crawford County, correct?

A. That is correct.
Q. Now, we're still on the same day that Mason Berry allegedly transported Justin Phillips to Crawford County initially, correct?
MR. CARTER: Your Honor, I'm objecting because I think the defense is trying to get the Agent, the witness, to weigh Mason Berry's testimony, which is not this Agent's job. It's the Jury's job.
THE COURT: Sustained. This is improper. Move on.
Q. (By Mr. Wood.) Back to Government's Exhibit Number 16. Should Mason Berry's trip -- trips -- to and from Crawford County and the hospital be on this exhibit?
A. They are.
Q. Can you show me where?
A. Yes, sir. This is from September 14th, 2017. On page 2 of this document, you see about one-third of the way down, there's a red --
Q. I agree. My question now, or should have been, are his trips from Franklin County initially to Crawford County on this exhibit?
A. No, sir.
MR. WOOD: That's all I have, Your Honor.

REDIRECT EXAMINATION

BY MR. CARTER:

Q. Mr. Moon, please put up Government's 16, page 1.
I just want to clean up the record here a little bit. Special Agent Ferguson, what is the date of these records?
A. September 14th, 2017.
Q. And who provided you with these records?
A. Mason Berry.
Q. And did he provide you records for September 13th?
A. I don't believe so.
Q. When you're conducting an investigation and interviewing a witness, do you provide them with information that you know that your investigation has already received?
A. No. That would cloud the information.
Q. Any other reasons?
A. They might use that information and try to provide it back to me to make their -- to bolster their story or to make it sound true to me.
Q. So you rely on their memory?
A. Yes.
Q. And you don't do things to try to alter their memory?
A. No.
Q. You were asked many, many questions about when Justin Phillips was taken to Crawford County and who took him to Crawford County. Do you remember that?
A. Yes, I do.

Q. Has there ever been any dispute whatsoever in the evidence that you have gathered as to when Justin Phillips was taken from Crawford County back to Franklin County?

MR. WOOD: Objection.

THE COURT: What's the objection?

MR. WOOD: That is a complete mischaracterization of the testimony that we have received here. His investigation facts have indicated that there was an issue of when Justin Phillips was transported. Mason Berry said it happened all in the same day. Justin Phillips says it happens two or three days apart. And Crawford County says it happens a couple of days apart.

MR. CARTER: Judge, that's not the question I asked.

THE COURT: So there have been various witnesses testify. It's going to be up to the Jury to sort out what the facts are in this case.

The question on the table that I would ask that Mr. Carter rephrase is about this witness's understanding of the facts.

Q. (By Mr. Carter.) What day do you understand that Justin Phillips was taken back to Crawford County (sic) and attacked by the defendant?

MR. SONGER: Franklin County.

A. September 14th, 2017.

Q. (By Mr. Carter.) And did you find in your investigation any evidence whatsoever to contradict that date?
A. No, I did not.
Q. In fact, did you find a lot of evidence, including these phone records, that reinforced that date?
A. Yes, I did.
MR. CARTER: Nothing further, Your Honor.
THE COURT: All right. Any further cross?
MR. WOOD: No, Your Honor.
THE COURT: Mr. Ferguson, you may stand down.
THE WITNESS: Thank you, Your Honor.
THE COURT: Any further rebuttal witnesses?
MR. CARTER: The government rests its rebuttal case, Your Honor.
THE COURT: Mr. Wood, any surrebuttal?
MR. WOOD: No, Your Honor.
THE COURT: All right. Ladies and Gentlemen, the case is now, the evidence portion of the case is now entirely submitted.

What's going to happen next is the Court will instruct you as to the law, then you will hear closing arguments, and then you will retire to deliberate.

We do need some time to get some things in order, so what I'm going to do is, we're going to have an extended

lunch break. But I would like for everyone to be back in your jury room by say about 12:25 so that we can start promptly at 12:30.

I'll remind you of the recess instruction. Do not speak with anyone, including your fellow jurors, about the facts of this case. You may not do that until after I have told you that it is time to deliberate, and we're not there yet. Do not let anyone else approach you and talk to you about the case. Do not read anything in print or television news media about the case. Don't read anything on social media. Don't do any of your own research.

And with that, the Court will be in -- well, the Jury is recessed until 12:30. Court will remain in session. Everyone please stand as the Jury exits.

(Jury out at 10:39 a.m.)

THE COURT: You may be seated. What is the next Court's Exhibit Number in order?

MS. CRAIG: Four.

THE COURT: Court is going to mark as Court's Exhibit Number 4 the 902.11 certificate of authenticity. This goes with Government's Exhibit 23. That will be for the Court record.

(Court's Exhibit 4 received)

THE COURT: Mr. White, I believe, e-mailed everyone last night with the Court's final-final set of

instructions. At the moment, he is retrieving a printed copy of those, if you haven't had a chance to print them. I don't think he's yet had a chance to make an adjustment to the instructions that are contingent upon whether Mr. Boen would testify or not, but we understand that that instruction will need to be altered.

So we will obviously, on final instruction number 4 in yellow highlight at the bottom, and then obviously, the red language in the bracket, that will come out because the defendant did not testify.

Then if you flip over to instruction number 5 at the bottom in yellow where it says, "Accordingly, the fact that Mr. Boen did not testify must not be considered by you in any way or even discussed in arriving at your verdicts." Now, the notes to Eighth Circuit Model Jury instruction 3.06 indicate that this instruction is proper, but only if the defendant wants the Jury instructed with this provision.

What is your preference, Mr. Wood?

MR. WOOD: We would request that instruction, Your Honor.

THE COURT: So we will include the yellow highlighted language on the Court's final-final draft of jury instructions.

So we could take up any further record at this

time on the jury instructions, or we could take a convenience break, give you time to collect your thoughts and come back in 10 minutes or so and do this, but what I'm shooting for is to have our jury instruction conference. I think we're very close, based on what you all told me yesterday. Then I can let you all go to lunch, get ready for your closing arguments, that sort of thing, while we print. There's a lot of printing involved here.

So are you prepared to go forward right now with the jury instruction conference, or would you like 10 minutes to kind of collect your thoughts?

MR. CARTER: We completely agree with the submitted jury instructions we received last night. We have no changes to them. We have no instructions to proffer, Your Honor.

THE COURT: All right. Mr. Wood, what is your position or would you like 10 minutes?

MR. WOOD: I don't need 10 minutes, Your Honor.

We would proffer the previous instruction that we provided to the Court.

THE COURT: Was this your justification use of physical force by law enforcement officers?

MR. WOOD: Correct, Your Honor.

THE COURT: I'm going to hand what's in my notebook. Just want to be sure it's the right one.

MR. WOOD: Yes, Your Honor.
THE COURT: All right. So we will find the copy that you were -- well, I will delete all of the red information at the bottom and we will mark that as -- it's Court's Exhibit 5, but it will also be marked as defendant's proffered instruction number 1.
(Count's Exhibit 5 Received)
MR. WOOD: And so that I think I'm clear for the record. We had offered that as a stand-alone jury instruction and/or discussed with the Court that it would be -- the Court would consider incorporating that into the objectively unreasonable element of its final. We had requested one or the other, and the Court denied that request. So I just wanted to make sure that we had that on the record that it was either/or, that the Court denied both of those requests, in case that matters at all.
THE COURT: And do you have a proffered instruction on the alternative incorporation?
MR. WOOD: I don't think we ever actually proffered that. It's my memory that the Court said that it would consider either a stand-alone, or the Court would incorporate it into its instructions if it determined that it was appropriate.
THE COURT: I'm just trying -- we've got the proffered, Defendant's proffered 1 as a stand-alone.

There's a lot of paperwork going back and forth. Just wanted to be sure that there's not a separate proffer on this same topic that you would like to put in the record at this time.

MR. WOOD: I'm sorry. There's not a separate proffer. Like I said, as I understood, the Court took it under advisement and said, if I decide it's not stand-alone, I will decide if it should be incorporated. And the Court didn't do that. And so I assume that both of those were denied, but we did not provide a subsequent alternative to the objectively unreasonable element.

THE COURT: So just that the record is clear. Defendant's proffered number 1, we've got that.

Anything else on any other aspect of the instructions?

MR. WOOD: No, Your Honor. All the other instructions are acceptable to the defense.

THE COURT: All right. So the Court is rejecting Defendant's proffered instruction number 1 because a defendant is generally not entitled to instruct the Jury on a state statutory affirmative defense in a federal criminal case where the right in question is one guaranteed by the Federal Constitution.

To the extent that this state law defense might create different rights than those established by the

Federal Constitution for pretrial detainees, for example, it would be preempted by the Federal Constitution.

However, if this state law justification defense is being offered to reframe, restate, incorporate, et cetera, the federal rights afforded to pretrial detainees vis-a-vis what constitutes reasonable versus unreasonable force, if that's the idea of this proffered instruction, the Court finds that that concept is duplicative to the Court's set of instructions and is therefore unnecessary, and for those reasons will not be given.

Very good. We have now completed our jury instruction conference. The Court will mark its discussion draft of instructions with all of the annotations as Court's Exhibit 6. The Court will mark the draft final-final instructions that we've all been looking at just now as we had our jury instruction conference, so that's Court's Exhibit 7. As I explained earlier, the Court will also be preparing a Jury copy of the instructions. Those will be identical to the Court's final-final set that we're looking at now, save and except the revisions that we've mentioned. They will not have any annotations at the bottom. And as soon as we get that printed, we will mark that as Court's Exhibit 8.

(Court's Exhibits 6-8 received)

THE COURT: I believe we agreed on an hour, up to

one hour each. The government can reserve up to 20 minutes, but no more than 20 minutes. So if you only use 30 minutes in your opening, you still just are going to have 20 minutes on rebuttal.

MR. SONGER: I'll make sure I will keep speaking until 40 minutes. Thank you.

THE COURT: I was afraid that wouldn't be a problem.

Where would the attorneys like to present closing arguments from? The smaller podium that we did opening statements, or the big lectern? The big lectern, you're going to be able to have the telestrator and the Elmo. The smaller one, you're not. But then again, ya'll have computers at the table, so tell me what your preference is.

MR. WOOD: Your Honor, my preference would be the large one so that I could have the Elmo and everything right there and draw and do all that cool stuff.

MR. CARTER: Over there, you're not behind glass.

THE COURT: Well, you're going to be behind glass. That's the purpose of my question. Mr. Wood would like to use the big podium. If that mis-puts you, I suppose we can let you use a different one, but I will move a plexiglass partition in front of you.

MR. SONGER: Okay, Your Honor. If we will be behind plexiglass partitions either way, I'm happy to use

the one that's already set up.

THE COURT: All right. Anything else that the parties would like to take up?

MR. SONGER: I'm sorry, Your Honor. I just didn't hear you.

THE COURT: Please be ready to go. I intend to have the Jury in their seats at 12:30. I'll read the instructions, and then we'll go right into closing arguments. We're in recess.

(recess taken from 10:52 a.m. to 12:33 p.m.)

THE COURT: Everyone should have a copy of the jury set of the jury instructions. Would the attorneys like a five-minute warning? Sheri will keep time. You've already --

MS. CRAIG: I've already talked to them.

THE COURT: Trying to do Sheri's job for her.

MS. CRAIG: Thank you.

THE COURT: Everyone please remain standing while we bring the Jury in.

(Jury in at 12:33 p.m.)

THE COURT: Everyone may be seated.

So all of the evidence has now been received. The Court will now give you its final jury instructions and then we will hear closing arguments.

In your seat, you should find a written copy of

the final jury instructions. This is your copy to keep. You may take it back to the jury room with you for deliberations. In a few minutes, I will be explaining about the verdict forms. We're only going to send one copy of the verdict forms back to avoid confusion, but this copy is your very own copy.

Members of the Jury, the instructions I gave you at the beginning of the trial and during the trial remain in effect. I will now give you some additional instructions. You must, of course, continue to follow the instructions I gave you earlier, as well as those I give you now. You must not single out some instructions and ignore others because all are important. This is true even though some of those I gave you at the beginning of the trial are not repeated here.

The instructions I am about to give you now are in writing and will be available to you in the jury room. I emphasize, however, that this does not mean that they are more important than my earlier instructions. Again, all instructions, whenever given and whether in writing or not must be followed.

Instruction number 2. It is your duty to find from the evidence what the facts are. You will then apply the law as I give it to you to those facts. You must follow my instructions on the law even if you thought the

law was different or should be different.

Do not allow sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you.

Instruction number 3. I have mentioned the word evidence. The evidence in this case consists of the testimony of witnesses, documents and other things received as exhibits, and the facts that have been stipulated, that is, formally agreed to by the parties.

You may use reason and common sense to draw deductions or conclusions from facts which have been established by the evidence in this case. But certain things are not evidence and I will list those for you again now.

Number one, the statements, arguments, questions and comments by lawyers representing the parties in the case are not evidence.

Objections are not evidence. Lawyers have a right to object when they believe something is improper, but you should not be influenced by the objection. If I have sustained an objection to a question, you must ignore the question and must not try to guess what the answer might have been.

Number three, any testimony that I struck from

the record or told you to disregard is not evidence and must not be considered.

Number four, anything you saw or heard about this case outside the four walls of this courtroom is not evidence.

Finally, if you were instructed that some evidence was received for a limited purpose only, you must follow that instruction. And when we get to it in a moment, there are two such instructions recaptured in the final instructions.

Number 4, in deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness said, or only part of what a witness said, or you may not believe anything a witness said.

In deciding what testimony to believe, consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with any evidence that you do believe.

In deciding whether or not to believe a witness,

keep in mind that people sometimes hear or see things differently and sometimes forget things. You need to consider therefore whether a contradiction is an innocent misrecollection or a lapse of memory or an intentional falsehood. And that may depend on whether it has to do with an important fact or only a small detail.

Number 5, the indictment in this case charges Mr. Boen with three crimes. Specifically, Mr. Boen is charged with three counts in the indictment.

Count One asserts that Mr. Boen, on or about September 14th, 2017, deprived Justin Phillips of his Constitutional rights by using unreasonable force.

Count Two asserts that Mr. Boen, on or about November 21, 2018, deprived Brandon English of his Constitutional rights by using unreasonable force.

And Count Three asserts that Mr. Boen, on or about December 3, 2018, deprived Zachary Greene of his Constitutional rights by unreasonable force.

Mr. Boen has pleaded not guilty to these charges.

The indictment is simply the document that formally charges Mr. Boen with the crime or crimes for which he is on trial. The indictment is evidence of nothing. At the beginning of the trial, I instructed you that you must presume Mr. Boen to be innocent. Thus, the defendant began the trial with a clean slate with no

evidence against him. The presumption of innocence alone is sufficient to find Mr. Boen not guilty and can be overcome only if the government proved during the trial, beyond a reasonable doubt, each element of the crime charged. Keep in mind that each of the three counts charges a separate crime. You must consider each count separately, and return a separate verdict for each count.

There is no burden on Mr. Boen to prove that he is innocent. Instead, the burden of proof remains on the government throughout the trial. Accordingly, the fact that Mr. Boen did not testify must not be considered by you in any way, or even discussed, in arriving at your verdicts.

Number 6. This pertains to Count One. The crime of deprivation of rights under color of law as charged in Count One of the indictment has four essential elements which are:

One, that on or about September 14, 2017, Mr. Boen deprived Justin Phillips of a right, privilege, or immunity secured by the Constitution or the laws of the United States; that is, the right of a pretrial detainee to be free from a law enforcement officer's use of objectively unreasonable force by punching Justin Phillips multiple times in the head and body while Justin Phillips was handcuffed and shackled in the back of a patrol vehicle and

was not resisting.

Two, that Mr. Boen acted willfully, that is, Mr. Boen committed such act or acts with a bad purpose or improper motive to disobey or disregard the law, specifically intending to deprive the person of that right.

Three, that Mr. Boen acted under color of law.

And four, that bodily injury resulted from Mr. Boen's conduct.

The parties have stipulated that the third element, which again is whether Mr. Boen acted under color of law, is proved. You should therefore consider this third element proved beyond a reasonable doubt.

If all of these elements have been proved beyond a reasonable doubt as to Mr. Boen, then you must find Mr. Boen guilty of the crime charged under Count One, otherwise, you must find Mr. Boen not guilty of this crime under Count One.

Instruction number 7. This pertains to Count Two. The crime of deprivation of rights under color of law as charged in Count Two of the indictment has four essential elements, which are:

One, that on or about November 21, 2018, Mr. Boen deprived Brandon English of a right, privilege, or immunity secured by the Constitution or the laws of the United States, that is, the right of a pretrial detainee to be

free from a law enforcement officer's use of objectively unreasonable force by ordering Brandon English brought to a detective's office, pushing Brandon English onto the floor, and grabbing Brandon English's hair or beard.

Two, that Mr. Boen acted willfully, that is, Mr. Boen committed such act or acts with a bad purpose or improper motive to disobey or disregard the law, specifically intending to deprive the person of that right.

And three, that Mr. Boen acted under color of law.

And four, that bodily injury resulted from Mr. Boen's conduct.

The parties have stipulated that the third element, which is whether Mr. Boen acted under color of law, is proved. You should therefore consider this element proved beyond a reasonable doubt.

And if all of the elements have been proved beyond a reasonable doubt as to Mr. Boen, then you must find Mr. Boen guilty of the crime charged under Count Two, otherwise, you must find Mr. Boen not guilty of this crime under Count Two.

Instruction number 8. This pertains to Count Three. The crime of deprivation of rights under color of law as charged in Count Three of the indictment has four essential elements, which are:

One, that on or about December 3rd, 2018, Mr. Boen deprived Zachary Greene of a right, privilege, or immunity secured by the Constitution or laws of the United States; that is, the right of a pretrial detainee to be free from a law enforcement officer's use of objectively unreasonable force by striking Zachary Greene multiple times in the head while Zachary Greene was shackled to a bench in the Franklin County Jail and was not resisting.

Two, that Mr. Boen acted willfully, that is, Mr. Boen committed such act or acts with a bad purpose or improper motive to disobey or disregard the law, specifically intending to deprive the person of that right.

Three, that Mr. Boen acted under color of law.

Four, that bodily injury resulted from Mr. Boen's conduct.

The parties have stipulated that the third element, which is whether Mr. Boen acted under color of law, is proved. You should therefore consider this element proved beyond a reasonable doubt.

If all of these elements have been proved beyond a reasonable doubt as to Mr. Boen, then you must find Mr. Boen guilty of the crime charged under Count Three, otherwise, you must find Mr. Boen not guilty of this crime under Count Three.

Next is instruction number 9. This is an

instruction that pertains to the first element of each of the counts. The first element of the offenses charged in Counts One, Two, and Three requires the government to prove beyond a reasonable doubt that Mr. Boen deprived the victims identified in the indictment of a right secured or protected by the Constitution or laws of the United States.

The indictment alleges that Mr. Boen deprived those victims of their rights to due process of the law, which includes the right of a pretrial detainee to be free from the use of objectively unreasonable force.

Under the 14th Amendment of the United States Constitution, a pretrial detainee, which is an individual who has been arrested for violating the law, but who has not yet been convicted of the crime for which he has been arrested, such pretrial detainee has the right to be free from a law enforcement officer's use of objectively unreasonable force while he is awaiting trial.

The use of force against a pretrial detainee violates the 14th Amendment if it is excessive under objective standards of reasonableness. If you determine that Mr. Boen used physical force against the victims identified in the indictment, you must then decide whether that force was reasonable. Unreasonable force is physical force that exceeds the objective need to use such force. Although a law enforcement officer may use force if there

is an objective basis to do so, he may not use more force than is reasonably necessary under the circumstances.

An officer may not use force solely to punish, retaliate against, or seek retribution against another person. An officer may not use force merely because a detainee questions an officer's authority, insults the officer, uses profanity, or otherwise engages in a verbal provocation unless the force is otherwise objectively reasonable at the time it is used.

In determining whether the force used was reasonable under all the facts and circumstances, keep in mind that force that is objectively reasonable at the beginning of an encounter may not be justified even seconds later if the objective justification for the initial use of force has been eliminated.

You should make this determination considering all of the facts and circumstances from the point of view of an ordinary and reasonable officer on the scene. In making your determination, you may consider the severity of the crime, if any, committed by the victims identified in the indictment. The extent, if any, to which the victims identified in the indictment posed a threat to the safety of the defendant or to any other person at the time that the force was used.

The extent, if any, to which the victims

identified in the indictment were physically resisting or attempting to flee at the time the force was used. The need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether a reasonable officer on the scene, without the benefit of hindsight, would have used that much force under similar circumstances. You must decide whether the officer's actions were reasonable in the light of all of the facts and circumstances confronting the officer.

Instruction number 10. This pertains to the second element of the counts charged. The second element of the offenses charged in Count Two, in Counts One, Two and Three, requires the government to prove beyond a reasonable doubt that Mr. Boen acted willfully.

To find that the defendant acted willfully, it is not necessary for you to find that the defendant knew the specific Constitutional provision or federal law that his conduct violated. You may find that Mr. Boen acted willfully even if you find that he had no real familiarity with the Constitution or with the particular Constitutional right involved. However, you must find that Mr. Boen had a specific intent to deprive the victims of a right protected by the Constitution or federal law.

Instruction number 11 is applicable to the fourth

element of the counts in the indictment. The fourth element of the offenses charged in Counts One, Two, and Three requires the government to prove beyond a reasonable doubt that bodily injury resulted from Mr. Boen's conduct. The term quote, "bodily injury," close quote, means A), a cut, abrasion, bruise, burn, or disfigurement. B), physical pain. C), illness. D), impairment of a function of a bodily member, organ, or mental faculty. Or E), any other injury to the body, no matter how temporary.

Instruction number 12. You have heard evidence during the trial about a use of force policy in place at the Franklin County Jail relating to the use of force by detention officers. You should not consider this use of force policy when you decide whether the defendant's use of force was objectively reasonable or unreasonable, but you may consider the use of force policy when you decide whether the defendant's actions were willful.

Number 13. You have heard evidence during the trial about an inmate's rights policy in place at the Franklin County Jail relating to the treatment of inmates. You should not consider this inmate's rights policy when you decide whether the defendant's use of force was objectively reasonable or unreasonable, but you may consider the inmate's rights policy when you decide whether the defendant's actions were willful.

Number 14. Reasonable doubt is a doubt based upon reason and common sense and not doubt based on speculation. A reasonable doubt may arise from careful and impartial consideration of all the evidence or from a lack of evidence. Proof beyond a reasonable doubt is proof of such a convincing character that a reasonable person, after careful consideration, would not hesitate to rely and act upon that proof in life's most important decisions. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of Mr. Boen's guilt. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

Number 15. Intent or knowledge may be proved like anything else. You may consider any statements made or acts done by Mr. Boen and all the facts and circumstances in evidence which may aid in a determination of Mr. Boen's knowledge or intent. You may, but are not required to, infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

Instruction number 16 is what I call the deliberation instruction, and this pertains to how you will go about doing your business in the jury room. I'm going to save a reading of this instruction until after closing arguments.

We will first hear closing arguments from the

government. The government has the burden of proof, as you have heard, so they get to make an initial closing argument, and then they will be permitted some additional time to provide a rebuttal closing argument.

Mr. Songer, you may proceed.

MR. SONGER: Thank you, Your Honor.

"If you live through this, you'll never forget it." That's how the defendant taunted Justin Phillips moments before he slammed his fist into Justin's face, sending blood gushing out of his mouth. That's how the defendant taunted Justin while he was handcuffed, with his feet shackled, sitting in the back of the patrol car, completely defenseless. "If you live through this, you will never forget it."

Justin Phillips lived through the defendant's beating, and he didn't forget it. You saw his emotion on the stand as he told you about the fear he felt while his eyes were swollen shut and he could taste blood in his mouth. And the officers who saw the defendant beat Justin and the other two victims in this case never forgot it either.

Deputy Mason Berry never forgot the sick feeling in his stomach when the defendant ordered him to pull off on a dark exit ramp late at night. Deputy Berry told you that watching the defendant beat Justin was like a scene

out of a horror movie.

Deputy Dalton Miller never forgot seeing the defendant bash Zach Greene in the head while Zach was chained to a metal bench in the jail shower room, not doing anything. Detective Travis Ball never forgot seeing the defendant beat Zachary neither. Just a few minutes before Dalton Miller got there, Detective Ball saw the defendant bash Zach in the head four or five more times with a closed fist while Zach was still on the ground, shackled to that same metal bench.

And Detective Ball and Detective Kevin Hutchison never forgot seeing the defendant slam Brandon English to the ground and rip his hair while Brandon was just sitting calmly in a chair in the detective's office.

Now, when the FBI started investigating those assaults, the defendant went to those officers and tried to get them to forget what they had seen. You heard the recorded calls where the defendant reminded officers that there's nothing on camera. You heard officers Berry, Miller, Ball, and Hutchison all tell you that the defendant pressured them to stay quiet about what they had seen. But the officers who witnessed the defendant's crimes refused to stay quiet because they knew that it's wrong to beat inmates who are compliant and not doing anything. It violated their training and what they stood for as law

enforcement officers. All those officers came forward because they never forgot the sick feeling they had when they watched the defendant, their boss, who had taken the same oath to uphold the law that they had taken, blatantly abuse his power and assume that he would get away with it, because he was the Sheriff. It offended Deputy Berry and Deputy Miller so much that they left the Sheriff's Office. It made Detective Ball so upset that he worked up the nerve to go into the FBI office and report one of his closest friends, someone he told you was like family to him.

Now, those officers knew the people the defendant beat up were not angels. They had all been arrested and taken to jail, and no one in this courtroom will tell you differently. But those officers told you that they deal with difficult people all the time. That's part of the job. And the officers told you that Justin, Zach, and Brandon weren't doing anything wrong at the time the defendant assaulted them. This is not a case where an officer had to use force in response to a legitimate threat and maybe went a little too far. You are not being asked to second guess an officer's split-second decision. The defendant didn't use force in response to a threat. He didn't use force in self-defense. He planned his beatings in advance. He was a bully with a badge.

The officers who witnessed the defendant's

beatings were so upset by them that they came forward, even though the defendant is a powerful man. And the defendant banked on that power. He thought he could beat up inmates he didn't like and get away with it, because the officers who worked for him would be too scared to say what their boss had done. You know what really happened, because all those officers had the courage to come forward and testify against the boss. From new jail officers, to young patrol deputies, all the way up to senior detectives and the Chief Deputy Sheriff in the department, all those officers came forward because they knew the defendant abused his power and tried to place himself above the law.

Those officers knew that the defendant did a disservice to all the law enforcement officers who put on their uniforms every day to protect and serve. Not to beat people who are handcuffed and shackled and defenseless.

Now, I'd like to take a few minutes to talk to you about how the law that Judge Brooks just instructed you on fits together with the facts that you heard in court this week. I apologize for our government technology.

As you heard, the defendant is charged with three different crimes in this case. Those are called counts. Count One is the beating of Justin Phillips in the back of the car. Count Two is the assault on Brandon English while he was sitting in the detective's office. And Count Three

is the beating of Zach Greene in the shower room.

Now, each of those counts is made up of different parts or elements which the Court just explained to you. And the evidence you heard this week proves each one of those elements beyond a reasonable doubt.

So number one, the first element you have to find is that the defendant acted under color of law. As the Court has explained, the parties have agreed that element is proven, so you can set it aside.

Number two is that the defendant deprived each of the victims of a right protected by the United States Constitution.

Number three, the defendant acted willfully.

And number four, that the defendant caused each of the victims some type of physical bodily injury.

Now, since that first element is already proven, let's start with the second one, that the defendant deprived each of the victims of a right protected by the United States Constitution. Now, the right at issue here is the right of Justin, Zach, and Brandon to be free of officers using unreasonable force against them. Everyone knows that law enforcement is a really tough job, and there are absolutely situations where officers have to use force in response to a legitimate threat. But the officers who testified this week who witnessed the defendant's crimes

told you that they are trained never to use force to punish someone or to retaliate based on something that happened earlier. And that's because using force to punish someone is a crime. And the evidence shows that's exactly what the defendant did.

So let's go through the three counts one at a time. Count One is Justin Phillips. You heard Justin describe how the Sheriff beat him in the face until his eyes were swollen shut with blood. But you don't have to only take Justin's word for it. Deputy Mason Berry was right there. He saw the entire beating. And even though Justin and Deputy Berry are not friends, and they have never talked about what happened, in fact, Justin is even suing Deputy Berry right now, they still agreed on all of the key points when they testified.

They both told you that on that transport back to Franklin County the night of September 14th, the defendant cursed at Justin and threatened him while drinking alcohol. They even both remembered that the defendant was drinking out of a Yeti cup. They both told you the vehicle pulled off on the Mulberry exit on I-40 and drove off the exit ramp. They both remembered that it was late at night, that there were no people around. They both told you Justin was just sitting in the back seat, handcuffed and shackled, not causing any trouble. They both told you that as soon as

the car stopped, the defendant jumped out, ran around to the passenger side, and beat Justin's face in while he wasn't doing anything. And they both agreed that Deputy Berry eventually stopped the defendant's attack.

Justin Phillips told you on the stand that Deputy Berry saved his life. There was blood everywhere. Deputy Berry said it looked like a scene from a horror movie. Now, the defense will have a chance to stand up in a few minutes, and I expect they will argue to you that you shouldn't believe that testimony, because four years later, not every single detail in Deputy Berry and Justin Phillips' stories perfectly line up. For example, whether Deputy Berry correctly remembered bringing Justin Phillips out to Crawford County originally before the beating on September 13th or September 14th. Or whether during the first part of the beating, Deputy Berry held Justin's head to help the defendant hit him in the face before he broke it up.

But none of those differences have anything to do with both of those witnesses' crystal-clear descriptions of what the defendant did on the night of September 14th as they drove back to Franklin County. They both were crystal clear that it was the defendant pounding his fist into Justin's face while Justin was in handcuffs and shackles. They were both crystal clear that the defendant had

committed a crime.

Now, you know there was no legitimate law enforcement reason for that beating because the defendant planned it in advance. Deputy Berry told you that he could have taken Justin back to Franklin County earlier that night. Deputy Berry was already in the parking lot of the Crawford County Jail where Justin was when the defendant called him and asked, "Are you alone?" Then the defendant said that he wanted to be the one who took Justin back to Franklin County. The defendant ordered Deputy Berry to drive 45 minutes to go pick him up and turn around and drive all the way back to where Deputy Berry already was standing so that they could get Justin Phillips together and the defendant would have a chance to beat him late at night before he got back to Franklin County.

And Deputy Berry told you how he knew that that was the defendant's plan. The defendant told him so right there in the car on the way to the beating. The defendant said he was going to teach Justin a lesson for trying to escape from the Franklin County Jail a few days earlier. And that's exactly what he did.

You also know there was no legitimate reason for that beating because the defendant pressured Deputy Berry to cover it up. The defendant pressured Deputy Berry to write a false report, and then he gave him a huge

promotion, all the way to Chief Deputy, as soon as Berry wrote it. Now, Berry was an inexperienced patrol deputy. He had been a road deputy for two years. He obviously wasn't qualified to be the number two officer in the entire Sheriff's Office. It was payback for writing a false report to cover up the boss's crime.

Then two years later, when the defendant learned that a Grand Jury was investigating that incident, he called up Deputy Berry, the first time they had talked in nearly a year, to make sure that Deputy Berry would keep covering for him. You heard the defendant's voice on that call trying to get Deputy Berry to say that, "Didn't Justin have a handcuff off when we were taking him?" Berry responded, "Don't get me lying." And you heard how the defendant responded when Berry said, "Don't get me lying." The defendant didn't say, "What are you talking about, man? You're not lying. That's exactly what happened." He didn't say anything like that. When Deputy Berry said, "Don't get me lying," the defendant responded, "Yeah, so." Then he reminded Deputy Berry that the camera in his car wasn't working that night and said, "It was just me and you there."

(Government's Exhibit 10 excerpt played as follows:)

VOICE NUMBER 1: But they're gonna call you into

their office, I'm sure, and want to talk to you about it.

VOICE NUMBER 2: Okay.

VOICE NUMBER 1: So, I mean, we need to -- I don't remember. Actually, I can't even remember what was said, either on the radio or -- I know we pulled over to the side of the road. Did he have one of his cuffs off or -- I can't remember.

VOICE NUMBER 2: Man, I -- don't even get me lying.

VOICE NUMBER 1: Yeah. So --

VOICE NUMBER 2: Okay. Well --

VOICE NUMBER 1: But, I mean, it was just me and you there so --

VOICE NUMBER 2: Yeah.

VOICE NUMBER 1: I mean, there wasn't -- the camera didn't work in your car either, did it?

(end of audio)

MR. SONGER: Those are not the words of a man who had a legitimate law enforcement reason for what he had done. Those are the words of a man who was trying to cover up a beating.

So now let's talk about Count Two, the assault on Brandon English. Just like with Justin Phillips, you heard from the victim, Brandon, and from all the officers who were on the scene with the defendant, Detective Ball and

Detective Hutchison. And they all described what happened pretty much the same way. They all told you there was no legitimate reason for the defendant to lunge at Brandon. The defendant was frustrated that Brandon wouldn't answer the detective's questions about those thefts they were investigating, so instead of respecting his right to remain silent, he told Detective Hutchison to go get Brandon and put him in the detective's office, a small room with no windows and no cameras.

Brandon and both detectives told you what happened moments later. While Brandon sat calmly in a chair, the defendant lunged at him, slammed him to the ground, and ripped out some of his hair. Brandon slammed his head against the hard floor. And the detectives told you that Brandon did nothing to provoke that attack. He was just sitting there. The defendant was just a bully. He assaulted Brandon to teach him a lesson for not talking to his detectives.

Now let's talk about Count Three, the assault on Zach Greene inside the shower room. Now, the defendant beat Zach twice that night a few minutes apart. And one again, the other officers who were on the scene make absolutely clear what happened. The defendant beat Zach because he was mad that he got called back to the jail to deal with the altercation between Zach and that trustee

inmate while the defendant had been out at dinner, drinking with his friends. Detective Ball was at that dinner with the defendant. He came back to the jail with him. And he stood a few feet away while the defendant hit Zach five times in the face with a closed fist, and then threw a cup of water on him, while Zach was on the ground, chained to a metal bench, not doing anything.

And the defendant didn't stop there. A few minutes later, the defendant pulled Deputy Dalton Miller aside and took him down to the shower room. When they got there, the defendant grabbed Dalton Miller by his sleeve and positioned his big body to block the view of the camera. And he asked, "Dalton, can I trust you?" Then the defendant leaned into the shower room, knocked Zach Greene three to four more times with a closed fist while Zach was still on the ground, chained to a metal bench, not doing anything. And then the defendant spit on him.

The defendant's blows to Zach's head were so loud that officers heard them 50 feet away in the dispatch room down a different hallway in a room that was soundproofed. You know the defendant didn't think he had any legitimate reason to punch Zach in the head. You heard that officers are trained never to strike an inmate in the head. That rule is in bold and underlined and all caps in their use of force policy, the policy the defendant has the power to

approve.

It's also clear that the defendant didn't have any legitimate reason for beating Zach because he went all-out to hide what he did. A few minutes after the assault when Deputy Miller was trying to leave the Sheriff's Office, the defendant came up to him again and asked several more times, "Can I trust you? Can I trust you?" Deputy Miller told you that the defendant's meaning was clear as day. He wanted Deputy Miller to stay quiet about the beating he just witnessed. And when the defendant found out the FBI was investigating that beating, he went to Detective Ball to make sure that he wouldn't turn him in either. The defendant reminded Detective Ball that there weren't any witnesses there except for their friend, Chris Roberson, and that there wasn't anything on camera.

(Government's Exhibit 9 played as follows:)

VOICE NUMBER 1: Yeah. Well, me and you and Chris was the only witnesses there, right?

VOICE NUMBER 2: Just us three.

VOICE NUMBER 1: And there wasn't anything on camera.

VOICE NUMBER 2: There was trustees, but --

VOICE NUMBER 1: Yeah.

VOICE NUMBER 2: One of those I guess died over

the weekend.

VOICE NUMBER 1: Yeah. And Huck is the one he supposedly bit.

VOICE NUMBER 2: Yeah. Well, if it comes down to it, we'll just have to talk to them, but maybe it won't.

VOICE NUMBER 1: I'd rather not. I mean, it's just my -- you know what I mean, it's mine and your word against, you know, everybody else's, I guess. But, I mean, nobody was even there when it, you know -- when we did that.

VOICE NUMBER 2: No. No, it was just me, you and Chris and then --

VOICE NUMBER 1: Yeah.

(end of audio)

MR. SONGER: Ladies and Gentlemen, when someone knocks a guy in the face repeatedly and then goes to one witness and says, "Can I trust you," and goes to another witness and reminds them, there was nothing on camera, that tells you he's trying to hide what he did. And what the defendant did was bash Zach Greene in the face while he was shackled to a bench.

That's more than enough evidence to prove beyond a reasonable doubt that the defendant beat Justin, Zach, and Brandon to punish them. But you also know the defendant beat them because, when he was around officers

who he thought wouldn't turn him in, he bragged about doing it. The morning after the defendant beat Justin Phillips, he proudly told Chief Deputy Carolyn McCain that Justin, quote, "Won't be giving us any more problems." He told Detective Ball around the same time that he had, quote, "Thumped Justin in the head," and he, quote, "Wouldn't be a problem anymore."

The defendant also bragged to Chief Deputy McCain that he was going to, "Go Bob Pritchard on inmates," a reference to an old Sheriff who was famous for beating people up. And after he assaulted Zach Greene, the defendant hosted a party at his house where he bragged to Deputy Miller that he had beaten Justin, just like he had beaten Zach. Then the defendant yelled out, "That's what they elect us to do, take care of business." Ladies and Gentlemen, there's no question that the defendant beat the victims in this case because he couldn't keep his mouth shut. He bragged about doing it.

Now, the defendant wants you to believe that all of those officers who were on the scene and saw his beatings are wrong, or that they are all out to get him. He wants you to believe that the officers who worked on different units and different shifts, who didn't hang out together outside of work, all came up with the same story about how the defendant beats inmates he doesn't like.

That's a wild conspiracy theory that doesn't fit the facts that you heard in court this week. You know that those officers who testified this week are credible because their accounts are consistent on all the important points, and consistent with what the victims told you.

You also know their testimony is credible because their testimony in court this week is backed up by their actions at the time of the beatings. This week, Deputy Mason Berry told you that watching the defendant beat Justin Phillips was so disturbing that it killed his desire to work in law enforcement, which is all he wanted to do since he was a little boy. And you know that's true because shortly after the beating, he resigned from the Sheriff's Office, even though he had just gotten a huge promotion. You also saw how traumatized Mason still is from watching that brutal beating. You saw that large man with the long beard break down in tears on the stand. Special Agent Ferguson told you that Mason broke down crying the first time he reported that incident to the FBI too.

This week, Deputy Miller told you that he was so outraged by the defendant beating Zach in the head while he was shackled to the bench in the shower room that he didn't want to be associated with the defendant anymore. And you know that's true because Deputy Miller never even came back

into the office after it happened. He finished his training at the academy and immediately transferred to a different Sheriff's Office to get as far away as he could.

This week, Detective Ball told you that he agonized over what to do after seeing the defendant assault Brandon English and Zach Greene just a couple weeks apart. He told you he thought about it every day, and he thought about how he would feel if someone did that to his own kids. He worked up the nerve to report the man who was his boss and one of his closest friends for years. He went to the FBI. And you know that's true because Special Agent Ferguson told you that a couple months after the Zach Greene beating, Detective Ball showed up at the FBI's office shaking with nerves. He clutched the statement he had written up about what he had seen the defendant do. The artery in his neck was pulsing. And then he told the FBI everything that happened, voluntarily. There's no grand conspiracy.

The defendant just wants you to ignore what is obvious from the evidence, that he beat Justin, Zach, and Brandon to punish them. He abused his power and violated their Constitutional rights. That's been proven beyond a reasonable doubt.

Now, the third element requires you to find that the defendant acted willfully. And that just means that

the defendant knew what he was doing was legally wrong, but he did it anyway. And the defendant absolutely knew it was wrong. Now, when you go back to the jury room, it's proper for you to consider your own common sense and life experience when you consider the evidence. And here, your common sense tells you all you need to know. It's obviously wrong to beat someone who is handcuffed and in shackles, or who is chained to a metal bench sitting on the ground, or who is just sitting calmly in a chair in an office. The defendant knew that was wrong, just like anybody else would.

The defendant's willfulness is also apparent because he violated the policies of his own department. Officer after officer told you that they're trained never to use force as punishment, never to strike inmates in the head. The officers on the scene who witnessed the defendant's beatings, who were trained on the same principles that the defendant was, told you that they were shocked when the defendant attacked people who were compliant and not doing anything wrong. Those officers knew the defendant was wrong. The defendant obviously knew it too.

And you know the defendant recognized that he was wrong because he tried to cover up what he did. When the defendant found out that his beatings were being

investigated, he called Deputy Berry and Detective Ball and reminded them that, "There's nothing on camera." He pressured Deputy Berry to write a false report. And he told him, "I've got your back, you've got mine." The defendant wanted all those officers to have his back, because he knew that if the truth came out, he would be in trouble. That proves he acted willfully.

Now, the final element you have to find for each count is that the defendant caused each of the victims some type of bodily injury. And as Judge Brooks just instructed you, bodily injury has a specific meaning under the law. It doesn't have to be a serious injury. You only have to find that the defendant caused cuts or bruises, or even just physical pain is enough to satisfy this element. So there's no question about that here.

The defendant punched Justin Phillips in the face until his eyes were swollen shut with blood. You saw the pictures of Justin taken right before the defendant picked him up when he didn't have a mark on his body. And you saw the pictures taken a few days later, even after Justin had had a chance to wash up and start to heal, that show bumps and bruises and swelling and cuts all over his face in all the places that the defendant beat him.

The defendant repeatedly hit Zach Greene in the face too, hit him hard enough that officers heard it

50 feet away in a soundproof room. There's no question that that hurt. And you heard testimony from Brandon English about the pain he felt when the defendant slammed him to the ground, hit his head on the hard floor, pulled out some of his hair. That proves bodily injury for each of the counts in the indictment.

All of the elements of all three counts are proven beyond a reasonable doubt. Ladies and Gentlemen, the defendant was the top law enforcement officer in Franklin County, but he was not above the law. His job was to investigate crimes, help victims, keep people safe. Not to beat and punish inmates as he saw fit. In our criminal justice system, judges dole out punishment. Not the Jury, not prosecutors, and certainly not the Sheriff. Beating inmates for punishment is a crime. People in the community count on law enforcement to be honest and uphold the law, especially the guy in charge. The defendant exploited that trust. The defendant thought he could beat inmates and get away with it because he had a fancy title, and because the officers who worked under him would be too scared to come forward and testify about what their boss had done.

But the defendant was wrong. The officers who witnessed these beatings weren't willing to stay quiet. Those officers knew that the defendant's beatings violated what they stood for. They knew that in this country, under

our Constitution, justice happens in a courtroom, not while chained to a metal bench, or while sitting calmly in a chair, or while handcuffed and shackled in the back seat of a patrol car on a dark exit ramp.

Beating people in those situations is not law enforcement. It's a crime. Now it's up to you to hold the defendant accountable for committing those crimes. The evidence you heard this week proves that he is guilty. Find him guilty. Thank you.

THE COURT: Thank you, Mr. Songer.

So I think it would be prudent to take a quick recess at this point, just to kind of give you an idea. After we come back from the recess, approximately an hour or so more to go before the case is yours, so we're going to take -- would a 10-minute recess be okay for everyone? We'll take a 10-minute recess. Court will be back in session at 1:50 p.m.

(Jury out at 1:40 p.m.)

(Jury in at 1:53 p.m.)

THE COURT: Everyone may be seated.

Mr. Wood, you may deliver the closing argument for the defense.

MR. WOOD: Thank you, Your Honor.

Good afternoon, Ladies and Gentlemen. Again, my name is Russell Wood. Mr. Songer there, government

attorney, very good attorney. There's a reason they brought him in from Washington, D.C. Very eloquent. But we didn't hear very much from the government about how their alleged facts actually lead to the establishment of the elements of each one of the offenses beyond a reasonable doubt.

This case is actually about credibility. Very little evidence, what I call hard evidence, photographs, and things like that. A lot of testimony. A lot of testimony of government witnesses. A lot of inconsistent testimony from government witnesses about very critical parts of the story as to each count that Sheriff Boen has been charged with.

We're here to get to the truth of what happened. And the government has introduced half-truths since this trial began. We have brought out the rest of the truths as this trial has gone on. The government has presented witnesses that are simply unbelievable. Witnesses that have admitted to lying on the witness stand. Witnesses that admit to violating the oaths they took as police officers to uphold the Constitution of the United States, in this case, also the Constitution of the State of Arkansas, and to protect the public and to protect other people. They admit to wholly violating that oath also.

They have put on witnesses who have admitted

political ambitions. Both Ball and Hutchison admitted they wanted to be Sheriff and there was no way at all that they could ever beat Sheriff Boen in an election. They would never be Sheriff.

They also put on witnesses who had financial incentives. Among the many issues with Mr. Phillips was his civil lawsuit, a lawsuit in which he hopes to make a lot of money. Now, you wouldn't know that talking to him because he said he didn't even know he had asked for money. Matter of fact, he barely even knew who his lawyer was. That statement is so ridiculous that it ought to tell you that he is a con man. That's what he does.

The government also presented you with witnesses for different counts that accused each other of violating the law and being in violation of civil rights. As to Count One, Justin Phillips, Mason Berry -- excuse me -- Justin Phillips alleged that Mason Berry held his head while the Sheriff beat him. Now, Justin Phillips is one of the government's star witnesses. Mason Berry, their number one star witness, the first witness that you heard from, the person that they put on the stand to lead this whole case off with, he's the guy that had all the facts about Justin Phillips. Justin Phillips says he's a liar. Mason Berry said Justin Phillips lied. Justin Phillips was lying when he said Mason Berry held his head and punched

him.

The witnesses provided by the government are essentially inconsistent on the main, central facts of each count to the point they cancel each other out. You cannot believe one without believing the other one is lying. If you believe this one, then this one must be lying. And the government put those types of witnesses on over and over and over and over throughout this case.

The government was investigating this case for years. The indictment was filed years ago. After four years of FBI investigation, the Department of Justice prosecution, the government come here with witnesses that were criminals, witnesses that were admitted liars, witnesses that accused other government witnesses of crimes. They come here with a few pictures of an empty office. A picture of a room which is central to one of the counts where the bench and everything that he was allegedly chained to gone. No videos. Receipts that show nothing. Phone records that don't show anything. Audiotapes that have nothing on them except for what the government wants you to infer, wants you to make some sort of inferences of some nefarious conduct by the Sheriff.

And in fact, in order to find for the government, you would have to infer a lot. You would have to infer evidence and proof as to each one of those counts. They

want you to infer that the Sheriff used force. They want you to infer that he injured, he created injuries to someone. And the government has tied themselves in knots trying to make their cases with these competing witnesses on the various counts, every one of them. The Zach Greene case, we're going to go through that in a second. Those witnesses are all over the place.

Travis Ball says him, Sheriff, and Chris Roberson were the only ones at the shower. Dalton Miller says, "Oh, no, no, no, no, it was just me and the Sheriff at the shower; nobody else." Dakota Cowens said he only saw the Sheriff and Roberson at the shower. Now, for the first time in this trial, the government has indicated now that Mr. Greene must have suffered multiple attacks by the Sheriff. Now, because their witnesses don't line up. Their witnesses say, "I'm the only one there." The next witness says, "Oh, no, no, no, no, we were the only ones there." Because that is a problem for the government, they have now proposed for the first time that there were multiple attacks on Mr. Greene.

They don't even know what happened, so they're going to throw it all against the wall and just see what sticks. The government has not presented you with a cohesive story on any of the three counts at this point in time. They certainly have not presented any evidence that

a reasonable person could rely upon to determine what happened in each one of these three scenarios.

First, you have to determine if the Sheriff even used force in any one of the three scenarios. Then you have to determine whether it was objectively unreasonable force. And you also have to determine if he acted willfully. Now, you have to determine if he used objectively unreasonable force beyond a reasonable doubt. Whether he acted willfully beyond a reasonable doubt. Did he act under color of law. We agree to that one. That's not a mystery. He was acting as his capacity as Sheriff. That's under the color of law. He was a police officer acting in that capacity when these issues arise. And then finally, did the conduct, the alleged conduct of the Sheriff, cause any bodily injury.

Now, all of these elements are issues that have to be proven beyond a reasonable doubt in each separate count. When making the assessment of objectively unreasonable force, then it is the force that would exceed the objective needed to use that force. Also, you have to make the determination, considering all the facts and circumstances from the point of view of an ordinary reasonable officer on the scene. Now, you have been advised of that, or you will be. Whether a reasonable officer on the scene, without the benefit of hindsight,

would have used that amount of force under similar circumstances. You must decide whether the officer's actions were reasonable in light of the facts and circumstances confronting them.

I want to talk about Justin Phillips. The primary government evidence is Mason Berry, his testimony, Justin Phillips, his testimony, and Mason Berry's police report that he filled out after he transported, he and the Sheriff, transported Justin back to Franklin County. When you're determining whether the Sheriff used objectively unreasonable force, then you get the benefit of considering all the facts and circumstances that confronted the Sheriff at the time.

So on the way up to Crawford County, Mr. Phillips escaped from his belly chain. He was attempting to get out of his leg shackles. He was being transported up there because he had already escaped from the Franklin County Detention Center. And he was engaging in that same type of conduct on the way up there. You heard from Zach English, and Mr. English testified that Justin Phillips was out of his belt, that the only reason that they didn't stop and deal with it right then and there is they were only a mile or two away from the detention center. They were transporting him during the middle of the day. So they called in, and they had five to 10 additional officers

waiting when they had to unload him at Crawford County.

Specifically though, Mr. English testified that Phillips was, first, banging around in the back. That's what he does. You start hearing the chains rattling. He's working on his restraints. He can't help that. There's going to be rattling of chains. You also hear testimony about the fact that he won't sit back. He leans forward up against the partition in those cars so you can't see what he's doing. When the deputies are looking in the back seat at him, he's up against that partition, up against the cage. You can't see what he's doing. That's one of his moves. And so they were able to get him that time to the detention facility without him escaping again.

Now, the interesting thing about Mason Berry, his testimony is, he picked up Justin Phillips on September the 14th because he tried to escape. September the 14th, 2017. He alleges he took him to Crawford County. They dropped Justin Phillips off at Crawford County. Mason Berry's testimony then was that he was on his way back to Franklin County with Zach English in tow. Zach English was his partner. They were headed back to Franklin County when he gets a phone call. In that phone call, he's asked to come back to Crawford County because Justin Phillips, doing what he does with his medical games, had already advised Crawford County that he had a medical condition. "I've got

a heart condition, I've had it since I was a kid, from Children's." He's playing that game. They have to take him to the hospital. So Crawford County says, "Hey, Mason Berry, somebody come back up here and watch this guy, because we're not going to pay to watch him." Mason Berry's testimony -- and this is not inconsequential. It's not a small inconsistency. His testimony is that he and Zach English turn around and go back to the hospital over in Van Buren. He testifies then that after that, they go over, take Justin Phillips back to Crawford County.

Mason Berry then testifies that in the parking lot of Crawford County, he receives a call from the Sheriff. Now, we just heard about this call from Mr. Songer. And it's, hey, I want to -- the Sheriff is saying, "I want to be the one to transport him, come back here and pick me up." A nefarious tone and implications in Mr. Songer's voice. The problem is, Mason Berry testified he didn't tell the Sheriff where he was at. He didn't advise the Sheriff, "Hey, I'm sitting in Crawford County parking lot." And like Mr. Songer said in the trial, "The guy's just inside the wall, you want me to go ahead and get him while I'm here?" He didn't tell the Sheriff that. He didn't tell anybody that.

Then he says he and Zach English ride back to Franklin County where they never, ever discussed the

Sheriff calling wanting Mason to come all the way back to Franklin County to pick him up to go get Phillips. Never said, "Man, that was a fishy phone call from the Sheriff." They never talked about that. Mason Berry says, "I never discussed that with Zach, I didn't tell him about it, I didn't complain about it." Nothing. There's no evidence that the Sheriff even knew that Mason was in Crawford County. Mason says, then he drops Zach off, picks up the Sheriff. The problem with that is, Zach English testified he didn't do any of that. He just testified that they took Phillips up to Crawford County on the day that he escaped from Franklin County. They transported him up there. They came back, and he went home.

Where in the world did Mason Berry come up with the rest of this story? That's not inconsequential. That is an entire fantasy that he has created, because in fact, you heard this morning Justin Phillips was transported up there and booked in on the 13th, September the 13th. He didn't come back until the next day, the 14th. The idea that Mason Berry did all of this stuff is a complete fantasy.

And it's exactly what he did when he met with the FBI and they told him that he was under investigation, that Justin Phillips had told them that he held his head while the Sheriff beat on him. And what did Mason do? He

started creating a new fantasy. He started creating a scenario where he would not get in trouble. He decided to create that story and create this other story about the Sheriff punching Phillips for no reason because he can't stand the pressure. It's like when he was up here on the stand. I asked him, "Oh, my gosh, that must have been scary to have to go to the FBI building for the first time and be told that you're under investigation for some allegations by Justin Phillips." And he just said, "No, no, no, it wasn't scary." That is ridiculous. That is not a credible response. He will say anything when he gets put under pressure. Unfortunately, that wasn't discovered until it was too late.

Mason Berry does go with the Sheriff to pick up Justin Phillips. There's no doubt about that. On the way back, there are essentially three versions by the government. There's three versions of events that have been entered into evidence for you to consider. One is Mason Berry's report. The other is Mason Berry's testimony about what happened. And the third is Justin Phillips' testimony about what happened. All three are different at the critical moment in time of the incident. The nucleus of what occurred out there, that small moment in time between opening the back door, trying to get Justin Phillips under control, getting him under control and

shutting the door, is a brief moment in time. Those types of events last a very short amount of time. That's the only issue, really, that is key to your consideration.

Now, Mason Berry's original story was, his original report was that Justin Phillips started doing what Justin Phillips has a repeated history of doing, which is he started working on his restraints. As soon as he got an opportunity, he starts working on his restraints. The difference this time was that it was at night. It was late at night. He starts working on his restraints. He gets his belly chain off, he gets a cuff off, and they hear him. And the Sheriff tells him, "Sit back, sit back. Get off of the cage. Let me see your hands. Let me see your cuffs."

Justin Phillips does what Justin Phillips does. He starts getting crazy. He does not like being restrained. He does not like being in jail. He will do whatever he needs to do to leave, to get himself out of that situation, to escape. That's just what he does. He starts kicking around, thrashing in the back of the vehicle. Mason's report says he starts tearing stuff up, starts hitting the roof and the walls. Then he starts hitting the plexiglass, breaks the plexiglass. They have to pull over.

Now, at this point in time, let's think about the facts and circumstances that are confronting the officers

out there. Unbelievably, Mason Berry says that when he cuffed and shackled Justin Phillips at Crawford County to load him up to bring him back, unbelievably, a high-risk escape artist, he does not fully restrain him. He testified that he put the cuffs on him, and that he put the leg shackles on him, but he did not, he did not fasten his cuffs to the belly chain. Because Mason said, "I was so distraught, I was so concerned that the Sheriff was going to do this or that." Well, when they pull over and the Sheriff opens the door to see if he has in fact slipped his cuffs, got out of his belly chains, got his leg shackles off, as usual, he sees, or, there's Justin, and he's out. He's got his -- he's got his belt off again. He's got a cuff off. This is what Justin does.

So what does Mason say? What does Mason report that happened? That the two of them, trying to get him back in restraints and under control, he starts fighting. That's what he does. When the police try to get him, he fights. And Mason said he started fighting. There was a scuffle that ensued at this point in time. It's in a dark area. It's night. The man cannot be allowed to escape. Escape is one of the worst situations that a law enforcement officer can have.

They finally get him rounded back up, get him cuffed, to the best of their ability. And then they run

lights and sirens all the way back to Franklin County. Once they get there, Justin Phillips is not done. He's not just going to give up. He's not done. They try to get him out of the car. He fights. Mr. Starnes come in today. They got him out of the car, trying to get him through the building. And what is he doing? He's still fighting them, tooth and nail. He's going to fight you until you get him put in a cell, preferably an isolation cell, period. Mr. Starnes come in here and told you that today.

Mr. Phillips, in his testimony, I know he come in here, he tried to be as demur and cowered down as an alleged victim as he could be. He had his head down, he was talking quietly and softly. He was trying to be on his best behavior. But it didn't take me long under just a little bit of probing with him for you to see him flash just a little bit. Even here in federal court, knowing that he needs to be as convincing as possible, he still couldn't keep his emotions under control. He told me, "You can roll your eyes all you want to, that ain't going to change the facts." He flashed just like that for a second, and then he went back down into his act. If you think back, think back on that. That's how he is. That is how quick Justin Phillips is. He's not a regular individual.

He testified that during this little moment in

time, what we're talking about, the force, the use of force by the Sheriff and Mason, that Mason grabbed him by the head and pulled it out of the car so that the Sheriff could just beat on him. That's a fact. The government's witness, his fact, he didn't have any recollection problems. He didn't say, "I think this happened." Man, one of their star witnesses, he said, "This is what happened."

What does Mason Berry say? Their other star witness, the first person the government put on the stand in this case, lead off with their strongest guy. He says, "Man, I didn't do that." Everything else that Justin says is true. The Sheriff beat him, and the Sheriff was mean to him and tried to whoop him, and hit him with, I guess, lead-laced gloves with steel, metal on the outside of the knuckles. All that was true. But when he said, Mason said what he said about me being involved, "Huh-uh, no, that ain't true. That part is not true."

Now, see, the government wants to cherry-pick this stuff. The government wants to say, well, Justin, his testimony about the Sheriff hitting him is true. His testimony about Mason hitting him, because Mason is one of our witnesses, he's one of our good witnesses, he has said everything that we want him to say. That didn't happen, okay? That part is not true. The government comes in

here, puts two totally different versions of events of the use of force on Justin Phillips before this Jury. Seems like that decision, who was right, who was wrong, who was lying, who was not, should have been made at some point in time by the government. No. No. We'll just act like the Sheriff is a monster, and we'll just throw it all up against the wall. We'll have witnesses that call each other liars. We'll have witnesses that call themselves liars. We'll just throw it all out there, give an impassioned speech to try to gin up everybody's emotions about what a monster my client is. We'll just let the Jury figure it out. The government hasn't even figured it out.

Then even with the aid of the FBI, an entire agency, they didn't try to figure it out. They didn't care. They don't want to figure it out. They've got both of them telling the story that they want to be told. The government filed this case. When they filed this case, this went all around the world. This news on this Sheriff right here was reported around the world. Europe, Australia, Russia. Sheriff beats inmates. They didn't care. They had the FBI. Which one of these stories is true? Go figure that out, and then let us know. But that's not what they did.

They filed this case, got into it, got witnesses going everywhere, talking about everything. And at that

point in time, it was too late. Can't take it back. Now it's time to start saving face. We've got to win at all costs. We don't want to lose. We need to win. And it's win at all costs. And that's why they have put evidence in front of you, half-truths, and throughout this trial, we have had to give the other half of it. As you sat there listening to this evidence, probably thought this man is a monster, until we had an opportunity to come up here and go, you know what, it's not quite what they say. There's completely different testimony. There is evidence that does not support anything that they are putting in front of you.

We had to do that. They didn't do it. They didn't figure it out beforehand. They didn't give you all of it and say, yeah, here's Mason Berry. Man, we really like his testimony, but here's some really messed-up stuff that he said and done. Sorry. No, they just put it in front of you. They left the rest of that out. Left it up to us to advise you about the rest of it.

Mason, or, excuse me, Justin Phillips says, the Sheriff, a monster, beat him with these lead gloves with metal strips on the outside. If the Sheriff would have beat him with lead gloves with metal strips on the outside, Justin Phillips probably wouldn't have survived the night. That makes no sense. None whatsoever. Mason Berry even

says, you know what, I was so ashamed that when we got to the detention facility, I couldn't even look at Justin. I just stayed at the front of the car and then I went inside.

But when he went inside, what did he see? He saw the Sheriff had some abrasions and cuts on his hands from having to fight with Justin, cleaning them up, because he didn't have any gloves on. There was no lead gloves with metal strips on the outside. That's ridiculous. That's crazy. Justin Phillips said, you can buy them in a law enforcement store. That's absurd. That makes no sense. He was trying to embellish his story. He wanted to make it look as bad as possible. He want to make the Sheriff look like a monster.

From the time that the Sheriff and Mason had to fight with him to get him back in restraints, Mason said he never looked at Justin's face. Never. Mason's testimony was that after the altercation, he did not look at Justin's face on scene. They went to the Franklin County Detention Center. He said he was so distraught that he walked up to the front of the car, never looked at Justin's face. You have received no evidence at all about any injuries on Justin Phillips' face until two or three days later when he met with his attorney.

When Justin Phillips went to Crawford County, first thing he did, try to go to the hospital. He gets to

hang out in the hospital. He likes the food better. He likes the beds better, and if it gets him an opportunity, he will take off. That's what he does. But the issue is he went to the hospital, and in that assessment, for the first time ever, you have been provided no evidence of any injury to his clavicle until he reported to that hospital. At that hospital visit, they diagnosed him with a broken clavicle, broken collar bone. They also diagnosed him, surprisingly, with renal failure, or renal impairment. Kidney problems. Kidney impairments. He gets released and gets to go back to Crawford County. They give him a sling to put his arm in.

This morning, the booking photo, you were told, come from the 13th, the day before he went to the hospital and then subsequently got released. Justin Phillips being Justin Phillips got booked in on the 13th at Crawford County, and sometime between 3:00 on the 15th, September the 15th, excuse me, September the 13th at 3:00, when he's booked in, 3:30, and 6:00 the next night when he goes to the hospital, he got into some kind of a fight or altercation with somebody in the Crawford County Jail and he ended up with a broken collar bone.

Now, did he fight with the jailers when they were trying to move him around or feed him or something? Who knows? Did he fight with another inmate? Who knows? But

the facts are, the evidence is, he went in there with nothing. No problems. And the government went out of their way to tell you and to have testimony about it, that he was fit as a fiddle whenever he checked into Crawford County. Somewhere in the next day and a half, he did what Justin Phillips does and he got into a fight with somebody. He got injured. Who knows what happened to them?

Now, the funny thing is that they do not take photographs when you get released from a facility. So his booking photos, they are from when he got booked in. There were no photos from when he left. I want you to check your notes, because the government sit there and introduced those photographs of Justin Phillips in his stripes. And they let him tell you that that was from the 14th, the day that he was booked out, was leaving. They sit there knowing that it wasn't true and let Justin Phillips testify that, "Oh, they didn't photograph me when I got booked in. They did something different. They photographed me when I left." And then the government says, "You know what, yeah, you're right. These photographs show there was nothing wrong with Justin Phillips when he left Crawford County, because they are the photos of 10 minutes before we picked him up, before Franklin County picked him up." They know that's not true. Now you know it's not true, because we had to bring in another witness to tell what the actual

truth was. It's not about finding the truth. It's about saving face. A conviction at all costs.

Agent Ferguson said, when he works a case, it's about the truth. He said -- I wrote it down here, because I wanted to know -- when he works a case, it's about getting to the truth. Did he get to the truth about who was telling the truth, Mason Berry or Justin Phillips, about whether Mason Berry held his head? No. Did he get to the truth about whether those booking photos are from when he went into Crawford County or when he got out? No. They didn't get to the truth of that. They didn't want to know that truth. They didn't want to give you that information.

But the fact is Justin Phillips got a broken clavicle somehow between the time he went to Crawford and the time that he left. And it didn't have anything to do with the Sheriff. None whatsoever.

Now, the other part is his impaired renal function. Justin Phillips, he knows what the law is. He knew what the definition of bodily injury is. Can I see that definition of bodily injury, please? Somehow, somewhere, as a result of meeting with somebody, or maybe he did it on his own on the internet, he come in here and he said, "Oh, man, that few days, all them body shots and hits, I started peeing bad, and my urination was messed

up." Well, let's look here. Under D), for bodily injury, "Impairment of a function of a bodily member or organ." Do you think that is a coincidence that Justin Phillips would say that to you indicating that the Sheriff did that to him? No. He knew what he was doing. He's a con man. He did what Justin Phillips does. He come in here and he lied about these injuries.

And then 'lo and behold, after he told that story, and the government, they sit right there and listened to it, knew that he said the Sheriff caused him some kidney problems because his urination was messed up. They knew about the medical report. They knew that before we even picked him up, before the Sheriff even had him in his vehicle, that he had been diagnosed with impaired renal function. Anybody remember the government telling you that? If I'm not mistaken, it was one of their exhibits. I don't remember Mr. Songer highlighting that in his eloquent closing.

They allowed Justin Phillips to come up there and imply -- at best, I'll say imply -- that his kidney problems were the result of the monstrous Sheriff. And they sit, quiet as a church mouse when he said that. And he told you all that and he misled ya'll. Because they knew that wasn't anything caused by the Sheriff. He had that before the Sheriff even picked him up.

Nobody saw -- there is no evidence, go back after this, look for it, everything. There is no evidence that anybody saw his face except Justin Phillips testifying that those injuries to his face were caused by the Sheriff. Let me back up.

There is no evidence or no testimony that anybody else saw his face at least two or three days when his attorney came to visit him and he asked her to take those pictures. Who knows what Justin Phillips did to himself in those few days leading up to asking his attorney, "Hey, come take some photos of me. Bring your camera, get your phone, I need some photographs taken." The government knows that's not outside of the realm of possibility for Mr. Phillips.

Let's go to Zach Greene. The government presented Travis Ball. Travis Ball is not in the least bit credible, okay. Travis Ball, he says that the Sheriff just beat Zach Greene. Let's put Zach's photo up here, please, his face photo. And it was just him, the Sheriff, and Chris. Then the next one, we've got Dalton Miller. Dalton Miller comes in, says, no, no, no, that's not true. That can't be true, because it was just me and the Sheriff. The Sheriff brought me over, he pulls me over, says, "Can I trust you? Can I trust you?" And then he just commences to just whacking him, beating him in the face.

Then there's Dakota Cowens. Nice kid. He says all he ever sees is the Sheriff and Chris Roberson, the Justice Solutions guy there. But he doesn't see any problem. Then he says he went and checked on Zach. Actually, he says, "I saw Zach after the Huckleberry Beehner fight. Had a little bloody lip, maybe a little bloody nose." After the Sheriff -- after the government alleges that the Sheriff got finished beating him in the face, Dakota Cowens testified, after the Sheriff left, he went back and had another look at Greene, saw him on his rounds. What did Greene have? Had a little lip and some stuff there.

Well, the Huckleberry Beehner fight happened before the Sheriff even got there. Everybody agrees on that. And there were photos taken. You've seen the photos, Defendant's Exhibit 6. There's not a lot of injury to him. B.J. Gilbreath took the photos right after the fight. Dakota Cowens says he saw him after the Sheriff left. Wasn't no different than he looked after the inmate fight. The nurse, Ronica Young, who said she sees him weekly, saw him two days later. Now, Mr. Songer come up here, and when his closing was done, Zach Greene had been nearly beaten to death. By the time Mr. Songer was done, Zach Greene would have been on life support, beating him in the face five or six times. Take a break. Sheriff is

going to come back with somebody else. Let me go get somebody else. Going to beat him in the face, four or five times. Then I'm going to go get somebody else. I'm going to come back. I'm going to throw some water at him. I'm going to spit at him, whatever.

Ronica Young says, I saw him two days later, and he didn't look any different than these photographs that were taken after the inmate fight. Nothing. Nothing. The Sheriff could not have hit him. If the Sheriff hit him four or five times in the face while he was just laying there, there would be some problems, no doubt. Travis Ball's testimony that the Sheriff just beat him, that cannot be true. Look at the photos.

Dalton Miller, just beat on him. That cannot be true. Look at the photos. It cannot be true. The only hard evidence that we have besides peoples' testimony, self-serving testimony, Travis Ball wants to be Sheriff. As a matter of fact, Travis Ball got to be Sheriff as a result of him turning this in. Look at the photos. It can't go down like that. Ronica Young said -- let me see his mouth. Ronica Young said his mouth always looks like that. You think maybe some people saw some stuff, walked by and go, oh, my God, he's got -- the Sheriff must have just beat the hell out of his lips. Beat him, caused all this injury. There's no evidence of that. Ronica Young

said, that's how his mouth always looks. The Sheriff could not have possibly done what these people say that he did. And that's the problem with the government's case. These photos. They got all the witnesses that they can get to say whatever, or that will say whatever, so that they are not charged with something, some false allegations. This could not have happened. It's common sense. Just take one of the beatings that Mr. Songer identified, and he would look like hamburger meat.

Let's talk about Brandon English. Mr. English is obviously a troubled kid. He's a thief. He's running amuck in the county. Nothing helps. He's stealing his grandmama's stuff. He's stealing his neighbor's stuff. They got him there. They are trying to question him about stealing somebody else's stuff, whatever it is he's done. They got him sitting there. Just like when I was in the military. Sometimes the CO may grab your shirt to yell at you to get your attention, try to change some conduct that you're displaying, okay. Try to get some sense into you. Try to scare you, scared straight. There's a whole T.V. show about stuff like that. Try to scare you. Say, look, you're going to have to change your life. You've got to make some changes or you're going to spend the rest of your life in prison. Nothing else is working. The Sheriff grabs his shirt, wants to scare him. The testimony from

Hutchison was Zach Greene pulled back and the chair tipped over. Okay. Oops. Whoops. There's no testimony that the Sheriff was trying to violate his rights. There's no testimony that the Sheriff got down there and beat on him.

Now, Mr. English come in here. He sees an opportunity, talking about, he grabbed my hair, and I was rubbing my noggin, and, ow, I had some pain. He knows. Where is that bodily injury again? He knows. He's talked to the government. They prepared him. He knows that there's a little catch-all phrase down here, "Any other injury to the body, no matter how temporary." That's all we have heard about this case, no matter how temporary. And, oh, I'm going to rub on my noggin a little bit. There's no testimony or evidence that he hit the ground hard. There's no evidence or anything that the Sheriff got on top of him and started beating him, grabbing his hair and yanking him around. It was an accident. The Sheriff was trying something a little different. Going to take him, try to grab him up, "Man, listen, kid, you're going down the wrong road." And the chair flipped over. This is a federal case for the government, the Department of Justice out of Washington, D.C., to come down here, put Travis Ball on there who wants to be Sheriff?

Then Hutchison, he wants to be Sheriff too. Awfully convenient for them two to make their statements,

clear the field out for themselves. Neither one of them is going to beat him as Sheriff; 90 percent approval rate. He's committed his life to the community.

Look at the drawings that I had Ball make. He's got his desk out there. He's got those other two, the Sheriff and English, out in front of his desk. He's behind his desk. You recall the testimony of Mr. Hutchison. He did it on the screen. I couldn't get a picture of it before I realized what was going on. He put him on this end. He put them over here. They were over here and it all happened. Travis Ball says, "They was over here in front of my desk." Hutchison said, "They were over here at the side of the desk." That's not consistent. Nothing about Brandon English is a violation of civil rights, going to try to call somebody bodily injury, going to do a bunch of physical pain and illness and bruises and burning him and causing problems to his bodily organs and stuff.

MS. CRAIG: Mr. Wood, you have eight minutes.

MR. WOOD: Thank you, Your Honor. I mean, Your Honor.

I mean, that's where we are at here. Here's the element. Did he willfully, intentionally try to violate Brandon English's civil rights, or did he grab him by the shirt, was going to try to give him a little, "get your life straight." It's ridiculous. It just didn't happen

that way. That's not what happened. It has been embellished and embellished and embellished by the government and their witnesses. Worked out really well for Travis. He got to be Sheriff for a while.

When you go back there, look at these elements for each count, please. The government really didn't go through them. The government, their closing was all about the monster. You've got to take care of him. You can't let this slide. Was he really a monster? Did that really happen to Zach Greene? From the government's case, who knows? Who knows? But the defendant, the Sheriff, we don't have to come in here and prove anything. All we've got to do is show what nonsense this case is. And you can't believe one witness of the government without calling the other one a liar.

Ask yourself, the evidence that you receive from the government versus the additional information, testimony and evidence that the defense elicited, was the government really trying to get to the truth, or did they have an agenda? I don't see how you can get to the truth and only give half stories, and only pick the parts of a person's testimony that you like. And then just don't tell everybody about the other part, the part that's totally different, that's a lie. You can't do that. That's not trying to get to the truth. I just want you to go back

there, look at the elements. Did he intentionally do anything? First of all, did he do anything? There's no evidence from Zach Greene other than a couple of self-serving testimonies that he did anything. And if you think he used force, look at those photos. If you think he bashed Greene in the head, he bashed -- Travis Ball says, he bashed him in the face, the first, he beat his face in. The second time, knocked him in the face three more times, bashed him in the face. These are all the things that Mr. Songer said on Zach Greene. Look at the photos. It's impossible. It's not just, could a reasonable person under the facts and circumstances. It's impossible.

And Justin Phillips, ya'll have all the evidence. Look at the dates. Look at the statements. Consider Mason Berry. He would say anything under the pressure of the FBI.

I'm going to ask that you go back, look at the elements, look at the contradictory evidence. Look at the lack of evidence that the government has. Four years, and the federal government is giving you guys a couple of photos of a decommissioned jail that don't even have the desks or anything else in them. And you have to draw. They have asked people to draw. You've got to draw the stuff on there. Draw where the bench was. This is the federal government alleging civil rights violations against

a man who has dedicated his life to law enforcement. You don't get a 90 percent approval rate going around and beating your constituents and their children.

Please go back and look at the evidence, and we would ask that you return a verdict of not guilty on all three counts. Thank you.

THE COURT: Thank you very much, Mr. Wood.

Mr. Songer, you may rebut.

MR. SONGER: Thank you, Your Honor. Take this down, please.

Ladies and Gentlemen, one of the first things that defense counsel said to you is that this case is about credibility because there's very little hard evidence. And first of all, testimony from multiple eyewitnesses who agree on the important points is really compelling, powerful evidence. So there's nothing wrong with that. But it's also not true. Think about just the Justin Phillips' count.

You saw, of course, testimony from Officer Berry who told you about that crazy route he had to drive back and forth that night, pick up the Sheriff, so then they could get Justin Phillips, and the Sheriff would have an opportunity to beat Justin Phillips before they got back to Franklin County. To corroborate that, you've got data that's automatically generated by Google maps on Officer

Berry's phone that shows that exact route that he described that's entered in evidence. You've seen it.

Deputy Berry also told you that the reason he did that was, when he was at the Crawford County Jail after dropping off Justin, he got a call from the Sheriff who said, "Are you alone?" Then he told him to step out of his car so they could talk, and then said to come get him. And today, you saw phone records from AT&T showing that Deputy Berry received a six-minute call from the defendant at the exact moment he left the Crawford County Jail and drove across the county to get him. You can't get better corroboration than that.

You also saw pictures of Justin Phillips that were taken right before he left. There's been some conflicting testimony about whether those were taken on September 13th or the 14th, but either way, they were taken within a day of when the Sheriff picked him up, and they show he didn't have a mark on his body. You also saw hospital records from about an hour and a half before the Sheriff picked him up that say clearly, Justin Phillips' skin was intact. He had no marks or deformations on his face. He had no injuries when the Sheriff picked him up, and there's absolute corroboration of that.

You also heard corroboration in the form of officers telling you about the Sheriff bragging about the

beatings that he did. And you notice that Mr. Wood didn't say a word about that in his closing, because the defense has no answer for it. Three different witnesses came in here and told you they heard the defendant bragging about beating Justin Phillips; Carolyn McCain, Dalton Miller, and Travis Ball. You didn't hear a word about that, because there's no response to it.

You also heard the recordings. You heard the Sheriff's own voice telling officers, "There's nothing on camera." Saying "I've got your back." And of course you also know that there would be even more evidence if the defendant had not made sure that his beatings occurred off camera. If he hadn't pressured officers to write false reports.

But the defendant is right that credibility of witnesses is important, so let's talk about that for a moment. Now, the defense spent a lot of time trying to convince you not to believe the testimony of the officers who testified this week. And when you evaluate the credibility of those officers in the jury room, it's appropriate for you to look at their connection to the different people in the case. Their connection to the victims, their connections to the government, and their connections to the defendant. So let's look at that.

The officers who witnessed the defendant's

beatings, would came in here and testified, none of them were friends with Justin or Zach or Brandon. Those are all inmates. The officers didn't have any reason to lie for them. None of those officers had any connection to the federal government. None of them received any deals or any favorable treatment from the Justice Department.

But every one of those officers knew the defendant personally. They had all worked for him. Some of them had been his good friends. And you know from your common sense that no law enforcement officer wants to come into court and testify against a fellow officer. That is a hard thing to do, especially when they're testifying against the boss. So when all those Franklin County officers came into court, took the stand, and were asked, what happened? Did Justin or Zach or Brandon do anything to provoke the defendant's attacks? Was there a threat? They had every incentive to shade their testimony to help the defendant, but they still all said, not just that the beatings were wrong, but that they were shocking. That they were personally offended as law enforcement officers. That they left the department, that they cried at night. Those officers are credible and courageous.

Let's talk specifically about Mason Berry, because the defense spent a lot of time talking about him. But ask yourself, what incentive did Deputy Berry have to

make up his testimony? When the FBI came to talk to Deputy Berry, this is what Deputy Berry knew at that time. He knew there was no video of what happened. He knew there were no other witnesses besides the defendant. He knew the defendant had already told him, "I've got your back, you've got mine." And he knew that there was a contemporaneous report that basically said everything was fine, nothing happened. In that situation, what possible incentive did Mason Berry have to tell the FBI, "Actually, none of that is true, I was right there on the scene when this terrible beating happened, and I helped cover it up." Why in the world would he incriminate himself when there was no outside evidence at that point? That doesn't make any sense.

He told the FBI what really happened because he hadn't been sleeping at night. It had been gnawing at him, and he cried while he told them. You also know Deputy Berry is telling the truth about the important stuff because it's corroborated by all the evidence I just talked about a moment ago; the Google maps, the AT&T call, the pictures, the audio recording.

Now, the defense also made a big deal about how one important detail of Deputy Berry's account is different from Justin Phillips', whether or not Deputy Berry was holding Justin's head while the Sheriff beat him. And it's

fair to ask if Deputy Berry minimized his role or not. But if what Deputy Berry said is correct and he stood and watched for a few seconds before intervening to save Justin while the defendant beat him, that's a crime. And if what Justin Phillips said is correct, that actually Deputy Berry held his head for a minute before saying that he had had enough and then stopping it, it doesn't matter. Either way, the defendant brutally beat Justin. And their testimony is clear and consistent on that point.

The defense also said that the government should have picked a story. Why would they put these people up who disagree? And picking a story for a witness is not what the government does. Special Agent Ferguson told you the FBI doesn't even share information with different witnesses. They don't tell a witness what someone else says, precisely because they don't want to risk any chance that those witnesses are shaping their stories or coordinating with each other. They want to ensure that they can come into court and give you fully independent accounts. And they did that, four years later. They gave you fully independent accounts that on every important detail that shows the defendant committed a crime match up.

The defense also said that Justin got in a fight sometime after he got to the Crawford County Jail and broke his clavicle. There's absolutely no evidence of that.

None. Justin was in a cell by himself at the Crawford County Jail, then he was taken to the hospital. He told you that he thought his clavicle had been messed up for a long time. But regardless, hospital records show that when he left the hospital, right before the defendant picked him up, yes, he had a broken clavicle, but he had nothing on his face. No cuts, no bruises, no deformations. Those records are admitted into evidence and you can look at them in the jury room.

The defendant also suggested that, well, maybe after Justin got back to Franklin County, because no one took a picture of him when he arrived, that maybe he beat himself up, that he gave himself injuries before those pictures were taken. And, again, that's not evidence. That's not an inference from evidence. That's a fantasy.

Zach Greene. The defense attorney said that if what the witnesses said happened had actually happened, that Zach Greene would have looked like hamburger meat. You heard testimony that on two occasions, the defendant took a closed fist, with the back of his hand, and hit people in the head multiple times. You know from your common sense that after a person gets hit with the back of the hand several times, what they probably look like is disoriented and bruised and red on their head where they got hit, which is exactly what Zach Greene looks like in

those pictures that are in evidence. You also heard that the defendant did that from both Detective Ball and Deputy Miller. And there's no evidence or reason that those people would shade their stories against the defendant.

The defense attorney barely even talked about Deputy Miller, because his integrity is unimpeachable. He had no reason to lie to you. And as we talked about a few minutes ago, his testimony is corroborated by the fact that he immediately left the Sheriff's Office, because he was so upset by this. He did that at the time, long before he had any idea that this case would happen.

Mr. Wood also told you, as it relates to Brandon English, that there was no evidence at all that the defendant violated his rights or caused any injuries. But I know you all have been paying attention during trial, and you know that's not true. Detective Ball said several times on the stand that he saw the defendant push Brandon over backwards onto the ground while he was just sitting, motionless. Brandon himself told you that the defendant slammed him to the ground and he hit his head on that hard floor. You saw a picture of that hard floor. Detective Hutchison told you that when Brandon got up, he was rubbing his head and appeared to be in pain.

The defense suggested that you have to find that some serious, life-threatening injury occurred. They are

asking you to focus on the wrong question because they can't answer the right one. As the Court instructed you, to find the bodily injury element satisfied, you only have to find that the victim suffered any type of physical injury, including pain, a bruise, a cut. And the evidence is clear that all three victims suffered that type of physical injury.

The defense also spent a lot of time talking about what they term are contradictions in facts that are peripheral to what is charged in this case. The charges before you are, what happened to Brandon English while he was sitting in that chair in the detective's office; what happened to Justin Phillips in the car on the way back to Franklin County; and what happened to Zach Greene while he was shackled to a bench in the shower room.

Contradictions about what happened days before or hours before or after about issues that just aren't important, about things that happened years ago, do nothing to undermine the clear testimony from every eyewitness you heard from who witnessed any of these incidents, who all told you that the defendant, without any provocation, beat the victims. Not a single eyewitness came into court and told you that any of the victims did anything to provoke any of the attacks. That's why the defense has to try to distract you with unrelated contradictions.

I think it's useful to consider an example from your own life in thinking about how memory works. These incidents happened about four years ago. If you think about a wedding that you attended four years ago, if a number of your friends or family members got together and reminisced about that wedding, it's likely that they would have somewhat different recollections about certain things that happened. Maybe what all different types of food that were served, or what the first couple songs that were played, what color your cousin's tie was. But I bet everyone would remember what the bride looked like walking down the aisle. And everyone will remember that they got married, and they were happy.

In this case, every witness agrees on the fundamental issue. Not a single witness told you any of the victims did anything to provoke the attacks. All the eyewitnesses told you they were shocked; shocked when the defendant violated the rights of people who were restrained and who were not doing anything wrong just to punish them for what they had done wrong before, which is against the law in this country.

Now, Mr. Wood mentioned multiple times that I came down here from Washington, D.C., so I feel obligated to tell you that I was born in Oklahoma and grew up in a little town called Irmo, South Carolina. I live in

Washington, D.C. now, but the great thing about the Constitution of the United States is it applies everywhere, to all people in this country, no matter where they live, and no matter if they have made mistakes in their life that have caused them to get in jail. And the defendant sworn an oath to uphold that Constitution, and he willfully violated it by beating people that he had been charged to protect.

You can't go back in time to stop the defendant from violating the Constitution, but you can do something to make sure he doesn't get away with it, to make sure that he doesn't get to willfully violate the Constitution and then brag about it and then cover it up. You can do something to make sure that the sacrifices of the brave officers who came in here and testified against their boss were not made in vain. You can make sure that the Constitutional protection against using excessive force is not just words on a scrap of paper. You can hold the defendant accountable by enforcing the Constitution of the United States in this case and finding him guilty of the crimes he committed. Thank you.

THE COURT: Thank you, Mr. Songer.

Ladies and Gentlemen, in your instruction packet, I'm going to instruct you on instruction number 16.

In conducting your deliberations and returning

your verdict, there are certain rules that you must follow. I will list these rules for you now.

First, when you go to the jury room, you must select one of your members as your foreperson. That person will preside over your discussions and speak for you here in court.

Second, it is your duty as jurors to discuss this case with one another in the jury room. You should try to reach agreement if you can do so without violence to individual judgment, because a verdict, whether guilty or not guilty, must be unanimous. And unanimous means everyone must agree.

Each of you must make your own conscientious decision, but only after you have considered all the evidence, discussed it fully with your fellow jurors, and listened to the views of your fellow jurors. Do not be afraid to change your opinions if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right or simply to reach a verdict.

Third, if Mr. Boen is found guilty, the sentence to be imposed is my responsibility. You may not consider punishment in any way in deciding whether the government has proved its case beyond a reasonable doubt.

Fourth, if you need to communicate with me during

your deliberations, you may send a note to me through the Court Security Officer signed by one or more jurors. I will respond as soon as possible, either in writing or orally in open court.

Please remember, though, when communicating with the Court or anyone else, do not tell anyone, including me, how your vote stands numerically at that time.

Fifth, your verdict must be based solely on the evidence and on the law which I have given to you in my instructions. The verdict, whether guilty or not guilty, must be unanimous. Nothing I have said or done is intended to suggest what your verdict should be. That is entirely for you to decide.

Finally, the verdict forms are simply the written notice of the decision that you reach in this case. You each have a set of the instructions. We will be sending back just one set of verdict forms. There is one verdict form for each count, for a total of three verdict forms. They all read essentially the same, but I'll read the one for Count One.

It says, "On the crime of deprivation of rights under color of law as charged in Count One of the indictment, We, the Jury, find the defendant, Anthony Boen," and then there's a line in the middle. And underneath there, it gives you your options. Your options

are, "guilty or not guilty."

And then that verdict must be signed by your foreperson and dated. There's an identical instruction, except the other two apply to Counts Two and Three respectively. The same procedure would be followed.

You will bring these verdict forms from the jury room, and when each of you -- I'm sorry -- we will provide these verdict forms to you in the jury room. And when each of you has agreed on the verdict, your foreperson will fill in the forms, sign and date them, and you will advise the Court Security Officer that you are ready to return to the courtroom. And that is when you have finished completing all three verdict forms.

So you may have some additional questions. For example, how long may we deliberate? The answer is, as long as you want to. At this point, you're completely in charge. At this point, we will begin feeding you. We will have some menus available, and the clerk will make sure that you can have a selection of essentially whatever you want, within reason.

If you want to deliberate past 5:00 today, that's fine. If you want to deliberate past 7:00, that's great. Our record is 2:30 in the morning. You don't have to deliberate that long.

So, next question. Well, what if we're tired and

we haven't reached our verdicts yet, and you would like to come back on a subsequent day or morning? That's fine too. You're in charge. You tell us what you'd like to do.

Does that mean we would come back tomorrow, on Saturday, or on Monday? It's up to you. You're in charge. You tell us.

We have five jurors who have served as alternate jurors, and we so much appreciate your service as alternate jurors. Only 12, the original 12 jurors, may actually deliberate. We normally have two or three alternates. We went with five this time because of the unknown of what COVID might deal us. I'm going to ask that our first and second alternates remain. That would be, our first alternate, Ms. Juror Number 28, and our second alternate, Ms. Juror Number 30. And we're going to have to sequester you separately in a room of the courthouse because you must remain free of anyone coming up and talking to you, that sort of thing.

As for our other alternate jurors, number 14, number 54, and number 48, I will excuse you at this time. And when we recess, you may gather your things from the jury room and you will be free to go with the sincere thanks of the Court.

The alternates do need to leave their notes. We need to give those to the clerk and we will secure those so

that no one reads those. The clerk will also be bringing back to you the verdict forms and all of the exhibits that have been received in evidence. You'll recall that there's some audio recordings. There is a device that will allow you to play the recordings. And one of the staff members from the clerk's office will show you how that works and then you can play them if you want to.

With that, the case is yours. I would ask everyone to join me in rising as the case is now in the hands of this Jury.

(Jury out at 4:18 p.m.)

THE COURT: Does the government have any further record they wish to make at this time on any matter?

MR. CARTER: We do not, Your Honor.

THE COURT: Mr. Wood?

MR. WOOD: No, Your Honor.

THE COURT: All right. I would like to state to counsel my appreciation of your thoroughness and your preparations. You have served your clients very well. And it's never easy to try a week-long case. There's a lack of sleep, a lot of stress. And all of you all have done very, very well, and I appreciate your trial of this matter.

I need you to be sure that Ms. Craig has a cell phone number of counsel so that she can contact you in the event that we have a question. You need to be close by.

If you want to go outside, that's fine. If you want to go to a different floor, that's fine. If you want to hang out in your assigned rooms, that's fine. But turn your cell phones on so that Ms. Craig can contact you and you can be back in the courtroom within a matter of three or four minutes.

And with that, Court will be in recess until we have a verdict or a note or something else to discuss.

(recess from 4:21 p.m. to 7:44 p.m.)

THE COURT: Counsel, the Jury has indicated to the CSO posted at the door that they have reached a verdict on one count, and that they would like to continue deliberating on the other two counts, but that they would like to recess tonight and come back later.

The protocol that I would propose is to bring the Jury to the courtroom to explain, basically to read model instruction 10.04, the partial verdict instruction, which says, "Members of the Jury, if you have reached unanimous agreement as to less than all of the counts, you may return a verdict as to that, or those counts, and then continue deliberating on the others. If you do choose to return a verdict as to some counts, but not others, that verdict will be final. You will not be able to change your minds about it later on."

And then I would propose to question the

foreperson if they have -- I think technically, that I should read them this instruction and send them back to the jury room to discuss their agreement that their verdict on the count that they have decided would be final and make sure that that's what they want to do. Seems a little bit arduous of a process, but I think that that is technically appropriate.

What would be the government's position?

MR. SONGER: No objection from the government, Your Honor. That sounds like the correct approach.

THE COURT: Mr. Wood?

MR. WOOD: No objection, Your Honor.

THE COURT: All right. Would you please bring in our two alternates and set them on the front row, and then separately bring in the Jury.

(Jury in at 7:46 p.m.)

THE COURT: Juror number 5, Mr. Brewer, I see that you're holding an envelope in your hand. Do I correctly deduce that you're the foreperson?

THE FOREPERSON: Yes, Your Honor.

THE COURT: Mr. Brewer, my understanding is that a few moments ago, you orally indicated to the security officer that the Jury had reached a verdict on one count, but desired to continue deliberating on the other two counts. Is that correct?

THE FOREPERSON: That's correct.

THE COURT: And that your continued deliberations, you wished to recess for the evening and to come back at a time that we would discuss, is that correct?

THE FOREPERSON: That's correct.

THE COURT: This is going to seem like a very arduous process, but I actually need to instruct you on the effect of returning less than all of the three verdicts this evening. I need to send you back to the jury room after I do that so that you can confirm amongst yourselves that this is the course of action you wish to take.

Members of the Jury, if, as you have indicated, you have reached a unanimous agreement as to one count, but not as to the other two counts, you may return a verdict as to the count that you have unanimously agreed on, and then continue deliberating on the others.

However, if you do choose to return a verdict as to the one count that you're referring to, that verdict will be final. You will not be able to change your minds about it later on.

I would ask that you now retire to the jury room, make sure that everyone is in unanimous agreement that you want your decision on the count that you have a verdict on to be final. And if so, to let the Court Security Officer know, and then we'll bring you back down the hallway, you

can tell me your decision on that, and then we will take up the issue of when to return for further deliberations.

So at this time, will everyone please stand and the Jury will be in recess until the Jury makes that decision.

(Jury out at 7:51 p.m.)

THE COURT: I do not anticipate necessarily that the Jury will be deliberating very long, so I would propose that the Court remain in session while we wait. I would note for the record that our two faithful alternate jurors are still with us. They have been brought in after the Court's colloquy with counsel before we brought the Jury in. I'll ask that they remain here as well.

(Jury in at 7:54 p.m.)

THE COURT: So Mr. Brewer, as we discussed a moment ago, is it true that the Jury has returned a unanimous verdict as to one of the three counts?

THE FOREPERSON: That's correct, Your Honor.

THE COURT: Which count is that?

THE FOREPERSON: Count Three.

THE COURT: Is the Jury unanimous in its agreement that if it returns this partial verdict, that that verdict will become final?

THE FOREPERSON: We would like to submit all three at once.

THE COURT: All right. So you would like to take verdict three back to the jury room --

THE FOREPERSON: That's correct, Your Honor.

THE COURT: -- when you continue deliberations?

THE FOREPERSON: That's correct, Your Honor.

THE COURT: Now, you were provided with an envelope. Is that envelope sealed?

THE FOREPERSON: No, sir.

THE COURT: Can you seal it for me? All right. And then when the Jury recesses, if you will please leave that with the Court Clerk at the desk here, and whenever we do return for further deliberations, we will return the sealed envelope to you in the jury room.

Has the Jury discussed when you would like to come back?

THE FOREPERSON: Yes, Your Honor. 8:30 on Monday.

THE COURT: All right. We shall return at 8:30 on Monday. Here is the procedure.

If you would get here just a few minutes before that, we will need to call the Court to order. We'll bring you here, make sure everyone is here, ask if you have anything to report from the weekend recess, and then we will send you in to continue your deliberations.

I need to read for you the recess instruction.

During this recess, and every other recess, you must not discuss this case with anyone, including your other jurors, over the recess, because when you deliberate, you can only deliberate as a body of 12. You can't deliberate as a smaller caucus of the Jury of 12.

You must not discuss this case with members of your family, people involved in the trial, or anyone else. Do not allow anyone to discuss this case with you or within your hearing. This would include any members of the media that may attempt to approach you, either when you're leaving the building, arriving Monday, or anytime in between. Only you have been chosen as jurors in this case and only you have sworn to uphold the law and no one else has been chosen to do this. You should not even talk among yourselves about the case before you have heard all the evidence and the case has been submitted to you by me for deliberations because it may affect your final decision. If anyone tries to talk to you about the case, please let me know about that immediately by notifying the Court Security Officer or a member of the Court staff.

When I say you must not discuss the case with anyone, I mean do not discuss it orally or in writing or in any form of electronic communication, as I have instructed you before. It is particularly important -- let me say that again. It is particularly important that you not read

any newspaper or other written account of this trial and that you not watch any televised news account of this trial or any radio program or blog or Facebook or Tweet or what have you. And you must not conduct any internet research or consult with any other sources about this case, the people involved in this case, or its general subject matter.

It is extremely important that you keep your mind free of any outside information. Only in this way will you be able to decide the case fairly based solely on the testimony, evidence presented in this courtroom, and my instructions on the law. If you were to decide this case based on anything else, you will have done an injustice.

It would be a violation of your oath for you to base your decision on some reporter's view or opinion or upon other information you acquire from outside the courtroom. It is very important that you follow these instructions.

When we recess, you will be free to collect your things from the jury room and then leave. I'm going to ask that everyone in the courtroom remain in the courtroom until the Jury has had an opportunity to leave the building. I'd like to ask that we be sure and send some Court Security Officers out on the lawn to be sure that they are not approached by the media or anything like that

until they can get off of the courthouse property.

Can we make that happen?

COURT SECURITY OFFICER: Yes, Your Honor.

THE COURT: As to our two alternates, you're still on our team and we need to have you come back Monday at 8:30 as well. If you will check in with the Court Clerk that you have been checking in with, they will return you to the same sequestration rooms where you have been sitting. The instructions that I just read to our Jury of 12 apply to you as alternate jurors as well.

Any questions? Everyone please stand as the Jury exits. Court will remain in session.

Let me also say that your notebooks with your notes in them, you should leave those in the jury room. They will be secured. No one will read them.

I would ask our alternate jurors, you may go ahead and leave as well. As you leave, you spent some time with the 12 jurors. As you're leaving, please don't speak with them. And we need to take custody of your -- we'll put those in sealed envelopes and return those to you.

(Jury out at 8:03 p.m.)

THE COURT: Any further record that the government would like to make at this time?

MR. SONGER: No, Your Honor.

THE COURT: Mr. Wood?

MR. WOOD: No, Your Honor.

THE COURT: So to be clear, if everyone would please be present and ready to go a little bit prior to 8:30, we will convene court, get our jurors checked in here in the courtroom and then send them right back to continue their deliberations on Monday.

I'm going to remain on the bench for a few more minutes to be sure that our jurors have an opportunity to get on the elevators and leave the property before the participants and visitors in the gallery leave.

Thank you very much everyone for accommodating our jurors. Court is in recess until 8:30 Monday.

(proceedings adjourned at 8:07 p.m.)

# C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 19th day of September 2021.



____________________________________

PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

