IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DISTRICT

UNITED STATES OF AMERICA PLAINTIFF

v. CASE NO. 2:19-CR-20037

ANTHONY BOEN DEFENDANT

---

SENTENCING HEARING

BEFORE THE HONORABLE TIMOTHY L. BROOKS

MARCH 10, 2022

FAYETTEVILLE, ARKANSAS

---

# A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. MICHAEL SONGER
United States Department of Justice
Civil Rights Division
905 Pennsylvania Ave NW
Washington, D.C. 20530
(202) 514-3204
michael.songer@usdoj.gov

MR. BRANDON T. CARTER
United States Attorneys Office
414 Parker Avenue
Fort Smith, Arkansas 72901
(479) 783-5125
brandon.t.carter@usdoj.gov

FOR THE DEFENDANT:

MR. RUSSELL A. WOOD
Wood Law Firm, P.A.
501 East 4th Street, Suite 4
Russellville, Arkansas 72801
(479) 967-9663
rwood@woodlawfirmpa.com

MR. PAUL PRATER
Prater Law Firm, PLLC
4700 Edgemere
North Little Rock, Arkansas 72116
(870) 543-9064
paul@praterlawfirmpllc.com

THE COURT: The first matter on the Court's docket today is in the case of the United States versus Anthony Boen. Our Case Number is 2:19-CR-20037, defendant number 1.

The matter is before the Court today for purposes of a sentencing hearing. This is the matter that was tried to a jury trial last August. The trial attorneys are present today and this includes Brandon Carter and Michael Songer on behalf of the United States. And it includes Russell Wood and Paul Prater on behalf of Mr. Boen.

Mr. Boen is obviously present as well. Good morning, sir.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Do you understand that the purpose of this hearing is to allow the Court to impose its sentence as a result of the two convictions by Jury decision in your case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: In the last 24 hours, have you consumed any medications, or really any drug or substance that would have the effect of impairing your ability to understand what's going on today?

THE DEFENDANT: No, Your Honor, I haven't.

THE COURT: Do you remain fully satisfied with

the legal services of your attorneys?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Let's begin, Mr. Boen, with a brief review of the procedural history in your case.

You were indicted by the Grand Jury back in November of 2019. The indictment was returned down in the Ft. Smith Division. There were three counts alleged in the indictment having to do with deprivation of rights under color of law. You pleaded not guilty to all three of those accounts, or those counts. The matter ultimately proceeded to trial from August 2nd of 2021 through August 9th of 2021. When the Jury's verdicts were announced, they indicated that you were found to be not guilty on Count One and you were found guilty on Counts Two and Three.

You were remanded into custody at that time, and then we began the process of a presentence investigation. Cory Johnson from U.S. Probation, who attended the whole trial of that matter, did further investigation and wrote the presentence report. His initial filing of the investigation was on October 14th of 2021.

In response, the government identified 10 objections. Mr. Wood, on your behalf, identified 15 objections. Officer Johnson considered the parties' objections. He was able to resolve some of each parties'

objections, but not all of them. He did finalize the presentence report as of November 12th of 2021. On the same day, Officer Johnson filed a document that we call the addendum to the presentence report. And this is the document where he summarizes the parties' objections and he explains why and how they were resolved, and if they weren't resolved, his reasoning as to not resolving them consistent with the objections.

Mr. Boen, I mention these presentence report documents because your attorneys had an obligation under our rules to make these documents available to you for review and to explain the contents of the presentence report documents. Did your attorneys do that with you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And have your attorneys answered any and all questions that you may have had about the presentence report documents?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. We will loop back to the remaining objections in just a moment.

I would like to make certain that I have reviewed everything that has been submitted to the Court for review. In addition to the objections, the parties have each submitted sentencing memorandums. The Court has also been supplied with a couple of victim impact

statements in the form of a letter. And then, Mr. Boen, I have received just a plethora of statements of support on your behalf. I don't know how many individual letters there were, but I know that it consumed something like 220 or 25 pages, so about a half of a ream of paper, in order to print them off. That may very well have set a record. I don't know that anyone has ever submitted that many letters of support. Of course the letters of support are very helpful to the Court. As I will explain in a moment, one of the sentencing factors the Court must consider is your background and your history and your characteristics. Some details about that are in the presentence report, but certainly the Court benefits from all of these letters because it learns more about you from the way other people have seen you over a much longer period of time and it gets much more detailed on your good works and that sort of thing. So great packet of letters. Some of the letters that I read are from very close family members, mom, and some siblings and children. And then the scope kind of goes out from that to friends that have known you a long time. But really, the bulk of the letters are just members of the community where you live, just dozens upon dozens upon dozens. Some of the letters even are individual letters, but they might be signed by a dozen or more people. One of them even has an attachment of a

bunch of people that have signed off as if it were signing off on a petition or something. So I think that that speaks well of your background and of your service and your standing in the community and I found all that to be very helpful.

I suppose I should also state for the record that this Judge presided over the trial, so I am aware and recall and have reviewed all of my notes and in many instances gone back and reviewed the transcripts, which are available, and so I have that trial testimony at my disposal.

There were many exhibits introduced at the trial and I have gone back and reviewed many of those exhibits in preparation for the sentencing hearing as well, but I'm obviously aware of all of the exhibits that were introduced at trial.

Beyond that, and I could have missed something, but I think that's it. Anything else that the government's attorneys are aware of that has been submitted for the Court's review at sentencing that I have not identified?

MR. CARTER: I don't believe so, Your Honor.

THE COURT: Mr. Wood, are you aware of anything that you have submitted that I have not identified?

MR. WOOD: No, Your Honor.

THE COURT: All right. Well, let's go back and take up these objections.

So originally, the government had 10 objections. My understanding would be that all of those objections were resolved by the final presentence report with one exception, that being government's objection to paragraph 107. Paragraph 107 is a statement of the probation officer providing his opinion that he was unaware of facts that would support an enhancement for obstruction of justice. The government objects and for the reasons set forth in their objections and I think also in their memorandum, they explain why the two-level enhancement for obstruction of justice should be included in the offense level calculation.

On the defendant's side of the ledger here, my understanding would be that objections 5 and 14 were resolved by the final presentence report, so that left 13 objections that were unresolved. But, Mr. Wood, my understanding is more recently, you are withdrawing the objections enumerated in your Document 108. You are withdrawing objections number 4, 6, 7, 8, 12 and 13, is that correct?

MR. WOOD: Yes, sir.

THE COURT: All right. So we will come back and take a look at the defendant's remaining objections, which

are objections 1, 2 and 3. And then there are objections 9, 10, 11 and 15.

Let's first take up the government's objection. I have read the objections. I have reviewed the briefing. Any further argument that you would like to make on the application of the two-level enhancement pursuant to 3C1.1 for obstruction of justice?

MR. SONGER: Just briefly, Your Honor. Would you like me to stand at the podium?

THE COURT: Either podium is fine.

MR. SONGER: Your Honor, I know the Court is familiar with the record here, but I would just highlight a couple points, which is that obstruction enhancement applies where the defendant attempts to influence testimony from a witness that can affect the investigation or the prosecution of the defense. And the evidence, those interviews at trial in this case shows not just one discrete attempt to intimidate or influence a potential witness, but a pattern of conduct that falls under this enhancement.

I think perhaps the most direct and most relevant evidence is on one of the offenses of conviction here, Count Three of the indictment, the assault on Zach Greene. One of the officers who witnessed that incident who ended up testifying at trial, Travis Ball, after the

defendant learned that there was a federal Grand Jury investigation into that specific assault, because he had received a Grand Jury subpoena for his office for information, he went to Detective Ball, who had witnessed the assault, and gave him essentially a cover story. He told Detective Ball directly, according to Ball's testimony at trial, that if anyone asks about this, what you should say is that the victim, Zach Greene, jumped up in my face and we had to put him against the wall, and that's all that happened. And he reminded him, and there was no one else there to see it who can contradict us. It was just me, you, and one other individual, Chris Roberson, who had been out drinking with the defendant earlier that night. That testimony at trial is corroborated by an audio recording that the government played at trial of a subsequent, around the same time, but shortly after, a conversation between the defendant and Detective Ball where the defendant made very similar statements that were recorded where he again suggested the same cover story and then reminded Detective Ball that there was no one else there that night when we did that. It was just me, you, and the third individual, Chris Roberson.

So that's two attempts to influence Detective Ball's testimony. And Detective Ball testified that the

defendant urged him to tell that story to the Grand Jury when he went in and testified. So that alone is sufficient to apply the obstruction enhancement in 3C1.1. It is an attempt to intimidate or influence a potential witness. But it certainly is not all that the Court has to rely upon. It's just one part of a much larger pattern that includes the defendant going to the witness, Mason Berry, who was a deputy in a patrol vehicle who witnessed the assault that was charged in Count One of the indictment in this case where he made very similar statements where the defendant told Officer Berry a similar cover story suggesting that we should say that the victim had gotten his handcuffs off and was trying to escape and that's why force was used. And as Detective Ball, the defendant again reminded Deputy Berry there was no way to contradict their story. The cameras in his car weren't working. There were no other witnesses who could contradict them. Statements that were pressuring him to give false testimony.

He did this with other witnesses as well. I'm sure Your Honor remembers at trial Detective Hutchison taking the stand and saying that, after the Sheriff learned that there was an investigation of the assault that was charged as Count Two of the indictment in this case where the defendant slammed a detainee to the ground

during an interrogation and pulled out his hair, that the Sheriff came to Detective Hutchison, who was in the room and witnessed that assault, and told him, they don't have anything about that incident, and made suggestive gestures to try to get him to agree that -- to get Detective Hutchison to agree that he would tell authorities that there was nothing there, nothing to see.

Your Honor, I just want to point out that not only are those words and actions clearly covered by the obstruction enhancement, but they are particularly resonant, particularly impactful coming from a person in the defendant's position who was not just any other fellow officer urging his fellow officers to lie. He was the Sheriff. He was the top law enforcement officer in the county, a powerful person in the local community. He directly controlled the employment of the officers he was attempting to intimidate and influence. So in that context, those types of intimidating actions are extra intimidating and extra likely to influence testimony. And given the pattern here, there's little question that that was the defendant's intent.

THE COURT: So question for you. You have mentioned some of the witness intimidation evidence as it relates to then Deputy Berry. And that goes to, or Berry's involvement was with Count One in which the Jury

returned a verdict of not guilty. So for purposes of calculating the offense level for Counts Two and Three, how and why should the Court rely on the intimidation evidence from Mr. Berry?

MR. SONGER: Two things, Your Honor. First, the Court can apply the 3C1.1 obstruction enhancement without any reliance on the evidence relating to Deputy Berry. There's more than enough evidence relating to how the defendant attempted to influence Detective Ball and Detective Hutchison as it relates to counts of conviction in this case. But the evidence related to Deputy Berry, because it involved closely related conduct that was part of the same investigation, is appropriate for the Court to consider.

THE COURT: Well, certainly under 3553(a), you may be right. But the specific line items in the calculation that would come into play here would be paragraph 115 as to Count Two and paragraph 121 as to Count Three. So you're saying that I can nevertheless take in intimidation that goes to a witness about the facts in Count One?

MR. SONGER: Yes, Your Honor. The guidelines allow the Court to consider relevant conduct without limitation that's sufficiently reliable. And as I think we cited in page 12 of our sentencing memo, there are

decisions, appellate decisions, indicating that recent amendments to the sentencing guidelines make clear that with an obstruction enhancement specifically, the Court can consider conduct that is intended to obstruct closely related conduct in addition to just the counts of conviction.

THE COURT: So where do I plug it in, is my question. Which paragraph? In other words, if the alleged intimidation of Berry as a witness occurred, what paragraph needs to change?

MR. SONGER: Your Honor, I think it would most logically fit in the discussion of the obstruction enhancement and what evidence is available to support it.

THE COURT: What paragraph?

MR. SONGER: With the Court's indulgence, one second, I can find it for you. Paragraph 107, Your Honor.

THE COURT: Well, that's an opinion paragraph. That's the probation officer's opinion. That's not part of the calculation.

MR. SONGER: Your Honor, I believe the facts that support the application of the enhancement are already described in the PSR as it's currently written, so the only change would be to the acknowledgement that those facts do constitute obstructive conduct.

THE COURT: Okay. Thank you. Mr. Wood?

MR. WOOD: Thank you. The government, in their obstruction of justice paragraphs, have identified four different individuals, one being Levi White. So I just want to address each one of them since they did raise Levi White and Miller. As far as Levi White, there was no evidence at trial as to the substance of the communication. The probation officer acknowledged that. There was no testimony at the trial and the government did not seek an evidentiary hearing before this Court to put in any evidence that they had regarding the substance of that conversation between Mr. Boen and Levi White. And so I would say that there's no evidence that's been presented either at trial or through evidentiary hearing regarding the substance, so we have no idea what those two individuals talked about. And I don't believe that meets the burden for the government on obstruction of justice as to Levi White.

Now, Deputy Miller, they have thrown him in there also. They put him in there. And as the Court remembers and well knows, there was testimony that Mr. Boen said, "Can I trust you, can I trust you," the night of the incidents. And then there was a party or something later on, "Can I trust you, can I trust you?" Regardless to whether it's true or not true, it's sufficiently reliable, the testimony was, about what

happened. The obstruction of justice enhancement for that individual and for those allegations, that would fail because there was no investigation that was open at the time that those statements were made. And without an open investigation, you cannot have an obstruction of justice.

THE COURT: So you think the chief law enforcement officer of a county telling an eyewitness to a crime the things that he said to Mr. Miller, that doesn't qualify for obstruction?

MR. WOOD: That's correct, Your Honor. If there's not an investigation, there can be no intent by the defendant to obstruct justice. He has to know that what he is saying is trying to thwart an investigation. That is our position on that. And that is --

THE COURT: So if you know that you have just committed a crime, and before the police arrive on the scene you begin intimidating the -- I'm talking about a generic case. I'm not describing the facts here. But someone who commits a crime who has not been charged with a crime intimidates eyewitnesses at the scene, let's just make it a really good extreme example. Let's say he threatens to kill some people. That's not obstruction of justice because law enforcement hasn't shown up to begin an investigation of the crime?

MR. WOOD: That is my understanding of the cases

on that particular issue. The defendant can't have formed the intent. He doesn't have the culpable mens rea to obstruct justice if there has been no investigation and he's not aware that there's an investigation. And so as far as Deputy Miller goes, that's our position on that.

The two calls from Travis Ball, which seems to be the main evidence for the government on the obstruction of justice. First of all, Travis Ball called him both times at the insistence of the -- or with the assistance of the FBI. Not the other way around. Mr. Boen didn't proactively call Deputy Ball. And the Court's heard those recordings. Everybody here has. And unlike the cases cited by the government, there's no direct instruction to lie or change stories or anything else. They are ambiguous. They are subject to interpretation. But we do not believe that those recorded phone calls rise to the level for the government to meet their burden on the obstruction of justice. And the Court is aware, I cross-examined Ball because they really, they are just kind of, he's probing. You know, Ball is probing for stuff, but he never asked him any questions. Ball, Deputy Ball was a detective, seasoned in interviewing suspects and eliciting information. There was never any relevant probing, substantive questions asked by Ball at all. It was just simply the two of them talking, asking, actually

factual, just asking what happened, didn't we do this, didn't we do that. We're talking a year and a half, two years prior that this alleged, this event occurred before the phone call. And so they had ever opportunity to ask him some probing questions if they wanted to see if he was going to obstruct justice. You know the FBI met with him and they went over what they would like for him to talk about and ask the Sheriff. And there was simply no direct statements by the Sheriff or anything else that would rise to the level of obstruction of justice.

Mason Berry, at the time that the phone calls occurred and the obstruction of justice allegation is made, he was not an employee of the Sheriff like the government just suggested. He worked -- he had quit and left. He worked for somebody else. And to kind of highlight our point that the government is kind of throwing some stuff up against the wall to see what sticks, if you notice in their memorandum, they actually try to claim, they're sitting there talking and the Sheriff is like, well, didn't we do this, and didn't that happen? And Mason Berry says, well, don't get me to lying, right. Which is a phrase, a figure of speech that people around the country use to indicate, hey, I don't remember, I'm not sure, don't get me to lying. And they try to make that -- they tried to spin that into the fact

that the Sheriff didn't address that was him condoning Mason Berry lying for him. Now, that's just absurd and that's a stretch. And that's the type of positions that the government has taken kind of throughout their memorandum.

Mason Berry wasn't charged with anything. And the statements by Mr. Boen were all factually accurate. So it's subject to interpretation. They want you to infer that the Sheriff meant that, to infer that he meant this. And, again, we don't believe that that rises to the level that the government has to meet in order to meet their burden on that. And so other than the audio recordings, the government hasn't presented any other evidence that the Sheriff, that there was any more direct or concrete directions that would qualify for obstruction of justice for the enhancement.

Nowhere in any of the audio recordings where the Sheriff instructs anybody to testify falsely or lie or anything else. The only allegation that there is that that occurred were, conveniently, statements by Ball and Hutchison that were not recorded, nobody knows whether or not that was accurate or not. And so we believe that the obstruction of justice is not a proper enhancement under the circumstances.

THE COURT: Thank you, sir. So the Court agrees

with Mr. Wood as to this Levi White person. The Magistrate Judge was presented with a petition to revoke pretrial bond because of what was believed to be improper influencing of someone known to be a witness to Mr. Boen. That matter went to, I think an evidentiary hearing. I don't have the transcript of that hearing. All I have is Judge Ford's ruling which was kind of a grant in part, deny in part. He denied revocation of the bond, but he did make some clarifications as to what would constitute crossing the line as it related to witnesses or potential witnesses and he thought with that clarification, Mr. Boen would know the boundaries that he had to avoid. This didn't come up again. There was no reason for it to come up again. And it's not -- it's just something that the Court is not going to consider as it relates to this objection.

With regard to Travis Ball, Travis Ball provides evidence that is germane to this objection, both in his testimony at trial about the events of the evening in which Mr. Greene was assaulted, to include the dinner before where the Sheriff was first notified about there being an incident at the jail. His testimony goes all the way through going back to the jail and the substantive events that form the basis for the conviction on Count Two. And then he testifies about the sort of

consciousness of guilt statements that Mr. Boen was making. He provides testimony that corroborates Dalton Miller's testimony about the "Can I trust you." And Mr. Ball also provided trial testimony about how the underlying investigation began and about how it was that he was speaking with the FBI and then he transitioned the conversation to some things that he had observed and was concerned about regarding Mr. Boen and his concern as to whether Mr. Boen was violating federal law. And that was the genesis of the investigation.

He also testified as to the timing of when Mr. Boen was alerted or came to know that there was an investigation ongoing. And he testified as to the circumstances surrounding why he participated in recorded telephone conversations with Mr. Boen. I believe it's exhibit, trial Exhibit 9, a conversation, I think the date there was June 20th of 2019. The overall context demonstrates that, A, there was an ongoing investigation, and, B, Mr. Boen was aware that subpoenas were being issued and he was aware that there was an ongoing investigation. And the context was, "What are we going to do if we get a subpoena? What are we going to do if we have to talk to the FBI?" And so Exhibit 9 was part of a larger conversation. I think Exhibit 9 itself is just excerpts, but in pretrial proceedings, the Court had the

ability to listen to the entirety of all of these recorded conversations, and so the Court may be in a little bit better position than even the Jury to understand the full context because the Court had the entirety of the conversations available and not just the excerpts that were ultimately admitted at trial. But at trial, and this is at, I believe it's trial Exhibit Number 9 with regard to the Zach Greene incident, which was Count Three for which there was a conviction. The Court finds by a preponderance of the evidence and based on what the Court believes to be the reasonable inferences to be drawn from both the context of the conversation as well as to the specific phrases used in the conversation, but Mr. Boen is explaining with regard to the Zach Greene encounter, "It was just the three of us." The Court knows that by "Just the three of us," that is referring to Boen and Ball and to Roberson. Ball was his long, long time friend. And Mr. Roberson was a vendor who the evidence shows had become a friend of his. He was in town that night on business. He attended the dinner before the occurrence with Zach Greene. He was staying at Mr. Boen's house, and I gathered that this was a not uncommon thing that happened whenever he was in town. So he is a good friend, I think is a reasonable inference, or was at the time, of Mr. Boen. And so the context here is, "It was just the

three of us." In other words, we're friends and we have the ability to align our stories, and since we were the only eyewitnesses, there wouldn't be anyone else to contradict what we say. The unspoken inference that the Court finds to be true is that, as long as we tell the same story, we don't have anything to be worried about.

I think that the Court's inference is further bolstered by Boen's statement that, "Hey, there weren't any cameras." Actually, there was a camera staring down the hallway, but it was situated such that it didn't look into the cell and there were people positioned that blocked what was going on. So there weren't any cameras. And, again, the only inference to be drawn is, if the three of us keep our stories straight, it can't be contradicted. We were the only eyewitnesses. There's no video footage.

Now, this was, all things considered, a pretty short conversation. But as part of the back and forth, at one point, Mr. Ball pushes back and he says, "Well, if it comes to it, we'll just have to talk to them." "Them" would be a reference to the FBI investigators that Boen was well aware of by that point.

And then in direct response to that, Boen says, "Well, I'd rather not." And, again, the context here is, "I'd rather not. We know what happened and we just need

to keep straight. We were the only ones there." The notion is, it's our word against everybody else's. The three of us, the three of us friends stick together and we'll get past this. Our word against everybody else's. We were the only ones that were there.

In context, this clearly is an attempt to obstruct or impede the administration of justice with respect to an investigation that Mr. Boen then and there knew was ongoing.

It is also an attempt to obstruct or impede that is related to the offense of conviction on Count Three. And according to 3C1.1, at a bare minimum, the Court believes that the evidence establishes by a preponderance of the evidence that there was an attempted obstruction of justice as it relates to Count Three and that that would warrant, at a minimum, a revision to line 121 of the presentence report adding the two-level enhancement as part of the offense calculation on Count Three. It does, just for explanation, require an adjustment or a revision to paragraph 107. Paragraph 107 should be revised to add a sentence that says, "At the sentencing hearing, the Court set forth the evidence that the Court relied upon in finding that, at a minimum, there was obstruction as it relates to Count Three," period.

Now, 3C1.1 also has this reference to relevant

conduct. And this goes to my questions for Mr. Songer. I understand where Mr. Songer is coming from. I think Mr. Songer and the government take the position that if there is any acts that would constitute obstruction of justice in the course of an investigation of either the counts of conviction or relevant conduct to the counts of conviction, then the obstruction of justice enhancement applies for every count of conviction when we get to calculating the offense level. Mr. Songer may very well be right about that. It's a little bit unclear to the Court, but Mr. Songer may very well be right about that. To the extent that the government's position is correct, then I will say here, and this is going to come up again when we get to the defendant's objections, but this is -- what happened with Berry, the recordings that we have about Berry, is certainly relevant conduct. The FBI was investigating several different civil rights issues, potential violations of federal law. It's not like they had cabined their investigation and assigned different FBI agents. It was one investigation. And as part of that one investigation, it was focusing and ultimately led to the three-count indictment.

But the offense conduct is the same categorically for Counts One, Two and Three. There is a temporal relationship of about a year, 14 months,

something like that, between Count One and the other events. And the conduct, which is physical assaulting of persons in custody, is the same. The three of these instances as laid out in Counts One, Two and Three collectively together show a pattern of criminal conduct. Count One resulted in a not guilty, but it was in fact charged in the indictment. So for those and many other reasons, Count One is relevant conduct, and in this particular situation where there is one pre-indictment, pre-verdict investigation by the FBI, the recordings that were introduced into evidence, and these were Exhibits 10 -- well, collectively, the secretive recordings, undercover recordings were Exhibits 9, 11, 12, 13 and 14. A couple of those involved Mr. Berry. And Mr. Berry's conversations with Mr. Boen make it very clear that Mr. Boen was telling Mr. Berry what to tell the FBI.

The phraseology that is used is, "I don't really, you know, remember what was said, but here's what I recall," which is code for, "Here's what we're going to tell the FBI. Here's what we need to tell the FBI. We pulled over, and he, Phillips, had a cuff off. And we were just going to try to get back, but he was" -- whatever was happening in the back. "So we pulled over, got control, and took him in. Just you and me there."

Now, this is consistent with Mr. Boen trying to

craft a story in an effort to persuade these witnesses, "No one can contradict us, it was just the three of us there," or, "It was just you and me there." And the other parallel with Berry is that, just as the camera didn't pick up any recording of the Zach Greene incident in the hallway, it just so happens that Berry's camera in his vehicle wasn't working. And Boen reminded Mr. Berry of that.

In the middle of this, Mr. Berry is saying things like, "Don't even get me lying." I kind of/sort of understand what Mr. Wood's point there is, but I don't think the context here supports that being just some common colloquialism. I think the reasonable inferences here, if you listen to the recordings and if you understand the context about subpoenas being issued and that's kind of the context for the call, and Boen is telling Berry that the FBI is interviewing people, subpoenas are being issued, and, "Oh, I don't recall what happened. Let's talk about this. Isn't this what happened?" And he lists some things. And then in that context, Berry says, "Don't get me lying." And the response was, by Boen, "It was just me and you there, and your camera didn't work."

This was an attempted obstruction or impeding of the administration of justice with respect to the

investigation that was ongoing by the FBI that ultimately led to the three separate counts in the indictment. And it is clear to this Court by a preponderance of the evidence in context that he was attempting to interfere with what this witness would say to the FBI and to have Mr. Berry tell a story that would be consistent with an exculpatory story, but an exculpatory story that was false.

There was also testimony at the trial -- again, to Mr. Wood's point, the investigation by the federal government hadn't begun yet -- but there was also testimony at the trial that Boen insinuated that a report, a police report, an incident report, should be drafted. And the testimony at trial and the reasonable inferences that the Court draws from the testimony is that this report was made a day or two, maybe three, after the incident. It should have been performed more contemporaneously. But bottom line, Mr. Boen was wanting Mr. Berry to fabricate false evidence, to create a narrative within the incident report that was not true. Now, Mr. Wood says I can't use that in arriving at my conclusions because Mr. Boen was not aware that there was a federal investigation ongoing. Mr. Wood may be right about that. It doesn't make a whole lot of common sense in this context when we are talking about multiple law

enforcement officers who had either committed or observed in their presence an assault taking place. And it's clear that Mr. Boen was trying to manufacture evidence.

But let's assume that the Court shouldn't consider that evidence. At a minimum, it is corroborative of that consciousness of guilt and a desire to alter the facts. Even if the Court can't consider what Boen did more contemporaneously with these events there at the police station, they nevertheless, the Court believes, happened and they are consistent with the activities, the actions of Mr. Boen after the investigation began. And they add added context for the Court to be able to arrive at its conclusion that Mr. Boen not only did these things, but he was predisposed to doing these things as evidenced by what he was doing at the time of the Zach Greene incident and at the time of the Justin Phillips incident.

And in that vein, there is also the statements or the testimony of Dalton Miller. Again, this happened on the day, the evening, the late evening hours of the Zach Greene incident. But this notion of impeding justice goes all the way from getting this large deputy, who is like 6'4", 340 pounds, and positioning him in such a way that would obstruct the view of the camera down the hallway to the shower room. And then asking the deputy, "Can I trust you," right before he proceeds to assault

Mr. Greene. And then that phrase, "Can I trust you," becomes a recurring pattern. He asks him that after the beating of Mr. Greene has taken place. Deputy Miller leaves. He can't believe what he just witnessed. He goes back out on patrol, but then he gets urged to come back to the after-party at Sheriff Boen's residence. And he kind of gets segregated into this conversation between Boen and Miller where this, "Can I trust you, can I trust you," happens again.

So according to Mr. Wood, the Court shouldn't consider that, and I won't, except to say that it is consistent with, I believe it happened, number one. And number two, it is consistent with the actions that even Mr. Wood would agree would be proper to consider, which is the actions of Mr. Boen after he was aware that the investigation had begun.

The Court is not entirely -- so bottom line, the Court is going to hang its hat, for purposes of this objection, on the testimony of Travis Ball as I have summarized, and in particular with regard to the recorded conversation that is Exhibit 9. And for purposes of this ruling, that's the only thing that the Court is going to hang its hat on.

I'm not certain as to whether that one incident of obstruction of justice then gets applied to every count

or whether it should only go to Count Three, which is the Zach Greene incident that was the subject of the phone call detailed in Exhibit 9. But I find that it's not guideline determinative at the end of the day, so the Court is going to take the most conservative approach possible here. I am not going to include an obstruction of justice enhancement in Count Two, but I am going to include an obstruction of justice enhancement on Count Three. And so that is how the Court resolves the government's objection number 12.

Let's turn our attention now to the defendant's objections. Those objections I think we can place in several different baskets, so to speak. Let's take up objections 1, 2 and 3 initially, and then we'll move on to some others. Objection number 1 is a broad objection that lacks any particular specificity, but the general idea is Mr. Boen contends that the presentence report should not contain paragraphs 29 through 35 because that has to do with how the investigation began with Ball going to the FBI. And best I can understand, maybe Mr. Wood can help me out here, the idea is that that's not -- it's either not relevant or it's improper to be included in the presentence report.

Objection number 2 is an objection to paragraphs 37 through 50 in their entirety. And I'm not real clear

on whether the objection is that the facts stated in paragraphs 37 to 50 are inaccurate and therefore they shouldn't be included, or whether the objection is, all of those facts are evidence going to Count One, the Justin Phillips incident, and Mr. Boen was found not guilty on Count One, and consequently the trial testimony pertaining to Count One can't be considered as relevant conduct.

And then there is objection 3. This is a very broad and nonspecific objection to paragraphs 51 through 105. These paragraphs detail the trial testimony as it relates to Counts Two and Three and the testimony presented at trial, and of course the Jury convicted on those counts. But nevertheless, the objection, as I understand it, is that the probation officer has written a narrative that is not balanced and it's not fair and it doesn't accurately incorporate all of Mr. Wood's points that were made on cross examination of the witnesses called to testify about Counts Two and Three.

So what I would like to do is to take up these wholesale objections for the reasons stated in defense objections 1, 2 and 3 that more or less seeks to strike, or not exactly sure what is proposed that the Court do, but the objection is to the entirety of the testimony at trial, more or less.

Mr. Wood, this is your objection. Obviously,

the government, to the extent that you have stated a proper objection, as to any particular fact, it would be the government's burden to prove the particular fact that you're objecting to. They would have to prove that at the sentencing hearing by a preponderance of the evidence, understanding that the Court is permitted to consider testimony and evidence that was presented at trial in ruling on the objections.

So I get it that it's the government burden, but it's your objection. So in terms of making further argument, I'm going to let you go first. And if you would like to go last, I'll let you go last as well.

MR. WOOD: Thank you, Your Honor. First, as to objection number 3, we withdraw that. Defendant will withdraw that objection.

THE COURT: All right. The Court will find that objection 3 to paragraphs 51 through 105 has been withdrawn.

MR. WOOD: Now, objection number 1 deals with the initiation of the investigation and there were a variety of different situations, rumors, allegations that Ball had told the FBI about. My objection is to any of the allegations that are not directly related to the three counts of the indictment. There has been -- they are not relevant conduct and there's no reason for them to be

considered. There's was nothing in the trial put forward about any of these allegations, about 309s and using county money to build his house and going to drug dealers' houses and dealing drugs, whatever. All of that stuff that's not directly related to the three counts. There's been no evidence presented at trial. The government has not requested or put forward any evidence at evidentiary hearing to support any of that. There's simply no indication of reliability as to this information. The Court has no information, no evidence before it to make a determination about the indication of accuracy and reliability of those statements, and so I don't believe that they should be considered as relevant conduct. They should not even be included in the PSR. They have nothing to do with this and they have not met any burden that would allow for the Court to consider those other allegations made by Mr. Ball.

THE COURT: So if I understand what you're saying, I mean, you have cast this broadly as an objection to paragraphs 29 through 35, but just kind of looking specifically, I think that your real objection may be to the content of paragraph 30 and to the content of paragraph 35, especially as it relates to Toby Yancey.

MR. WOOD: That is correct.

THE COURT: For purposes of making a good record

here, are you now limiting objection 1 to the content of paragraphs 30 and 35?

MR. WOOD: It would be paragraph 30.

THE COURT: Paragraph 30 pertains to the use of 309s for private purposes. Paragraph 35 is this notion about going around town to residences of sex offenders and telling them to get the -- to leave Franklin County or he's going to make their life hell. And then it talks about Yancey.

MR. WOOD: Yes. 35, 30. And those are the two paragraphs, Your Honor.

THE COURT: So you are withdrawing the objection, or you're limiting your objection number 1 to paragraphs 30 and 35?

MR. WOOD: That's correct. We can do that.

And then on objection number 2, this has to deal with Justin Phillips. While he was -- Mr. Boen was found not guilty, we understand the Court is allowed to consider relevant conduct and relevant evidence from that. However, we do not believe that the facts and allegations surrounding Justin Phillips are even relevant conduct. We don't believe that they meet the burden. And if you just look at the testimony of Justin Phillips and Mason Berry, obviously, the Jury had a problem with it, had a problem with some portions of it, while that does not have a

10:24AM bearing on whether the Court could consider it if it was relevant conduct. Mason Berry testified that he did not secure Justin Phillips properly before they left the jail in Crawford County. And he also testified that he does 10:24AM not know if Justin Phillips actually slipped his cuffs as they were pulling over or traveling back to Franklin County. He testified that he couldn't say one way or the other where the guy had actually slipped his cuffs. What we do know is that he was a perpetual escape risk, 10:25AM escaping from the county. He escaped his cuffs and was attempting to get out of his leg shackles when Zach English and Berry, Zach English, a deputy, and Berry were taking him to Crawford County. He got out of his cuffs and was fixing to get out of his -- attempting to get out 10:25AM of his leg shackles. And we also know that the government's witnesses in this case, Mason Berry and Justin Phillips, said that each other was lying. Justin Phillips said that Mason Berry was holding his head while the Sheriff was hitting him. And then Mason Berry said, 10:25AM that's absolutely not true.

So the issues we have here is that, while Justin Phillips says, "Oh, I wasn't doing anything in the back of the car, I wasn't slipping my cuffs, I wasn't doing any of this other stuff," neither one of those individuals are 10:26AM particularly -- are credible. And the reality of it is,

Mason Berry said he didn't secure the guy. And whether or not he was slipping out of his cuffs and that's what justified Mr. Boen having an altercation with him trying to keep him from escaping and getting him back in the cuffs, that hasn't been shown to be by a preponderance of the evidence or that that is a reliable statement by Justin Phillips or Mason Berry. I mean, the reality of it is, like the Jury, this is open to interpretation of all different witnesses. And so I don't believe that that should be considered relevant conduct because I don't think that the Court has a clear indication of the reliability of any of their statements in light of the testimony that they gave that he was not out of his handcuffs, that he was not escaping, and that this was just some premeditated act by the Sheriff, by Mr. Boen. If he was out of his handcuffs and there was an altercation, it's justified, because escape in Arkansas is one of the most liberal use-of-force situations that you can have.

So while I understand the government, because Justin Phillips in the photographs, he's got some decent injuries, so they want the Court to consider that. They want to show, oh, my gosh, this guy beat Justin Phillips up. But I don't think the evidence is strong enough to support that. Justin Phillips also testified that once he

got to the county, that the deputies got him out of the car and ran his face into the wall at every corner through the jail. And so if he says, well, I got all these injuries from the Sheriff, that's not reliable either because he also testified that his head and his face was rammed into the walls at every corner and turn through the jail while they were putting him in the cell.

We also have Mason Berry, who acknowledged that he lied on the police report. Did he lie on the police report, or is the police report true and he fabricated some stuff on the stand once he was contacted by the FBI and thought he may be getting in some criminal trouble himself. So the evidence does not support the Court considering this incident as relevant conduct because it just does not rise to the level of having an indication of reliability to show that this is -- the accuracy of the testimony is probable.

THE COURT: Go ahead and finish. I'm sorry.

MR. WOOD: That's fine. I'm finished.

THE COURT: I have a question for you. The evidence is undisputed, is it not, that Mr. Boen was in the county patrol car with Officer Berry and Justin Phillips on the night of this occurrence, correct?

MR. WOOD: Correct.

THE COURT: Why? Why was Mr. Boen in the car

that night?

MR. WOOD: I don't think that there's been any evidence presented to the Court as to why he was in the car. I would tell the Court that I suspect it's a situation, a two-pronged situation. Because --

THE COURT: The evidence that is in the record is that Berry was already at Crawford County with another deputy when he received a phone call. And there's evidence about the phone call, or there is in evidence, evidence of the phone call from Mr. Boen. And right after the phone call from Mr. Boen, there is electronic evidence that says that he drove all the way back to Ozark, which is 45 minutes, and then picks Boen up and drives back to Crawford County to pick up Mr. Phillips. And this is in the late evening hours. Why?

MR. WOOD: Well, the evidence in the record is that Mason Berry, when he received that phone call and the Sheriff said, "Hey, come pick me up, we've got to go get Justin Phillips," Mason Berry didn't tell the Sheriff, "Hey, I'm sitting outside here in the parking lot right now." He just said, "Okay," and he got in his car and went back.

I cross-examined him on this: "Well, did you tell him? Why didn't you tell him, hey, I'm sitting right here, do you want me to pick him up?"

"Oh, I guess I just didn't think about it or anything else."

There's no evidence that the Sheriff knew that he was at Crawford County in the parking lot. To the contrary, Mason Berry's testimony --

THE COURT: Okay. Well, would the Sheriff call and want to be out in the patrol car with Mr. Phillips in those circumstances at that time of the night?

MR. WOOD: Well, that's an easy one, because his staff is undertrained. He's understaffed. And anytime that there was a dangerous situation or they were dealing with a dangerous inmate, he is the one who personally had to go do that stuff because most of their employees are young, 18, 19, minimum wage people. He would take that -- and I will tell the Court, I've represented quite a few sheriffs and administration people. I have never seen a Sheriff or anybody in administration that had so much hands-on activity in their sheriff's department. But he was in such a bad position with money, staffing, quality individuals, that he wanted to go do that himself in case there was a problem, he wouldn't be putting any of his young, inexperienced people in jeopardy. And so that's why he does that, because he knew.

THE COURT: Was Mr. Berry young and inexperienced?

MR. WOOD: Well, but they don't have -- they didn't want him to be transporting Justin Phillips by himself. And it was at night and there was only one deputy on duty for the whole county that was serving the rest of the county and he did not want to pull that deputy to put him with Mason Berry and leave the county completely unprotected. And that's something that he had to do all the time because of staffing issues.

But his other concern was Mason, or, excuse me, Justin Phillips is a known violent offender and an escape risk and the Sheriff wanted to make sure -- he's the most experienced person -- he wanted to make sure that he was there to try to deal with that and make sure that nothing happened.

THE COURT: All right. Thank you.

MR. WOOD: And that's all on the Justin Phillips issues. So 3 has been withdrawn. Your Honor, I've got them on my outline, 9, 10, 11, and 15.

THE COURT: Let me take them in these separate buckets, if you don't mind. It will help me keep my rulings straight.

Mr. Songer, I think we're down to the content of paragraphs 30 and 35, and then objection 2 is that the paragraphs explaining the trial testimony of Count One should not be included because there is not a

sufficient -- A, they are acquitted conduct; B, even with the different lower standard, there's not sufficient reliability for the Court to consider them as relevant conduct. Objection 3 has been withdrawn, so I think we are just left with paragraph 30, 35, and then this relevant conduct argument.

MR. SONGER: The government has no intention to ask the Court to rely on the information in paragraph 30 or 35 in considering the sentencing here today. We have no objection to withdrawing that information.

Objection 2 relating to consideration of the Justin Phillips incident, as the Court knows, it's well established that conduct beyond the offenses of convictions, including conduct for which the defendant has been acquitted, is appropriate to consider if it is both relevant and reliable, meaning that it's been proven beyond a preponderance of the evidence. There's no question that the conduct is extremely relevant. The defendant was charged with a pattern of three separate instances abusing his power as Sheriff to assault people that he was sworn to protect. The Phillips incident is one of those three assaults.

The question is whether it has been reliably shown by a preponderance of the evidence, and the evidence that the Court heard at trial easily reaches that bar.

There was only testimony from two people with direct knowledge of that incident at trial, Justin Phillips and Mason Berry. And while they didn't agree on every single detail, as Mr. Wood pointed out, they did agree in their testimony in court on every significant detail. That Justin Phillips was in the Crawford County Jail. When he left, he had no injuries on his body. That the Sheriff, Defendant Boen, was one of the people who picked him up and put him in a car to take him back to Crawford County. There's no dispute about that fact. There's no dispute that when pictures were taken of Justin Phillips when he got back to Crawford County a couple days later, his face was swollen and cut. He had marks all over that appear to be from someone getting punched in the face repeatedly. And the only two people who testified at trial with direct knowledge both said that it was Defendant Boen who repeatedly punched Justin Phillips in the face.

There was disagreement on whether or not Mason Berry was helping to hold Justin Phillips while the defendant was beating him, but there was no disagreement on the fact that it was the defendant who was beating Justin Phillips while he was handcuffed in the back seat of that patrol car.

As Your Honor suggested, that testimony is corroborated by the fact that phone records show that as

Deputy Berry testified to, he received a call from Defendant Boen while he was at the Crawford County Jail. It's corroborated by GPS data that shows as soon as he got that call, he drove all the way across the county, picked up the defendant, then drove him all the way back to Crawford County. And it's corroborated by the circumstances, which as Your Honor suggested, the question is, why was the defendant in the car that night? There was no other apparent law enforcement reason for why, at 10:00 at night, the defendant would have called Deputy Berry, who was already at the jail, already had another deputy with him to drive an hour and a half out of his way to pick the Sheriff up. And that question of why the defendant was in the car was answered by Deputy Berry in court when he said that the defendant told him as they drove back to Crawford County to get Justin Phillips that they were going to beat him. They were going to teach him a lesson for not -- for having previously tried to escape from the Franklin County Jail.

The defendant continued to answer that question after they picked Justin Phillips up. He taunted Justin Phillips and told him that this beating was coming. He said, "If you live through this, you will never forget it." Both Justin Phillips and Mason Berry describe the defendant taunting Justin Phillips as they started to

drive back to Franklin County. They both testified that the car was stopped at the top of the same dark exit ramp. And they both testified that when the car stopped, the defendant brutally beat Justin Phillips. And that's corroborated by the photographic evidence and the other evidence at trial.

That's enough for the Court to find by a preponderance of the evidence that the assault happened and it's highly relevant conduct for the Court to consider.

THE COURT: Thank you, Mr. Songer. The objections to the content of paragraphs 30 and 35 the Court deems to be non-guideline determinative. The Court will also state that it has no intention of relying upon the information contained in paragraphs 30 and 35 for any sentencing purpose or reason today. And, therefore, the Court need not make a ruling on those two paragraphs.

As to objection number 2 and the trial testimony going to Count One, which is the Justin Phillips incident, the Jury returned a verdict of not guilty on Count One. However, as Mr. Wood concedes as a threshold matter and as Mr. Songer has explained, it is permissible for a District Court in a sentencing hearing to rely on evidence that it finds to have been, or facts that it finds to have been established by a preponderance of the evidence before the

Court.

The U.S. Supreme Court has made clear and the Eighth Circuit has confirmed that, quote, "A District Court may use a defendant's relevant conduct in sentencing if it finds by a preponderance of the evidence that the conduct occurred, even if that conduct formed the basis of a criminal charge on which a Jury acquitted the defendant." That's from *United States v. Tyndall*, T-Y-N-D-A-L-L, 521 F.3d 877. The pinpoint is 883. That's a 2008 case from the Eighth Circuit.

Another is *United States v. Lasley*, 832 F.3d 910. The pinpoint is 914. This is a 2016 case from the Eighth Circuit. And in this case, I have a quote that kind of goes more to the rationale of why it is that a sentencing court may consider evidence that was acquitted at trial, but which the Court concludes occurred on a preponderance basis.

In *Lasley*, the Court said, quote, "Because a Jury's acquittal establishes only that the government failed to prove an essential element of an offense beyond a reasonable doubt, it is well settled that a sentencing court may consider the conduct underlying an acquitted charge so long as that conduct has been proved by a preponderance of the evidence."

There are some other cases that are cited there,

including *United States v. Martin*, which is an Eighth Circuit case. Also *United States v. Watts*, which is a Supreme Court case, and *United States v. Stroud*, which is another Eighth Circuit case.

The Court would also reference for the record *United States v. McKanry*, M-C-K-A-N-R-Y, 628 F.3d at 1010, specifically at page 1020. All of these cases go to the notion of permitting a sentencing court to consider acquitted conduct, provided that the conduct has been supported by evidence that would meet a preponderance standard.

Before I explain how I see the reliability of the evidence on Count One and whether it met the preponderance standard or not, I want to include a broad statement for the record here to be crystal clear. The Court in its sentencing decisions today is not relying on any objected to fact or characterization of facts in the presentence report itself. This Court presided over the trial, and therefore instead bases all of its findings of fact and its sentencing decisions based on the trial testimony that was presented to the Court.

If it were the case that every time a case is tried that the summary of the testimony in the presentence report could be attacked and the government held to its burden, they would literally have to put on the exact same

testimony that was presented at trial. And that's simply not the law. The Court is entitled to rely on the testimony and evidence at trial. So this is just a blanket observation and ruling by the Court that the Court has relied exclusively on the testimony and evidence at trial in ruling on any objections and in making its sentencing decisions.

Now getting back to Count One and whether there is sufficient reliable evidence to conclude that the alleged conduct occurred, the alleged conduct being the brutal assault upon Mr. Phillips in the back of a squad car on a dark interstate exit late at night.

Three people were involved with this occurrence. Mr. Boen, it's undisputed he was in the vehicle on that trip. And then Mr. Berry, Officer Berry, Deputy Berry, who provided lengthy testimony at trial. And then there was also the victim of Count One, Justin Phillips. And he appeared, testified, submitted to cross examination.

The Court literally had a bird's eye view of these witnesses as they testified at trial. The Court had the ability to examine their demeanor, their facial expressions, the tone and manner in which they testified. With regard to Officer Berry, based on his testimony and based on all of the other evidence at the trial, the Court concludes that Mr. Berry was not telling the complete

truth about what happened in that incident with Justin Phillips. The Court believes that the totality of the evidence and reasonable inferences to be deduced is that Mr. Berry was a pleaser. He wanted to ingratiate himself with the Sheriff. He may have been intimidated by the Sheriff, but he wanted to please the Sheriff. He wanted to seem like he was one of the guys. And when he got the phone call and then picked up Mr. Boen and it was explained what was going to happen that evening, the Court concludes that Mr. Berry was kind of willing to go along with it. It's just that Mr. Berry didn't know how far the assault would go. And so this is why, under Mr. Wood's cross examination, some of his story breaks down, particularly when we get to the patrol car stopping and what his initial actions were. I mean, what he was saying didn't really make sense about walking around the car and who was doing what. But Mr. Berry had boxed himself in early with his statement to the FBI in which I think he was significantly downplaying his involvement in this incident for whatever reason. Perhaps he didn't want to get charged so he was going to either deny any criminal participation in the event, or best case, significantly downplay what his role was. And I just think that he placed himself in a box and he tried to stick with that, and I think that cross examination exposed that he was not

as innocent in all of this as he would lead the Jury to believe. And ultimately, I think that was perhaps a problem for the Jury.

However, I think that ultimately Mr. Berry, that the balance of his testimony was accurate and was true. The timeline of events that evening are corroborated from multiple different records that are not in dispute, all the way from Berry's initial taking of Phillips from Franklin County to Crawford County because of the escape attempt. And then the call that Crawford County had to take him to the hospital and that, we're not going to pay to have Crawford County officers sit at the hospital, you need to send some people up here, to records that document the times that the transfers between the hospital and the jail were taking place. And ultimately the records of Mr. Phillips being discharged from Crawford County to the custody once again of Mr. Berry and the other deputy who was with him.

There is the phone record that corroborates the phone call that Mr. Berry testified about. Because of the data on his iPhone and the program that he had open on the iPhone that traced his movements that evening and the timing of those movements and when he left the parking lot with Mr. Phillips relative to the call that was placed to, or placed by Mr. Boen, all of this other corroborating

evidence leads the Court to conclude that the largest portion of Mr. Berry's testimony as to the timeline of events happened the way that they happened. And it's just that the Court believes that he was a little bit more of a willing participant initially. The Court believes that Mr. Berry did hold Mr. Phillips, got him by the head or however it was that Phillips described it. But when the assault reached a certain point, Berry panicked. He didn't realize he was signing up for that level of brutality. The Court believes the testimony to the extent that Berry had genuine concern for Mr. Phillips' life. And ultimately, the Court believes, I think it was Phillips that testified to this, that Berry intervened like a referee in a fight and separated, stopped, shut down what was going on, didn't let Phillips get out of the vehicle and got Mr. Boen back in the front seat. And then this radio traffic was concocted. And perhaps Berry was a willing participant in concocting the story as well, but that was mainly Boen at that point making the communications.

So to Mr. Songer's point, the Court agrees that the critical facts here, which is that Mr. Boen with premeditation, knowing that he was going to assault Mr. Phillips, that he had planned to do so. That explains why he was in the vehicle that night at 10:00 or later

that night. That explains why. It's the only reason why, when there are two deputies that already have Phillips, why they would deviate and come back and pick up Boen, because Boen wanted to be in the vehicle so that he could commit this assault. Phillips had escaped from his jail, he had embarrassed him, and he was going to show Phillips who was the boss of Franklin County.

Let's talk about Phillips. Justin Phillips testified at length at trial. The Court had a bird's eye view of that testimony as well. And this testimony was very interesting. Mr. Phillips' testimony was riveting. The Jury was hanging on every word. I'm not going to say that the Court finds that 100 percent of the words that came out of his mouth were true. But despite impeachment with the 609 convictions and his criminal history, he had that working against him. Despite his station in life being a pretty good reason why one would not want to believe him, I think by and large, his testimony was very true and accurate. I realize that he has these 609 issues. But the manner in which he testified, the questions, the tough questions that he owned up to, and the way that he explained what happened that night lines up with all of the other evidence that the Court believes to be true as well. And the Court believes that Mr. Phillips was brutally assaulted by Mr. Boen in the

back of that car while he was in cuffs and restrained, and that Mr. Boen's subsequent efforts to erase that from the record are unpersuasive.

Now, the Jury had to make its decision beyond a reasonable doubt. And I think that that portion of Berry's testimony where he denied or extremely minimized his participation in the beating may very well have been why the Jury just wasn't willing to find that the government had met each element beyond a reasonable doubt. But this Court has no problem believing that the evidence and all reasonable inferences from the evidence, that this event occurred. And even if Berry was an equal participant, which he was not, he was a minor participant at the beginning, but even if he were an equal participant, that doesn't mean that Mr. Boen did not assault a restrained person in the custody of the Franklin County Sheriff's Department.

So what do we do with that finding by the Court? First of all, it goes to Mr. Wood's point about there's no reliable information such that it should be considered relevant conduct and therefore shouldn't be included in the presentence report. The Court, acknowledging some credibility issues as I have stated, finds by a preponderance of the evidence that the core conduct at issue here, i.e., Mr. Boen's assault of Mr. Phillips in

the back of the patrol car on the side of the interstate exit, that happened. And the Court easily concludes that by a preponderance of the evidence, even though for the reasons that I've noted about credibility, perhaps the Court couldn't find that beyond a reasonable doubt.

But for our purposes here, it is proper to include the trial testimony in the presentence report. So to the extent that the objection is that paragraphs 37 to 50 should not be included in the presentence report, for the reasons I've stated, that objection will be overruled. To the extent that the objection is that it shouldn't be considered or treated as relevant conduct because the evidence that is summarized by the probation officer, that evidence is not reliable evidence and/or that it is stated in terms that are more favorable to the government and don't include all of the cross examination points that were made, the Court will simply say that the Court -- to the extent that there's a question about the accuracy or whether the summary set forth in paragraphs 37 to 50 is fair and balanced, again, the Court is not relying on the facts as summarized by Mr. Johnson. The Court in its sentencing decisions and its guideline decisions is based on the testimony and evidence that the Court received during the trial.

A related issue is, since the Jury acquitted on

Count One, what extent should the Court use acquitted conduct in doling out punishment? And so I think that that is a related, but distinct issue from whether it should be included in the presentence report. And the extent to which the Court should consider Count One for punishment purposes I will take up when we get to the 3553(a) factors.

Objection 3 has been withdrawn. The next basket of objections raised by the defendant goes to their objections 9, 10, 11 and 15. The objections here are potentially guideline determinative. There are two enhancements that are implicated by these objections. And the guideline is implicated at paragraphs 105, 111, and 117. One of the issues has to do with the two-level enhancement that comes into the offense level calculation when a victim of an offense under color of law is committed upon a person who is restrained. And the probation officer has indicated that both Brandon English in Count Two and Zach Greene in Count Three were restrained at the time that they were assaulted. I'm not seeing any real objection to the notion that Zach Greene was restrained. The undisputed testimony by every witness that I can recall was that he was in the shower room with a shackle of one foot to two feet long. One end of the shackle was on his ankle or his leg and the other end was

attached to the small bench. I don't really see that there's a dispute that that constitutes a restraint as to Count Three for purposes of guideline 3A1.3 and a two-level enhancement.

But what I do hear is an objection that Brandon English was restrained. Generally speaking, the facts on Count Two are that English was called to one of the deputy's offices, one of the investigator's offices, and a couple of deputies were in the room and Boen had summoned Mr. English after learning that English was either not fessing up to his involvement in some thefts in the county, or that English knew who the perpetrator of the thefts were and was not ratting people out, one or the other. In any event, English gets brought to the room and he's sitting in a chair opposite Ball and Boen is sitting in the other chair opposite Ball. And no sooner than Brandon English sets his rear-end in the chair, Mr. Boen starts yelling, and for lack of a better term, dives into him and the chair goes backward and Mr. English hits his head on the hard floor. And there's some hair and/or beard pulling by Mr. Boen.

The idea here is that Mr. English was not in handcuffs. He was not in shackles. And obviously the Jury convicted on this count. But the objection really is that the two-level enhancement should not be included.

The probation officer says the circumstances of a detainee in a small windowless room with two or three law enforcement officers is tantamount to being restrained.

This is my understanding of how the objections to 9, 10 and 11 and 15 are postured, Mr. Wood. Have I accurately described that?

MR. WOOD: Yes, Your Honor.

THE COURT: You may offer any further argument at this time.

MR. WOOD: Your Honor, on that particular objection, it's undisputed that Greene, Mr. Greene, was chained to the bench. With that determination, that's -- the rest of it, the objection on the English restraint is going to be moot as far as calculation purposes, guideline calculation purposes. But I do believe that the scenario with Mr. English is distinguishable from some of the case law, so I'm just simply going to rest that argument on what we have provided to the Court. Like I said, I think it's moot. It's just that I believe that being in the office, just an office, is less restrictive than some of the cases that have been cited, so I wanted to preserve that objection. It's a moot issue, so I'm not going to present any additional argument or evidence on the Brandon English restraint.

THE COURT: All right. Mr. Songer?

11:12AM MR. SONGER: Your Honor, we agree that this is not a guideline determinative issue given there's no dispute that Mr. Greene was restrained at the time of the assault. It wouldn't affect the grouping analysis either, 11:13AM even if it were only to be applied to Count Three involving Mr. Greene. There would only be a four-level difference in their offense levels. The same grouping analysis would still apply.

That said, the restraint enhancement should 11:13AM apply to Mr. English because he was assaulted while he was in a closed room, inside a correctional facility, surrounded by three officers. There is significant case law supporting that those circumstances constitute a restraint, including the Eighth Circuit's decision in 11:13AM *United States v. Wilson* in 2012. There are others as well. So we would ask the Court to apply a two-level restraint victim enhancement.

THE COURT: As to the detainee being in restraints enhancement on Count Two, the Court is going to 11:14AM sustain the defendant's objection. The parties acknowledge that it's not really guideline determinative here, but I do think it is important to rule because the nature of an assault when the Court is considering the nature of the offense and the circumstances surrounding 11:14AM the offense under the 3553(a) factors, I think it is

significant as to whether the Court envisions and construes Mr. English as being restrained. And certainly there's case law. The probation officer has cited to some case law in the addendum. And what the case law is clear about is that the term "restraint" does not literally require that the subject be in handcuffs or shackles. There are other more broad ways in which a detained person can be considered to be restrained. But I just feel like it stretches the policy and it downplays or it waters down the significance of an assault upon someone who is literally lying on the floor shackled to a bench.

This is a situation where there was just some bizarre conduct by Mr. Boen that wasn't necessary, had no purpose, and caught everyone by surprise. It happened very, very quickly. I just don't think the fact that this takes place in a detective's office in the presence of investigators who thought that they were there, and Mr. English thought that they were there for an interview. It just doesn't feel right to construe Mr. English as being restrained, and so the Court will sustain the objection. I realize it's not guideline determinative, but I think it's important for the Court to rule, to the extent that the Court needs to discuss these issues when it balances the 3553(a) factors.

So that objection as to English is sustained and

that will necessitate an adjustment to paragraph 113 of the presentence report. That needs to be changed to say omitted or not included by ruling of the Court and that needs to be changed from plus two to zero.

So the other aspect of these objections 9, 10, 11 and 15 goes to the inclusion of there being two or more participants when determining the base offense level at 2H1.1. The probation officer has established that the base offense level is a 12 pursuant to that guideline based on the notion that there were two or more participants involved in the offense. That's the base offense level for Count Two at paragraph 111. And it's the base offense level in Count Three at paragraph 117. It's the position of the defense, as I understand it, that there weren't two or more participants, there was only one participant, and therefore, the base offense level should be 10, not 12.

Mr. Wood, any additional argument you would like to make on that one?

MR. WOOD: Yes, sir.

So according to the addendum that has responded, where Mr. Johnson responded to our objection, it appears that there are three incidents where there's two or more participants cited and alleged by Mr. Johnson. First of all, I would say that the government, the prosecutor's

office, it wasn't part of their sentencing memorandum nor did they address in a response to our objections their request or defending a two-point, two or more participant enhancement in this case. So as I understand it, this was simply a determination by probation.

Now, the first incident would be what I'm calling the Miller incident with Mr. Greene where Mr. Boen brought Mr. Miller in there and witnessed the attack on Mr. Greene. And Mr. Ball was there. So the allegation by probation is that this Miller incident, Ball was the second participant. Now, the government's case was clear. The Court just reiterated that all of these individuals said that they were shocked, surprised, dumbfounded with what occurred in each one of these circumstances. And so part of the definition of a participant is a person who is criminally responsible for the commission of the offense. You don't have to be convicted, but you have to be criminally responsible. If you are not criminally responsible, then you cannot be a participant.

So what we're dealing with on the Miller incident where Ball is alleged to have been the second participant, there's been no evidence presented at trial or subsequently in evidentiary hearing pursuant to our objection to this that says or establishes that Ball would be criminally liable for the underlying offense. There's

no indication, there's no evidence, that he knowingly violated Mr. Greene's rights. In fact, they were surprised, he just didn't have the culpable mens rea. They were surprised. They had no idea that this was going to occur. And that's a requirement. First of all, he had to knowingly violent his Constitutional rights. There's also no evidence that he would have violated those Constitutional rights by causing bodily injury. There's no evidence that he struck Greene or had anything to do with Mr. Greene.

It's a little unclear to me that, in the PSR, it talks -- in the addendum, it also talks about aiding and abetting. And it's unclear if the offense -- to me, anyway -- if the offense that we're talking about Ball having to commit, if it's aiding and abetting, well, Mr. Ball, there's no evidence that he had any prior knowledge that this was going to occur. And we have -- his conduct would not meet the definition of aiding and abetting either. He didn't do anything to facilitate this alleged conduct or induce it in any way. In fact, he said he was shocked and appalled. So he could not be criminally responsible. If anything, if you say, well, there was some other potential statute, criminal statute, that he would have violated, I believe that -- for instance, a failure to protect. I don't even know if

that's available or not, but if there were the situation, it's clear that he wasn't doing it knowingly and voluntarily. If it would have been anything, according to his testimony, it would have been under duress, because he was scared of the Sheriff, scared for his job, and he says that he just walked away because he was concerned.

So when we're dealing with Ball, the underlying offense, he couldn't be held criminally responsible for that. He didn't knowingly engage in any conduct for violation of civil rights that resulted in the bodily injury of Mr. Greene.

On the second incident, it's going to be with Ball also, Deputy Ball. And I'm calling this the English incident. Now, the PSR states that, "It's further believed the defendant was assisted by Ball as a participant in the incident involving Brandon English." Again, there's been no evidence presented at trial, through Ball's testimony or anybody else's, or any evidentiary hearing as a result of our objection that Ball knowingly would have violated Mr. English's civil rights in this particular instance. Again, they all testified that they were shocked and didn't know what was going on. And it happened so fast. And, again, if you are not criminally responsible for the underlying offense, then you are not a participant if you are not criminally

11:26AM responsible. So I think in both of these situations to say that Ball was a participant in the conduct for which Mr. Boen was convicted, it's just not going to meet the burden of proof necessary, and there's been no evidence 11:26AM for the state of mind that Mr. Ball would have had to have had in order to meet the definition of participant in this particular instance.

Again, if we are talking about the crime of aiding and abetting, which he could subsequently be 11:27AM punished with the same degree of punishment as the principal, then, again, there's been no evidence that he knowingly aided Mr. Boen. There's no evidence that he did anything to aid, that he knowingly aided Mr. Boen with an intent to facilitate that civil rights violation with 11:27AM bodily injury. So, again, it happened so fast. They were surprised. Their testimony and the evidence is they didn't even know what was going on. Certainly, did not participate.

Christopher Roberson as a participant. Again, 11:27AM he could not be convicted, or, excuse me, held criminally responsible for the attack on Mr. Greene, because, number one, he wouldn't -- he's not a police officer acting under the color of law, so that statute, that civil rights violation would not apply to him as an individual 11:28AM civilian. Additionally, his subsequent statement to Scout

Ingram as she was coming down the hallway, Mr. Roberson was out in the hallway. I would tell the Court, remind the Court that Mr. Roberson testified that he was highly intoxicated. He said that he had drank eight or 10 Ketel Ones. But he also testified that being out in the hallway, he couldn't see. He couldn't see what was going on. He heard some stuff. He heard a slap or something to that effect, but he couldn't see. So, again, in addition to not acting under color of law, it would be impossible for him to be convicted of that underlying offense. His conduct telling Ms. Ingram, "Hey, it's been handled," that conduct is after the fact. That would not be participating in the commission of the offense or even aiding and abetting in the commission of the offense. That conduct would be after the fact. Now, he may be -- he could have some other issue, accessory after the fact or something. But for the purposes of this PSR and what has been listed as a participant, he can't be the underlying offense. But then also, even if you looked at aiding and abetting, well, that occurs prior to the commission of the offense. That's engaging in conduct that brings about, assists, the commission of the offense. The offense had already been committed, of which he didn't even view. He couldn't even see it. And so his statements to Ms. Ingram that "It's already been handled"

would not fall under anything that would allow for him to be counted as a participant also in this case.

Additionally, he didn't direct her not to come down there. He just simply made a statement to her that "It's been handled." She could have came down if she wanted to. However, there's no evidence before the Court that was presented at trial or any subsequent evidentiary hearing that would cause Mr. Roberson to be held criminally responsible, even if he wasn't convicted.

And so that's the basis of our three objections to the two or more participants. I just don't think that that enhancement fits into what we have going on here. I think it's clear that nobody participated or helped the Sheriff. Everybody said this was just an instant event that just took them all by surprise. And so the two-point enhancement I believe should be reduced to the 10-point. We obviously have the six-point. We obviously had some force. So I believe that 10, under the circumstances, is the proper base level offense for Mr. Boen.

THE COURT: Thank you, Mr. Wood. Mr. Songer, do you agree?

MR. SONGER: I bet you could guess, Your Honor.

I do not agree. We agree with the probation office that the proper base offense level is 12 for both Counts Two and Three because they each involve two or more

participants.

THE COURT: I've got Boen. Who are the other participants that could be criminally responsible?

MR. SONGER: Certainly. In both cases, the other officers who are on the scene are criminally responsible under the same statute that the defendant was convicted under, 18 U.S.C. Section 242 which criminalizes both directly depriving someone of their Constitutional rights by using force, or by failing to intervene when a fellow officer is depriving someone of their rights. And both counts involve conduct by additional officers who failed to intervene who could be criminally liable.

For Count Three, the incident involving Zach Greene in the shower room, Detective Ball, testimony at trial established that he was standing right next to the Sheriff. He saw the incident unfold. He recognized it was wrong. He said he was shocked because he knew it was wrong. He saw the Sheriff first throw a cup of water in Zach Greene's face. Then he heard the Sheriff taunt Zach Greene, talk trash to him. And then he saw the Sheriff lean into the shower room and punch Zach Greene in the head five or six times. And even though he found that conduct to be shocking and he recognized it was wrong, he took no effort at all to try to intervene to stop it.

THE COURT: He brought it to the attention of

law enforcement, did he not?

MR. SONGER: Yes, Your Honor, months later. But at the scene, he made no effort to stop it. And certainly that is a consideration in assessing how to use prosecutorial resources and whether ultimately to charge him.

THE COURT: Under your argument, Dalton Miller would be a participant, right?

MR. SONGER: Failure to intervene liability requires that an officer both recognize that he had a duty to intervene and had an opportunity to at least start to try to intervene. I think the facts clearly show with respect to Travis Ball that he had that opportunity because of the length of the interaction, the tossing of water, the trash talking, and then five or six punches during all of which he stood by and didn't even say anything.

THE COURT: So you're really going to parse your theory as between Ball being criminally responsible and Dalton Miller not?

MR. SONGER: The incident with Dalton Miller unfolded more quickly. And he did, even though it was a shorter period of time in which he had an opportunity to intervene, he did intervene. He did tell the defendant, "Knock it off." That was his testimony in court. Whereas

Detective Ball didn't even, in the context of a longer assault, did not try to intervene in the same way.

Mr. Wood is incorrect that to be liable under this theory, an officer would have to actually cause the injuries to the victim. That's simply not true. The law only requires that they recognized that what they were seeing was wrong and that they made no attempt to intervene, even though they had an opportunity to do so.

This is the exact theory that Officers Kueng and Thao were just convicted on in Minnesota in the George Floyd incident where neither of those officers themselves caused any injury to Mr. Floyd, but they were nonetheless convicted under Section 242 for failing to intervene to stop Officer Chauvin, who was the one applying the force. So that is why there are multiple participants as defined by the guidelines for the Zach Greene incident.

The same principle applies to Count Two with the Brandon English incident. I think there, the evidence at trial shows that after the defendant slammed Brandon English over backwards onto the ground and got on top of him and was pulling at his hair and yelling at him, that that portion of the incident went on for approximately 30 seconds while both Detective Hutchison and Detective Ball stood by. Both of those detectives testified that, again, they were shocked by that unprovoked assault. They

immediately knew it was wrong. Yet even though the assault went on for 30 seconds or so, neither of them lifted a finger, neither of them said a word. So under the guidelines, they are criminally liable and therefore participants.

THE COURT: Thank you, Mr. Songer.

The Court is going to sustain the objection largely for the reasons articulated by Mr. Wood. The reasons advanced by the probation officer in the presentence report and by Mr. Songer just now present a very interesting academic exercise. And certainly we know anecdotally recently that the officers who stood by for nine minutes, or whatever it was, while George Floyd's neck was being pinned down by the main culprit's knee, they have been convicted on this exact same theory that's being advanced here. So, clearly, if there were facts here that were analogous to that, I can certainly see why there would be a good argument, and perhaps a clear-cut case for including them as participants.

But those aren't the facts here. If we can just use the closest facts that we have by analogy, if we're looking at what the facts are as the Court laid out earlier about Count One and about Mason Berry's involvement, that would be a situation where Mr. Berry could perhaps be construed as a participant. That

certainly happened over a longer period of time. He physically was holding Mr. Phillips' head, and to the aiding and abetting argument, was assisting Mr. Boen in the assault. But I think it's a bridge too far to do some sort of relevant conduct analysis and say that Mr. Berry is a participant for purposes of calculating the base offense level on Counts Two and Three, so I'm not going to go there.

I think just pragmatically, if you get to the point where you are having to parse between Dalton Miller being criminally responsible or not being criminally responsible while Travis Ball is, that's some pretty darn fine parsing that as a practical matter doesn't make any sense to this Court. The incidents occurred -- technically, there were two vignettes where there were assaults as it relates to Zachary Greene, but each of those vignettes, events happened very, very quickly. And it's easy to say in hindsight that Ball should have done something more, but he's also intoxicated. And I just think that the government has not persuaded the Court that the two or more participants should be considered here in establishing the base offense level, therefore, the objection will be sustained. The base offense level in both Counts Two and Three will be set pursuant to 2H1.1(a)(3) at a 10.

Mr. Wood, I think the Court has now addressed all unresolved and unwithdrawn objections, is that correct?

MR. WOOD: Yes, Your Honor.

THE COURT: All right. So in summary, just to make sure everyone's scorecard is correct, the Court has sustained Mr. Boen's objection to the two participant involvement in the calculation of the base offense level in Counts Two and Three and agrees that the base offense level should be a 10.

The Court has also sustained that portion of the defense objection to including a restrained person enhancement regarding Mr. English in Count Two.

And the Court has sustained the government's objection and will include an obstruction of justice enhancement in the offense level calculation for the reasons that I've explained earlier, and since it's non-guideline determinative, the Court is going to take the most conservative approach that it can, given its findings, and apply the obstruction of justice only as an enhancement on Count Three.

The Court will instruct the probation officer to make revisions as implicated by the rulings that I have just summarized. And this will include the need to do some math where we have adjusted offense levels that vary

and that sort of thing. But other than changes and revisions specifically instructed by the Court today, the final presentence report is otherwise adopted and approved.

So it is 11:45. We've been going for about two hours and 45 minutes. What's going to happen next is that the Court is going to summarize for you, Mr. Boen, the various sentencing factors that the Court has applied in arriving at its sentencing decision. And then I'm going to give the attorneys an opportunity to address the Court and make an argument or a recommendation as to what they think an appropriate sentence should be. And when they are finished, I will give you an opportunity to address the Court. I have been given to understand that you do intend to what we say allocute, and I have been provided with a written copy of your remarks. And I didn't have a chance to read these before we went on the record this morning, but if it's okay with Mr. Wood, we're going to take a break and I'm going to go ahead and read this so that I can hear it for a second time when Mr. Boen reads it in open court, but I want to get it firmly in my head. I think that's important. But I think we do all need to take a break.

Ms. Barden, are you okay with 30 minutes?

THE REPORTER: Sure.

THE COURT: Ms. Craig, can I have 30 minutes or do we need more?

MS. CRAIG: I'm good with 30 minutes.

THE COURT: Anyone need more than 30 minutes?

MR. SONGER: No, Your Honor.

MR. WOOD: No, Your Honor.

THE COURT: We'll be in recess until 12:15.

(recess taken from 11:45 a.m. to 12:18 p.m.)

THE COURT: Mr. Boen, I would now like to explain and summarize the sentencing framework that is used in federal sentencing proceedings. The way I like to think of it is, it's a two-step framework and there are factors that the Court must consider at each step. And these factors must be considered in sequential order.

Step one involves the calculation and then the consideration of what we call the guideline range of punishment. And the guideline range is calculated by applying the United States Sentencing Guidelines to the facts of the case and to your background. The guideline range is where the Court must begin its analysis. This is what the Sentencing Commission advises the Courts to be an appropriate sentence. But the guideline range itself is not binding on the Court. The guideline range is merely advisory to the Court. Sometimes and in some situations the guideline range can be thought of as, if that's all we

had, it would be a one-size-fits-all approach. And the Courts have been clear over the years that sentencing should not be a one-size-fits-all approach. The Courts are instructed instead to conduct sentencing on an individualized basis so that a sentence is custom-tailored to the defendant then before the Court.

So for that reason, there's a second step to the process. And in the second step, there are many other sentencing factors that the Court must apply to the facts of the case and to your background. And after the Court considers the factors as applied in your case from the second step of the process, the Court is tasked to look back at the guideline range and make a judgment about whether the guideline range in your particular case is appropriate. And if so, then the Court can use these same sentencing factors in step two to fine-tune exactly where within the guideline range would be the most appropriate.

But as I said, the Court isn't bound to sentence within the guideline range. So sometimes it is the case, as I know that Mr. Wood is going to advocate, where the guideline range produces a range that in the Court's judgment is too harsh. The Court does have the ability to impose a sentence that is less severe than the guideline range. So that is an option.

The opposite of that is also true. There are

times and situations where the facts and these factors in the second step of the process would suggest that the guideline range isn't harsh enough. And in those cases, subject to the statutory maximum before the Court, the Court has the discretion to impose a sentence that is more harsh, or which is to say above the guideline range, and in fact this is what the government is, I think, going to recommend in this case.

So when we get to step two of the process, I will summarize for you the factors that the Court considers in step two, but the Court is required to begin with step one and the calculation of the guideline range, so I would like to summarize that calculation for you.

For the most part, this calculation has already been made for us within the final presentence report. However, as we all know, the Court, in ruling on objections, different line items have changed, so I would like to summarize the guideline calculation for you now.

To make the calculation, I first have to determine what I call two entry points onto a sentencing grid. The first entry point is known as the offense level. The second entry point is known as the criminal history category. With regard to the offense level and for the reasons that were addressed earlier in ruling on the base offense level, the offenses that you have been

convicted of are associated with a level 10 base offense level. We then look to certain, what are called specific offense characteristics that surround the offense conduct. And sometimes those attributes warrant an enhancement. And here, some enhancements have been applied, so I'm going to break this down by count.

Count Two, the base offense level is a 10. A six-level enhancement has been applied because in your case, you were an elected public official. And in this case, while being an elected official, you committed the offense in your capacity as the Sheriff, which is to say under color of law. So there's a six-level enhancement that is applied. And as to Count One, we add those two components and that gives us an adjusted offense level of a 16.

Then we look to Count Three. Count Three starts with a base level of 10 as well. It also has this same six-level enhancement because you were a public official at the time of the offense and/or the offense was committed under color of law. Both aspects of that apply in our case, so that's the six level.

With regard to Count Three, and this is the matter involving Zach Greene being shackled to the bench in the shower room, there is a two-level enhancement because the person that the offense was committed upon was

physically restrained at the time. That's a two-level enhancement. And then for the reasons explained earlier, the Court has also found that there was an obstruction of justice and there were attempts on your part to entice or intimidate a witness into providing statements to law enforcement that would be false. So that's obstruction of justice for the reasons I explained earlier, and that's another two-level enhancement. So on Count Three, the adjusted offense level, if we add all of these levels up is a level 20.

The next matter of the calculation involves, we have two counts of conviction and we have to merge them. And so the guidelines require us to perform what's called a multiple count adjustment. This is explained in the final presentence report, but it requires us to look at the two counts of conviction, and we use the count that produces the highest adjusted offense level, which is Count Three. And that's true because 20 is greater than 16. And then we look, for purposes of combining them, we see how comparable the two offenses of conviction are as measured by the adjusted offense level. And when the lesser adjusted offense level is within four levels of the greater offense level, then the two counts are merged for guideline, or for offense level purposes by adding two levels.

In sum, we take the offense level 20 produced by Count Three, we add an additional two levels, that gets us up to a total offense level of a 22.

Now, sometimes there is a situation where the offense level can be reduced based on what the guidelines define as acceptance of responsibility. You don't qualify for that, so your total offense level remains a 22.

Then we go to the second input in the formula, the criminal history category. And unlike the offense level, the criminal history category is very easy to calculate. We look to any prior criminal convictions, and you have none. You score zero criminal history points and so that places you in our lowest criminal history category, which is a category I.

Now we pull out that sentencing grid and the Court finds the intersection point between an offense level 22 and a criminal history category I. And at that point of intersection, it's recommended that the Court impose a period of incarceration of between 41 and 51 months and for that period of incarceration to be followed by a term of supervised release for a period of one to three years. It is also suggested that the Court impose a fine in the range of between 15,000 and up to as much as $150,000. The Court is also required to impose what we call a special assessment. That is $100 per count of

conviction.

Mr. Boen, this is the guideline range. This is step one. The Court must consider that range as being appropriate, but the Court is not bound to sentence within that range.

Now we go to step two. Step two, again, is a consideration of factors that lets the Court custom-tailor the sentence in your particular case. A summary of the factors in step two would include a requirement that the Court look to the nature of these offenses of conviction and the circumstances, the totality of the facts and circumstances surrounding them. The Court is also required to take into account your personal history, background, and characteristics. And this is why those letters are especially helpful and important. The presentence report contains a lot of information about your background actually, but the letters give the Court a more robust set of facets through which to look at your life and to take into account this particular sentencing factor of your background and characteristics.

The Court is also required to avoid unwarranted differences when sentencing defendants who are similar in the sense of their criminal histories, if any, and who are similar in the sense of their offenses of conviction. At the end of the day, there is another factor that really

sums up the entire process. The Court's ultimate task is to pinpoint a specific sentence on an individualized basis that will be sufficient, but not greater than necessary, to achieve and fulfill the purposes and goals of federal sentencing.

So what are those? Congress instructs the District Courts that as it contemplates upon its sentence, it should impose that sentence which will be a reflection of the relative seriousness of the offense. The Court's sentence should promote respect for the law. The Court's sentence should be just, which is to say a punishment fitting of the crime. The Court's sentence should also have a deterrent effect, and there are two parts to deterrence. There's specific deterrence, which means that the Court's sentence must be sufficient, but not greater than necessary, to deter you specifically from committing this or other criminal conduct in the future. And then there's general deterrence, which is to say that the sentence imposed here might serve as a message through the community that would have a deterrent effect on others who might otherwise seek to engage in this type of criminal conduct. Finally, the Court must consider the need to protect the public from you, to the extent that the Court harbors concern that you might reoffend in the future and thereby place public safety at jeopardy.

The Court too must recognize that it has multiple tools in its tool belt and it should impose a sentence that will take into account various forms of correctional treatment. So these are the factors that the Court looks to and has applied in your case as it has reviewed all of the sentencing materials submitted for its review today. Now the Court must look back at the starting point of the guideline range and make that determination of whether the guideline range is truly appropriate in your case or whether the Court should, what we say vary downward, as Mr. Wood I think is going to suggest, or whether the Court should vary upward, as I think that the government is going to suggest. That is where we are.

I'm going to let the attorneys address the Court, and then as I indicated, I will permit you to address the Court. Mr. Carter?

MR. CARTER: That's correct, Your Honor.

Your Honor, you said during your colloquy that you believe the government was going to ask for an upward variance. Indeed, that belief is correct. The government is indeed seeking an upward variance in this case to a range that falls approximately between the top end of the guidelines as figured in the PSR and the statutory maximum.

The reason the government does this is the guidelines in this case either don't take into account at all, or they completely undervalue facts which are particular to this case that are better addressed by the 3553(a) factors. Under those same factors, I anticipate the defense is -- and the Court does as well -- going to ask for a downward variance, so it seems that everybody agrees the guidelines don't necessarily work in this case, or at least the parties agree.

And it seems the reason the parties agree this is also similar and that this underlying current is that the defendant was a law enforcement officer. The defense sees this as a very highly mitigating factor. I'm going to argue over the course of the next few minutes it's actually an aggravating factor, especially given that the defendant wasn't a mere police officer, but he was the Sheriff, the chief elected law enforcement officer in Franklin County.

So beginning with the nature and seriousness of the offense, there are more victims of this offense than it seems at first glance and there's more than the guidelines take into account. On its very surface, looking at the guidelines, looking at the facts of the case, this is a violent offense. It was violent to Brandon English. It was violent to Zachary Greene, and

the guidelines do take that into account. What it doesn't necessarily take into account is the distinguishing characteristic between an officer who perhaps was acting in the line of duty and went too far and their judgments were questioned and a premeditated and deliberated set of attacks, like these were. The guidelines treats those the same way and that's one way the guidelines undervalue the actions of Mr. Boen in this case.

These victims in this case were vulnerable. Perhaps one of the most vulnerable positions you can be in is when you are an inmate in a correctional facility. You're certainly more vulnerable when you are shackled to a bench and your movement is even further restrained. These folks could not defend themselves, were not in a position to defend themselves. And in the case of Justin Phillips, the acquitted conduct, he was brutally attacked while handcuffed. That's another thing the guidelines don't necessarily take into account is the acquitted conduct, which the Court has already made the record, the government has proved by a preponderance of the evidence. And in trying to apply that as it relates to the factors, the Court just alluded, you have to look at the totality of the facts of the offense. And the Justin Phillips' incident is part of that totality of the facts.

You also look at the characteristics of the

defendant, which I'll talk about in more detail here in a little bit, but the acquitted conduct in Count One goes specifically to the defendant's characteristics. It shows this pattern of his abuse of his office of Sheriff and this pattern of abusing inmates that are in his custody, and this idea that Franklin County was his county and that he was the boss of this county.

Count One being proven by a preponderance of the evidence also goes to the application of the 3553(a) factors in that one of the factors is the application of the guidelines. And this acquitted conduct is not taken into account at all by the guidelines. As a result of that, the government's argument is the guidelines are just simply too low. So as for how Count One plugs into this, that's the government's argument. But I'm not finished talking about victims.

There are other victims that aren't in the indictment that should be taken into account of when looking at the 3553(a) factors. The defendant, to an extent, made his fellow law enforcement officers who testified as witnesses victims of this offense by the situation he put them in. Travis Ball, Kevin Hutchison, Mason Berry, Dalton Miller. The defendant was right in that, to an extent, law enforcement is sort of a fraternity. I have myself been a member of that

fraternity for the better part, close to 25 years now in my previous capacity as a state trooper and now as a prosecutor. By putting members of that fraternity into this position, you victimize them to an extent. And certainly by asking them to lie, you victimize them, as is taken into account by the obstruction enhancement.

Another victim of this offense, though, are the people of Franklin County, the 14,000 or so citizens in Franklin County. And I bring this up and I want to illustrate this point with this. You will remember at trial and in pretrial, there was a lot of talk about a former Sheriff named Bob Pritchard. Bob Pritchard hasn't been the Sheriff of Franklin County since 1986. Bob Pritchard in May will have been deceased for the last 25 years. However, his infamy continues on. And this is worse. Bob Pritchard was never convicted of the offenses the defendant has been convicted of here today, and yet his infamy lives on in Franklin County and people remember him, not in a good light. I would venture to say that for at least a generation, Franklin County is going to have the reputation of being a place where that, if you do get arrested, the Sheriff is going to do their own justice, no matter who the Sheriff is. It may not matter if we can reincarnate Andy Taylor of Mayberry, North Carolina, as the Sheriff of Franklin County. They are going to walk

around with that reputation, or be seated down there south of us with that reputation, I would venture to say for at least the amount of time that Bob Pritchard has carried that reputation.

The entire law enforcement community as a whole is a victim of the defendant's offense as well. Not only has the defendant done damage to Franklin County, he's done damage to just the law enforcement community as a whole, nationally. Almost 25 years ago, I was a brand new state trooper and law enforcement was seen as a generally honest and honorable profession. I remember being very, very proud around 9-11 of the outpouring of support that existed for law enforcement officers. Something has happened in the 20 years since or so. I can't say what it is. I can't put my finger on what it is. But law enforcement, I'm not saying it's no longer an honest and honorable profession, but the perception of it by the public is much different than it was, say, 20 or 25 years ago. And the defendant is the reason for that. Not the only reason for it, but certainly is a reason for it.

Moving now to the characteristics of Mr. Boen himself, again, the underlying current here is that he was the elected Sheriff of Franklin County and had been so for the better part of a decade. Again, the defense sees this as mitigating, but it's really aggravating. The defendant

was in a very, very unique position to commit this offense by way of his position as a law enforcement officer. The guidelines account for the fact that he was acting under color of law, and the guidelines account for him being a public official. But the guidelines value those two things exactly the same, a six-point increase, meaning had a 19-year-old jailer committed these exact same offenses that was in the employ of Mr. Boen, the guidelines would be exactly the same as they are for the chief elected law enforcement officer for that entire county. And that's a way that the guidelines undervalue the seriousness of this offense.

As the elected Sheriff, the defendant was in a really, really unique position to commit this offense. The offense would be impossible or next to possible for say the elected assessor or the coroner of Franklin County to commit. As the Sheriff, you're in a very unique position of having what I'm going to call personal access to someone's Constitutional rights, nonetheless at a time when they are very, very, very vulnerable. And in looking at this access the defendant has to these Constitutional rights, his actions were to beat very vulnerable victims, often brutally, often while they were in handcuffs or chains or surrounded by other officers in a closed room. That says something about this defendant's

characteristics.

Now, I was not able to determine in trial, and I've gotten a little better view on it here today through Mr. Wood's arguments, but it's been difficult for me to determine during trial or these hearings if the defendant's position on Counts Two and Three has been that those things just didn't happen at all, or they did happen, but it was justified based upon the situation we were in. The latter is really worse. If it's the defendant's position that these things were justified, that says something about his own internal code of conduct that is disturbing to the government.

To this end, my segue is, it seems like the defendant lives a dual life. The best description and the best way I can rationalize this in my own head is that the power of the defendant's elected office had gone to his head in some way where he didn't see himself as just the Sheriff. He saw himself more like the king of Franklin County or the emperor of Franklin County, which he frequently would describe throughout this investigation or throughout the trial as "his county." This was "his county."

Now, if you were a loyal subject of the Sheriff, you probably thought he was kind or benevolent. This is where those letters the Court alluded to comes into play.

Most of these letters were presented to reflect this, and a lot of those letters contain legitimate mitigation, as I would expect to have from somebody that was a law enforcement officer for the better part of a decade. A couple of the letters were, to put it kindly, offensive. Many of the letters were, I think the Court called it a petition earlier. They were in a petition format, and it is something that somebody signed that maybe they knew the Sheriff, maybe they didn't know the Sheriff, but I would venture to say that all of the letters that were presented on behalf of the Sheriff, they didn't see the other side of Anthony Boen. They saw the kind, benevolent Anthony Boen who grew pumpkins to pay for shop-with-a-cop, but they didn't see the side of Anthony Boen that issued what he called "eviction notices" when he dispenses his own justice to get desirables out of what he called "his county." They didn't see the side that beat vulnerable inmates, often when they were chained and shackled, and they certainly didn't see the side that when it's over, he goes back and does it a second time and spits on them. They didn't see the side of Anthony Boen that tries to cover up what he's done by using the influence of his elected position. I'd venture to say that nobody that wrote a letter on the defendant's behalf ever saw that side of the defendant, and that's what I mean by this dual

life.

And I alluded to this earlier, but as it relates to this offense, this defendant did this with a purposeful mind. He premeditated these offenses. He thought about doing it and he did it. It wasn't an offense that was created while he was acting in the line of duty or we're second guessing what he did. It's not what happened in Minnesota. It's not what happened in Ferguson, Missouri. These are premeditated and deliberated attacks, and the guidelines don't fully account for that distinguishing characteristic.

I want to talk about deterrence, and this is another one of those areas where the guidelines don't help a whole lot. Specific deterrence as it relates to this defendant, I don't know if that's a factor or not. And the reason I say that is, the moment he was convicted back in August, essentially he was prevented from ever committing this violation of law ever again because he will never work as a law enforcement officer ever again. That's pretty obvious.

General deterrence in this matter is absolutely paramount, though, more so than it is in many of the cases that come before this Court. I'm before this Court a lot. I'm frequently before this Court on narcotics offenses. We always go through the exercise of saying we hope that

drug dealers see this sentence and it persuades the next drug dealer to not deal drugs. I don't know if I'm a glass-half-empty person. I hope that's certainly true. I don't think drug dealers are having conferences where they get together and talk about the sentence that was handed down and why they shouldn't deal drugs. This case is far different for that very reason.

There are national implications in a case where law enforcement officers sentenced in today's environment -- well, let's set that aside and let's just talk about Arkansas. The Western District of Arkansas has 34 counties, I think. The whole state has 74, 75. I never can remember, 75, I believe. At the very least, I expect those 75 County Sheriffs that are in place right now to be paying very, very close attention to what's happening here today. I expect that the folks at the Arkansas Law Enforcement Training Academy in Camden and over here in Springdale are paying very, very close attention to what's happening here today. I expect the State Police are paying very, very close attention to what's happening here today. I expect that this case will be part of all of those organizations' training for many, many years to come. That's why this case is different than your average narcotics dealer. The sentence the Court hands down here today will be a deterrent to all of

those law enforcement officers, if there's any potential Anthony Boens in amongst them. I hope there's not, but if there is one, the sentence in this case has to send to that individual a strong message that this kind of conduct will not be tolerated.

Sentencing disparity is a difficult proposition in this case as well, especially within the confines of the Western District of Arkansas. In this district, there are no defendants like Anthony Boen. There is only Anthony Boen. Looking outside the Western District of Arkansas as we have done a little bit here today when we talked about Minneapolis, Minnesota, oftentimes, these cases involve line-level police officers, maybe a sergeant, maybe a corporal, maybe a jailer. It is very infrequent that they involve the elected chief law enforcement officer of an entire county. This defendant was in a position of public trust as the Sheriff of Franklin County. He took an oath of office, he took an oath to uphold the Constitution, and the guidelines undervalue this, treating him the same as they would that line-level police officer.

In addition, in looking at all the aggravating factors I've highlighted here, the guidelines in this case, at least in the government's view, are just too low when contrasted with comparably serious conduct that this

Court sees regularly. What comes to mind, and this may seem like an odd comparison, is the case of Paul Petersen that this Court saw about a year ago, maybe a little more than that. The facts of these cases, Mr. Boen's case and Paul Petersen's case are not comparable in the least bit, but the defendants are. They were public officials who both took oaths to uphold the law, and they both should have known better. Mr. Boen's case is maybe even more aggravating because using that position, he committed these violations of law. And as I understand the Petersen case, he had -- what he was doing in that case criminally had nothing to do with his elected position. This is actually worse.

In looking at all of these factors, the government's recommendation is an upward variance; a variance to a range that falls somewhere between the top number in the guidelines and the statutory maximum. The defendant in this case has urged in their sentencing memo a sentence of 18 to 24 months, which is simply too low to do justice in this case. That's a sentence, I'll point out, that's significantly lower than had the defendant accepted responsibility and pled guilty. In this case, there's been, so far, no acceptance, no atonement by this defendant. And the sentence, the sentence that they suggest is even lower than it would be had he pled guilty.

12:57PM Such a variance, as they suggested, would likely create a sentencing disparity, not just with offenders similar to this defendant, but on cases which encompass at least equal or maybe even less serious conduct. It wouldn't 12:57PM have any deterrent effect here in the Western District of Arkansas. And it certainly doesn't take into account the defendant's lack of respect for the law, which should be heightened because he was the elected Sheriff of Franklin County.

12:57PM Your Honor, as I've alluded to and as the Court knows, I was a law enforcement officer myself briefly, ever so briefly. And I'm really troubled by the state of this relationship between the public and its police. Police often are miscast as lacking humanity, as devoid of 12:58PM empathy, as devoid of compassion, and they are seen as being militaristic. And society suffers as a result of this. The defendant and his actions have contributed to this. I alluded to Andy Griffith earlier. As a society, I'm not so naive to believe that we are going to get back 12:58PM to Mayberry, North Carolina, but it would be nice to get the arrow pointed in that direction again.

The sentence recommended by the United States sends a message to the public and the police that police will be held accountable. And it sends a message to 12:59PM police that have less than pure motives that their conduct

absolutely won't be tolerated. This sentence provides justice for the defendant, provides justice for the victims, provides justice for society, and it's not greater than necessary, like the statutory maximum would be. We're not advocating for that here. We would ask that you seriously consider an upward variance in the defendant's case and sentence him to somewhere between the top number of the guidelines and the maximum sentence. Thank you, Your Honor.

THE COURT: Thank you very much, Mr. Carter. Well said. Mr. Wood?

MR. WOOD: Your Honor, as the Court alluded to earlier, the sentencing guidelines have already factored in a significant number of enhancements in this particular case. A six-level enhancement for being a police officer in this particular instance is a significant enhancement under the sentencing guidelines. That is not an inconsequential enhancement of the levels when it comes to the consideration that Mr. Boen was a police officer or the Sheriff or anything else. Additionally, the enhancements for the physical restraint of Mr. Greene and the enhancement for the use of force in the base level offense are additionally significant enhancements that are already factored into the commissions, or to the sentencing guideline range.

Mr. Boen was a Sheriff for approximately 10 years in Franklin County. He was the chief officer of a county that was underfunded, understaffed. He was the recipient of a jail that had not been in state compliance for years and years and years. He was not given the money or the resources to ever bring it into compliance. As a result of that, and I alluded to it earlier, while he may have been the Sheriff, he was doing all of the different duties of that jail. He was down in the trenches. He was a jailer. He was a dispatcher. He was a patrolman. And so to act like that he was the Sheriff and had no other duties within the department, that's just not correct here.

He's in there in the trenches, like everybody else. And it was even more difficult than that because he was responsible for maintaining the security of that facility. Now, his employees, they were all young, 18, 19 years old. The county paid them minimum wage. They don't train them. They don't send them to ALETA, to the academy, to learn how to do any of this stuff. He has to try to get them trained and to get them the knowledge to be able to do that job. He had to do that on his own with his own budget, work it in, let's try to get these people some training. So that created a unique situation for this particular county and for Mr. Boen to where he was

involved with a lot of hands-on activity with the inmates at that facility. In fact, his employees were so unable to run the facility without him that if there was any type of disturbance in the jail -- and they occurred all the time, all the time -- he had to go in and go back into the pods to handle the situation himself to try to deescalate. There's been riots, whatever the inmates have come up with, he is the one that has to go back there and try to deescalate the situation because he wouldn't let his employees go back there without him, because it was dangerous.

And so 10 years of working under these conditions, and there's three incidents that we're talking about here. There were three counts. There were not multiple, routine beatings of inmates who were routinely or usually chained up or handcuffed. There's no evidence of that. That's not what we're dealing with here. We're dealing with the three individuals that were on this indictment.

So I want to look at the seriousness of the offense. Mr. Boen was convicted of a serious office offense. It's definitely -- this is serious business. But we also have to look at the reality of the situation. And this is a very difficult argument for me to make, for the defendant to make, because it can always be construed

as being heartless or trying to minimize the impact on the victims for which he was convicted of causing bodily injury to. But in the grand scheme of things, we're not talking about serious injuries, okay. He was convicted of causing them bodily injury, that's true. However, if you look at Mr. English's injuries, we're talking about, his photograph, he had a bruise on his chest and he said that the chair went over. He said -- he never actually said on his own that he hit his head, but he said he hit everything and some hair got pulled out, okay. That's a serious offense. He was convicted. You're a police officer under color of law. That's still a serious offense, okay. But when you look at the statute, the statute says, did you violate somebody's rights? And if you did, okay, then it's not -- you've got a misdemeanor, okay. But if you cause bodily injury, now we're going to up that and you're going to be looking at some time.

But you also have to look at this in relation to the actual bodily injury that occurred. And on Mr. English, while it's still serious, the bodily injury was so minor that you could almost not have a conviction for this offense if there was any less injury. And I don't know if I said that very well, but the injuries were so minor that anything less, he couldn't have been convicted of the crime. And I think the sentencing

guidelines under the statute do not take that into consideration, that when we're talking -- this was not, a guy died because somebody was on his neck. This was not a Rodney King thing where we beat them and their head is all blowed up and they've got broken bones and we caused internal whatever. This was as minimal -- and the government went out of their way to make sure that, at the jury trial, that everybody knew that there was no mentioning of anything other than just the most temporary, fleeting pain would qualify as bodily injury. And so that has to be taken into consideration.

Same thing with Greene. Now, he was restrained. And we're dealing with bodily injury again. The inference was that he felt some pain from being hit, but he had no physical injuries to him. The evidence was that he got into a fight with the inmate. The photographs that were taken of him that documented his injuries, the jailer, Dakota Cowen said, yes, I saw him after the inmate fight and that's what he looked like. And then he said, I saw him after the Sheriff left for the night and he didn't have any different injuries on him. That's exactly what he looked like again. And the nurse saw him the next day or the day after that, and she testified that he didn't have any injuries on him, physical, that you could see, physical injuries on him that were different or in

addition to the injuries that he had in the photographs that were taken before the Sheriff ever got there.

So I say that's a difficult argument to make, because it is. The government, if they have a rebuttal, will come up here and say, well, you're downplaying the seriousness of the offense and the injury, but that's just reality. The reality of it is, is that he was convicted of bodily injury, but it was almost the least amount of bodily injury that you can cause and still be convicted under the statute. And I think that that is not being taken into consideration whether you are in the statute when you go from a misdemeanor to a felony and in the sentencing guidelines where if he would have had to have stitches, either one of them would have had to have stitches or broken bones mended up, or if it was a prolonged just really violent attack. But that's just not the reality of what we're dealing with here, and that has to be taken into consideration. If the injuries that those two sustained -- and, again, I'm not downplaying them -- would have happened in state court by a non-police officer, this would be a pass for six months to dismiss with no further criminal conduct, or maybe at most a misdemeanor probation-type situation. So the amount of bodily injury, I think, is not properly accounted for, or the lack of bodily injury, by the sentencing guidelines

and the amount of time that the guidelines propose.

As far as deterrence for future criminal conduct of this defendant, his past, he has no criminal history. I would venture to say that it would not be hard for this Court to believe that he's never going to engage in any criminal conduct in the future. He's not going to be a police officer. He won't have the authority or opportunity to be around individuals like this again. And there's no indication that his criminal conduct would extend to anything else.

Deterrence for the community, for other police officers, I get what Mr. Carter is saying. I'm a former police officer, former military, former prosecutor. And it's a bad thing to be convicted of civil rights violations. It's a bad thing. Certainly, and this does have the attention of law enforcement, of people for the most part, around the state and in this community. But when we ask for a downward variance to 24 months, that's a significant indicator to the law enforcement community, because what does 24 months do? It does what it's going to and has done to Mr. Boen. It's going to ruin their lives. It's going to ruin them financially. It's going to ruin them professionally. It's going to ruin them publicly. It's going to ruin their families. He's not -- as we were talking about the criminals, the drug dealers,

and whether a sentence would be a deterrent to other drug dealers. It's not; not in my experience. They don't seem to be deterred. None of my client do, anyway. But you're talking about a whole different segment of society when you're talking about deterrence for future -- to other police officers for this type of conduct. They are not made up and have the same mentality as most of your drug dealers do. This is going to be a deterrence. They're a whole different group of people. They don't want to be ruined publicly and professionally. The stigma, losing their certificate, future employment, going to prison.

Now we're going to have to go to prison. There's going to be protective custody. If you are going to go to prison, you don't want to go to prison as a police officer and have to go to protective custody. That's not going to be a good situation. They know that. And so when you talk about deterrence, it's not going to take an extended amount of time. It's not going to take 320 months to get these police officers' attention as far as deterrence for any conduct like which Mr. Boen has been convicted of. Twenty-four months would be a sufficient deterrent to this group of individuals. And a Sheriff, as far as deterrence to other publicly elected officials like other sheriffs, I think that applies even more so. They are definitely not going to want to go to prison, not even

for 24 months. So I think the deterrence factor of a shorter downward variance would have the impact that the factors are looking for without being unnecessarily harsh.

Talk about his history and his characteristics. And I tell you, when I got the e-mail the other day from the Court, I had no clue how many letters of support that you had received, because I tried to tell them, hey, send them to me and then the process is I'll send them to the probation office or to the Court. But that didn't happen. So I haven't seen them and I didn't read the letters. They are what they are. So I have no idea how many you have received, other than the total number of pages. I have no idea what they have said. But I suspect, just from representing Mr. Boen for the last couple of years, that they are going to be pretty positive. And contrary to what Mr. Carter says, those individuals reached out on their own. We didn't solicit those. As a matter of fact, I tried to say, whoa, whoa, don't be sending a bunch. Let me get them to the Court, because as a public official, you've got no idea what people are going to be sending in to the Court. I was concerned. I said, hey, let's send them here, because I was concerned because who knows what they would send in when you start dealing with the public and your supporters and stuff like that. But I would venture to say that they are probably almost all positive

reflections of him throughout his life, throughout his time as Sheriff. He was a wildly popular Sheriff, 80, 90 percent election rate. And he worked in the communities. He helped the inmates. He started things so that the inmates' lives would be better, to try to get them fresh vegetables, because they are not getting the proper nutrition through what the county was offering. The county was out of state standards. He was trying to get them out. Let the 309s grow some vegetables. Let's let these guys do this stuff. I venture to think that those letters of support, there is going to be some of them that are from people that worked for him, that were in jail in his facility, that were in his jail, a bunch, in and out and in and out and in and out. And the government would have you believe that he's got this double life where he's in there just beating on people that are shackled and handcuffed and everything else. But that's not what the totality of the circumstances I believe would indicate to the Court. I don't think you can hide that if that was your true nature. I don't think you can hide that, not from that many people. Not from people that you put in jail, not from people that are housed in your facility. He went out of his way to help the inmates. Did the stress of the job, did the frustration of the job get to him? Well, he was convicted

of a couple of incidents where obviously something happened. But it's not something that happened other than these three times that there is any evidence of. Dalton Miller should be confirmation of that. If any inkling of this had ever occurred, any type of conduct like what Mr. Boen was convicted of, I would believe that Dalton Miller would have been the first one to leave that jail.

THE COURT: He did.

MR. WOOD: He did after this, yes. I'm saying previous. If that was his routine conduct, if that was the way that he treated people routinely, I think Dalton Miller would have seen that and he would have left before this incident. There's no doubt that something occurred in this anomalous situation, just three counts. But his characteristics, as far as him personally, has been nothing but -- and I'm not talking about the three counts of the indictment -- has been nothing but positive for his community, for his family, for the jail, his employees and the inmates. And I don't think that that can be ignored or that it should be -- that I should allow the government to imply that he runs around on a routine basis doing this type of conduct. I just don't think that that is supported by the totality of the circumstances or the evidence that the Court has been provided.

The Court has the ability to provide a downward

variance in this case. The best case scenario without the obstruction of justice when negotiating with the government before trial was 24 to 30 months. They were fine with that. If you went on the plea that was extended, the offer, if you win on obstruction of justice and you don't get hit with that, there was no two-point for participants. They were fine with 24 to 30 months. Now, nothing has changed. No facts changed. No witnesses changed. The amount of injuries didn't change. Nothing changed other than the fact that he elected to go to trial. Now the government has these arguments where they want not just what the guidelines are, but we want way more than that. Well, that's not reasonable. They were fine with it before. Now, if our mandate, if their mandate is to seek justice, that sounded like justice. And then they said, worst case scenario, if you lose at the sentencing --

MR. CARTER: Your Honor, I'm going to object to this about plea negotiations for two reasons. One, it's not relevant. Two, a lot of it is not true. There was never an offer the government made in this case, certainly not one of any specificity.

MR. WOOD: Your Honor, I will be happy to get the e-mail from Mr. Carter outlining the best case scenario and the worst case scenario, and let me know if

your client wants to take the deal.

THE COURT: Well, I think we're getting a little far astray. I'll accept Mr. Wood's representation of that. I don't know how relevant it is because that's not what happened. If there is a plea, there's acceptance of responsibility and so it alters a lot of the different variables. I'll note that the government disagrees with your characterization, but that's fine. I'll accept what you say at face value.

MR. WOOD: And so that was sufficient punishment. As long as he took what they told him to take and accept the facts as they laid them out, then we are fine with this. But to have the audacity to say, that's not the way that we say things happened so we can't accept that and go to trial and exercise his rights, now the government, instead of saying 24 to 30 months, best case scenario, 51 months to something, worst case scenario. Now they are acting like he's Charles Manson over here and that's all he does is beat people, chained up and handcuffed in his jail. Nothing changed. They have the exact same information then as they have now.

THE COURT: Well, how is that relevant? It wasn't like it's a binding plea agreement.

MR. WOOD: Your Honor, the case law says that it is proper to present this at the sentencing.

THE COURT: To present what?

MR. WOOD: The rejected plea deal. The case law says the Court is not required to accept it, but that does not mean that it cannot -- the contents of a rejected plea deal show that the government, the only thing that has changed, they were willing to say a reasonable sentence was 24 to 30, but the only reason it's anything different now is because we went to trial.

THE COURT: Well, a proposed plea agreement where a defendant accepts responsibility, even if it is with regard to the same conduct, is just a different animal than a defendant who does not accept responsibility, who exercises their right, justifiably so. It's the government's burden. Every defendant in every criminal case can do that. But there are consequences. And one of the consequences is, you don't get acceptance under the guideline calculation.

And so I hear what you're saying. I take it at face value. I just don't -- I'll just tell you in advance, I don't see the Court putting a whole lot of weight on that argument.

MR. WOOD: Yes, sir. So the Court, as it stated earlier, there's the prison sentence, different amounts for prison sentence and one to three years of supervised release. Your Honor, I would propose that a sentence of

24 months with three years of supervised release would provide a sentence that was adequate to punish Mr. Boen, but was not more than what was necessary in this particular situation.

I would also like to point out, in the PSR, I believe they say that the defendant's financial condition is such that he doesn't have the ability to pay. I'd also like to point out when we are talking about potential fine --

THE COURT: Well, I saw that too, but I also saw a net worth that would suggest to the Court that he certainly had the ability to pay a low-end guideline range fine.

MR. WOOD: Well, I just know what the PSR said, their recommendation. His net worth, I can't remember if that included his residence, his homestead.

THE COURT: It does.

MR. WOOD: But I also wanted to advise the Court that we don't believe that a financial penalty, a fine is necessary in this matter because all three of the victims have all filed civil lawsuits against Mr. Boen. Mr. Phillips filed one right off the bat right after his arrest or somewhere thereafter. That case was stayed. But there's a civil lawsuit by Mr. Phillips, and now there is a new lawsuit by Mr. Greene and Mr. English that was

recently served on Mr. Boen, and that was probably a week or so ago, but he was also re-served again this morning in court.

So Mr. Boen is going to spend the next couple of years or however long dealing with the financial repercussions of these convictions. In the civil case for Greene and English, it's just going to be a damages issue. He's going to end up paying something, is my belief, because there is not going to be able to contest liability. So there's going to be adequate opportunity for him to be financially impacted as a result of these two convictions.

THE COURT: Well, I don't know how significant of a factor or how much weight would be appropriate to give to that argument either, but since you brought it up, this Court sees a lot of federal 1983 actions brought against Deputy Sheriffs and Sheriffs, for that matter. And so the Court is anecdotally aware of the county's pool of money and the provision of attorneys. You have some subject matter expertise in at least an analogous situation. Are you suggesting that the association of counties or whatever it's called, that all of Jason Owens' clients, are you saying that they are not going to step in to defend those cases and to pay judgments?

MR. WOOD: That's correct. I represent Mr. Boen

on all of the civil litigation also in conjunction with Mr. --

THE COURT: And that's pursuant to some police association?

MR. WOOD: That's correct. As of right now, on the new lawsuit that was just filed by Mr. Greene and Mr. English, the County has refused to submit Mr. Boen. And the AAC, on their own accord, has also cited intentional criminal conduct as an exclusion to their risk management fund coverage, so they have said they are going to represent the County and they will represent Mr. Boen in his official capacity, the County, but individually, he will not be receiving any coverage from the AAC.

Now, just for full disclosure, on the Phillips case, now that's been stayed for a year and a half or more, and Mr. Owens was initially representing the County on that one also. It's unclear to me initially whether they were extending individual coverage. It got stayed, so I haven't been too concerned about it. It kind of is what it is, but it was stayed so I really didn't relook at it. But I guarantee you that once these get going, the AAC will cite intentional criminal conduct, or intentional conduct, on the original Phillips case to deny coverage individually for Mr. Boen. So those are all issues.

So at this point in time, he is not covered for

any judgment against him individually. My organization does not provide that either. It's defense only. And so he has significant exposure out there individually. And so in lieu of a fine, any assets that he may have are in significant peril as a result of those cases.

I would also tell the Court -- I don't know how this is going to play out -- but I wouldn't be surprised if the County -- it's filed in state court, both of them. The County has made rumblings about removing it to federal court, and then depending on where it lands, because you handled all of this stuff, I don't know how that works. Judge Holmes may move to transfer it to you because you have familiarity with the facts, I don't know. So that's out there also.

THE COURT: All right.

MR. WOOD: Just out of full disclosure.

Your Honor, I think just to highlight, we would request 24 months with three years of supervised release. We believe that that is a sentence that is sufficient, but not greater than necessary, to meet the desires of the Court, of the judicial system guidelines. And that's based on my arguments. But in particular, I just don't know that the statute and the guidelines fairly account for the degree of bodily injury that we are dealing with here. And so with that, that will be all that I have and

I know that the Court is aware, Mr. Boen has a statement that he would like to read to the Court.

THE COURT: All right. Thank you very much, Mr. Wood. That was extremely well said. I appreciate that. Did I hear something earlier about there was going to be a PowerPoint presentation or something?

MR. WOOD: Well, it just didn't work out.

THE COURT: Well, I wanted to be sure there wasn't something else that we needed to --

MR. WOOD: We prepared one, but we didn't use it.

THE COURT: That's fine. Good job.

Mr. Boen, would you like to make a statement?

THE DEFENDANT: Yes, Your Honor. First of all, I would like to say thank you --

THE COURT: Sir, you may stand up at the lectern as well.

THE DEFENDANT: First of all, Your Honor, I'd like to say thank you for allowing me to speak, address the Court.

I understand that during the time of my trial, the goal was to bring out any flaws that I had while I was the Sheriff of Franklin County. If I could, I would like to highlight some of the things that I done, did, that were a positive reflection of my character as I worked

hard to serve the citizens of Franklin County for many years.

Some of the things, Mr. Wood had already touched on. When I took office in 2011, I inherited a jail that ``was built in around 1970. It was designed to house maybe 38, 40 inmates. There were times that as crime increased, drugs, we had a population of over, in the 70s, but it would average probably 50 to 60, you know. And I knew that was something that it had to be addressed and it's something that I -- it fell on me to take care of. So I would put out videos, and of course addressing the quorum court, on social media that how our jail, how inhumane it was. How the overcrowding, they were sleeping on floors. The showers were rusted out. Just, it was just inhumane. And also the state was going to shut us down.

So we had a tax, an election to pass a tax. And of course I was going to be the one to have to address this and push it. And of course anytime you ask the public for money, to get in their pockets, it can be political suicide for an elected official. But this is something that I felt it had to be taken care of. I worked hard pushing the jail on social media, offering tours to people from the county, anyone that would want to come by and visit just to see the living conditions that

these inmates had to live in. And also how it was a safety risk for our employees, the way the jail was designed. I worked hard for that, and it passed. I want to say it was 65 percent of the vote that we got a new facility built that could house over 100 inmates, a very nice facility. That was one of the things I done. And the inmates was one of the main reasons that I pushed for that, the inhumane living conditions for them.

One of the things Mr. Wood addressed also, I had a friend who owned some land right by the river just a few blocks from the jail. I would let the inmates get out and work that jail. We would plant different plants of vegetables, watermelons. And we would harvest that produce, take it back to the jail, and we would feed those inmates fresh vegetables twice a day as long as it was garden season. Sometimes we canned them. If there was some produce left, we would sell it on the courthouse square to raise money for our department, because we had a very small budget, no money to work with. We used some of the money to purchase bulletproof vests for our department.

Then also in the fall, I would have the inmates get out and we would plant pumpkins. And I have a passion for helping children. And we would grow those pumpkins in the fall. The inmates would come harvest them and we

would sit on the courthouse square and sell those pumpkins for fall decorations. And there was times we were -- we would raise several thousand dollars to take some of the less fortunate children, to give them a good Christmas. And the inmates always loved doing that. They felt like they were giving back to the community and helping kids. That's another thing, positive thing that I tried to do to give back to the community and to help rehabilitate the inmates, give them -- you know, learn how to grow a garden. They would take care of all of it.

Over the years as Sheriff, of course as crime, the crime rate up, I seen a lot of inmates come and go through my jail, a lot of times the same ones. Many of those inmates -- well, before my incarceration, they would still call me for advice or message me, text me, call me, come by and see me and tell me thanks for the way I treated them, for helping them to feel like a part of society again. I've helped many of those get into drug programs, drug court. I've helped them get jobs when they were out, helped them get vehicles. Just been there for them anytime they needed a shoulder to cry on, advice, or just to talk. And I would tell them all, anytime you need me, night or day, you have got my cell phone number. Just call me and I would be there.

Of course, the Jury found me guilty on two

counts. That's the reason I'm here. I'd like to say this not only is affecting me. I have five children, one of who I adopted. Her mother was on drugs. My ex-wife and I, we adopted her. I'm her world. I'm the only -- well, me and my wife are the only stable thing she's ever had in her life. I have four other children. I have four grandchildren and one on the way that will be here this summer.

And besides affecting me now, they say every -- sometimes things happen for a reason and sometimes it's for the best. The way I conducted my business, and people will say, oh, being a Sheriff, it's nothing. If I was not in that office, dispatch was required to give my cell number to anyone that called that needed me. I was available 24/7. I never had a day off in 10 years. And I did put being Sheriff above my family. Christmas, Thanksgiving, I would take calls. As Mr. Wood said, there was times I had to do for several, a long time, do my own transports. I would come back in -- I would have to cover 3:00-to-11:00 shift. Time I get home, anytime an overcrowded jail, people is going to be on each others' nerves. There's going to be fights. They'd threaten my jailers. They would call me, Sheriff, we need you to come down here. I had an 18, 19-year-old kid and usually an elderly lady, older lady, I'd say in her 60s, there at

nights. Most of the time, we just had two. So they would call me, Sheriff, we need you to come down here and deal with this. They are tearing the place up, they are threatening us or my deputies. They was calling me every weekend, it seemed like. But I was at that jail most of the time. During the day was my quiet time as far as with the jail. But I was there many, many occasions. Like I said, birthdays, my kids, I've had to go deal with someone. Talked people out of suicide. So this is not only affecting me, it's affecting my children. And I have been -- if this had not have happened, I would have ran for reelection, which would have been another four-year term, and I do believe it would have been the death of me. My health couldn't handle it. And after being -- the indictment, I realize what it was like to have a life again. Of course, I have this hanging over my head. It was hard to focus on life with that. But you always want to help everybody else, but I was taking away from my children. It was affecting my health. So I've give a lot to the job and it's taken a toll on me. My career is gone, my reputation. Financially, this is going to -- civil suits. This is going to take effect on my life years down the road. And I apologize to the Court that we're here. My family.

I've been incarcerated in solitary confinement

for over seven months now. A person has a lot of time to sit and think. That's all I have is my time, my thoughts, my memories. And I've reflected on my life, not only as Sheriff, mistakes I made, things I could have done different, but as a dad, a grandpa. And I've repented of those things to my children. But it's changed me already, and I can see how my stress level is not as high, even being incarcerated, the effect that it was taking, the toll on my family. And, yes, I made some bad decisions in my life, things that I wish I could take back, but I couldn't. I believe that good people make bad decisions. And I've always -- I'm a very religious man. I study my bible. But what keeps me going now in my cell, I read a lot about King David. King David, he committed adultery. He took another man's wife in. She became pregnant. So the first thing David does, he's got to try to figure out how he's going to cover his sins, how he's going to fix this. So he has him to come in from battle, tries to get him drunk, tells him to go sleep with your wife. He wanted Uriah to think that was his child. Uriah didn't do it. He slept on the porch. He wouldn't go. So David was going to try again. So David brought him in, got him drunk again, sent him with gifts, said, go be with your wife. He wouldn't do it. Uriah was a faithful servant to David, to the King. It was an honor to serve the King.

So David knew he had to try something different. So David wrote out a decree and said, give it to -- he sent it by the hand of the man he was going to kill, told him to put him in the heat of the battle. So that's what they done. And when they got in the heat of the battle, David told the other soldiers to back off. So Uriah was dead. David fixed his problem, so he thought. He covered his sin, so he thought. But, yes, there was a price to pay for David. God spared his life, but there was still a price to pay, and David understood that.

But just like David, he's human. He was flesh. The bible said he was a man after God's own heart. And I think, how could a man after God's own heart do such a thing, commit murder and adultery? And the way he done it, to try to get him drunk to cover his sin and his mistake. I can't compare -- my righteousness can't compare to anything of King David's, but I know I'm a good man. I've got a good heart. I've repented of everything that I have done. My soul is in the hand of God. But my fate today is in your hands, Judge, and I ask that you show me mercy, and my children. And I thank you for allowing me to speak, Your Honor.

THE COURT: Thank you, Mr. Boen. I really appreciate what you had to say. You are obviously a very articulate person. Your allocution statement, I want to

state for the record was, the Court believes, obviously sincere and a genuine expression of your remorsefulness. That's probably one of the top five allocution statements that I've ever heard, and so I very much appreciate that, sir. Thank you.

So let's return to this two-step framework that I summarized for you earlier. The guideline range would suggest the appropriateness of a sentence between 41 months and 51 months. The guideline range as I explained though is merely advisory. It's where the Court's analysis must begin, but it can't end there. We have to go to the second step. We have to look to the other factors that I summarized earlier and we have to apply and weigh those on the facts of your particular case on the way to an individualized sentence.

And in doing so, I think that some of these factors in the second step, sometimes they are referred to as the 3553(a) factors because that's where they are found in the code book. I'm going to begin on the aggravating side.

So one of the purposes of sentencing that the Court must look to is the relative seriousness of the offense. This is a federal felony offense, two convictions. All federal felony offenses are serious, but what the guidelines are talking about is relative

seriousness. And I have to acknowledge right out of the gate that the offense conduct in this case is certainly not the most egregious of facts and crimes that are prosecuted in this courtroom. This Court has regular opportunity to see crimes, sex crimes against children or other violent crimes where guns were used or large-scale drug-trafficking organizations. And so in a relative sense, I recognize that we're not talking about seriousness at that sort of far end of the spectrum.

By the same token, when we talk about relative seriousness, these are not offenses that are at the relative low end of the spectrum either. What are we as a nation of laws who abide by the rule of law if there is not vindication of the deprivation of rights, and especially so when a person has been deprived of their rights criminally.

I think that it is serious because it is a violent, the offense conduct here does involve violence. Many of the offenses that are serious and that are prosecuted in this Court, let's say drug offenses where no firearms were used, there are no victims other than society and perhaps the addict, a lot of those people have a guideline range much, much higher than yours, and yet no physical violence is associated with the offense conduct. Here, there was violence. So in terms of relative

1:50PM seriousness, no, it's not the most serious, but nor is it the least serious. And I think that the guideline that is applied here is just kind of at the very cusp of reflecting the true relative seriousness. So relative seriousness here is viewed as aggravating. 1:51PM

Mr. Carter made an observation that is true. It hadn't occurred to me to put it in my notes, but this six levels that is added to the base offense level, that applies in one of two situations. Where the defendant was a public official, or where the offense was committed 1:52PM under color of law. And here, both of those prongs apply. And I think that for the elected County Sheriff to commit a violent offense constituting deprivation of rights, certainly under color of law, that that is particularly egregious. 1:52PM And I don't know that it is really fully captured by those six levels, so I agree with the government's point on that.

Moving on to the nature and the totality of the facts and circumstances that surround the offense conduct, I think what I would initially like to do is to address 1:53PM how I see some of the counts of the indictment as compared to the counts that resulted in convictions.

So Count One, Justin Phillips, I have stated on the record earlier that I think that Mr. Berry was trying to round off the corners on what really happened so that 1:53PM

he could come across more kind of as a hero than what it really was. He was a coward and he went along with this, but only to a point. The Jury acquitted. I have explained why I find by a preponderance of the evidence that the core act of the assault on Mr. Phillips happened. And I have explained that the law is that the Court, where there is evidence that establishes the conduct by a preponderance of the evidence, the Court may take that into consideration. And the brutality that was employed with respect to Mr. Phillips and the circumstances of which he was restrained, really out of all three instances, in the Court's mind, that was the most egregious brutality. But here's what I want to say about that.

I think that just as a judicial philosophy, the Court regularly puts juries in very difficult positions to make decisions about what the facts were in a case. And that's kind of a bedrock principle, a founding principle of our country. And I just think that it doesn't sit very well with me that I would take into account the happening of an event for which someone is criminally culpable. I don't just feel real comfortable taking that into account for punishment purposes, even though the law says that I can. So I'm not going to spend a whole lot of time talking about Justin Phillips. I'm not going to spend

really any more time talking about the brutality of the actual act at the end of the exit ramp. But what I do think is fair game are the contextual facts, how this fits into a timeline of your career there at the Sheriff's Office, what it says about your character, especially what it says about your character after Mr. Phillips is back at the jail. That's not something that you were on trial for, but there was testimony about what happened to Mr. Phillips back at the jail. And I think that this really goes to not only the totality of the facts and circumstances, but what I really think that it applies to is your character. And so I'll talk a little bit more about that, but I want the record to be clear that, even though I can consider acquitted conduct where it's established by a preponderance -- and I have already found that it is -- I'm not going to factor that incident of what happened at the end of the exit ramp into the Court's punishment decisions today. And I do that out of a sense of respect for the Jury's verdict.

When we consider what happened to Mr. Phillips after he arrived back at the jail, and you used a term a few moments ago, "inhumane." You were not given a budget to run a professional jail and the conditions, the physical conditions, were such that it was bordering on inhumane treatment and that bothered you. And yet I was

shocked to hear Justin -- you can shake your head, Mr. Boen, that's fine. That's fine. I found Justin Phillips to be a very credible witness. I did. I found his testimony to be riveting. And his testimony was that he's taken back to the jail. He's stripped and he's thrown in the hole. And he's left that way until his lawyer shows up, which is three or four days later. And then miraculously, before his lawyer gets there, he gets cleaned up a little bit. That's inhumane. That's inhumane. And as we will see, that seems to be a recurring theme.

Moving on to Brandon English. I think that the conviction regarding Blandon English is significant and I place weight on it here in terms that it establishes that these aren't just a one-off situation. This attitude and belief that you were going to be the enforcer of the rules that you believed should be enforced and that it was your county and you had the authority to tell people to get out of it that you didn't like or that you felt were undesirable. It shows that these other instances weren't just a one-off. It shows that this was more permeating about how you viewed yourself in the role of Sheriff.

Beyond that, I don't think the Brandon English thing is terribly significant here. I don't know, but I highly doubt that if Brandon English and that incident, if

that were the only mark against you, I highly doubt that the Department of Justice would have prosecuted that. I do agree with Mr. Wood that the harm there was de minimis. Was it completely inappropriate? Absolutely. Was it a violation of the trust of the badge and the oath? Absolutely. But if that was the only thing that you had ever done, I don't think you would be sitting where you are sitting now. So I weight that for context, I weight that on character. Obviously, you were convicted. Obviously, some punishment is due for that. But it was a very quick outburst and I think it says more about your character than it does about an intent to brutalize somebody.

The count of conviction as it relates to Zach Greene, however, I do find to be particularly egregious. Again, our country is a country of laws. Our country is one that's predicated on the rule of law. When people violate the law, there's a criminal justice system that deals with it. And people who commit crimes against children, speaking of very serious offenses, are dealt with. Frequently, they meet very serious punishments. But the great thing about our Constitution is, even criminals have Constitutional rights that must be observed. And just because someone is accused of a crime and they're physically sitting in jail doesn't mean that

they can be treated inhumanely.

The offense conduct against Mr. Greene is consistent with your character that is a common thread running through these other incidents, but here are some of the reasons why I think it's particularly egregious. First of all, the offense conduct occurred in two separate vignettes, two separate points in time that evening. There was one vignette in which Mr. Ball and Mr. Roberson were eyewitnesses. And then there was another vignette when the only eyewitness was Deputy Dalton Miller. Both instances were premeditated. You amped yourself up on that car ride back from Bricktown, or whatever it's called, and you were getting your game on. I don't know if your intent was to show off to your buddies. There was a suggestion, I think in Travis Ball's testimony, that you were intoxicated. I don't know -- I mean, he didn't paint you as a horrible drunk, but there was a factual dispute about whether you had had very much to drink that night. What is interesting is, the defense theory at trial was that you maybe had half a glass of wine. So we can't even blame this on some really bad decisions because you were impaired. This is something that you did, viewed from the defense theory of the case, clear-headed, had all this time to think about it. So I don't know if you were showing off to your buddies. But the first thing you do

is you go straight to the shower room. You see a person who has been accused of a horrible crime, but they're helpless. They are shackled to a bench in a very small area. He had caused some disturbance in your jail earlier that evening. And by God, no one messes with the King's jail. You were going to show him. And you did. Threw water, a glass of water in his face. And then you proceeded to whoop him. And that's the end of that vignette.

And at some other point shortly thereafter, you grabbed Dalton Miller and you say, come here. Now, for the record, I have to comment on Dalton Miller's credibility. Dalton Miller could not have had more credibility as a witness on the witness stand if he put an American flag around his shoulders. He was literally, looks like you look up "Boy Scout" and he's in the picture next to it. In observing his demeanor and the way that he testified and the impression that the events that he observed left on him, I believe every single word of Dalton Miller's testimony. He says you grabbed him, brought him to the shower room, strategically placed the 6'4", 340-pound Mr. Miller in a position where it would obscure the camera, asking him, "Can I trust you, can I trust you? Look what I'm getting ready to do, son. Here's how I rule this jail."

Dalton Miller is a rookie. He looked up to you. He always wanted to be a cop. You were a hero to him. And then there's round two in your assault of this helpless person, shackled to a bench in the shower room. And Dalton Miller couldn't believe what had just happened. According to Dalton Miller's testimony, when you had finished getting in your blows, you then did something. This is a common thread that I think is very disgusting and inhumane. You spit on him. No law enforcement officer, no elected Sheriff, no matter what someone in his charge, someone chained to a bench in his jail does, gives anyone the right to disrespect another human being by spitting on them. You want to talk about inhumane conditions at your jail? That's an inhumane condition at your jail.

The time it took to move from vignette one to vignette two is another act of premeditation. You had to have thought through, hey, Dalton Miller, he's a big guy, he's going to block the evidence. And by the way, tampering with evidence or figuring out ways to manufacture evidence or the absence of evidence that would otherwise be present is another common theme that runs through your offense conduct. "I can trust you, can't I, Dalton?" And then you get Dalton Miller to come back to your after-party at your house and you pull him aside and

you go back to these questions, "Can I trust you?"

Deputy Miller said this "can I trust you" line was repeated multiple times at the jail and then again when he was corralled into coming over to the after-party at your house. He was asked at trial what he understood that to mean. Deputy Miller testified, "Pretty much like he" -- referring to Sheriff Boen -- "wanted me to sweep everything under the rug." Question, "And how did that make you feel for your boss to ask you that?"

Answer, "Well, it was a man that I looked up to and I always thought he was a good man, and I was just very distraught." He explains why you wanted -- you told him that -- that the Sheriff wanted him to come to the Sheriff's house. He just wanted to leave. He went back out on patrol, but he gets a call. He feels uncomfortable, but he goes back.

At some point at the after-party, question, "Was it just you, the Sheriff, and Travis Ball left?"

"Yes, sir."

"And at that point, did the Sheriff say anything to you?"

"Well, he asked me repeatedly, like he asked me if I could -- if he could trust me."

"He asked if he could trust you again?"

"Yes. He said this multiple times while I was

at the house."

"How did he say it?"

Answer, "It was intimidating." Intimidating. "Like he wanted to make sure, almost like he was questioning me, almost. It was very intimidating. It was close to the end of my shift. I continued patrolling, trying to get it out of my head and I eventually went home crying, because this was a man that I looked up to as a hero. And I always thought he was a good man and a good role model as a law enforcement officer, and then for something like that to happen, it just opened my eyes."

So again this common theme of intimidation of subordinates. When the FBI started investigating, you continued this pattern, given what the Court reasonably believes occurred with the Justin Phillips deal, and then to hear Mason Berry's testimony about how it came to be that there was an incident report that was drafted that didn't reflect the truth at all. I do very much believe that part of Mason Berry's testimony. And that's this pattern of thinking that you're above the law and that you can alter the records, you can manufacture evidence, or create the absence of evidence. All that is aggravating.

And then we have the actual recordings that were in evidence. And in context, I mean, you are literally then interfering with the federal investigation trying to

influence testimony and interfering with these witnesses. Common theme, I find all that to be aggravating.

The offense conduct here is a breach of the public trust. And not just as the breach of trust of an elected official, but as an elected law enforcement officer, the so-called chief law enforcement officer in Franklin County. And according to one witness, you had this idea that you wanted to recreate the mystique of Bob Pritchard. That was your role model.

Mr. Carter made mention of this, and I think it's true, about how you viewed Franklin County as yours. It was your kingdom. You got to decide how the undesirables would be run out of town. It's a common theme running through all the evidence in this case, and I think that that is aggravating.

After I had already made some notes about what I wanted to say about that, I turned my attention to reading all of the letters that had been submitted, hundreds of pages of letters. And I came across this letter. And almost kind of in the sign-off part of this letter, there are three very short, very concise sentences that so accurately describe your thinking and your mentality. This letter writer says, "Your Honor, the Sheriff acted like he was the judge, jury, and executioner. He let the power go to his head. As the Sheriff, he should be held

to a higher standard."

I agree with every one of those sentences and I couldn't sum up my thoughts about this aggravating component any better than how that letter writer explained it. You have every right to hold the government accountable to its burden of proof. You have the right to be presumed innocent, and that is a bedrock principle of our criminal justice system. And this Court just is always very, very careful not to say anything that could be construed as holding that against you. I do not hold it against you whatsoever for holding the government to their proof. Count One is a very good reason, very good example of why the Court shouldn't hold it against you.

That said, there's no acceptance of responsibility here. In almost every sentencing before this Court, the concept of acceptance of responsibility is on the mitigating side of the ledger. Here, it's on the aggravating side of the ledger.

One of the purposes of sentencing is to promote respect for the law. You're a sworn law enforcement officer elected by the public. You took an oath after every election to uphold and defend the Constitution of the State of Arkansas and of the United States. And your actions in this case demonstrate that you have no respect for the badge and no respect for the oath. And that's

2:25PM aggravating as it relates to promoting respect for the law.

With regard to deterrence, in terms of specific deterrence, I do not have a whole lot of concern about

2:25PM this Court ever seeing you again in terms of reoffending. I believe that specific deterrence and the need for specific deterrence is mitigating here. I don't think that -- your criminal history is such that I just don't have a whole lot of concern that you are going to reoffend

2:26PM again and therefore, I don't have a whole lot of concern about you reoffending on the public. I don't have a whole lot of concern about imposing a sentence to -- there's no great need to take public safety into context. You will never be a law enforcement officer again. If there were a

2:26PM chance of that, I would have concern, but there's not.

But there is this concept of general deterrence. And I heard your fabulous allocution. I've heard all the very articulate things that Mr. Wood had to say in favor of a downward variance. But the concept of general

2:26PM deterrence is aggravating in the sense that the Court, through its sentence, must send a message to law enforcement that this type of conduct is unacceptable. There are a lot of civil rights cases. We don't see a whole lot of criminal deprivation of rights cases. But

2:27PM what we see a lot of in the civil cases are actions that

law enforcement officers commit in the heat of the moment when they have a very precious few seconds to decide what they are going to do. And I think in this case that the sentence here needs to send a clear message that, when someone is in custody, when someone is in handcuffs, when someone is shackled to a bench, it's hands off unless they are a threat to the jailer, to law enforcement. Here, with regard to Zach Greene, he wasn't doing anything. Nothing. And so general deterrence in these situations where the conduct is premeditated and not in the heat of the moment where a law enforcement officer should be given a little more slack, I think a message has to be sent. And so specific deterrence, I'm not too concerned about. General deterrence I think I need to take into consideration here.

Let's turn to the mitigating side of the equation. Mr. Boen, you are a first-time offender. You have no prior criminal history. In many sentencings, that is a factor that weighs heavily in the Court's sentencing decision. And I've taken it into consideration here. Obviously, if you had some sort of prior convictions for things that were violent in nature, that wouldn't be good. So it has to play in a mitigating light here that you have no prior criminal history. That said, the whole idea of giving significant weight to a first-time offender, it's

kind of like you're giving somebody a second chance for having made a dumb mistake. When you are an elected law enforcement officer and you assault people who are shackled to a bench, you don't get a second chance. You don't get to replay that. You don't get a do-over. So in your particular case and on the facts here, the fact that you are a first-time offender is not weighted as heavily as it might be if this criminal activity arose in some other context.

It sounds like you were raised in a good home, especially as your mother is concerned. However, your father was not in the equation and there were multiple instances where your stepfather had a drinking problem, and when he was drinking, that created a lot of conflict and strife in the family. Fortunately, he got over that and I think things were good in the end. But in your formative years, you perhaps suffered from a lack of a proper father figure in your life. And one can't help but wonder if these notions that it's okay to engage in violence, gratuitous violence, that you may have learned from your stepfather, so I'll accept that as mitigating.

Mr. Wood and Mr. Boen makes the point that the conviction here results in a punishment by the loss of Mr. Boen's profession in law enforcement. He will never be a law enforcement officer again. And so in that sense,

the punishment here is a little more unique and burdensome in that sense. Fortunately, Mr. Boen does have some construction management skills and some entrepreneurial skills. He had a small business for a number of years there in Ozark. And he's also a farmer and a cattleman, and so he does have some good skills to fall back on, even though he won't be a law enforcement officer again.

The point was made that because Mr. Boen was previously a law enforcement officer and because of some of the particular facts in the offense of conviction, that if word gets out in the prison about those facts, that that might increase his risk of harm in the population. I don't have any reason to doubt that that's true, and that, therefore, means that your punishment may -- your incarceration may be more difficult to serve than for the average defendant, so I think the Court should take that into account as mitigating and in terms of what the sentence imposed should be.

You are 51 years old. Age is not supposed to be a factor in sentencing, but I think one's station in life is always an important factor to think about. At 51, of course, you were a few years younger during the offense conduct, but this conduct is not a result of immaturity. You're a full grown man in a position of enormous responsibility and a person that makes decisions who has

been given a lot of responsibility that's not good. But by the same token, you're 51 and the Court is mindful of this unique station in your life where you have these children and grandchildren and one child that is still in the house that needs perhaps a fatherly influence that you didn't have. I appreciate you recognizing that. I think that is mitigating.

You do have good education. High school graduate, barely from the GPA there, but a high school graduate nonetheless. You do have tremendous family support. And sometimes that's kind of to be expected, but the family support here is very deep. You are the patriarch of your family and at every level up and down, sideways, you have enormous family support that will be a constant source that you can rely upon while incarcerated. And, obviously, that family support is so important when you get out for reestablishing yourself, so I think that that is mitigating.

And then I want to talk about the letters from the community. I would suggest to Mr. Wood that, next time, it might be a good idea to read some of those letters. There's a few of them that you might have culled out, but let me just set those isolated exceptions to the side. There's a tremendous outpouring from the community. And I want to recognize, Mr. Boen, that in a federal

criminal case where the case has gone to trial and it's all about the crime that has been committed, and then we get to the sentencing hearing, and the whole point is to rehash the bad things that someone did, it can start looking like the only thing that anyone is interested in are those instances where I did bad things and I don't get any credit for the rest of my life. And I want you to understand that I'm fully aware and am always cognizant not to allow myself to fall down that trap. I don't think -- there could be some exceptions, but you're not one of them. People typically are not defined by the few bad decisions that they have made. We have to put that into the context of all of the good things that people have done throughout their lives. And that is one thing that's a common theme through all of this support that you have in the community. They see you as a good person. They see you as a hard worker. I mean, what you said in your allocution statement, that is not just Mr. Boen saying things to toot his own horn. Those same things were repeated time and time and time again. If I heard about the pumpkin patch one time, I heard about it 100 times. And what a good idea. And you making the most of the natural resources, getting inmates outside to work in the garden, to harvest food that they can then eat, that's a great idea. You're an outside-the-box thinker. People

write, even some inmates, about the positive influence that you had in their lives. Parents write about their children and the positive influence that you had on their children who had intersected with you through some crime that they were alleged to have committed.

So I want you to know, Mr. Boen, that when I hand down this sentence, it's not because I think that you don't have any good in your heart. It's not that I think that you have never done anything good. It's not that I'm focused only on the bad things suggested by the offenses of conviction here. I read all of the letters. You have done much good deeds in your community. And I have to, I feel compelled to weigh that against the very bad things that I've mentioned today that you did and among some of those character flaws that seem to be a common thread that run through the bad things. I don't think that you're a bad person, Mr. Boen. I think that you're a good person that let a little bit of authority go to their head and you made some really bad decisions. That's what I think. But it doesn't mean that you're a bad person.

There's some mental health issues. I think those are probably more recent post-divorce and then following the indictment here, but he does have some depression and anxiety issues. Obviously, as a composite, that is viewed as mitigating.

Sentencing disparity. When the Court sentences methamphetamine distributors or firearms cases or child pornography cases, looking for comparators to ground the Court to avoid sentencing disparity is very easy. The Court doesn't frequently see deprivation of rights cases. It's not to say that we don't have them. There was one involving the chief of police over in, I think it was Bull Shoals many years ago. And this is one of those situations where they show up to arrest somebody and things get way out of control and the guy is getting hit in the head with the butt of a shotgun or something like that. And the Department of Justice sent a trial lawyer down and worked with a senior AUSA on that case, tried it over in Harrison. Hung Jury on some of the counts and we were going to retry it and then they reached a settlement and that person didn't go back into law enforcement, but it didn't result in an actual sentence. So there's no comparator there. But the Court has made itself aware of federal sentencing more broadly in this area. And I think that this notion of general deterrence weighs heavily in this area and gives context to sentencing disparity as well.

Of course, the facts in these types of cases are very rarely similar and I'm certainly aware of cases that ended up with a dead victim or a maimed victim, but this

is a strange case in that the actual injuries in a big picture sense are not terribly egregious. But the egregiousness comes from the restraint, an inmate in the charge of an elected law enforcement officer, the premeditated acts and the lack of respect to the badge, the intimidation of witnesses. Very difficult to find comparables that have all of those factors, but I have taken sentencing disparity into consideration.

So at bottom, I will conclude with one of the remarks that you made in your allocution. You put your life in perspective and I think what you said is true. It's certainly validated by all the letters. But you laid it all out there and you asked for mercy. And I think you made a good case for mercy. But there's an old saying about mercy. Mercy tempers justice, but first there must be justice.

This is a case where the Court could easily weigh the aggravating factors here to justify an upward variance. This is not a case where the Court can weigh the mitigating factors and justify a downward variance. But I think in assessing a sentence that would be sufficient, but not greater than necessary, I think that an upper, middle to upper end guideline range sentence is the most appropriate sentence.

For these reasons, it is the judgment of this

2:45PM Court, Mr. Boen, that you are to be sentenced to the custody of the United States Bureau of Prisons to a term of 48 months on Count Two and 48 months on Count Three, with those terms to be run concurrently.

2:46PM With regard to -- was there a facility request, Mr. Wood?

MR. WOOD: Not a specific facility, Your Honor. We would just ask or request the recommendation be for as close as possible to this location because he does have 2:46PM extended family that will probably want to try to get with him.

THE COURT: Is the closest to Ozark, would that be Forrest City, Texarkana or El Reno?

THE DEFENDANT: Forrest City, I believe it is, 2:47PM with federal.

MR. WOOD: I would probably say Forrest City.

THE COURT: Is the closest?

MR. WOOD: I believe so.

THE COURT: Do you want me to make that request 2:47PM or just say --

MR. WOOD: Forrest City.

THE COURT: Forrest City. The Court will include a request that Mr. Boen be designated to the BOP facility in Forrest City, Arkansas, to the extent that 2:47PM facility has bed space available in Mr. Boen's

classification level.

With regard to supervised release, the defendant shall be placed on supervised release for a term of two years on each count. Those terms shall be run concurrently. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which he is released.

While on supervised release, the defendant shall not commit any federal, state or local crimes. He shall be prohibited from possessing a firearm or other dangerous device. He shall not possess a controlled substance and he shall comply with the mandatory drug testing provisions and DNA collection provisions of Title 18 United States Code Section 3583(d).

The defendant shall further comply with the standard conditions of supervised release as recommended by the United States Sentencing Commission. And, Mr. Boen, those will be included with your judgment and commitment paperwork. In addition, I'm going to impose these, what we call special conditions:

Number one, the defendant shall not purchase, possess, use, distribute or administer marijuana or obtain or possess a medical marijuana card or prescription.

Number two, the defendant shall submit to

inpatient or outpatient mental health testing, evaluation, counseling and/or treatment as may be deemed necessary and as directed by the United States Probation Office, both in terms of the depression and anxiety issues suggested by the presentence report, but also for anger management issues as likewise can be inferred from the offense conduct here.

Number three, the defendant shall submit his person, residence, place of employment and vehicle to a search to be conducted by the United States Probation Office at a reasonable time and in a reasonable manner based upon a reasonable suspicion that evidence of any violation of the conditions of supervised release might thereby be disclosed.

With regard to a fine, as suggested by the Court's comments earlier, I have reviewed the information that is available in the presentence report about the defendant's financial condition. He has a positive net worth, cattle, vehicles. He doesn't have a tremendous amount of wealth, but the Court is persuaded that, given the support in the community, his skill sets in the construction industry, the farming industry, small business opportunities, the Court is well persuaded that while incarcerated and then while on supervised release, he can make payments towards a fine and that the

imposition of a fine is well warranted to be employed as one of the Court's tools on its tool belt. For those reasons, the Court is going to impose a fine in the sum of $4,800. Interest will be waived. The Court will impose a $100 special assessment per count for a total of $200. This makes the total financial obligations $5,000. Technically, this amount is due and payable immediately, however, to the extent that it can't all be paid upfront, the payment schedule will be as follows:

Any unpaid portion of the financial penalty shall be paid by the defendant during his term of imprisonment at a rate of up to 50 percent of the defendant's available funds in accordance with the Bureau of Prisons Inmate Financial Responsibility Program. To the extent that he is permitted to engage in residential reentry programming, those payments will be equal to 10 percent of the defendant's gross monthly income.

Finally, the payment of any remaining balance shall become a condition of supervised release and payable in monthly installments of $250, or 15 percent of the defendant's net monthly household income, whichever is greater, with the entire balance to be paid in full not later than one month prior to the end of the period of supervised release.

Mr. Wood, this is the Court's intended sentence.

Are you aware of any legal reason why it should not be imposed?

MR. WOOD: No, Your Honor.

THE COURT: Mr. Carter?

MR. CARTER: No, Your Honor.

THE COURT: Very well. The sentence is imposed as stated.

Mr. Boen, you do have the right to appeal. And that includes your convictions on Counts Two and Three and it certainly includes your right to appeal the sentence and the sentencing analysis that has been imposed and undertaken today. There's some important things you need to understand about your appeal rights, though.

Number one, you have a short time within which to exercise your rights to appeal. You have 14 days from the day that the Court enters its judgment to get your notice of appeal filed with the clerk. If you can't afford to pay the filing fee, the Court will waive it.

You should also understand that you have the right to be represented by counsel on appeal. And if you cannot afford to retain an attorney privately, then the Court will appoint an attorney free of charge to represent you on appeal.

Now, Mr. Wood knows that at a bare minimum, his obligation going forward is to confer with you to

2:54PM determine whether you want to appeal, and if so, to assist you in timely filing the notice of appeal. So you will have an opportunity to confer with him about that, but I want to make sure as you leave the courtroom today that
2:54PM you do fully understand your appeal rights as I have just explained. Do you understand these rights?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Upon conclusion of our hearing, Mr. Boen will be remanded back to the custody of
2:54PM the United States Marshals Service pending designation and transfer.

Anything else, Mr. Carter?

MR. CARTER: No, Your Honor. Thank you.

THE COURT: Anything else, Mr. Wood?

2:54PM MR. WOOD: Your Honor, I may have missed it. We would request that he be awarded credit for time served, approximately seven months, whatever that amount is.

THE COURT: Yes, sir. That is understood and kind of works in the background, but I do want to affirm
2:54PM that you're correct, that he does receive credit for that time. That will be calculated and applied by the Bureau of Prisons, but you're correct.

MR. WOOD: Thank you.

THE COURT: We're adjourned.

2:55PM (proceedings concluded at 2:55 p.m.)

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 20th day of March 2022.

______________________________________
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas

